| | | |
|---|---|---|
| Consumers Research, et al. | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 25-60535 |
| Federal Communications Commission | ) | |
| and the | ) | |
| United States of America | ) | |

**MOTION FOR LEAVE TO INTERVENE**

The Benton Institute for Broadband & Society (Benton), the National Digital

Inclusion Alliance (NDIA) and the Center for Media Justice dba MediaJustice

(MediaJustice) (collectively Movants), pursuant to 28 U.S.C. §2348 and Rule 15(d)

of the Federal Rules of Appellate Procedure (Rule 15(d) to intervene in the

above-captioned proceeding in support of Respondents.  The Petition for Review in

this proceeding was filed on September 30, 2025 and docketed on October 1, 2025.

Accordingly, this Motion for Leave to Intervene is timely filed pursuant to Rule

15(d).

Counsel for Respondents Federal Communications Commission (FCC) and

the United States have stated that the government parties consent to the grant of this

motion.  Counsel for the Petitioners has stated that his clients will oppose grant of

this motion.

Petitioners have brought this proceeding to challenge the constitutionality of

two statutory provisions governing aspects of the FCC's Universal Service Fund (USF), as well as certain statutory and constitutional challenges to the operation and authority of the USF and the formation and governance of the Universal Service Administrative Company (USAC),

**MOVANTS**

Benton is a 44 year-old 501(c)(3) private operating foundation with a "goal to bring open, affordable, high-performance broadband to all people in the U.S. to ensure a thriving democracy." To effectuate that mission, Benton provides information and analyses about broadband policy. Expanding the scope and use of the USF programs is among its highest priorities. Benton works with partners throughout the country, and has organized broadband access coalitions in Pennsylvania, North Carolina and Missouri. These coalitions include recipients of USF funding in the e-rate and Rural Health Care (RHC) programs, and serve recipients of the Lifeline program. Benton assists these coalitions in educating the public about the nature and availability of USF funds and in applying for such funds. Benton and its coalitions have advocated, and will continue to advocate, for use of 47 U.S.C. §§254(c)(3) and 254(h)(2) to fund additional new services, including but not limited to supporting for school bus wifi and wifi hotspot loans.

Benton's mission would be significantly impaired if the USF were abolished

or if the scope of Section 254 were narrowed.  Its mission would also be harmed by the elimination or restrictions of the existence, form or structure of USAC temporarily or permanently.  Benton also would incur significant expenses revising its publications and educational materials and substantial personnel expenses in devising alternative mechanisms to insure that all Americans have access to affordable broadband service.

NDIA is a non-profit 501(c)(3) organization supporting a community of digital inclusion practitioners and advocates who engage in local and state-level efforts across the US to promote equitable internet access, adoption, and use for low- and moderate-income households and communities, whether urban, rural, or Tribal.  NDIA has over 2000 affiliates in all 50 states, all US Territories, the District of Columbia and partnerships with over 48 Tribal Entities.  Many of these are direct recipients of USF e-rate and RHC funds and also support Lifeline recipients.  Even those that do not directly receive USF funds support local groups that receive USF funding.  To educate, inform and service its affiliates, NDIA has frequent interaction with USAC and relies upon USAC's established educational and outreach functions to facilitate its affiliates access to, and use of, covered services.  It also advances digital equity by supporting and promoting the work of organizations engaged in digital inclusion work, and educating policymakers and the public about digital

equity.

NDIA's mission would be significantly impaired if the USF were abolished or if the scope of Section 254 were narrowed. Its mission would also be harmed by the elimination of, or restrictions on, the existence, form or structure of USAC temporarily or permanently. If it were required to do so, NDIA also would incur significant expenses revising its publications and educational materials and substantial personnel expenses in devising alternative mechanisms to achieve digital equity, deployment and connectivity, including all programs funded by the USF.

