No. 25-60535

---

# In the United States Court of Appeals for the Fifth Circuit

---

**CONSUMERS' RESEARCH; CAUSE BASED COMMERCE, INC.; EDWARD J. BLUM; KERSTEN CONWAY; SUZANNE BETTAC; ROBERT KULL; KWANG JA KIRBY; TOM KIRBY; JOSEPH BAYLY; JEREMY ROTH; DEANNA ROTH; LYNN GIBBS; PAUL GIBBS; RHONDA THOMAS; JAMES ROMEO; CODY CARNETT; PHILLIP ARONOFF; JACQUELINE KLEIN,**

*Petitioners,*

v.

**FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,**

*Respondents.*

Petition for Review of an Order of the
Federal Communications Commission
Agency No. 96-45

## OPENING BRIEF FOR PETITIONERS

Michael Buschbacher
Jared M. Kelson
James R. Conde
Laura B. Ruppalt
  *Counsel of Record*
BOYDEN GRAY PLLC
800 Connecticut Ave. NW, Suite 900
Washington, DC 20006
202-955-0620
lruppalt@boydengray.com
*Counsel for Petitioners*

# CERTIFICATE OF INTERESTED PERSONS

*Consumers' Research et al. v. Federal Communications Commission et al.*
No. 25-60535

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

*Petitioners*

1.      Consumers' Research. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2.      Cause Based Commerce, Incorporated. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

3.      Edward J. Blum

4.      Kersten Conway

5.      Suzanne Bettac

6.      Robert Kull

7.      Kwang Ja Kirby

8. Tom Kirby

9. Joseph Bayly

10. Jeremy Roth

11. Deanna Roth

12. Lynn Gibbs

13. Paul Gibbs

14. Rhonda Thomas

15. James Romeo

16. Cody Carnett

17. Phillip Aronoff

18. Jacqueline Klein

*Respondents*

19. Federal Communications Commission

20. United States of America

*Intervenors*

1. Schools, Health & Libraries Broadband Coalition

2. Benton Institute for Broadband & Society

3. National Digital Inclusion Alliance

4. Center for Media Justice (d/b/a MediaJustice)

5. National Telecommunications Cooperative Association (d/b/a NTCA – The Rural Broadband Association)

*Counsel*

6. Boyden Gray PLLC: Michael Buschbacher, Jared M. Kelson, James R. Conde and Laura B. Ruppalt are counsel for Petitioners.

7. Federal Communications Commission: James M. Carr, P. Michele Ellison, and Jacob M. Lewis are counsel for Respondent FCC.

8. United States Department of Justice: Pamela Bondi, Caroline W. Tan, and Michael S. Raab are counsel for Respondent United States of America.

9. Andrew Jay Schwartzman is counsel for Intervenors Benton Institute for Broadband & Society, National Digital Inclusion Alliance, and Center for Media Justice (d/b/a MediaJustice).

10. HWG LLP: Jason Neal and Sean A. Lev are counsel for Intervenor Schools, Health & Libraries Broadband Coalition.

11. Wilkinson Barker Knauer, LLP: Jennifer Tatel, Daniel H. Kahn, and Tyler D. Dillon are counsel for Intervenor National Telecommunications Cooperative Association (d/b/a NTCA – The Rural Broadband Association).

Dated: January 12, 2026

/s/ Laura B. Ruppalt
Laura B. Ruppalt
*Counsel of Record for Petitioners*

## **REQUEST FOR ORAL ARGUMENT**

Pursuant to Federal Rule of Appellate Procedure 34(a) and (f) and Fifth Circuit Rule 28.2.3, Petitioners respectfully request oral argument. This case involves complex issues of constitutional and administrative law. Oral argument would substantially aid the Court in its resolution of the case.

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................... vi

TABLE OF AUTHORITIES ................................................................ ix

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF ISSUES................................................................... 1

INTRODUCTION............................................................................... 3

STATEMENT OF THE CASE ............................................................. 5

    A.    Statutory and Regulatory Background ................................. 5

        1.    Before 1996, Universal Service Was a Condition of Monopoly Status .......................................................... 5

        2.    The Telecommunications Act of 1996 Reinvents Universal Service ......................................................... 6

        3.    FCC Creates and Appoints USAC as Permanent Administrator of the Universal Service Fund .............. 8

        4.    Section 254's "Definition" of Universal Service and FCC's Longstanding Interpretation ........................... 10

        5.    USAC Imposes Skyrocketing Rates, Raising Billions of Dollars Through Ineffective Taxation ................... 14

    B.    The Supreme Court Narrowly Interprets § 254 ................... 16

    C.    Agency Proceedings................................................................ 19

SUMMARY OF THE ARGUMENT ..................................................... 22

LEGAL STANDARD .......................................................................... 23

ARGUMENT ...................................................................................... 24

I.    Petitioners Have Standing.................................................24

II.   Sections 254(c)(3) and (h)(2) Unconstitutionally Delegate
      Legislative Power...................................................................25

      A.    The Intelligible-Principle Test Supplies the
            Standard....................................................................28

      B.    Sections 254(c)(3) and h(2) Unmoor Certain
            Programs From § 254's Intelligible Principle.............29

      C.    Other Provisions of § 254 Do Not Supply an
            Intelligible Principle for § 254(h)(2) ...........................35

III.  FCC's Failure to Show the Contribution Factor Satisfies
      § 254 Under *Consumers' Research*, 606 U.S. 656, is
      Arbitrary..............................................................................38

      A.    The Supreme Court's Interpretation of § 254 Departs
            Drastically from FCC's Prior View When It
            Established and Expanded the Programs...................40

      B.    FCC Must Show That the Contribution Factor
            Satisfies the Supreme Court's Interpretation of § 254
            ...................................................................................43

IV.   FCC Lacks Statutory Authority to Create or Appoint USAC
      ...........................................................................................46

      A.    Congress Did Not Specifically Authorize FCC to
            Create USAC, as Required by the Government
            Corporation Control Act.............................................47

      B.    Congress Did Not Otherwise Authorize USAC's
            Involvement as Administrator.....................................49

V.    USAC Violates the Appointments Clause ...........................54

      A.    USAC's Directors and CEO are "Officers of the
            United States"............................................................56

1. USAC's Directors and CEO Exercise Significant, Continuing Federal Power ......................................56

2. It Doesn't Matter Whether USAC Is "Private" or "Government" .........................................................58

3. Nonetheless, USAC is a "Government" Entity for Purposes of the Appointments Clause ...................60

B. The Appointment of USAC's Directors and CEO Violates the Appointments Clause .............................64

VI. FCC's Failure to Respond to Comments Violates the APA..65

CONCLUSION ..........................................................................67

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpine Secs. Corp. v. FINRA,*
121 F.4th 1314 (D.C. Cir. 2024)...........................................................54

*Am. Power & Light Co. v. SEC,*
329 U.S. 90 (1946)................................................................................38

*Am. Wild Horse Pres. Campaign v. Perdue,*
873 F.3d 914(D.C. Cir. 2017) .............................................................46

*Auffmordt v. Hedden,*
137 U.S. 310 (1890).............................................................................59

*Batterton v. Francis,*
432 U.S. 416 (1977).............................................................................57

*Bechtel v. FCC,*
957 F.2d 873 (D.C. Cir. 1992) ............................................................45

*Bittner v. United States,*
598 U.S. 85 (2023) ..............................................................................53

*Blanca Tel. Co. v. FCC,*
991 F.3d 1097 (10th Cir. 2021).............................................................8

*Buckley v. Valeo,*
424 U.S. 1 (1976).................................................................................58

*Coinbase, Inc. v. SEC,*
126 F.4th 175 (3d Cir. 2025)................................................... 39, 40, 45

*Collins v. Yellen,*
594 U.S. 220 (2021).............................................................................55

*Columbia Broad. Sys. v. United States,*
316 U.S. 407 (1942)...............................................................................1

*Competitive Enter. Inst. v. FCC,*
  970 F.3d 372 (D.C. Cir. 2020) ............................................ 25

*Consumers' Rsch. v. FCC,*
  109 F.4th 743 (5th Cir. 2024) .............15–17, 20, 24–26, 49, 50, 52, 60

*Consumers' Rsch. v. FCC,*
  67 F.4th 773 (6th Cir. 2023) ............................................ 16, 20, 24, 66

*Consumers' Rsch. v. FCC,*
  88 F.4th 917 (11th Cir. 2023) ......................................... 16, 17, 36, 52

*Currin v. Wallace,*
  306 U.S. 1 (1939) ........................................................... 54

*DHS v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020) ........................................................... 39

*DOT v. Ass'n of Am. RRs,*
  575 U.S. 43 (2015) ......................................................... 50

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) ....................................................... 45

*FCC v. Consumers' Research,*
  606 U.S. 656 (2025)
  ...................... 1–7, 15, 17–19, 22, 23, 25–29, 31, 33–38, 42–46, 53, 63

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021) ....................................................... 23

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010) ....................................................... 65

*United States ex rel. Heath v. Wis. Bell, Inc.,*
  92 F.4th 654 (7th Cir. 2024) ............................................ 10

*Hill v. FCC,*
  496 F. App'x 396 (5th Cir. 2012) ...................................... 34

*In re Incomnet, Inc.,*
  463 F.3d 1064 (9th Cir. 2006) ......................................... 8–10

x

*Kennedy v. Braidwood Mgmt.*,
606 U.S. 748 (2025) ................................................................ 54, 55

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) ....................................................................... 51

*In re LAN Tamers, Inc.*,
329 F.3d 204 (1st Cir. 2003) ...................................................... 12, 41

*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995) ............................................................ 47, 60, 64

*Lucia v. SEC*,
585 U.S. 237 (2018) .................................................................. 55–58

*MCR Oil Tools, LLC v. DOT*,
110 F.4th 677 (5th Cir. 2024) ....................................................... 46

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*,
60 F.4th 956 (5th Cir. 2023) ..................................................... 66, 67

*Mistretta v. United States*,
488 U.S. 361 (1989) ....................................................................... 28

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut.
Auto. Ins.*, 463 U.S. 29 (1983) ..................................................... 39

*Nat'l Ass'n of Priv. Fund Managers v. SEC*,
151 F.4th 252 (5th Cir. 2025) ....................................................... 39

*Nat'l Cable Television Ass'n, Inc. v. United States*,
415 U.S. 336 (1974) ....................................................................... 26

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
107 F.4th 415 (5th Cir. 2024) ........................................ 60, 61, 63, 64

*Oklahoma v. United States*,
2025 WL 3653642 (6th Cir. Dec. 17, 2025) .................................. 54

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) ......................................................................... 66

*Pittson Co. v. United States,*
    368 F.3d 385 (4th Cir. 2004) ............................................... 54

*Portland Cement Ass'n v. EPA,*
    665 F.3d 177 (D.C. Cir. 2011) ............................................. 45

*Rural Cellular Ass'n v. FCC,*
    588 F.3d 1095 (D.C. Cir. 2009) ..................................... 12, 41

*Sunshine Anthracite Coal Co. v. Adkins,*
    310 U.S. 381 (1940) ............................................................ 53

*Tex. Corn Producers v. EPA,*
    141 F.4th 687 (5th Cir. 2025) ...................................... 66, 67

*Tex. Off. of Pub. Util. Counsel v. FCC,*
    183 F.3d 393 (5th Cir. 1999) .............................................. 31

*Tex. Off. of Pub. Util. Counsel v. FCC,*
    265 F.3d 313 (5th Cir. 2001) .................................... 3, 12, 41

*Todd & Co., Inc. v. SEC,*
    557 F.2d 1008 (3d Cir. 1977) ............................................. 54

*U.S. Telecom Ass'n v. FCC,*
    359 F.3d 554 (D.C. Cir. 2004) ............................... 50, 52, 53

*United States v. Frame,*
    885 F.2d 1119 (3d Cir. 1989) ............................................. 54

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ............................................................ 29

*Wis. Bell, Inc. v. United States ex rel. Heath,*
    604 U.S. 140 (2025) ..................................................... 10, 48

