IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 25-60535

CONSUMERS' RESEARCH, ET AL.,

PETITIONERS,

v.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

RESPONDENTS.

ON PETITION FOR REVIEW OF AN ORDER OF THE
FEDERAL COMMUNICATIONS COMMISSION

BRETT A. SHUMATE
ASSISTANT ATTORNEY GENERAL

MICHAEL S. RAAB
CAROLINE W. TAN
ATTORNEYS

UNITED STATES
    DEPARTMENT OF JUSTICE
WASHINGTON, D.C. 20530

D. ADAM CANDEUB
GENERAL COUNSEL

JACOB M. LEWIS
ASSOCIATE GENERAL COUNSEL

JAMES M. CARR
COUNSEL

FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

## CERTIFICATE OF INTERESTED PERSONS
## REQUIRED BY 5TH CIR. R. 28.2.1

No. 25-60535, *Consumers' Research, et al. v. Federal Communications Commission and United States of America*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**<u>Petitioners</u>:**

Consumers' Research
Cause Based Commerce, Inc.
Edward J. Blum
Kersten Conway
Suzanne Bettac
Robert Kull
Kwang Ja Kirby
Tom Kirby
Joseph Bayly
Jeremy Roth
Deanna Roth
Lynn Gibbs
Paul Gibbs
Rhonda Thomas
James Romeo
Cody Carnett
Phillip Aronoff
Jacqueline Klein

**Petitioners' Counsel:**

Michael Buschbacher
Jared M. Kelson
James R. Conde
Laura B. Ruppalt
Boyden Gray PLLC
800 Connecticut Ave., N.W., #900
Washington, DC  20006

**Respondents:**

Federal Communications Commission
United States of America

**Respondents' Counsel:**

D. Adam Candeub
Jacob M. Lewis
James M. Carr
Federal Communications Commission
Washington, DC  20554

Brett A. Shumate
Michael S. Raab
Caroline W. Tan
United States Department of Justice
Washington, DC  20530

**Intervenors:**

Benton Institute for Broadband & Society
National Digital Inclusion Alliance
Center for Media Justice (d/b/a MediaJustice)
Schools, Health & Libraries Broadband Coalition
NTCA—The Rural Broadband Association

**Intervenors' Counsel:**

Andrew Jay Schwartzman
525 Ninth Street, NW, Seventh Floor
Washington, DC 20004
*Counsel for Benton Institute for Broadband & Society, National Digital Inclusion Alliance, and Center for Media Justice (d/b/a MediaJustice)*

Jason Neal
Sean A. Lev
HWG LLP
1919 M Street, NW, Eighth Floor
Washington, DC 20036
*Counsel for Schools, Health & Libraries Broadband Coalition*

Jennifer Tatel
Daniel H. Kahn
Tyler D. Dillon
Wilkinson Barker Knauer, LLP
1800 M Street, NW, Suite 800N
Washington, DC 20036
*Counsel for NTCA—The Rural Broadband Association*

March 13, 2026

/s/James M. Carr
James M. Carr
Counsel of Record
Federal Communications Commission
Washington, DC 20554

## STATEMENT REGARDING ORAL ARGUMENT

Respondents believe that the Court could find oral argument helpful in examining the claims raised by petitioners.

# TABLE OF CONTENTS

Table of Authorities...........................................................................iii

Jurisdiction ....................................................................................1

Questions Presented .........................................................................2

Statutes and Regulations ..................................................................2

Introduction ...................................................................................2

Counterstatement.............................................................................4

    A.   The Universal Service Mandate And Section 254 Of The
         Communications Act ...............................................................4

    B.   The FCC's Implementation Of Section 254..........................9

    C.   The FCC's Universal Service Contribution Rules.............13

    D.   The Previous Litigation.......................................................15

    E.   The Fourth Quarter 2025 Contribution Factor ..................17

Summary of Argument....................................................................19

Standard of Review ........................................................................23

Argument.......................................................................................24

I.    Sections 254(c)(3) And (h)(2) Do Not Unlawfully Delegate
     Legislative Power To The FCC ..........................................24

    A.   Congress Does Not Delegate Legislative Power When It
         Provides An "Intelligible Principle" To Guide
         Administrative Implementation Of Its Enactments. ..........26

    B.   The Guidance Provided By Congress Satisfies The
         Intelligible-Principle Test By Limiting The FCC's
         Discretion To Implement Sections 254(c)(3) and (h)(2). ...................28

II. Petitioners' Claim That The FCC Failed To Show It
Complied With Section 254 Is Not Properly Before This
Court And Is Baseless In Any Event ........................................................37

III. Petitioners' Challenges To The Appointment Of USAC And
Its CEO And Directors Provide No Basis For Vacating The
Contribution Factor ...................................................................................43

    A.   The FCC Had Authority To Appoint USAC To
Administer The Universal Service Fund.............................................43

    B.   The Appointment Of USAC's CEO And Directors Did
Not Violate The Appointments Clause. ..............................................51

    C.   It Was In Any Event Lawful For The FCC To Consider
USAC's Projections When Setting The Contribution
Factor. ..................................................................................................55

IV. The Commission Was Not Required To Respond To
Petitioners' Comments ..............................................................................57

Conclusion ......................................................................................................61

# TABLE OF AUTHORITIES

**CASES**

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)..............................27

*Action for Children's Television v. FCC*, 821 F.2d 741 (D.C. Cir. 1987).................................59

*Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608 (5th Cir. 2000)....................................... 33, 35

*Allnet Commc'n Serv., Inc. v. Nat'l Exchange Carrier Ass'n*, 965 F.2d 1118 (D.C. Cir. 1992) .........................11

*Am. Family Ass'n v. FCC*, 365 F.3d 1156 (D.C. Cir. 2004)........................................39

*Am. Power & Light Co. v. SEC*, 329 U.S. 90 (1946) .............................. 27, 37

*AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366 (1999) .........................................................6

*AT&T, Inc. v. FCC*, 886 F.3d 1236 (D.C. Cir. 2018) ....................................35

*Carney v. Adams*, 592 U.S. 53 (2020).............................38

*Children's Health Def. v. FCC*, 25 F.4th 1045 (D.C. Cir. 2022)............................................39

*City of Portland v. EPA*, 507 F.3d 706 (D.C. Cir. 2007)....................................... 23, 58, 60

*Coastal Conservation Ass'n v. U.S. Dep't of Commerce*, 846 F.3d 99 (5th Cir. 2017) ....................24

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986) .........................................50

*Consumers' Rsch. v. FCC*, 109 F.4th 743 (5th Cir. 2024) (en banc).......................................15

*Consumers' Rsch. v. FCC*, 63 F.4th 441 (5th Cir. 2023).............................................15

*FCC v. Consumers' Rsch.*, 606 U.S. 656 (2025) ................................... *passim*

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ...........................................24

*FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542 (2025) ........................................................................ 60

*Freytag v. Comm'r*, 501 U.S. 868 (1991) ........................................ 52, 53, 54

*Gundy v. United States*, 588 U.S. 128 (2019) (plurality) ............................................................................... 27

*Hikvision USA, Inc. v. FCC*, 97 F.4th 938 (D.C. Cir. 2024) ..................................................................................... 50

*Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421 (5th Cir. 2021) ............................................................... 23, 24, 58, 60

*In re FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014) ................................. 35, 41

*Int'l Dark-Sky Ass'n v. FCC*, 106 F.4th 1206 (D.C. Cir. 2024) ............................................................................. 22, 56

*J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394 (1928) ............................................................................... 27

*Jackson v. City of Houston*, 143 F.4th 640 (5th Cir. 2025) ..................................................................................... 38

*Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748 (2025) ........................................................... 37, 51, 52, 57

*Kovac v. Wray*, 109 F.4th 331 (5th Cir. 2024) .................................... 50

*Lance v. Coffman*, 549 U.S. 437 (2007) ................................................. 38

*Loving v. United States*, 517 U.S. 748 (1996) ..................................... 26

*Lucia v. SEC*, 585 U.S. 237 (2018) ........................... 51, 52, 53, 54

*Lutostanski v. Brown*, 88 F.4th 582 (5th Cir. 2023) ........................... 38

*Mass. Trustees of Eastern Gas & Fuel Assocs. v. United States*, 377 U.S. 235 (1964) ................................... 60

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994) ....................................................................... 59

*Mistretta v. United States*, 488 U.S. 361 (1989) ........................... 28

*Mobility Workx, LLC v. Unified Pats., LLC*, 15 F.4th 1146 (Fed. Cir. 2021) ............................................................. 58

*N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12 (1932) ............................................................................... 28

iv

*Nat'l Broadcasting Co. v. United States*, 319 U.S. 190 (1943) ................................................................28

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ..........................10

*Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498 (D.C. Cir. 2020) ................................................................12

*Nat'l Religious Broadcasters v. FCC*, 138 F.4th 282 (5th Cir. 2025) ....................................................50

*Nueva Esperanza, Inc. v. FCC*, 863 F.3d 854 (D.C. Cir. 2017) ............................................. 39, 59

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) ....................................27

*Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633 (1990) ................................................................48

*Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92 (2015) ................................................................58

*Prostar v. Massachi*, 239 F.3d 669 (5th Cir. 2001) ....................................48

*Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969) ................................................................50

*Rural Cellular Ass'n v. FCC*, 588 F.3d 1095 (D.C. Cir. 2009)................................................................35

*Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974) ................................................38

*Smith v. City of Jackson*, 351 F.3d 183 (5th Cir. 2003)................................................................48

*Swayne & Hoyt v. United States*, 300 U.S. 297 (1937) ................................................................50

*Tex. Off. of Pub. Util. Counsel v. FCC*, 183 F.3d 393 (5th Cir. 1999) ...................................... *passim*

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) ................................................................58

*Touby v. United States*, 500 U.S. 160 (1991)................................................24

*United States Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004)................................................................56

*United States v. Allen-Shinn*, 150 F.4th 687 (5th Cir. 2025)................................................................24

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982) ................................38

*Verizon Tel. Cos. v. FCC*, 453 F.3d 487 (D.C. Cir. 2006)................................................................39

*Wayman v. Southard*, 23 U.S. (10 Wheat.) 1 (1825) ....................26

*White Glove Staffing, Inc. v. Methodist Hosps. of Dallas*, 947 F.3d 301 (5th Cir. 2020) ........................42

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ................................................................ 27, 28

*Worldcall Interconnect, Inc. v. FCC*, 907 F.3d 810 (5th Cir. 2018) ........................................ 39, 42, 60

*Yakus v. United States*, 321 U.S. 414 (1944) ................................28

**CONSTITUTION**

U.S. CONST. art. I, § 1 ................................................................24

U.S. CONST. art. II, § 2 ................................................................51

**STATUTES**

5 U.S.C. § 553 ................................................................ 23, 57

5 U.S.C. § 706(2)(A) ................................................................24

28 U.S.C. § 2342(1) ................................................................1

31 U.S.C. § 9102 ................................................................ 44, 55

47 U.S.C. § 151 ................................................................5

47 U.S.C. § 153(24) ................................................................10

47 U.S.C. § 153(53) ................................................................10

47 U.S.C. § 254 ................................................................6

47 U.S.C. § 254(a)(1)-(2) ................................................................9

47 U.S.C. § 254(b)(1)................................................................32

47 U.S.C. § 254(b)(1)-(6)................................................................7

47 U.S.C. § 254(b)(2) ...................................................................30

47 U.S.C. § 254(b)(5) ............................................................... 3, 33

47 U.S.C. § 254(b)(7) .....................................................................7

47 U.S.C. § 254(c)(1) .....................................................................8

47 U.S.C. § 254(c)(1)(A) ...............................................................41

47 U.S.C. § 254(c)(1)(A)-(D) ..........................................................8

47 U.S.C. § 254(c)(1)(B) ...............................................................41

47 U.S.C. § 254(c)(1)(C) ...............................................................41

47 U.S.C. § 254(c)(1)(D) ...............................................................41

47 U.S.C. § 254(c)(3) ........................................................... *passim*

47 U.S.C. § 254(d) .................................................................. 3, 7, 13

47 U.S.C. § 254(e) .......................................................................33

47 U.S.C. § 254(h)(1)(A) ................................................... 20, 30, 32

47 U.S.C. § 254(h)(1)(A)-(B) .................................................. 8, 20

47 U.S.C. § 254(h)(1)(B) ................................................... 20, 30, 31

47 U.S.C. § 254(h)(2) ............................................................ 2, 25

47 U.S.C. § 254(h)(2)(A) ...................................................... *passim*

47 U.S.C. § 254(j) ................................................................. 46, 47

47 U.S.C. § 402(a) ..........................................................................1

47 U.S.C. § 405(a) ............................................................ 21, 39, 42

47 U.S.C. § 410 ...............................................................................9

47 U.S.C. § 1752(i)(5) ..................................................................49

American Rescue Plan Act of 2021, Pub. L. No.
   117-2, 135 Stat. 4 ....................................................................49

## REGULATIONS

47 C.F.R. § 54.101(a) ...................................................................10

47 C.F.R. §§ 54.302-54.322 ..........................................................9

47 C.F.R. §§ 54.400-54.424 ..........................................................9

47 C.F.R. §§ 54.500-54.523 ..........................................................9

47 C.F.R. § 54.502(a)(1)-(2) ...........................................10

47 C.F.R. § 54.507 .........................................................35

47 C.F.R. §§ 54.600-54.633 .............................................9

47 C.F.R. § 54.619 .........................................................35

47 C.F.R. § 54.702(b) .....................................................12

47 C.F.R. § 54.702(c) .....................................................52

47 C.F.R. § 54.703(b) .....................................................12

47 C.F.R. § 54.703(c) .....................................................12

47 C.F.R. § 54.703(c)(1)-(3) ...........................................51

47 C.F.R. § 54.704(b)(1)-(3) ..................................... 12, 51

47 C.F.R. § 54.706(a) .....................................................13

47 C.F.R. § 54.709 .........................................................57

47 C.F.R. § 54.709(a)(2) .................................................13

47 C.F.R. § 54.709(a)(3) ..................................... 1, 14, 15, 19

47 C.F.R. §§ 54.719-54.725 ...................................... 13, 52

47 C.F.R. § 69.117 (1995).................................................46

## ADMINISTRATIVE MATERIALS

*Addressing the Homework Gap through the E-Rate Program*, FCC 25-62, WC Docket No. 21-31 (rel. Sept. 30, 2025) ...................................36

