No. 25-60535

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

CONSUMERS' RESEARCH; CAUSE BASED COMMERCE,
INCORPORATED; EDWARD J. BLUM; KERSTEN CONWAY; SUZANNE
BETTAC; ROBERT KULL; KWANG JA KIRBY; TOM KIRBY; JOSEPH
BAYLY; JEREMY ROTH; DEANNA ROTH; LYNN GIBBS; PAUL GIBBS;
RHONDA THOMAS; JAMES ROMEO; CODY CARNETT; PHILLIP
ARONOFF; JACQUELINE KLEIN,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

_____

Petition for Review of an Order of the
Federal Communications Commission

---

## JOINT BRIEF IN SUPPORT OF RESPONDENTS OF INTERVENORS SCHOOLS, HEALTH & LIBRARIES BROADBAND COALITION, BENTON INSTITUTE FOR BROADBAND & SOCIETY, NATIONAL DIGITAL INCLUSION ALLIANCE, AND CENTER FOR MEDIA JUSTICE, DBA MEDIAJUSTICE

---

Andrew Jay Schwartzman
525 9th Street NW, 7th Fl.
Washington, DC 20004
(202) 241-2408
AndySchwartzman@gmail.com

Sean A. Lev
Jason Neal
HWG LLP
1919 M Street, NW, 8th Floor
Washington, D.C.  20036
(202) 730-1300
jneal@hwglaw.com

*Counsel for Benton Institute for
Broadband & Society, National Digital
Inclusion Alliance, and Center for
Media Justice dba MediaJustice*

*Counsel for Schools, Health &
Libraries Broadband Coalition*

March 20, 2026

# CERTIFICATE OF INTERESTED PARTIES

**No. 25-60535, *Consumers' Research, et al. v. Federal Communications Commission and United States of America***

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

(1) Petitioners are: Consumers' Research; Cause Based Commerce, Incorporated; Edward J. Blum; Kersten Conway; Suzanne Bettac; Robert Kull; Kwang Ja Kirby; Tom Kirby; Joseph Bayly; Jeremy Roth; Deanna Roth; Lynn Gibbs; Paul Gibbs; Rhonda Thomas; James Romeo; Cody Carnett; Phillip Aronoff; Jacqueline Klein.

(2) Counsel for Petitioners are: Michael Buschbacher, Jared M. Kelson, James R. Conde, and Laura B. Ruppalt of Boyden Gray PLLC.

(3) The Federal Communications Commission is a federal agency, and the United States of America is a respondent by statute.

(4) Counsel for the Federal Communications Commission are: D. Adam Candeub, Jacob Matthew Lewis, and James Michael Carr. Counsel for the United States of America are: Brett Shumate, Michael S. Raab, and Caroline W. Tan.

(5) Intervenor Schools, Health & Libraries Broadband (SHLB) Coalition, supporting Respondents, is an incorporated 501(c)(3) public interest organization with over 300 members who share the goal of promoting open, affordable, high-quality broadband for anchor institutions and their communities.  Its members include representatives of health care providers and networks, schools, libraries, state broadband offices, private sector companies, state and national research and education networks, and consumer organizations.  A complete list is available at https://www.shlb.org/.  Schools, Health & Libraries Broadband Coalition is a non-profit corporation that has no owners or subsidiaries; accordingly, it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

(6) Counsel for Intervenor Schools, Health & Libraries Broadband Coalition are Sean A. Lev and Jason Neal of HWG LLP.

(7) Benton Institute for Broadband & Society, the National Digital Inclusion Alliance, and the Center for Media Justice doing business as MediaJustice have intervened in this appeal in support of Respondents.  Counsel for those intervenors is Andrew Jay Schwartzman.

(8) National Telecommunications Cooperative Association, dba NTCA – The Rural Broadband Association has intervened in this appeal in support of

Respondents.  Counsel for this intervenor are Jennifer Tatel, Daniel H. Kahn, Tyler D. Dillon, and Zane Altemus of Wilkinson Barker Knauer, LLP.

(9) American Library Association has filed an *amicus curiae* brief in support of Respondents.  Counsel for American Library Association is Catherine E. Ferri of the Communications & Technology Law Clinic, Georgetown Law.

Pursuant to Fifth Circuit Rule 28.2.1, the following describes the "large group of persons or firms" that are "financially interested in the outcome" of this litigation: Petitioners challenge the Federal Communications Commission's approval of the *Proposed Fourth Quarter 2025 Universal Service Contribution Factor*, Public Notice, DA 25-840, CC Docket No. 96-45 (rel. Sept. 15, 2025) (JA___-___). Telecommunications companies obligated to pay a percentage of their interstate end-user revenues to the Universal Service Fund based on the contribution factor are financially interested in the outcome of this litigation.  The Universal Service Fund pays for four programs: the "Lifeline/Link Up" program, the "High Cost" program, the "Schools and Libraries" program, and the "Rural Health Care" program.  *See, e.g.*, Federal Communications Commission, *Universal Service Support Mechanisms*, https://www.fcc.gov/consumers/guides/universal-service-support-mechanisms (last visited Mar. 19, 2026).  Direct beneficiaries of those programs, providers of services covered by those programs, and many other

participants in the overall telecommunications industry are financially interested or potentially interested in the outcome of this litigation.

Dated: March 20, 2026

/s/ Jason Neal

Jason Neal
*Counsel of Record for Schools, Health & Libraries Broadband Coalition*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

JURISDICTIONAL STATEMENT ......................................................................3

STATEMENT OF ISSUES PRESENTED.............................................................3

STATEMENT OF THE CASE ..............................................................................3

INTERESTS OF INTERVENORS .......................................................................11

SUMMARY OF ARGUMENT ............................................................................13

ARGUMENT ........................................................................................................16

I.  THE COURT SHOULD REJECT PETITIONERS'
    NON-DELEGATION ARGUMENTS...........................................................16

II. THE COURT SHOULD REJECT PETITIONERS' ARGUMENTS
    THAT THE FCC HAS MISINTERPRETED SECTION 254. ......................29

    A.  PETITIONERS' CLAIMS ARE NOT PROPERLY BEFORE
        THIS COURT..........................................................................................29

    B.  PETITIONERS' STATUTORY ARGUMENTS LACK
        MERIT......................................................................................................39

CONCLUSION .....................................................................................................43

# TABLE OF AUTHORITIES

## CASES

*Allen v. Wright*,
468 U.S. 737 (1984)...............................................................33

*Child.'s Health Def. v. FCC*,
25 F.4th 1045 (D.C. Cir. 2022)...........................................37

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)..............................................................32

*Consumers' Rsch. v. FCC*,
109 F.4th 743 (5th Cir. 2024) (en banc)......................9, 33

*El Paso City v. Trump*,
982 F.3d 332 (5th Cir. 2020) ...............................................34

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025)........................... 1, 2, 3, 4, 8, 9, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 28, 37, 39, 40, 41, 42

*Huawei Techs. USA, Inc. v. FCC*,
2 F.4th 421 (5th Cir. 2021) .................................................35

*Lorillard v. Pons*,
434 U.S. 575 (1978)..............................................................25

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010)..............................................................32

*Raines v. Byrd*,
521 U.S. 811 (1997)..............................................................33

*Time Warner Ent. Co., L.P. v. FCC*,
144 F.3d 75 (D.C. Cir. 1998).............................................38

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)..............................................................32

*Tribune Co. v. FCC*,
133 F.3d 61 (D.C. Cir. 1998)........................................31, 36

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001)..............................................................28

*Worldcall Interconnect, Inc. v. FCC*,
907 F.3d 810 (5th Cir. 2018) .............................................38

*WWHT, Inc. v. FCC,*
  656 F.2d 807 (D.C. Cir. 1981)................................................................36

**STATUTES**

28 U.S.C. § 2344 ................................................................................29

47 U.S.C. § 153(24) ........................................................................2, 20

47 U.S.C. § 153(50) ........................................................................2, 20

47 U.S.C. § 254 .............................. 1, 2, 3, 4, 5, 13, 15, 16, 18, 23, 24, 25, 26, 35

47 U.S.C. § 254(b) .......................................... 4, 14, 25, 26, 27, 28, 33, 40

47 U.S.C. § 254(b)(1)............................................................................21

47 U.S.C. § 254(b)(2)............................................................................25

47 U.S.C. § 254(b)(3)............................................................................25

47 U.S.C. § 254(b)(5)......................................................................16, 25, 39

47 U.S.C. § 254(b)(6)............................................................................25

47 U.S.C. § 254(c) .......................................................... 25, 26, 33, 40

47 U.S.C. § 254(c)(1)............................................ 4, 14, 19, 20, 26, 27, 41, 42

47 U.S.C. § 254(c)(3)................................... 2, 4, 9, 13, 14, 17, 19, 20, 24, 26, 27

47 U.S.C. § 254(d) ........................................ 5, 13, 16, 18, 22, 24, 39

47 U.S.C. § 254(e) ......................................................................5, 13, 16, 39

47 U.S.C. § 254(h) ........................................ 2, 14, 18, 19, 20, 24, 26

47 U.S.C. § 254(h)(1)(B) ..................................................................7, 26, 27

47 U.S.C. § 254(h)(2)............................ 2, 7, 9, 13, 14, 17, 18, 19, 20, 21, 24, 27

47 U.S.C. § 254(h)(2)(A) ........................................ 14, 18, 19, 20, 21, 22, 23, 25

47 U.S.C. § 254(h)(5)............................................................................7

47 U.S.C. § 254(h)(7)............................................................................7

47 U.S.C. § 402(a) ................................................................................29

47 U.S.C. § 405 ................................................................................37

47 U.S.C. § 405(a) ........................................................................15, 38

47 U.S.C. § 1302(a) ............................................................................21

47 U.S.C. § 1302(b) ..........................................................................6

47 U.S.C. § 1302(d)(1)....................................................................2, 21

American Recovery and Reinvestment Act of 2009, Pub. L.
No. 111-5, § 6001(k)(2)(C), 123 Stat. 115 .........................................6

Consolidated Appropriations Act, 2001, Pub. L. No. 106-554,
§ 1721, 114 Stat. 2763 (2000) ....................................................7, 25

Departments of Commerce, Justice, and State, the Judiciary, and
Related Agencies Appropriations Act, 1998, Pub. L. No. 105-119,
§ 623, 111 Stat. 2440 (1997)............................................................6

Infrastructure Investment and Jobs Act, Pub. L. No. 117-58,
§ 60104(c), 135 Stat. 429 (2021).................................................6, 42

## REGULATIONS

47 C.F.R. § 1.401(a)........................................................................31

## ADMINISTRATIVE DECISONS

*Connect America Fund*, Report and Order and Order on
Reconsideration, 32 FCC Rcd. 1624 (2017)...................................34, 42

*High-Cost Universal Service Support*, Order on Remand and
Memorandum Opinion and Order, 25 FCC Rcd. 4072 (2010).........................40

*Modernizing the E-rate Program for Schools and Libraries*, Report
and Order and Further Notice of Proposed Rulemaking,
29 FCC Rcd. 8870 (2014)..............................................................21

*Promoting Telehealth for Low-Income Consumers,
COVID-19 Telehealth Program*, Report and Order,
35 FCC Rcd. 3366 (2020)....................................................22, 23, 28

