No. 25-60535

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

CONSUMERS' RESEARCH; CAUSE BASED COMMERCE, INC.; EDWARD J. BLUM; KERSTEN CONWAY; SUZANNE BETTAC; ROBERT KULL; KWANG JA KIRBY; TOM KIRBY; JOSEPH BAYLY; JEREMY ROTH; DEANNA ROTH; LYNN GIBBS; PAUL GIBBS; RHONDA THOMAS; JAMES ROMEO; CODY CARNETT; PHILLIP ARONOFF; JACQUELINE KLEIN

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,

*Respondents*

Petition for Review of an Order of the Federal Communications Commission
Agency No. 96-45

**BRIEF OF INTERVENOR NTCA – THE RURAL BROADBAND ASSOCIATION IN SUPPORT OF RESPONDENTS**

Jennifer Tatel
  *Counsel of Record*
Daniel H. Kahn
Tyler D. Dillon
Zane Altemus
Wilkinson Barker Knauer, LLP
1800 M Street NW, Suite 800N
Washington, DC 20036
(202) 783-4141
jtatel@wbklaw.com
*Counsel for NTCA – The Rural Broadband Association*

March 20, 2026

# CERTIFICATE OF INTERESTED PERSONS

## No. 25-60535

*Consumers' Research; Cause Based Commerce, Inc.; Edward J. Blum; Kersten Conway; Suzanne Bettac; Robert Kull; Kwang Ja Kirby; Tom Kirby; Joseph Bayly; Jeremy Roth; Deanna Roth; Lynn Gibbs; Paul Gibbs; Rhonda Thomas; James Romeo; Cody Carnett; Phillip Aronoff; Jacqueline Klein*

*v.*

*Federal Communications Commission;*
*United States of America*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

<u>Petitioners</u>

1. Consumers' Research.  It has no parent corporation, and no public held corporation owns 10% or more of its stock.

2. Cause Based Commerce, Incorporated.  It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

3. Edward J. Blum

4. Kersten Conway

5. Suzanne Bettac

6. Robert Kull

7. Kwang Ja Kirby

8. Tom Kirby

9. Joseph Bayly

10. Jeremy Roth

11. Deanna Roth

12. Lynn Gibbs

13. Paul Gibbs

14. Rhonda Thomas

15. James Romeo

16. Cody Carnett

17. Phillip Aronoff

18. Jacqueline Klein

Respondents

19. Federal Communications Commission ("FCC")

20. United States of America

Intervenors

21. National Telecommunications Cooperative Association d/b/a NTCA – The Rural Broadband Association ("NTCA"). It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

22. Schools, Health & Libraries Broadband Coalition. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

23. Benton Institute for Broadband & Society. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

24. Center for Media Justice d/b/a MediaJustice. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

25. National Digital Inclusion Alliance. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

<u>Counsel</u>

26. Boyden Gray PLLC: Michael Buschbacher, Jared M. Kelson, James R. Conde, and Laura B. Ruppalt are counsel for Petitioners.

27. FCC: D. Adam Candeub, Jacob M. Lewis, and James M. Carr are counsel for Respondent FCC.

28. United States Department of Justice: Brett A. Shumate, Caroline W. Tan, and Michael S. Raab are counsel for Respondent United States of America.

29. Wilkinson Barker Knauer, LLP: Jennifer Tatel, Daniel H. Kahn, Tyler D. Dillon, and Zane Altemus are counsel for Intervenor NTCA.

30. HWG LLP: Jason Neal and Sean A. Lev are counsel for Intervenor Schools, Health & Libraries Broadband Coalition.

31. Andrew Jay Schwartzman, PLLC: Andrew Jay Schwartzman is counsel for Intervenors Benton Institute for Broadband & Society, the National Digital Inclusion Alliance, and the Center for Media Justice d/b/a MediaJustice.

*/s/ Jennifer Tatel*
Jennifer Tatel

## STATEMENT REGARDING ORAL ARGUMENT

NTCA believes that the Court could find oral argument helpful in examining the claims raised by Petitioners.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..................................................................... i

STATEMENT REGARDING ORAL ARGUMENT ..............................................................v

TABLE OF AUTHORITIES ........................................................................................... viii

JURISDICTIONAL STATEMENT ....................................................................................1

STATEMENT OF THE ISSUES.........................................................................................1

STATEMENT OF THE CASE.............................................................................................1

    A.    Intervenor's Interest in This Case. ......................................................................1

    B.    Background. ..........................................................................................................3

SUMMARY OF ARGUMENT ...........................................................................................6

ARGUMENT .......................................................................................................................8

I.    Section 254 Provides an Intelligible Principle for Advanced Services in E-Rate and Rural Health Care. .........................................................................................8

    A.    The Supreme Court Reaffirmed the Longstanding Intelligible Principle Test.............................................................................................10

    B.    Section 254(b)'s Mandatory Principles Supply an Intelligible Principle for FCC Support for Advanced Services in E-Rate and Rural Health Care.................................................................................................14

    C.    Section 254(h) Independently Meets the Intelligible Principle Test. .........................................................................................................17

    D.    The Constitutional Avoidance Doctrine Supports the Constitutionality of Sections 254(c)(3) and (h)(2).................................20

II.    USAC Does Not Have Significant Authority, and Its Creation Was Lawful. ..............................................................................................................21

    A.    *Consumers' Research* Confirms That USAC Board Members and Its CEO Do Not Have Significant Authority, So They Are Not Officers Subject to the Appointments Clause. ................................................21

    B.    The Establishment of USAC Was Valid..............................................23

III.    The FCC Complied with the APA in Establishing the Quarterly Contribution Factor. ..................................................................................................................28

    A.    *Consumers' Research* Did Not Adopt a New Interpretation of Section 254 for the FCC to Evaluate.............................................................29

| B. | In Setting the Quarterly Contribution Factor, the FCC Does Not Engage in Rulemaking. | 31 |
| C. | The FCC's "Deemed Granted" Conclusion to the Quarterly Process Complies with the APA. | 32 |
| D. | The FCC Need Not Revisit All USF Mechanisms When It Establishes the Contribution Factor Each Quarter. | 35 |
| IV. | Granting the Petition Would Upset Investment-Backed Expectations | 38 |
| CONCLUSION | | 40 |

# TABLE OF AUTHORITIES

**CASES**

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) ..................12

*Am. Power & Light Co. v. Sec. & Exch. Comm'n*, 329 U.S. 90 (1946) ..................12

*Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) ...............................................27

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988).........................................32

*Buckley v. Valeo*, 424 U.S. 1 (1976) ......................................................................21

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962).......................34

*City of Arlington v. FCC*, 668 F.3d 229 (5th Cir. 2012)......................................31

*City of Portland v. Env't Prot. Agency*, 507 F.3d 706 (D.C. Cir. 2007) .................35

*Consumers' Rsch. v. FCC*, 109 F.4th 743 (5th Cir. 2024) ........................................5

*Consumers' Rsch. v. FCC*, 67 F.4th 773 (6th Cir. 2023) ...........................................29

*Consumers' Rsch. v. FCC*, 88 F.4th 917 (11th Cir. 2023) ........................................30

*Consumers' Rsch. v. FCC*, No. 21-3886, 2023 WL 3807406 (6th Cir. May 30, 2023)...........................................................................................................................5

*Duncan v. Walker*, 533 U.S. 167 (2001)....................................................................16

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568 (1988) ......................................................................................................20

*FCC v. Consumers' Rsch.*, 145 S. Ct. 587 (2024) ......................................................5

*FCC v. Consumers' Rsch.*, 606 U.S. 656 (2025)...............................................passim

*Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591 (1944)...........................11

*Freytag v. CIR*, 501 U.S. 868 (1991)........................................................................21

*Gundy v. United States*, 588 U.S. 128 (2019)...........................................................11

*Hooper v. Cal.*, 155 U.S. 648 (1895).........................................................................20

*Huawei Technologies, Inc. v. FCC*, 2 F.4th 421 (5th Cir. 2021).............................35

*In re MCP No. 185*, 124 F.4th 993 (6th Cir. 2025) ................................................26

*Int'l Dark-Sky Ass'n, Inc. v. FCC*, 106 F.4th 1206 (D.C. Cir. 2024).......................24

*Lucie v. Sec. & Exch. Comm'n*, 585 U.S. 237 (2018) ..............................................21

*Massachusetts v. Env't Prot. Agency*, 549 U.S. 497 (2007)....................................35

*Mistretta v. United States*, 488 U.S. 361 (1989)..............................................11, 13

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983). 34

*Nat'l Broad. Co. v. United States*, 319 U.S. 190 (1943) ........................................... 11

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ............................................................................................................... 17, 26

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F.4th 415 (5th Cir. 2025) ........................................................................................................... 22

*Nat'l Relig. Broads. v. FCC*, 138 F.4th 282 (5th Cir. 2025) ..................................... 25

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) ................................................ 12

*Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633 (1990) ...................... 32

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015) ................................................. 33

*Qwest Corp. v. FCC*, 258 F.3d 1191 (10th Cir. 2001) .............................................. 29

*Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*, 25 F.4th 12 (D.C. Cir. 2022) ........................................................................................................... 19

*Sch., Health & Librs. Broadband Coal. v. Consumers' Rsch.*, 145 S. Ct. 587 (2024) ............................................................................................................... 5

*Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80 (1943) .................................. 34

*Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194 (1947) .......................... 34, 36

*Shell Offshore, Inc. v. Babbitt*, 238 F.3d 622 (5th Cir. 2001) .................................. 32

*Sierra Club v. Costle*, 657 F.2d 298 (D.C. Cir. 1981) .............................................. 32

*Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212 (1989) ........................................... 19

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001) ................................................................................................... 27

*Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393 (5th Cir. 1999) ................. 25, 37

*The Grissoms, LLC v. Antero Res. Corp.*, 133 F.4th 605 (6th Cir. 2025) ................ 19

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519 (1978) ................................................................................................... 33

*Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001) .............................. 12, 13

STATUTES AND LEGISLATION

28 U.S.C. § 2344 ....................................................................................................... 23

31 U.S.C. § 9102 ....................................................................................................... 23

47 U.S.C. § 153(24) .................................................................................................. 17

47 U.S.C. § 153(53) .......................................................................................17

47 U.S.C. § 154(i) .........................................................................................25

47 U.S.C. § 254 ............................................................................................25

47 U.S.C. § 254(b) ........................................................................................14

47 U.S.C. § 254(b)(1).............................................................................13, 15

47 U.S.C. § 254(b)(2)–(3) .............................................................................17

47 U.S.C. § 254(b)(3).....................................................................................13

47 U.S.C. § 254(b)(5).....................................................................................13

47 U.S.C. § 254(b)(5)–(6) .............................................................................15

47 U.S.C. § 254(c)(1)...............................................................................13, 14

47 U.S.C. § 254(c)(3)..................................................................................9, 14

47 U.S.C. § 254(d) .....................................................................................3, 13

47 U.S.C. § 254(e) .........................................................................................13

47 U.S.C. § 254(h)(1)(B) ...............................................................................16

47 U.S.C. § 254(h)(2)(A) ............................................................................9, 18

47 U.S.C. § 254(j) ..........................................................................................26

47 U.S.C. § 402(a) .........................................................................................23

47 U.S.C. § 646(c) .........................................................................................28

47 U.S.C. § 1752(i)(5) ...................................................................................28

American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 (2021)............28

Broadband Data Improvement Act, Pub. L. 110-385, 122 Stat. 4096 (2008).........28

Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, 114 Stat. 2763 (2000) ........................................................................................28

Every Student Succeeds Act, Pub. L. No. 114-95, 129 Stat. 1802 (2015)...............28

Frank R. Lautenberg Chemical Safety for the 21st Century Act, Pub. L. No. 114-182, 130 Stat. 448 (2016) ...................................................................................28

No Child Left Behind Act of 2001, Pub. L. No. 107-110, 115 Stat. 1425 (2002) ...28

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996)...........8

**RULES AND REGULATIONS**

47 C.F.R. § 1.2(a) ...................................................................................37

47 C.F.R. § 1.3 ........................................................................................37

47 C.F.R. § 1.41 ......................................................................................37

47 C.F.R. § 1.53–.59 ...............................................................................37

47 C.F.R. § 1.106 ....................................................................................37

47 C.F.R. § 1.401 ....................................................................................37

47 C.F.R. § 1.415 ....................................................................................37

47 C.F.R. § 1.429 ....................................................................................37

47 C.F.R. §§ 1.1200–.1216 .....................................................................37

47 C.F.R. pt. 54 .........................................................................................3

47 C.F.R. § 54.5 ......................................................................................18

47 C.F.R. §§ 54.701–.717 .........................................................................4

47 C.F.R. § 54.702(c) ...........................................................................4, 22

47 C.F.R. § 54.706 ....................................................................................3

47 C.F.R. § 54.709 ....................................................................................3

47 C.F.R. § 54.709(a)(3) .....................................................................34, 36

47 C.F.R. §§ 54.719–.725 .......................................................................37

**ADMINISTRATIVE MATERIALS**

*Changes to the Bd. of Dirs. of the Nat'l Exch. Carrier Ass'n, Inc. et al.*, Report and Order et al., 12 FCC Rcd 18400 (1997) .......................................................25, 26

*Changes to the Bd. of Dirs. of the Nat'l Exch. Carrier Ass'n, Inc. et al.*, Third Report and Order et al., 13 FCC Rcd 25058 (1998) .................23, 25, 26, 27

*Comments and Objections of Consumers' Rsch. et al.*, CC Docket No. 96-45 (Aug. 8, 2025).............................................................................................5

*Comments and Objections of Consumers' Rsch. et al.*, CC Docket No. 96-45 (Sept. 15, 2025) .......................................................................................5

*Fed.-State Joint Bd. on Universal Serv.*, Report and Order, 12 FCC Rcd 8776 (1997)...................................................................................................2

*Fed.-State Joint Bd. on Universal Serv.*, Report to Congress, 13 FCC Rcd 11501 (1998)..................................................................................................17

*Lifeline & Link Up Reform & Modernization, et al.*, Report and Order and Further Notice of Proposed Rulemaking, 27 FCC Rcd 6656 (2012)................................39

*Promoting Telehealth in Rural Am.*, Report and Order, 34 FCC Rcd 7335 (2019) ............................................................................2

*Report on the Future of the Universal Serv. Fund*, Report, 37 FCC Rcd 1004 (2022)................................................................................................31

LEGISLATIVE MATERIALS
H.R. Rep. No. 103-560 (1994), 1994 WL 283992 ..................................................26

OTHER MATERIALS
*Auction 904: Rural Digital Opportunity Fund*, FCC, https://www.fcc.gov/auction/904 ....................................................................3

Black's Law Dictionary (12th ed. 2024) ................................................................24

Brief for the Federal Petitioners, *FCC v. Consumers' Rsch.*, 606 U.S. 656 (2025) (No. 24-354), 2025 WL 104514 ....................................................................33

Brief of Bipartisan Former Commissioners of the Federal Communications Commission as Amici Curiae in Support of Petitioners, *FCC v. Consumers' Rsch.*, 606 U.S. 656 (2025) (Nos. 24-354 & 24-422), 2025 WL 267962 .............34

Brief of Petitioners Competitive Carriers Association et al., *FCC v. Consumers' Rsch.*, 606 U.S. 656 (2025) (No. 24-354), 2025 WL 104515 ..............................21

*Broadband/Internet Availability Survey Report*, NTCA (Dec. 2025), https://www.ntca.org/sites/default/files/documents/2025-12/2025BroadbandInternetAvailabilityReport.pdf ............................................1, 2

Electronic Comment Filing System, FCC, https://www.fcc.gov/ecfs/search ..........37

*Enhance*, Webster's Dictionary, https://www.merriam-webster.com/dictionary/enhance ..................................................................18

*Feasible*, Webster's Dictionary, https://www.merriam-webster.com/dictionary/feasible....................................................................18

Kristen E. Hickman & Richard J. Pierce, Jr., ADMINISTRATIVE LAW TREATISE Ch. 11 (6th ed. 2019)....................................................................................36

Letter from Robert P. Murphy, Gen. Couns., Gen. Acct. Off., to Hon. Ted Stevens, U.S. Senate, at 5-6 (Feb. 10, 1998), https://www.gao.gov/assets/b-278820.pdf ..23

Stipulation of Voluntary Dismissal, *Consumers' Rsch. v. FCC* (D.C. Cir. June 17, 2024) (No. 23-1091)....................................................................................5

*Universal Service*, FCC, https://www.fcc.gov/general/universal-service ..................3

*Universal Service: Sustainability and Business Cases for Rural Connectivity*, Cartesian (Mar. 2026), https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.ntca.org%2Fsites%2Fdefault%2Ffiles%2Fdocuments%2F2026-03%2FSustainability-and-Business-Cases-for-Rural-Connectivity.pptx............................................2, 39

*Urban Rate Survey Data & Resources*, FCC, https://www.fcc.gov/economics-analytics/industry-analysis-division/urban-rate-survey-data-resources................36

# JURISDICTIONAL STATEMENT

NTCA adopts the jurisdictional statement made by Respondents.

# STATEMENT OF THE ISSUES

NTCA adopts the statement of issues made by Respondents.

# STATEMENT OF THE CASE

## A.    Intervenor's Interest in This Case.

NTCA is a general cooperative association whose membership is composed of nearly 850 independent, family-owned, and community-based telecommunications companies providing voice and broadband services in rural areas.  NTCA's members build and deliver connectivity and operate essential services in rural and small-town communities across the United States.  NTCA's members use Universal Service Fund ("USF") support to serve customers who would otherwise go unserved or who would face the prospect of paying rates for services far in excess of those charged in urban areas for comparable services.