MediaJustice is a non-profit, 501(c)(3) organization organized in 2009. It is dedicated to democratizing the economy, government, and society through policies and practices that, among other things, ensure democratic media ownership, fundamental communication rights, universal media and technology access at affordable prices. MediaJustice works with a group of over 200 local, regional, or statewide affiliate social-justice organizations. MediaJustice also leverages its expertise through participation in several state and local coalitions devoted to broad and affordable access. Through research, the publishing and dissemination of reports, trainings, and strategic convenings and technical support, MediaJustice seeks to build a movement for a more just and participatory digital world. MediaJustice directly supports programs that enable users to obtain more affordable

access to communications services and technology, including the Lifeline and

E-Rate programs funded by the USF.  MediaJustice will suffer severe harm if the

people they serve no longer have access to USF funded programs.  In addition,

MediaJustice incur significant expense if they had to revise their programs and

publications.

## I.     THE HOBBS ACT ESTABLISHES THE STANDARD FOR INTERVENTION IN THIS CASE.

Review in this proceeding is governed by the Hobbs Act, 28 U.S.C. §§2341,

*et seq.* That provision gives this Court jurisdiction and sets out the procedures and

standards governing review of the agency action below.  With respect to

intervention, Section 2348 provides in relevant part that

> Communities, associations, corporations, firms, and individuals, whose
> interests are affected by the order of the agency, may intervene in any
> proceeding to review the order.

By specifying the qualification for intervention as extending to parties "whose

interests are affected by the order of the agency," the Hobbs Act stands in

distinction from other provisions of the U.S. Code that allow for direct review of

agency actions in the Courts of Appeal but do not establish any standard for

qualification for intervention.

As this Court may be aware, this case is the latest in a series of related

proceedings that Petitioners have filed in this and other Courts of Appeal in each

successive calendar quarter. Movants' unopposed motions for intervention were granted in the Sixth, Eleventh and D.C. Circuits. See, Order, *Consumers' Research v. FCC*, No. 23-1091 (D.C. Circuit May 23, 2023 (as amended); Order, *Consumers' Research v. FCC*, No. 22-13315 (11th Circuit December 13, 2022); Order, *Consumers' Research v. FCC*, No. 21-3886 (6th Cir. November 18, 2021). In addition, Movants filed three unopposed motions for intervention with this Court, each of which were granted. See Order, *Consumers' Research v. FCC*, No. 22-60363 (5th Cir. July 26, 2022) (Clement, J.); Order, *Consumers' Research v. FCC*, No. 24-60195 (5th Cir. April 27, 2022) (Engelhardt, J.); Order, *Consumers' Research v. FCC*, No. 22-60008 (5th Cir. January 26, 2022) (Oldham, J.). However, their fourth unopposed motion to intervene in this Court was denied by Judge Wilson on the basis that Movants did not satisfy the requirement under Rule 24(a)(2) of the Federal Rules of Civil Procedure (Rule 24(a)(2)) that proposed intervenors should show that their interests will not be adequately represented by the governmental Respondents. Order, *Consumers' Research v. FCC*, No. 23-60525 (5th Cir. October 30, 2023) at 2.

Petitioners have now advised Movants that they will oppose this motion for the reasons set forth in Judge Wilson's October 30, 2023 order in No. 23-60525.

To be sure, Movants do not believe that Judge Wilson's order was correctly

decided.[1]  But because Judge Wilson's order did not take into account that the case

arose under the Hobbs Act, §§28 U.S.C. 2348, *et seq.* and because this case

presents different, additional legal issues not raised in the earlier case, grant of this

motion would not be inconsistent with Judge Wilson's order.