## Constitutional Provisions

U.S. Const. art. I, § 1 ............................................................ 28

U.S. Const. art. II, § 2, cl. 2 .......................................... 55, 65

**Statutes**

5 U.S.C. § 551(4) ........................................................... 66

5 U.S.C. § 553 ..................................................... 39, 44, 66

5 U.S.C. § 706(2) ........................... 22, 24, 27, 38, 4, 49, 54, 66

28 U.S.C. § 2342(1) ......................................................... 1

28 U.S.C. § 2343 ............................................................ 1

28 U.S.C. § 2344 ............................................................ 1

31 U.S.C. § 9102 ....................................................... 47, 49

47 U.S.C. § 154(i) ......................................................... 48

47 U.S.C. § 254 ............................................................. 3

47 U.S.C. § 254(a)(1) .................................................. 51, 52

47 U.S.C. § 254(b) ............................................. 3, 11, 30, 43

47 U.S.C. § 254(c)(1) ............................. 3, 10, 13, 30, 43, 44, 51

47 U.S.C. § 254(c)(3) ................................................. 13, 30

47 U.S.C. § 254(d) ..................................................... 7, 51

47 U.S.C. § 254(f) ......................................................... 51

47 U.S.C. § 254(h)(1) ............................................. 37, 51, 52

47 U.S.C. § 254(h)(2) ............................................. 13, 32, 35

47 U.S.C. § 254(i) ......................................................... 51

47 U.S.C. § 254(j) ......................................................... 52

47 U.S.C. § 402(a) .......................................................... 1

# Regulations

47 C.F.R. pt. 54, subpt. D ........................................................... 7

47 C.F.R. pt. 54, subpt. E ........................................................... 7

47 C.F.R. pt. 54, subpt. F ........................................................... 7

47 C.F.R. pt. 54, subpt. G ........................................................... 7

47 C.F.R. § 1.4 ......................................................................... 1

47 C.F.R. § 1.103 ..................................................................... 1

47 C.F.R. § 54.5 ....................................................................... 8

47 C.F.R. § 54.407(c) ................................................................ 8

47 C.F.R. § 54.701 ................................................... 8, 9, 57, 62

47 C.F.R. § 54.702 ........................................................... 58, 63

47 C.F.R. § 54.703 ............................................... 8, 57, 62, 64

47 C.F.R. § 54.704 ........................................... 9, 57, 62, 64, 65

47 C.F.R. § 54.705 ................................................... 9, 57, 62

47 C.F.R. § 54.709(a) ................................... 1, 7, 9, 22, 58

47 C.F.R. § 54.712(a) ................................................................ 8

47 C.F.R. § 54.715(c) .............................................................. 63

47 C.F.R. § 54.719 .................................................................. 58

47 C.F.R. § 54.720 .................................................................. 58

47 C.F.R. § 54.721 .................................................................. 58

47 C.F.R. § 54.722 .................................................................. 58

47 C.F.R. § 54.723 .................................................................. 58

47 C.F.R. § 54.724 ................................................................. 58

47 C.F.R. § 54.725 ................................................................. 58

**Other Authorities**

Benton Inst. for Broadband & Soc., *More Than a Third of Americans Have Access to One or No Broadband Provider* (Jan. 4, 2025), https://www.benton.org/blog/more-third-americans-have-access-one-or-no-broadband-provider ..................... 44

*Commission Approves Incorporation Documents for Universal Service Administrative Company, Schools and Libraries Corporation, and Rural Health Care Corporation*, 12 FCC Rcd. 14094 (1997) ............................................. 62

*In re Connect America Fund ETC Annual Reports & Certifications*, 32 FCC Rcd. 1624 (2017) ............................................ 44

FCC, *2026 Budget Estimates to Congress* (May 2025), https://docs.fcc.gov/public/attachments/DOC-411718A1.pdf ......................... 15

*Feasible*, American Heritage Dictionary (3d ed. 1992)........................... 35

*In re Fed.-State Joint Bd. on Universal Serv.*, 12 FCC Rcd. 8776 (1997) ............................................ 13, 31, 32, 36, 41

*Leadership*, USAC, https://www.usac.org/about/leadership/; .................. 8

*In re Lifeline and Link Up Reform & Modernization*, 27 FCC Rcd. 6656 (2012) .................................................................... 31

*Memorandum of Understanding Between FCC and the USAC* (Oct. 17, 2024), https://www.fcc.gov/sites/default/files/usac-mou.pdf ............................................................................... 63

*In re Modernizing the E-Rate Program for Schools and Libraries*, FCC 25-63, WC Docket No. 13-184 (rel. Sept. 30, 2025) ............................................................................. 34

*Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73 (2007) ............................ 59, 60

*Proposed Second Quarter 2000 Universal Service Contribution Factor*, 15 FCC Rcd. 16469 (2000) ................................ 14

*In re Rural Digit. Opportunity Fund*, 35 FCC Rcd. 686 (2020) ...................................................................... 43

*Rural Digit. Opportunity Fund Phase I Auction*, 35 FCC Rcd. 6077 (2020) ............................................................ 12, 40

*In re Schools & Libraries Cybersecurity Pilot Program*, 39 FCC Rcd. 6158 (2024) ......................................................... 14, 34, 44

U.S. Gov't Accountability Off., GAO-24-106967, *Administration of Universal Service Programs Is Consistent With Selected FCC Requirements* (2024), https://www.gao.gov/assets/gao-24-106967.pdf ............................ 15, 16

U.S. Gov't Accountability Off., Letter B-278820 (Feb. 10, 1998), https://www.gao.gov/assets/b-278820.pdf .................... 48, 61, 63

USAC, *Amended and Restated By-laws of Universal Service Administrative Company* (rev. Jan. 26, 2024), https:// www.usac.org/wp-content/uploads/about/documents/ leadership/usacbylaws.pdf ................................................................. 62

# JURISDICTIONAL STATEMENT

The Federal Communications Commission ("FCC") issued the Proposed Fourth Quarter 2025 Universal Service Contribution Factor on September 15, 2025. *See Proposed Fourth Quarter 2025 Universal Service Contribution Factor*, CC Docket No. 96-45, DA 25-840 (rel. Sept. 15, 2025), JA__. It was "deemed approved by the [FCC]" 14 days later on September 29, 2021. 47 C.F.R. § 54.709(a)(3). The Petition was timely filed on October 1, 2025. *See* 28 U.S.C. §§ 2342(1), 2344; 47 U.S.C. § 402(a); 47 C.F.R. §§ 1.4, 1.103; *see also Columbia Broad. Sys. v. United States*, 316 U.S. 407, 416–20 (1942). Venue is proper because numerous Petitioners reside in this Circuit. 28 U.S.C. § 2343.

# STATEMENT OF ISSUES

(1) Whether Congress unconstitutionally delegated legislative power to FCC in 47 U.S.C. § 254(c)(3) and (h)(2) because those provisions free FCC from the constraints of the § 254 criteria that the Supreme Court held provided an "intelligible principle" in *FCC v. Consumers' Research*, 606 U.S. 656 (2025).

(2) Whether FCC acted arbitrarily by failing to show that the Fourth Quarter 2025 contribution factor satisfies § 254, as interpreted by

the Supreme Court in *Consumers' Research*.

(3)    Whether FCC lacks statutory authority to create or appoint the Universal Service Administrative Company ("USAC") as the permanent administrator of the Universal Service Fund.

(4)    Whether USAC's involvement in the Universal Service Fund violates the Appointments Clause.

(5)    Whether FCC's failure to respond to Petitioners' comments violates the Administrative Procedure Act ("APA").

## **INTRODUCTION**

Section 254 of the Communications Act delegates to FCC the power to establish a Universal Service Fund tax to subsize telecommunications and other services. 47 U.S.C. § 254. Section 254 doesn't specify precisely what "universal service" is, but provides FCC six "principles" and four factors to "consider" when establishing the tax. *Id.* § 254(b), (c)(1). For decades, FCC and lower courts construed these principles and factors as optional and "aspirational," allowing FCC virtually unfettered discretion to determine what services to fund and how much money to raise. *See, e.g.*, *Tex. Off. of Pub. Util. Counsel v. FCC*, 265 F.3d 313, 321 (5th Cir. 2001) ("*TOPUC II*").

The Supreme Court, however, has now decisively rejected FCC's reading. In *FCC v. Consumers' Research*, the Court held that § 254(b)'s principles and § 254(c)(1)'s factors are "separately mandatory … criteria" that must each be "met" and which together provide an "intelligible-principle" for § 254's "contribution scheme generally." 606 U.S. at 682–89 & n.9. As three Justices in dissent explained, that reading departs significantly from FCC's prior construction: indeed, "FCC has long and consistently understood the statute to mean the opposite"—that the

factors must only be considered by FCC, let alone individually satisfied. *Id.* at 729 (Gorsuch, J., dissenting). The upshot, the dissenters noted, is that "existing programs" may now be "render[ed] … illegal." *Id.* at 731.

The Court in *Consumers' Research* also left unresolved two of the most far-reaching provisions of the Universal Service Fund scheme: §§ 254(c)(3) and (h)(2), which expressly relieve FCC from considering § 254's principles and factors when raising funds for schools, libraries, and health care providers. *Id.* at 687 n.9 (majority op.). As the dissenters observed, challengers therefore "remain free … in a future proceeding, to … attack … the constitutionality" of §§ 254(c)(3) and (h)(2). *Id.* at 733 (Gorsuch, J., dissenting).

Petitioners take up that invitation here. As explained herein, §§ 254(c)(3) and (h)(2) unconstitutionally delegate legislative power to FCC when raising funds for schools, libraries, and health care providers because those provisions relieve the agency from the binding criteria that the Supreme Court held constituted § 254's intelligible principle. FCC's Fourth Quarter 2025 contribution factor is also unlawful for other reasons: FCC arbitrarily failed to show that the contribution factor satisfies § 254's mandatory criteria, as construed by the Supreme Court;

FCC lacks statutory authority to create and involve USAC in the Universal Service Fund; USAC violates the Appointments Clause; and FCC failed to respond to significant comments, violating the APA.

Because these defects render the Fourth Quarter 2025 contribution factor unlawful, this court should vacate the factor and remand to FCC.

## STATEMENT OF THE CASE

**A.    STATUTORY AND REGULATORY BACKGROUND**

### 1.    Before 1996, Universal Service Was a Condition of Monopoly Status

For nearly a century, the federal government has embraced a policy of "universal" telephone service. *Consumers' Rsch.*, 606 U.S. at 664–66 (majority op.). "For much of the 20th century, [universal service] referred to a policy aimed at making landline local phone service available to all consumers at a reasonable cost," whether they were located in major metropolitan areas where service is easily provided or isolated rural communities where service is difficult to provide. *Id.* at 712–13 (Gorsuch, J., dissenting) (quotation marks omitted).

Universal service was initially a condition of the monopoly status granted to incumbent telephone companies like AT&T. *Id.* at 713. "Regulators manipulated [the] rates" that AT&T could charge "to expand

Americans' access to telephones," for example, by setting "long-distance rates … to subsidize local rates, business rates to subsidize residential rates, and urban rates to subsidize rural rates." *Id.* (cleaned up); *see also id.* at 665–66 (majority op.). But this "system of implicit subsidies … began to falter in the 1970s and 1980s, as new long-distance carriers entered the picture" and AT&T's monopoly was ended by decree. *Id.* at 713 (Gorsuch, J., dissenting).

## 2. The Telecommunications Act of 1996 Reinvents Universal Service

When Congress passed the Telecommunications Act of 1996, it "fundamentally restructured the local telephone market," opening local telephone service markets to competition, and in so doing dealt "a fatal blow to the preexisting system of universal service" because "there would no longer be monopolies whose rates regulators could adjust to subsidize some customers at the expense of others." *Consumers' Rsch.*, 606 U.S. at 714 (Gorsuch, J, dissenting) (cleaned up).