*Affordable Connectivity Program*, 37 FCC Rcd 484 (2022) ...................................................................49

*Changes to the Board of Directors of the National Exchange Carrier Association, Inc.*, 12 FCC Rcd 18400 (1997) ...................................... 11, 44

*Changes to the Board of Directors of the National Exchange Carrier Association, Inc.*, 13 FCC Rcd 25058 (1998) ....................................... *passim*

*Connect America Fund*, 33 FCC Rcd 1380 (2018)................................ 40, 41

*Establishing Emergency Connectivity Fund to Close the Homework Gap*, 36 FCC Rcd 8696 (2021).........................49

*Federal-State Joint Board on Universal Service*, 12
FCC Rcd 8776 (1997), *aff'd in part and rev'd in
part*, *TOPUC*, 183 F.3d 393 .......................................................... 10, 11, 47

Memorandum of Understanding Between the
Federal Communications Commission and the
Universal Service Administrative Company (Oct.
17, 2024)................................................................................... 12, 13, 52, 54

*Modernizing the E-Rate Program for Schools and
Libraries*, 29 FCC Rcd 8870 (2014) ...........................................34

*Modernizing the E-Rate Program for Schools and
Libraries*, FCC 25-63, WC Docket No. 13-184
(rel. Sept. 30, 2025) ..................................................................35

*Report in Response to Senate Bill 1768 and
Conference Report on H.R. 3579*, 13 FCC Rcd
11810 (1998) ................................................................. 45, 47, 48

*Report on the Future of the Universal Service Fund*,
37 FCC Rcd 10041 (2022) .................................................. 23, 58

*Rural Digital Opportunity Fund*, 35 FCC Rcd 686
(2020) ....................................................................................... 40, 41

*Rural Health Care Support Mechanism*, 21 FCC
Rcd 11111 (2006)......................................................................34

*Rural Health Care Support Mechanism*, 27 FCC
Rcd 16678 (2012)......................................................................32

*Schools and Libraries Cybersecurity Pilot
Program*, 39 FCC Rcd 6158 (2024)..........................................43

## LEGISLATIVE MATERIALS

H.R. Rep. No. 103-560 (1994) ................................................... 11, 46

## TREATISE

P. HUBER, M. KELLOGG, & J. THORNE, FEDERAL
TELECOMMUNICATIONS LAW (3d ed. Supp. 2022) .........................5

**OTHER MATERIALS**

En Banc Brief for Petitioners, *Consumers' Research v. FCC*, 5th Cir. No. 22-60008 (filed July 31, 2023)......................................................................................25

FCC, Affordable Connectivity Program Consumer FAQ ..............................................................................49

FCC, Emergency Connectivity Fund FAQs....................................49

Reply Brief for Petitioners, *Consumers' Research v. FCC*, 5th Cir. No. 22-60008 (filed July 15, 2022)......................................25

U.S. General Accounting Office, Letter B-278820 (Feb. 10, 1998) ........................................................ 44, 45, 46

U.S. Government Accountability Office, Administration of Universal Service Programs Is Consistent with Selected FCC Requirements, GAO-24-106957 (July 2024) .....................................................45

Consumers' Research, et al.,

Petitioners,

v.

Federal Communications Commission
and United States of America,

Respondents.

_____

On Petition for Review of an Order of the
Federal Communications Commission

_____

Brief for Respondents

_____

## JURISDICTION

The universal service contribution factor for the fourth quarter of 2025
was deemed approved by the Federal Communications Commission on
September 29, 2025.  Public Notice, Proposed Fourth Quarter 2025 Universal
Service Contribution Factor, DA 25-840 (OMD Sept. 15, 2025) (JA___-___)
(Public Notice); 47 C.F.R. § 54.709(a)(3).  Petitioners filed a petition for
review on October 1, 2025, invoking this Court's jurisdiction under 47 U.S.C
§ 402(a) and 28 U.S.C. § 2342(1).

## QUESTIONS PRESENTED

(1)  Whether 47 U.S.C. §§ 254(c)(3) and (h)(2) unconstitutionally delegate legislative power to the FCC.

(2)  Whether, in claiming that the FCC failed to show that its fourth quarter 2025 contribution factor satisfies section 254, petitioners have substantiated their assertion that the contribution factor fails to comply with section 254.

(3)  Whether the contribution factor should be vacated because the FCC lacked authority to designate the Universal Service Administrative Company (USAC) to administer the Universal Service Fund.

(4)  Whether the method by which USAC's chief executive officer and board of directors were appointed violated the Constitution's Appointments Clause.

(5)  Whether the FCC violated the Administrative Procedure Act by failing to address petitioners' comments concerning the contribution factor.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in an addendum bound with this brief.

## INTRODUCTION

Section 254 of the Communications Act directs the FCC to adopt policies and rules "to preserve and advance universal service," 47 U.S.C.

§ 254(b)(5), by "making communications services available, at affordable prices, to all Americans." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 663 (2025). To fulfill this mandate, the Commission created the Universal Service Fund. For nearly three decades, this Fund has supported subsidy programs that have benefited millions of Americans nationwide, enabling remote rural areas, low-income households, schools, libraries, and rural health care facilities to obtain essential communications services at reasonable rates. To finance these programs, Congress required "telecommunications carriers" (*i.e.*, telephone companies) to make monetary contributions to the Universal Service Fund. *See* 47 U.S.C. § 254(d).

In previous litigation, petitioners challenged the lawfulness of the universal service contribution factor for the first quarter of 2022, asserting that section 254 unconstitutionally delegated legislative power to the FCC and that the Commission improperly delegated government power to USAC, the private company that the agency selected to administer the Fund. Reversing an en banc decision by this Court, the Supreme Court rejected these claims. *Consumers' Rsch.*, 606 U.S. at 698.

Petitioners now return to this Court seeking review of the contribution factor that the FCC used to set the amount of carriers' universal service contributions for the fourth quarter of 2025. Petitioners again press a claim

that Congress unconstitutionally delegated legislative power to the FCC. Although targeted to a narrower set of statutory provisions, their new argument is no more persuasive than their previous contention.

In addition, petitioners assert that the FCC failed to show that the challenged contribution factor satisfies the Supreme Court's interpretation of the requirements of section 254. But petitioners nowhere explain how they have been injured by the agency's asserted failure, and their claims of noncompliance have no basis.

Petitioners also mount statutory and constitutional attacks on USAC's designation as the administrator of the Universal Service Fund. Those claims have no bearing on the sole issue now before this Court: whether the FCC acted lawfully when it approved the fourth quarter 2025 contribution factor. In any event, petitioners' claims lack merit.

The Court should uphold the FCC's adoption of the contribution factor for the fourth quarter of 2025.

## COUNTERSTATEMENT

### A. The Universal Service Mandate And Section 254 Of The Communications Act

From its inception, the Federal Communications Commission has been tasked by Congress "with making communications services available, at affordable prices, to all Americans." *Consumers' Rsch,*, 606 U.S. at 663.

Section 1 of the Communications Act of 1934 (the statute creating the FCC) directs the agency to take action "to make available, so far as possible, to all the people of the United States … a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151. This policy goal "became known as 'universal service.'" *Consumers' Rsch.*, 606 U.S. at 663.

For many years, the Commission promoted universal service primarily by "manipulati[ng]" telephone service "rates for some customers to subsidize more affordable rates for others." *Tex. Off. of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 406 (5th Cir. 1999) (*TOPUC*). "Long-distance rates were set enough above cost 'to subsidize local rates, business rates to subsidize [non-business] rates, and urban rates to subsidize rural rates.'" *Consumers' Rsch.*, 606 U.S. at 665 (quoting P. HUBER, M. KELLOGG, & J. THORNE, FEDERAL TELECOMMUNICATIONS LAW § 6.1.2, pp. 6-7 (3d ed. Supp. 2022)).

This system of implicit subsidies would have been unsustainable if a telephone company that sought "to subsidize below-cost rates to rural customers with above-cost rates to urban customers" was "vulnerable to a competitor" offering "at-cost rates to urban customers." *TOPUC*, 183 F.3d at 406. Before the 1990s, however, "States typically granted an exclusive franchise in each local service area to a local exchange carrier" (*i.e.*, a

provider of local telephone service).  *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371 (1999).

The Telecommunications Act of 1996 (1996 Act) "ended the longstanding regime of state-sanctioned monopolies" and opened local telecommunications markets to competition.  *Ibid*.  With the advent of competition, "Congress recognized that the universal service system of implicit subsidies would have to be re-examined."  *TOPUC*, 183 F.3d at 406. Consequently, as part of the 1996 Act, Congress added a new "universal service" provision to the Communications Act:  47 U.S.C. § 254.

Section 254 provides that the FCC "shall base" its universal service policies on six "principles":

> (1)  Quality services should be available at just, reasonable, and affordable rates.
>
> (2)  Access to advanced telecommunications and information services should be provided in all regions of the Nation.
>
> (3)  Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.
>
> (4)  All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

(5) There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.

(6) Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in section 254(h).

*Id.* § 254(b)(1)-(6).[1]

To ensure that the Commission could effectively pursue these objectives, Congress "discarded the implicit subsidies embedded in ratemaking and substituted a plan for explicit transfer payments" to subsidize universal service. *Consumers' Rsch.*, 606 U.S. at 666. Section 254(d) requires "[e]very telecommunications carrier that provides interstate telecommunications service" to "contribute, on an equitable and nondiscriminatory basis," to the FCC's Universal Service Fund "to preserve and advance universal service." 47 U.S.C. § 254(d).

Section 254(c) defines "[u]niversal service" as "an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and

---

[1] The statute also permits the FCC to base its universal service policies on "other principles" that "are consistent with" the Communications Act if (in the judgment of the Commission and a Joint Board of federal and state regulators) such principles "are necessary and appropriate for the protection of the public interest." 47 U.S.C. § 254(b)(7).

information technologies and services." *Id*. § 254(c)(1).  In deciding which telecommunications services are eligible for federal universal service support under section 254(c)(1), the Commission "shall consider the extent to which" such services—

> (A) are essential to education, public health, or public safety;
>
> (B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;
>
> (C) are being deployed in public telecommunications networks by telecommunications carriers; and
>
> (D) are consistent with the public interest, convenience, and necessity.

*Id*. § 254(c)(1)(A)-(D).

"In addition to the services included in the definition of universal service" under section 254(c)(1), "the Commission may designate additional services" to receive universal service funding if they are provided to "schools, libraries, and health care providers for the purposes of [section 254(h)]." *Id*. § 254(c)(3).  Section 254(h)(1) requires carriers to provide discounted services to rural health care providers, elementary schools, secondary schools, and libraries.  *Id*. § 254(h)(1)(A)-(B).  Section 254(h)(2)(A) directs the FCC to "establish competitively neutral rules" to "enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit

elementary and secondary school classrooms, health care providers, and libraries." *Id*. § 254(h)(2)(A).

## B. The FCC's Implementation Of Section 254

To implement section 254, Congress directed the FCC to revise its rules based on recommendations by a Federal-State Joint Board on Universal Service. *See* 47 U.S.C. § 254(a)(1)-(2); *see also id*. § 410 (describing the composition and function of Joint Boards). After reviewing the Joint Board's recommendations and the comments of interested parties, the Commission created four universal service programs: (1) the "High Cost" program, which "furnishes carriers with funds enabling them to provide basic communications services" in rural, insular, and other high-cost areas at rates "comparable to those charged in urban areas," *Consumers' Rsch.*, 606 U.S. at 668 (citing 47 C.F.R. §§ 54.302-54.322); (2) the "Lifeline" program, which "gives low-income consumers a markdown on their monthly phone bills," *ibid*. (citing 47 C.F.R. §§ 54.400-54.424); (3) the "E-Rate" program, which "subsidizes communications services for schools and libraries," *ibid*. (citing 47 C.F.R. §§ 54.500-54.523); and (4) the Rural Health Care program, which subsidizes communications services that "rural hospitals and other health care facilities" need to provide "telemedicine" services to "far-flung patients," *ibid*. (citing 47 C.F.R. §§ 54.600-54.633).

The FCC adopted a rule designating the telecommunications services that qualify for universal service support under section 254(c)(1). *Federal-State Joint Board on Universal Service*, 12 FCC Rcd 8776, 8809-22 ¶¶ 61-82 (1997) (*Universal Service Order*), *aff'd in part and rev'd in part*, *TOPUC*, 183 F.3d 393. That rule provides that the only telecommunications services currently eligible for support under section 254(c)(1) are voice telephony services that include certain specified features. *See* 47 C.F.R. § 54.101(a).

Invoking its authority under sections 254(c)(3) and 254(h)(1)(B), the FCC designated two additional services provided to schools and libraries—internet access and internal connections—as services eligible for support. *Universal Service Order*, 12 FCC Rcd at 9008-23 ¶¶ 436-463; 47 C.F.R. § 54.502(a)(1)-(2).[2] In *TOPUC*, this Court upheld the FCC's authority to subsidize these services. 183 F.3d at 440-43.

---

[2] As amended, the Communications Act distinguishes between—and separately defines—"telecommunications service" and "information service." *See* 47 U.S.C. § 153(24), (53); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 975-77 (2005). The Commission interpreted "the mandate in section 254(h)(2)(A) to enhance access to 'advanced telecommunications and information services'" to reflect an intent by Congress to authorize funding for information services (such as internet access) as well as telecommunications services. *Universal Service Order*, 12 FCC Rcd at 9010-11 ¶ 439.

In 1997, the FCC appointed the National Exchange Carrier Association (NECA) as the temporary administrator of the four universal service programs. *Universal Service Order*, 12 FCC Rcd at 9216-17 ¶ 866.[3] The Commission later directed NECA "to create an independently functioning, not-for-profit subsidiary" known as USAC, which would "administer temporarily" the High Cost and Lifeline programs "as well as perform billing and collection functions" for all four of the universal service programs. *Changes to the Board of Directors of the National Exchange Carrier Association, Inc.*, 12 FCC Rcd 18400, 18415 ¶ 25 (1997) (*NECA Order*). In November 1998, the FCC named USAC the permanent administrator of the Universal Service Fund, including all four universal service programs. *Changes to the Board of Directors of the National Exchange Carrier Association, Inc.*, 13 FCC Rcd 25058, 25059-61, 25069-70 ¶¶ 2, 5, 20 (1998) (*USAC Order*).