*Rural Digital Opportunity Fund, Connect America Fund*,
Report and Order, 35 FCC Rcd. 686 (2020)...........................................35

*Rural Health Care Support Mechanism*, Report and Order,
27 FCC Rcd. 16678 (2012)..........................................................23, 27

*Rural Health Care Support Mechanism*, Report and Order, Order on
Reconsideration, and Further Notice of Proposed Rulemaking,
18 FCC Rcd. 24546 (2003)............................................................27

# OTHER AUTHORITIES

Bill Callaghan *et al.*, Nat'l Digit. Inclusion All. and Pub. Knowledge, *The Discount Internet Guidebook* (2018) ........................................................12

En Banc Brief for Petitioners, *Consumers' Rsch. v. FCC*, 109 F.4th 743 (2024) (No. 22-60008) ...........................................................17

FCC and U.S. Petition for Writ of Certiorari, *FCC v. Consumers' Rsch.*, 606 U.S. 656 (2025) (No. 24-354).........................................................41

FCC, *Connecting America: The National Broadband Plan* (2010) .........................6

FCC, *The Universal Service Fund: How It Impacts the United States* (2024) .................................................................................................5

John B. Horrigan, Benton Inst. for Broadband & Soc'y, *Reimagining Lifeline: Universal Service, Affordability, and Connectivity* (2022)................12

Jordan Arnold, Benton Inst. for Broadband & Soc'y, *The Future of American Farming: Broadband Solutions for the Farm Office, Field, and Community* (2021) .........................................................................11

*Program Data: Lifeline Participation*, USAC (last visited Mar. 12, 2026) .......................................................................................................5

Reply Brief for Petitioners, *Consumers' Rsch. v. FCC*, 109 F.4th 743 (2024) (No. 22-60008)......................................................................17

S. Rept. No. 104-230 (1996).........................................................................26, 27

**INTRODUCTION**

The United States and the Federal Communications Commission ("FCC") properly explain that Petitioners' arguments disregard key statutory language, ignore clear guidance from the Supreme Court in Petitioners' own prior challenge, and misread relevant agency decisions. Intervenors Schools, Health & Libraries Broadband Coalition ("SHLB"), Benton Institute for Broadband & Society, National Digital Inclusion Alliance, and Center for Media Justice doing business as MediaJustice submit this brief to address Petitioners' two lead arguments and expand upon several key reasons their arguments should be rejected.

*First*, although Petitioners continue to press a nondelegation argument, they have learned none of the lessons from the Supreme Court's decision in their prior challenge. *See FCC v. Consumers' Rsch.*, 606 U.S. 656 (2025). Although the Court did not address the particular nondelegation arguments Petitioners now press, it made clear that statutory language in 47 U.S.C. § 254 identical to or less specific than that at issue here was sufficient to pass constitutional muster as to the two relevant questions in this context: "First, how much money can the FCC raise through contributions? And second, on what things can it spend those funds?" 606 U.S. at 680-81.

As to the first question, the same requirement of "sufficiency"—here, buttressed by the similar requirement that the agency act in an "economically

1

reasonable" manner—that the Court explicitly held to be a constitutionally adequate floor and ceiling, *see id.* at 681, applies to the two subsections that Petitioners' challenge. *See infra* pp. 18, 21-22. As to the second question, Section 254(c)(3) authorizes support only for services delineated in Section 254(h). In turn, Section 254(h)(2)—the provision Petitioners challenge—places multiple meaningful restrictions on what services can be supported. That provision is limited to "telecommunications" and "information services," both of which are defined in the Communications Act, 47 U.S.C. § 153(24), (50), and makes clear that only the subset of those that are "advanced," another term to which the Communications Act provides content, *see id.* § 1302(d)(1), should be furthered. In these ways, and others discussed below, Section 254(h) contains numerous "ascertainable and meaningful guideposts" for the FCC that are at least as significant as those the Supreme Court held to be adequate. *Consumers' Rsch.*, 606 U.S. at 681.

*Second*, Petitioners' claim that the Supreme Court's decision establishes that the FCC has long misinterpreted Section 254 flounders at the threshold. Contrary to their premise, the Court never suggested that the FCC has been misinterpreting Section 254. In fact, the Court majority stated plainly that "Congress made clear the parameters of the programs, *and the FCC has operated within them.*" *Id.* at 687 (emphasis added). Even more specifically, the Court explained that "[e]ach of

2

the four programs the FCC now operates under Section 254 reflects Congress's choices about universal service's scope and content" and that "[e]ach provides communications services *satisfying the Act's listed criteria*." *Id.* at 686 (emphasis added).

In any event, the Court need not even reach the issue of this alleged statutory misinterpretation because, as Respondents have rightly stressed, Petitioners' submissions both here and before the agency have raised only a generalized interpretive dispute, not a concrete legal claim that they have connected to real current or imminent harm. For that reason, they lack standing, their claim is not ripe, and they have not satisfied statutory exhaustion requirements.

## JURISDICTIONAL STATEMENT

Intervenors adopt the jurisdictional statement from Respondents' brief. *See* Resp. Br. 1. Moreover, as discussed below, issues regarding Petitioners' standing and the ripeness of some claims implicate whether the Court has jurisdiction and whether the Court should exercise its jurisdiction.

## STATEMENT OF ISSUES PRESENTED

Intervenors adopt the statement of issues from Respondents' brief. *See* Resp. Br. 2. Intervenors address issues 1 and 2 in this brief.

## STATEMENT OF THE CASE

In 1996, Congress adopted fundamental changes that moved away from a monopoly-based system for local telephone service to a competitive market-driven

approach.  Because competition was inconsistent with the use of implicit subsidies, Congress required the FCC to replace its implicit subsidy system with explicit universal service mechanisms, as codified in 47 U.S.C. § 254.  *See* Resp. Br. 4-6 (describing relevant history).  Those mechanisms include support for high-cost areas, low-income consumers, schools and libraries, and rural health care facilities. *See Consumers' Rsch.*, 606 U.S. at 667-68.

Congress defined universal service in general as "an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services."  47 U.S.C. § 254(c)(1).  However, it also authorized the FCC, "in addition to the services included in the definition of universal service under [Section 254(c)(1)]," to "designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of [Section 254(h)]."  *Id.* § 254(c)(3).  And, for all of universal service, Congress identified a series of "principles" upon which "the Commission shall base" its policies and the Universal Service Fund programs.  *Id.* § 254(b).

Congress also established the framework for contributions to finance universal service.  It required every "carrier that provides interstate telecommunications services [to] contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the

4

Commission to preserve and advance universal service." *Id*. § 254(d). Congress specified that the support be "explicit and sufficient to achieve the purposes" of Section 254. *Id.* § 254(e).

Beginning in 1997, and continuing over the following years, the FCC adopted and refined its regulations implementing Congress's directions and establishing the four Universal Service Fund programs: High Cost, Lifeline, E-Rate, and Rural Health Care. *See also* Resp. Br. 10. Today, the High Cost program funds rural services to consumers and businesses in every state and territory. Over 8.1 million households subscribe to the Lifeline program, including low-income households, veterans, and people on tribal lands.[1] From 2022 to 2024, 106,000 schools and more than 12,500 libraries received funding from the E-Rate program, benefiting over 54 million students.[2] From 2021 to 2023, over 16,000 health care providers received funding from the Rural Health Care program.[3]

Congress established periodic reporting requirements in the Telecommunications Act of 1996 and subsequent legislation to oversee the FCC's implementation of Section 254. For example, the FCC must conduct an annual

---

[1]  *Program Data: Lifeline Participation*, USAC, https://www.usac.org/lifeline/resources/program-data/ (last visited Mar. 12, 2026) (figures from "Lifeline Participation Rate" Excel file).

[2]  FCC, *The Universal Service Fund: How It Impacts the United States* 1 (2024).

[3]  *Id.*

inquiry into "the availability of advanced telecommunications capability to all Americans" and, if necessary, "take immediate action to accelerate deployment of such capability." 47 U.S.C. § 1302(b). And in 1997, immediately after the FCC issued rules implementing Section 254, Congress required the FCC to submit a detailed report on who was required to contribute, and who was permitted to receive, universal service funds.[4] Likewise in 2009, Congress mandated that the FCC assess the state of broadband deployment.[5] The FCC published the National Broadband Plan the following year.[6] And in 2021, Congress further required the FCC to provide recommendations for "improving its effectiveness in achieving the universal service goals for broadband," with a limitation that the recommendations "may not in any way reduce the congressional mandate to achieve the universal service goals for broadband."[7]

Congress itself also modified Section 254 after the FCC's initial implementation decisions. For example, after the FCC promulgated the

---

[4]   Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-119, § 623, 111 Stat. 2440, 2521-22 (1997).

[5]   American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 6001(k)(2)(C), 123 Stat. 115, 515-16.

[6]   FCC, *Connecting America: The National Broadband Plan* (2010).

[7]   Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 60104(c), 135 Stat. 429, 1205-06 (2021).

foundational rules for the E-Rate program under Section 254(h)(1)(B) and (h)(2), Congress adopted extensive requirements, now codified at Section 254(h)(5)-(7), regarding support for internet access under the program. *See* Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, § 1721, 114 Stat. 2763, 2763A-343-50 (2000).

Behind the statistics regarding the Universal Service Fund are countless stories of Americans who benefit from the Universal Service Fund programs. For Spring Independent School District in Texas, E-Rate funding was essential in allowing the district to build a resilient wireless foundation that supports students, teachers, and staff every day in their schools. Students gained consistent access to digital resources, collaboration platforms, and learning applications, whether in classrooms, libraries, or common areas. Similarly, East Baton Rouge Parish Library, in Louisiana, has been able to provide internet connectivity in library conference rooms for telehealth opportunities, health fairs, and wellness programs, and allow residents to access other digital resources seven days a week at all library locations.

The FCC has also been able to deliver this impact under Section 254 without meaningfully increasing the overall size of the Fund in recent years. The graph below illustrates this phenomenon. The most important line is the dotted orange one at the bottom. Contrary to Petitioners' claim that the Fund has "skyrocketed,"

it shows that the Fund's size has remained relatively flat. Pet. Br. 14. Although

the contribution factor has increased (the blue line), that is because the contribution

base has decreased (the higher dotted orange line). *See Consumers' Rsch.*, 606

U.S. at 686-87 (comparing expenditures in 1999 and 2024).



Petitioners recently challenged the constitutionality of the Universal Service

Fund in its entirety, contending that Section 254 as a whole violated the public

non-delegation doctrine and that the FCC's reliance on the Universal Service

Administrative Company ("USAC") for support regarding certain aspects of the

Fund violated the private non-delegation doctrine. Sitting en banc, this Court held

in favor of Petitioners, concluding that "*the combination* of Congress's sweeping

delegation to FCC and FCC's unauthorized subdelegation to USAC" violated the

constitution.  *Consumers' Rsch. v. FCC*, 109 F.4th 743, 778 (5th Cir. 2024) (en banc), *rev'd*, 606 U.S. 656.