USF support is critically important to NTCA and its rural member companies. For example, high-cost support enables rural carriers to deploy high-speed broadband networks and provide service at affordable rates to especially high-cost areas in the country, where population densities tend to average a handful of serviceable locations per square mile.  *See, e.g., Broadband/Internet Availability Survey Report*, NTCA, at 3 (Dec. 2025), https://www.ntca.org/sites/default/files/documents/2025-

12/2025BroadbandInternetAvailabilityReport.pdf ("NTCA Broadband Survey"). USF support also helps cover the higher operating and equipment costs that rural carriers face because they lack the economies of scale available to providers in more heavily populated areas. *See*, *e.g.*, *Promoting Telehealth in Rural Am.*, Report and Order, 34 FCC Rcd 7335, 7348 (2019); *Fed.-State Joint Bd. on Universal Serv.*, Report and Order, 12 FCC Rcd 8776, 8918 (1997). USF support for schools, libraries, and rural health care institutions is important for NTCA members because they provide services to the vast majority of primary and secondary schools, public libraries, and hospitals/medical clinics located in their rural service areas. *See* NTCA Broadband Survey at 6. A recent analysis commissioned by NTCA shows that a 40% reduction in USF support would prevent many small and medium providers in rural areas from sustaining operations on existing networks.[1] Petitioners' challenge threatens the Fourth Quarter 2025 USF contribution factor, Pet. App. Ex. A, and, more broadly, key USF programs as well as the system of administration on which USF depends.

---

[1] *Universal Service: Sustainability and Business Cases for Rural Connectivity*, Cartesian, at 4 (Mar. 2026), https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.ntca.org%2Fsites%2Fdefault%2Ffiles%2Fdocuments%2F2026-03%2FSustainability-and-Business-Cases-for-Rural-Connectivity.pptx ("*USF Report*").

**B.      Background.**

*USF.*   Through USF, the FCC implements Congress's charge to promote the availability of affordable, reliable communications service nationwide.    *See generally Universal Service*, FCC, https://www.fcc.gov/general/universal-service (last visited March 20, 2026).   USF is made up of four programs: (1) the "High-Cost" program, which supports service to rural and other high-cost areas; (2) the "Rural Health Care" program, which supports service for healthcare providers outside urban areas; (3) the "E-Rate" program, which supports service for schools and libraries; and (4) the "Lifeline" program, which supports service for low-income consumers. *Id*.  The FCC allocates support via these programs through detailed rules and orders. *See* 47 C.F.R. pt. 54; *see also*, *e.g.*, *Auction 904: Rural Digital Opportunity Fund*, FCC, https://www.fcc.gov/auction/904 (last visited Mar. 20, 2026) (providing at "Releases" tab over 100 FCC orders and public notices implementing the Rural Digital Opportunity Fund, a High-Cost support auction mechanism).

Pursuant to Section 254(d) of the Communications Act of 1934, as amended (the "Act"), the FCC requires telecommunications carriers and certain telecommunications providers to contribute to USF, allocating contributions using a quarterly contribution factor calculated based on contributors' assessable revenue and the cost of the programs.  *See* 47 C.F.R. §§ 54.706, 54.709.  The Universal

Service Administrative Company ("USAC"), a non-profit, assists the FCC in ministerial tasks for administration of USF, including mechanical calculations that inform the contribution factor. *See id.* §§ 54.701–.717; *see also id.* § 54.702(c) (forbidding USAC from "mak[ing] policy" or "interpret[ing] unclear provisions" of the Act or FCC rules).

***This Litigation.*** Petitioners have now been bringing court challenges to the FCC's quarterly contribution factor for almost five years.[2] Their prior challenges, spanning four circuits, culminated in the Supreme Court's decision in June 2025 in *FCC v. Consumers' Research* affirming the constitutionality of USF and of USAC's administrative role. *See FCC v. Consumers' Rsch.*, 606 U.S. 656 (2025).

In an apparent attempt to obtain a circuit split, Petitioners had filed challenges to various quarterly contribution factors, making substantially identical arguments, in the Fifth Circuit, Sixth Circuit, Eleventh Circuit, and D.C. Circuit. Panels in the Fifth Circuit, Sixth Circuit, and Eleventh Circuit unanimously rejected their arguments. Those courts affirmed the constitutionality of both Congress's delegation of USF authority to the FCC and the FCC's limited reliance on USAC for administrative tasks. The Sixth Circuit also denied a petition for rehearing en banc. *Consumers' Rsch. v. FCC*, No. 21-3886, 2023 WL 3807406 (6th Cir. May 30,

---

[2] While individual petitioners have changed slightly, Consumers' Research and Cause Based Commerce, Inc. have been petitioners in each prior case since 2021 and are among Petitioners here.

2023).  Petitioners voluntarily dismissed their D.C. Circuit challenge subsequent to oral argument in that case.  Stipulation of Voluntary Dismissal, *Consumers' Rsch. v. FCC* (D.C. Cir. June 17, 2024) (No. 23-1091).  This Court, sitting en banc, held by a 9-7 vote that the combination of Congress's delegation to the FCC and the FCC's use of USAC violated the Constitution. *Consumers' Rsch. v. FCC*, 109 F.4th 743, 756 (5th Cir. 2024).

The Supreme Court granted certiorari to resolve the circuit split. *Sch., Health & Librs. Broadband Coal. v. Consumers' Rsch.*, 145 S. Ct. 587 (2024); *FCC v. Consumers' Rsch.*, 145 S. Ct. 587 (2024).  By a 6-3 vote, the Court rejected Petitioners' arguments, holding that Congress's direction to the FCC to implement USF, USAC's role in administration, and the combination thereof are consistent with the Constitution. *Consumers' Rsch.*, 606 U.S. at 664, 698.

Undeterred, Petitioners want yet another bite at the apple.  They filed legal objections to the 2025 fourth quarter contribution factor with the FCC, raising arguments they had not pursued in their prior court cases. *See Comments and Objections of Consumers' Rsch. et al.*, CC Docket No. 96-45 (Sept. 15, 2025); *Comments and Objections of Consumers' Rsch. et al.*, CC Docket No. 96-45 (Aug. 8, 2025).  Following the FCC's adoption of the contribution factor in accordance with its rules, Petitioners brought this case. *See generally* Pet. Br.  NTCA sought to intervene to protect the interests of its rural member companies.  Petitioners opposed

intervention, but this Court granted NTCA's motion to intervene, along with other motions, on November 14, 2025. *See* Order Granting Motions to Intervene (Nov. 14, 2025).

## SUMMARY OF ARGUMENT

Petitioners' latest attacks ignore and distort the Supreme Court's decisive ruling against them in *Consumers' Research*. For instance:

- Petitioners insinuate that the Constitution requires a "bevy of limits" on FCC programs, Pet. Br. 29, but the Court reaffirmed that an intelligible principle suffices. *Consumers' Rsch.*, 606 U.S. at 683.

- Petitioners state that USF contributions are "[s]kyrocketing," Pet. Br. 14, but the Court correctly identified that USF has operated at "roughly constant inflation-adjusted dollars." *Consumers' Rsch.*, 606 U.S. at 686.

- Petitioners claim that USAC's leaders "[e]xercise [s]ignificant, [c]ontinuing [f]ederal [p]ower," Pet. Br. 56, but the Court confirmed that USAC lacks any decision-making authority and instead "do[es] arithmetic" and applies FCC rules. *Consumers' Rsch.*, 606 U.S. at 693.

The only place in *Consumers' Research* one can find support for Petitioners' contrary assertions is the dissenting opinion. Indeed, Petitioners' Introduction section cites the dissent more than the majority opinion. But the dissent is not the

6

law, no matter how much Petitioners would prefer otherwise. The Supreme Court's binding holdings in *Consumers' Research* and well-established principles of constitutional and administrative law demonstrate the invalidity of Petitioners' grab-bag of arguments.

*First*, Congress's direction to the FCC to support advanced services in E-Rate and Rural Health Care complies with the nondelegation doctrine. *Consumers' Research* reaffirmed that Congress satisfies the Constitution by providing an intelligible principle. Section 254 provides ample guidance and constraints that readily satisfy that test.

*Second*, Petitioners' attacks on USAC are foreclosed. Petitioners claim that the method of appointment of USAC's directors and CEO violates the Appointments Clause. But the Appointments Clause applies only to officials that wield "significant authority," and the Supreme Court correctly confirmed that USAC has none. The establishment of USAC did not violate the Government Corporation Control Act ("GCCA") because the FCC had the statutory authority that the GCCA requires. Regardless, that establishment occurred almost three decades ago, so the challenge is time-barred.