Judge Wilson's order was premised on the analysis set out in *Texas v. U.S.*

*Dept. of Energy*, 754 F.2d 550, 551 (5th Cir. 1985).  That case was brought pursuant

to the Nuclear Waste Policy Act of 1982, 42 U.S.C. §§10101 *et seq.*  Like many

other statutes that provide for direct review in the Courts of Appeal, that statute

does not refer at all to intervention on appeal.  See 42 U.S.C. §10139.  Thus,

because Rule 15(d) itself does not specify a standard for intervention, in Texas and

many other cases not arising under the Hobbs Act, this and other courts of appeal

have looked to Rule 24(a)(2) for guidance.  On that premise, the Texas Court said

that

> Rule 15(d) of the Federal Rules of Appellate Procedure governs
> interventions in administrative appeals such as this one.  That rule

---

[1]As in the instant motion, Movants relied upon Rule 15(d) and Section 2348 of the Hobbs Act.  By contrast, Judge Wilson based his decision on an application of principles developed under Rule 24(a)(2), a provision not mentioned in the unopposed motion.  Because the motion was unopposed, and similar unopposed motions based on Section 2348 and Rule 15(d) had been granted on six prior occasions. each without reference to Rule 24(a)(2), Movants did not have occasion to address Rule 24(a)(2).  Thus they had no opportunity prior to Judge Wilson's order to explain why the motion should have been granted under the authority of Section 2348 and Rule 15(d) without need to draw analogies to Rule 24(a)(2). .

provides no standard for resolving intervention questions, but the Court
has identified two considerations: first, the statutory design of the act
and second, the policies underlying intervention in the trial courts
pursuant to Fed.R.Civ.P. 24. International Union, United Automobile,
Aerospace and Agricultural Implement Workers v. Scofield, 382 U.S.
205 (1965)

*Texas*, 754 F.2d at 551.

In *International Union v. Scofield*, the case upon which *Texas* relied, the

Supreme Court observed that "The Labor Act does not, however, provide explicitly

for intervention at the appellate court level." *International Union*, 382 U.S. at 209.

Thus, the Court said

Lacking a clear directive on the subject, we look to the statutory design
of the Act. Of course, in considering the propriety of intervention in the
courts of appeals, our discussion is limited to Labor Board review
proceedings. Federal agencies are not fungibles for intervention
purposes -- Congress has treated the matter with attention to the
particular statutory scheme and agency.

*Id.*, 382 U.S. at 210 (citation omitted).

The lesson of *International Union* is that each judicial review statute must be

examined separately, and that "In some instances, the words of the statute

themselves elicit an answer." *Id.* And here, unlike the Labor Act and the Nuclear

Waste Policy Act, the word of Hobbs Act ***do*** provide an answer, and there ***is*** a

"statutory design." Section 2348 expressly describes a permissive regime, one that

as a matter of policy is well-suited for the  agencies that fall within the ambit of the

Hobbs Act.  The design of the Hobbs Act balances the interest in fairness and judicial economy with the need for Article III standing to seek judicial review. Whatever the concerns may be about difficulties arising from intervention under other statutory schemes, it makes sense that there should be a permissive standard for intervention in cases involving regulatory bodies such as the FCC that issue rules and policies with broad societal impact.

The structure of the Hobbs Act reinforces this policy of singularity and finality. It grants the courts of appeals "exclusive jurisdiction to make and enter...a judgment determining the validity of, and enjoining, setting aside, or suspending, in whole or in part, the order of the agency."  Hobbs Act proceedings often determine the validity of broad, legislative-type administrative rules with maximum national finality.  Because it charges a reviewing appellate court with great responsibilities, broad party participation is especially beneficial in carrying out that function. Allowing interested persons to participate in the single forum designated for review improves the quality of judicial decisionmaking and ensures that all parties who will be legally bound by the subsequent decision have a meaningful opportunity to be heard in the single forum designated for review.

This litigation is a paradigmatic example of when an agency order involving a single party below can affect a large number of regulated entities, consumers and

other stakeholders.  Overly restrictive intervention standards could leave many affected parties unrepresented in the one dispositive proceeding.  The immediate consequence of such a restriction would be to deprive these parties of any meaningful opportunity to contribute arguments or evidence before the decision's validity is definitively settled.  The permissive intervention standard set forth in Section 2348 is therefore an institutional mechanism designed to ensure that the single, legally decisive proceeding is comprehensive.