Congress responded with 47 U.S.C. § 254, which "discarded the implicit subsidies embedded in ratemaking and substituted a plan for explicit transfer payments to ensure that basic communications services extend across the country." *Id.* at 666 (majority op.). Under the new

statutory scheme, "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by [FCC] to preserve and advance universal service." 47 U.S.C. § 254(d). "FCC must use the money in that fund, now known as the Universal Service Fund, to pay for subsidy programs for designated populations and facilities." *Consumers' Rsch.*, 606 U.S. at 666.

FCC has established several such "mechanisms," including a High-Cost Program, which includes the Connect America Fund to provide broadband internet across the country, 47 C.F.R. pt. 54, subpt. D; a Low-Income Program, which includes the Lifeline Program to subsidize phone and internet services for low-income consumers, *id.* pt. 54, subpt. E; a Schools and Libraries Program, *id.* pt. 54, subpt. F; and a Rural Health Care Program, *id.* pt. 54, subpt. G.

By regulation, FCC requires carriers to pay a percentage of their interstate and international telecommunications revenues at a rate set every quarter, called a quarterly "contribution factor." *See id.* § 54.709(a). Carriers typically "pass along to [their] customers the cost of [their] contributions," *Consumers' Rsch.*, 606 U.S. at 669, which FCC's

regulations expressly permit, *see, e.g.*, 47 C.F.R. §§ 54.407(c), 54.712(a). The "charge generally appears on phone bills as the 'Universal Service Fund Fee.'" *In re Incomnet, Inc.*, 463 F.3d 1064, 1066 (9th Cir. 2006).

### 3. FCC Creates and Appoints USAC as Permanent Administrator of the Universal Service Fund

FCC subsequently "appointed" the Universal Service Administrative Company ("USAC"), a non-profit company registered in Delaware, as "the permanent Administrator" of the Universal Service Fund. 47 C.F.R. § 54.701(a).

USAC is an "independent subsidiary of the National Exchange Carrier Association, Inc." ("NECA"), *id.* § 54.5, which itself "is a membership organization of telecommunications carriers," *Blanca Tel. Co. v. FCC*, 991 F.3d 1097, 1105 (10th Cir. 2021). USAC has a 20-member board of directors comprising individuals from various "interest groups affected by and interested in universal service programs" and who "are nominated by their respective interest groups." *Leadership*, USAC, https://www.usac.org/about/leadership/; *see* 47 C.F.R. §§ 54.701(b), 54.703(b). After their nomination, USAC directors are approved by the FCC Chairman. 47 C.F.R. § 54.703(c)(3). USAC's directors nominate a Chief Executive Officer ("CEO"), who is then also approved by the FCC

Chairman. *Id.* § 54.704(b).

USAC is charged with establishing the budget for the Universal Service Fund. *Id.* § 54.709(a). Each quarter, USAC announces a proposed contribution amount—essentially how much money it wants for "universal service" for the next quarter. FCC's Office of the Managing Director then ministerially calculates what percentage of all telecommunication carriers' expected interstate and international end-user revenues would be necessary to reach that target. *Id.* This number is published as the proposed quarterly contribution factor. A quarterly contribution factor is "deemed approved" by FCC unless the agency acts within 14 days of publication, and the rate takes effect at the start of the next quarter, just a few days later. *Id.* § 54.709(a)(3).

USAC takes legal title to the contributions it receives from carriers and deposits them into the Universal Service Fund, then chooses how to disburse funds to recipients through the High-Cost, Low-Income, Schools and Libraries, and Rural Health Care Programs. *See Incomnet*, 463 F.3d at 1072; 47 C.F.R. §§ 54.701(c), 54.705. Although courts disagree whether

USAC acts as FCC's agent in administering the Universal Service Fund,[1] FCC exercises power over the Fund only in the most indirect manner. For example, FCC "has no ability to control the funds … through direct seizure or discretionary spending." *Incomnet*, 463 F.3d at 1074.

### 4. Section 254's "Definition" of Universal Service and FCC's Longstanding Interpretation

Congress imposed no formula or objective limit on how much money FCC can raise under § 254. Instead, it directed the money must be spent on "universal service," which it defined as "an evolving level of telecommunications services that the [FCC] shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services." 47 U.S.C. § 254(c)(1). Congress further provided various considerations to guide FCC in determining what services qualify as "universal service."

*Section 254(b).* First, Congress directed that FCC "shall base policies for the preservation and advancement of universal service" on six

---

[1] *Compare Incomnet*, 463 F.3d at 1074 (USAC is not FCC's agent), *with United States ex rel. Heath v. Wis. Bell, Inc.*, 92 F.4th 654, 668 (7th Cir. 2024) (USAC is FCC's agent); *see also Wis. Bell, Inc. v. United States ex rel. Heath*, 604 U.S. 140, 146 n.2 (2025) ("express[ing] no view" on whether USAC is FCC's agent).

"principles": (1) "Quality services should be available at just, reasonable, and affordable rates"; (2) "Access to advanced telecommunications and information services should be provided in all regions of the Nation"; (3) "Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas"; (4) "All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service"; (5) "There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service"; and (6) "Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in [47 U.S.C. § 254(h)]." 47 U.S.C. § 254(b). FCC can also determine additional "principles." *Id.* § 254(b)(7).

Although prefaced with "shall," each principle also includes "should." Consistent with this exhortative language, FCC had long maintained that § 254(b)'s principles were non-binding guidelines that FCC could balance against one another and "ignore" at its "discretion." *See, e.g.*, *Rural Digit. Opportunity Fund Phase I Auction*, 35 FCC Rcd. 6077, ¶ 114 n.262 (2020). Courts of appeals had agreed. *See, e.g.*, *TOPUC II*, 265 F.3d at 321 (section 254(b)'s principles are "aspirational guideline[s]" that FCC can "balance[] with other statutory objectives"); *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1103 (D.C. Cir. 2009) (FCC "enjoys broad discretion" to "balance[] [section 254(b)'s principles] against" each other); *In re LAN Tamers, Inc.*, 329 F.3d 204, 214 (1st Cir. 2003) (section 254(b) principle is an "aspiration").

*Section 254(c)(1).* Second, in "establishing" what constitutes "universal service," Congress directed FCC to "consider" four factors: "the extent to which" those services (A) "are essential to education, public health, or public safety"; (B) "have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers"; (C) "are being deployed in public telecommunications networks by telecommunications carriers"; and

(D) "are consistent with the public interest, convenience, and necessity." 47 U.S.C. § 254(c)(1). Similar to the § 254(b) principles, FCC had long maintained that "all four criteria enumerated in section 254(c)(1) must be considered, but not each necessarily met." *In re Fed.-State Joint Bd. on Universal Serv.*, 12 FCC Rcd. 8776, 8809 (1997).

**Sections 254(c)(3) and (h)(2).** Finally, for schools, libraries, and health care providers, Congress relaxed these already flexible considerations. In § 254(c)(3), Congress provided that for schools, libraries, and health care providers, FCC "may designate *additional services* for" support "*[i]n addition to* the services included in the definition of universal service under [§ 254(c)(1)]." 47 U.S.C. § 254(c)(3) (emphases added). And in § 254(h)(2), Congress directed FCC to "establish competitively neutral rules … to enhance, to the extent technically feasible and economically reasonable, access to *advanced telecommunications and information services*" for those entities. *Id.* § 254(h)(2)(A) (emphasis added). "Advanced information … and telecommunications services are things that are … *above the baseline* of what's been considered universal services," that is, "novel technolog[ies]" that need not meet other § 254 principles and factors. Tr. of Oral Arg. at

41:23–42:4, *Consumers' Rsch.*, Nos. 24-354 & 24-422 (U.S. Mar. 26, 2025) (emphasis added). FCC therefore has historically invoked §§ 254(c)(3) and (h)(2) as authority to fund schools, libraries, and healthcare programs without regard to the other § 254 principles and factors. *See, e.g.*, *In re Schools & Libraries Cybersecurity Pilot Program*, 39 FCC Rcd. 6158, 6182 & n.150 (2024) (citing § 254(h)(2)(A) as authority for funding "'next-generation' … equipment and services that are not currently eligible for … support" under other Universal Service Fund programs).

## 5. USAC Imposes Skyrocketing Rates, Raising Billions of Dollars Through Ineffective Taxation

In the thirty years since its inception, the Universal Service Fund tax rate has skyrocketed.

In the second quarter of 2000, USAC imposed a contribution factor of 5.7% on all end-user interstate telecommunication revenues, amounting to an expected $1.1 billion in contributions for that quarter. *Proposed Second Quarter 2000 Universal Service Contribution Factor*, 15 FCC Rcd. 16469 (2000). The rate steadily climbed, and by 2025 it had reached unprecedented levels. For the fourth quarter 2025—at issue in this suit—USAC set the contribution factor at 38.1% with $2.15 billion collected, the highest rate in the Universal Service Fund's thirty-year

history. *See Proposed Fourth Quarter 2025 Universal Service Contribution Factor*, JA__. The Fund is expected to collect nearly $9 billion in 2025, more than 20 times the FCC's entire annual budget. *See* FCC, *2026 Budget Estimates to Congress* 63 (May 2025), https://docs.fcc.gov/public/attachments/DOC-411718A1.pdf.

"The skyrocketing contribution factor is attributable in part—but only in part—to a shrinking contribution base." *Consumers' Rsch.*, 606 U.S. at 719 n.4 (Gorsuch, J., dissenting). It also has grown to cover ever-expanding services, as well as USAC's ballooning operational costs, which increased by 27.5% from 2018 through 2023, alone. U.S. Gov't Accountability Off. ("GAO"), GAO-24-106967, *Administration of Universal Service Programs Is Consistent with Selected FCC Requirements* 17 (2024), https://www.gao.gov/assets/gao-24-106967.pdf.

"[W]aste and fraud have also contributed to the [Fund's] astronomical growth." *Consumers' Rsch. v. FCC*, 109 F.4th 743, 751 (5th Cir. 2024) (en banc), *vacated on other grounds*, 606 U.S. 656. That abuse has been enabled, in part, by notoriously lax oversight by USAC and FCC. As early as 2010, the GAO faulted USAC for its lack of "effective internal controls" and ineffective audits. *Id.* at 751–52. By 2024, USAC

and FCC had fully implemented only about half of GAO's recommendations since 2017. GAO-24-106967, *supra*, at 23–24. The result is a program that FCC's Inspector General has said participants view "as 'a big candy jar' of 'free money.'" *Consumers' Rsch.*, 109 F.4th at 751.

## B.   THE SUPREME COURT NARROWLY INTERPRETS § 254

Beginning in 2021, a group including some Petitioners brought challenges to vacate several quarterly contribution factors, alleging that the Universal Service Fund scheme unconstitutionally delegated legislative power to FCC and that FCC's redelegation of that legislative power to USAC violated the private nondelegation doctrine. The Sixth and Eleventh Circuits denied the petitions, concluding that § 254 satisfied the "intelligible principle" test for delegation under Article I and that there was no private nondelegation violation. *Consumers' Rsch. v. FCC*, 67 F.4th 773, 787–97 (6th Cir. 2023); *Consumers' Rsch. v. FCC*, 88 F.4th 917, 923–28 (11th Cir. 2023).

Judge Newsom concurred in judgment, but opined that even if § 254 didn't violate Article I, USAC's involvement may exceed FCC's statutory authority and violate Article II. *Consumers' Rsch.*, 88 F.4th at 933–38

(Newsom, J., concurring in judgment). Regarding the latter, he explained that USAC exercises federal *executive* power, which, under Article II, requires that USAC is subject to the ultimate control of the President, for example, through appointment and removal. *Id.* at 933–38 & n.7 (emphasis added). He doubted that USAC satisfied Article II in these respects. *Id.*

This Court sitting *en banc* reached a different conclusion than its sister circuits. Although the *en banc* Court was "highly skeptical" that the Universal Service Fund satisfied either the intelligible-principle test or the private nondelegation doctrine, it ultimately held that it "need not resolve either question" because it concluded that "*the combination* of Congress's sweeping delegation to FCC and FCC's unauthorized subdelegation to USAC violates" Article I. *Consumers' Rsch.*, 109 F.4th at 778. The *en banc* Court also concluded that FCC's delegation to USAC "likely violates … § 254" since that statute "does not authorize" USAC's involvement. *Id.* at 774–78 & n.21.