_____

[3] NECA, "a nonprofit, non-stock membership corporation," was "formed pursuant to FCC orders following the break-up of AT&T" in the early 1980s. *Allnet Commc'n Serv., Inc. v. Nat'l Exchange Carrier Ass'n*, 965 F.2d 1118, 1119 (D.C. Cir. 1992). Before section 254 was enacted, NECA administered several FCC programs designed to "keep local [telephone] rates affordable," including a "Universal Service Fund" and "two Lifeline Assistance Programs." H.R. Rep. No. 103-560, at 33 (1994).

USAC is a private not-for-profit corporation.  *See*

https://www.usac.org/about/.  Its board of directors includes representatives

of private industry, recipients of universal service funding, state

telecommunications regulators, and consumer groups, as well as USAC's

chief executive officer.  *See* 47 C.F.R. § 54.703(b).  USAC's directors are

nominated by the groups represented on the board and selected by the

Chairman of the FCC.  *Id*. § 54.703(c).  Similarly, USAC's chief executive

officer is nominated by the board of directors and chosen by the FCC

Chairman.  *Id*. § 54.704(b)(1)-(3).

USAC's role is "exclusively administrative," *USAC Order*, 13 FCC

Rcd at 25067 ¶ 16, and "relatively narrow," *Nat'l Lifeline Ass'n v. FCC*, 983

F.3d 498, 503 (D.C. Cir. 2020).  USAC "may not make policy."  47 C.F.R.

§ 54.702(c).  It is limited to performing administrative tasks such as "billing

contributors, collecting contributions" to the Universal Service Fund, "and

disbursing universal service support funds."  *Id*. § 54.702(b).  USAC "must

carry out all [these] tasks 'consistent with' the FCC's rules, 'orders, written

directives, and other instructions.'"  *Consumers' Rsch.*, 606 U.S. at 693

(quoting Memorandum of Understanding Between the Federal

Communications Commission and the Universal Service Administrative

Company at 2 (Oct. 17, 2024) (FCC-USAC MOU), available at

https://www.fcc.gov/sites/default/files/usac-mou.pdf).  "And anyone

aggrieved by an action of [USAC] may seek *de novo* review by the

Commission."  *Ibid*. (citing 47 C.F.R. §§ 54.719-54.725).

Thus, as the Supreme Court has recognized, USAC "is broadly

subordinate to the Commission."  *Id*. at 692.  On questions involving the

administration of the Universal Service Fund, the FCC—not USAC—is "the

final authority."  *Id*. at 694.  *See* FCC-USAC MOU at 2, § III.A (the FCC is

"responsible for the overall management, oversight, and administration" of

the Universal Service Fund).

## C.   The FCC's Universal Service Contribution Rules

Pursuant to 47 U.S.C. § 254(d), FCC rules require all

"telecommunications carriers providing interstate telecommunications

services" to "contribute" to the Universal Service Fund.  47 C.F.R.

§ 54.706(a).  "To calculate how much carriers must contribute to the Fund,"

the FCC uses a "formula known as the 'contribution factor.'"  *Consumers'*

*Rsch.*, 606 U.S. at 668-69.  This factor is "based on the ratio of total projected

quarterly expenses of the universal service support [programs] to the total

projected collected end-user interstate and international telecommunications

revenues, net of projected contributions."  47 C.F.R. § 54.709(a)(2).

At least 60 calendar days before the start of each quarter, USAC "must submit" to the FCC "its projections of demand" and "administrative expenses" for the Universal Service Fund for the upcoming quarter "and the basis for those projections." *Id*. § 54.709(a)(3). At least 30 days before the start of the quarter, USAC "must submit" to the FCC "the total contribution base" (the projected collected interstate and international end-user telecommunications revenues for all carriers). *Ibid*. After receiving USAC's submissions, the FCC announces USAC's projections and proposes a "contribution factor … in a public notice … available on the Commission's website." *Ibid*.

Although USAC "makes recommendations" to the FCC, the Commission ultimately "decides whether or how to use" USAC's projections "in setting the contribution factor." *Consumers' Rsch.*, 606 U.S. at 694. At any point "within the fourteen-day period following release of the Commission's public notice," the FCC may revise USAC's projections and set them "at amounts that the Commission determines will serve the public interest." 47 C.F.R. § 54.709(a)(3). "If the Commission takes no action" within 14 days of the public notice, USAC's projections and the proposed contribution factor are "deemed approved by the Commission." *Ibid.*

Once the contribution factor has been approved by the Commission, USAC applies it to each carrier's contribution base (*i.e.*, its projected interstate and international telecommunications revenues) "to calculate the amount of individual" carriers' quarterly "contributions." *Ibid*.

### D. The Previous Litigation

In a series of petitions for review filed in four different courts (the Fifth, Sixth, Eleventh, and D.C. Circuits), petitioners challenged the constitutionality of every universal service contribution factor from the fourth quarter of 2021 through the third quarter of 2025. They argued that the Commission could not lawfully collect universal service contributions during those quarters because (1) section 254 delegated legislative power to the FCC in violation of Article I of the Constitution and (2) the FCC unlawfully delegated government power to USAC, a private entity.

A panel of this Court rejected petitioners' claims and denied the petition for review. *Consumers' Rsch. v. FCC*, 63 F.4th 441 (5th Cir. 2023). On rehearing en banc, this Court ruled that "*the combination* of Congress's sweeping delegation" to the FCC and the FCC's "subdelegation to USAC violates the Legislative Vesting Clause in Article I, § 1" of the Constitution, even assuming that neither delegation by itself would be unconstitutional. *Consumers' Rsch. v. FCC*, 109 F.4th 743, 778 (5th Cir. 2024) (en banc).

15

On review, the Supreme Court reversed. *Consumers' Rsch.*, 606 U.S. at 698. First, emphasizing the "mandatory" nature of section 254's various "statutory criteria," *id.* at 688, the Court held that Congress had "sufficiently guided and constrained" the FCC's discretion "to implement the universal-service contribution scheme" to keep it within constitutional bounds. *Id.* at 664. The Court then determined that the FCC's use of USAC was permissible because the Commission "retained all decision-making authority" and relied on USAC "only for non-binding advice." *Ibid.* Finally, the Court rejected this Court's "combination theory," concluding that "a meritless public nondelegation challenge plus a meritless private nondelegation challenge cannot equal a meritorious 'combination' claim." *Id.* at 697.

The Court had "no occasion" in its decision "to address any nondelegation issues raised by" two specific statutory provisions—sections 254(c)(3) and (h)(2)—because petitioners had not argued that those particular provisions were themselves unconstitutional, and instead had challenged only "the contribution scheme generally." *Id.* at 687 n.9.

### E.   The Fourth Quarter 2025 Contribution Factor

On August 1, 2025, USAC submitted to the FCC its projections of demand and administrative expenses for the Universal Service Fund for the fourth quarter of 2025.[4]

One week later, petitioners filed comments in response to USAC's projections.  Comments and Objections of Consumers' Research, CC Docket No. 96-45 (Aug. 8, 2025) (JA___-___) (August Comments).  Petitioners raised no specific objections to those projections.  Instead, pursuing the issue left open by the Supreme Court, they asserted that sections 254(c)(3) and (h)(2) were unconstitutional under the nondelegation doctrine, and that "the Commission should reduce the Contribution Factor by the amount accounted for those unlawful provisions and the programs derived from them."  *Id*. at 2 (JA___).   In addition, petitioners claimed that the Supreme Court's interpretation of section 254 was "dramatically different" from the FCC's past reading of the statute.  *Id*. at 14 (JA___).  Therefore, they contended, the Commission "must expressly acknowledge that its prior interpretation has been rejected" and "explain how" the new contribution factor "satisfies the Supreme Court's opinion."  *Id*. at 15 (JA___).  Petitioners also maintained

---

[4] *See* Federal Universal Service Support Mechanisms Fund Size Projections for Fourth Quarter 2025 (JA___-___).

that the FCC's use of USAC was unlawful because (1) the Commission lacked statutory authority to establish USAC, *id*. at 21-24 (JA___-___), and (2) the appointment of USAC's board of directors violated the Constitution's Appointments Clause, *id*. at 20-21 (JA___-___).

After USAC provided the FCC with its calculation of the contribution base for the fourth quarter of 2025,[5] the Commission proposed a quarterly contribution factor of 38.1 percent in a public notice issued on September 15, 2025. Public Notice (JA___-___). The proposed contribution factor was based in large part on USAC's cost and revenue projections, which were set forth in the public notice. *Id*. at 1-2 (JA___-___). For purposes of calculating the contribution factor, the FCC's Wireline Competition Bureau, in consultation with the FCC's Office of Managing Director, "directed USAC to apply $100 million in unused Schools & Libraries (E-Rate) program funds to offset the $628.68 million projected E-Rate program demand for the quarter." *Id*. at 1 (JA___). "This offset reduce[d] the fourth quarter 2025 contribution factor to a level below what [it] would have been based on USAC's filings." *Ibid*.

_____

[5] *See* Federal Universal Service Support Mechanisms Quarterly Contribution Base for the Fourth Quarter 2025 (JA___-___).

In accordance with FCC rules, the public notice stated that if the Commission took "no action" within 14 days, the proposed contribution factor "shall be deemed approved by the Commission." *Id*. at 3-4 (JA___-___). On the same day that the FCC released the public notice, petitioners filed comments reiterating their earlier arguments. Comments and Objections of Consumers' Research, CC Docket No. 96-45 (Sept. 15. 2025) (JA___-___) (September Comments).

The FCC took no action within 14 days after the public notice was released. Accordingly, on September 29, 2025, the proposed contribution factor for the fourth quarter of 2025 was "deemed approved by the Commission." *See* 47 C.F.R. § 54.709(a)(3).

## SUMMARY OF ARGUMENT

The FCC based its approval of the universal service contribution factor on a reasonable estimate of the revenues needed to cover the Universal Service Fund's expenses for the fourth quarter of 2025. Petitioners have given this Court no good reason to disturb the FCC's decision.

I. Contrary to petitioners' assertion (Br. 25-38), sections 254(c)(3) and (h)(2) do not violate the nondelegation doctrine. Under those provisions, the FCC's discretion to make universal service funding available to "additional" or "advanced" services is cabined by multiple statutory constraints.

19

First, any services subsidized under those provisions may be provided only to "an identified set of recipients," *Consumers' Rsch.*, 606 U.S. at 685—elementary and secondary schools, libraries, and rural health care providers. *See* 47 U.S.C. §§ 254(c)(3), (h)(2)(A).

Second, the services must meet specific criteria to qualify for funding. Either they must be "necessary for the provision of health care services in a State," *id.* § 254(h)(1)(A), or they must be "for educational purposes," *id.* § 254(h)(1)(B).

Third, the amount of the subsidy for most of these services is determined by applying a statutorily prescribed formula. *Id.* §§ 254(h)(1)(A)-(B).

Finally, before the FCC decides to use the Universal Service Fund to subsidize an additional service, section 254 requires the Commission to consider generally how any such decision would affect the "affordability" of other services. *See Consumers' Rsch.*, 606 U.S. at 684 n.7, 687. The Commission cannot raise more revenue "than is adequate or necessary to finance the universal-service programs Congress wants." *Id.* at 681. Taking these considerations into account, the FCC may take only "economically reasonable" measures to enhance access to advanced services to schools,

libraries, and health care providers under section 254(h).  *See* 47 U.S.C.
§ 254(h)(2)(A).

By means of these multiple restrictions, Congress has provided more
than enough guidance to "set out an intelligible principle" defining "the
boundaries of [the FCC's] delegated authority."  *Consumers' Rsch.*, 606 U.S.
at 673 (cleaned up).

II.  Petitioners broadly assert that the FCC failed to demonstrate that
the contribution factor it adopted "satisfies" the Supreme Court's
interpretation of section 254.  Br. 38-46.  That generalized claim is
procedurally precluded.  Given the vagueness of the claim, the Commission
received no reasonable "opportunity to pass" on this issue.  47 U.S.C.
§ 405(a).  In any event, the argument is unfounded.  Petitioners have offered
no persuasive evidence that any of the FCC's current universal service
programs fail to comply with section 254.

III.  Petitioners' challenges to the designation of USAC and the
appointment of its CEO and directors (Br. 46-65) are both meritless and
irrelevant.

A.  Given Congress's previous confirmation that NECA had the
authority to administer universal service programs, the FCC reasonably
concluded that it was authorized to appoint USAC—NECA's subsidiary—to

replace NECA as administrator of the Universal Service Fund.  In any event, Congress later approved the FCC's action by expressly authorizing the Commission to use USAC to administer new programs created during the COVID-19 pandemic.  That ratification removes any doubt about the Commission's authority to appoint USAC as the Fund's administrator.

B.  The appointment of USAC's CEO and directors by the FCC Chairman did not violate the Appointments Clause.  Because USAC is overseen by the Commission at every turn, USAC's CEO and directors do not exercise significant discretion in performing their assigned duties.  Therefore, they are not "Officers of the United States," and the Appointments Clause does not apply to them.

C.  In any event, petitioners' claims concerning USAC have no bearing on the sole issue raised by their petition:  whether the FCC lawfully adopted the fourth quarter 2025 contribution factor.  Whether or not the Commission had express congressional authorization to appoint USAC to administer the Universal Service Fund, it needed no such express authorization to seek "advice" from an "outside entity" like USAC when setting the contribution factor.  *See Int'l Dark-Sky Ass'n v. FCC*, 106 F.4th 1206, 1215-17 (D.C. Cir. 2024).  And USAC's role in determining the contribution factor did not involve any exercise of "executive power."  Br. 65.  USAC simply provided

"non-binding advice" to the Commission. *Consumers' Rsch.*, 606 U.S. at 664.

IV.  Finally, there is no basis for petitioners' contention that the FCC "violated the APA's procedural requirements by failing to respond to Petitioners' comments." Br. 65 (citing 5 U.S.C. § 553).  Those requirements apply only to rulemaking.  The FCC's "adoption of a contribution factor is an adjudication, not a rulemaking." *Report on the Future of the Universal Service Fund*, 37 FCC Rcd 10041, 10097 ¶ 119 (2022) (*2022 Report to Congress*).