The Supreme Court reversed.  It concluded that Congress had "provided the Commission with clear guidance on how to promote universal service using carrier contributions" and that neither the FCC's reliance on USAC nor the combination of the two issues separately offended the Constitution.  *Consumers' Rsch.*, 606 U.S. at 698.  The Court also concluded that "Congress made clear the parameters of the programs, and the FCC has operated within them."  *Id.* at 687.  Having reversed this Court's judgment, the Supreme Court remanded for further proceedings, which ended when Petitioners dismissed their challenge.

In September 2025, Petitioners filed comments once more, this time in response to an FCC public notice regarding the calculation of the contribution factor for the fourth quarter of 2025.  They once again argued that the Commission should "set the [contribution factor] at 0.000 or reduce the Factor by the amount accounted for by any unlawful portions."  Comments and Objections of Consumers' Research *et al.* at 1, CC Docket No. 96-45 (filed Sept. 15, 2025) ("Consumers' Research Comments") (JA___).  As relevant to the arguments we address in this brief, Petitioners asserted that Section 254(c)(3) and (h)(2)—which the Supreme Court did not address specifically because Petitioners had raised no arguments particular to them—were "unconstitutional under the nondelegation

doctrine." *Id.* at 2 (JA___). Petitioners claimed that "those provisions are unconstitutional because they do not impose even qualitative restrictions on the Commission's ability to raise money for covered programs." *Id.* (JA___).

Petitioners also asserted that the Supreme Court had made a "drastic change in statutory meaning" and—in the course of ruling in favor of the FCC—had actually "told [the FCC] that its broad interpretation of its own authority is plain wrong." *Id.* (JA___). Accordingly, Petitioners argued, the FCC must "respond to" the Court's decision and "reduce the Factor" based on any programs the FCC concludes are inconsistent with the statute's purportedly new meaning. *Id.* at 1-2. (JA___-___). Petitioners did not identify particular programs that violate the statute, except to point to one example from Justice Gorsuch's dissent in the Supreme Court and to argue that "[t]here are undoubtedly other programs that do not comply." *Id.* at 18. (JA___). Even as to that example, Petitioners did not show that the agency's nearly decade-old decision affected the contribution factor and, if so, by how much.

The FCC adopted the contribution factor for the fourth quarter of 2025 without setting the factor to 0% or otherwise eliminating congressionally authorized Universal Service Fund programs. Petitioners then filed the instant challenge in this Court.

**INTERESTS OF INTERVENORS**

Intervenors joined this case to support the many educational institutions, health care providers, and American consumers and businesses that—in the nearly thirty years since the FCC established the Universal Service Fund—have come to rely upon it for mission-critical broadband and other communications services. The Schools, Health & Libraries Broadband Coalition ("SHLB") is a public interest organization whose mission is to promote open, affordable, high-quality broadband for anchor institutions and their communities. SHLB and its members, who include many universal service recipients, support the E-Rate, Rural Health Care, and other universal service programs to ensure that community anchor institutions have access to broadband internet access—the essential twenty-first century tool they need to serve and benefit the public.

Benton Institute for Broadband & Society is a forty-four-year-old, private operating foundation that conducts research and engages in advocacy to bring open, affordable, high-performance broadband to all people in the United States to ensure a thriving democracy. To advance its mission, Benton seeks to assist enrollment in Universal Service Fund-funded programs in many ways and conducts policy research on Universal Service Fund-funded programs.[8]

---

[8] *See* Jordan Arnold, Benton Inst. for Broadband & Soc'y, *The Future of American Farming: Broadband Solutions for the Farm Office, Field, and*

National Digital Inclusion Alliance is a non-profit 501(c)(3) organization supporting a community of digital inclusion practitioners and advocates who engage in local- and state-level efforts across the United States to promote equitable internet access, adoption, and use for low- and moderate-income households and communities, whether urban, rural, or Tribal.  In addition to participating in proceedings at the Federal Communications Commission, National Digital Inclusion Alliance provides educational resources to its affiliates and the public on affordability and digital equity.[9]  Many of National Digital Inclusion Alliance's 625 affiliates, located in forty-six states, directly support people and institutions who use Universal Service Fund programs that enable users to obtain more affordable access to communications services and technology, such as Lifeline, E-Rate, the High Cost Fund, and its successor program, the Rural Digital Opportunity Fund.

---

*Community* (2021), https://www.benton.org/sites/default/files/FutureAmerican Farming.pdf (detailed reporting regarding how broadband access affects the economy of rural America); John B. Horrigan, Benton Inst. for Broadband & Soc'y, *Reimagining Lifeline: Universal Service, Affordability, and Connectivity* (2022), https://www.benton.org/sites/default/files/reimaginglifeline_ final1_0.pdf (analysis based on a high-quality national poll of potential and actual Lifeline subscribers).

[9] *See, e.g.*, Bill Callaghan *et al.*, Nat'l Digit. Inclusion All. and Pub. Knowledge, *The Discount Internet Guidebook* (2018), https://discounts. digitalinclusion.org/pdfs/Discount%20Internet%20Guidebook%20v3.1.pdf (illustrating how private-sector initiatives and Universal Service Fund programs can expand access to areas that lack adequate connectivity).

The Center for Media Justice dba MediaJustice is a non-profit, 501(c)(3) organization established in 2009. It is dedicated to democratizing the economy, government, and society through policies and practices that, among other things, ensure democratic media ownership, fundamental communication rights, and universal media and technology access at affordable prices. MediaJustice has a network of over 100 local, regional, or statewide affiliate social-justice organizations. MediaJustice and its affiliates directly support programs that enable users to obtain more affordable access to communications services and technology, including the Lifeline and E-Rate programs funded by the Universal Service Fund.

## SUMMARY OF ARGUMENT

**I.** Petitioners' arguments that Section 254(c)(3) and (h)(2) grant the FCC "effectively boundless authority" and thus violate the non-delegation doctrine lack merit. Pet Br. 27. Those provisions are subject not only to Section 254's requirement that all the FCC's support mechanisms be "sufficient," 47 U.S.C. § 254(d), (e), but also to Section 254(h)(2)'s specific limitation to provide support under that provision only "to the extent … economically reasonable." Congress also provided "appropriate guidance about the nature and content" of the universal-service programs supported under Section 254(c)(3) and (h)(2) by using defined and well-understood terms that cabin the reach of those programs. *Consumers' Rsch.*, 606 U.S. at 683.

In this regard, Section 254(c)(3) authorizes "additional services for" the

E-Rate and Rural Health Care programs under Section 254(h) for a basic reason:

the telecommunications needs of schools, libraries, and health care providers differ

from those of the residential customers who benefit from the Lifeline and High

Cost programs authorized under Section 254(c)(1).  Those "additional services,"

however, are confined to those permitted by Section 254(h)'s terms.  And

Section 254(h)(2)(A), the provision Petitioners challenge here, contains numerous

"ascertainable and meaningful guideposts" for the FCC that are at least as

constraining as those the Supreme Court has already approved.  *Consumers' Rsch.*,

606 U.S. at 681.  Among other things, both the statute and the FCC's decisions

implementing it reflect that the restrictions to "advanced telecommunications and

information services," the requirements that the FCC's rules be "competitively

neutral," and the direction to enhance access to those services "to the extent

technically feasible and economically reasonable" all constrain the FCC's

decision-making.  47 U.S.C. § 254(h)(2).  Even beyond that, the structure of the

statute confirms that the principles of Section 254(b) also limit the FCC's exercise

of its authority under Section 254(c)(3) and (h)(2)(A).

**II.**  Petitioners' claims that the FCC has misinterpreted Section 254 in light

of the Supreme Court's decision in *Consumers' Research* also fail.  Although

Petitioners claim to be challenging the FCC's Fourth Quarter 2025 Contribution

Factor, *see* Pet. Br. 39-40, they make no showing that the contribution factor is incorrectly calculated. Instead, they asked the FCC, and now ask the Court, to decide in the abstract, without reference to the facts and context of a particular agency decision, whether snippets of text from scattered agency decisions are inconsistent with the Supreme Court's interpretation of Section 254. Petitioners' abstract concerns are not sufficient to establish standing, to create a ripe controversy warranting exercise of jurisdiction, or to exhaust issues before the FCC under 47 U.S.C. § 405(a).

If the Court reaches the merits of these claims, it should reject them. While Petitioners assert that "the Court's interpretation" of Section 254 "departed drastically from interpretations embraced by prior courts and by [the] FCC," Pet. Br. 38, the Supreme Court held the opposite: "Congress made clear the parameters of the programs, *and the FCC has operated within them*." *Consumers' Rsch.*, 606 U.S. at 687 (emphasis added). None of Petitioners' attempts to undermine that conclusion succeed. For example, while Petitioners treat the concept of "balancing" competing statutory priorities as somehow impermissible under the Court's decision, *see* Pet. Br. 41, the Court in fact *endorsed* the view that the FCC "may still have to strike balances in addressing th[e] criteria" identified in Section 254. *Consumers' Rsch.*, 606 U.S. at 688.

**ARGUMENT**

**I. THE COURT SHOULD REJECT PETITIONERS' NON-DELEGATION ARGUMENTS.**

When Petitioners' previous non-delegation challenge reached the Supreme Court, that Court rejected it, holding that Congress "imposed ascertainable and meaningful guideposts for the FCC to follow when carrying out its delegated function of collecting and spending contributions from carriers" in the Universal Service Fund. *Consumers' Rsch.*, 606 U.S. at 681. Multiple parts of Section 254 "direct[] the FCC to collect the amount that is 'sufficient' to support the universal-service programs Congress has told it to implement." *Id.* (citing 47 U.S.C. § 254(b)(5), (d), (e)). And, the Court held, "[e]ach of the four programs the FCC now operates under Section 254 reflects Congress's choices about universal service's scope and content." *Id.* at 686. The Court described the E-Rate and Rural Health Care programs—parts of which are authorized by the sub-provisions Petitioners target in this case—as "[s]pecifically authorized" by Congress and *not* "suggest[ing] an agency vested with unbridled discretion." *Id.* Even though the FCC "no doubt exercises significant discretion" under the statute, "it is discretion tethered to legislative judgments" throughout Section 254. *Id.* at 691.

Petitioners nonetheless seize upon a footnote in the Supreme Court's decision to revive their non-delegation challenge. Because Petitioners had not "argue[d] that Sections 254(c)(3) and (h)(2) are unconstitutional" or "advance[d]

16

any arguments that are specific to those provisions," the Court noted that it "ha[d] no occasion to address any nondelegation issues raised by" them. *Id.* at 687 n.9. Much like their previous theory, which "read Section 254 extravagantly, the better to create a constitutional problem," *id.* at 690, Petitioners argue that these two subsections give the FCC "effectively boundless authority to determine the scope of universal service—and thus the funds it can raise—for schools, libraries, and health care providers." Pet. Br. 27; *see also* Resp. Br. 25 (noting that Petitioners previously described the programs under these provisions as "'only a sliver' or 'a minuscule part' of the universal service regime" (quoting Reply Brief for Petitioners at 38 and En Banc Brief for Petitioners at 51, *Consumers' Rsch.*, 109 F.4th 743 (No. 22-60008)). Again, Petitioners' "arguments do not show statutory construction at its best." *Consumers' Rsch.*, 606 U.S. at 691.