*Third*, Petitioners' Administrative Procedure Act ("APA") challenges depend upon multiple misstatements of law. *Consumers' Research* affirmed the FCC's existing approach; it did not establish a new interpretation that the FCC has ignored,

as Petitioners claim.  Petitioners attack the "deemed approved" component of the FCC's quarterly process because they view that process as a freewheeling exercise in discretion.  The Supreme Court dispelled that exact myth already, confirming that the FCC sets the contribution factor quarterly, with help from USAC, by performing arithmetic based on preexisting regulations.  Following a final step of enlisting the public to triple-check this work, the FCC uses a "deemed granted" conclusion to avoid an unnecessary pro forma ruling when there are no mistakes.  This conforms to the APA and is commendable efficiency.  In asking this Court to find that the APA forces the FCC to be ready to consider everything to do with every USF mechanism every quarter, Petitioners are effectively asking the Court to make USF unworkable.

*Finally*, NTCA's members depend on the ongoing stability of USF to serve Americans in rural areas.  This reliance interest counsels strongly in favor of rejecting Petitioners' arguments and ending their Sisyphean quest to disrupt USF.

**ARGUMENT**

**I.**   **SECTION 254 PROVIDES AN INTELLIGIBLE PRINCIPLE FOR ADVANCED SERVICES IN E-RATE AND RURAL HEALTH CARE.**

In the Telecommunications Act of 1996, Congress expanded universal service to encompass support for schools and libraries and for rural health care. Telecommunications Act of 1996, Pub. L. No. 104-104, § 254, 110 Stat. 56, 71–75 (1996) (codified at 47 U.S.C. § 254(h)) ("1996 Act").  Recognizing that educators

and health care providers may have evolving needs that differ from those served by the high-cost and low-income programs, Congress permitted the FCC to "designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h)" that are "[i]n addition to the services included in the definition of universal service under paragraph (1)."  47 U.S.C. § 254(c)(3).  Within Section 254(h), Congress directed the FCC to "establish competitively neutral rules . . . to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries."  *Id.* § 254(h)(2)(A).

Petitioners, having failed to prove that Section 254 violates the nondelegation doctrine, now target these specific provisions.  Specifically, Petitioners argue that Sections 254(c)(3) and (h)(2) "[u]nmoor" support for advanced services in E-Rate and Rural Health Care from the constraints in Sections 254(b)-(c)(1) that the Supreme Court upheld in *Consumers' Research*.  *See* Pet. Br. 29.  But the Supreme Court did not state that the specific statutory factors it upheld represent the only way that Congress could satisfy the longstanding intelligible principle test in the context of USF.

The statutory framework for USF support for advanced services in E-Rate and Rural Health Care readily satisfies the intelligible principle test.  The FCC correctly

9

explained that Section 254 limits: (1) the recipients of support under the E-Rate and Rural Health Care programs, (2) the types of services that the FCC may subsidize, and (3) the amount of funding available for those services. *See* Resp. Br. 28–32. The FCC also correctly explained that Section 254(h) and the sufficiency principle in Sections 254(b)(5) and (e) require the FCC to consider the costs of expanding universal service programs before supporting an additional service. *See id.* at 32-35. NTCA writes separately to emphasize that Section 254(b) applies to support for advanced services in E-Rate and Rural Health Care even though Section 254(c)(1) does not and that Section 254(b) suffices to supply an intelligible principle regarding the amount of support. Further, Section 254(h)(2) itself constrains and guides the FCC and, together with the remainder of Section 254(h), satisfies the intelligible principle test.

**A.** **The Supreme Court Reaffirmed the Longstanding Intelligible Principle Test.**

Following their failed quest to overturn the intelligible principle test, Petitioners now concede (as they must) that it controls here. *See* Pet. Br. 28. However, their misleading characterization of that test renders their concession empty. They imply that the Supreme Court concluded that, unless USF legislation contains the precise "bevy of limits" that the Court analyzed, it fails the intelligible principle test. *See*, *e.g.*, Pet. Br. 29–30. The Supreme Court said no such thing.

Instead, the Supreme Court affirmed and applied "the usual intelligible-principle test." *Consumers' Rsch.*, 606 U.S. at 680. "Th[e] [intelligible principle] standards, the Court has made clear, are not demanding." *Gundy v. United States*, 588 U.S. 128, 146 (2019). Congress simply must "ma[k]e clear both 'the general policy' that the agency must pursue and 'the boundaries of [its] delegated authority'" and "provide[] sufficient standards to enable both 'the courts and the public [to] ascertain whether the agency' has followed the law." *Consumers' Rsch.*, 606 U.S. at 673 (citations omitted). Thus, the Supreme Court has affirmed, "without deviation, Congress' ability to delegate power under broad standards." *Mistretta v. United States*, 488 U.S. 361, 373 (1989). For instance, the Court has upheld Congress's direction to:

- The FCC to regulate broadcast licensing in "the 'public interest, convenience, or necessity.'" *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 216 (1943).

- The Federal Power Commission to ensure "just and reasonable" rates. *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 600–01 (1944).

- The Securities and Exchange Commission to prevent "unfair[] or inequitabl[e]" distribution of voting power among security holders.

*Am. Power & Light Co. v. Sec. & Exch. Comm'n*, 329 U.S. 90, 104 (1946).

- The Environmental Protection Agency "in setting national ambient air quality standards" at a level "requisite to protect the public health." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 462, 472 (2001).

Indeed, "the Court . . . ha[s] found the requisite 'intelligible principle' lacking in only two statutes, one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman*, 531 U.S. at 474 (discussing *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)).

The Supreme Court emphasized in *Consumers' Research* that Section 254 fits comfortably within the bounds of the intelligible principle test. *See Consumers' Rsch.*, 606 U.S. at 686 (stating that "the statutory policy is clear and the statutory boundaries specific"); *see also id.* at 691 ("The policy [Section 254] expresses is clear and limiting."). It underlined that "each of the [Section 254] criteria has to be met," meaning that the FCC must satisfy multiple and distinct layers of statutory standards to justify USF support. *Id.* at 688. Among other things, the framework requires the FCC to conclude that the funding is "sufficient" (a term that imposes "a

floor and a ceiling alike"), *id.* at 681, provides "[q]uality services," supports services "reasonably comparable to those services provided in urban areas," and supports a limited set of telecommunications services, 47 U.S.C. § 254(b)(1), (b)(3), (b)(5), (c)(1), (d), (e). These Section 254 criteria together are *more* demanding than statutory standards the Court has previously upheld. Thus, despite Petitioners' implications otherwise, *see*, *e.g.*, Pet. Br. 29–30, the Supreme Court did *not* suggest that the Section 254 provisions it analyzed represent all that the Constitution allows.

Petitioners are correct that "[w]hat suffices as an intelligible principle will vary based on 'the extent and character' of the power sought to be delegated." Pet. Br. 28 (quoting *Mistretta*, 488 U.S. at 372). But this means Congress has a freer hand here than in earlier situations the Supreme Court has reviewed. Broad, previously affirmed standards have impacted essentially all Americans. *See*, *e.g.*, *Whitman*, 531 U.S. at 475 ("[A]ir standards . . . affect the entire national economy."). In contrast, only a subset of two USF programs are at issue here, not the entirety of USF as in *Consumers' Research*, and certainly not something as pervasive as the air we breathe. *See* Resp. Br. at 25 (quoting earlier briefs of Petitioners characterizing the matters at issue here as "only a sliver" and "a minuscule part" of USF). The scope of the power Congress conferred in Sections 254(c)(3) and (h)(2) is relatively limited, but as discussed below, the guidance it provides is greater than statutes that grant broader authority to agencies that the Supreme Court has upheld.

13

**B.** **Section 254(b)'s Mandatory Principles Supply an Intelligible Principle for FCC Support for Advanced Services in E-Rate and Rural Health Care.**

Section 254(b) sets forth binding "policies for the preservation and advancement of universal service." 47 U.S.C. § 254(b); *see also Consumers' Rsch.*, 606 U.S. at 687–88. These policies apply to the advanced services supported pursuant to Sections 254(c)(3) and (h)(2). In concluding otherwise, Petitioners misunderstand Section 254(c) and its place in the statutory structure.

Section 254(c) defines the services supported by universal service mechanisms. Section 254(c)(1) sets forth the criteria by which the FCC may define services supported by universal service mechanisms in general and requires that the FCC consider the extent to which the supported telecommunications services meet four enumerated principles. 47 U.S.C. § 254(c)(1). Section 254(c)(3) authorizes the FCC to, "[i]n addition to the services included in the definition of universal service under paragraph (1)," "designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h)." *Id.* § 254(c)(3). Thus, the plain text of Section 254(c)(3) authorizes the FCC to designate "additional services" for "universal service" support for schools, libraries, and health care providers.