## II. EVEN IF THIS COURT WERE TO LOOK TO RULE 24(a)(2) PRINCIPLES, MOVANTS MORE THAN SATISFY THAT RELATIVELY LOW BAR.

Movants have shown that 28 U.S.C. §2348 establishes the standard for, and governs the evaluation of, intervention in Hobbs Act cases.  However, in light of Judge Wilson's October 30, 2023 order in No. 23-60525, Movants respectfully demonstrate here that, even if reference to the four part test assessing intervention under Rule 24(a)(2) were appropriate, Movants easily pass muster and this motion should be granted.

There should be no dispute that Movants qualify under the first three elements set out in Rule 24(a)(2), as this motion is timely filed, Movants are interested parties and grant of any portion of the petition for review would interfere with Movants' ability to fulfill their missions and to protect their affiliates.  The remaining question,

adequacy of representation, was the basis of Judge Wilson's prior order denying intervention. However, it was adopted under a different factual setting without hearing argument as to the applicability of Rule 24(a)(2) to Hobbs Act intervention. It is also the question that Petitioners evidently intend to pursue.

Notably, after Movants and their co-intervenors filed a petition for writ of certiorari with respect to this Court's decision in No. 22-60008, Petitioners asked the Supreme Court to hold the petition, invoking Judge Wilson's order in No. 23-60008 as authority for the proposition that the intervenors' "interests are adequately represented by the government...." Brief for the Respondents at 2, *SHLB Coalition, et al. v. FCC*, No. 24-422 (filed October 16, 2024). The Court nonetheless granted the intervenors' petition for certiorari and consolidated it with the government's petition for certiorari. Movants and the other intervenors filed separate briefs and were allowed to present separate oral argument before the Court

Even if the argument that Movants were adequately represented by the government is properly at issue, notwithstanding that this is a Hobbs Act case, under the burden on the moving party under Rule 24(a)(2) is "minimal." *Sierra Club v. Espy*, 18 F.3d 1202, 1207 (5th Cir. 1994). And "[t]he applicant need only show that representation 'may be' inadequate." *Id.* As this Court said more recently in *La Union del Pueblo Entero v. Abbott*, 29 F.4[th] 307-08, the Movant "'need not show

that the representation by existing parties will be, for certain, inadequate,' but instead that it *may* be inadequate." *Id.* (quoting *Texas v United States*, 805 F.3d 653, 661 (5ᵗʰ Cir. 2015)(emphasis in the original).

The interests at stake that supported the Supreme Court's acquiescence to intervenors' certiorari petition, and six prior appeals court orders allowing Movants to intervene remain. Importantly, while all the previous companion cases brought by Petitioners in each successive calendar quarter since 4Q21 were directed solely at the non-delegation and private non-delegation issues ultimately addressed by the Supreme Court, the Petition for Review in this proceeding raises several new issues. The addition of these issues increases the harms Movants face and could expand their divergence in interests with the government. Among other things, in addition to specifically challenging the constitutionality of 47 U.S.C. §254(c)(3) and 47 U.S.C. §254(h)(2) for the first time, Petitioners also make the new claim that they that the FCC must go back to the drawing board and entirely revise its jurisprudence on Section 254 based on Petitioners' claim that the Supreme Court has somehow invalidated thirty years of FCC administration of Section 254. Petition for Renew at 4. For the first time, they also present four additional issues with respect to USAC's operations in conformance with Article II, the Commission's authority to appoint USAC to administer the USF at all, violation of the Government Corporation

Control Act, and violations of the due process clause by USAC.   Petition for Renew at 5.