The Supreme Court, however, reversed. The Court concluded that § 254, on the whole, provides a sufficient "intelligible principle[] to guide the FCC as it raises funds" for universal service. *Consumers' Rsch.*, 606

U.S. at 683–88. To identify that principle, the Court adopted a narrow interpretation of § 254, requiring that the § 254(b) principles and § 254(c)(1) factors are *separately mandatory.*" *Id.* at 687–88 (emphasis added). At oral argument, the Acting Solicitor General agreed "that each … criteria must be met," reversing FCC's longstanding position. *Id.* The Court underscored, however, that its interpretation didn't hinge on the government's agreement—it exercised its "'independent judgment in deciding' what power Congress ha[d] conferred." *Id.* Under the Court's interpretation, FCC "may fund only essential, widely used, and affordable services, for the benefit of only designated recipients," which requires that each of § 254's "criteria" are satisfied. *Id.* at 687–89.

Notably, the Court considered only §§ 254(b) and (c)(1). In a footnote, the Court expressly declined to consider the effect of §§ 254(c)(3)'s and (h)(2)'s provisions for "additional" and "advanced" services, respectively, since the challengers "d[id] not advance any arguments that are specific to those provisions." *Id.* at 687 n.9. The Court also held there was no private nondelegation violation, and it rejected this Court's "combination" theory. *Id.* at 692–98.

Justices Gorsuch, Thomas, and Alito dissented, and would have

held that § 254 "impermissibly delegates Congress's taxing power to the FCC." *Id.* at 720 (Gorsuch, J., dissenting). Justice Gorsuch faulted the Court for "rewrit[ing]" the statute, but observed that even the majority "c[ould not] bring itself to defend" §§ 254(c)(3) and (h)(2). *Id.* at 732. He noted that challengers "remain free … in a future proceeding[] to renew their attack on the constitutionality of whatever contributions the FCC demands" under §§ 254(c)(3) and (h)(2). *Id.* at 733.

Although it reversed this Court's *en banc* constitutional holding, the Supreme Court left other parts of the opinion untouched. The Supreme Court did not disturb this Court's standing analysis and agreed that the challenge was not moot. *Id.* at 671 n.1 (majority op.). The Supreme Court also limited its analysis to the constitutional questions presented, and so did not address this Court's conclusion regarding the FCC's statutory authority to appoint USAC. *See id.* at 720 n.6 (Gorsuch, J., dissenting).

## C. AGENCY PROCEEDINGS

Petitioners comprise several organizations and individuals who are adversely affected by the Universal Service Fund tax. Petitioner Consumers' Research, for example, is an independent educational 501(c)(3) nonprofit organization whose mission is to increase the

knowledge and understanding of issues, policies, products, and services of concern to consumers, and who pays the "Universal Service Fee" in its monthly bill. *See Comments and Objections of Consumers' Research et al.* 3–4, CC Docket No. 96-45 (Sept. 15, 2025) ("*Petitioners' September Comment*"), JA__–__; Dkt. 64, Ex. 1 (Hild Decl.) ¶ 3.[2] Other Petitioners are individuals who pay the Universal Service Fund tax through their monthly phone bills via line-item charges. *See, e.g.*, *id.*, Ex. 2 (Aronoff Decl.) ¶ 3; Ex. 3 (Bayly Decl.) ¶ 3. And Petitioner Cause Based Commerce, Inc., is a reseller of telecommunications services and pays directly into the Universal Service Fund. *See Consumers' Rsch.*, 109 F.4th at 752–53; *Consumers' Rsch.*, 67 F.4th at 783–84.

On August 1, 2025, USAC proposed its Fourth Quarter 2025 Universal Service Fund budget, seeking approximately $2.2 billion in total collections over the upcoming quarter, including $1.176 billion for the High-Cost Program, $244 million for the Low-Income Program, $181 million for the Rural Health Care Program, and $652 million for the Schools and Libraries Program. USAC, *Federal Universal Service*

_____

[2] Referenced declarations are attached to the letter simultaneously filed to the docket. Dkt. 64.

*Support Mechanisms Fund Size Projections for Fourth Quarter 2025*, at 18, 20, 29, 60 (Aug. 1, 2025), JA__, __, __, __.

On August 8, 2025, Petitioners filed a comment with FCC. *See Comments and Objections of Consumers' Research et al.*, CC Docket No. 96-45 (Aug. 8, 2025) ("*Petitioners' August Comment*"), JA__–__. Petitioners argued that §§ 254(c)(3) and (h)(2) violate the nondelegation doctrine, and that the contribution factor and Universal Service Fund scheme violate numerous other constitutional and statutory requirements. *Id.* On August 29, 2025, USAC proposed its Fourth Quarter 2025 projected revenue base. USAC, *Federal Universal Service Support Mechanisms Quarterly Contribution Base for the Fourth Quarter 2025* (Aug. 29, 2025), JA__–__.

On September 15, 2025, FCC's Office of Managing Director issued a public notice of its Proposed Fourth Quarter 2025 contribution factor, specifying a proposed 38.1% tax rate on interstate and international telecommunications revenues to raise the $2.2 billion that USAC demanded, after applying $100 million in unused program funds to offset projected demand. *Proposed Fourth Quarter 2025 Universal Service Contribution Factor*, JA__–__. On September 15, 2025, Petitioners filed

another Comment, raising the same arguments as in their August Comment. *Petitioners' September Comment*, JA__–___.

On September 29, 2025, fourteen days after FCC's public notice, the 38.1% tax rate was "deemed approved by the Commission" pursuant to regulation. 47 C.F.R. § 54.709(a)(3). Petitioners timely filed their Petition in this Court on October 1, 2025. Dkt. 1.

## SUMMARY OF THE ARGUMENT

Because FCC's Fourth Quarter 2025 contribution factor is unlawful for several independent reasons, this Court should grant the Petition, vacate the factor, and remand to FCC for further proceedings. 5 U.S.C. § 706(2)(A), (C), (D).

*First*, §§ 254(c)(3) and (h)(2), which apply to services for schools, libraries, and health care providers, allow FCC to ignore the criteria that the Supreme Court held were necessary to provide § 254's "intelligible principle." *Consumers' Rsch.*, 606 U.S. at 683–91. These two provisions therefore give FCC virtually unbounded authority to raise funds for schools, libraries, and health care providers, unconstitutionally delegating to FCC the taxing power reserved to Congress by Article I. *See infra* Part II.

*Second*, FCC acted arbitrarily by failing to show that its contribution factor satisfies § 254, as interpreted months earlier by the Supreme Court in *Consumers' Research*, 606 U.S. 656. In that case, the Supreme Court adopted an interpretation of § 254 considerably narrower than FCC's longstanding view of its authority under that section. FCC, however, issued the Fourth Quarter 2025 contribution factor as if nothing had changed, failing even to acknowledge the Supreme Court's recent interpretation. *See infra* Part III.

*Third*, FCC lacks statutory authority to create USAC and appoint it administrator of the Universal Service Fund, including its role in determining the contribution factor. *See infra* Part IV.

*Fourth*, even if USAC were lawfully created, its directors and CEO are not installed consistent with the Appointments Clause. *See infra* Part V.

*Finally*, FCC violated the APA by failing to address Petitioners' meaningful comments. *See infra* Part VI.

## **LEGAL STANDARD**

The APA supplies the substantive standard for review. *See, e.g.*, *FCC v. Prometheus Radio Project*, 592 U.S. 414, 422–23 (2021) (applying

APA to FCC actions). The APA provides that courts must "hold unlawful and set aside agency action" that is "arbitrary" or "capricious," "not in accordance with law," "in excess of statutory jurisdiction," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

## ARGUMENT

### I.  PETITIONERS HAVE STANDING

This Court has previously held that at least one Petitioner has standing to challenge FCC's Universal Service Fund contribution factor, *Consumers' Rsch.*, 109 F.4th at 752–53, and FCC has never questioned Petitioners' standing.

Petitioner Cause Based Commerce, Inc., contributes directly to the Universal Service Fund and therefore "incurred a classic pocketbook injury as a result of its legal obligation to pay the [Universal Service Fund] Tax. Its injury is fairly traceable to the challenged conduct because the size of its [fourth quarter 2025 Universal Service Fund] liability was controlled by the contribution factor set by USAC. And, at the time the petition was filed, its injury could have been redressed by a favorable judicial decision." *Consumers' Rsch.*, 109 F.4th at 753; *see also Consumers' Rsch.*, 67 F.4th at 783–84.

Other Petitioners have standing because they pay a separate line-item in their monthly phone bill that is expressly earmarked for the Universal Service Fund, with the precise amount based on the quarterly contribution factor determined pursuant to § 254. They have paid that extra cost in the past (including in Fourth Quarter 2025) and, because they intend to maintain phone service, will continue paying that tax on a monthly basis. *See, e.g.*, Hild Decl. ¶ 3; Aronoff Decl. ¶ 3; Bayly Decl. ¶ 3. Those extra costs are sufficient to establish standing because they "are 'certainly an injury-in-fact,'" and "next month's [] bill is 'certainly impending.'" *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 383 (D.C. Cir. 2020).

The Supreme Court has held that these challenges are not moot, even though fourth quarter 2025 has now passed. The "contribution factor is in effect for only three months, a period too short to complete judicial review of its lawfulness." *Consumers' Rsch.*, 606 U.S. at 671 n.1 (cleaned up). It therefore qualifies for the "capable of repetition, yet evading review" exception to mootness. *Id.*

## II.  SECTIONS 254(C)(3) AND (H)(2) UNCONSTITUTIONALLY DELEGATE LEGISLATIVE POWER

"The Constitution vests '[a]ll legislative Powers … in a Congress of

the United States.'" *Consumers' Rsch.*, 109 F.4th at 758 (quoting U.S. Const. art. I, § 1). As a result, "the lawmaking function belongs to Congress," and "Congress may not constitutionally delegate that power to another constitutional actor." *Id.* at 759 (quotation marks omitted). That constitutional mandate is commonly referred to as the "nondelegation doctrine."

Raising revenue for the Universal Service Fund is a "legislative function" subject to constitutional limits on delegation.[3] *Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 341 (1974). The Supreme Court rejected the argument that the Universal Service Fund's "contribution scheme *generally* is unconstitutional" under the

---

[3] Petitioners have argued at length elsewhere that Universal Service Fund contributions are a tax. *See, e.g.*, Br. for Resp. at 25–29, *Consumers' Rsch.*, Nos. 24-354 & 24-422 (U.S. Feb. 11, 2025). This *en banc* Court agreed. *Consumers' Rsch.*, 109 F.4th at 756–58. As did three Justices of the Supreme Court, *Consumers' Rsch.*, 606 U.S. at 722 (Gorsuch, J., dissenting), and the Court has never held otherwise, *id.* at 679 (declining to determine whether contributions are taxes or fees).

But whether Universal Service Fund contributions are "taxes" or instead are "fees"—as FCC has previously argued, *Consumers' Rsch.*, 109 F.4th at 756–57—raising revenue for the Universal Service Fund is a legislative function subject to nondelegation limits. *See Consumers' Rsch.*, 606 U.S. at 679 (nondelegation analysis applies whether Universal Service Fund contributions are taxes or fees).

nondelegation doctrine, concluding that §§ 254(b) and (c)(1) imposed *mandatory* "qualitative" limits on what "universal service" means, thereby limiting how much revenue FCC can raise for most aspects of the Fund. *Consumers' Rsch.*, 606 U.S. at 681–87, 687 n.9 (emphasis added).