Furthermore, the APA only requires an agency to respond to *significant* comments presented during a rulemaking—*i.e.*, comments raising arguments that could change the outcome of the proceeding.  Petitioners' comments in this case did not require a response because they "were 'incapable of affecting'" the contribution factor "the agency ultimately adopted." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 451 (5th Cir. 2021) (quoting *City of Portland v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007)).

## STANDARD OF REVIEW

Under the APA, this Court "may set aside an agency action only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Coastal Conservation Ass'n v. U.S. Dep't of Commerce*, 846

F.3d 99, 110-11 (5th Cir. 2017) (quoting 5 U.S.C. § 706(2)(A)).  Judicial

review under this standard is "narrow and highly deferential."  *Huawei*, 2

F.4th at 449.  A reviewing court "may not substitute its own policy judgment

for that of the agency."  *FCC v. Prometheus Radio Project*, 592 U.S. 414,

423 (2021).  The Court must uphold the challenged FCC action if the agency

"acted within a zone of reasonableness."  *Huawei*, 2 F.4th at 449 (quoting

*Prometheus*, 592 U.S. at 423).

The Court reviews constitutional issues and questions of statutory

interpretation de novo.  *See United States v. Allen-Shinn*, 150 F.4th 687, 689

(5th Cir. 2025); *Huawei*, 2 F.4th at 434.

## ARGUMENT

### I.     SECTIONS 254(C)(3) AND (H)(2) DO NOT UNLAWFULLY DELEGATE LEGISLATIVE POWER TO THE FCC

Article I of the Constitution states:  "All legislative Powers herein

granted shall be vested in a Congress of the United States."  U.S. CONST. art.

I, § 1.  "From this language," the Supreme Court "derived the nondelegation

doctrine," the principle "that Congress may not constitutionally delegate its

legislative power to another branch of Government."  *Touby v. United States*,

500 U.S. 160, 165 (1991).

In their previous challenge to the constitutionality of the Universal

Service Fund, petitioners argued that the universal service "contribution

scheme generally is unconstitutional, and that the contribution factor should be set to zero" because section 254 as a whole violated the nondelegation doctrine. *Consumers' Rsch.*, 606 U.S. at 687 n.9. Rejecting that claim, the Supreme Court held that the FCC's "significant discretion" in implementing section 254 was "tethered to legislative judgments about the scope and content of the universal-service program." *Id.* at 691.

The nondelegation claim in this case is much narrower. It concerns just two specific subparagraphs of section 254: 47 U.S.C. §§ 254(c)(3) and (h)(2), which authorize the FCC to designate "additional" or "advanced" services to receive funding under two of the FCC's four universal service programs, E-Rate and Rural Health Care. Petitioners claim that sections 254(c)(3) and (h)(2) are "two of the most far-reaching provisions of the Universal Service Fund scheme," Br. 4, but they previously characterized the programs covered by these provisions as "only a sliver"[6] or "a minuscule part"[7] of the universal service regime. Consequently, they do not contend that the appropriate remedy for the alleged unlawful delegation in this case is

---

[6] Reply Brief for Petitioners at 38, *Consumers' Research v. FCC*, 5th Cir. No. 22-60008 (filed July 15, 2022).

[7] En Banc Brief for Petitioners at 51, *Consumers' Research v. FCC*, 5th Cir. No. 22-60008 (filed July 31, 2023).

a contribution factor of zero. Instead, they ask the Court to direct the FCC to "reduce" the challenged contribution factor "by the amounts raised under the purported authority of §§ 254(c)(3) and (h)(2)." Br. 38.

No such reduction is warranted because petitioners' nondelegation challenge to sections 254(c)(3) and (h)(2) is unavailing.

### A. Congress Does Not Delegate Legislative Power When It Provides An "Intelligible Principle" To Guide Administrative Implementation Of Its Enactments.

Although "Congress may not delegate the power to make laws," it may lawfully delegate "the authority to make policies and rules that implement its statutes." *Loving v. United States*, 517 U.S. 748, 771 (1996). From the earliest days of the Republic, the Supreme Court has recognized that Congress may delegate to an administrative agency the power to "fill up the details" of a legislative program. *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825).

In determining how far Congress "may commit something to the discretion of other departments," *Wayman*, 23 U.S. at 46, it has long been settled that a delegation to an administrative agency is constitutional if Congress provides an "intelligible principle" to guide the agency's discretion, a standard that fixes the "extent and character of" the agency's delegated authority "according to common sense and the inherent necessities of the

governmental coordination." *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 404, 406 (1928).  When "examining a statute for the requisite intelligible principle," courts "have generally assessed whether Congress has made clear both the 'general policy' that the agency must pursue and 'the boundaries of [its] delegated authority.'"  *Consumers' Rsch.*, 606 U.S. at 673 (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).

Petitioners concede—as they must—that this Court must apply the intelligible-principle test when reviewing their nondelegation claim in this case.  Br. 28-29; *see Consumers' Rsch.*, 606 U.S. at 673-80.  This test is "not demanding."  *Gundy v. United States*, 588 U.S. 128, 146 (2019) (plurality).  "Only twice in this country's history" has the Supreme Court found a delegation unconstitutional (both times in 1935); and in those cases, Congress "failed to articulate *any* policy or standard to confine discretion."  *Ibid*. (citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935), and *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)).

Otherwise, courts "have almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474-75 (2001).  As a result, over the years, the Supreme Court has upheld as constitutional congressional delegations to the FCC and the

ICC to regulate broadcasting and railroad consolidations in the "public interest," *see Nat'l Broadcasting Co. v. United States*, 319 U.S. 190, 225-26 (1943); *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24-25 (1932), to the EPA to regulate air quality to protect the "public health," *Whitman*, 531 U.S. at 472, and to the wartime Price Administrator to ensure that commodity prices are "fair and equitable," *Yakus v. United States*, 321 U.S. 414, 426-27 (1944).

Moreover, as petitioners acknowledge, the amount of congressional guidance that "suffices as an intelligible principle will vary based on 'the extent and character' of the power sought to be delegated." Br. 28 (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). "The guidance needed" to satisfy the test "is greater" when the scope of the delegation is broader. *Consumers' Rsch.*, 606 U.S. at 673. Conversely, when (as here) the scope of the challenged delegation is narrower, less guidance is required. *Ibid*.

### B. The Guidance Provided By Congress Satisfies The Intelligible-Principle Test By Limiting The FCC's Discretion To Implement Sections 254(c)(3) and (h)(2).

Section 254(c)(3) provides that the FCC "may designate additional services"—which are not "included in the definition of universal service under" section 254(c)(1)—to receive funding under the E-Rate and Rural

Health Care programs "for the purposes of" section 254(h).  47 U.S.C.
§ 254(c)(3).  Section 254(h)(2) directs the Commission to establish
"competitively neutral" rules "to enhance, to the extent technically feasible
and economically reasonable, access to advanced telecommunications and
information services for all public and nonprofit elementary and secondary
school classrooms, health care providers, and libraries."  *Id*. § 254(h)(2)(A).
Congress has imposed multiple restrictions on the FCC's implementation of
these provisions.  Those constraints easily satisfy the intelligible-principle
test.

To begin with, the services selected for funding under sections
254(c)(3) and (h)(2) may be provided only to "an identified set of recipients,"
*Consumers' Rsch*., 606 U.S. at 685—"schools, libraries, and health care
providers."  47 U.S.C. § 254(c)(3); *see also id*. § 254(h)(2)(A) (only "public
and nonprofit elementary and secondary school classrooms, health care
providers, and libraries" may receive "advanced" services under section
254(h)(2)).

The statute also limits the types of services the FCC may subsidize.
Petitioners make much of the FCC's past statement that the "additional
services" eligible for funding under section 254(c)(3) are not limited to
telecommunications services.  Br. 31 (citing *TOPUC*, 183 F.3d at 441).  But

that does not mean there are no limits:  The statute expressly directs the FCC to adopt rules to enhance access to "advanced telecommunications *and information* services" for schools, libraries and health care providers.  47 U.S.C. § 254(h)(2)(A) (emphasis added); *see also id*. § 254(b)(2) ("Access to advanced telecommunications *and information* services should be provided in all regions of the Nation.") (emphasis added).  And this Court has upheld the Commission's reading of the statute to include non-telecommunications services.  *See TOPUC*, 183 F.3d at 440-43 (upholding the Commission's decision to provide E-Rate funding to internet access and internal connections, two non-telecommunications services).

In addition, any services that receive subsidies under the E-Rate and Rural Health Care programs—including services designated under sections 254(c)(3) and (h)(2)—must be "essential to education and healthcare, with a focus on underserved populations."  *Consumers' Rsch.*, 606 U.S. at 686. Section 254(h)(1) prescribes the criteria that services must meet to qualify for funding under those programs.  Services subsidized by the Rural Health Care program must be "necessary for the provision of health care services in a State."  47 U.S.C. § 254(h)(1)(A).  Services subsidized by the E-Rate program must be "for educational purposes."  *Id*. § 254(h)(1)(B).  Given these

statutory requirements, petitioners are simply wrong to assert that section 254(h)(1) "does not purport to limit the services [the] FCC can fund." Br. 36.

Section 254(h)(1) also limits the amount of funding available for services provided under the E-Rate and Rural Health Care programs. The statute requires the FCC to use specific formulas to calculate the amount of the subsidy for most services supported by the programs.

Support under the E-Rate program is limited to "an amount that the Commission, with respect to interstate services, and the States, with respect to intrastate services, determine is appropriate and necessary to ensure affordable access to and use of" the supported services by elementary schools, secondary schools, and libraries. 47 U.S.C. § 254(h)(1)(B). Support for telecommunications services under the Rural Health Care program is set at "an amount equal to the difference, if any, between the rates for services provided to health care providers for rural areas in a State and the rates for similar services provided to other customers in comparable rural areas in that

State." 47 U.S.C. § 254(h)(1)(A).[8] By prescribing how to calculate the amount of E-Rate and Rural Health Care funding, those formulas limit the revenue that the FCC can raise to subsidize services for schools, libraries, and health care providers.

More generally, Congress required the FCC to consider the cost of expanding its universal service programs before deciding to subsidize an additional service. Section 254(h)(1)(B) specifically directs the Commission to "ensure affordable access" to supported services for schools and libraries. And, as the Supreme Court recognized, Congress's universal service policies generally contain an "affordability principle." *Consumers' Rsch.*, 606 U.S. at 687; *see* 47 U.S.C. § 254(b)(1) (services "should be available" at "reasonable" and "affordable rates"). That principle, for example, "precludes" the Commission from providing funds to support "a luxury

_____

[8] This formula applies only to telecommunications services provided to health care providers. The statute separately requires that funding for access to information services for health care providers must be "economically reasonable." 47 U.S.C. § 254(h)(2)(A). Pursuant to section 254(h)(2)(A), the FCC's Healthcare Connect Fund subsidizes the provision of broadband services to health care providers at a flat 65 percent discount rate. *See Rural Health Care Support Mechanism*, 27 FCC Rcd 16678, 16699-16701 ¶¶ 44-49, 16719-24 ¶¶ 91-98 (2012). The Commission concluded that this rate was "economically reasonable and fiscally responsible, given the $400 million cap for the health care support mechanism and the anticipated demand for program support." *Id*. at 16700 ¶ 48.

service" that "would require setting contributions so high as to interfere with carriers' ability to provide other services, to other customers, affordably." *Consumers' Rsch.*, 606 U.S. at 684 n.7.

Another section 254(b) principle states that funding should be "sufficient … to preserve and advance universal service." 47 U.S.C. § 254(b)(5); *see also id*. § 254(e) (universal service "support should be … sufficient to achieve the purposes" of section 254). This sufficiency principle also requires the FCC to exercise fiscal restraint in implementing its universal service programs. As the Supreme Court has explained, "the word 'sufficient'" in section 254(b)(5) "sets a floor and a ceiling alike." *Consumers' Rsch.*, 606 U.S. at 681. Thus, if the FCC raised more revenue than "necessary to finance the universal-service programs Congress wants," the "revenue would not be 'sufficient' but instead excessive." *Id*. at 681-82.[9]

Section 254(h)(2)(A) places a similar restriction on the FCC's authority to provide support for schools, libraries, and rural health care providers.

---

[9] This Court reached basically the same conclusion more than 25 years ago, finding that "excessive funding" of universal service programs could "violate the sufficiency requirements" of section 254 and "detract from universal service by causing rates unnecessarily to rise, thereby pricing some consumers out of the market." *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 620 (5th Cir. 2000).

Under that provision, any rules adopted by the FCC to enhance access to advanced services for schools, libraries, and health care providers must be "technically feasible and economically reasonable." 47 U.S.C. § 254(h)(2)(A).

Petitioners maintain that the phrase "economically reasonable" cannot "provide any ascertainable guidance or limit." Br. 35. But the universal service principles of affordability and sufficiency inform the meaning of what is "economically reasonable." And the Commission's settled reading of the statute underscores that view.

Consistent with the affordability and sufficiency principles in section 254(b), the FCC has construed the phrase "economically reasonable" in section 254(h)(2)(A) to impose "a responsibility" on the agency "to be a prudent guardian of the public's resources." *Modernizing the E-Rate Program for Schools and Libraries*, 29 FCC Rcd 8870, 8890 ¶ 50 (2014). When considering whether a new rule regarding advanced services would satisfy the statute's requirement of "economic reasonableness, the Commission has generally focused on the effect any new rules would have on growth" in its E-Rate and Rural Health Care programs. *Rural Health Care Support Mechanism*, 21 FCC Rcd 11111, 11114 ¶ 11 (2006). For example, when the FCC recently decided to stop funding the provision of Wi-Fi access

on school buses, the agency cited its duty "as a responsible, prudent steward" to conduct a thorough cost-benefit analysis "before expanding a universal service program" such as the E-Rate program. *Modernizing the E-Rate Program for Schools and Libraries*, FCC 25-63, WC Docket No. 13-184, ¶ 14 (rel. Sept. 30, 2025).

Based on its understanding of its fiscal obligations under section 254, the Commission has long been concerned with containing the costs of its universal service programs. It has repeatedly adopted measures to restrain the growth of the Universal Service Fund—measures that this Court and others have upheld.[10] Among other things, the Commission has adopted rules that cap annual spending on both the E-Rate and Rural Health Care programs. *See* 47 C.F.R. §§ 54.507, 54.619. This commitment to cost containment has enabled the Commission to provide universal service subsidies "at roughly constant inflation-adjusted dollars" over the past quarter century. *Consumers' Rsch.*, 606 U.S. at 686.