Section 254(c)(3) and (h)(2), properly understood in the context of Congress's overall direction in the statute, do not provide the FCC with the expansive authority Petitioners claim. And they do not violate the non-delegation doctrine. *See* Resp. Br. 26-28 (describing intelligible-principle test, as the Supreme Court affirmed in *Consumers' Research v. FCC*). Just as in Petitioners' previous challenge, the "inquiry into the nature of the FCC's discretion involves … two closely related questions. First, how much money can the FCC raise through

contributions?  And second, on what things can it spend those funds?"

*Consumers' Rsch.*, 606 U.S. at 680-81.

The answer to the first question is the same here as with respect to the rest of Section 254: "the amount that is 'sufficient' to support the universal-service programs." *Id.* at 681.  That requirement comes primarily from 47 U.S.C. § 254(d)'s direction—which applies to all contributions made as a result of Section 254—that the FCC's support mechanisms be "specific, predictable, and sufficient."  47 U.S.C. § 254(d).  The Supreme Court concluded that "the word 'sufficient' sets a floor and a ceiling alike."  *Consumers' Rsch.*, 606 U.S. at 681. And the sufficiency requirement applies to programs established under Section 254(h) just like the other programs—the FCC establishes one contribution factor for all of the Universal Service Fund to which "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis."  47 U.S.C. § 254(d).  Moreover, as discussed below, Section 254(h)(2) reinforces that requirement for the programs supported under that provision, permitting the FCC to enhance access to the relevant services only "to the extent … economically reasonable."  *Id.* § 254(h)(2)(A).

Petitioners' challenges ultimately go to the second question: whether Congress provided "appropriate guidance about the nature and content" of the

universal-service programs supported under Section 254(c)(3) and (h)(2).

*Consumers' Rsch.*, 606 U.S. at 683.  There, too, Congress provided the FCC more than adequate guardrails.

Start with Section 254(c)(3), which states: "In addition to the services included in the definition of universal service under [Section 254(c)(1)], the Commission may designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h)."  47 U.S.C. § 254(c)(3).  As Respondents explain, Section 254(c)(3) is restricted to "'an identified set of recipients,'" *i.e.*, schools, libraries, and health care providers, which itself provides a significant constraint on FCC authority.  Resp. Br. 29 (quoting *Consumers' Rsch.*, 606 U.S. at 685).[10]

There is a straightforward reason—though one ignored by Petitioners—that Congress authorized "additional services" in the programs described in subsection (h) beyond those authorized under Section 254(c)(1) for these particular recipients.  Schools, libraries, and health care providers are sizable enterprises that likely will have telecommunications needs that differ from those of the residential customers who benefit from the Lifeline and High Cost programs authorized under Section 254(c)(1).  Because of those starkly different circumstances, it would make

---

[10]  Section 254(h)(2)(A), addressed below, similarly is restricted to "public and nonprofit elementary and secondary school classrooms, health care providers, and libraries."  47 U.S.C.§ 254(h)(2)(A).

no sense to tie support for these larger enterprises on which countless communities depend to whether a "substantial majority of *residential* customers" subscribe to the same services they need, *id.* § 254(c)(1) (emphasis added).

Moreover, Section 254(c)(3) is not a freestanding source of authority. It authorizes only the services that meet the specific criteria set forth in Section 254(h). And Section 254(h), in turn, contains numerous "ascertainable and meaningful guideposts" for the FCC that are at least as constraining as those the Supreme Court has already approved. *Consumers' Rsch.*, 606 U.S. at 681.

Petitioners focus on Section 254(h)(2), which in relevant part directs the FCC to "establish competitively neutral rules … to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries." 47 U.S.C. § 254(h)(2)(A). Contrary to Petitioners' suggestions, this provision is replete with guidance from Congress as to both questions the Supreme Court identified.

For example, the services to which Congress required the FCC to "enhance" access are "advanced telecommunications and information services." *Id.* Congress defined both "telecommunications" and "information services." *See id.* § 153(24), (50). As to the subset of those services that are "advanced," Congress

20

mentioned that concept in a separate provision of the same statute, directing the FCC to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms)." *Id.* § 1302(a); *see also id.* § 1302(d)(1) (defining "'advanced telecommunications capability' … without regard to any transmission media or technology, as high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology"). The FCC has, unsurprisingly, recognized that its "exercise of authority under section 254," including Section 254(h)(2), "is informed by, and advances the objectives of," that provision. *Modernizing the E-rate Program for Schools and Libraries*, Report and Order and Further Notice of Proposed Rulemaking, 29 FCC Rcd. 8870, ¶ 71 n.153 (2014).

Congress also directed that the FCC's rules be "competitively neutral," and that they enhance access to the relevant services "to the extent technically feasible and economically reasonable." 47 U.S.C. § 254(h)(2)(A). These requirements provide additional guidance regarding how the FCC may exercise its authority under Section 254(h)(2)(A). Take the "economically reasonable" requirement, for example. The Supreme Court understood a similar reference to "reasonable … and affordable rates" in Section 254(b)(1) to mean "more a basic than a budget-busting

good." *Consumers' Rsch.*, 606 U.S. at 684.  In the context of a statute that repeatedly emphasizes affordability, the "economically reasonable" requirement readily provides an intelligible principle to guide the FCC's path.  *See, e.g.*, *id.* at 684 n.7 (excessive subsidies "would require setting contributions so high as to interfere with carriers' ability to provide other services, to other customers, affordably," and the "affordability principle precludes that result").  The "economically reasonable" requirement also reinforces, and is itself informed by, the sufficiency requirement under Section 254(d), discussed above.

The Commission has recognized all of those directions as relevant to the scope of its authority under Section 254(h)(2)(A).  In establishing a recent telehealth pilot program, for example, the Commission walked through Section 254(h)(2)(A) part by part, discussing how the program "will be 'competitively neutral,'" "will be 'technically feasible,'" and "will be 'economically reasonable,'" drawing in each instance on the Commission's past orders applying the statute.  *Promoting Telehealth for Low-Income Consumers, COVID-19 Telehealth Program*, Report and Order, 35 FCC Rcd. 3366, ¶ 89 (2020) (quoting 47 U.S.C. § 254(h)(2)(A)).

The FCC's application of those principles also had bite: it supported broadband connections, but rejected proposals to support some other services and devices, concluding at the time that "it would not be 'technically feasible and

economically reasonable'" to do so.  *Id.* ¶¶ 58, 65-66 (quoting 47 U.S.C.

§ 254(h)(2)(A)).  The Commission declined, for example, to provide support for

particular end-user devices and equipment, determining based on the record then

before it that such support "could significantly reduce the … funding available for

the costs directly associated with providing connected care services, and would

limit the number of pilot projects we can select."  *Id.* ¶ 65.  Other, similar examples

abound.  *See, e.g.*, *Rural Health Care Support Mechanism*, Report and Order, 27

FCC Rcd. 16678, ¶ 79 (2012) (rejecting suggestions to prohibit self-construction of

infrastructure in a Rural Health Care program, as doing so "when self-construction

is the most cost-effective option, would be contrary to the command in section

254(h)(2)(A) that support be 'economically reasonable'").

In addition, as Respondents explain, the FCC has taken other actions with

respect to these programs "[b]ased on its understanding of its fiscal obligations"

under this language and other parts of Section 254, such as by adopting caps on

annual spending in the E-Rate and Rural Health Care programs.  Resp. Br. 35.  The

FCC's actual implementation of Congress's direction contradicts Petitioners'

narrative.  *Cf. Consumers' Rsch.*, 606 U.S. at 686 (stating "[t]he proof is in the

pudding" based on analysis of the FCC's implementation of Section 254).

In arguing to the contrary, Petitioners ignore both the statutory context and

the FCC's actual application of these terms.  Petitioners remove "feasibility" from

its place in the statute and rely on a dictionary definition to suggest that Congress

"allow[ed] FCC to proceed all the way up to the point of literal impossibility."

Pet. Br. 35. They likewise pluck out "reasonable" and characterize it as merely "an

instruction to go forth and do good." *Id.* at 36 (quoting *Consumers' Rsch.*, 606

U.S. at 741 (Gorsuch, J., dissenting)). These arguments suffer from a familiar

flaw: The Supreme Court already rejected Petitioners' method of reading terms in

Section 254 "extravagantly, the better to create a constitutional problem," when in

fact they "show nothing of the kind." *Consumers' Rsch.*, 606 U.S. at 687, 690. As

discussed above, both the Supreme Court's discussion of reasonable rates and the

FCC's own history in acting under the statute contradict Petitioners' arguments.

Petitioners also suggest that "no surrounding provisions" in Section 254

provide meaningful additional guardrails for the authority that Section 254(c)(3)

and (h)(2) grant the FCC. Pet. Br. 35; *see also id.* at 30-31. Even if that were true,

it would not matter, because, as shown above, Section 254(h) itself provides

intelligible principles both as to what services can be supported and how much

support the FCC can require. *See Consumers' Rsch.*, 606 U.S. at 680-81.

In any event, Petitioners are incorrect. As discussed above, for example, the

sufficiency requirement from Section 254(d) constrains the FCC's actions and

reinforces the limits of what programs and levels of support would be

"economically reasonable." Moreover, as also discussed above, Congress has even

amended Section 254 over time with respect to the E-Rate program, after the FCC established the program's foundational rules (including under Section 254(c) and (h)(2)(A)), without ever suggesting that the FCC had been misapplying these provisions. *See, e.g.*, Consolidated Appropriations Act, 2001 § 1721, 114 Stat. at 2763A-343-50; *cf. Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

Beyond that, Petitioners are also wrong in arguing that Congress "released FCC from any constraints imposed by the § 254(b) principles, as those principles by their express terms apply only to 'universal service.'" Pet. Br. 30. Multiple principles from Section 254(b) are relevant to the FCC's exercise of authority under Section 254(h)(2)(A). *See, e.g.*, 47 U.S.C. § 254(b)(2), (3) (identifying importance of access to "advanced telecommunications and information services" across the country); *id.* § 254(b)(5) (identifying sufficiency as a "principle[]" on which the FCC should base its policies for preserving and advancing universal service); *id.* § 254(b)(6) (identifying as a principle that schools and libraries "should have access to advanced telecommunications services *as described in subsection (h)*" (emphasis added)); *see also* Resp. Br. 35-36 (addressing this argument).

The structure of the statute confirms that the principles of Section 254(b) are relevant to the FCC's exercise of its authority under Section 254(c)(3) and (h). Section 254(b) guides the FCC's "policies for the preservation and advancement of universal service." 47 U.S.C. § 254(b). Section 254(c) is titled "Definition," which establishes that the subprovisions therein define universal service—not only Section 254(c)(1), but also Section 254(c)(3). Consistent with that title, the body text of Section 254 twice refers to a "definition" of universal service—once for each of those provisions. First, there is a "definition of universal service under [Section 254(c)(1)]," which the FCC shall establish based on the four considerations in that subsection. *Id.* § 254(c)(3). Second, there is a "definition of universal service under [Section 254(c)(3)]" for purposes of the E-Rate and Rural Health Care programs. *Id.* § 254(h)(1)(B). Petitioners are thus incorrect in treating the Section 254(b) principles as inapplicable because they "by their express terms apply only to 'universal service.'" Pet. Br. 30. Programs authorized under Section 254(h) for the services the FCC identifies based on Section 254(c)(3) are part of "universal service" just like the programs under other parts of Section 254 for services identified under Section 254(c)(1). That is precisely what Congress meant to achieve through the structure of Section 254(c). *See, e.g.*, S. Rept. No. 104-230, at 131 (conference report on S.652, which became the Telecommunications Act of 1996, explaining that the FCC was given "specific

26

authority to alter the definition [of universal service] from time to time, and to provide a different definition for schools, libraries, and health care facilities"); *id.* at 133 ("the Commission could determine that telecommunications and information services that constitute universal service for classrooms and libraries shall include dedicated data links").