As Petitioners admit, Section 254(b) includes mandatory requirements that apply to "universal service." Pet. Br. 29. These principles direct and constrain how

much the FCC may provide in support for advanced services in E-Rate and Rural Health Care. In particular, Section 254(b) identifies that "[q]uality services should be available at just, reasonable, and affordable rates" and requires "sufficient" support for the purposes specified in Section 254(h). *See* 47 U.S.C. § 254(b)(1), (5)–(6). These constraints compare favorably to those the Supreme Court has previously affirmed, *supra* 11-12. *Consumers' Research* confirms that the "sufficient" standard, in particular, supplies both a floor and a ceiling for support. *Consumers' Rsch.*, 606 U.S. at 681–82. Combined with the specification in Section 254(h) of who receives support for what purposes, *see* Resp. Br. 29–31, Section 254(b) therefore provides an intelligible principle.

Petitioners are incorrect in asserting that Sections 254(c)(3) and (h)(2) "deviate[]" from the "general scheme that the Supreme Court analyzed" by "reliev[ing] FCC from considering the qualitative limits" in Section 254(b). Pet. Br. 27. They claim that because the advanced telecommunications and information services that the FCC must support pursuant to Sections 254(c)(3) and (h)(2) extend beyond the more limited set of telecommunications services identified in Section 254(c)(1), these services are not "universal service" and therefore are not constrained by Section 254(b). *See* Pet. Br. 29–33. They appear to draw this conclusion from the statement in Section 254(c)(1) that "[u]niversal service is" the set of telecommunications services the FCC identifies. Pet. Br. 30–31.

But *all* of Section 254(c) defines universal service. Section 254(c)(3) cross-references Section 254(h), and Section 254(h)(2) makes clear that "advanced telecommunications and information services" are universal service in the E-Rate and Rural Health Care contexts. The phrase in Section 254(c)(3) "[i]n addition to the services included in the definition of universal service under paragraph (1)" shows that Section 254(c)(3) *adds* to the definition of universal service, not that services supported under Section 254(c)(3) are *separate from* the definition of universal service, as Petitioners posit. That is why Congress used the phrase "in addition" and qualified "the definition of universal service" with "under paragraph (1)." Petitioners fail to give adequate weight to "in addition" and effectively read out "under paragraph (1)." *Cf. Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty 'to give effect, if possible, to every clause and word of a statute.'") (citation omitted).

The text of Section 254(h)(1) affirms that services supported under Section 254(c)(3) are within the ambit of "universal service." Section 254(h)(1)(B) requires telecommunications carriers serving a geographic area to provide service to schools and libraries "upon a bona fide request for any of its services that are *within the definition of universal service under subsection (c)(3)*." 47 U.S.C. § 254(h)(1)(B) (emphasis added). Under Petitioners' reading of Section 254, this language would be nonsensical.

16

The text of Section 254(b) confirms that this reading is correct. Section 254(b) expressly refers to services that are *not* telecommunications services and therefore are not services that fall under the scope of (c)(1). In particular, it refers to "information services," *see* 47 U.S.C. § 254(b)(2)–(3), which is a distinct and mutually exclusive category of service from "telecommunications service[s]." *See* 47 U.S.C. § 153(24), (53); *see also Fed.-State Joint Bd. on Universal Serv.*, Report to Congress, 13 FCC Rcd 11501, 11507–08 ¶ 13 (1998); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 975–76 (2005). Section 254(b) also refers to "advanced" services, conforming to the terminology of Section 254(c)(3). *See* 47 U.S.C. § 254(b)(2)–(3). In sum, advanced services are universal service in the contexts of E-Rate and Rural Health Care, and therefore Section 254(b) applies and supplies an intelligible principle.

## C.   Section 254(h) Independently Meets the Intelligible Principle Test.

Even standing alone, Section 254(h) meets the intelligible principle test. As discussed above, Sections 254(h)(1) and (2)(A) identify the services that the FCC must support and the beneficiaries of that support. As the FCC explains, formulas set forth in Sections 254(h)(1)(A)-(B) specify the level of support to be given where those formulas apply. *See* Resp. Br. 31–32. Section 254(h)(2)(A) also guides and constrains the amount of support the FCC must provide by directing the FCC to "enhance" access to all forms of advanced services supported in E-Rate and Rural

Health Care "to the extent technically feasible and economically reasonable."  47

U.S.C. § 254(h)(2)(A).

First, under Section 254(h)(2)(A), any rules the FCC establishes must be "economically reasonable."  This speaks directly to the question of how much support to provide, informed by the universal service principles of affordability and sufficiency.  The FCC has expressly considered the economic reasonableness of actions it has taken in E-Rate and Rural Health Care.  *See* Resp. Br. 34–35 (collecting examples).  Second, the statute specifies that the standard of economical reasonableness applies to services that are "technically feasible," which the FCC has concluded limits it to supporting what is "capable of accomplishment as evidenced by prior success under similar circumstances."  47 C.F.R. § 54.5; *see also Feasible*, Webster's Dictionary, https://www.merriam-webster.com/dictionary/feasible (last visited Mar. 20, 2026) (defining "feasible" to mean "capable of being done or carried out").  Finally, the directive for the FCC to "enhance" adds yet another layer of guidance and constraint, as its plain meaning of "improve" indicates that funding for supported services must be additive but not transformative.  *See Enhance*, Webster's Dictionary, https://www.merriam-webster.com/dictionary/enhance (last visited

Mar. 20, 2026) (defining "enhance" to mean to "increase or improve in value [or] quality").[3]

Read together, the constraints in Section 254(h)(2)(A) direct the FCC to provide an amount of support that is reasonable, from a financial perspective, to improve (but not fundamentally transform) access to advanced services that have been implemented successfully in the marketplace. This guidance compares favorably to the statute the Supreme Court upheld in *Skinner v. Mid-Am. Pipeline Co.*, which directed the Secretary of Transportation "to 'establish a schedule of fees based on the usage, in *reasonable* relationship to volume-miles, miles, revenues, or an appropriate combination thereof, of natural gas and hazardous liquid pipelines.'" *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 214 (1989) (emphasis added). Here, as there, a reasonableness standard tied to specific considerations is sufficient to satisfy the Constitution.[4]

---

[3] Courts have interpreted the word "enhance" in accordance with its meaning to impose meaningful, legally significant limits. *See*, *e.g.*, *The Grissoms, LLC v. Antero Res. Corp.*, 133 F.4th 605, 610 (6th Cir. 2025) (explaining that "'to enhance' is '[t]o increase or make greater, as in value'" and thus does not include processing unrefined gas mixtures into marketable products because "[e]nhancements suggest an existing market and the goal of making a product within that market more valuable") (citation omitted); *Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*, 25 F.4th 12, 14 (D.C. Cir. 2022) ("'[E]nhancement of tribal lands' does not include an acquisition that merely increases the Tribe's landholdings.").

[4] As noted above, the FCC is further constrained by the formulas in Section 254(h)(1)(A)-(B) where they apply. *See supra* 17.

**D. The Constitutional Avoidance Doctrine Supports the Constitutionality of Sections 254(c)(3) and (h)(2).**

Even if the Court otherwise harbors some doubt as to the best statutory construction here, the canon of constitutional avoidance requires confirmation that Sections 254(c)(3) and (h)(2) are constitutionally valid. "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). "The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Id.* (quoting *Hooper v. Cal.*, 155 U.S. 648, 657 (1895)).

However, Petitioners again construe the statute "extravagantly, the better to create a constitutional problem." *Consumers' Rsch.*, 606 U.S. at 690. This Court, unlike Petitioners, should not so easily set aside the Supreme Court's recent reminder that "[s]tatutes (including regulatory statutes) should be read, if possible, to comport with the Constitution, not to contradict it." *Id.* at 691.

**II.** **USAC DOES NOT HAVE SIGNIFICANT AUTHORITY, AND ITS CREATION WAS LAWFUL.**

**A.** ***Consumers' Research* Confirms That USAC Board Members and Its CEO Do Not Have Significant Authority, So They Are Not Officers Subject to the Appointments Clause.**

Petitioners argue that USAC's board members and CEO are officers under Article II of the Constitution. Pet. Br. 54–65. The reality of USAC's ministerial role closes the door on Petitioners' Appointment Clause argument, and by confirming that USAC lacks decisional authority, *Consumers' Research* deadbolts the already-closed door.

A person is an officer subject to the Appointments Clause only if he or she has "significant authority." *Buckley v. Valeo*, 424 U.S. 1, 126 (1976). The Supreme Court specifically has found "significant authority" where officials wield "significant discretion" concerning important functions. *Lucie v. Sec. & Exch. Comm'n*, 585 U.S. 237, 248 (2018). By contrast, the Court has suggested that "ministerial tasks" would not be sufficient to constitute "significant authority." *See Freytag v. CIR*, 501 U.S. 868, 881 (1991) ("[S]pecial trial judges perform more than ministerial tasks.").