This Court has described two instances where there is a presumption of adequate representation.  Neither is operative here.  First, this presumption applies only in cases where the Respondent "is presumed to represent the interests of all of its citizens," *Hopwood v. Texas*, 21 F.3d 603, 605 (5th Cir. 1994) (per curiam), such as "when the putative representative is a governmental body or officer charged by law with representing the interests of the [intervenor]," *Texas v. United States*, 805 F.3d at 661 (quotation omitted).  Here, the FCC and United States are deemed to represent "the broad public interest," not just those of the particular proposed intervenors.  *Sierra Club v. Espy*, at 1208; *see also Doe #1 v, Glickman*, 256 F.3d 271, 280-81  (5th Cir. 2001).  In this instance, the FCC is managing the collection and distribution of funds where there are competing interests seeking such funding, and where the government's interest in minimizing expenditures may be at odds with Movants' wishes.

The second presumption arises when the government and the supporting intervenors "share the same ultimate objective.:  But as this court held *in Brumfield v. Dodd*, 749 F.3d 339, 345-46 (5th Cir. 2014), the presumption did not apply even where the intervenors supporting the government share the goal of affirmance

-13-

because the government has "many interests" at stake, whereas the intervenors were concerned with making sure that benefits are maximally available, so that their interests "may not align precisely."

At the outset, Movants stress that, while they share some common interests with Respondents, they nonetheless have different objectives. *See, e.g., Entergy Gulf States La, LLC v. Environmental Protection Administration*, 817 F.3d 198, 203. As Movants' interests are based on their missions of greater access and use, and expansion of, USF programs, they complement, but are different from, the interests of the governmental Respondents. Among other things, the primary interests of the Respondents relate to the administration of the USF, whereas Movants seek to broaden the program. Thus, for example Movants have advocated, and will continue to advocate, for use of 47 U.S.C. §§ 254(c)(3) and 254(h)(2) to fund additional new services. In two recent instances, Respondent FCC has taken a position adverse to Movants as to the application of those provisions to allow e-rate funds to be used for school bus wi-fi and lending of wifi hotspots. See *Modernizing the E-Rate Program for Schools and Libraries;* FCC 25-63, WC Docket 13 184 at 2 (September 30, 2025); *Addressing the Homework Gap Through the E-Rate Program*, FCC 25-62, WC Docket No. 21-31 at 11 (Sept. 30, 2025).

Respondents' and Movants' interests in this case overlap, but are far from

identical.  This divergence is now far greater than in the past.  The Petition for

Review now takes aim at USAC on multiple bases that were not previously at issue

and thus not part of Judge Wilson's assessment in his October 30, 2022 order.  .

With the core constitutionality of Section 254 no longer in doubt, impairment or

abolition of USAC poses a far greater threat to Movants than to the Respondents.

While the FCC could respond to an adverse decision by administering USF

programs on its own, or by creating a new entity that did not have the same alleged

flaws with respect to USAC's governance, Movants have a powerful interest in

maintaining the current structure of USAC and its governance.  For one particular

example, 47 C.F.R. §54.703(b) provides that USAC's board membership include,

*inter alia*, representatives of schools,[2] of libraries.[3] of rural health care providers,[4] of

low income consumers,[5] of state consumer advocates[6] and of Tribal Communities.[7]

Movants would be severely impaired if USF programs were no longer administered

by an entity that lacked such representation.

## CONCLUSION

Accordingly, Benton, NDIA and MediaJustice respectfully request that the

---

[2]See 47 C.F.R. §54.703(b)(7).
[3]See 47 C.F.R. §54.703(b)(8).
[4]See 47 C.F.R. §54.703(b)(9).
[5]See 47 C.F.R. §54.703(b)(10).
[6]See 47 C.F.R. §54.703(b)(12).
[7]See 47 C.F.R. §54.703(b)(13).

Court grant leave to intervene in support of Respondents FCC and the United

States, and grant all such other relief as may be just and proper.