But Congress's delegation to FCC for raising revenue for schools, libraries, and health care providers deviates substantially from the general scheme that the Supreme Court analyzed. Sections 254(c)(3) and (h)(2)—which the Court expressly declined to analyze, *id.* at 687 n.9.— relieve FCC from considering the qualitative limits that the Court held provided an intelligible principle "to guide the FCC as it raises funds," *id.* at 683. Without those limits, FCC has effectively boundless authority to determine the scope of universal service—and thus the funds it can raise—for schools, libraries, and health care providers, violating even the forgiving intelligible-principle test and rendering § 254 unconstitutional with respect to these programs.

To the extent the Fourth Quarter 2025 contribution factor includes funding for these programs, it is unlawful and must be set aside. 5 U.S.C. § 706(2)(A).

## A.    The Intelligible-Principle Test Supplies the Standard

Although "[a]ll legislative Powers" are vested in Congress, U.S. Const. art. 1 § 1, the Supreme Court has "recognized that Congress may seek assistance from its coordinate branches" to carry out legislation, *Consumers' Rsch.*, 606 U.S. at 672 (cleaned up). "To distinguish between the permissible and the impermissible in this sphere," courts ask "whether Congress has set out an 'intelligible principle' to guide what it has given the agency to do." *Id.* at 673 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

To satisfy this test, Congress must have "made clear both 'the general policy' that the agency must pursue and 'the boundaries of [its] delegated authority,'" and have "provided sufficient standards to enable both 'the courts and the public [to] ascertain whether the agency' has followed the law." *Id.* (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946), and *OPP Cotton Mills, Inc. v. Adm'r of Wage & Hour Div.*, 312 U.S. 126, 144 (1941)). What suffices as an intelligible principle will vary based on "the extent and character" of the power sought to be delegated, *Mistretta v. United States*, 488 U.S. 361, 372 (1989), and "the degree of agency discretion that is acceptable varies according to the

scope of the power congressionally conferred," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475 (2001).

## B. Sections 254(c)(3) and h(2) Unmoor Certain Programs From § 254's Intelligible Principle

Sections 254(c)(3) and (h)(2) violate the nondelegation doctrine because—for schools, libraries, and health care providers—they remove the bevy of limits that the Supreme Court found provided the intelligible principle for § 254. "[T]he boundaries of [the] delegated authority" under §§ 254(c)(3) and (h)(2) for these programs therefore are not "clear." *Consumers' Rsch.*, 606 U.S. at 673 (quotation marks omitted). Quite the opposite: these provisions gut § 254 of *any* meaningful limits for funding services for schools, libraries, and health care providers.

To find an intelligible principle in the Universal Service Fund scheme, the Court held that the "criteria" in §§ 254(b) and (c)(1) are "separately mandatory," meaning that "each … has to be met." *Id.* at 687–88. A telecommunications service therefore qualifies as universal service—and FCC can raise taxes to support it—only if it is "essential to education, public health, or public safety" *and* "through the operation of market choices by customers, [it has] been subscribed to by a substantial majority of residential customers" *and* its rates are "just, reasonable, and

affordable" *and* it is "provided in all regions of the Nation"—among half a dozen other requirements. 47 U.S.C. § 254(b), (c)(1).

But §§ 254(c)(3) and (h)(2) allow FCC to raise tax revenue for schools, libraries, and health care providers without having to comply with the ten commandments in §§ 254(b) and (c)(1) that the Supreme Court held were critical to § 254's guidance for other programs. Indeed, FCC itself has long acknowledged that these two provisions grant it powers unlike any others in § 254.

*First*, § 254(c)(3) states that for "schools, libraries, and health care providers," FCC can designate "*additional* services" for funding "*[i]n addition* to the services included in the definition of universal service under [§ 254(c)(1)]." 47 U.S.C. § 254(c)(3) (emphases added). For these programs, Congress thus expressly freed FCC from the limits imposed on "universal service" by § 254(c)(1)'s four mandatory factors—the factors simply don't apply. By authorizing FCC to go beyond the statutory definition of "universal service," Congress also released FCC from any constraints imposed by the § 254(b) principles, as those principles by their express terms apply only to "universal service." 47 U.S.C. § 254(b) (principles apply to "policies for the preservation and advancement of

*universal service*" (emphasis added)).

For schools, libraries, and health providers, Congress therefore *did not* "insist[] that the FCC always look to whether services are essential, affordable, and widely used," *Consumers' Rsch.*, 606 U.S. at 667, but expressly told FCC that it isn't bound by those considerations at all. By FCC's telling, the agency need not even limit itself to "telecommunications" services under § 254(c)(3). *Tex. Off. of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 441 (5th Cir. 1999) ("FCC points out that there is no language restricting these 'additional' services to telecommunications services.").

This means that § 254(c)(3) allows FCC to impose taxes to pay for "a broad class of services" well beyond "universal service." *Id.* at 445. FCC itself has long agreed. *See, e.g.*, *Fed.-State Joint Bd. on Universal Serv.*, 12 FCC Rcd. at 8811 n.93 ("Pursuant to section 254(c)(3), the Commission may designate for support additional telecommunications services not included in the 'core' services designated under section 254(c)(1) for schools, libraries, and health care providers."); *In re Lifeline and Link Up Reform & Modernization*, 27 FCC Rcd. 6656, 6831 (2012) (FCC "may provide support to non-telecommunications carriers providing non-

telecommunications services, such as Internet access and internal connections" under § 254(c)(3)).

*Second*, § 254(h)(2) reinforces FCC's boundless authority when raising revenue for schools, libraries, and health care providers. Section 254(h)(2) states FCC shall "enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries." 47 U.S.C. § 254(h)(2)(A).

As in § 254(c)(3), the "advanced … services" authorized by § 254(h)(2) are not limited to "universal service" as defined elsewhere in the statute. FCC itself has long stated that this provision "is *notably broader* than the other provisions of section 254." *Fed.-State Joint Bd. on Universal Serv.*, 12 FCC Rcd. at 9086 (emphasis added). According to FCC, it allows the agency to raise funds to give to entities that are not eligible telecommunication carriers, which would otherwise violate § 254(e). *Id.*

Taken separately or together, §§ 254(c)(3) and (h)(2) fail to impose an intelligible principle on FCC's ability to raise taxes to fund the

extensive programs covered by those subsections. As Justices Gorsuch, Thomas, and Alito explained, and as the Acting Solicitor General affirmed at oral argument, the "additional" and "advanced" services authorized by §§ 254(c)(3) and (h)(2) "go 'above the baseline of what's been considered universal service'" and are determined "without regard to whether they satisfy the four factors outlined in § 254(c)(1)" or the six principles in § 254(b). 606 U.S. at 716 (Gorsuch, J., dissenting) (quoting Tr. of Oral Arg. 42, 47).

As the dissenters emphasized: "When it comes to deciding what programs to fund under § 254(c)(3) and § 254(h)(2), the FCC is unconstrained by any of the subsection (c)(1) factors the Court … lean[ed] on so heavily," or on the § 254(b)(1) principles that inform the definition of "universal service" under § 254(c)(1). *Id.* at 732. Given all this, the Supreme Court was "unwilling to say that [§§ 254(c)(3) and (h)(2)] impose a 'qualitative' cap—and understandably so." *Id.* "[T]hat in itself is a notable development: [it] marks the first time in a long time that the Court has confronted a statutory delegation and found no way to save it." *Id.* at 733. Moreover, "experience illustrates just how uncapped the FCC's § 254(c)(3) and § 254(h)(2) programs really are." *Id.* at 732. "[I]n 2024, the

FCC announced that it would … begin funding 'Wi-Fi hotspots and services to be used off-premises by students, school staff, and library patrons.' As far as the FCC sees it, subsections (c)(3) and (h)(2) might allow it to collect enough taxes to supply take-home hotspots to anyone with a library card. Or maybe even take-home Starlink devices for library patrons nationwide, to help shrink the 'digital divide between Americans with access to broadband at home and those without.'" *Id.* at 732–33 (cleaned up) (citing authorities).[4]

The off-premises Wi-Fi program isn't an anomaly. FCC has regularly acknowledged that §§ 254(c)(3) and (h)(2) authorize programs that § 254 otherwise would not permit. *See, e.g.*, *Schools & Libraries Cybersecurity Pilot Program*, 39 FCC Rcd. at 6182 & n.150 (citing § 254(h)(2) as authority for funding "'next-generation' … equipment and services that are not currently eligible for … support" under core Universal Service Fund programs); *see also, e.g.*, *Hill v. FCC*, 496 F. App'x 396, 397 (5th Cir. 2012) (per curiam) (explaining that "FCC established

_____

[4] FCC recently ended its Wi-Fi hotspot program for school buses. *In re Modernizing the E-Rate Program for Schools and Libraries*, FCC 25-63, WC Docket No. 13-184 (rel. Sept. 30, 2025). But the fact that FCC claimed discretion to fund such a sweeping program underscores the breadth of authority granted under §§ 254(c)(3) and h(2).

the E-rate program" "[p]ursuant to th[e] directive [in § 254(h)(2)]").

None of that satisfies the now-mandatory requirements in §§ 254(b) and (c)(1).

## C.     Other Provisions of § 254 Do Not Supply an Intelligible Principle for § 254(h)(2)

Section 254(c) contains no surrounding provisions that could even plausibly supply an intelligible principle for § 254(c)(3). Nor do other parts of § 254(h) supply an intelligible principle for § 254(h)(2).

*First*, § 254(h)(2)(A)'s language allowing FCC to fund "advanced … services" "to the extent technically feasible and economically reasonable" imposes no meaningful limit. 47 U.S.C. § 254(h)(2)(A). "Feasible" means "[c]apable of being accomplished or brought about; possible," *Feasible*, American Heritage Dictionary 667 (3d ed. 1992), allowing FCC to proceed all the way up to the point of literal impossibility. Nor does "economically reasonable" provide any ascertainable guidance or limit. Phrases like "reasonable" or "just and reasonable" might have a sufficient meaning when it comes "to setting rates for regulated monopolies like public utilities—a context where it incorporates 'concepts with a long history at common law.'" *Consumers' Rsch.*, 606 U.S. at 740 (Gorsuch, J., dissenting). "But outside that sphere, the same phrase may amount to

little more than an instruction to go forth and do good." *Id.* at 741. That is certainly the case here, where Congress expressly severed § 254(h)(2) from any historical and textual limits applicable to other Universal Service Fund programs. Accordingly, "reasonable" here cannot have an established meaning. Or, as Judge Newsom aptly put it, words like "'reasonable' … cannot possibly constrain the FCC's policymaking discretion in any meaningful way. They leave the agency all the room it needs to do essentially whatever it wants," *Consumers' Rsch.*, 88 F.4th at 931 (Newsom, J., concurring in judgment), which is precisely how FCC has understood the provisions, *see, e.g.*, *Fed.-State Joint Bd. on Universal Serv.*, 12 FCC Rcd. at 9086 (§ 254(h)(2) "is notably broader than the other provisions of section 254").

*Second*, § 254(h)(1) does not purport to limit the services FCC can fund at all. Instead, that provision obligates carriers to provide certain telecommunications services at reduced rates and entitles those carriers to rebates for those services. Specifically, § 254(h)(1)(A) requires carriers to provide telecommunications "necessary for the provision of health care services" to rural health care providers "at rates that are reasonably comparable" to rates charged in urban areas, and entitles those carriers

to a rebate "amount equal to the difference" between rural and urban rates. 47 U.S.C. § 254(h)(1)(A). Section 254(h)(1)(B) is similar, but for schools and libraries. It requires carriers to provide "any of its services that are within the definition of universal service under [§ 254(c)(3)]" to schools and libraries when used "for educational purposes at rates less than the amounts charged for similar services to other parties," and entitles those carriers to a rebate "amount equal to the amount of the discount treated as an offset to its" Universal Service Fund contribution. *Id.* § 254(h)(1)(B). Accordingly, these provisions relate only to reimbursement for specific services, and therefore say nothing whatsoever about what services can be authorized in the first instance by § 254(h)(2)'s expansive language.