Petitioners make much of the fact that the FCC's designation of additional services for funding under sections 254(c)(3) and (h)(2) "is

---

[10] *See AT&T, Inc. v. FCC*, 886 F.3d 1236, 1251-53 (D.C. Cir. 2018); *In re FCC 11-161*, 753 F.3d 1015, 1079-83 (10th Cir. 2014); *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101-08 (D.C. Cir. 2009); *Alenco*, 201 F.3d at 620-21.

unconstrained" by the eligibility criteria listed in section 254(c)(1).  Br. 33 (quoting *Consumers' Rsch.*, 606 U.S. at 732 (Gorsuch, J., dissenting)).  But petitioners ignore the many other restrictions that section 254 places on the FCC's implementation of sections 254(c)(3) and (h)(2).  In view of those multiple statutory constraints, petitioners have no basis for asserting that the statute imposes no "meaningful limits" on the FCC's authority to "fund[] services for schools, libraries, and health care providers."  Br. 29.

To support their claim that the agency's discretion is "effectively boundless" (Br. 27), petitioners point to an "off-premises Wi-Fi program" for schools and libraries that the FCC launched in 2024.  Br. 34; *see Consumers' Rsch.*, 606 U.S. at 732 (Gorsuch, J., dissenting).  But the Commission terminated that program last year.  *Addressing the Homework Gap through the E-Rate Program*, FCC 25-62, WC Docket No. 21-31 (rel. Sept. 30, 2025).  In any event, petitioners cannot rely on that single program to establish a nondelegation violation given the numerous limitations that Congress has placed on the FCC's collection and disbursement of universal service contributions.

By blinding themselves to the substantial guidance Congress provided to the Commission in section 254, petitioners continue to "read" the statute "extravagantly, the better to create a constitutional problem."  *Consumers'*

*Rsch.*, 606 U.S. at 690.  But the statute "should be read, if possible, to comport with the Constitution, not to contradict it."  *Id*. at 691.  This Court must "avoid reading the statute in a manner that would render it clearly unconstitutional when there is another reasonable interpretation available." *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 776 (2025).

Section 254 sets forth the "general policy" that the FCC must pursue in providing support to schools, libraries, and rural health care providers as well as "the boundaries of [its] delegated authority" under sections 254(c)(3) and (h)(2).  *Consumers' Rsch.*, 606 U.S. at 673 (quoting *Am. Power & Light*, 329 U.S. at 105).  Congress "imposed ascertainable and meaningful guideposts for the FCC to follow when carrying out its delegated function of collecting and spending [universal service] contributions from carriers."  *Id*. at 681.  The nondelegation doctrine requires nothing more.

## II.    PETITIONERS' CLAIM THAT THE FCC FAILED TO SHOW IT COMPLIED WITH SECTION 254 IS NOT PROPERLY BEFORE THIS COURT AND IS BASELESS IN ANY EVENT

Petitioners contend that the FCC violated the APA by failing to explain how the fourth quarter 2025 contribution factor complies with the Supreme Court's interpretation of section 254.  Br. 38-46.  In petitioners' view, such an explanation was necessary because the dissent in *Consumers' Research* asserted that "[t]he Court construed § 254 to mean the 'opposite' of [the]

FCC's longstanding prior view." Br. 46 (quoting *Consumers' Rsch.*, 606 U.S. at 729 (Gorsuch, J., dissenting)). Nothing in the Court's opinion, however, suggested that the Court believed that its reading of section 254 "drastically departed from" the Commission's longstanding interpretation of the statute. Br. 41.

Petitioners do not claim that they are injured by any specific FCC action that violates section 254. Instead, they broadly allege that they are injured by the FCC's failure to demonstrate that it is following the law (*i.e.*, the Supreme Court's interpretation of section 254). "This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that [courts] have refused to countenance in the past." *Lutostanski v. Brown*, 88 F.4th 582, 586 (5th Cir. 2023) (quoting *Lance v. Coffman*, 549 U.S. 437, 442 (2007)). "The Supreme Court has repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power." *Jackson v. City of Houston*, 143 F.4th 640, 646 (5th Cir. 2025).[11]

---

[11] *See, e.g., Carney v. Adams*, 592 U.S. 53, 58-60 (2020); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 482-83 (1982); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216-27 (1974).

Petitioners' generalized claim concerning the FCC's compliance with section 254 is precluded by section 405 of the Communications Act because the Commission did not receive a fair "opportunity to pass" on the issue. *See* 47 U.S.C. § 405(a); *Worldcall Interconnect, Inc. v. FCC*, 907 F.3d 810, 823 (5th Cir. 2018). "To preserve [an] argument for appellate review," petitioners were "required to present it to the Commission … with sufficient clarity to require the Commission to pass upon it." *Nueva Esperanza, Inc. v. FCC*, 863 F.3d 854, 860-61 (D.C. Cir. 2017).[12]  In their comments, petitioners argued that "[t]he Commission [m]ust [a]ddress and [c]omply [w]ith the Supreme Court's [c]hanged [i]nterpretation of Sections 254(b) and (c)," August Comments at 12 (heading) (JA __) ; *accord* September Comments at 13 (heading) (JA __), and that the Court's interpretation "threaten[s] to render existing programs illegal," August Comments at 16 (citation omitted) (JA __); September Comments at 18 (JA __).  An argument at that level of "generality" is "not enough to preserve every conceivable claim of unlawful action." *Children's Health Def. v. FCC*, 25 F.4th 1045, 1050 (D.C. Cir. 2022).

---

[12] *See also Verizon Tel. Cos. v. FCC*, 453 F.3d 487, 499 n.3 (D.C. Cir. 2006); *Am. Family Ass'n v. FCC*, 365 F.3d 1156, 1166 (D.C. Cir. 2004).

Even if this argument were not procedurally barred, it is unsubstantiated. In their comments before the Commission, petitioners speculated that there are "undoubtedly" some programs that currently receive universal service funding "that do not comply" with the Supreme Court's interpretation of section 254. August Comments at 17 (JA___); September Comments at 18 (JA___). Yet their comments identified just one example: a program that "subsidizes certain high-speed services that … are not yet embraced by a substantial majority of residential customers," a prerequisite for support under section 254(c)(1). August Comments at 16 (JA___) (quoting *Consumers' Rsch.*, 606 U.S. at 731 (Gorsuch, J., dissenting)); *see also* September Comments at 18 (JA___).

Building on that argument, petitioners assert in their brief that "various FCC programs fund gigabit-speed broadband networks" that do not meet the eligibility criteria of section 254(c)(1). Br. 43-44. Under those programs, however, such networks are not currently eligible for universal service funding unless they are used to provide voice telephony service—a service that indisputably satisfies the section 254(c)(1) criteria. *See Rural Digital Opportunity Fund*, 35 FCC Rcd 686, 708 ¶ 43 (2020) (carriers "receiving Rural Digital Opportunity Fund support" are required "to provide standalone voice service"); *Connect America Fund*, 33 FCC Rcd 1380, 1384 ¶ 11 (2018)

(recipients of Connect America Fund support are obligated to provide "the supported service:  voice telephony").

It is true that under the Connect America Fund and Rural Digital Opportunity Fund programs, the Commission has conditioned the provision of universal service subsidies on the recipient's agreement to use its network facilities to offer high-speed broadband services as well as voice telephony services.[13]  But this broadband condition does not change the fact that "voice telephony is" currently "the supported service" for which carriers receive universal service funding.  *Rural Digital Opportunity Fund*, 35 FCC Rcd at 708 ¶ 43; *see also Connect America Fund*, 33 FCC Rcd at 1384 ¶ 11 (recipients of Connect America Fund support "have the responsibility of providing the supported service:  voice telephony").

There is no doubt that "a substantial majority of residential customers" subscribe to voice telephony service.  47 U.S.C. § 254(c)(1)(B).  And petitioners do not dispute that such service satisfies every other eligibility requirement of section 254(c)(1).  *See id*. § 254(c)(1)(A), (C), (D). Consequently, the FCC's funding of voice telephony service under the

---

[13] The Tenth Circuit upheld the FCC's authority under section 254 to impose such a condition to promote the deployment of broadband services. *In re FCC 11-161*, 753 F.3d at 1042-54.

Connect America Fund and Rural Digital Opportunity Fund programs is fully consistent with the Supreme Court's interpretation of section 254. *See Consumers' Rsch.*, 606 U.S. at 688 (to be eligible for universal service support under section 254(c)(1), a service must meet "each of the criteria" listed in section 254(c)(1)(A)-(D)).

Although petitioners theorize that "[o]ther Universal Service Fund programs" may not comply with section 254 (Br. 44), their brief identifies only one other program that they believe raises statutory compliance concerns: a cybersecurity pilot program for schools and libraries. Br. 44 n.6. The Court should decline to consider any arguments regarding this program for several reasons. First, petitioners did not preserve those arguments for review because they never mentioned the cybersecurity pilot program in their comments to the FCC. 47 U.S.C. § 405(a); *Worldcall*, 907 F.3d at 823. Second, petitioners' contention that the program may not comply with section 254 was relegated to a footnote in their brief. "Arguments subordinated in a footnote are insufficiently addressed in the body of the brief, and thus are waived." *White Glove Staffing, Inc. v. Methodist Hosps. of Dallas*, 947 F.3d 301, 308 (5th Cir. 2020). Lastly, petitioners have done nothing to explain the basis for their suggestion that the cybersecurity pilot program does not comply with section 254. That program was not required to satisfy the

section 254(c)(1) eligibility criteria because it was adopted pursuant to
sections 254(c)(3) and (h)(2)(A). *See Schools and Libraries Cybersecurity
Pilot Program*, 39 FCC Rcd 6158, 6222-26 ¶¶ 114-121 (2024).

### III. PETITIONERS' CHALLENGES TO THE APPOINTMENT OF USAC AND ITS CEO AND DIRECTORS PROVIDE NO BASIS FOR VACATING THE CONTRIBUTION FACTOR

Petitioners contend that the contribution factor must be vacated
because the FCC's designation of USAC to administer the Universal Service
Fund was legally defective. They argue that (1) the FCC lacked statutory
authority to designate USAC as the Universal Service Fund administrator, Br.
46-54, and (2) the process by which USAC's CEO and directors were
appointed violated the Appointments Clause, Br. 54-65. Neither claim has
merit. But even if the Court found one or both of these claims persuasive, it
still would have no basis for vacating the contribution factor. Regardless of
whether USAC and its top officials were lawfully appointed, it was
permissible for the FCC to consider USAC's projections, which were wholly
advisory, when setting the contribution factor.

#### A. The FCC Had Authority To Appoint USAC To Administer The Universal Service Fund.

Petitioners maintain that the FCC "lacks statutory authority to create
USAC or appoint it as permanent administrator" of the Universal Service
Fund. Br. 46. That is incorrect.

In July 1997, the FCC directed NECA (which was then the Fund's temporary administrator) to create USAC as an "independently functioning, not-for-profit subsidiary" that would "administer temporarily" some of the Fund's programs. *NECA Order*, 12 FCC Rcd at 18415 ¶ 25. The Commission also instructed NECA to "create two unaffiliated, not-for-profit corporations … to administer portions of" the E-Rate and Rural Health Care programs. *Id*. at 18416 ¶ 26. In response to the *NECA Order*, Senator Ted Stevens asked the General Accounting Office (GAO) whether the FCC had "the legal authority to establish" the two unaffiliated corporations to administer the E-Rate and Rural Health Care programs. *See* U.S. General Accounting Office, Letter B-278820 (Feb. 10, 1998) (GAO Letter), available at https://www.gao.gov/assets/b-278820.pdf.

The GAO concluded that the FCC violated the Government Corporation Control Act (GCCA), 31 U.S.C. § 9102, "by directing the establishment of the Schools and Libraries Corporation and the Rural Health Care Corporation." GAO Letter at 8. Under the GCCA, "[a]n agency may establish or acquire a corporation to act as an agency only by or under a law of the United States specifically authorizing the action." 31 U.S.C. § 9102. The GAO found that the FCC lacked authority to establish the Schools and Libraries Corporation and the Rural Health Care Corporation without

"explicit congressional authorization."  GAO Letter at 4-8.  The GAO made

no such finding with respect to USAC, which (unlike the other two

corporations) was a "subsidiary" of NECA.  *Id*. at 3.[14]

In light of the GAO's findings, Congress directed the FCC in May

1998 to submit a report proposing "a revised structure" that "shall consist of a

single entity" to administer the "programs established under section 254(h)."

*See Report in Response to Senate Bill 1768 and Conference Report on H.R.

3579*, 13 FCC Rcd 11810, 11810 n.2 (1998) (*1998 Report to Congress*).  The

FCC proposed to designate USAC "as the single entity responsible" for

administering the E-Rate and Rural Health Care programs.  *Id*. at 11815 ¶ 8.

It substantially adopted that proposal in November 1998 and named USAC

the permanent administrator of the Universal Service Fund.  *USAC Order*, 13

FCC Rcd at 25059-60 ¶¶ 2-5.

Citing the GAO Letter, petitioners contend that the FCC violated the

GCCA by installing USAC as the Fund's administrator without specific

---

[14] More recently, in a July 2024 report to Senator Ted Cruz, the GAO (now
known as the Government Accountability Office) stated that "USAC is not a
federal agency or other establishment in the executive branch of the U.S.
government."  U.S. Government Accountability Office, Administration of
Universal Service Programs Is Consistent with Selected FCC Requirements,
GAO-24-106957, at 2 (July 2024), available at
https://www.gao.gov/assets/880/870109.pdf.

congressional authorization.  Br. 48.  But the GAO "made findings only with respect to the creation of" the Schools and Libraries and Rural Health Care Corporations; it "did not make any findings concerning the establishment of USAC." *USAC Order*, 13 FCC Rcd at 25066 ¶ 14.  This distinction reflected a material difference between USAC and the other two corporations.  Unlike those corporations, "USAC was created as a subsidiary of NECA." *Ibid*. And NECA, USAC's parent company, "was lawfully created and has the authority to administer" the FCC's universal service programs. *Ibid*.  Since NECA was established in 1983, "neither [the] GAO nor any other party has alleged that the creation of NECA was unlawful or that it violated the GCCA." *Id*. at 25070 ¶ 21.