In fact, the FCC has repeatedly looked to Section 254(b)'s principles in exercising its authority under Section 254(h)(2) in the past.[11] When creating a Rural Health Care program establishing a discount for monthly internet access for health clinics, the Commission chose a flat discount, concluding that that approach was "consistent with section 254(b)(5)," limiting the amount of support "per month to a reasonable level." *Rural Health Care Support Mechanism*, Report and Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking, 18 FCC Rcd. 24546, ¶ 27 (2003) (internal quotation omitted). The Commission reached the same conclusion for the Healthcare Connect Fund in 2012, looking again to ensure its approach was "consistent with section 254(b)(5)." *Rural Health Care Support Mechanism*, 27 FCC Rcd. at ¶ 88. Likewise, when the FCC more recently created pilot programs for telehealth and connected health care, it looked to

---

[11] Petitioners do not purport to challenge programs authorized under 47 U.S.C. § 254(h)(1)(B), which include services included "within the definition of universal service" under both Section 254(c)(1) and (c)(3). *See* Pet. Br. 37 (distinguishing Section 254(h)(1)(B) from what Petitioners call "expansive language" in Section 254(h)(2)).

Section 254(b)'s principles. *See Promoting Telehealth for Low-Income Consumers; COVID-19 Telehealth Program*, 35 FCC Rcd. at ¶ 91 ("While we rely on our authority under section 254(h)(2)(A) to establish the Pilot Program, the Pilot Program is also consistent with the directive that the Commission base policies for the advancement of universal service on the principles outlined in section 254(b) of the Act.").

Finally, although the Court need not reach the issue, the intelligible-principle test is less demanding here than it was in Petitioners' prior nondelegation challenge. *See* Resp. Br. 28. As the Supreme Court explained, "'the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred.'" *Consumers' Rsch.*, 606 U.S. at 673 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475 (2001)); *see also* Pet. Br. 28-29 (quoting *Whitman* for the same proposition). Given the Supreme Court's conclusion that it was permissible for the FCC to "exercise[] significant discretion in carrying out" Congress's *overall* direction, *Consumers' Rsch.*, 606 U.S. at 691, Petitioners bear an even greater burden to demonstrate that Congress provided inadequate guidance for these *subcomponents* of the overall Universal Service Fund. They have not carried that burden.

## II. THE COURT SHOULD REJECT PETITIONERS' ARGUMENTS THAT THE FCC HAS MISINTERPRETED SECTION 254.

### A. PETITIONERS' CLAIMS ARE NOT PROPERLY BEFORE THIS COURT.

There is an established way to bring to court a dispute about an agency's decision—especially when the agency, like the FCC, is subject to the Hobbs Act. A party argues to the agency that a specific, concrete decision the agency is contemplating is wrong because it is, for instance, contrary to a statute. If the agency disagrees and adopts that decision anyway, the party files a petition for review soon after that decision (within sixty days, in the context of the FCC) and explains both why the discrete decision leads to actual or imminent harm to it that the court can fix and why the decision is wrong on the merits. *See* 47 U.S.C. § 402(a); 28 U.S.C. § 2344.

That ordinary process has significant advantages for the agency, interested parties, and, not least of all, a reviewing court. The legal issues are teed up concretely in a defined context by parties with a real stake in the outcome, and the court will have the benefit of the agency's reasoning as to the specific claims of illegality and its expertise as to related, often highly technical issues.

Petitioners' claims about the FCC's alleged misinterpretation of Section 254 breach all these principles. Although they claim to be challenging the FCC's Fourth Quarter 2025 Contribution Factor, *see* Pet. Br. 39-40, they make no

showing that the contribution factor is incorrectly calculated.  Instead, their brief makes clear that they are asking the Court to rummage through scattered agency orders—and even briefs—issued over a period of three decades, and to decide in the abstract, without reference to the facts and context of a particular agency decision, whether the snippets of text from those few documents are inconsistent with the Supreme Court's interpretation of Section 254.  And they do all that without even trying to show that the interpretations they claim the agency adopted actually affected the results in these decades-old matters, much less that the agency decisions are causing them harm many years later.

In all these respects, Petitioners' statutory-interpretation claim here is nothing like the constitutional challenge to the Universal Service scheme that they brought in the prior case.  There, they were challenging the lawfulness of the Universal Service Fund as a whole; their claim was not dependent on the context of individual FCC determinations for particular programs; and the FCC had no power to determine that the statute was unconstitutional.

The consequences of accepting Petitioners' extreme position would be significant.  Under their theory, any Universal Service Fund contributor can bring a case to federal court challenging the reasoning in any one of the scores of Universal Service Fund orders the FCC has issued since 1997, simply by filing a comment on the FCC's proposed quarterly contribution factor.

Petitioners' method of proceeding is also completely unnecessary.  The FCC

has an established procedure for raising claims about FCC orders that allegedly

depend on an unlawful statutory understanding and are causing continuing harm.

Under the FCC's rules, Petitioners could file a petition for rulemaking at the FCC

challenging the validity of any FCC rule governing the Universal Service Fund.

*See* 47 C.F.R. § 1.401(a) ("Any interested person may petition for the issuance,

amendment or repeal of a rule or regulation.").  If the FCC rejects their petition,

and these parties are in fact being injured, they can then raise that specific and

concrete disagreement in a reviewing court.

In this regard, this case is much like *Tribune Co. v. FCC*, 133 F.3d 61 (D.C.

Cir. 1998), where the D.C. Circuit declined to consider in an adjudication an

argument that the FCC acted arbitrarily in failing to reconsider a regulation in light

of Supreme Court precedent.  *See id.* at 68; Resp. Br. 58 (explaining that setting a

contribution factor is an adjudication).  The court refused to do so even though "[i]t

may well be that faced with a rulemaking petition the FCC would be thought

arbitrary and capricious if it refused to reconsider its rule in light of persuasive

evidence that … [its] rationale is no longer tenable." *Tribune Co.*, 133 F.3d at 68.

In all events, Respondents are correct (at 38-39) that Petitioners' argument is

not properly before the Court.  In fact, there are multiple related reasons that

Petitioners' claim should be dismissed.

31

***1. Standing.*** As Respondents have correctly argued, Petitioners lack standing. To be sure, Petitioners disagree with how they claim the FCC has interpreted the relevant statutory provisions and believe that the agency's reading is contrary to the Supreme Court's later interpretation of Section 254. *See, e.g.,* Pet. Br. 40.

A general disagreement about the correct reading of a statute does not create standing, however. "Federal courts do not possess a roving commission to publicly opine on every legal question," and they do not "exercise general legal oversight of the Legislative and Executive Branches." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021). Petitioners thus must go beyond such an interpretive dispute and demonstrate that a specific FCC action has caused them concrete and actual or imminent injury. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'") (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).

Petitioners fail to carry that burden. Petitioners claim that they meet standing requirements because they are challenging the contribution factor for the fourth quarter of 2025 and either "contribute[] directly to the Universal Service

Fund" or "pay a separate line-item in their monthly phone bill that is expressly earmarked for the Universal Service Fund." Pet. Br. 24-25.

Petitioners, however, do not connect the alleged FCC misinterpretation to the amounts they pay to the Universal Service Fund directly or indirectly. As the FCC has correctly stated, "Petitioners do not claim that they are injured by any specific FCC action that violates section 254." Resp. Br. 38. Even assuming that the FCC has in some order or orders in the past three decades misread Section 254(b) or (c), to establish their standing Petitioners still need to show—and have not shown—that (1) the agency's alleged error in that particular order actually affected the result in the specific matter before the FCC and (2) that the result, in turn, affected the amount of fees that regulated parties paid in the relevant quarter. *See, e.g.*, *Allen v. Wright*, 468 U.S. 737, 751 (1984) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."); *Raines v. Byrd*, 521 U.S. 811, 819 (1997) ("plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him").

Petitioners note that (at least as to the one Petitioner that pays directly into the Fund) this Court has previously concluded that similar allegations were sufficient to create standing. *See* Pet. Br. 24 (quoting *Consumers' Rsch.*, 109 F.4th

33

at 753).  The Court's prior decision, however, involved a constitutional challenge that could have invalidated the *entire* Universal Service Fund program, so accepting Petitioners' legal claim would have resulted in them owing no fees at all, at least as a forward-looking matter.  Petitioners' statutory-interpretation claim in this case is different.  Their argument now is about a supposed misinterpretation of the statute that could, at most, have affected discrete subparts of the Universal Service Fund program, and which, as far as the record here shows, has not harmed Petitioners at all.  *Cf. El Paso City v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020) ("As the party seeking to invoke federal jurisdiction, the plaintiffs bear the burden of establishing standing for each claim they assert … .").

Petitioners refer to one instance where they believe the FCC funded "gigabit-speed broadband networks" improperly, but that is provided only as an "example," Pet. Br. 43, of how the FCC's alleged interpretation of the statute is inconsistent with the Supreme Court's decision.  In any event, they do not connect that allegedly improper decision to the amount they were required to contribute in the fourth quarter of 2025.  Pet. Br. 43-44; *see* Resp. Br. 38.  That failure is particularly notable given that the FCC included networks that could support the faster service as part of a reverse auction that was designed to be as efficient as possible.  *See Connect America Fund*, Report and Order and Order on Reconsideration, 32 FCC Rcd. 1624, ¶ 22 (2017) (noting that reverse auction was

intended to get the most "bang-for-the-buck" and that, as designed, "every bidder … must have the opportunity to exert competitive pricing pressure on every other bidder"); *Rural Digital Opportunity Fund, Connect America Fund*, Report and Order, 35 FCC Rcd. 686, ¶ 18 (2020) ("Our experience in the [previous] auction demonstrates that reverse auctions allow for market forces to maximize the impact of finite universal service resources while awarding support to those providers that will make the most efficient use of the budgeted funds.").

*2. Ripeness.* Even if Petitioners had demonstrated standing, the Court should exercise its discretion to determine that their claim is not ripe. The ripeness doctrine is a prudential one that "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 434 (5th Cir. 2021) (internal quotation omitted). In making that judgment, this Court applies to a two-part test that balances "the fitness of the issues for judicial decision" with "the hardship to the parties of withholding court consideration." *Id.* (internal quotation omitted).

This case presents a paradigmatic "abstract disagreement[] over administrative policies," *id.*, as Petitioners seek to litigate the agency's allegedly improper understanding of Section 254. That issue is not fit for judicial decision because there is not a concrete, discrete issue that is appropriate for judicial

resolution here. Rather, as discussed, Petitioners claim a general disjuncture between the FCC's analysis in its orders and briefs with the later Supreme Court decision.