USAC's directors and CEO wield no discretion or authority, and USAC's function is entirely ministerial. *See* Brief of Petitioners Competitive Carriers Association et al. at 17, *FCC v. Consumers' Rsch.*, 606 U.S. 656 (2025) (No. 24-354), 2025 WL 104515, at *17. USAC "may not make policy, interpret unclear

provisions of the statute or rules, or interpret the intent of Congress," and "[w]here the Act or the Commission's rules are unclear, or do not address a particular situation, the Administrator shall seek guidance from the Commission." 47 C.F.R. § 54.702(c). The Supreme Court squarely confirmed that USAC has no "decision-making authority" and explained at length that the FCC, not USAC, has complete control of implementing Section 254. *Consumers' Rsch.*, 606 U.S. at 693–94.

Petitioners acknowledge the Supreme Court's conclusion in this regard, but only where it serves them, in the context of arguing that USAC is a government entity. Pet. Br. 63 ("[T]he Supreme Court has concluded that FCC effectively 'control[s] the operation of' USAC.") (quoting *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F.4th 415, 437–38 (5th Cir. 2025)); *id.* ("USAC 'is broadly subordinate to' FCC") (quoting *Consumers' Rsch.*, 606 U.S. at 692); *id.* ("USAC 'must carry out all its tasks consistent with the FCC's rules, orders, written directives, and other instructions.'") (quoting *Consumers' Rsch.*, 606 U.S. at 693). Elsewhere, they cling to their presuppositions regarding USAC's supposed power, stating that USAC's "directors and CEO control implementation of the Universal Service Fund," Pet. Br. 57, and casually referencing contributions "that USAC demanded," *id.* at 21. They are incorrect to attribute discretion or authority to USAC, and accordingly, their Appointments Clause argument fails.

**B.      The Establishment of USAC Was Valid.**

Petitioners once again miss the mark when asserting that USAC's establishment exceeded the FCC's statutory authority.  Pet. Br. 46.  Petitioners filed their claim decades too late, and in any event, the FCC had the requisite statutory authority to establish USAC both as a corporate entity and as permanent administrator.

**1.      Petitioners Filed Their GCCA Claim Decades After Expiration of the Statute of Limitations.**

Decades have passed since the deadline by which Petitioners could challenge the establishment of USAC.  By statute, challenges to FCC actions must be brought within 60 days.  *See* 47 U.S.C. § 402(a); 28 U.S.C. § 2344.  Petitioners challenge the establishment of USAC, as they must, because the GCCA prohibition on which they rely limits an agency's ability to "establish" a corporation.  31 U.S.C. § 9102.  USAC was established in 1997.  Letter from Robert P. Murphy, Gen. Couns., Gen. Acct. Off., to Hon. Ted Stevens, U.S. Senate, at 2–3 (Feb. 10, 1998), https://www.gao.gov/assets/b-278820.pdf.  Thus, the claim is time-barred.  Even if Petitioners modified their argument to challenge the FCC's appointment of USAC as the permanent administrator of USF programs, that would fare no better, as the FCC issued that order in 1998.  *Changes to the Bd. of Dirs. of the Nat'l Exch. Carrier Ass'n, Inc. et al.*, Third Report and Order et al., 13 FCC Rcd 25058, 25100 ¶¶ 2, 84 (1998) ("1998 USAC Order").

The issuance of the quarterly contribution factor does not restart the clock. The quarterly contribution factor neither "establish[es]" USAC nor appoints it as permanent administrator. Nor does the quarterly contribution factor somehow create a window for an as-applied challenge; USAC's establishment was a one-time event. *See Establish*, Black's Law Dictionary (12th ed. 2024) (providing, as the relevant definition of establish, "[t]o make or form; to bring about or into existence"). It would defy ordinary usage and common sense to claim that the FCC establishes USAC every quarter. Thus, there is no action the FCC took during the quarterly contribution factor process that could violate the GCCA, and Petitioners do not provide precedent stating otherwise.

### 2. The FCC Had the Authority to Establish USAC.

Regardless of any of the above, the FCC had the necessary legal authority to create USAC and appoint it as the permanent administrator of USF. As an initial matter, agencies may turn to outside parties for fact-gathering and advice without impermissibly delegating authority. *Int'l Dark-Sky Ass'n, Inc. v. FCC*, 106 F.4th 1206, 1216 (D.C. Cir. 2024). As discussed above, the Supreme Court correctly confirmed that USAC performs only nondiscretionary activities, and the FCC retains decisionmaking authority, notwithstanding Petitioners' ongoing protestations otherwise. *See supra* § II.A. Given that the FCC could simply have turned to an

existing entity to fulfill that same role, the FCC's establishment of USAC as its preferred fact-gatherer and advice-giver was lawful.

Further, the FCC had authority to create USAC and appoint it as permanent administrator pursuant to Section 254 and its Section 154(i) ancillary authority. 47 U.S.C. §§ 154(i), 254. The FCC expressly relied on these authorities, among others, in directing USAC's creation and appointing it as permanent administrator. *See Changes to the Bd. of Dirs. of the Nat'l Exch. Carrier Ass'n, Inc. et al.*, Report and Order et al., 12 FCC Rcd 18400, 18448 ¶ 97 (1997) ("1997 USAC Order"); *see also* 1998 USAC Order, 13 FCC Rcd at 25065–66 ¶ 14 (discussing earlier reliance on Sections 154(i) and 254). As discussed throughout this litigation, Section 254 empowers the FCC to implement USF in accordance with Congress's guidance. Section 154(i) "grants 'ancillary authority' for the FCC to 'fulfill its primary directives contained elsewhere in the statute.'" *Nat'l Relig. Broads. v. FCC*, 138 F.4th 282, 292 (5th Cir. 2025) (quoting *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 444 (5th Cir. 1999)). Through Section 154(i), "Congress intended to allow the FCC broad authority to implement [Section 254] of the Act." *Tex. Off. of Pub. Util. Couns.*, 183 F.3d at 443–44. The FCC's authority over USF in Section 254 and its authority to take implementation measures under Section 154(i) suffice to justify both the creation of USAC and the appointment of USAC as permanent administrator.

The FCC's authority to create and appoint USAC is informed and supported by history. Courts interpret the 1996 Act, including Section 254, "'against the background of' the FCC's pre-Telecommunications Act's regulatory efforts." *In re MCP No. 185*, 124 F.4th 993, 1005 (6th Cir. 2025) (quoting *Brand X*, 545 U.S. at 992–93). Prior to the 1996 Act, the National Exchange Carrier Association ("NECA") administered high-cost and low-income support. H.R. Rep. No. 103-560 (1994), 1994 WL 283992. As a new, independent NECA subsidiary initially responsible for administering high-cost and low-income support, USAC simply took over the responsibilities previously handled by its parent, *see* 1997 USAC Order, 12 FCC Rcd at 18417 ¶ 28, and the FCC later added administration of other USF programs to USAC's responsibilities, *see* 1998 USAC Order, 13 FCC Rcd at 25063-64 ¶¶ 10–12. As the FCC explained, "Congress was aware of NECA's role when it adopted section 254, which affirmed and expanded the Commission's authority to direct the administration of universal service and therefore, implicitly affirmed the Commission's authority to employ an independent entity to administer universal service." *Id*. at 25066 ¶ 14 (footnote omitted).

Section 254(j) further affirms the FCC's understanding. That provision makes clear that "[n]othing in [Section 254] shall affect the collection, distribution, or *administration* of the Lifeline Assistance Program provided for by the Commission." 47 U.S.C. § 254(j) (emphasis added). As Congress was aware, NECA administered

26

Lifeline at the time of the 1996 Act's passage. The statute, therefore, expressly permits reliance on NECA (or its subsidiary, USAC) for Lifeline. Expanding that role to encompass E-Rate and Rural Health Care was an expedient outgrowth that facilitated FCC implementation of Congress's direction in Section 254.

Finally, even if Congress had to specifically authorize USAC's creation and administration of USF, and even if it failed to do so as of 1998, it has plainly acquiesced to USAC's role since that time. While the Supreme Court takes "extreme care" when "recogniz[ing] congressional acquiescence to administrative interpretations of a statute," *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 (2001), it has found acquiescence where Congress has been made "acutely aware" of the interpretation and agency actions relying on that interpretation, there has been "vigorous and widespread debate and discussion in and out of Congress," and Congress "[f]ail[ed] . . . to modify" the agency's actions, *see Bob Jones Univ. v. United States*, 461 U.S. 574, 599 (1983). The standard for acquiescence is met here.