Respectfully submitted,

/s/ Andrew Jay Schwartzman

Andrew Jay Schwartzman
525 Ninth Street, NW
Seventh Floor
Washington, DC 20004
(202) 241-2408
AndySchwartzman@gmail.com

October 29, 2025

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1.  Petitioners are: Consumers' Research; Cause Based Commerce, Incorporated; Edward J. Blum; Kersten Conway; Suzanne Bettac; Robert Kull; Kwang Ja Kirby; Tom Kirby; Joseph Bayly; Jeremy Roth; Deanna Roth; Lynn Gibbs; Paul Gibbs; Rhonda Thomas; James Romeo; Cody Carnet, Phillip Aronoff and Jacqueline Klein.

2.  Counsel for Petitioners are: R. Trent McCotter, Jared M. Kelson, and Laura B. Ruppalt of Boyden Gray PLLC.

3.  The Federal Communications Commission is a federal agency, and the United States of America is a respondent by statute.

4.   Counsel for the Federal Communications Commission are: Pamela Bondi, P. Michele Ellison, and Jacob M. Lewis. Counsel for the United States of America are: Pamela Bondi and P. Michele Ellison.

5.  Counsel for Movant-Intervenor Schools, Health & Libraries Broadband Coalition are Jason Neal and Sean A. Lev of HWG, LLP.

6. Movant Benton Institute for Broadband & Society, Center for Media Justice dba MediaJustice and National Digital Inclusion Alliance are incorporated 501(c)(3) public interest organizations which share the goal of promoting open, affordable, high-quality broadband in the United States. As non-profit corporations which have not issued stock, they have no owners or subsidiaries, and accordingly, no parent corporation and no publicly held corporation owns 10% or more of their stock.

7. Counsel for Movants is Andrew Jay Schwartzman of Andrew Jay Schwartzman, PLLC.

8. Pursuant to Fifth Circuit Rule 28.2.1, the following describes the "large group of persons or firms" that may be "financially interested in the outcome" of this litigation: Petitioners challenge the Federal Communications Commission's approval of the *Proposed Fourth Quarter 2025 Universal Service Contribution Factor*, Public Notice, DA 25-840, CC Docket No. 96-45 (released September 15, 2025). Carriers which must remit fees based on their interstate end-user revenues to the Universal Service Fund have a financial interest in the outcome of this litigation. The Universal Service Fund pays for four programs: the "Lifeline/Link Up" program, the "High-Cost" program, the "Schools and Libraries" program,

and the "Rural Health Care" program. Beneficiaries of the four Universal

Service Fund programs, service providers covered by those programs, and

other elements of telecommunications industry have, or potentially may

have financial interests in the outcome of this litigation.

Respectfully submitted,

/s/ Andrew Jay Schwartzman
Andrew Jay Schwartzman
525 Ninth Street, NW
Seventh Floor
Washington, DC 20004
(202) 241-2408
AndySchwartzman@gmail.com

October 29, 2025

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This document complies with [the type-volume limit of FED. R. APP. P. 28(d)(2)(A) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f):

   **X**    this document contains **3419** words, **or**

   ☐    this brief uses a monospaced typeface and contains [*state the number of*] lines of text.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because:

   **X**    this document has been prepared in a proportionally spaced typeface using WordPerfect 2021 in 14 point Times Roman, or

   ☐    this document has been prepared in a monospaced typeface using _____ with _____.

/s/ Andrew Jay Schwartzman

Attorney for Benton Institute for Broadband & Society, National Digital Inclusion Alliance and Media Justice.

October 29, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of October, 2025, I electronically filed the

foregoing *Motion for Leave to Intervene* with the Clerk of the Court for the United

States Court of Appeals for the Fifth Circuit using the Court's appellate CM/ECF

system.  I further certify that service was accomplished on all participants in the

case via the Court's CM/ECF system.

Respectfully submitted,

/s/ Andrew Jay Schwartzman

Andrew Jay Schwartzman
525 Ninth Street, NW
Seventh Floor
Washington, DC 20004
(202) 241-2408
AndySchwartzman@gmail.com

October 29, 2025