\* \* \*

The Supreme Court found an intelligible principle in § 254 by construing the criteria in §§ 254(b) and (c)(1) as "separately mandatory." 606 U.S. at 688. But for services for schools, libraries, and health care providers, §§ 254(c)(3) and (h)(2) relieve FCC from considering those criteria. The result is a grant of authority to FCC for those particular programs with no "clear[] ... boundaries" and only a vague "general

policy" of assisting schools, libraries, and health care providers obtain telecommunications (and other) services. *See Am. Power & Light Co*, 329 U.S. at 105.

That boundless delegation is unconstitutional. This Court therefore should vacate and remand the Fourth Quarter 2025 contribution factor, with instructions to reduce it by the amounts raised under the purported authority of §§ 254(c)(3) and (h)(2).

## III. FCC's Failure to Show the Contribution Factor Satisfies § 254 Under *Consumers' Research*, 606 U.S. 656, is Arbitrary

*Consumers' Research* was the first time that the Supreme Court had construed FCC's authority under § 254, and so was a landmark in the history of the Universal Service Fund. 606 U.S. 656. Moreover, by reading each of § 254(b)'s principles and § 254(c)(1)'s factors as separately mandatory, the Court's interpretation departed drastically from interpretations embraced by prior courts and by FCC itself. But FCC has ignored the Supreme Court's landmark decision and didn't even attempt to show that it has authority to impose the Fourth Quarter 2025 contribution factor under the Court's interpretation of § 254. That failure is a textbook violation of the APA. 5 U.S.C. § 706(2)(A).

The APA requires federal agencies "to engage in reasoned

decisionmaking and directs that agency actions be 'set aside' if they are 'arbitrary' or 'capricious.'" *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (cleaned up) (quoting 5 U.S.C. § 706(2)(A)). "Under arbitrary-and-capricious review, [FCC] must show that it 'reasonably considered the relevant issues and reasonably explained the decision.'" *Nat'l Ass'n of Priv. Fund Managers v. SEC*, 151 F.4th 252, 265 (5th Cir. 2025) (quoting *Prometheus Radio Project*, 592 U.S. at 423). This includes explaining the "legal authority" for the action. 5 U.S.C. § 553(b)(2); *Coinbase, Inc. v. SEC*, 126 F.4th 175, 189 (3d Cir. 2025) ("[f]ailure to articulate an adequate legal basis for agency action" is a "ground for setting aside an agency action").

Moreover, an agency acts arbitrarily if it "entirely failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983), which includes failing to "acknowledge and account for a changed regulatory posture," *Nat'l Ass'n of Priv. Fund Managers*, 151 F.4th at 271 (quoting *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011)).

FCC's Fourth Quarter 2025 contribution factor flunks this review. FCC did not attempt to explain how the contribution factor satisfies the

Court's interpretation of § 254, which, alone, is sufficient to set aside the factor. *Coinbase*, 126 F.4th at 189. FCC also didn't acknowledge that the Court had interpreted § 254, and had done so in a way that departs significantly from FCC's interpretation when it initiated the Universal Service Fund programs. That change in legal landscape is "an important aspect" of the contribution factor that FCC must consider; its failure to do so was arbitrary.

## A. The Supreme Court's Interpretation of § 254 Departs Drastically from FCC's Prior View When It Established and Expanded the Programs

For decades, FCC has asserted—and operated under—the view that each § 254(b) consideration is "only a principle, not a statutory command," which the agency may "ignore" in service of other principles found in the statute. *See, e.g.*, *Rural Digit. Opportunity Fund Phase I Auction*, 35 FCC Rcd. 6077, ¶ 114 n.262. FCC has said the same to courts for decades, insisting the "principles identified in section 254(b) were not statutory requirements." Br. for FCC at 12, *U.S. W. Commc'ns, Inc. v. FCC*, Nos. 99-9546 et al. (10th Cir. May 26, 2000); Br. for FCC at *26–27, *TOPUC II*, No. 00-60434, 2000 WL 34430695 (Nov. 30, 2000) (same). In earlier proceedings involving Petitioners, FCC told this Court, sitting *en*

*banc*, that those principles are not "mandatory," and FCC need only "take the principles into account." FCC En Banc Br. at 28, *Consumers' Rsch.*, No. 22-60008 (5th Cir. Aug. 30, 2023). And FCC told the Supreme Court the same thing at the certiorari stage, insisting that the agency could "balance the [§ 254(b)] principles against one another when they conflict," meaning it could ignore any particular factor(s) so long as it did "not depart from them altogether." Cert. Pet. at 13, *Consumers' Rsch.*, No. 24-354 (U.S. Sept. 30, 2024). The courts of appeals long concurred, holding the § 254(b) principles were "aspirational only" and thus not mandatory. *TOPUC II*, 265 F.3d at 321; *see also, e.g.*, *Rural Cellular Ass'n*, 588 F.3d at 1103; *LAN Tamers*, 329 F.3d at 214.

FCC has long viewed the § 254(c)(1) factors the same way, contending that "all four … must be considered, but not each necessarily met." *Fed.-State Joint Bd. on Universal Serv.*, 12 FCC Rcd. at 8809. And, again, FCC told the Supreme Court the same thing at the certiorari stage, insisting that § 254(c) requires the Commission only "to *consider* certain factors." Cert. Pet. at 3, *Consumers' Rsch.*, No. 24-354, *supra* (emphasis added); *id.* at 13 (same); *id.* at 15 (same).

The Supreme Court, however, drastically departed from this view.

Far from being optional, the Court held that "*each* of the criteria" in §§ 254(b) and (c) is "separately mandatory" and "has to be met." 606 U.S. at 687–88 (emphasis added). In other words, for every Universal Service Fund program:

- "Quality services" must "be available at just, reasonable, and affordable rates"; *and*

- "Access to advanced telecommunications and information services" must "be provided in all regions of the Nation"; *and*

- "Consumers in all regions of the Nation" must "have access to telecommunications and information services … that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas"; *and*

- The "mechanisms to preserve and advance universal service" must "be specific, predictable and sufficient"; *and*

- The services must be "essential to education, public health, or public safety"; *and*

- The services must "have, through the operation of market choices by customers, been subscribed to by a substantial majority of

42

residential customers"; *and*

- The services must be "being deployed in public telecommunications networks by telecommunications carriers"; *and*

- The services must be "consistent with the public interest, convenience, and necessity,"

among other requirements. 47 U.S.C. § 254(b)(1)–(6), (c)(1).

The Supreme Court's directive that each criteria is "separately mandatory" is, therefore, the "opposite" of how "FCC has long and consistently understood the statute." *Consumers' Rsch.*, 606 U.S. at 729 (Gorsuch, J., dissenting).

## B. FCC Must Show That the Contribution Factor Satisfies the Supreme Court's Interpretation of § 254

This seismic shift "calls existing programs into question and promises profound implications for future ones as well." *Consumers' Rsch.*, 606 U.S. at 731 (Gorsuch, J., dissenting). Because FCC launched the funded programs before the Supreme Court decided *Consumers' Research*, it has never shown that they satisfy § 254 as now authoritatively construed.

For example, various FCC programs fund gigabit-speed broadband networks. *See, e.g.*, *In re Rural Digit. Opportunity Fund*, 35 FCC Rcd.

686, 688 (2020); *In re Connect America Fund ETC Annual Reports & Certifications*, 32 FCC Rcd. 1624, 1626–27 (2017). But FCC hasn't shown that "a substantial majority of residential customers" subscribe to this ultra-high speed service.[5] *See* 47 U.S.C. § 254(c)(1)(B). Indeed, FCC expressly rejected that it was limited to funding widely used services. *See Connect America Fund*, 32 FCC Rcd. at 1631. Nor did FCC show that gigabit-speed networks meet *all* of the other § 254(c) factors and § 254(b) principles, as the Supreme Court's interpretation requires. Other Universal Service Fund programs suffer from similar defects.[6]

Under the APA, FCC must explain its legal authority for setting the Fourth Quarter 2025 contribution factor. 5 U.S.C. § 553(b)(2). And in light of the Supreme Court's interpretation of § 254 in *Consumers'*

---

[5] It appears that nowhere near a majority subscribe to gigabit service. *See* Benton Inst. for Broadband & Soc., *More Than a Third of Americans Have Access to One or No Broadband Provider* (Jan. 4, 2025), https://www.benton.org/blog/more-third-americans-have-access-one-or-no-broadband-provider ("[a]pproximately 26 percent of households subscribe" to gigabit service "when it is available").

[6] *See, e.g.*, *Schools & Libraries Cybersecurity Pilot Program*, 39 FCC Rcd. at 6223–26 (designating Universal Service Fund monies to "expand[] funding for cybersecurity services and equipment [for schools and libraries] beyond basic firewalls," without showing that the funded "advanced" and "next-generation" firewalls meet all of the §§ 254(b) and (c)(1) criteria).

*Research*, 606 U.S. 656, the agency can't simply reference prior orders, which were based on a drastically different view of FCC's § 254 authority. FCC's failure "to provide even [a] minimal level of analysis" in this regard renders "its action … arbitrary and capricious," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), and is sufficient grounds for setting the factor aside, *Coinbase*, 126 F.4th at 189.

Moreover, agencies "have an obligation to deal with newly acquired evidence in some reasonable fashion," "to reexamine their approaches if a significant factual predicate changes," and "to acknowledge and account for a changed regulatory posture." *Portland Cement Ass'n*, 665 F.3d at 187 (quotation marks omitted). This applies to changes in statutory posture no less than to changes in regulatory landscape. *See Bechtel v. FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992) ("changes in … legal circumstances may impose upon [an] agency an obligation to reconsider a settled policy or explain its failure to do so"). FCC therefore was required to acknowledge the shift in law—that is, the Supreme Court's new interpretation of FCC's § 254 authority—and explain how the agency has changed its operation of the Universal Service Fund in response or why it need not change.

FCC cannot evade this obligation by "insist[ing] that nothing changed" following *Consumers' Research*. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 924 (D.C. Cir. 2017). The Supreme Court's construction of § 254 is obviously a change—and a significant one. The Court construed § 254 to mean the "opposite" of FCC's longstanding prior view. 606 U.S. at 729 (Gorsuch, J., dissenting). FCC "does not get to bury its head in the sand and ignore" changes in the law "it d[oes] not want to consider." *MCR Oil Tools, LLC v. DOT*, 110 F.4th 677, 698 (5th Cir. 2024) (quotation marks omitted).

FCC's silence in the face of the Supreme Court's drastic reinterpretation of § 254 is not reasoned decisionmaking, and so violates the APA.

## IV. FCC Lacks Statutory Authority to Create or Appoint USAC

FCC's reliance on USAC in setting the contribution factor, and implementing the Universal Service Fund generally, is also unlawful for a more fundamental reason: FCC lacks statutory authority to create USAC or appoint it as permanent administrator of the Fund. Because FCC set the Fourth Quarter 2025 contribution factor in reliance on actions by an unauthorized entity, the factor is unlawful. 5 U.S.C.

§ 706(2)(C).

## A. Congress Did Not Specifically Authorize FCC to Create USAC, as Required by the Government Corporation Control Act

The federal government has a long history of using the corporate form to achieve governmental objectives, dating to the first Bank of the United States, which was created within years of the Constitution's ratification. *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 386 (1995). But "[b]y the end of World War II, Government-created and -controlled corporations had gotten out of hand, in both their number and their lack of accountability," in part because agencies had taken to creating corporations without congressional approval. *Id.* at 389.

To "reestablish order," Congress passed the Government Corporation Control Act ("GCCA"). *Id.* Among other things, the GCCA "prohibited creation of new Government corporations without specific congressional authorization." *Id.* at 390. In relevant part, the GCCA provides that "[a]n agency may establish or acquire a corporation to act as an agency only by or under a law of the United States *specifically authorizing* the action." 31 U.S.C. § 9102 (emphasis added).