As Congress was well aware, *see* GAO Letter at 2-3; H.R. Rep. No. 103-560, at 33, NECA "had been administering" the FCC's "high cost support" program "for more than a decade" before section 254 was enacted. *USAC Order*, 13 FCC Rcd at 25065-66 ¶ 14.  NECA had also been administering the FCC's Lifeline program before Congress adopted section 254.  *See* 47 C.F.R. § 69.117 (1995).  Indeed, Congress expressly authorized the Commission to *continue* using NECA to administer the Lifeline program under section 254.  *See* 47 U.S.C. § 254(j) ("Nothing in this section shall

affect" the "administration of the Lifeline Assistance Program" under pre-existing FCC rules, which had designated NECA as administrator).

After section 254 became law, NECA continued to play a prominent role in administering universal service. In 1997, the FCC named NECA the temporary administrator of the newly created Universal Service Fund. *Universal Service Order*, 12 FCC Rcd at 9216-17 ¶ 866.

In response to the GAO Letter, Congress asked the FCC to propose a "revised structure" under which "a single entity" would administer the E-Rate and Rural Health Care programs. *See 1998 Report to Congress*, 13 FCC Rcd at 11810 n.2. The FCC reasonably construed this request for a "single entity" proposal as confirmation that "Congress specifically contemplated that the Commission" had "authority to employ an independent entity" like NECA or USAC "to administer universal service" under section 254. *USAC Order*, 13 FCC Rcd at 25065-66 ¶ 14; *see 1998 Report to Congress*, 13 FCC Rcd at 11815 ¶ 8. Given Congress's recognition that NECA has the authority to administer the Lifeline program, *see* 47 U.S.C. § 254(j), the FCC properly concluded that there was "no statutory impediment" to appointing USAC—a NECA subsidiary—to replace NECA as administrator of the Universal Service Fund. *USAC Order*, 13 FCC Rcd at 25066 ¶ 14.

To be sure, out of an abundance of caution, the FCC asked Congress to provide "specific statutory authorization" of USAC's appointment "to eliminate any further question concerning the Commission's authority to appoint USAC as the permanent Administrator." *Id*. at 25070 ¶ 21; *see also 1998 Report to Congress*, 13 FCC Rcd at 11819 ¶ 15. Congress never acted on this request.

Petitioners claim that this congressional inaction confirms that the FCC violated the GCCA. Br. 48. As this Court has long understood, however, "congressional inaction" is "a problematic interpretive guide," *Prostar v. Massachi*, 239 F.3d 669, 678 (5th Cir. 2001), because it "is susceptible of multiple interpretations." *Smith v. City of Jackson*, 351 F.3d 183, 186 n.1 (5th Cir. 2003). "[S]everal equally tenable inferences may be drawn from [congressional] inaction." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990). In this case, for example, one plausible explanation for such inaction is that Congress believed that adoption of the FCC's proposal was unnecessary because the agency already had authority to appoint a "single entity" like USAC to act as the Universal Service Fund administrator.

Moreover, Congress approved the FCC's use of USAC to implement two new programs established during the COVID-19 pandemic: the Affordable Connectivity Program (originally known as the Emergency

Broadband Benefit Program) and the Emergency Connectivity Fund.[15]  In the

legislation creating those programs, Congress expressly authorized the FCC

to use USAC to administer them.  *See* 47 U.S.C. § 1752(i)(5) ("The

Commission shall have the authority to avail itself of the services of the

Universal Service Administrative Company to implement the Affordable

Connectivity Program, including developing and processing reimbursements

and distributing funds to participating providers."); American Rescue Plan

Act of 2021, Pub. L. No. 117-2, Title VII, § 7402(c)(2)(A)(ii), 135 Stat. 4,

109 (directing "the Commission and the Universal Service Administrative

Company to administer" the Emergency Connectivity Fund).  Those

authorizations are inexplicable if Congress doubted the propriety of the

---

[15] The Affordable Connectivity Program and its predecessor, the
Emergency Broadband Benefit Program, were established "to offer eligible
low-income households discounts off the cost of broadband service and
connected devices."  *Affordable Connectivity Program*, 37 FCC Rcd 484, 485
¶ 1 (2022).  Due to a lack of additional funding from Congress, the program
ended on June 1, 2024.  FCC, Affordable Connectivity Program Consumer
FAQ, available at https://www.fcc.gov/affordable-connectivity-program-
consumer-faq.  The Emergency Connectivity Fund was created to "provide
funding for schools and libraries to meet the otherwise unmet connectivity
needs of students, school staff, and library patrons during the COVID-19
pandemic."  *Establishing Emergency Connectivity Fund to Close the
Homework Gap*, 36 FCC Rcd 8696, 8702 ¶ 15 (2021).  After the COVID-19
public health emergency expired, the program ended on June 30, 2024.  FCC,
Emergency Connectivity Fund FAQs, available at
https://www.fcc.gov/emergency-connectivity-fund-faqs.

Commission's designation of USAC as the administrator of the Universal Service Fund.

"Congressional action can ratify or 'give the force of law to official action unauthorized when taken.'" *Nat'l Religious Broadcasters v. FCC*, 138 F.4th 282, 294 (5th Cir. 2025) (quoting *Kovac v. Wray*, 109 F.4th 331, 340 (5th Cir. 2024)); *see also Swayne & Hoyt v. United States*, 300 U.S. 297, 301-02 (1937). In this case, "Congress has not just kept its silence" concerning the FCC's authority to appoint USAC to administer universal service programs, "but has ratified it with positive legislation." *Nat'l Religious Broadcasters*, 138 F.4th at 294 (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986)).[16] The FCC reasonably determined that it was authorized to establish USAC in 1997, but in any event Congress ratified the FCC's action by explicitly authorizing the Commission to use USAC to administer the programs adopted during the COVID-19 pandemic.

---

[16] *See also Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381-82 (1969); *Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 946 (D.C. Cir. 2024).

## B. The Appointment Of USAC's CEO And Directors Did Not Violate The Appointments Clause.

"The Appointments Clause in Article II of the Constitution specifies how 'Officers of the United States[]' … must be appointed.… Principal officers must be appointed by the President 'with the Advice and Consent of the Senate.'" *Braidwood Mgmt.*, 606 U.S. at 759 (quoting U.S. CONST. art. II, § 2, cl. 2). While "[i]nferior officers may also be appointed via Presidential nomination and Senate confirmation," the Appointments Clause provides that "Congress may 'by Law vest' appointment of inferior officers 'in the President alone, in the Courts of Law, or in the Heads of Departments.'" *Id.* at 760 (quoting U.S. CONST. art. II, § 2, cl. 2).

Petitioners argue that because USAC's CEO and directors are appointed by the FCC Chairman through a selection process prescribed by FCC regulations, *see* 47 C.F.R. §§ 54.703(c)(1)-(3), 54.704(b)(1)-(3), their appointment "violates the Appointments Clause." Br. 64. But neither USAC's CEO nor the members of its board of directors are "Officers of the United States" at all. Consequently, "the Appointments Clause cares not a whit about who named them." *Lucia v. SEC*, 585 U.S. 237, 245 (2018).

For purposes of the Appointments Clause, an officer is an appointee who occupies a continuing office "established by Law," U.S. CONST. art. II, § 2, cl. 2, and who "exercises 'significant authority pursuant to the laws of the

51

United States.'" *Braidwood Mgmt.*, 606 U.S. at 759 (quoting *Lucia*, 585 U.S. at 245). In assessing the "significance" of the authority wielded by an appointee, the Supreme Court has held that appointees are officers subject to the Appointments Clause if they "exercise significant discretion" when performing their assigned duties. *Lucia*, 585 U.S. at 247 (quoting *Freytag v. Comm'r*, 501 U.S. 868, 881-82 (1991)).

Under this standard, USAC's CEO and directors clearly are not "officers." In administering the Universal Service Fund, USAC exercises little or no discretion. It "may not make policy," 47 C.F.R. § 54.702(c), and it "must carry out all its tasks 'consistent with' the FCC's rules, 'orders, written directives, and other instructions.'" *Consumers' Rsch.*, 606 U.S. at 693 (quoting FCC-USAC MOU at 2). Moreover, "anyone aggrieved by an action of [USAC] may seek *de novo* review by the Commission." *Ibid*.; *see* 47 C.F.R. §§ 54.719-54.725.

Even more clearly, USAC's role "in determining the contribution factor" involves "no policy-making." *Consumers' Rsch.*, 606 U.S. at 693. "[T]he Commission alone has decision-making authority" to set the contribution factor; USAC merely "plays an advisory role" in the process, providing the FCC with projections of expenses based on FCC rules that

"dictate" the "scope" of the programs supported by the Universal Service Fund. *Ibid*.

Although USAC, "following the FCC's rules, makes recommendations," the FCC "decides whether or how to use" USAC's projections "in setting the contribution factor." *Id*. at 694. USAC's "projections can have only the legal (or, indeed, practical) effect the Commission decides they should." *Ibid*. The Commission "either revises or approves" USAC's projections, "converts them into a contribution factor, and formally promulgates them." *Ibid*. In short, the FCC—not USAC—"sets the contribution factor." *Ibid*.

Petitioners assert that it "makes no difference" that "USAC's decisions are guided by FCC regulations and reviewable by [the] FCC on appeal." Br. 58. They claim that "USAC's directors and CEO are no different" than the Tax Court's special trial judges, who were found to be officers in *Freytag* "even though their decisions are guided by law" and "are reviewable by a 'regular Tax Court judge.'" *Ibid*. (quoting *Lucia*, 585 U.S. at 249); *see Freytag*, 501 U.S. at 873.

Unlike USAC's CEO and directors, however, the Tax Court's special trial judges perform a number of "important functions" that involve the exercise of "significant discretion": "They take testimony, conduct trials, rule

on the admissibility of evidence, and have the power to enforce compliance with discovery orders." *Freytag*, 501 U.S. at 881-82. *See also Lucia*, 585 U.S. at 248 (quoting *Freytag*, 501 U.S. at 882) (SEC administrative law judges are officers subject to the Appointments Clause because they "exercise the same 'significant discretion' when carrying out the same 'important functions'" as the Tax Court's special trial judges).

USAC, by contrast, does not exercise significant discretion when performing any of its functions. The administrative duties that the FCC has assigned to USAC are nothing "more than ministerial tasks." *Cf. Freytag*, 501 U.S. at 881 (the Tax Court's "special trial judges perform more than ministerial tasks"). Furthermore, USAC "must carry out all its tasks 'consistent with' the FCC's rules, 'orders, written directives, and other instructions.'" *Consumers' Rsch.*, 606 U.S. at 693 (quoting FCC-USAC MOU at 2). The multiple constraints on its authority preclude USAC from exercising any significant discretion when administering the Universal Service Fund. Accordingly, USAC's CEO and directors are not "officers," and their appointment is not governed by the Appointments Clause.

### C. It Was In Any Event Lawful For The FCC To Consider USAC's Projections When Setting The Contribution Factor.

For the reasons discussed above, petitioners' statutory and constitutional challenges to the appointment of USAC and its top officials are baseless. In any event, those challenges have no bearing on the sole question now before this Court: whether the FCC lawfully adopted the fourth quarter 2025 contribution factor.

Petitioners assert that because Congress did not specifically authorize the FCC to appoint USAC to administer the Universal Service Fund, the Commission could not lawfully set the contribution factor "in reliance on actions by" USAC, "an unauthorized entity." Br. 46. Petitioners base this claim on the GCCA, but that statute requires express statutory authorization only when an agency seeks to "establish or acquire a corporation *to act as an agency*." 31 U.S.C. § 9102 (emphasis added).

The GCCA does not bar the FCC from considering USAC's submissions in this case because USAC was not "act[ing] as an agency" when it provided the FCC with projections related to the contribution factor. USAC's role in this context was strictly "advisory." *Consumers' Rsch.*, 606 U.S. at 693. It "ma[de] recommendations" and submitted projections to the

FCC, which then "decide[d] whether or how to use them in setting the contribution factor." *Id*. at 694.

The FCC does not need congressional authorization to seek "advice" from an "outside entity" like USAC. *See Int'l Dark-Sky Ass'n*, 106 F.4th at 1215-17. Agencies often rely on various "types of legitimate outside party input into agency decision-making processes," including "fact gathering" and "advice." *See id*. at 1216; *United States Telecom Ass'n v. FCC*, 359 F.3d 554, 566-68 (D.C. Cir. 2004). The Supreme Court has recognized that "Government agencies may rely on advice and assistance from private actors." *Consumers' Rsch.*, 606 U.S. at 692. "As long as" the FCC "retains decision-making power" (as it did here), "it may enlist private parties" like USAC "to give it recommendations." *Ibid*. The Commission acted well within its authority when it considered USAC's projections in this case.

Petitioners also claim that the contribution factor "must be vacated" because "the appointment of USAC's directors and CEO violates the Appointments Clause." Br. 65. They argue that in light of this alleged constitutional violation, "USAC cannot lawfully exercise executive power on behalf of [the] FCC." *Ibid*. But USAC does not exercise "executive power" when it assists the FCC in determining the contribution factor. It merely provides "non-binding advice" to the Commission. *Consumers' Rsch.*, 606

U.S. at 664, 693-94.  When USAC submits projections for the FCC's

consideration, USAC's CEO and directors do not exercise any "significant

governmental authority" that would "qualify [them] as 'officers'" subject to

the Appointments Clause.  *Braidwood Mgmt.*, 606 U.S. at 762; *see id*. at 761

(members of "an advisory body" that "made only non-binding

recommendations" were "not officers at all").[17]

## IV.   THE COMMISSION WAS NOT REQUIRED TO RESPOND TO PETITIONERS' COMMENTS

Petitioners assert that the FCC "violated the APA's procedural

requirements by failing to respond to Petitioners' comments."  Br. 65.  Those

procedural requirements, however, apply only to rulemaking.  *See* 5 U.S.C.