Indeed, even as presented by Petitioners, the question here is not a purely legal one. They contend that the FCC's failure to respond to their arguments about the supposed tension between the agency's prior decisions and the Supreme Court's later determination violated standards for reasoned decision-making and explanation. *See* Pet. Br. 38-40. But those standards necessarily depend on the particular regulatory context. *WWHT, Inc. v. FCC*, 656 F.2d 807, 817 (D.C. Cir. 1981) ("the parameters of the 'arbitrary and capricious' standard of review will vary with the context of the case").

The context here is the FCC making an omnibus determination as to the correct quarterly contribution factor. As in the *Tribune Co.* case discussed above, a claim regarding the FCC's interpretation of a particular statutory provision is much better evaluated in a petition for rulemaking as to a specific FCC rule, *see supra* p. 31, rather than in the context of an FCC adjudication as to the quarterly contribution factor. *See Tribune Co.*, 133 F.3d at 68.

On the other side of the ledger, as discussed above and in Respondents' brief (at 38), Petitioners have not shown that the FCC decisions they cite have increased

the contribution factor for the relevant period, so there is no hardship in following the established process for raising these issues at the agency.

> **3. Exhaustion.** Petitioners also have not met the statutory-exhaustion requirements of 47 U.S.C. § 405 as to any cognizable claim here. As Respondents correctly explain (at 39), Petitioners' comments to the agency, like their brief, focus on their "generali[zed]" claim that the FCC has interpreted Section 254 in a different way than the Supreme Court, which is "not enough to preserve every conceivable claim of unlawful action." *Child.'s Health Def. v. FCC*, 25 F.4th 1045, 1050 (D.C. Cir. 2022); *see* Consumers' Research Comments at 13 ("The Supreme Court's majority opinion salvaged § 254 from Commenters' nondelegation challenge by interpreting it drastically differently than any prior court or the Commission itself ever had.") (JA___).

The closest those comments come to identifying a legal claim is a quotation from Justice Gorsuch's dissent, which characterized the 2017 *Connect America Order* discussed above as a "multibillion-dollar effort to promote 'broadband service in unserved high-cost areas.'" Consumers' Research Comments at 18 (quoting *Consumers' Rsch.*, 606 U.S. at 731 (Gorsuch, J. dissenting)) (JA___). Beyond that, Petitioners' comments relied on the hand-waving suggestion that "[t]here are undoubtedly other programs that do not comply." *Id.* at 18. (JA___).

That is not sufficient to satisfy the statutory exhaustion requirement that Congress imposed here. The Communications Act prohibits parties from raising on judicial review of an FCC action any claim relying on "questions of fact or law upon which the Commission … has been afforded no opportunity to pass" unless the party has first filed a petition for reconsideration. 47 U.S.C. § 405(a). This Court has interpreted Section 405(a) to require that an argument be "reasonably 'flagged' for the agency's consideration." *Worldcall Interconnect, Inc. v. FCC*, 907 F.3d 810, 820 (5th Cir. 2018) (internal quotation omitted).[12] To the extent that Petitioners now seek to argue that the FCC, at some point or points in the past, erred in a specific application of Section 254 and that any such error has led to a larger Universal Service Fund contribution factor for the quarter at issue, they failed to make that argument to the FCC. And the passing reference to Justice Gorsuch's dissent did not indicate how, if at all, the Universal Service Fund contribution factor for the relevant quarter was affected by the agency's supposed legal error. *See Time Warner Ent. Co., L.P. v. FCC*, 144 F.3d 75, 79 (D.C. Cir. 1998) ("Even where an issue has been 'raised' before the Commission, if it is

---

[12] Petitioners' arguments regarding the FCC's interpretation and implementation of the *statute* are readily distinguishable from their previous arguments regarding the constitutionality of the Universal Service Fund. The resolution of the previous case in this Court and the Supreme Court therefore does not answer these statutory-exhaustion issues.

done in a less than complete way, … the Commission has not been afforded a fair opportunity." (citation omitted)).

### B. PETITIONERS' STATUTORY ARGUMENTS LACK MERIT.

If the Court does reach the substance of Petitioners' claim, they have not demonstrated that the FCC acted unlawfully.

Petitioners' core contention here is simply wrong. They assert that "the Court's interpretation" of Section 254 "departed drastically from interpretations embraced by prior courts and by [the] FCC," Pet. Br. 38, and that the FCC acted arbitrarily by not addressing how its existing programs were consistent with this "seismic shift," *id.* at 43. The Supreme Court said the exact opposite, however: "Congress made clear the parameters of the programs, *and the FCC has operated within them*." *Consumers' Rsch.*, 606 U.S. at 687 (emphasis added); *see also* Resp. Br. 38.

In fact, the Court endorsed the FCC's key judgments as to what, as noted above, are the two key statutory questions underlying the nondelegation issue: "First, how much money can the FCC raise through contributions? And second, on what things can it spend those funds?" *Consumers' Rsch.*, 606 U.S. at 680-81.

As to the first question, in concluding that the use of the word "sufficient" in Section 254(b)(5) (as well as Section 254(d) and (e)) "sets a floor and a ceiling alike," *id.* at 681, the Court highlighted that the FCC has "long viewed the statute

in just that way." *Id.* at 682. The Court then cited and quoted from an FCC 2010 decision to support that conclusion. *See id.* (citing *High-Cost Universal Service Support*, Order on Remand and Memorandum Opinion and Order, 25 FCC Rcd. 4072, 4074 (2010)).

The Court was equally clear in supporting the Commission's actions to date in defining the "things" on which the agency "can spend those funds." The Court explained that "[e]ach of the four programs the FCC now operates under Section 254 reflect[] Congress's choices about universal service's scope and content" and, even more to the point, "[e]ach provides communications services *satisfying the Act's listed criteria*." *Id.* at 686 (emphasis added).

Nor did the Court ever take issue with how the FCC has interpreted the specific provisions of Section 254(b) and (c). On the contrary, it cited the Solicitor General's argument on behalf of the FCC in support of the conclusion that "each of the criteria has to be met." *Id.* at 688. At the same time, however, the Court recognized that the FCC may "exercise[] significant discretion" in implementing those provisions in a manner so long as it remains "tethered to legislative judgments about the scope and content of the universal-service program." *Id.* at 691.

Nor do the scattered FCC statements Petitioners cite undermine that conclusion. Although Petitioners treat the concept of "balancing" competing

statutory priorities as somehow impermissible under the Court's decision, *see* Pet. Br. 41 (quoting FCC and U.S. Petition for Writ of Certiorari at 13, *Consumers' Rsch.*, 606 U.S. 656 (No. 24-354)), the Court in fact confirmed that the FCC "may still have to strike balances in addressing th[e] criteria" identified in Section 254. *Consumers' Rsch.*, 606 U.S. at 688.  And the understanding that Section 254 inevitably requires balancing is fully consistent with, and gives content to, the FCC's prior statements that it must "consider" or "take … into account" competing statutory values.  Pet. Br. 40-41 (citations omitted).

Thus, although Petitioners rely heavily on the Supreme Court dissent's *characterization* of the Court's analysis, *see, e.g.*, *id.* at 43, the Court's opinion itself repeatedly makes clear that the FCC's prior determinations were consistent with the statute.  There is thus no basis to conclude that there was a "change in [the] legal landscape," *id.* at 40, that the agency would act arbitrarily in disregarding.

Similarly, the FCC's *Connect America* order Petitioners cite does not show that the Supreme Court's decision created a supposed change in the "legal landscape."  *Id.*  As Respondents have correctly explained (at 40-41), Petitioners misunderstand the legal issue there, because, in that context, universal service funding for networks is conditioned on the provision of voice service, which Petitioners do not, and could not, contend fails to meet the Section 251(c)(1)

criteria.  Even if that were not the case, as the Supreme Court itself stressed, Congress intended universal service to be an "evolving level" of service, 47 U.S.C. § 254(c)(1), which "is itself a direction" to the agency to ensure that the universal service program is of "enduring utility," *Consumers' Rsch.*, 606 U.S. at 689. Consistent with that statutory direction, the FCC in 2017 appropriately made a predictive judgment as to what performance the network would provide "over a 10-year term."  *See Connect America Fund*, 32 FCC Rcd. at ¶ 24.

Finally, after the decisions Petitioners cite as allegedly contradicting Congress's instructions, Congress endorsed the FCC's understanding of its statutory obligations, especially as to broadband services such as the one Petitioners attack.  In 2021, Congress directed the FCC to provide recommendations for "improving its effectiveness in achieving the universal service goals for broadband," with the explicit caveat that the recommendations "may not in any way reduce the congressional mandate to achieve the universal service goals for broadband."  Infrastructure Investment and Jobs Act § 60104(c), 135 Stat. at 1206.  Thus, far from indicating that the FCC had gone too far in supporting broadband access, Congress directed that the FCC not even *recommend* any lessening of that support.  That ratification of the FCC's actions cannot be squared with Petitioners' claim that the FCC has somehow ignored the limits that Congress placed on it.

# CONCLUSION

The Court should deny the petition for review.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
</table>

/s/ Andrew Jay Schwartzman

Andrew Jay Schwartzman
525 9th Street NW, 7th Fl.
Washington, DC 20004
(202) 241-2408
AndySchwartzman@gmail.com

/s/ Jason Neal

Sean A. Lev
Jason Neal
HWG LLP
1919 M Street, NW, 8th Floor
Washington, D.C. 20036
(202) 730-1300
jneal@hwglaw.com

*Counsel for Benton Institute for Broadband & Society, National Digital Inclusion Alliance, and Center for Media Justice dba MediaJustice*

*Counsel for Schools, Health & Libraries Broadband Coalition*

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of March, 2026, the foregoing document was filed via CM/ECF. Service was accomplished on all parties or their counsel of record via CM/ECF.

/s/ Jason Neal
Jason Neal

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing document complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in 14-point Times New Roman font.

I further certify that the foregoing document complies with the requirements of Fifth Circuit Rule 32 and Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,297 words according to the word-count feature of Microsoft Word.

/s/ Jason Neal
Jason Neal

# Statutory Addendum

# TABLE OF CONTENTS

| Document | Page |
|---|---|
| 28 U.S.C. § 2344 | 1 |
| 47 U.S.C. § 153 | 2 |
| 47 U.S.C. § 254 | 3 |
| 47 U.S.C. § 402(a) | 18 |
| 47 U.S.C. § 405(a) | 19 |
| 47 U.S.C. § 1302 | 21 |

**§2344. Review of orders; time; notice; contents of petition; service**

On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies. The action shall be against the United States. The petition shall contain a concise statement of—

    (1) the nature of the proceedings as to which review is sought;

    (2) the facts on which venue is based;

    (3) the grounds on which relief sought; and

    (4) the relief prayed.

The petitioner shall attach to the petition, as exhibits, copies of the order, report, or decision of the agency. The clerk shall serve a true copy of the petition on the agency and on the Attorney General by registered mail, with request for a return receipt.

## §153. Definitions

For the purposes of this chapter, unless the context otherwise requires—

\*\*\*

(24) Information Service

The term "information service" means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

\*\*\*

(50) Telecommunications

The term "telecommunications" means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.