Congress has been acutely aware of USAC since its inception and engaged in vigorous debate regarding USAC's role in the administration of universal service programs. *See*, *e.g.*, 1998 USAC Order, 13 FCC Rcd at 25063–64 ¶¶ 8–9 (discussing early interplay between Congress and the FCC). Congress has enacted statutes expressly acknowledging USAC and selectively allowing or disallowing it from

performing functions beyond its core USF role.  *See* 47 U.S.C. § 646(c) (barring use of USAC in broadband mapping); *id.* § 1752(i)(5) (allowing the FCC to use USAC to aid in implementing now-terminated non-USF low-income subsidy); American Rescue Plan Act of 2021, Pub. L. No. 117-2, tit. VII, § 7402(c)(2), 135 Stat. 4, 109 (2021) (allowing the FCC to use USAC to aid in implementing non-USF COVID-era support program for remote learning).  Despite amending Section 254 five times since 1998[5] and holding hundreds of hearings involving discussion of USF, Congress made no changes to the statute to limit reliance on USAC for USF.  Within this specific statutory and historical context, Congress's selective expansion of USAC's functions constitutes affirmative acquiescence to its core role.

## III.  THE FCC COMPLIED WITH THE APA IN ESTABLISHING THE QUARTERLY CONTRIBUTION FACTOR.

Petitioners claim that to satisfy the APA, the FCC must show the quarterly contribution factor aligns with a "new interpretation" of Section 254 provided in *Consumers' Research*.  Pet. Br. 38–46.  But there is no new interpretation.  Instead, the Supreme Court affirmed the interpretation applied by courts and the FCC.

---

[5] *See* Frank R. Lautenberg Chemical Safety for the 21st Century Act, Pub. L. No. 114-182, tit. II, § 202(a), 130 Stat. 448, 512 (2016); Every Student Succeeds Act, Pub. L. No. 114-95, tit. IX, § 9215(s), 129 Stat. 1802, 2171 (2015); Broadband Data Improvement Act, Pub. L. 110-385, tit. II, § 215, 122 Stat. 4096, 4104 (2008); No Child Left Behind Act of 2001, Pub. L. No. 107-110, tit. X, § 1076(hh), 115 Stat. 1425, 2094 (2002); Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, div. B, tit. XVII, §§ 1721(a)–(d), 1732, 114 Stat. 2763, 2763A-343–51 (2000).

Petitioners also claim the FCC violated the APA by failing to respond to their comments filed in the fourth quarter 2025 contribution proceeding.  However, the quarterly process is an adjudication, and the FCC had no duty to seek comment.  Regardless, the APA provides considerable flexibility to agencies to design their processes, and the "deemed granted" conclusion of the public notice process simply reflects the narrow, error-correcting nature of the process.  Ultimately, Petitioners' APA arguments assume that the FCC must be ready to rethink every facet of all USF mechanisms each quarter, an expectation that (if true) would grind USF to a halt.  However, the FCC may proceed incrementally, maintaining established programs while adapting them over time.

## A. *Consumers' Research* Did Not Adopt a New Interpretation of Section 254 for the FCC to Evaluate.

Petitioners claim that the FCC acted arbitrarily in violation of the APA by failing to consider the "new" conclusion in *Consumers' Research* that the criteria in Section 254(b) are mandatory.  Pet. Br. 42–46.  The premise of this argument is false.  Courts prior to *Consumers' Research* have long made clear that the Section 254(b) criteria are mandatory.  *See*, *e.g.*, *Qwest Corp. v. FCC*, 258 F.3d 1191, 1200 (10th Cir. 2001) ("The plain text of the statute mandates that the FCC 'shall' base its universal policies on the principles listed in § 254(b).  This language indicates a mandatory duty on the FCC."); *Consumers' Rsch. v. FCC*, 67 F.4th 773, 791 (6th Cir. 2023) (noting "shall" and "should" in Section 254(b) have been read together

by courts in finding Section 254(b)'s enumerated principles are requirements); *Consumers' Rsch. v. FCC*, 88 F.4th 917, 924 (11th Cir. 2023) (identifying each of Section 254(b)'s factors as principles the FCC "must" comply with).

Petitioners' description of *Consumers' Research* as a "landmark in the history of the Universal Service Fund," Pet. Br. 38, does not square with the fact that the Supreme Court simply found a thirty-year-old statute constitutional. The Court made no indication that it was adopting a new interpretation of Section 254. Instead, it emphasized the *conformity* of existing FCC practice with its understanding of the meaning of Section 254. It stated that "the statutory policy is clear and the statutory boundaries specific. The proof is in the pudding: Each of the four programs the FCC now operates under Section 254 reflects Congress's choices about universal service's scope and content." *Consumers' Rsch.*, 606 U.S. at 686. It also noted that during oral argument, the government confirmed that the FCC already viewed the Section 254 criteria as mandatory. *Id.* at 688 (citing Tr. of Oral Arg. 10, 27–29, 177–78).

Petitioners make much of court and FCC precedent that envisioned that the FCC would sometimes need to balance the Section 254(b) principles. Pet. Br. 12. Absent from Petitioners' brief, however, is the Supreme Court's recognition that this balancing is likely to continue:

> Of course, the Commission may still have to strike balances in addressing those criteria, along with the

statute's other provisions. It may, for example, have to decide whether to make a service more affordable (by giving a larger subsidy) or instead extend it to a broader swathe of recipients. But that kind of discretion—balancing or no—does not raise a constitutional problem: A "degree of policy judgment," as we have explained, "can be left to those executing or applying the law."

*Consumers' Rsch.*, 606 U.S. at 688–89.

In sum, there simply is no new standard for the FCC to consider.

**B.      In Setting the Quarterly Contribution Factor, the FCC Does Not Engage in Rulemaking.**

Petitioners' APA analysis incorrectly identifies the FCC's quarterly calculations as a "rulemaking" under the APA. Petitioners say that the contribution factor "prescribes future contribution rates to implement universal service," and therefore it is a "rule" under 5 U.S.C. § 551(4). Pet. Br. 66. That is not so.

This Court looks to two factors to distinguish rulemakings from adjudications: (1) the agency's characterization of its own action; and (2) the ultimate product of the agency action. *City of Arlington v. FCC*, 668 F.3d 229, 240 (5th Cir. 2012), *aff'd*, 569 U.S. 290 (2013). The FCC characterizes the quarterly contribution process as an adjudication. *Report on the Future of the Universal Serv. Fund*, Report, 37 FCC Rcd 1004, 10097–98 ¶ 119 (2022). This Court "accord[s] significant deference to an agency's characterization of its own action." *City of Arlington*, 668 F.3d at 240 (footnote omitted). Further, the quarterly contributions process applies existing rules and yields immediate effects, both hallmarks of

adjudication.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 216–17 (1988)

(Scalia, J., concurring) (the "central distinction" between rulemaking and

adjudication is that rules have legal consequences "*only* for the future") (emphasis

added); *Shell Offshore, Inc. v. Babbitt*, 238 F.3d 622, 628 (5th Cir. 2001) (rejecting

the claim that a proceeding was an adjudication where the agency "established a new

policy").

Because the quarterly process is an informal adjudication, the APA's

prescribed notice and comment process does not apply.  *Shell Offshore*, 238 F.3d at

627 ("There is no notice and comment requirement for an agency adjudication.").

That the FCC has chosen *voluntarily* to go "above and beyond" by seeking public

comment on the contribution factor calculation does not somehow compel it to

conform to rulemaking procedures.

**C.**     **The FCC's "Deemed Granted" Conclusion to the Quarterly Process Complies with the APA.**

The APA gives agencies considerable flexibility to design processes by which

they reach decisions.  *See Sierra Club v. Costle*, 657 F.2d 298, 386–400 (D.C. Cir.

1981) (finding the EPA could engage in ex parte communications after the formal

notice and comment period).  Courts do not impose specific procedural requirements

on agencies beyond those established by the APA unless the Due Process Clause is

implicated or the agency's governing statute contains specific procedural mandates.

*Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 654–56 (1990).

"Beyond the APA's minimum requirements, courts lack authority 'to impose upon [an] agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 102 (2015) (quoting *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978)).

The FCC's process makes use of that flexibility to balance thoroughness and expedience. As *Consumers' Research* noted, the FCC's process prior to the Public Notice at issue is extensive and gives ample time for it to detect and correct errors. 606 U.S. at 693–94. Prior to the 14-day public comment period is a 60-day period where the FCC reviews USAC's projections "behind the scenes" and approves or revises them as appropriate. *Id.* at 695. And although the FCC conducts a meaningful review of USAC's projection, it rarely needs to revise USAC's arithmetic. Brief for the Federal Petitioners at 47, *FCC v. Consumers' Rsch.*, 606 U.S. 656 (2025) (No. 24-354), 2025 WL 104514, at *47. The lack of changes by the FCC to USAC's figures "reflects the limited role the Administrator performs in estimating the expenses of programs whose contours FCC regulations precisely define." *Consumers' Rsch.*, 606 U.S. at 695. The Public Notice that the FCC issues seeking comment provides one last check, enlisting the public in the error correction

process.[6]  Because an error is unlikely and the question at issue is narrow, the FCC creates the opportunity to spare itself issuing a final written order where it sees no need for changes.  47 C.F.R. § 54.709(a)(3).