Creation of USAC to administer the Universal Service Fund

therefore requires "specific[] authoriz[ation]" from Congress. *Id.* But no statute provides such authorization. Section 254 certainly does not—it does not mention USAC nor authorize creation of *any* corporation. Nor does FCC's *general* authority to "perform any and all acts … necessary" to execute its functions, 47 U.S.C. § 154(i), provide "*specific[]*" direction to create USAC, as required by the GCCA, 31 U.S.C. § 9102 (emphasis added). Nor does it matter that FCC directed NECA to file the incorporation paperwork rather than doing it itself. The GCCA "prohibits an agency from creating or causing creation of a corporation to carry out government programs without explicit statutory authorization." GAO Letter B-278820, at 5–6 (Feb. 10, 1998), https://www.gao.gov/assets/b-278820.pdf. FCC cannot avoid this prohibition "by directing another organization to act as the incorporator." *Id.* at 5.

The violation is particularly clear here, where FCC previously asked "Congress for specific statutory authority to create or designate, one or more entities, such as the Universal Service Administrative Company, to administer the federal universal service support mechanisms. But, Congress refused the agency's request." *Wis. Bell, Inc. v. United States ex rel. Heath*, 604 U.S. 140, 165 (2025) (Thomas, J.,

concurring) (cleaned up) (quoting *Report in Response to Senate Bill 1768 and Conference Report on H.R. 3579*, 13 FCC Rcd. 11810, 11819 (1998)). "To this day, Congress has never passed a law approving [USAC] as a government corporation." *Id.* at 166.

Because the creation of USAC was not "specifically authoriz[ed]" by Congress, 31 U.S.C. § 9102, USAC's operations—and FCC's reliance on them—are *ultra vires*. 5 U.S.C. § 706(2)(C).

## B. Congress Did Not Otherwise Authorize USAC's Involvement as Administrator

Nor is USAC's involvement permissible were it considered a wholly "private" company. Although "*Congress* may formalize a limited role for private parties in executing its laws, … agencies may not." *Consumers' Rsch.*, 109 F.4th at 775 (cleaned up). This means that an agency may subdelegate its authority or obligations *only if* Congress has expressly provided that it may do so. As this Court has explained, this straightforward, sensible rule is supported by history and consistent with precedent. *See id.* at 774–76.

"At the Founding, the maxim that *delegata potestas non potest delegari*—no delegated powers can be further delegated—was widely accepted." *Id.* at 774. Although there were exceptions, "[t]he founding-era

rule against subdelegation of delegated agency authority is as clearly established as any proposition of law can be." *Id.*; *see also id.* at 774–75 (discussing founding era history). Courts of appeals, therefore, have since held that "while federal agency officials may subdelegate their decision-making authority to subordinates absent evidence of contrary congressional intent, they may not subdelegate to outside entities … absent affirmative evidence of authority to do so." *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 566 (D.C. Cir. 2004); *see also id.* at 565 ("case law strongly suggests that subdelegations to outside parties are assumed to be improper absent an affirmative showing of congressional authorization" (collecting cases)).

This presumption against implied authorization to delegate to outside entities safeguards a "vital constitutional principle": that "[l]iberty requires accountability." *DOT v. Ass'n of Am. RRs*, 575 U.S. 43, 57 (2015) (Alito, J., concurring). "[W]hen an agency delegates power to outside parties, lines of accountability may blur, undermining an important democratic check on government decision-making" and "aggravat[ing] the risk of policy drift inherent in any principal-agent relationship." *U.S. Telecom Ass'n*, 359 F. 3d at 565–66. The presumption

also ensures that agencies remain in their proper constitutional lane. After all, as the Supreme Court announced long ago in another case against FCC, "an agency *literally has no power to act* … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) (emphasis added).

No provision of § 254 provides for third-party administration of the Universal Service Fund. Rather, Congress expressly tasked *FCC* with establishing and implementing programs to advance universal service. *See, e.g.*, 47 U.S.C. § 254(c)(1), (d), (h)(1)(B) (directives to "the Commission"). Section 254 "conspicuously never even *mentions* USAC, let alone authorizes its involvement in the [Universal Service Fund]." *Consumers' Rsch.*, 88 F.4th at 933 (Newsom, J., concurring in judgment).

This wasn't an oversight. Consistent with the presumption against delegation to private parties, when Congress wanted non-federal entities to play a role in implementing universal service, it said so. For example, Congress directed FCC to "institute" a "Federal-State Joint Board" to provide recommendations on universal service. 47 U.S.C. § 254(a)(1). Congress also affirmed states' roles in advancing universal service. *Id.* § 254(f), (h)(1)(B), (i). And it grandfathered into the new Universal

Service Fund the minor role that USAC's parent, NECA, already had in administering the Lifeline program by regulation. *Id.* § 254(j); *see Consumers' Rsch.*, 109 F.4th at 776–77. Although Congress defined specific roles for these non-federal entities, it did not provide a role for an outside administrator of the new universal service programs created by § 254. Congress thus "knew how to empower private companies and chose not to empower them to administer [these] aspects of the [Universal Service Fund]." *Id.* at 777.

Nor does § 254 implicitly authorize FCC to establish an outside Fund administrator. Some courts of appeals have presumed that even without express statutory authorization, an agency may rely on an outside party to provide "input into agency decision-making processes" where the outside party merely (1) "establish[es] a reasonable condition for granting federal approval"; (2) "provide[s] the agency with factual information"; or (3) provides "advice." *U.S. Telecom Ass'n*, 359 F.3d at 566–67. But that presumption doesn't apply where, as in § 254, Congress expressly stated when it wanted FCC to rely on an outside entity to gather facts, 47 U.S.C. § 254(j) (maintaining NECA's role in the Lifeline program), or provide advice, *id.* § 254(a)(1) (directing institution of the

Federal-State Joint Board to provide recommendations). *See Bittner v. United States*, 598 U.S. 85, 94 (2023) ("When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning[.]").

In any event, USAC's involvement in the Universal Service Fund goes far beyond gathering facts or providing advice. USAC administers the fund *in toto*: "It manages the day-to-day operations of the Fund, billing and collecting contributions from carriers and distributing the resulting pot of money, as FCC rules provide, to program beneficiaries," as well as helping to "determin[e] the contribution factor." *Consumers' Rsch.*, 606 U.S. at 669 (cleaned up). And, critically, many of those decisions take effect unless expressly overturned by FCC. In those instances where courts have permitted roughly analogous delegations to outside entities, the delegation has been pursuant to statute, not at an agency's initiative. *See, e.g., Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 387–88, 397 (1940) (delegation to district boards pursuant to

the Bituminous Coal Conservation Act of 1937).[7]

* * *

In short, however one characterizes USAC or describes its role in administering the Universal Service Fund, there is no express statutory authority for it. Accordingly, USAC's actions are unlawful, and FCC's reliance on them exceeds its statutory authority. 5 U.S.C. § 706(2)(C).

## V. USAC VIOLATES THE APPOINTMENTS CLAUSE

Even if FCC had statutory authority to create and appoint USAC to administer the Universal Service Fund, USAC's involvement violates Article II because USAC's directors and CEO are not installed consistent with the Appointments Clause.

"The Appointments Clause in Article II of the Constitution specifies how 'Officers of the United States[]' … must be appointed." *Kennedy v. Braidwood Mgmt.*, 606 U.S. 748, 759 (2025) (quoting U.S.

---

[7] *See also, e.g.*, *Oklahoma v. United States*, 2025 WL 3653642, at *2–3, *6–7 (6th Cir. Dec. 17, 2025) (Horseracing Integrity and Safety Act); *Alpine Secs. Corp. v. FINRA*, 121 F.4th 1314, 1318, 1320–21, 1325–28 (D.C. Cir. 2024) (Maloney Act); *Pittson Co. v. United States*, 368 F.3d 385, 393–98 (4th Cir. 2004) (Coal Industry Retiree Health Benefits Act); *Todd & Co., Inc. v. SEC*, 557 F.2d 1008, 1012–13 (3d Cir. 1977) (Maloney Act); *see also cf. Currin v. Wallace*, 306 U.S. 1, 6, 15 (1939) (Tobacco Inspection Act); *United States v. Frame*, 885 F.2d 1119, 1122–23, 1129 (3d Cir. 1989) (Beef Promotion and Research Act).

Const. art. II, § 2, cl. 2). Principal officers must be appointed by the President with the advice and consent of the Senate; inferior officers may alternatively be appointed by "the President alone, … the Courts of Law, or … the Heads of Departments," but only if "Congress" provides for such appointment "by Law." U.S. Const. art. II, § 2, cl. 2.

"The Appointments Clause is more than a matter of etiquette or protocol—it is among the significant structural safeguards of the constitutional scheme" and ensures that the President retains ultimate control over all individuals exercising federal executive power. *Braidwood Mgmt.*, 606 U.S. at 760 (cleaned up). In implementing the Universal Service Fund, USAC's directors and CEO exercise executive authority on behalf of FCC and so are subject to the Appointments Clause. But USAC's directors and CEO are not appointed by any method provided in the Clause, and so cannot lawfully exercise federal executive power under Article II. USAC's actions, including those related to setting the quarterly contribution factor, are therefore unlawful and void. *See Collins v. Yellen*, 594 U.S. 220, 258 (2021) (actions stemming from "exercise of power that the actor did not lawfully possess" are "void"); *Lucia v. SEC*, 585 U.S. 237, 251 (2018).

**A.    USAC's Directors and CEO are "Officers of the United States"**

In light of the power USAC exercises on behalf of FCC, USAC's directors and CEO are "Officers of the United States" subject to the Appointments Clause. This is true whether USAC is considered "private" or "government," although USAC is properly a "government" entity for constitutional purposes.

**1. USAC's Directors and CEO Exercise Significant, Continuing Federal Power**

An individual is an "officer" for purposes of the Appointments Clause if he (1) "hold[s] a continuing office established by law" and (2) exercises "significant authority" in that office. *Lucia*, 585 U.S. at 245, 247. USAC's directors and CEO satisfy both requirements.

*First*, USAC's directors and CEO serve in continuing positions established by "law." Although no statute provides for their roles, the offices of USAC director and CEO are established and defined by regulation.[8] The CEO serves indefinitely and is a member of the board as

---

[8] Substantive regulations "issued by an agency pursuant to statutory authority [that] implement the statute … have the force and effect of law." *Batterton v. Francis*, 432 U.S. 416, 425 n.9 (1977). To the extent that FCC's regulations governing USAC were not issued

(*footnote continued on next page*)

long as she remains CEO. 47 C.F.R. §§ 54.703(b)(14), 54.704. The other USAC directors serve three-year terms and may be reappointed for subsequent terms. *Id.* § 54.703(d). They therefore serve permanently, not "temporarily or episodically." *Lucia*, 585 U.S. at 248. And their "appointment is to a position created by [regulations]," which further specify their "duties" and "means of appointment." *Id.* (quotation marks omitted); *see* 47 C.F.R. §§ 54.703(c) (board selection process); 54.704 (CEO duties and selection process); 54.705 (board committee duties).

*Second*, USAC's directors and CEO exercise "significant discretion when carrying out … important functions." *Lucia*, 585 U.S. at 248 (quotation marks omitted). The CEO has "management responsibility for the administration of the federal universal service support mechanisms" and "for all [USAC] employees." 47 C.F.R. § 54.704(a). The directors serve on committees that direct the USAC divisions in administering the universal service mechanisms. *Id.* § 54.701(c). As a result, together the directors and CEO control implementation of the Universal Service Fund, including collecting and disbursing nearly $9 billion annually on

"pursuant to statutory authority," *see supra* Part IV, USAC is unlawful for that reason.

behalf of FCC. *Id.* § 54.702. Under their supervision, USAC decides who can receive funding and how much. *Id.* § 54.702(b). Based on these decisions, USAC projects demand for Universal Service Fund monies for future quarters and determines a tax rate (the contribution factor) that is "deemed approved" unless FCC takes action (which it rarely does). *Id.* § 54.709(a).