§ 553.  The FCC did not engage in rulemaking when it approved the

contribution factor.  It simply applied 47 C.F.R. § 54.709—a long-established

"rule prescribing the methodology for calculating carriers' universal service

---

[17] In an effort to embellish the importance of USAC's role in setting the contribution factor, petitioners assert that USAC's projections are often "deemed approved" because the FCC "rarely" modifies them.  Br. 58.  As the Supreme Court observed, however, USAC's "recommendations … cannot go into effect without [the FCC's] say-so."  *Consumers' Rsch*., 606 U.S. at 695.  Therefore, the question of "how often the FCC revises [USAC's] projections" is legally irrelevant.  *Ibid*.  In any event, the FCC *did* revise USAC's projections before setting the contribution factor in this case.  *See* Public Notice at 1 (JA___) (an offset of $100 million in unused E-Rate program funds "reduce[d] the fourth quarter 2025 contribution factor to a level below what [it] would have been based on USAC's filings").

contributions"—to a "specific set of facts" associated with the fourth quarter of 2025 to determine the contribution factor for that quarter. *2022 Report to Congress*, 37 FCC Rcd at 10097 ¶ 119. The FCC's "adoption of a contribution factor is an adjudication, not a rulemaking." *Ibid*.

Even in a rulemaking proceeding, the APA requires only that an agency "consider and respond to *significant* comments received." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015) (emphasis added); *see* Br. 66. "Comments are 'significant,' and thus require response, only if they raise points 'which, … if adopted, would require a change in an agency's proposed rule.'" *Huawei*, 2 F.4th at 449 (quoting *City of Portland*, 507 F.3d at 714-15)). Petitioners' comments in this case did not require a response because they "were 'incapable of affecting'" the contribution factor "the agency ultimately adopted." *Id*. at 451 (quoting *City of Portland*, 507 F.3d at 715).

The FCC was not obliged to respond to petitioners' nondelegation claim because the agency lacks authority to find section 254 unconstitutional. "[A]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994); *see also Mobility Workx, LLC v. Unified Pats., LLC*, 15 F.4th 1146, 1150 (Fed. Cir. 2021) ("agencies generally do not have authority to declare a statute

unconstitutional"). Accordingly, petitioners' comments questioning the constitutionality of section 254 could not affect the FCC's approval of the contribution factor. Unless a court has ruled section 254 unconstitutional, the Commission has a duty to implement the statute that Congress enacted. *See MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 n.4 (1994) (the FCC is "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes").

As for petitioners' assertion that the FCC needed to explain how the contribution factor satisfied section 254, this argument is based on the supposition that some current universal service programs do not comply with the Supreme Court's interpretation of section 254. In their comments, however, petitioners offered few (if any) examples of any such programs. The Commission had no obligation to respond to such a vague and undeveloped argument. "[A]gencies are neither expected nor required to be clairvoyant." *Action for Children's Television v. FCC*, 821 F.2d 741, 748 (D.C. Cir. 1987). A party that objects to a proposed Commission action must present its objection to the FCC "with sufficient clarity to require the Commission to pass upon it." *Nueva Esperanza*, 863 F.3d at 861.

Petitioners' comments concerning the lawfulness of the Commission's designation of USAC and the appointment of its top officials required no response from the Commission because those comments "were 'incapable of affecting'" the contribution factor "the agency ultimately adopted." *Huawei*, 2 F.4th at 451 (quoting *City of Portland*, 507 F.3d at 715).  For the reasons discussed above in Part III.C of the Argument, those claims, even if accepted, would not "require a change" in the FCC's proposed contribution factor, since USAC's involvement in establishing the contribution factor was purely advisory.  *Id*. at 449 (cleaned up).

In any event, even assuming that the FCC erred by not responding to petitioners' comments, the error was harmless.  As we explained above in Sections I-III of the Argument, none of petitioners' claims have merit.  Thus, any "error" that the Commission may have made when it failed to address those claims "'had no bearing on the procedure used or the substance of [the] decision reached.'"  *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 590 (2025) (quoting *Mass. Trustees of Eastern Gas & Fuel Assocs. v. United States*, 377 U.S. 235, 248 (1964)); *see also Worldcall*, 907 F.3d at 818-19.  In these circumstances, "a remand" to the agency to address petitioners' comments "would be pointless."  *Wages & White Lion*, 604 U.S. at 590.

## CONCLUSION

The petition for review should be denied.

Respectfully submitted,

BRETT A. SHUMATE
ASSISTANT ATTORNEY GENERAL

D. ADAM CANDEUB
GENERAL COUNSEL

MICHAEL S. RAAB
CAROLINE W. TAN
ATTORNEYS

JACOB M. LEWIS
ASSOCIATE GENERAL COUNSEL

/s/ James M. Carr

UNITED STATES
   DEPARTMENT OF JUSTICE
WASHINGTON, D.C. 20530

JAMES M. CARR
COUNSEL

FEDERAL COMMUNICATIONS
   COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

March 13, 2026

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    ☒   this document contains <u>12,233</u> words, *or*

    ☐   this document uses a monospaced typeface and contains _ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒   this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word in Office 365</u> in <u>14-point Times New Roman</u>, *or*

    ☐   this document has been prepared in a monospaced spaced typeface using _____ with _____.

<u>*/s/ James M. Carr*</u>

James M. Carr
Counsel

Federal Communications Commission
Washington, D.C.  20554
(202) 418-1740

**CERTIFICATE OF FILING AND SERVICE**

I, James M. Carr, hereby certify that on March 13, 2026, I filed the foregoing Brief for Respondents with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the electronic CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ James M. Carr*

James M. Carr
Counsel

Federal Communications Commission
Washington, D.C. 20554
(202) 418-1740

# Statutory Addendum

**Contents**

**47 U.S.C. § 254**......................................................................................1

**47 C.F.R. § 54.507**................................................................................7

**47 C.F.R. § 54.619**................................................................................9

**47 C.F.R. § 54.702**..............................................................................11

**47 C.F.R. § 54.703**..............................................................................14

**47 C.F.R. § 54.704**..............................................................................17

**47 C.F.R. § 54.709**..............................................................................18

# 47 U.S.C. § 254

## § 254. Universal service

(a) Procedures to review universal service requirements

    (1) Federal-State Joint Board on universal service

Within one month after February 8, 1996, the Commission shall institute and refer to a Federal-State Joint Board under section 410(c) of this title a proceeding to recommend changes to any of its regulations in order to implement sections 214(e) of this title and this section, including the definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for completion of such recommendations. In addition to the members of the Joint Board required under section 410(c) of this title, one member of such Joint Board shall be a State-appointed utility consumer advocate nominated by a national organization of State utility consumer advocates. The Joint Board shall, after notice and opportunity for public comment, make its recommendations to the Commission 9 months after February 8, 1996.

    (2) Commission action

The Commission shall initiate a single proceeding to implement the recommendations from the Joint Board required by paragraph (1) and shall complete such proceeding within 15 months after February 8, 1996. The rules established by such proceeding shall include a definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for implementation. Thereafter, the Commission shall complete any proceeding to implement subsequent recommendations from any Joint Board on universal service within one year after receiving such recommendations.

(b) Universal service principles

The Joint Board and the Commission shall base policies for the preservation and advancement of universal service on the following principles:

    (1) Quality and rates

Quality services should be available at just, reasonable, and affordable rates.

(2) Access to advanced services

Access to advanced telecommunications and information services should be provided in all regions of the Nation.

(3) Access in rural and high cost areas

Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

(4) Equitable and nondiscriminatory contributions

All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

(5) Specific and predictable support mechanisms

There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.

(6) Access to advanced telecommunications services for schools, health care, and libraries

Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in subsection (h).

(7) Additional principles

Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter.

(c) Definition

(1) In general

Universal service is an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services. The Joint Board in recommending, and the Commission in establishing, the definition of the services that are supported by Federal universal service support mechanisms shall consider the extent to which such telecommunications services--

(A) are essential to education, public health, or public safety;

(B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;

(C) are being deployed in public telecommunications networks by telecommunications carriers; and

(D) are consistent with the public interest, convenience, and necessity.

(2) Alterations and modifications

The Joint Board may, from time to time, recommend to the Commission modifications in the definition of the services that are supported by Federal universal service support mechanisms.

(3) Special services

In addition to the services included in the definition of universal service under paragraph (1), the Commission may designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h).

(d) Telecommunications carrier contribution

Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service. The Commission may exempt a carrier or class of carriers from this requirement if the carrier's telecommunications activities are limited to such an extent that the level of such carrier's contribution to the

preservation and advancement of universal service would be de minimis. Any other provider of interstate telecommunications may be required to contribute to the preservation and advancement of universal service if the public interest so requires.

(e) Universal service support

After the date on which Commission regulations implementing this section take effect, only an eligible telecommunications carrier designated under section 214(e) of this title shall be eligible to receive specific Federal universal service support. A carrier that receives such support shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended. Any such support should be explicit and sufficient to achieve the purposes of this section.

* * *

(h) Telecommunications services for certain providers

(1) In general

(A) Health care providers for rural areas

A telecommunications carrier shall, upon receiving a bona fide request, provide telecommunications services which are necessary for the provision of health care services in a State, including instruction relating to such services, to any public or nonprofit health care provider that serves persons who reside in rural areas in that State at rates that are reasonably comparable to rates charged for similar services in urban areas in that State. A telecommunications carrier providing service under this paragraph shall be entitled to have an amount equal to the difference, if any, between the rates for services provided to health care providers for rural areas in a State and the rates for similar services provided to other customers in comparable rural areas in that State treated as a service obligation as a part of its obligation to participate in the mechanisms to preserve and advance universal service.

(B) Educational providers and libraries

All telecommunications carriers serving a geographic area shall, upon a bona fide request for any of its services that are within the definition of universal service under subsection (c)(3), provide such services to elementary schools,

secondary schools, and libraries for educational purposes at rates less than the amounts charged for similar services to other parties. The discount shall be an amount that the Commission, with respect to interstate services, and the States, with respect to intrastate services, determine is appropriate and necessary to ensure affordable access to and use of such services by such entities. A telecommunications carrier providing service under this paragraph shall--

> (i) have an amount equal to the amount of the discount treated as an offset to its obligation to contribute to the mechanisms to preserve and advance universal service, or

> (ii) notwithstanding the provisions of subsection (e) of this section, receive reimbursement utilizing the support mechanisms to preserve and advance universal service.

(2) Advanced services

The Commission shall establish competitively neutral rules--

(A) to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries; and

(B) to define the circumstances under which a telecommunications carrier may be required to connect its network to such public institutional telecommunications users.

* * *

> (i) Consumer protection

> The Commission and the States should ensure that universal service is available at rates that are just, reasonable, and affordable.

(j) Lifeline assistance

Nothing in this section shall affect the collection, distribution, or administration of the Lifeline Assistance Program provided for by the Commission under regulations

set forth in section 69.117 of title 47, Code of Federal Regulations, and other related sections of such title.

* * *

**47 C.F.R. § 54.507**

§ 54.507 Cap.

(a) Amount of the annual cap. The aggregate annual cap on federal universal service support for schools and libraries shall be $3.9 billion per funding year, of which $1 billion per funding year will be available for category two services, as described in § 54.502(a)(2), unless demand for category one services is higher than available funding.

(1) Inflation increase. In funding year 2016 and subsequent funding years, the $3.9 billion funding cap on federal universal service support for schools and libraries shall be automatically increased annually to take into account increases in the rate of inflation as calculated in paragraph (a)(2) of this section.

(2) Increase calculation. To measure increases in the rate of inflation for the purposes of this paragraph (a), the Commission shall use the Gross Domestic Product Chain-type Price Index (GDP–CPI). To compute the annual increase as required by this paragraph (a), the percentage increase in the GDP–CPI from the previous year will be used. For instance, the annual increase in the GDP–CPI from 2008 to 2009 would be used for the 2010 funding year. The increase shall be rounded to the nearest 0.1 percent by rounding 0.05 percent and above to the next higher 0.1 percent and otherwise rounding to the next lower 0.1 percent. This percentage increase shall be added to the amount of the annual funding cap from the previous funding year. If the yearly average GDP–CPI decreases or stays the same, the annual funding cap shall remain the same as the previous year.

(3) Public notice. When the calculation of the yearly average GDP–CPI is determined, the Wireline Competition Bureau shall publish a public notice in the Federal Register within 60 days announcing any increase of the annual funding cap including any increase to the $1 billion funding level available for category two services based on the rate of inflation.

(4) Filing window requests. At the close of the filing window, if requests for category one services are greater than the available funding, the Administrator

shall shift category two funds to provide support for category one services. If available funds are sufficient to meet demand for category one services, the Administrator, at the direction of the Wireline Competition Bureau, shall direct the remaining additional funds to provide support for category two requests.

(5) Amount of unused funds. All funds collected that are unused shall be carried forward into subsequent funding years for use in the schools and libraries support mechanism in accordance with the public interest and notwithstanding the annual cap. The Chief, Wireline Competition Bureau, is delegated authority to determine the proportion of unused funds, if any, needed to meet category one demand, and to direct the Administrator to use any remaining funds to provide support for category two requests. The Administrator shall report to the Commission, on a quarterly basis, funding that is unused from prior years of the schools and libraries support mechanism.

(6) Application of unused funds. On an annual basis, in the second quarter of each calendar year, all funds that are collected and that are unused from prior years shall be available for use in the next full funding year of the schools and libraries mechanism in accordance with the public interest and notwithstanding the annual cap as described in this paragraph (a).

* * *

§ 54.619 Cap.

(a) Amount of the annual cap. The aggregate annual cap on Federal universal service support for health care providers shall be $571 million per funding year. When total demand during a filing window period exceeds the total remaining support available for the funding year, an internal cap of $150 million per funding year for upfront payments and multi-year commitments under the Healthcare Connect Fund Program shall apply.

(1) Inflation increase. In funding year 2018 and subsequent funding years, the $571 million cap on federal universal support in the Rural Health Care Program shall be increased annually to take into account increases in the rate of inflation as calculated in paragraph (a)(2) in this section. In funding year 2020 and subsequent funding years, the $150 million cap on multi-year commitments and upfront payments in the Healthcare Connect Fund Program shall also be increased annually to take into account increases in the rate of inflation as calculated in paragraph (a)(2) in this section.

(2) Increase calculation. To measure increases in the rate of inflation for the purposes of paragraph (a)(1) in this section, the Commission shall use the Gross Domestic Product Chain-type Price Index (GDP–CPI). To compute the annual increase as required by paragraph (a)(1) in this section, the percentage increase in the GDP–CPI from the previous year will be used. For instance, the annual increase in the GDP–CPI from 2017 to 2018 would be used for the 2018 funding year. The increase shall be rounded to the nearest 0.1 percent by rounding 0.05 percent and above to the next higher 0.1 percent. This percentage increase shall be added to the amount of the annual Rural Health Care Program funding cap and the internal cap on multi-year commitments and upfront payments in the Healthcare Connect Fund Program from the previous funding year. If the yearly average GDP–CPI decreases or stays the same, the annual Rural Health Care Program funding cap and the internal cap on multi-year commitments and upfront payments in the Healthcare Connect Fund Program shall remain the same as the previous year.