\*\*\*

**§254. Universal service**

(a) Procedures to review universal service requirements

  (1) Federal-State Joint Board on universal service

     Within one month after February 8, 1996, the Commission shall institute and refer to a Federal-State Joint Board under section 410(c) of this title a proceeding to recommend changes to any of its regulations in order to implement sections 214(e) of this title and this section, including the definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for completion of such recommendations. In addition to the members of the Joint Board required under section 410(c) of this title, one member of such Joint Board shall be a State-appointed utility consumer advocate nominated by a national organization of State utility consumer advocates. The Joint Board shall, after notice and opportunity for public comment, make its recommendations to the Commission 9 months after February 8, 1996.

  (2) Commission action

     The Commission shall initiate a single proceeding to implement the recommendations from the Joint Board required by paragraph (1) and shall complete such proceeding within 15 months after February 8, 1996. The rules established by such proceeding shall include a definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for implementation. Thereafter, the Commission shall complete any proceeding to implement subsequent recommendations from any Joint Board on universal service within one year after receiving such recommendations.

(b) Universal service principles

    The Joint Board and the Commission shall base policies for the preservation and advancement of universal service on the following principles:

  (1) Quality and rates

     Quality services should be available at just, reasonable, and affordable rates.

  (2) Access to advanced services

     Access to advanced telecommunications and information services should be provided in all regions of the Nation.

  (3) Access in rural and high cost areas

     Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to

telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

(4) Equitable and nondiscriminatory contributions

All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

(5) Specific and predictable support mechanisms

There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.

(6) Access to advanced telecommunications services for schools, health care, and libraries

Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in subsection (h).

(7) Additional principles

Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter.

(c) Definition

(1) In general

Universal service is an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services. The Joint Board in recommending, and the Commission in establishing, the definition of the services that are supported by Federal universal service support mechanisms shall consider the extent to which such telecommunications services—

(A) are essential to education, public health, or public safety;

(B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;

(C) are being deployed in public telecommunications networks by telecommunications carriers; and

(D) are consistent with the public interest, convenience, and necessity.

(2) Alterations and modifications

The Joint Board may, from time to time, recommend to the Commission modifications in the definition of the services that are supported by Federal universal service support mechanisms.

(3) Special services

In addition to the services included in the definition of universal service under paragraph (1), the Commission may designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h).

(d) Telecommunications carrier contribution

Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service. The Commission may exempt a carrier or class of carriers from this requirement if the carrier's telecommunications activities are limited to such an extent that the level of such carrier's contribution to the preservation and advancement of universal service would be de minimis. Any other provider of interstate telecommunications may be required to contribute to the preservation and advancement of universal service if the public interest so requires.

(e) Universal service support

After the date on which Commission regulations implementing this section take effect, only an eligible telecommunications carrier designated under section 214(e) of this title shall be eligible to receive specific Federal universal service support. A carrier that receives such support shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended. Any such support should be explicit and sufficient to achieve the purposes of this section.

(f) State authority

A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State. A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms.

(g) Interexchange and interstate services

Within 6 months after February 8, 1996, the Commission shall adopt rules to require that the rates charged by providers of interexchange telecommunications services to subscribers in rural and high cost areas shall be no higher than the rates charged by each such provider to its subscribers in urban areas. Such rules shall also require that a provider of interstate interexchange telecommunications services shall provide such services to its subscribers in each State at rates no higher than the rates charged to its subscribers in any other State.

(h) Telecommunications services for certain providers

(1) In general

(A) Health care providers for rural areas

A telecommunications carrier shall, upon receiving a bona fide request, provide telecommunications services which are necessary for the provision of health care services in a State, including instruction relating to such services, to any public or nonprofit health care provider that serves persons who reside in rural areas in that State at rates that are reasonably comparable to rates charged for similar services in urban areas in that State. A telecommunications carrier providing service under this paragraph shall be entitled to have an amount equal to the difference, if any, between the rates for services provided to health care providers for rural areas in a State and the rates for similar services provided to other customers in comparable rural areas in that State treated as a service obligation as a part of its obligation to participate in the mechanisms to preserve and advance universal service.

(B) Educational providers and libraries

All telecommunications carriers serving a geographic area shall, upon a bona fide request for any of its services that are within the definition of universal service under subsection (c)(3), provide such services to elementary schools, secondary schools, and libraries for educational purposes at rates less than the amounts charged for similar services to other parties. The discount shall be an amount that the Commission, with respect to interstate services, and the States, with respect to intrastate services, determine is appropriate and necessary to ensure affordable access to and use of such services by such entities. A telecommunications carrier providing service under this paragraph shall—

(i) have an amount equal to the amount of the discount treated as an offset to its obligation to contribute to the mechanisms to preserve and advance universal service, or

(ii) notwithstanding the provisions of subsection (e) of this section, receive reimbursement utilizing the support mechanisms to preserve and advance universal service.

(2) Advanced services

The Commission shall establish competitively neutral rules—

(A) to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries; and

(B) to define the circumstances under which a telecommunications carrier may be required to connect its network to such public institutional telecommunications users.

(3) Terms and conditions

Telecommunications services and network capacity provided to a public institutional telecommunications user under this subsection may not be sold, resold, or otherwise transferred by such user in consideration for money or any other thing of value.

(4) Eligibility of users

No entity listed in this subsection shall be entitled to preferential rates or treatment as required by this subsection, if such entity operates as a for-profit business, is a school described in paragraph (7)(A) with an endowment of more than $50,000,000, or is a library or library consortium not eligible for assistance from a State library administrative agency under the Library Services and Technology Act [20 U.S.C. 9121 et seq.].

(5) Requirements for certain schools with computers having Internet access

(A) Internet safety

(i) In general

Except as provided in clause (ii), an elementary or secondary school having computers with Internet access may not receive services at discount rates under paragraph (1)(B) unless the school, school board, local educational agency, or other authority with responsibility for administration of the school—

(I) submits to the Commission the certifications described in subparagraphs (B) and (C);

(II) submits to the Commission a certification that an Internet safety policy has been adopted and implemented for the school under subsection (l); and

(III) ensures the use of such computers in accordance with the certifications.

(ii) Applicability

The prohibition in clause (i) shall not apply with respect to a school that receives services at discount rates under paragraph (1)(B) only for purposes other than the provision of Internet access, Internet service, or internal connections.

(iii) Public notice; hearing

An elementary or secondary school described in clause (i), or the school board, local educational agency, or other authority with responsibility for administration of the school, shall provide reasonable public notice and hold at least one public hearing or meeting to address the proposed Internet safety policy. In the case of an elementary or secondary school other than an elementary school or a secondary school as defined in section 7801 of title 20, the notice and hearing required by this clause may be limited to those members of the public with a relationship to the school.

(B) Certification with respect to minors

A certification under this subparagraph is a certification that the school, school board, local educational agency, or other authority with responsibility for administration of the school—

(i) is enforcing a policy of Internet safety for minors that includes monitoring the online activities of minors and the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are—

(I) obscene;

(II) child pornography; or

(III) harmful to minors;

(ii) is enforcing the operation of such technology protection measure during any use of such computers by minors; and

(iii) as part of its Internet safety policy is educating minors about appropriate online behavior, including interacting with other individuals on social networking websites and in chat rooms and cyberbullying awareness and response.

(C) Certification with respect to adults

A certification under this paragraph is a certification that the school, school board, local educational agency, or other authority with responsibility for administration of the school—

(i) is enforcing a policy of Internet safety that includes the operation of a technology protection measure with respect to any of its computers with

Internet access that protects against access through such computers to visual depictions that are—

(I) obscene; or

(II) child pornography; and

(ii) is enforcing the operation of such technology protection measure during any use of such computers.

(D) Disabling during adult use

An administrator, supervisor, or other person authorized by the certifying authority under subparagraph (A)(i) may disable the technology protection measure concerned, during use by an adult, to enable access for bona fide research or other lawful purpose.

(E) Timing of implementation

(i) In general

Subject to clause (ii) in the case of any school covered by this paragraph as of the effective date of this paragraph under section 1721(h) of the Children's Internet Protection Act, the certification under subparagraphs (B) and (C) shall be made—

(I) with respect to the first program funding year under this subsection following such effective date, not later than 120 days after the beginning of such program funding year; and

(II) with respect to any subsequent program funding year, as part of the application process for such program funding year.

(ii) Process

(I) Schools with Internet safety policy and technology protection measures in place

A school covered by clause (i) that has in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C) shall certify its compliance with subparagraphs (B) and (C) during each annual program application cycle under this subsection, except that with respect to the first program funding year after the effective date of this paragraph under section 1721(h) of the Children's Internet Protection Act, the certifications shall be made not later than 120 days after the beginning of such first program funding year.

(II) Schools without Internet safety policy and technology protection measures in place

A school covered by clause (i) that does not have in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C)—

(aa) for the first program year after the effective date of this subsection in which it is applying for funds under this subsection, shall certify that it is undertaking such actions, including any necessary procurement procedures, to put in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C); and

(bb) for the second program year after the effective date of this subsection in which it is applying for funds under this subsection, shall certify that it is in compliance with subparagraphs (B) and (C).

Any school that is unable to certify compliance with such requirements in such second program year shall be ineligible for services at discount rates or funding in lieu of services at such rates under this subsection for such second year and all subsequent program years under this subsection, until such time as such school comes into compliance with this paragraph.

(III) Waivers

Any school subject to subclause (II) that cannot come into compliance with subparagraphs (B) and (C) in such second year program may seek a waiver of subclause (II)(bb) if State or local procurement rules or regulations or competitive bidding requirements prevent the making of the certification otherwise required by such subclause. A school, school board, local educational agency, or other authority with responsibility for administration of the school shall notify the Commission of the applicability of such subclause to the school. Such notice shall certify that the school in question will be brought into compliance before the start of the third program year after the effective date of this subsection in which the school is applying for funds under this subsection.

(F) Noncompliance

(i) Failure to submit certification

Any school that knowingly fails to comply with the application guidelines regarding the annual submission of certification required by this paragraph shall not be eligible for services at discount rates or funding in lieu of services at such rates under this subsection.

(ii) Failure to comply with certification

Any school that knowingly fails to ensure the use of its computers in accordance with a certification under subparagraphs (B) and (C) shall

reimburse any funds and discounts received under this subsection for the period covered by such certification.

(iii) Remedy of noncompliance

(I) Failure to submit

A school that has failed to submit a certification under clause (i) may remedy the failure by submitting the certification to which the failure relates. Upon submittal of such certification, the school shall be eligible for services at discount rates under this subsection.

(II) Failure to comply

A school that has failed to comply with a certification as described in clause (ii) may remedy the failure by ensuring the use of its computers in accordance with such certification. Upon submittal to the Commission of a certification or other appropriate evidence of such remedy, the school shall be eligible for services at discount rates under this subsection.

(6) Requirements for certain libraries with computers having Internet access

(A) Internet safety

(i) In general

Except as provided in clause (ii), a library having one or more computers with Internet access may not receive services at discount rates under paragraph (1)(B) unless the library—
(I) submits to the Commission the certifications described in subparagraphs (B) and (C); and
(II) submits to the Commission a certification that an Internet safety policy has been adopted and implemented for the library under subsection (l); and
(III) ensures the use of such computers in accordance with the certifications.

(ii) Applicability

The prohibition in clause (i) shall not apply with respect to a library that receives services at discount rates under paragraph (1)(B) only for purposes other than the provision of Internet access, Internet service, or internal connections.