Petitioners' APA arguments rest on the mistaken (and already rejected) premise that setting the contribution factor is a free-wheeling exercise in unbridled discretion.  If that premise were true, then perhaps the FCC's process would have to be equally open-ended.  The Supreme Court explained, however, that the "expense side" of USF is "dictated" by "the FCC's rules implementing the Act."  *Consumers' Rsch.*, 606 U.S. at 693.  In adjudications, courts look to whether an agency considered the pertinent issues and provided contemporaneous, rational responses to those issues.[7]  *See Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted by [be] clearly disclosed and adequately sustained.");  *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 207 (1947)

---

[6] Brief of Bipartisan Former Commissioners of the Federal Communications Commission as Amici Curiae in Support of Petitioners, *FCC v. Consumers' Rsch.*, 606 U.S. 656 (2025) (Nos. 24-354 & 24-422), 2025 WL 267962.

[7] Essentially the same standard applies to rulemakings under the arbitrary and capricious standard.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'") (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

(finding that an agency decision with some rational and statutory foundation could not be disturbed). In the case of the quarterly contribution factor, the math is either correct or not. If the factor is deemed approved, then the FCC confirms its calculations are valid in light of the data and preexisting regulations, and there is simply nothing more to say. *See Huawei Technologies, Inc. v. FCC*, 2 F.4th 421, 451 (5th Cir. 2021) (stating that even in a rulemaking, an agency need not respond to arguments that are "incapable of affecting" the outcome) (quoting *City of Portland v. Env't Prot. Agency*, 507 F.3d 706, 715 (D.C. Cir. 2007)).

**D.     The FCC Need Not Revisit All USF Mechanisms When It Establishes the Contribution Factor Each Quarter.**

Petitioners insist upon a quarterly process that goes far beyond the math-checking safeguard the FCC employs today. Pet. Br. 38–46. According to Petitioners, every quarter the FCC must quickly resolve stakeholder comments disagreeing with any aspect of USF. *Id.* Contrary to this unworkable scheme, federal agencies possess broad authority to act incrementally, tailor review processes, and maintain existing programs while evaluating changed circumstances. The Supreme Court in *Massachusetts v. Env't Prot. Agency*, 549 U.S. 497 (2007), explicitly recognized this principle, explaining that "[a]gencies, like legislatures, do not generally resolve massive problems in one fell swoop," but rather "whittle away over time, refining their approach as circumstances change and [as] they develop a more nuanced understanding of how best to proceed." *Id.* at 499; *see*

*also Chenery Corp.*, 332 U.S. at 202 ("Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations."). This foundational principle acknowledges that complex regulatory schemes often require phased, rather than wholesale and repeated, implementation as agencies gather experience and respond to evolving conditions.

The reasoned decision-making standard in which Petitioners ground their Section 254 APA argument requires evaluation of factual, policy, and legal circumstances alike. *See* Kristin E. Hickman & Richard J. Pierce, Jr., ADMINISTRATIVE LAW TREATISE Ch. 11 (6th ed. 2019); Pet. Br. 38–39. Accepting Petitioners' argument means that the FCC potentially would have to completely reconsider all aspects of every one of its mechanisms anew every quarter. This is an unreasonable expectation. The practicalities of the quarterly contribution process mean that the agency has only a limited amount of time to act each quarter. *See* 47 C.F.R. § 54.709(a)(3). The FCC maintains dozens of USF mechanisms, each set pursuant to Section 254 with reference to technological development, marketplace factors, and population data. *See*, *e.g.*, *Urban Rate Survey Data & Resources*, FCC, https://www.fcc.gov/economics-analytics/industry-analysis-division/urban-rate-survey-data-resources (last visited Mar. 20, 2026) (providing annual data and methodology to compare urban and rural voice and broadband rates in support of certain universal service mechanisms). Weighing every issue that commenters can

36

possibly identify about these dozens of mechanisms takes time, care, and organized

processes, not the free-for-all Petitioners demand.

To be clear, the FCC has many existing mechanisms for seeking changes to

any and all aspects of USF.[8]  Since the passage of the 1996 Act, the FCC has

continuously molded USF through rulemakings and other proceedings.  In fact, by

the time this Court received a challenge to Section 254 in 1999, the FCC had already

issued seven reconsideration orders relating to Section 254.  *Tex. Off. of Pub. Util.*

*Couns.*, 183 F.3d at 406.  In 2025 alone, the FCC ruled on more than 1,500

applications relating to USF.  NTCA, among many others, makes use of the

extensive vehicles available to advocate for policy change.[9]  Petitioners are of course

free to do the same by participating in substantive proceedings that shape the

contours of the individual programs.  But rather than pursue normal channels of

advocacy, Petitioners insist on a maximalist role for the quarterly contribution

---

[8] *See*, *e.g.*, 47 C.F.R. §§ 1.2(a) (petitions for declaratory ruling), 1.3 (petitions for waiver), 1.41 (informal requests), 1.53–.59 (petitions for forbearance), 1.106 (petitions for reconsideration in non-rulemaking proceedings), 1.401 (petitions for rulemaking), 1.415 (comments in rulemakings), 1.429 (petitions for reconsideration in rulemakings), 1.1200–.1216 (permissible written and oral *ex parte* communications); *see also id.* §§ 54.719–.725 (seeking FCC review of USAC decisions).

[9] *See*, *e.g.*, Electronic Comment Filing System, FCC, https://www.fcc.gov/ecfs/search (last visited Mar. 20, 2026) (searching in the FCC filing system under "Name(s) of Filer(s)" for "NTCA" identifies 3,520 filings attributed to NTCA).

comment process.  It is not difficult to notice that their vision would make USF unworkable.

**IV.  GRANTING THE PETITION WOULD UPSET INVESTMENT-BACKED EXPECTATIONS.**

Before the Supreme Court and four circuits over almost five years, Petitioners have devoted pages upon pages to criticizing universal service.  Their repeated, one-sided story ignores the many benefits that USF provides and the disruption that would be caused by holding any portion of Section 254 unconstitutional.

Through USF, telecommunications providers across the country receive substantial funding to ensure connectivity for millions of Americans.  Consumers, schools, libraries, health care providers, and telecommunications providers all would be harmed by the loss of USF support.  Rural consumers would be forced to pay more for service and may lose access to planned deployments that would allow them to get the same fast connectivity as their urban peers.  In some parts of rural America, residents could suffer disruptions in service should smaller providers based in these communities fail in the face of a loss of essential USF support.  Students may lose the connectivity they need for modern education, and rural patients may lose access to essential healthcare services.

NTCA's members' experiences demonstrate that in low-density rural areas, universal service support helps to make the business case for the investment of private capital by smaller providers to deploy networks and deliver services that

satisfy the universal service principles articulated by Section 254. *See supra* at 1–2.

Further, by increasing the availability of communications services, USF support helps "all consumers, not just low-income consumers, receive value from the network effects of widespread voice and broadband subscribership." *Lifeline & Link Up Reform & Modernization, et al.*, Report and Order and Further Notice of Proposed Rulemaking, 27 FCC Rcd 6656, 6665 ¶ 17 (2012). The deployment of USF support increases demand for services (including via network effects), facilitates economies of scale, and increases incentives to invest in and connect all Americans for NTCA members and users and industries who rely upon their networks.

But these benefits would be lost or diminished significantly if universal service support were cut off or curtailed, to the ultimate detriment of consumers, enterprises, and anchor institutions that rely on network deployments, including in hard-to-serve areas. As noted above, a recent analysis shows that reducing USF support by just 40% would render some rural providers' operations unsustainable. *USF Report* at 4.

Further, abruptly disrupting USF support would imperil current network buildouts, which take long periods of time from start to finish and rely on future revenues to complete. Many of NTCA's members have invested in network infrastructure, made business plans, and offered service plans to American

consumers in reliance on future universal service payments. The consequences of disrupting those expectations could be devastating, particularly for small businesses operating in rural areas. These sorts of investment-backed expectations should caution against accepting Petitioners' reframing of the majority opinion in *Consumers' Research*, which concluded straightforwardly that USF is lawful.

## CONCLUSION

For these reasons, this Court should deny the Petition.

Respectfully submitted,

*/s/ Jennifer Tatel*
Jennifer Tatel
  *Counsel of Record*
Daniel H. Kahn
Tyler D. Dillon
Zane Altemus
Wilkinson Barker Knauer, LLP
1800 M Street NW, Suite 800N
Washington, DC 20036
(202) 783-4141
jtatel@wbklaw.com
*Counsel for NTCA – The Rural Broadband Association*

March 20, 2026

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,940 words, excluding the parts of the brief exempted by Fed. R. App. 32(f) and Circuit Rule 32.2.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word using 14-point Times New Roman font.

*/s/ Jennifer Tatel*
Jennifer Tatel

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 20, 2026, I electronically filed the foregoing Brief of Intervenors NTCA – The Rural Broadband Association in Support of Respondents with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Jennifer Tatel*
Jennifer Tatel