That USAC's decisions are guided by FCC regulations and reviewable by FCC on appeal, *id.* §§ 54.719–725, makes no difference. The Supreme Court held that special trial judges working for the Tax Court are "officers," even though their decisions are guided by law and their opinions are reviewable by a "regular Tax Court judge." *Lucia*, 585 U.S. at 249 (discussing *Freytag v. CIR*, 501 U.S. 868 (1991)); *see also id.* (the special judge's "opinion counts for nothing unless the regular judge adopts it as his own"). USAC's directors and CEO are no different.

## 2. It Doesn't Matter Whether USAC Is "Private" or "Government"

Whether an individual "exercis[es] significant authority pursuant to the laws of the United States" and so "is an 'Officer of the United States,'" *Buckley v. Valeo*, 424 U.S. 1, 126 (1976), does not turn on the official status of the individual's employer. Accordingly, for purposes of

the Appointments Clause, it does not matter whether USAC is a "private" or "government" entity.

Although most often those wielding power on behalf of the United States are federal employees, even individuals employed by private entities can exercise significant federal authority, which is why the Supreme Court doesn't end its Appointments Clause analysis after concluding that an individual isn't a federal employee. *See, e.g.*, *Auffmordt v. Hedden*, 137 U.S. 310, 326–28 (1890) (merchant appointed as appraiser, but not employed by the federal customs department, was not an officer because he had no general, continuing federal duties).

The Office of Legal Counsel ("OLC") has similarly rejected the assertion that "a private actor cannot be an officer." *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 121 (2007). Surveying the case law, OLC concluded that even early Supreme Court precedent "allows for an office that does not involve government employment in the modern sense." *Id.* "[W]hat matters is the nature of a position—its authority and continuance—not its label, and thus not whether Congress placed it within the federal service." *Id.* For example, OLC observed that "Congress may not … resort to the corporate

form as an artifice to evade the solemn obligations of the doctrine of separation of powers." *Id.* at 75 (quotation marks omitted).

The Appointments Clause therefore applies to USAC's directors and CEO regardless whether it is considered private or government. *Id.*

### 3. Nonetheless, USAC is a "Government" Entity for Purposes of the Appointments Clause

Nonetheless, USAC is properly considered a "government" entity for constitutional purposes, so there is no question its directors and CEO are subject to the Appointments Clause.[9]

It is well-established that private companies can "sometimes be regarded as" government entities "for constitutional purposes." *Lebron*, 513 U.S. at 378. In those circumstances, the Constitution binds the company just as it binds a federal entity. *Id.* at 392–93 ("The Constitution constrains governmental action 'by whatever instruments or in whatever

---

[9] In a prior challenge, "all parties proceeded on the assumption that [USAC] is private for constitutional purposes," and "[n]o one suggested that [USAC] might qualify as a government entity or that its directors were subject to the Appointments Clause." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black* ("*Horsemen's II*"), 107 F.4th 415, 437 (5th Cir. 2024), *vacated on other grounds*, 145 S. Ct. 2837 (2025); *see Consumers' Rsch.*, 109 F.4th at 748 (assuming USAC is private). Accordingly, whether USAC is "private" or "government" for constitutional purposes is not "settle[d]." *Horsemen's II*, 107 F.4th at 437.

modes that action may be taken.'").

"The analysis guiding th[e] inquiry" whether a private company "qualifies as part of the federal government for constitutional purposes … comes from *Lebron*." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black* ("*Horsemen's II*"), 107 F.4th 415, 437–38 (5th Cir. 2025), *vacated on other grounds*, 145 S. Ct. 2837 (2025). This Court has identified three factors from *Lebron* that weigh in favor of considering a private company as "government": the company was (1) "created by the federal government by special law" (2) "to further governmental objectives," and (3) the federal government "control[s] the operation" of the company and "retain[ed] for itself permanent authority to appoint a majority of the [company's] directors." *Id.* at 438 (quotation marks omitted). USAC satisfies all three.

*First*, USAC was "created by the federal government." *Id.* "On July 18, 1997, [FCC] … directed NECA to create an independently functioning not-for-profit subsidiary to be designated the Universal Service Administrative Company (USAC)." GAO Letter B-278820, *supra*, at 3 (citing *In re Changes to the Bd. of Directors of the Nat'l Exch. Carrier Ass'n, Inc. and Fed.-State Joint Bd. on Universal Serv.*, 12 FCC Rcd.

18400 (1997)). Two months later, FCC approved USAC's proposed articles of incorporation and bylaws and "direct[ed] NECA to file the relevant incorporation documents." *Commission Approves Incorporation Documents for Universal Service Administrative Company, Schools and Libraries Corporation, and Rural Health Care Corporation*, 12 FCC Rcd. 14094, 14094 (1997).

Moreover, USAC's corporate structure and operation is established and governed by federal regulation. FCC regulations set the size and composition of USAC's board, 47 C.F.R. §§ 54.701(b), 54.703(b); establish the process for director selection, *id.* § 54.703(c); set the directors' terms, *id.* § 54.703(d); organize the board into committees, *id.* §§ 54.701(b), 54.705; provide for public meetings, *id.* § 54.703(e); and establish the role of CEO and define her duties, *id.* §§ 54.701(d), 54.704. USAC's bylaws similarly incorporate these provisions of the federal code. *See* USAC, *Amended and Restated By-laws of Universal Service Administrative Company* (rev. Jan. 26, 2024), https://www.usac.org/wp-content/uploads/about/documents/leadership/usacbylaws.pdf. USAC is a creature of the federal government.

*Second*, USAC was "created to further 'governmental objectives.'"

*Horsemen's II*, 107 F.4th at 438. In 1997, FCC directed the creation of USAC to "administer the universal service support program for high-cost areas and low-income consumers." GAO Letter B-278820, *supra*, at 3. Ultimately, FCC made USAC "responsible for administering" all of the universal service mechanisms. 47 C.F.R. § 54.702(a). Indeed, USAC serves no purpose beyond this purely governmental objective: its "sole purpose" is to administer the Universal Service Fund "as an agent and instrumentality of the FCC." *Memorandum of Understanding Between FCC and the USAC* 2 (Oct. 17, 2024), https://www.fcc.gov/sites/default/files/usac-mou.pdf.

*Third*, the Supreme Court has concluded that FCC effectively "control[s] the operation of" USAC. *Horsemen's II*, 107 F.4th at 438. The Court explained that USAC "is broadly subordinate to" FCC. *Consumers' Rsch.*, 606 U.S. at 692. FCC "approves [USAC's] budget," and USAC "must carry out all its tasks consistent with the FCC's rules, orders, written directives, and other instructions." *Id.* at 693 (quotation marks omitted); *see also* 47 C.F.R. §§ 54.702(c), 54.715(c). And by regulation, FCC's Chairman has "permanent authority to appoint" not just "a majority," but *all* of USAC's directors, subject to nominations by

stakeholder groups. *Horsemen's II*, 107 F.4th at 438; *see* 47 C.F.R. § 54.703(c)(3).

Because USAC was created at the behest of FCC to further purely governmental objectives and FCC retains control of the company, USAC is a government entity for purposes of Article II. *See Lebron*, 513 U.S. at 394–99; *Horsemen's II*, 107 F.4th at 437–38.

## B. The Appointment of USAC's Directors and CEO Violates the Appointments Clause

Whether USAC's directors and CEO are principal or inferior officers, their appointment violates the Appointments Clause.

By regulation, each USAC director, except the CEO, is nominated by an "industry or non-industry group" with an interest in the Universal Service Fund. 47 C.F.R. § 54.703(c)(1). The FCC Chairman "review[s]" the nomination and "select[s]" a director. *Id.* § 54.703(c)(3). If the represented group cannot agree on a nominee or does not submit a nomination, the Chairman selects an individual to represent that group as director. *Id.* The CEO is appointed by a similar process. The directors nominate an individual, subject to the FCC Chairman's review and approval. *Id.* § 54.704(b)(1)–(2). If the directors cannot agree or do not submit a nomination, the Chairman selects the CEO on his own. *Id.*

64

§ 54.704(b)(3).

But neither the CEO nor any director is appointed by the President and confirmed by the Senate, as required for a principal officer. Nor has "Congress … by Law" provided for another appointment method, as permissible for an inferior officer. U.S. Const. art. II, § 2, cl. 2. And even if a method laid out by an agency in *regulation* were sufficient for purposes of the Appointments Clause (it is not), the method here does not satisfy the Clause because the FCC Chairman is not a "Head[] of Department[]"; that designation belongs to FCC, as a whole, not the Chairman, alone. *Id.*; *cf. Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 511–13 (2010).

\* \* \*

Because the appointment of USAC's directors and CEO violates the Appointments Clause, USAC cannot lawfully exercise executive power on behalf of FCC. FCC's contribution factor, issued in reliance on USAC's unlawful actions, therefore must be vacated.

## VI.   FCC'S FAILURE TO RESPOND TO COMMENTS VIOLATES THE APA

Finally, FCC violated the APA's procedural requirements by failing to respond to Petitioners' comments. *See* 5 U.S.C. §§ 553, 706(2)(D).

Under the APA, FCC must provide opportunity to comment on proposed rules, *id.* § 553(c), and "must consider and respond to significant comments received," *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). "Comments are 'significant,' and thus require response … if they raise points 'which, if true … and which, if adopted, would require a change in an agency's proposed rule.'" *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023). This includes "comments that … challenge a fundamental premise underlying the proposed agency decision." *Tex. Corn Producers v. EPA*, 141 F.4th 687, 704 (5th Cir. 2025) (quotation marks omitted).

FCC's Fourth Quarter 2025 contribution factor prescribes future contribution rates to implement universal service as described in § 254 and so is a "rule" subject to the APA's notice-and-comment requirements. 5 U.S.C. § 551(4). "Once it has received USAC's projections, the FCC issues a Public Notice publishing the proposed contribution factor and solicits public comment," and "[t]he public had until [the fourteenth day after issuance of the proposed contribution factor] to submit comment and objections." *Consumers' Rsch.*, 67 F.4th at 783, 796.

Petitioners raised each of the arguments above in comments filed

after FCC issued public notice of the proposed Fourth Quarter 2025 contribution factor.[10] *See Petitioners' September Comment*, JA__–__. As explained above, the issues raised are undoubtedly "significant" and would "require a change" in the agency's determination of the contribution factor. *Mexican Gulf Fishing*, 60 F.4th at 971. "The APA thus required the Agency to respond to those comments—either by defending its prior [approach] or by changing" the contribution factor or its process for determining the factor. *Tex. Corn Producers*, 141 F.4th at 710. FCC's failure to do so is a clear violation of the APA that requires setting the Fourth Quarter 2025 contribution factor aside. *Id.* at 710–11 (vacatur is the "default" remedy under the APA).

## CONCLUSION

For the foregoing reasons, this Court should grant the petition, vacate the Fourth Quarter 2025 contribution factor, and remand to FCC for further proceedings.

---

[10] Petitioners raised the same arguments in comments filed after USAC published its demand projections. *See Petitioners' August Comment*, JA__–__.

January 12, 2026

Respectfully submitted,

*/s/ Laura B. Ruppalt*

Michael Buschbacher
Jared M. Kelson
James R. Conde
Laura B. Ruppalt
  *Counsel of Record*
BOYDEN GRAY PLLC
800 Connecticut Ave. NW, Suite 900
Washington, DC 20006
202-955-0620
lruppalt@boydengray.com
*Counsel for Petitioners*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fifth Circuit Rule 32 and Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,909 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) and Fifth Circuit Rule 32.1 because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14-point font.

Dated: January 12, 2026       */s/ Laura B. Ruppalt*
                                          Laura B. Ruppalt
                                          BOYDEN GRAY PLLC
                                          800 Connecticut Ave. NW, Suite 900
                                          Washington, DC 20006
                                          (202) 955-0620

# CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2026, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

Dated: January 12, 2026

*/s/ Laura B. Ruppalt*
Laura B. Ruppalt
BOYDEN GRAY PLLC
800 Connecticut Ave. NW, Suite 900
Washington, DC 20006
(202) 955-0620