(3) Public notice. After calculating the annual Rural Health Care Program funding cap and the internal cap on multi-year commitments and upfront payments in the Healthcare Connect Fund Program based on the GDP–CPI, the Wireline Competition Bureau shall publish a public notice in the Federal Register within 60 days announcing any increase of the annual funding cap based on the rate of inflation.

(4) Amount of unused funds. All unused collected funds shall be carried forward into subsequent funding years for use in the Rural Health Care Program in accordance with the public interest and notwithstanding the annual cap. The Administrator, on a quarterly basis, shall report to the Commission on unused Rural Health Care Program funding from prior years.

(5) Application of unused funds. On an annual basis, in the second quarter of each calendar year, all unused collected funds from prior years shall be available for use in the next full funding year of the Rural Health Care Program notwithstanding the annual cap as described in paragraph (a) in this section. The Wireline Competition Bureau, in consultation with the Office of the Managing Director, shall determine the proportion of unused funding for use in the Rural Health Care Program in accordance with the public interest to either satisfy demand notwithstanding the annual cap, reduce collections for the Rural Health Care Program, or to hold in reserve to address contingencies for subsequent funding years. The Wireline Competition Bureau shall direct the Administrator to carry out the necessary actions for the use of available funds consistent with the direction specified in this section.

(b) [Reserved]

§ 54.702 Administrator's functions and responsibilities.

(a) The Administrator, and the divisions therein, shall be responsible for administering the schools and libraries support mechanism, the rural health care support mechanism, the high-cost support mechanism, and the low income support mechanism.

(b) The Administrator shall be responsible for billing contributors, collecting contributions to the universal service support mechanisms, and disbursing universal service support funds.

(c) The Administrator may not make policy, interpret unclear provisions of the statute or rules, or interpret the intent of Congress. Where the Act or the Commission's rules are unclear, or do not address a particular situation, the Administrator shall seek guidance from the Commission.

(d) The Administrator may advocate positions before the Commission and its staff only on administrative matters relating to the universal service support mechanisms.

(e) The Administrator shall maintain books of account separate from those of the National Exchange Carrier Association, of which the Administrator is an independent subsidiary. The Administrator's books of account shall be maintained in accordance with generally accepted accounting principles. The Administrator may borrow start up funds from the National Exchange Carrier Association. Such funds may not be drawn from the Telecommunications Relay Services (TRS) fund or TRS administrative expense accounts.

(f) The Administrator shall create and maintain a website, as defined in § 54.5, on which applications for services will be posted on behalf of schools, libraries and rural health care providers.

(g) The Administrator shall file with the Commission and Congress an annual report by March 31 of each year. The report shall detail the Administrator's operations, activities, and accomplishments for the prior year, including information about participation in each of the universal service support

mechanisms and administrative action intended to prevent waste, fraud, and abuse. The report also shall include an assessment of subcontractors' performance, and an itemization of monthly administrative costs that shall include all expenses, receipts, and payments associated with the administration of the universal service support programs. The Administrator shall consult each year with Commission staff to determine the scope and content of the annual report.

(h) The Administrator shall report quarterly to the Commission on the disbursement of universal service support program funds. The Administrator shall keep separate accounts for the amounts of money collected and disbursed for eligible schools and libraries, rural health care providers, low-income consumers, and high-cost and insular areas.

(i) Information based on the Administrator's reports will be made public by the Commission at least once a year as part of a Monitoring Report.

(j) The Administrator shall provide the Commission full access to the data collected pursuant to the administration of the universal service support programs.

(k) Pursuant to § 64.903 of this chapter, the Administrator shall file with the Commission a cost allocation manual (CAM) that describes the accounts and procedures the Administrator will use to allocate the shared costs of administering the universal service support mechanisms and its other operations.

(l) The Administrator shall make available to whomever the Commission directs, free of charge, any and all intellectual property, including, but not limited to, all records and information generated by or resulting from its role in administering the support mechanisms, if its participation in administering the universal service support mechanisms ends.

(m) If its participation in administering the universal service support mechanisms ends, the Administrator shall be subject to close-out audits at the end of its term.

(n) The Administrator shall account for the financial transactions of the Universal Service Fund in accordance with generally accepted accounting principles for federal agencies and maintain the accounts of the Universal Service Fund in accordance with the United States Government Standard General Ledger. When the Administrator, or any independent auditor hired by the Administrator, conducts

audits of the beneficiaries of the Universal Service Fund, contributors to the Universal Service Fund, or any other providers of services under the universal service support mechanisms, such audits shall be conducted in accordance with generally accepted government auditing standards. In administering the Universal Service Fund, the Administrator shall also comply with all relevant and applicable federal financial management and reporting statutes.

(o) The Administrator shall provide performance measurements pertaining to the universal service support mechanisms as requested by the Commission by order or otherwise.

§ 54.703 The Administrator's Board of Directors.

(a) The Administrator shall have a Board of Directors separate from the Board of Directors of the National Exchange Carrier Association. The National Exchange Carrier Association's Board of Directors shall be prohibited from participating in the functions of the Administrator.

(b) Board composition. The independent subsidiary's Board of Directors shall consist of twenty (20) directors:

(1) Three directors shall represent incumbent local exchange carriers, with one director representing the Bell Operating Companies and GTE, one director representing ILECs (other than the Bell Operating Companies) with annual operating revenues in excess of $40 million, and one director representing ILECs (other than the Bell Operating Companies) with annual operating revenues of $40 million or less;

(2) Two directors shall represent interexchange carriers, with one director representing interexchange carriers with more than $3 billion in annual operating revenues and one director representing interexchange carriers with annual operating revenues of $3 billion or less;

(3) One director shall represent commercial mobile radio service (CMRS) providers;

(4) One director shall represent competitive local exchange carriers;

(5) One director shall represent cable operators;

(6) One director shall represent information service providers;

(7) Three directors shall represent schools that are eligible to receive discounts pursuant to § 54.501;

(8) One director shall represent libraries that are eligible to receive discounts pursuant to § 54.501;

(9) Two directors shall represent rural health care providers that are eligible to receive supported services pursuant to § 54.601;

(10) One director shall represent low-income consumers;

(11) One director shall represent state telecommunications regulators;

(12) One director shall represent state consumer advocates;

(13) One director shall represent Tribal communities; and

(14) The Chief Executive Officer of the Administrator.

(c) Selection process for board of directors.

(1) Sixty (60) days prior to the expiration of a director's term, the industry or non-industry group that is represented by such director on the Administrator's Board of Directors, as specified in paragraph (b) of this section, shall nominate by consensus a new director. The industry or non-industry group shall submit the name of its nominee for a seat on the Administrator's Board of Directors, along with relevant professional and biographical information about the nominee, to the Chairman of the Federal Communications Commission. Only members of the industry or non-industry group that a Board member will represent may submit a nomination for that position.

(2) The name of an industry or non-industry group's nominee shall be filed with the Office of the Secretary of the Federal Communications Commission in accordance with part 1 of this chapter. The document nominating a candidate shall be captioned "In the matter of: Nomination for Universal Service Administrator's Board of Directors" and shall reference FCC Docket Nos. 97–21 and 96–45. Each nomination shall specify the position on the Board of Directors for which such nomination is submitted. Two copies of the document nominating a candidate shall be submitted to the Wireline Competition Bureau's Telecommunications Access Policy Division.

(3) The Chairman of the Federal Communications Commission shall review the nominations submitted by industry and non-industry groups and select each director of the Administrator's Board of Directors, as each director's term expires pursuant to paragraph (d) of this section. If an industry or non-industry group does not reach consensus on a nominee or fails to submit a nomination

for a position on the Administrator's Board of Directors, the Chairman of the Federal Communications Commission shall select an individual to represent such group on the Administrator's Board of Directors.

(d) Board member terms. The directors of the Administrator's Board shall be appointed for three-year terms, except that the Chief Executive Officer shall be a permanent member of the Board. Board member terms shall run from January 1 of the first year of the term to December 31 of the third year of the term, except that, for purposes of the term beginning on January 1, 1999, the terms of the six directors shall expire on December 31, 2000, the terms of another six directors on December 31, 2001, and the terms of the remaining six directors on December 31, 2002. Directors may be reappointed for subsequent terms pursuant to the initial nomination and appointment process described in paragraph (c) of this section. If a Board member vacates his or her seat prior to the completion of his or her term, the Administrator will notify the Wireline Competition Bureau of such vacancy, and a successor will be chosen pursuant to the nomination and appointment process described in paragraph (c) of this section.

* * *

§ 54.704 The Administrator's Chief Executive Officer.

(a) Chief Executive Officer's functions.

(1) The Chief Executive Officer shall have management responsibility for the administration of the federal universal service support mechanisms.

(2) The Chief Executive Officer shall have management responsibility for all employees of the Universal Service Administrative Company. The Chief Executive Officer may delegate such responsibility to heads of the divisions established in § 54.701(g).

(3) The Chief Executive Officer shall serve on the Administrator's Board of Directors as set forth in § 54.703(b) and on the Committees of the Board established under § 54.705.

(b) Selection process for the Chief Executive Officer.

(1) The members of the Board of Directors of the Administrator shall nominate by consensus a Chief Executive Officer. The Board of Directors shall submit the name of its nominee for Chief Executive Officer, along with relevant professional and biographical information about the nominee, to the Chairperson of the Federal Communications Commission.

(2) The Chairperson of the Federal Communications Commission shall review the nomination submitted by the Administrator's Board of Directors. Subject to the Chairperson's approval, the nominee shall be appointed as the Administrator's Chief Executive Officer.

(3) If the Board of Directors does not reach consensus on a nominee or fails to submit a nomination for the Chief Executive Officer, the Chairperson of the Federal Communications Commission shall select a Chief Executive Officer.

§ 54.709 Computations of required contributions to universal service support mechanisms.

(a) Prior to April 1, 2003, contributions to the universal service support mechanisms shall be based on contributors' end-user telecommunications revenues and on a contribution factor determined quarterly by the Commission. Contributions to the mechanisms beginning April 1, 2003 shall be based on contributors' projected collected end-user telecommunications revenues, and on a contribution factor determined quarterly by the Commission.

(1) For funding the federal universal service support mechanisms prior to April 1, 2003, the subject revenues will be contributors' interstate and international revenues derived from domestic end users for telecommunications or telecommunications services, net of prior period actual contributions. Beginning April 1, 2003, the subject revenues will be contributors' projected collected interstate and international revenues derived from domestic end users for telecommunications or telecommunications services, net of projected contributions.

(2) Prior to April 1, 2003, the quarterly universal service contribution factor shall be determined by the Commission based on the ratio of total projected quarterly expenses of the universal service support mechanisms to the total end-user interstate and international telecommunications revenues, net of prior period actual contributions. Beginning April 1, 2003, the quarterly universal service contribution factor shall be determined by the Commission based on the ratio of total projected quarterly expenses of the universal service support mechanisms to the total projected collected end-user interstate and international telecommunications revenues, net of projected contributions. The Commission shall approve the Administrator's quarterly projected costs of the universal service support mechanisms, taking into account demand for support and administrative expenses. The total subject revenues shall be compiled by the Administrator based on information contained in the Telecommunications Reporting Worksheets described in § 54.711(a).

(3) Total projected expenses for the federal universal service support mechanisms for each quarter must be approved by the Commission before they are used to calculate the quarterly contribution factor and individual contributions. For each quarter, the Administrator must submit its projections of demand for the federal universal service support mechanisms for high-cost areas, low-income consumers, schools and libraries, and rural health care providers, respectively, and the basis for those projections, to the Commission and the Office of the Managing Director at least sixty (60) calendar days prior to the start of that quarter. For each quarter, the Administrator must submit its projections of administrative expenses for the high-cost mechanism, the low-income mechanism, the schools and libraries mechanism and the rural health care mechanism and the basis for those projections to the Commission and the Office of the Managing Director at least sixty (60) calendar days prior to the start of that quarter. Based on data submitted to the Administrator on the Telecommunications Reporting Worksheets, the Administrator must submit the total contribution base to the Office of the Managing Director at least thirty (30) days before the start of each quarter. The projections of demand and administrative expenses and the contribution factor shall be announced by the Commission in a public notice and shall be made available on the Commission's website. The Commission reserves the right to set projections of demand and administrative expenses at amounts that the Commission determines will serve the public interest at any time within the fourteen-day period following release of the Commission's public notice. If the Commission take no action within fourteen (14) days of the date of release of the public notice announcing the projections of demand and administrative expenses, the projections of demand and administrative expenses, and the contribution factor shall be deemed approved by the Commission. Except as provided in § 54.706(c), the Administrator shall apply the quarterly contribution factor, once approved by the Commission, to contributor's interstate and international end-user telecommunications revenues to calculate the amount of individual contributions.

(b) If the contributions received by the Administrator in a quarter exceed the amount of universal service support program contributions and administrative costs for that quarter, the excess payments will be carried forward to the following

quarter. The contribution factors for the following quarter will take into consideration the projected costs of the support mechanisms for that quarter and the excess contributions carried over from the previous quarter. The Commission may instruct the Administrator to treat excess contributions in a manner other than as prescribed in this paragraph (b). Such instructions may be made in the form of a Commission Order or a public notice released by the Wireline Competition Bureau. Any such public notice will become effective fourteen days after release of the public notice, absent further Commission action.

(c) If the contributions received by the Administrator in a quarter are inadequate to meet the amount of universal service support program payments and administrative costs for that quarter, the Administrator shall request authority from the Commission to borrow funds commercially, with such debt secured by future contributions. Subsequent contribution factors will take into consideration the projected costs of the support mechanisms and the additional costs associated with borrowing funds.

(d) If a contributor fails to file a Telecommunications Reporting Worksheet by the date on which it is due, the Administrator shall bill that contributor based on whatever relevant data the Administrator has available, including, but not limited to, the number of lines presubscribed to the contributor and data from previous years, taking into consideration any estimated changes in such data.