(iii) Public notice; hearing

A library described in clause (i) shall provide reasonable public notice and hold at least one public hearing or meeting to address the proposed Internet safety policy.

(B) Certification with respect to minors

A certification under this subparagraph is a certification that the library—

(i) is enforcing a policy of Internet safety that includes the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are—

(I) obscene;

(II) child pornography; or

(III) harmful to minors; and

(ii) is enforcing the operation of such technology protection measure during any use of such computers by minors.

(C) Certification with respect to adults

A certification under this paragraph is a certification that the library—

(i) is enforcing a policy of Internet safety that includes the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are—

(I) obscene; or

(II) child pornography; and

(ii) is enforcing the operation of such technology protection measure during any use of such computers.

(D) Disabling during adult use

An administrator, supervisor, or other person authorized by the certifying authority under subparagraph (A)(i) may disable the technology protection measure concerned, during use by an adult, to enable access for bona fide research or other lawful purpose.

(E) Timing of implementation

(i) In general

Subject to clause (ii) in the case of any library covered by this paragraph as of the effective date of this paragraph under section 1721(h) of the Children's Internet Protection Act, the certification under subparagraphs (B) and (C) shall be made—

(I) with respect to the first program funding year under this subsection following such effective date, not later than 120 days after the beginning of such program funding year; and

(II) with respect to any subsequent program funding year, as part of the application process for such program funding year.

(ii) Process

(I) Libraries with Internet safety policy and technology protection measures in place

A library covered by clause (i) that has in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C) shall certify its compliance with subparagraphs (B) and (C) during each annual program application cycle under this subsection, except that with respect to the first program funding year after the effective date of this paragraph under section 1721(h) of the Children's Internet Protection Act, the certifications shall be made not later than 120 days after the beginning of such first program funding year.

(II) Libraries without Internet safety policy and technology protection measures in place

A library covered by clause (i) that does not have in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C)—

(aa) for the first program year after the effective date of this subsection in which it is applying for funds under this subsection, shall certify that it is undertaking such actions, including any necessary procurement procedures, to put in place an Internet safety policy and technology protection measures meeting the requirements necessary for certification under subparagraphs (B) and (C); and

(bb) for the second program year after the effective date of this subsection in which it is applying for funds under this subsection, shall certify that it is in compliance with subparagraphs (B) and (C).

Any library that is unable to certify compliance with such requirements in such second program year shall be ineligible for services at discount rates or funding in lieu of services at such rates under this subsection for such second year and all subsequent program years under this subsection, until such time as such library comes into compliance with this paragraph.

(III) Waivers

Any library subject to subclause (II) that cannot come into compliance with subparagraphs (B) and (C) in such second year may seek a waiver of subclause (II)(bb) if State or local procurement rules or regulations or competitive bidding requirements prevent the making of the certification otherwise required by such subclause. A library, library board, or other authority with responsibility for administration of the library shall notify the Commission of the applicability of such subclause to the library. Such notice shall certify that the library in question will be brought into compliance before the start of the

third program year after the effective date of this subsection in which the library is applying for funds under this subsection.

(F) Noncompliance

(i) Failure to submit certification

Any library that knowingly fails to comply with the application guidelines regarding the annual submission of certification required by this paragraph shall not be eligible for services at discount rates or funding in lieu of services at such rates under this subsection.

(ii) Failure to comply with certification

Any library that knowingly fails to ensure the use of its computers in accordance with a certification under subparagraphs (B) and (C) shall reimburse all funds and discounts received under this subsection for the period covered by such certification.

(iii) Remedy of noncompliance

(I) Failure to submit

A library that has failed to submit a certification under clause (i) may remedy the failure by submitting the certification to which the failure relates. Upon submittal of such certification, the library shall be eligible for services at discount rates under this subsection.

(II) Failure to comply

A library that has failed to comply with a certification as described in clause (ii) may remedy the failure by ensuring the use of its computers in accordance with such certification. Upon submittal to the Commission of a certification or other appropriate evidence of such remedy, the library shall be eligible for services at discount rates under this subsection.

(7) Definitions

For purposes of this subsection:

(A) Elementary and secondary schools

The term "elementary and secondary schools" means elementary schools and secondary schools, as defined in section 7801 of title 20.

(B) Health care provider

The term "health care provider" means—
(i) post-secondary educational institutions offering health care instruction, teaching hospitals, and medical schools;
(ii) community health centers or health centers providing health care to migrants;

(iii) local health departments or agencies;

(iv) community mental health centers;

(v) not-for-profit hospitals;

(vi) rural health clinics;

(vii) skilled nursing facilities (as defined in section 395i–3(a) of title 42); and

(viii) consortia of health care providers consisting of one or more entities described in clauses (i) through (vii).

(C) Public institutional telecommunications user

The term "public institutional telecommunications user" means an elementary or secondary school, a library, or a health care provider as those terms are defined in this paragraph.

(D) Minor

The term "minor" means any individual who has not attained the age of 17 years.

(E) Obscene

The term "obscene" has the meaning given such term in section 1460 of title 18.

(F) Child pornography

The term "child pornography" has the meaning given such term in section 2256 of title 18.

(G) Harmful to minors

The term "harmful to minors" means any picture, image, graphic image file, or other visual depiction that—

(i) taken as a whole and with respect to minors, appeals to a prurient interest in nudity, sex, or excretion;

(ii) depicts, describes, or represents, in a patently offensive way with respect to what is suitable for minors, an actual or simulated sexual act or sexual contact, actual or simulated normal or perverted sexual acts, or a lewd exhibition of the genitals; and

(iii) taken as a whole, lacks serious literary, artistic, political, or scientific value as to minors.

(H) Sexual act; sexual contact

The terms "sexual act" and "sexual contact" have the meanings given such terms in section 2246 of title 18.

(I) Technology protection measure

The term "technology protection measure" means a specific technology that blocks or filters Internet access to the material covered by a certification under paragraph (5) or (6) to which such certification relates.

(i) Consumer protection

The Commission and the States should ensure that universal service is available at rates that are just, reasonable, and affordable.

(j) Lifeline assistance

Nothing in this section shall affect the collection, distribution, or administration of the Lifeline Assistance Program provided for by the Commission under regulations set forth in section 69.117 of title 47, Code of Federal Regulations, and other related sections of such title.

(k) Subsidy of competitive services prohibited

A telecommunications carrier may not use services that are not competitive to subsidize services that are subject to competition. The Commission, with respect to interstate services, and the States, with respect to intrastate services, shall establish any necessary cost allocation rules, accounting safeguards, and guidelines to ensure that services included in the definition of universal service bear no more than a reasonable share of the joint and common costs of facilities used to provide those services.

(l) Internet safety policy requirement for schools and libraries

(1) In general

In carrying out its responsibilities under subsection (h), each school or library to which subsection (h) applies shall—

   (A) adopt and implement an Internet safety policy that addresses—
      (i) access by minors to inappropriate matter on the Internet and World Wide Web;
      (ii) the safety and security of minors when using electronic mail, chat rooms, and other forms of direct electronic communications;
      (iii) unauthorized access, including so-called "hacking", and other unlawful activities by minors online;
      (iv) unauthorized disclosure, use, and dissemination of personal identification information regarding minors; and
      (v) measures designed to restrict minors' access to materials harmful to minors; and

   (B) provide reasonable public notice and hold at least one public hearing or meeting to address the proposed Internet safety policy.

(2) Local determination of content

A determination regarding what matter is inappropriate for minors shall be made by the school board, local educational agency, library, or other authority responsible for making the determination. No agency or instrumentality of the United States Government may—

(A) establish criteria for making such determination;

(B) review the determination made by the certifying school, school board, local educational agency, library, or other authority; or

(C) consider the criteria employed by the certifying school, school board, local educational agency, library, or other authority in the administration of subsection (h)(1)(B).

(3) Availability for review

Each Internet safety policy adopted under this subsection shall be made available to the Commission, upon request of the Commission, by the school, school board, local educational agency, library, or other authority responsible for adopting such Internet safety policy for purposes of the review of such Internet safety policy by the Commission.

(4) Effective date

This subsection shall apply with respect to schools and libraries on or after the date that is 120 days after December 21, 2000.

## §402. Judicial review of Commission's orders and decisions

(a) Procedure

    Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of title 28.

***

**§405. Petition for reconsideration; procedure; disposition; time of filing; additional evidence; time for disposition of petition for reconsideration of order concluding hearing or investigation; appeal of order**

(a) After an order, decision, report, or action has been made or taken in any proceeding by the Commission, or by any designated authority within the Commission pursuant to a delegation under section 155(c)(1) of this title, any party thereto, or any other person aggrieved or whose interests are adversely affected thereby, may petition for reconsideration only to the authority making or taking the order, decision, report, or action; and it shall be lawful for such authority, whether it be the Commission or other authority designated under section 155(c)(1) of this title, in its discretion, to grant such a reconsideration if sufficient reason therefor be made to appear. A petition for reconsideration must be filed within thirty days from the date upon which public notice is given of the order, decision, report, or action complained of. No such application shall excuse any person from complying with or obeying any order, decision, report, or action of the Commission, or operate in any manner to stay or postpone the enforcement thereof, without the special order of the Commission. The filing of a petition for reconsideration shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking such review (1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass. The Commission, or designated authority within the Commission, shall enter an order, with a concise statement of the reasons therefor, denying a petition for reconsideration or granting such petition, in whole or in part, and ordering such further proceedings as may be appropriate: *Provided*, That in any case where such petition relates to an instrument of authorization granted without a hearing, the Commission, or designated authority within the Commission, shall take such action within ninety days of the filing of such petition. Reconsiderations shall be governed by such general rules as the Commission may establish, except that no evidence other than newly discovered evidence, evidence which has become available only since the original taking of evidence, or evidence which the Commission or designated authority within the Commission believes should have been taken in the original proceeding shall be taken on any reconsideration. The time within which a petition for review must be filed in a proceeding to which section 402(a) of this title applies, or within which an appeal must be taken under section 402(b) of this title in any case, shall be computed from the date upon

which the Commission gives public notice of the order, decision, report, or action complained of.

***

# 47 U.S.C. § 1302

## §1302. Advanced telecommunications incentives

(a) In general

The Commission and each State commission with regulatory jurisdiction over telecommunications services shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.

(b) Inquiry

The Commission shall, within 30 months after February 8, 1996, and annually thereafter, initiate a notice of inquiry concerning the availability of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) and shall complete the inquiry within 180 days after its initiation. In the inquiry, the Commission shall determine whether advanced telecommunications capability is being deployed to all Americans in a reasonable and timely fashion. If the Commission's determination is negative, it shall take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market.

(c) Demographic information for unserved areas

As part of the inquiry required by subsection (b), the Commission shall compile a list of geographical areas that are not served by any provider of advanced telecommunications capability (as defined by subsection (d)(1)) and to the extent that data from the Census Bureau is available, determine, for each such unserved area—

(1) the population;

(2) the population density; and

(3) the average per capita income.

(d) Definitions

For purposes of this subsection:

(1) Advanced telecommunications capability

The term "advanced telecommunications capability" is defined, without regard to any transmission media or technology, as high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology.

(2) Elementary and secondary schools

The term "elementary and secondary schools" means elementary and secondary schools, as defined in section 7801 of title 20.