**No. 25-60535**

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

**CONSUMERS' RESEARCH; CAUSE BASED COMMERCE, INC.; EDWARD J. BLUM; KERSTEN CONWAY; SUZANNE BETTAC; ROBERT KULL; KWANG JA KERBY; TOM KIRBY; JOSEPH BAYLY; JEREMY ROTH; DEANNA ROTH; LYNN GIBBS; PAUL GIBBS; RHONDA THOMAS; JAMES ROMEO; CODY CARNETT; PHILLIP ARONOFF; JACQUELINE KLEIN,**

*Petitioners,*

v.

**FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,**

*Respondents.*

---

Petition for Review of an Order of the
Federal Communications Commission
Agency No. 96-45

---

**FIFTH CIRCUIT RULE 30.2 JOINT APPENDIX**

---

D. Adam Candeub
Jacob M. Lewis
James M. Carr
FEDERAL COMMUNICATIONS
COMMISSION
Washington, DC 20554

Brett A. Shumate
Michael S. Raab
Caroline W. Tan
UNITED STATES DEPARTMENT OF
JUSTICE
Washington, DC 20530
*Counsel for Respondents*

Michael Buschbacher
James R. Conde
Jared M. Kelson
Laura B. Ruppalt
BOYDEN GRAY PLLC
Washington, DC 20006
*Counsel for Petitioners*

Sean A. Lev
Jason Neal
HWG LLP
Washington, DC 20036
*Counsel for Intervenor Schools, Health, & Libraries Broadband Coalition*

Andrew Jay Schwartzman
Washington, DC 20004
*Counsel for Intervenors Benton Institute for Broadband & Society, National Digital Inclusion Alliance, and Center for Media Justice dba MediaJustice*

Jennifer Tatel
Daniel H. Kahn
Tyler D. Dillon
Zane Altemus
WILKINSON BARKER KNAUER, LLP
Washington, DC 20036
*Counsel for Intervenors NTCA— The Rural Broadband Association*

## TABLE OF CONTENTS

**TAB**                                                                          **Page**

1   *Comments and Objections of Consumers' Research et al.*,
    CC Docket No. 96-45 (filed Sept. 15, 2025)................................. JA1

2   *Proposed Fourth Quarter 2025 Universal Service
    Contribution Factor*, CC Docket No. 96-45, DA 25-840 (rel.
    Sept. 15, 2025).................................................................... JA320

3   USAC, *Federal Universal Service Support Mechanisms
    Quarterly Contribution Base for the Fourth Quarter 2025*
    (Aug. 29, 2025) ................................................................... JA324

4   Excerpts from *Comments and Objections of Consumers'
    Research et al.*, CC Docket No. 96-45 (filed Aug. 8, 2025)
    (exhibits omitted) ................................................................ JA332

5   USAC, *Federal Universal Service Support Mechanisms
    Fund Size Projections for Fourth Quarter 2025* (Aug. 1,
    2025) ................................................................................. JA360

April 3, 2026

/s/ Laura B. Ruppalt
Michael Buschbacher
James R. Conde
Jared M. Kelson
Laura B. Ruppalt
BOYDEN GRAY PLLC
800 Connecticut Ave. NW,
  Suite 900
Washington, DC 20006
202-955-0620
Counsel for Petitioners


/s/ James M. Carr
D. Adam Candeub
Jacob M. Lewis
James M. Carr
FEDERAL COMMUNICATIONS
COMMISSION
Washington, DC 20554
202-418-1740

Brett A. Shumate
Michael S. Raab
Caroline W. Tan
UNITED STATES DEPARTMENT OF
JUSTICE
Washington, DC 20530 Counsel
for Respondents

/s/ Jason Neal
Sean A. Lev
Jason Neal
HWG LLP
1919 M Street NW, 8th Floor
Washington, DC 20036
202-730-1300
Counsel for Intervenor Schools,
Health, & Libraries Broadband
Coalition


/s/ Andrew Jay Schwartzman
Andrew Jay Schwartzman
525 9th St. NW, 7th Fl.
Washington, DC 20004
202-241-2408
Counsel for Intervenors Benton
Institute for Broadband &
Society, National Digital
Inclusion Alliance, and Center
for Media Justice dba
MediaJustice


/s/ Jennifer Tatel
Jennifer Tatel
Daniel H. Kahn
Tyler D. Dillon
Zane Altemus
WILKINSON BARKER KNAUER, LLP
1800 M Street NW, Suite 800N
Washington, DC 20036
202-783-4141
Counsel for Intervenors NTCA—
The Rural Broadband
Association

# TAB 1

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | § | |
| | § | |
| Proposed Fourth Quarter 2025 | § | CC Docket No. 96-45 |
| Universal Service Contribution Factor | § | |

---

**COMMENTS AND OBJECTIONS OF CONSUMERS' RESEARCH, CAUSE BASED COMMERCE, INC., EDWARD J. BLUM, KERSTEN CONWAY, SUZANNE BETTAC, ROBERT KULL, KWANG JA KIRBY, TOM KIRBY, JOSEPH BAYLY, JEREMY ROTH, DEANNA ROTH, LYNN GIBBS, PAUL GIBBS, RHONDA THOMAS, JAMES ROMEO, CODY CARNETT, PHILLIP ARONOFF, AND JACQUELINE KLEIN**

---

Commenters Consumers' Research, Cause Based Commerce, Inc., Edward J. Blum, Kersten Conway, Suzanne Bettac, Robert Kull, Kwang Ja Kirby, Tom Kirby, Joseph Bayly, Jeremy Roth, Deanna Roth, Lynn Gibbs, Paul Gibbs, Rhonda Thomas, James Romeo, Cody Carnett, Phillip Aronoff, and Jacqueline Klein (together, "Commenters") respectfully submit these comments and objections in response to the Office of Managing Director ("OMD")'s *Public Notice of Proposed Fourth Quarter 2025 Universal Service Contribution Factor*.[1] The Commission should set the *Fourth Quarter 2025 Contribution Factor* at 0.000 or reduce the Factor by the amount accounted for by any unlawful portions.

## I. INTRODUCTION

Commenters previously submitted comments and commenced litigation arguing that various aspects of the Universal Service Fund ("USF") are unlawful. The

---

[1] *Available at* https://docs.fcc.gov/public/attachments/DA-25-840A1.pdf.

Supreme Court recently rejected some of those arguments but expressly left others open, did not address others at all, and announced a new interpretation of the relevant statute—47 U.S.C. § 254—that is contrary to thirty years of FCC rules, litigation positions, and practice. *See FCC v. Consumers' Rsch.*, 145 S. Ct. 2482 (2025).

Several important arguments remain for why the USF, either in whole or in part, is unlawful, including in its application by the Commission.

(1)     The Supreme Court majority expressly declined to rule whether 47 U.S.C. §§ 254(c)(3) and (h)(2) are unconstitutional under the nondelegation doctrine. *See* 145 S. Ct. at 2505 n.9. The dissenting Justices explained that those provisions are unconstitutional because they do not impose even qualitative restrictions on the Commission's ability to raise money for covered programs. *Id.* at 2531 (Gorsuch, J., dissenting). Because those provisions are unconstitutional, the Commission should reduce the Contribution Factor by the amount accounted for those unlawful provisions and the programs derived from them.

(2)     The Supreme Court majority held that the criteria in §§ 254(b)(1)–(6) and (c)(1) are *each* mandatory. 145 S. Ct. at 2506. But the Commission has denied that interpretation for thirty years. The Commission must (1) expressly acknowledge and respond to this drastic change in statutory meaning, and (2) substantively comply with the statute as interpreted by the Supreme Court. The Commission cannot simply go about its business as if nothing ever changed. Yet the proposed rate of 38.1% is the highest in history and is shocking, given that the Supreme Court just told this agency that its broad interpretation of its own authority is plain wrong.

JA2

(3)    The Supreme Court held that the involvement of USAC in determining the Contribution Factor did not violate Article I private nondelegation principles, but the Court did not address the separate argument, raised by Judge Newsom in the Eleventh Circuit, that USAC's involvement in collecting and spending money on the back end amounts to an unconstitutional delegation of Article II executive powers. It does, and that warrants setting the Contribution Factor at 0.000.

(4)    The Commission lacks statutory authority to appoint USAC as the permanent administrator of the USF, which means USAC cannot collect or spend USF moneys for the challenged quarter.

(5)    USAC violates the Government Corporation Control Act, which bars agencies from creating new corporate agents without express authorization from Congress.

(6)    USAC's and private carriers' self-interest violates due process.

## II. COMMENTERS

Commenter Consumers' Research is an independent educational 501(c)(3) nonprofit organization whose mission is to increase the knowledge and understanding of issues, policies, products, and services of concern to consumers and to promote the freedom to act on that knowledge and understanding. Consumers' Research believes that the cost, quality, availability, and variety of goods and services used or desired by American consumers—from both the private and public sectors—are improved by greater consumer knowledge and freedom. Consumers' Research has Verizon phone service in its own name, paid with its own funds. The monthly bill

contains the Universal Service Charge as a separate line item entitled "Federal Universal Service Fee."

Commenter Cause Based Commerce, Inc., is a reseller of telecommunications services. Caused Based Commerce sends 5% of customers' monthly plan price to a cause/charity of the customer's choosing. As a reseller of telecommunications services, Cause Based Commerce collects from consumers money associated with the Universal Service Fund, and pays into the Universal Service Fund.

Commenter Edward J. Blum lives in Florida, has Verizon phone service in his own name, pays the monthly bill himself, and his charge contains the Universal Service Charge tax as a separate line item.

Commenter Kersten Conway is an art teacher who resides in League City, Texas. She has Verizon phone service in her own name and pays the monthly bill herself. Her monthly bill contains the Universal Service Charge tax as a separate line-item titled "Fed Universal Service Charge." Ms. Conway has been a teacher for 35 years across Texas, rural South Dakota, and Minnesota. Many of her former students are from the Lakota Sioux Nation and still keep in contact with her. She has been divorced for almost 20 years and is currently co-raising three young grandchildren. Every penny counts, and retirement is not an option for her at this time.

Commenter Suzanne Bettac lives in San Antonio, Texas, and has Sprint/T-Mobile phone service in her own name and pays the monthly bill herself. Her monthly

bill contains the Universal Service Charge tax as a separate line-item titled "Federal Univ. Service Assess Non-LD."

Commenter Robert Kull lives in San Antonio, Texas, and has Verizon phone service in his own name and pays the monthly bill himself. His monthly bill contains the Universal Service Charge tax as a separate line-item titled "Fed Universal Service Charge."

Commenters Kwang Ja Kirby and Tom Kirby live in San Antonio, Texas, and have AT&T phone service in Kwang Ja's name and pay the monthly bill using their joint credit card. Their monthly bill contains the Universal Service Charge tax as a separate line-item titled "Federal Universal Service Charge."

Commenter Joseph Bayly is a pastor and editor who resides in Maineville, Ohio, with his wife and six children. He has spent more than a decade in ministry in the Midwest, and currently serves as the founding pastor of Christ Church in Cincinnati. Mr. Bayly provides the sole income for his family. He has AT&T phone service in his own name and pays the bill himself. His monthly bill contains the Universal Service Charge as a separate line item entitled "Federal Universal Service Charge."

Commenters Jeremy and Deanna Roth are a married couple who reside in Akron, Ohio. Mr. Roth is a civil designer who provides the sole income for his family. Mrs. Roth is a homemaker and mother of their two young children. Like many families, they have numerous financial demands, and every penny counts. The Roths have T-Mobile phone service in Jeremy's name. They pay the bill from their mutual

checking account. The monthly bill contains the Universal Service Charge as a separate line-item entitled "Federal Universal Service Fund."

Commenters Lynn and Paul Gibbs are a retired couple that reside in the city of Oregon, Ohio. They are in their late sixties and have had their cell phone service for years, most recently over two years with AT&T. They use Auto-pay tied to their checking account to pay their monthly bill, which contains the Universal Service Charge as a separate line item entitled "Federal Universal Service Charge."

Commenter Rhonda Thomas resides in Milton, Georgia. She has Cricket phone service in her own name, and her monthly bill includes the Federal Universal Service "fee."

Commenter James Romeo resides in Texas. He has AT&T phone services in his own name, and his monthly bill includes a line item for "Federal Universal Service Charge."

Commenter Cody Carnett resides in Texas. He has phone services in his own name, and his monthly bill includes the Federal Universal Service "fee."

Commenter Phillip Aronoff resides in Texas. He has phone services in his own name, and his monthly bill includes the Federal Universal Service "fee."

Commenter Jacqueline Klein resides in Texas. She has phone services in her own name, and her monthly bill includes the Federal Universal Service "fee."

## III. ARGUMENTS

The majority and dissenting opinions at the Supreme Court—which are attached as Exhibit A and incorporated herein—provide a lengthy history of the USF

program and Commenters' challenges to it. Commenters pick up where those opinions left off.

## A.    Sections 254(c)(3) and (h)(2) Violate the Nondelegation Doctrine.

The government acknowledged at the Supreme Court that USF contributions are taxes and that only Congress may impose taxes. *See* 145 S. Ct. at 2525 (Gorsuch, J., dissenting) (citing Tr. of Oral Arg. 53). The majority never disagreed, *see id.* at 2535 n.17 ("The Court never denies that universal-service 'contributions' are taxes …."), and longstanding precedent supports that proposition because "some of the administrative costs at issue 'inure[] to the benefit of the public,'" *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 223 (1989); *see* Expert Report of Dr. George Ford (attached as Exhibit B). Because taxing is a legislative function (and USF charges would be legislative even if they were not taxes—a point never disputed by the Commission in years of litigation), the intelligible-principle doctrine applies to the USF statutory provisions related to raising revenue for the USF Contribution Factor. *NCTA v. United States*, 415 U.S. 336, 340 (1974) ("Taxation is a legislative function, and Congress … is the sole organ for levying taxes.").

In its recent opinion, the Supreme Court rejected the argument that the USF's "contribution scheme generally is unconstitutional" under the nondelegation doctrine. *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2505 n.9 (2025). The Court did so by holding that 47 U.S.C. §§ 254(b) and (c)(1) imposed "qualitative" limits on what "universal service" means—and thereby limits how much tax revenue the Commission could raise for most aspects of the USF. *Id.* at 2501–07.

To find those qualitative limits, the Court construed "each" of the ten "criteria" in §§ 254(b) and (c)(1) as "separately mandatory," meaning they *must* "be met." *Id.* at 2505–06. Under this interpretation, a telecommunications service qualifies as universal service—and the FCC can raise taxes to support it—*only* if it is "essential to education, public health, or public safety" **and** "through the operation of market choices by customers, [it has] been subscribed to by a substantial majority of residential customers" **and** its rates are "just, reasonable, and affordable" **and** it is "provided in all regions of the Nation"—among half a dozen other requirements. 47 U.S.C. § 254(b), (c)(1).

But there are two provisions in § 254 that allow the Commission to raise tax revenue without having to comply with the ten commandments in §§ 254(b) and (c)(1). Section 254(c)(3) allows the Commission to raise taxes for services that are "[i]n *addition to* the services included in the definition of universal service." *Id.* § 254(c)(3) (emphasis added). And § 254(h)(2) allows the Commission to raise taxes for "*advanced* telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries." *Id.* § 254(h)(2) (emphasis added). Advanced services include things like "broadband networks." 145 S. Ct. at 2521 (Gorsuch, J., dissenting).

Sections 254(c)(3) and (h)(2) violate the intelligible-principle test because they do not contain the bevy of limits the Court found so critical for § 254's other provisions, and therefore "the boundaries of th[e] delegated authority" under §§ 254(c)(3) and (h)(2) are not "*clearly* delineate[d]." *Skinner v. Mid-America Pipeline*

JA8

*Co.*, 490 U.S. 212, 219 (1989) (emphasis added). Indeed, as explained below, the Commission itself has long stated these two provisions are unlike any others in § 254.

***Section 254(c)(3)*** states that the Commission can designate "additional services" for USF funding "[i]n addition to the services included in the definition of universal service." 47 U.S.C. § 254(c)(3). The Commission is thus expressly freed from the limits imposed by the scope of "universal service" in §§ 254(b) and (c)(1). *See TOPUC v. FCC*, 183 F.3d 393, 441 (5th Cir. 1999). The Commission need not even limit itself to telecommunications services under § 254(c)(3). "[T]here is no language restricting these 'additional' services to telecommunications services." *Id.*; *see In re Lifeline & Link Up Reform & Modernization*, 27 FCC Rcd. 6656, 6831 (2012). Taken together, this means § 254(c)(3) allows the FCC to impose taxes to pay for "a broad class of services" well beyond "universal service." *TOPUC*, 183 F.3d at 445. The FCC itself has long agreed. *See In re Fed.-State Joint Bd. on Universal Serv.*, 12 FCC Rcd. 8776, 8811 n.93 (1997) ("Pursuant to section 254(c)(3), the Commission may designate for support additional telecommunications services not included in the 'core' services designated under section 254(c)(1) for schools, libraries, and health care providers.").

***Section 254(h)(2)*** says the Commission shall "enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries." 47 U.S.C. § 254(h)(2). Like § 254(c)(3), this is not limited to the standard definition of "universal service." The Commission has long stated this provision "is *notably broader* than the

other provisions of section 254." *In re Fed.-State Joint Bd. on Universal Serv.*, 12 FCC Rcd. at 9086 (emphasis added). It even allows the Commission to raise funds to give to entities that are *not* eligible telecommunication carriers, which would otherwise violate § 254(e). *Id.*

As Justice Gorsuch explained, the "additional" and "advanced" services authorized by §§ 254(c)(3) and (h)(2) thus "go above the baseline of what's been considered universal service" and are determined "without regard to whether they satisfy the four factors outlined in § 254(c)(1)" or the six factors in § 254(b). 145 S. Ct. at 2522 (Gorsuch, J., dissenting). "When it comes to deciding what programs to fund under § 254(c)(3) and § 254(h)(2), the FCC is unconstrained by any of the subsection (c)(1) factors the Court rewrites and leans on so heavily." *Id.* at 2531.

Given all this, the Supreme Court majority opinion was "unwilling to say that [§§ 254(c)(3) and (h)(2)] impose a 'qualitative' cap—and understandably so." *Id.* "[T]hat in itself is a notable development: Today marks the first time in a long time that the Court has confronted a statutory delegation and found no way to save it." *Id.*

Further, "experience illustrates just how uncapped the FCC's § 254(c)(3) and § 254(h)(2) programs really are." *Id.* "[I]n 2024, the FCC announced that it would … begin funding 'Wi-Fi hotspots and services to be used off-premises by students, school staff, and library patrons.' As far as the FCC sees it, subsections (c)(3) and (h)(2) might allow it to collect enough taxes to supply take-home hotspots to anyone with a library card. Or maybe even take-home Starlink devices for library patrons nationwide, to help shrink the 'digital divide between Americans with access to

JA10

broadband at home and those without.'" *Id.* (cleaned up) (citing authorities). None of that satisfies the now-mandatory requirements in §§ 254(b) and (c)(1)—but the Commission can raise funds for it anyway, thanks to §§ 254(c)(3) and (h)(2).

The Commission has acknowledged that §§ 254(c)(3) and (h)(2) authorize programs that § 254 otherwise would not permit. For example, it created a Healthcare Connect Fund Program in 2012 "to promote the use of broadband services and facilitate the formation of health care provider consortia"—and cited § 254(h)(2) as the authority for doing so. *In re Report on the U.S. Universal Serv. Fund*, FCC 22-67, at 42 (rel. Aug. 15, 2022) https://docs.fcc.gov/public/attachments/FCC-22-67A1.pdf. And "[p]ursuant to th[e] directive [in § 254(h)(2)], the FCC established the E-rate program." *Hill v. FCC*, 496 F. App'x 396, 397 (5th Cir. 2012).

The power to spend money on these programs comes with a commensurate power to raise taxes to pay for them. As the Supreme Court explained, § 254(d)(1)'s dictate that the Commission raise "sufficient" taxes to pay for the USF means "the FCC cannot raise less than is adequate or necessary to finance th[ose] programs." 145 S. Ct. at 2502. And that "sufficient" clause also reconfirms why §§ 254(c)(3) and (h)(2) fail nondelegation scrutiny: saying the FCC can raise "sufficient" funds "takes us only halfway, because it raises the question: Sufficient for what?" 145 S. Ct. at 2503. Sections 254(c)(3) and (h)(2) lack the qualitative limits—i.e., "for what?"— that were so critical to save the rest of § 254 from nondelegation demise.

The Commission may point to § 254(h)(2)'s language about the Commission being limited "to the extent technically feasible and economically reasonable." 47

JA11

U.S.C. § 254(h)(2)(A). That imposes no meaningful limit. Recall, the Commission itself has long stated that § 254(h)(2) "is *notably broader* than the other provisions of section 254." *In re Fed.-State Joint Bd. on Universal Serv.*, 12 FCC Rcd. at 9086 (emphasis added). Indeed, the "feasibility" clause of § 254(h)(2)(A) means the Commission can proceed all the way up to the point of literal impossibility. *See Feasible*, Merriam-Webster, https://www.merriam-webster.com/dictionary/feasible ("capable of being done or carried out"). The "economically reasonable" clause imposes no limit, either. Phrases like "reasonable" or "just and reasonable" might have a sufficient meaning when it comes "to setting rates for regulated monopolies like public utilities—a context where it incorporates 'concepts with a long history at common law.'" 145 S. Ct. at 2535–36 (Gorsuch, J., dissenting). "But outside that sphere, the same phrase may amount to little more than an instruction to go forth and do good." *Id.* at 2536. That is certainly the case here, where Congress expressly unmoored § 254(h)(2) from all historical and textual limits applicable to *other* USF services. Accordingly, "reasonable" here cannot have an established meaning. Or, as Judge Newsom aptly put it, words like "'reasonable' … cannot possibly constrain the FCC's policymaking discretion in any meaningful way. They leave the agency all the room it needs to do essentially whatever it wants." *Consumers' Rsch. v. FCC*, 88 F.4th 917, 931 (11th Cir. 2023) (Newsom, J., concurring in judgment).

Section 254(h)(2) is also distinguishable from § 254(h)(1)(A), on which the Commission has occasionally relied. The latter provides a formula for calculating a

refund for providing services in certain narrow circumstances, which says nothing about what services can be authorized by § 254(h)(2)'s expansive language.

Sections 254(c)(3) and (h)(2) thus allow the Commission to raise tax revenues without even the flimsy qualitative limits the Supreme Court imposed to save other provisions in § 254. The lack of "clearly delineate[d] … boundaries" in §§ 254(c)(3) and (h)(2) means they violate the nondelegation doctrine. *Skinner*, 490 U.S. at 219.

\* \* \*

The Supreme Court saved most of § 254 by "rewrit[ing]" provisions to impose meaningful "qualitative" limits on raising revenue, but the majority saw no way to do so for §§ 254(c)(3) and (h)(2), even after the dissent highlighted the problems with those provisions. *Id.* at 2529 (Gorsuch, J., dissenting). That was an "unmistakabl[e]" "signal[]" that "there are some abdications of congressional authority, including in the very statute before us, that the present majority isn't prepared to stomach." *Id.* at 2519.

Because §§ 254(c)(3) and (h)(2) are unconstitutional, the Commission should reduce the Contribution Factor by the amount represented by programs and revenue-raising purportedly authorized by those provisions.

**B.    The Commission Must Address and Comply With the Supreme Court's Changed Interpretation of Sections 254(b) and (c).**

The Supreme Court's majority opinion salvaged § 254 from Commenters' nondelegation challenge by interpreting it drastically differently than any prior court or the Commission itself ever had. The Supreme Court held that "each of the criteria"

JA13

in §§ 254(b) and (c) is "separately mandatory" and "has to be met." 145 S. Ct. at 2505–06.

In other words:

- "Quality services [*must*] be available at just, reasonable, and affordable rates";

- "Access to advanced telecommunications and information services [*must*] be provided in all regions of the Nation";

- "Consumers in all regions of the Nation … [*must*] have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas";

- Universal service *is* that level of service that is "essential to education, public health, or public safety";

- Universal service *is* those services that "have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers"; and

- Universal service *is* those services that "are being deployed in public telecommunications networks by telecommunications carriers."

47 U.S.C. §§ 254(b)(1)–(6), (c)(1).

That drastically novel interpretation presents two problems for the Commission: one procedural and one substantive.

JA14

*First*, the Commission has long contended and operated under its view that each § 254(b) criteria is "only a principle, not a statutory command," which the agency may "ignore" in service of other principles found in the statute. *Rural Digital Opportunity Fund Phase I Auction*, 35 FCC Rcd. 6077, 6119 n.262 (2020). The Commission has said the same to Courts for decades, insisting "the seven principles identified in section 254(b) were not statutory requirements." Br. for FCC at 12, *U.S. W. Commc'ns, Inc. v. FCC*, Nos. 99-9546 et al. (10th Cir. May 26, 2000); Br. for FCC at *26–27, *TOPUC v. FCC* ("*TOPUC II*"), 2000 WL 34430695 (Nov. 30, 2000) (same). In proceedings involving Commenters, the Commission told the *en banc* Fifth Circuit that the Commission are not "mandatory," and the Commission only must "take the principles into account." FCC *En Banc* Br. at 28, *Consumers' Rsch. v. FCC*, No. 22-60008 (5th Cir. Aug. 30, 2023). The Commission told the Supreme Court the same thing, at least at the certiorari stage, insisting that the agency could "balance the [§ 254(b)] principles against one another when they conflict," meaning it could ignore any particular factor(s) so long as it did "not depart from them altogether." Cert. Pet. at 13, *FCC v. Consumers' Rsch.*, No. 24-354 (U.S. Sept. 30, 2024). The lower courts have long concurred, holding the § 254(b) principles were "aspirational only" and thus not mandatory. *TOPUC II*, 265 F.3d at 321.

The Commission has long said the same for the § 254(c)(1) criteria, too: "[A]ll four criteria enumerated in section 254(c)(1) must be considered, but not each necessarily met." *In re Federal-State Joint Board on Universal Service*, 12 FCC Rcd. 8776, 8809 (1997). And, again, the Commission told the Supreme Court the same

thing, at least at the certiorari stage, insisting that § 254(c) requires the Commission only "to *consider* certain factors." Cert. Pet. at 3, *Consumers' Rsch.*, No. 24-354, *supra*; *id.* at 13 (same); *id.* at 15 (same).

But the Supreme Court adopted a construction of §§ 254(b) and (c) that is dramatically different from how the Commission has long construed and implemented those provisions. When it comes to the binding nature of each of those elements, "the FCC has long and consistently understood the statute to mean the opposite" of what the Supreme Court just held. 145 S. Ct. at 2529 (Gorsuch, J., dissenting). The majority even held that while prior Commission interpretations were entitled to deference, that is no more, as the Court "exercis[ing] our independent judgment" concluded the relevant factors are now mandatory. *Id.* at 2491 (majority op.) (cleaned up).

This seismic shift "calls existing programs into question and promises profound implications for future ones as well." *Id.* at 2530 (Gorsuch, J., dissenting). The Commission therefore must expressly acknowledge this shift in the law and explain how it has changed its operation of the USF in response. *See Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (an agency must "acknowledge and account for a changed regulatory posture"). If the Commission simply continues about its business and pretends the Supreme Court's changed interpretation never happened, that is necessarily arbitrary and capricious. *See id.*

If the Commission does change its approach, that is not the end of the story. It still must "display awareness that it *is* changing position" and "show that there are

good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

The Commission also "must consider and respond to significant comments received during the period for public comment," *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015), and Commenters' arguments here are as "significant" as it gets: the Supreme Court has rejected the Commission's longstanding interpretation of §§ 254(b) and (c), and this threatens to upend large swaths of the USF program. The Commission therefore must expressly acknowledge that its prior interpretation has been rejected, explain its framework going forward, and explain how the current Contribution Factor allegedly satisfies the Supreme Court's opinion.

Relatedly, the Commission cannot "ignore" that its "prior policy has engendered serious reliance interests that must be taken into account," given the longstanding nature of its now-erroneous interpretation, and the Commission must acknowledge those reliance interests and explain how they will be addressed. *Mortg. Bankers Ass'n*, 575 U.S. at 106; *see also DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020) (agency was "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns").

*Second*, the Commission must *actually and substantively* comply with the Supreme Court's interpretation of §§ 254(b) and (c). "Now, the FCC can fund a program only if it satisfies all subsection (b) principles and *all* subsection (c) factors," which admittedly "calls existing programs into question and promises profound

implications for future ones as well." 145 S. Ct. at 2530 (Gorsuch, J., dissenting). The Supreme Court's reinterpretation of the statute "threaten[s] to render existing programs illegal—all while leaving the FCC (and program beneficiaries) guessing about the implications for future initiatives." *Id.*

We already know the Commission is not complying. "Take an example. Back in 2017, the FCC launched a multibillion-dollar effort to promote 'broadband service in unserved high-cost areas.' Among other things, the program subsidizes certain high-speed services that, the FCC has acknowledged, are not yet embraced by 'a substantial majority of residential customers.'" *Id.* (citations omitted).

There are undoubtedly other programs that do not comply. Given its prior insistence for decades that it need not *actually and substantively satisfy* every §§ 254(b) and (c) criteria, and its express acknowledgments that it in fact was *not* doing so for at least some programs, the Commission assuredly is not magically in compliance with a binding Court opinion that says every §§ 254(b) and (c) criteria indeed *is* mandatory.

**C. USAC's Involvement in Collecting and Spending Contributions Violates Article II, Including the Appointments Clause.**

The Supreme Court's majority opinion rejected the argument that USAC's role in "setting the contribution factor" violates the private nondelegation doctrine. 145 S. Ct. at 2509. The Court did not address, however, whether USAC's role in collecting and spending that money on the backend violates Article II (including the Appointments Clause) by delegating executive power to a private entity. *See id.* at

2524 n.6 (Gorsuch, J., dissenting) (noting this issue was not addressed in the prior proceedings).

Without any express statutory authority to do so, the Commission "appointed" USAC as "the permanent Administrator of the federal universal service support mechanisms." 47 C.F.R. § 54.701(a). USAC takes legal title to the contributions it receives from carriers and deposits them into the Universal Service Fund, then disburses funds to subsidize the general welfare via provision of service to libraries, schools, rural areas, and high-cost areas. *In re Incomnet, Inc.*, 463 F.3d 1064, 1072 (9th Cir. 2006). USAC generally divides these funds among its High-Cost and Low-Income Program, the Schools and Libraries Program, and the Rural Health Care Program. 47 C.F.R. §§ 54.101, 54.701(c); *see also id.* §§ 54.304, 54.308, 54.404, 54.501, 54.601.

USAC does not simply hold funds in the Universal Service Fund as the Commission's agent. *Incomnet*, 463 F.3d at 1074 (citing 47 C.F.R. § 54.715(c)). The Commission exercises power over the fund only indirectly, essentially by overseeing USAC. *Id.* The Commission has no ability to control the funds in the Universal Service Fund through direct seizure or discretionary spending. *Id.* USAC thus "decides if, when, and how it disburses funds on behalf of the [Fund's] beneficiaries." *Id.* at 1076 (citing 47 C.F.R. §§ 54.701(a), 54.704(a), 54.705, 54.715).

As explained in the attached concurring opinion by Judge Newsom (attached as Exhibit C), it is "clear" that USAC is "exercising *executive* power." *Consumers' Rsch. v. FCC*, 88 F.4th 917, 933–34 (11th Cir. 2023) (Newsom, J., concurring in

judgment). "The FCC depends on [USAC], a private entity, to carry out Congress's instructions," and "that description perfectly describes the 'executive' function." *Id.* at 921 (majority op.); *id.* at 934 (Newsom, J., concurring in judgment). "The term 'execute' has long meant—and means today—'to carry out or into complete effect,'" or "'to put in act; to do what is planned or determined.'" *Id.* (Newsom, J., concurring in judgment) (cleaned up). "So yes, it seems obvious … that in collecting de facto taxes and distributing benefits USAC is exercising 'executive' power." *Id.*

Although the Executive Branch can delegate at least some executive powers *within* that Branch, it "can't" do the same simply by letting "private parties exercis[e] *executive* power." *Id.* at 935. That is so "for both formal, structural reasons—in particular, Article II's explicit vesting of federal 'executive Power' in the President— and instrumental ones—specifically, the risks inherent in giving enforcement power to those not subject to political and legal constraints." *Id.* (cleaned up) "Delegation to a private entity breaks the ordinary chain of accountability that our 'carefully calibrated' system of government is designed to uphold." *Id.* at 938.

Further, "[l]iberty requires accountability." *DOT v. Ass'n of Am. R.R.s*, 575 U.S. 43, 57 (2015) (Alito, J., concurring). Every executive branch official is in some way accountable to the people because every executive branch official may be removed— for good cause at least—by the President, who is himself "the most democratic and politically accountable official in Government." *Seila L. LLC v. CFPB*, 591 U.S. 197, 224 (2020). Private persons, in contrast, may not be removed by the President because private persons do not wield any portion of "[t]he executive Power" our Constitution

JA20

vests "in a President of the United States of America." U.S. Const. art. II, § 1, cl. 1. Accordingly, "[t]here is no reason to lightly infer that Congress intends to insulate law execution from democratic accountability in this way." *Consumers' Rsch. v. FCC*, 109 F.4th 743, 775 (5th Cir. 2024) (*en banc*) (attached as Exhibit D).

Thus, at the very least, USAC's role in collecting and spending contributions is unconstitutional because of USAC's insulation from presidential oversight. *See* 145 S. Ct. at 2517 (Kavanaugh, J., concurring) (noting particular concerns with delegations to those "who are not removable at will by the President and who thus operate largely independent of Presidential supervision and direction"). Under that framework, "the key isn't the degree of the FCC's control, but the *President's*. And in that connection, the Supreme Court's decisions treat appointment and removal powers as the primary devices of executive control. The removal issues vis-à-vis USAC … are doubly fraught. First, the only word regarding USAC's removal comes from its own bylaws, which authorize the entity's board to remove one of its members by a majority vote and with the approval of the FCC's chairman. So far as the bylaws are concerned, then, USAC is essentially in charge of its own continuance in office. Second, and to compound matters, because the FCC is an independent agency, whose commissioners may be removed only for cause, USAC's board members enjoy something akin to the double-for-cause-removal protection that the Supreme Court has recently held to be unconstitutional." *Consumers' Rsch.*, 88 F.4th at 937–38 (Newsom, J., concurring in judgment) (citations omitted).

JA21

Accordingly, USAC's role violates Article II's prohibition on delegation of executive power outside the executive branch.

For similar reasons, USAC violates Article II's Appointments Clause, which requires that those who exercise executive power be, at the very least, appointed pursuant to law (i.e., a federal statute) and take an Article VI oath. But USAC board members and employees are not appointed pursuant to Article II (no statute authorizes USAC at all, let alone appointment of its employees) and do not take an oath to uphold the Constitution. Rather, USAC has a 20-member Board of Directors comprised of individuals from various "interest groups affected by and interested in universal service programs" and who were nominated "by their respective interest groups." *Leadership*, Universal Serv. Admin. Co., https://www.usac.org/about/leadership/ (last visited Aug. 8, 2025); 47 C.F.R. § 54.703(b). After their nomination by these interest groups, USAC board members are approved by the chair of the Commission, but not by the entire Commission, in violation of Article II. 47 C.F.R. § 54.703(c)(3); *see Free Enter. Fund v. PCAOB*, 561 U.S. 477, 511–12 (2010) (the FCC as a whole is a "Head of Department" for Article II purposes). Board directors are not nominated by the President nor confirmed by the Senate. Further, the FCC Chair is required to appoint members nominated by particular groups of constituents under § 54.703(c)(3) unless "an industry or non-industry group does not reach consensus on a nominee or fails to submit a nomination." 47 C.F.R. § 54.703(c)(3).

Justice Gorsuch flagged this issue as one remaining for later resolution: "one might ask whether the Administrative Company's leaders qualify as officers of the

United States and, if so, whether their role complies with the Appointments Clause." 145 S. Ct. at 2524 n.6 (Gorsuch, J., dissenting). As explained above, it does not. Accordingly, USAC's role is unconstitutional, and the Commission can neither collect USF money nor spend it so long as USAC is involved.

**D.    The Commission Lacks Statutory Authority to Appoint USAC the Permanent Administrator of the USF.**

As noted above, the Commission "appointed" USAC as "the permanent Administrator of the federal universal service support mechanisms," 47 C.F.R. § 54.701(a), and USAC plays a critical role in collecting and spending USF money on the backend.

But USAC's role is not authorized by any statute, and "there is no precedent establishing that federal agencies may subdelegate powers in the absence of statutory authorization." *Consumers' Rsch.*, 109 F.4th at 774. The government has previously argued that § 254(b)(5) authorizes USAC's role, but in reality that provision "seems to suggest precisely the opposite" because it "specifically instructs FCC to establish 'Federal and State mechanisms,' which indicates Congress intended to make government entities responsible for administering universal service programs." *Id.* at 776.

To be sure, Congress did expressly authorize the involvement of a different private entity in one small aspect of USF, but "Congress's explicit recognition of one relatively minor aspect of private companies' participation in the pre-1996 Lifeline Assistance regime thus evinces that Congress knew how to empower private

companies and chose not to empower them to administer other aspects of the USF." *Id.* at 777.

In short, however one describes USAC's role in administering the USF, there is no express statutory authority for it. And there is no reason to believe the Commission possesses some inherent power to involve USAC, especially for the backend collection and spending activities unaddressed in the Supreme Court's opinion. As the Supreme Court announced long ago in a case against the FCC: "an agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

There is every reason to believe that Congress has *not* authorized USAC to carry out the USF as its permanent administrator. Accordingly, USAC's actions are void and unlawful—and the Commission violates the Telecommunications Act and the APA by relying on USAC.

**E.    USAC Violates the Government Corporation Control Act.**

The Government Corporation Control Act ("GCCA") provides that "[a]n agency may establish or acquire a corporation to act as an agency only by or under a law of the United States specifically authorizing the action." 31 U.S.C. § 9102. The statute "prohibit[s] [the] creation of new Government corporations without specific congressional authorization." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 390 (1995); *see Wisconsin Bell, Inc. v. United States ex rel. Heath*, 145 S. Ct. 498, 513 (2025) (Thomas, J., concurring).

The Commission previously "ask[ed] Congress for 'specific statutory authority to create or designate one or more entities, such as the Universal Service

Administrative Company, to administer the federal universal service support mechanisms.'" 145 S. Ct. at 514 (Thomas, J., concurring) (cleaned up) (quoting *Report in Response to Senate Bill 1768 and Conference Report on H.R. 3579*, 13 FCC Rcd. 11810, 11819 (1998)). But "Congress refused the agency's request." *Id.*

"To this day, Congress has never passed a law approving the Administrative Company as a government corporation, nor has it authorized the FCC to formally label the Administrative Company a subagency." *Id.* But USAC acts as "an agent of the United States"—and thus its actions are unlawful and void under the GCCA. *Id.*

In fact, USAC has long been recognized as even more than an agent for the Commission: the Commission exercises power over the fund only indirectly, essentially by overseeing USAC. *Incomnet*, 463 F.3d at 1074 (citing 47 C.F.R. § 54.715(c)). The Commission has no ability to control the funds in the Universal Service Fund through direct seizure or discretionary spending. *Id.*

And nothing in the Supreme Court's recent decision changes that. If anything, it confirms it. USAC uses the Commission's "rules" to "estimate[] the programs' cost," "then publicly reports those projections, along with supporting documents." 145 S. Ct. at 2509. And when it comes to spending, USAC exerts "considerably greater effort" to determine "the programs' scope" and—perhaps most importantly—decides *which particular entities* receive all those billions of dollars, as explained above. *Id.* at 2508.

Thus, in all aspects but especially in calculating and spending USF money, USAC acts as the Commission's agent. But Congress never authorized USAC, and

JA25

thus USAC's role violates the GCCA. Accordingly, USAC's actions are void and unlawful—and the Commission violates the GCCA and the APA by relying on USAC.

## F.   USAC's and Carriers' Self-Interest Violates Due Process.

Justice Gorsuch noted that USAC's "directors overwhelmingly represent entities with a financial stake in expanding universal service: those who benefit from universal-service programs (like schools and hospitals) and those who get paid to supply the benefits (the carriers)." 145 S. Ct. at 2524 n.6 (Gorsuch, J., dissenting). This "seemingly conflicted arrangement may offend the Fifth Amendment's Due Process Clause." *Id.*

Indeed it does. As the D.C. Circuit has explained, "it violates due process for Congress to give a self-interested entity rulemaking authority over its competitors." *Ass'n of Am. R.R.s v. DOT*, 821 F.3d 19, 27 (D.C. Cir. 2016). "[I]n the very nature of things, one person may not be intrusted with the power to regulate the business of another, and especially of a competitor." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (invoking due process).

Like in *Carter Coal*, here the "power conferred upon the majority is, in effect, the power to regulate the affairs of an unwilling minority." *Id.* Unlike government officials, who are at least "presumptively disinterested," the decisionmakers here are entities "whose interests may be and often are adverse to the interests of others in the same business." *Id.*

The Supreme Court majority itself agreed "carriers submit their projections on FCC forms and the Administrator adds them up" to form the Contribution Factor. 145 S. Ct. at 2508. The carriers and USAC thus both have an incentive to make the

Factor as large as possible so there's more money overall to put back in their pockets. When it comes to spending, USAC exerts "considerably greater effort" to determine "the programs' scope" and—perhaps most importantly—decides *which particular entities* receive all those billions of dollars, as explained above. *Id.* All this from a self-interested Board to self-interested carriers (by contrast, Commenter Cause Based Commerce does not receive USF money on the back end). This gross self-interest violates due process.

## G.    Additional APA and Federal Register Act Violations.

In a final insult to transparency and the democratic process, the Commission has never previously complied with the Administrative Procedure Act ("APA")'s requirements when issuing proposed quarterly rates for the Universal Service Fund. The APA establishes the procedures federal administrative agencies use for "rule making," defined as the process of "formulating, amending, or repealing a rule." 5 U.S.C. § 551(5). "Rule," in turn, is defined broadly to include "statement[s] of general or particular applicability and future effect" that are designed to "implement, interpret, or prescribe law or policy." *Id.* § 551(4). That definition expressly includes "the approval or prescription for the future of rates." *Id.* Any forthcoming *Proposed Fourth Quarter 2025 Universal Service Contribution Factor* would be a rule (at least upon its becoming effective after 14 days) because it has future effect and general applicability—indeed, by its very terms, it has nearly "universal" applicability and involves billions of dollars in forced contributions.

Accordingly, the Commission would be required to follow the three-step procedure for notice-and-comment rulemaking: (1) "the agency must issue a general

JA27

notice of proposed rule making, ordinarily by publication in the Federal Register"; (2) if "notice is required, the agency must give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," and the "agency must consider and respond to significant comments received during the period for public comment"; (3) "when the agency promulgates the final rule, it must include in the rule's text a concise general statement of its basis and purpose." *Mortg. Bankers Ass'n*, 575 U.S. at 95–96 (cleaned up).

If past is prelude, the Commission will perform none of these steps for the *Proposed Fourth Quarter 2025 Universal Service Contribution Factor*, nor will the Commission find that any limited exception applies. *See* 5 U.S.C. § 553(b)(4)(A)–(B).

*First*, there presumably will be no Federal Register notice.

*Second*, the Commission presumably will not formally open the process to public comment. Commenters are filing this particular Comment with the Commission despite the lack of any dedicated docket or invitation to do so. And even after OMD acts, the window for comments is an illegally short 14 days, which will prejudice Commenters by forcing them to rush to finalize any Comment within that short period. And presumably the Commission will not respond to "significant comments" before the 14-day "deemed approved" period passes. *See* 47 C.F.R. § 54.709(a)(3)

*Third*, the Commission's decision to establish such a shortened review process does not excuse the Commission from issuing a reasoned decision for its action, although it presumably will not comply with this requirement, either, as the

Commission has apparently never done so for prior quarterly reviews. Indeed, under *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), the Commission can defend its action in court only on those grounds provided by the Commission itself in its administrative decision—which presumably will not exist here despite this Comment's attempt to trigger the Commission into complying with the basic safeguards of the APA.

The Commission has no one to blame but itself for any difficulty in responding to comments in such a short period, given that it established this entire process, including the 14-day window and the "deemed approved" provision.

For all these reasons, the Commission has repeatedly violated the APA for past Contribution Factors and will do so again unless it complies with the requirements outlined above for any *Proposed Fourth Quarter 2025 Universal Service Contribution Factor*.

Relatedly, if the Commission does not publish its proposal in the Federal Register, the Commission would also violate the Federal Register Act. *See* 44 U.S.C. § 1505. And the Commission presumably will violate the Federal Register Act again by failing to publish any Proposed Factor after the expiration of the 14-day "deemed approved" period (assuming the Commission did not issue its own order on the matter, which itself would then need to be published in the Federal Register). *Id.*

Dated: September 15, 2025

**<u>Submitted via ECFS</u>**

Respectfully submitted,

<u>/s/ R. Trent McCotter</u>

R. Trent McCotter
Jonathan Berry
Michael Buschbacher
Jared M. Kelson
BOYDEN GRAY PLLC
800 Connecticut Ave. NW
Suite 900
Washington, DC 20006
(202) 706-5488
tmccotter@boydengray.com

# EXHIBIT A

# SUPREME COURT OPINION

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FEDERAL COMMUNICATIONS COMMISSION ET AL. *v.* CONSUMERS' RESEARCH ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 24–354.   Argued March 26, 2025—Decided June 27, 2025*

The Communications Act of 1934 established the Federal Communications Commission (FCC or Commission) and instructed it to make available to "all the people of the United States," reliable communications services "at reasonable charges." 47 U. S. C. §151. That objective is today known as "universal service." The universal-service project arose from the concern that pure market mechanisms would leave some population segments—such as the poor and those in rural areas—without access to needed communications services. Under the 1934 Act, the FCC pursued universal service primarily through implicit subsidies, using its rate-regulation authority to lower costs for some consumers at the expense of others.

In 1996, Congress amended the Act and created a new framework for achieving universal service. Section 254 of the amended statute requires every carrier providing interstate telecommunications services to "contribute" to a fund, known as the Universal Service Fund. See §254(d). The FCC must use the money in the Fund to pay for universal-service subsidy programs. See §§254(a), (d), (e). The statute designates the beneficiaries of universal-service subsidies—low-income consumers, those in rural areas, schools and libraries, and rural hospitals. §§254(b)(3), (h)(1), (j). And it provides detailed guidance regarding the communications services to which those beneficiaries should have access. In deciding what services to subsidize, the FCC "shall consider the extent to which" a service is "essential to education,

————————

*Together with No. 24–422, *Schools, Health, & Libraries Broadband Coalition et al.* v. *Consumers' Research et al.*, also on certiorari to the same court.

Syllabus

public health, or public safety" and has "been subscribed to by a substantial majority of residential customers." §§254(c)(1)(A)–(B). So too, the Commission must evaluate whether a service can be made available at an "affordable rate[]." §254(b)(1). Section 254 also sets forth "principles" on which the FCC "shall base" its universal-service policies. §254(b). Among other things, those principles direct that all consumers, "including low-income consumers" and those in "rural" areas, should have access to quality services at affordable prices. See *ibid.* The FCC also may add "other principles" found both "consistent with" the Act and "necessary and appropriate for the protection of the public interest, convenience, and necessity." §254(b)(7).

To calculate how much carriers must contribute to the Fund, the FCC has devised a formula, known as the "contribution factor." 47 CFR §54.709(a). That factor is a fraction, expressed as a percentage, whose numerator is the Fund's projected quarterly expenses (the subsidy payments it will make plus overhead) and whose denominator is contributing carriers' total projected quarterly revenue. §54.709(a)(2). A carrier must pay into the Fund an amount equal to its own projected revenue multiplied by the contribution factor. §54.709(a)(3).

The FCC has appointed the Universal Service Administrative Company, a private, not-for-profit corporation, as the Fund's "permanent Administrator." §54.701(a). The Administrator manages the Fund's day-to-day operations and also plays a role in producing the financial projections that end up determining the contribution factor. See §§54.702, 54.709(a)(2)–(3). Each quarter, the Administrator projects the Fund's expenses, adds up revenue estimates it receives from carriers, and submits those figures to the Commission for approval and eventual use in calculating the contribution factor. See §§54.709(a)(2)–(3).

In December 2021, the FCC set a 25.2% contribution factor for the first quarter of 2022. Consumers' Research petitioned for review in the Fifth Circuit, contending that the universal-service contribution scheme violates the nondelegation doctrine. The en banc court granted the petition, replacing a panel decision to the contrary. See 109 F. 4th 743; 63 F. 4th 441. In the full Fifth Circuit's view, the combination of Congress's delegation to the FCC and the FCC's "subdelegation" to the Administrator violated the Constitution, even if neither delegation did so independently. 109 F. 4th, at 778.

*Held*: The universal-service contribution scheme does not violate the nondelegation doctrine. Pp. 10–37.

(a) Article I of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." §1. Accompanying that assignment of power to Congress is a bar on its further delegation. At the same time, this Court has recognized

Syllabus

that Congress may "seek[] assistance" from its coordinate branches and "vest[] discretion" in executive agencies to implement the laws it has enacted. *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394, 406. To distinguish between the permissible and the impermissible in this sphere, this Court asks whether Congress has set out an "intelligible principle" to guide what it has given the agency to do. *Id.*, at 409. Under that test, Congress must make clear both "the general policy" the agency must pursue and "the boundaries of [its] delegated authority." *American Power & Light Co.* v. *SEC*, 329 U. S. 90, 105. Pp. 10–11.

(b) Although the intelligible-principle standard has long guided this Court's nondelegation doctrine, Consumers' Research insists that a different test applies here. According to Consumers' Research, universal-service contributions are taxes. And tax statutes, Consumers' Research argues, must satisfy a special nondelegation rule. For those statutes, Congress must set a definite or objective limit on how much money an agency can collect—a numeric cap, a fixed tax rate, or the equivalent. Section 254 contains no such limit, so, in Consumers' Research's view, it is unconstitutional.

The Court rejects that argument. To begin with, precedent forecloses it: In both *J. W. Hampton*, 276 U. S., at 409, and *Skinner* v. *Mid-America Pipeline Co.*, 490 U. S. 212, 220–221, the Court declined requests to create a special nondelegation rule for revenue-raising legislation. The test Consumers' Research proposes also would throw a host of federal statutes into doubt, as Congress has often empowered agencies to raise revenue without specifying a numeric cap or tax rate. See, *e.g.*, 12 U. S. C. §§16, 243, 1815(d)(1). Consumers' Research responds that those other statutes can be distinguished as imposing fees, rather than taxes, and thus be exempted from its numeric-limit requirement. But *Skinner* made clear that whether a charge is a tax or a fee is irrelevant to the nondelegation inquiry. See 490 U. S., at 223. Finally, the Consumers' Research position produces absurd results, divorced from any reasonable understanding of constitutional values. Under its view, a revenue-raising statute containing non-numeric, qualitative standards can never pass muster, no matter how tight the constraints they impose. But a revenue-raising statute with a numeric limit will always pass muster, even if it effectively leaves an agency with boundless power. In precluding the former and approving the latter, the Consumers' Research approach does nothing to vindicate the nondelegation doctrine or the separation of powers. Pp. 12–19.

(c) Under the usual intelligible-principle test, the universal-service contribution scheme clears the nondelegation bar. Section 254 directs the FCC to collect contributions that are "sufficient" to support universal-service programs. §§254(b)(5), (d), (e). The word "sufficient" sets

Syllabus

both a floor and a ceiling—the FCC cannot raise *less* than what is adequate or necessary to finance its universal-service programs, but it also cannot raise *more* than that amount. And the "sufficiency" ceiling imposes a meaningful limit on the Commission, because Section 254 also provides appropriate guidance about the nature and content of universal service. The statute makes clear whom the program is intended to serve: those in rural and other high-cost areas (with a special nod to rural hospitals), low-income consumers, and schools and libraries. See §§254(b)(3), (6), (h)(1). And it also defines the services those beneficiaries should receive. In order for the FCC to subsidize a service, the service must be subscribed to by a substantial majority of residential customers, available at affordable rates, and essential to education, public health, or safety. §§254(b)(1), (3), (c)(1)(A)–(B). Those conditions, each alone and together, provide the FCC with determinate standards for operating the universal-service program.

Consumers' Research contends that the Act gives the FCC boundless authority, but the provisions it points to show nothing of the kind. It first argues that the Commission need not actually adhere to each of the criteria Section 254 uses to define universal service. Properly understood, however, those criteria are separately mandatory. Next, Consumers' Research highlights Section 254(c)(1)'s description of universal service as an "evolving level of telecommunications services that the Commission shall establish periodically" in light of advances in technology. That provision, it says, enables the FCC to redefine universal service as it sees fit. But the permission Congress gave the FCC to fund different services over time does not strip the statute of standards and constraints. The Commission still may fund only essential, widely used, and affordable services, for the benefit of only designated recipients. Finally, Consumers' Research maintains that the statutory provision enabling the FCC to articulate "[a]dditional principles" to guide its universal-service policies allows the agency to rewrite its own authority. §254(b)(7). But that is not so, because Section 254(b)(7) requires the added principles to be "consistent with" the rest of the statute. So they cannot change the statute's other principles, much less its conditions on what subsidies can go toward and who can receive them. Pp. 19–30.

(d) Consumers' Research separately claims that the FCC has impermissibly delegated authority to the Administrator to set the contribution factor. In making this argument, Consumers' Research invokes what is commonly called the private nondelegation doctrine. In *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 311, this Court struck down a statute authorizing certain coal producers to set rules for the rest of the industry, finding the delegation improper because it was made to "private persons whose interests" are often "adverse to the interests of others."

Syllabus

But a counterpart case, *Sunshine Anthracite Coal Co.* v. *Adkins*, 310 U. S. 381, 388, approved a statute permitting private actors to make recommendations to a Government agency for "approv[al], disapprov[al], or modifi[cation]." That arrangement was valid, because the private parties "function[ed] subordinately to" the agency and were subject to its "authority and surveillance." *Id.*, at 399.

Under those precedents, the Commission's use of the Administrator is permissible. The Administrator is broadly subordinate to the Commission: The Commission appoints the Administrator's Board of Directors, approves its budget, and requires the Administrator to act "consistent with" its rules and directives. 47 CFR §§54.703(b)–(c), 54.715(c); Memorandum of Understanding Between the Federal Communications Commission and the Universal Service Administrative Company 2 (Oct. 17, 2024). And the Commission's authority and oversight over the Administrator extend to determining the contribution factor. Working within FCC rules, the Administrator produces the initial projections of carrier revenues and Fund expenses that feed into the contribution factor. §§54.709(a)(2)–(3). The Administrator then reports its figures to the Commission, which reviews—and if needed, revises—the projections before approving them and publishing the contribution factor. See §54.709(a)(3). The Commission then has 14 days to make additional changes before the factor is "deemed approved by the Commission." *Ibid.* So although the Administrator makes recommendations, the Commission is, throughout, the final authority. Pp. 30–34.

(e) The Court also rejects the basis of the decision below: that the "*combination*" of Congress's grant of authority to the FCC and the FCC's reliance on the Administrator violates the Constitution, even if neither one does so alone. 109 F. 4th, at 778 (emphasis in original). The Fifth Circuit founded that theory on *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 483–484, where this Court struck down a statute because it gave an executive officer two "layers of protection" from the President's removal authority. Even granting that each layer of protection was alone permissible, the Court thought the combination was too much. According to the Fifth Circuit, similar reasoning applied here: Even if Congress lawfully conferred discretion on the Commission and the Commission lawfully sought assistance from the Administrator, the combination was impermissible. 109 F. 4th, at 778. But the court's logic does not work. In *Free Enterprise Fund*, the two layers of for-cause protection operated on a single axis, with the one exacerbating the other. That is not the case here: A law violates the traditional nondelegation doctrine when it authorizes an agency to legislate. And a law violates the private nondelegation doctrine when it allows non-governmental entities to

Syllabus

govern. Those doctrines do not operate on the same axis. So a measure implicating (but not violating) one does not compound a measure implicating (but not violating) the other, in a way that pushes the combination over a constitutional line. Pp. 34–37.

109 F. 4th 743, reversed and remanded.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAVANAUGH, BARRETT, and JACKSON, JJ., joined. KAVANAUGH, J., and JACKSON, J., filed concurring opinions. GORSUCH, J., filed a dissenting opinion, in which THOMAS and ALITO, JJ., joined.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

Nos. 24–354 and 24–422

FEDERAL COMMUNICATIONS COMMISSION, ET AL., PETITIONERS

24–354        *v.*
CONSUMERS' RESEARCH, ET AL.

SCHOOLS, HEALTH & LIBRARIES BROADBAND COALITION, ET AL., PETITIONERS

24–422        *v.*
CONSUMERS' RESEARCH, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 27, 2025]

JUSTICE KAGAN delivered the opinion of the Court.

Nearly a century ago, Congress charged the then-new Federal Communications Commission (FCC or Commission) with making communications services available, at affordable prices, to all Americans. That objective became known as "universal service." Some decades on, near the turn of the 21st century, Congress reaffirmed its commitment to universal service while providing new and more detailed instructions to the FCC about how to achieve it. Under the amended statutory plan, the FCC would use required payments, called contributions, from telecommunications companies to subsidize basic communications services for consumers in certain underserved communities—particularly, rural and low-income areas. To carry out that

JA38

mandate, the Commission established discrete subsidy programs for the consumers Congress had identified, set up a special fund to receive and disburse the companies' payments, and enlisted a private corporation, called the Universal Service Administrative Company, to help manage that fund's operations.

The question in this case is whether the universal-service scheme—more particularly, its contribution mechanism—violates the Constitution's nondelegation doctrine, either because Congress has given away its power to the FCC or because the FCC has given away its power to a private company. We hold that no impermissible transfer of authority has occurred. Under our nondelegation precedents, Congress sufficiently guided and constrained the discretion that it lodged with the FCC to implement the universal-service contribution scheme. And the FCC, in its turn, has retained all decision-making authority within that sphere, relying on the Administrative Company only for non-binding advice. Nothing in those arrangements, either separately or together, violates the Constitution.

I

A

The Communications Act of 1934, ch. 652, 48 Stat. 1064, established the FCC and empowered it to regulate communications services. In the Act's very first provision, Congress instructed the FCC to pursue the goal now called universal service. The FCC, Congress stated, was "to make available, so far as possible, to all the people of the United States," reliable communications services "at reasonable charges." 47 U. S. C. §151.

The universal-service project arose from the concern that pure market mechanisms would leave some segments of the population without access to needed communications services. That is because providers of those services, also called carriers, can reap greater profits from some classes

of customers than from others. Carriers, for example, make more money in urban areas than in rural ones because fixed costs in cities are spreadable over many more users. See S. Benjamin et al., Telecommunications Law and Policy §15.3.1, p. 763 (2d ed. 2006); *In re Federal-State Joint Bd. on Universal Serv.*, 12 FCC Rcd. 8776, 8784 (1997) (Universal Service Order). Similarly, carriers may prefer to focus on business customers instead of residential or not-for-profit customers (like schools and libraries) because the former are willing to pay more for the same services. See *id.*, at 8784. So carriers have incentives to neglect some kinds of customers in providing services or setting prices. See P. Huber, M. Kellogg, & J. Thorne, Federal Telecommunications Law §6.1.2, pp. 6–9, 6–10, and n. 26 (3d ed. Supp. 2022). The result, policymakers thought, would be severe inequities in access to communications systems, and a swiss-cheese-like communications network for the whole country. See *ibid.*; Universal Service Order, 12 FCC Rcd., at 8780–8781, 8783.

Under the original Act, the FCC addressed that concern—and promoted universal service—through a "patchwork quilt of implicit and explicit subsidies." FCC, Report to Congress 5 (FCC 98–67, 1998). The earliest and dominant squares of that quilt were implicit subsidies, provided under the FCC's authority to set "just and reasonable" rates. See Universal Service Order, 12 FCC Rcd., at 8784; 47 U. S. C. §201(b). Carriers then operated as regulated monopolies, with the FCC (and its state counterparts) superintending the rates they could charge different kinds of customers for different services. See Universal Service Order, 12 FCC Rcd., at 8784–8785; Huber, Federal Telecommunications Law §6.1.1.2, p. 6–7. And regulators used that authority over rates to shift costs: Long-distance rates were set enough above cost "to subsidize local rates, business rates to subsidize [non-business] rates, and urban rates to subsidize rural rates." *Id.*, p. 6–7. So, for example, a "large

New York [City] brokerage firm making heavy use of long-distance service" would end up "subsidiz[ing] the local services of homeowners in Fishkill." *Ibid.*; see Universal Service Order, 12 FCC Rcd., at 8784. Over time, though, towns like Fishkill benefited as well from explicit subsidy programs. The FCC, for example, began in the 1980s to levy assessments on long-distance carriers and disburse the proceeds to carriers serving high-cost communities. See *id.*, at 8890–8892; 47 CFR §§36.601–36.641, 69.116(a) (1996). And the FCC began, through the so-called Lifeline program, to make payments directly reducing low-income consumers' monthly phone bills. See Universal Service Order, 12 FCC Rcd., at 8957–8958; §§69.104(j)–(l), 69.117, 69.203(f)–(g).

In 1996, Congress overhauled the Act to "promote competition and reduce regulation" in the telecommunications sector. See Telecommunications Act, 110 Stat. 56. As part of those reforms, Congress created a new framework for achieving universal service. The amended Act discarded the implicit subsidies embedded in ratemaking and substituted a plan for explicit transfer payments to ensure that basic communications services extend across the country. See §254; Universal Service Order, 12 FCC Rcd., at 8783–8784.

Section 254 of the amended statute requires every carrier providing interstate telecommunications services to "contribute," in line with the statute and FCC rules, to a fund designed to "preserve and advance universal service." §254(d). The FCC must use the money in that fund, now known as the Universal Service Fund, to pay for subsidy programs for designated populations and facilities needing improved access. See §§254(a), (e); *Wisconsin Bell, Inc.* v. *United States ex rel. Heath*, 604 U. S. ___, ___ (2025) (slip op., at 2). The statute, for example, continues the Lifeline program aiding low-income individuals. See §254(j). It directs the FCC to provide assistance to rural hospitals, as

well as to schools and libraries. See §254(h)(1). And it instructs the FCC to expand communications access for consumers in "rural" and other "high cost areas." §254(b)(3). The carrier contributions collected to support those programs, the Act further provides, must be "sufficient" to carry them out and so to "advance universal service." §§254(d)–(e).

The statute also provides detailed guidance for identifying the specific communications services to which the statute's beneficiaries should have access. On the one hand, the Act recognizes that those services, given the expected pace of technological change, are unlikely to stay static: Universal service, says the statute, is "an evolving level of telecommunications services that the Commission shall establish periodically" as it accounts for "advances in telecommunications and information technologies and services." §254(c)(1). On the other hand, the Act specifies the relevant criteria in every period. In deciding which communications services the "definition" of universal service encompasses, the FCC "shall consider the extent to which" a service (1) is "essential to education, public health, or public safety"; (2) has, through market forces, "been subscribed to by a substantial majority of residential customers"; and (3) is in fact "being deployed in public telecommunications networks by telecommunications carriers." §§254(c)(1)(A)–(C). So too, the Commission must evaluate whether a service can be made available at an "affordable rate[]." §254(b)(1). Congress thus struck a balance in establishing universal service's metes and bounds—affording the FCC latitude to adapt to technological developments, but insisting that the FCC always look to whether services are essential, affordable, and widely used.

Echoing the provisions just described, Congress also listed six "principles" on which the FCC "shall base" all its universal-service policies. §254(b). First, "[q]uality services should be available at just, reasonable, and affordable

JA42

rates." §254(b)(1).   Second, "all regions of the Nation" should have access to those services.  §254(b)(2).  Third, all consumers, "including low-income consumers and those in rural, insular, and high cost areas," should have access to services that are "reasonably comparable" in quality and price to those in urban areas.  §254(b)(3).  Fourth, every carrier should make "an equitable and nondiscriminatory contribution" to the achievement of universal service. §254(b)(4).  Fifth, the subsidies given to advance that goal should be "specific, predictable[,] and sufficient." §254(b)(5).  And sixth, "schools," "libraries," and "health care providers" should have access to services.  §254(b)(6). That list concludes with a provision enabling the FCC to add "other principles" found both "consistent with" the Act and "necessary and appropriate for the protection of the public interest, convenience, and necessity."  §254(b)(7).

The Commission now operates, under the terms of the Act, four universal-service programs.  Lifeline, which pre-dated the Act, gives low-income consumers a markdown on their monthly phone bills, usually of $9.25 per month.  See §254(j); 47 CFR §§54.400–54.424 (2024); *supra*, at 4.  The High Cost program, which similarly built on a pre-1996 explicit subsidy program, furnishes carriers with funds enabling them to provide basic communications services in "rural, insular, and [other] high cost areas" at costs comparable to those charged in urban areas.  §254(b)(3); §§54.302–54.322; *supra*, at 4.  The E-Rate program subsidizes communications services for schools and libraries across the country, with greater discounts going to facilities in rural or low-income areas.  See §§254(b)(6), (h)(1)(B); §§54.500–54.523; *Wisconsin Bell*, 604 U. S., at ___ (slip op., at 3).  And finally, the Rural Health program supports rural hospitals and other health care facilities, enabling them to use telemedicine in caring for far-flung patients and ensuring that they receive the needed communications services at roughly the rates urban facilities pay.  See §§254(b)(6),

(h)(1)(A); §§54.600–54.633.

To calculate how much carriers must contribute to the Fund for those programs, the FCC has devised a formula, known as the "contribution factor." 47 CFR §54.709(a). That factor is a fraction, expressed as a percentage, whose numerator is the Fund's projected expenses for the upcoming quarter (the subsidy payments it will make plus overhead) and whose denominator is the total projected revenue of contributing carriers during that same period. See §54.709(a)(2). A carrier must pay into the Fund an amount equal to its own projected revenue multiplied by the contribution factor. See §54.709(a)(3). So, for example, if the FCC forecasts that it will need, in a given quarter, 25% of all carrier revenues to cover the costs of its universal-service programs, a carrier expecting to generate $100 million in revenue in that quarter will have to contribute $25 million. The carrier may then pass along to its customers the cost of its contributions. See §54.712(a). Every quarter, the FCC updates its expense and revenue projections, comes up with a new contribution factor, and announces it in a public notice. See §§54.709(a)(2)–(3). During the next 14 days, the FCC may revise the factor as it thinks proper. See §54.709(a)(3). If the FCC takes no action within that period, the factor is "deemed approved by the Commission" and goes into effect. *Ibid.* Carriers must then kick in to the Fund accordingly.

The FCC in 1998 appointed the Universal Service Administrative Company as the Fund's "permanent Administrator." §54.701(a). The Administrator, as we will call it, is a private, not-for-profit corporation owned by an association of carriers. See §54.5; *Wisconsin Bell*, 604 U. S., at ___ (slip op., at 2). It manages the day-to-day operations of the Fund, "bill[ing] and collect[ing] contributions from carriers" and "distribut[ing] the resulting pot of money, as FCC rules provide, to program beneficiaries." *Id.*, at ___ (slip op., at 2); see §54.702. More relevant here, the Administrator

Opinion of the Court

plays a role each quarter in producing the financial projections that end up determining the contribution factor. See §§54.709(a)(2)–(3). Specifically, the Administrator estimates the Fund's expenses (again, the costs of the programs plus overhead) and adds up the estimates it receives from individual carriers about their revenues. See *ibid.* The Administrator then submits those figures, along with supporting documentation, to the Commission for approval and eventual use in calculating required contributions. See *ibid.*

B

In December 2021, the FCC proposed a contribution factor of 25.2% for the first quarter of 2022. Respondents—the non-profit organization Consumers' Research, a carrier, and several consumers (collectively, Consumers' Research)—filed comments (during the 14-day, post-notice period described above) requesting that the FCC instead set the contribution factor at 0%. In support of that submission, Consumers' Research argued that the universal-service contribution scheme violates the Constitution's nondelegation rule. The Commission took no action in response, so the 25.2% contribution factor went into effect.

Consumers' Research then petitioned for review in the Court of Appeals for the Fifth Circuit. The en banc court granted the petition, replacing a panel decision to the contrary. See 109 F. 4th 743 (2024); 63 F. 4th 441 (2023). In the full Fifth Circuit's view, the universal-service contribution mechanism is unconstitutional because of its so-called "double-layered delegation." 109 F. 4th, at 782.

The court's analysis proceeded by expressing "skeptic[ism]" about each of two aspects of the contribution scheme, while declining to rule on either one. *Id.*, at 778. First, the court stated, Congress in Section 254 "may have delegated legislative power" to the FCC by giving it "the power to tax" carriers "without supplying an intelligible

principle to guide [its] discretion." *Id.*, at 756. The court described Section 254's limits on the Commission's authority as "minimal," "contentless," and "amorphous." *Id.*, at 760, 761, 767. Nonetheless, the court decided not to decide whether Congress had impermissibly transferred authority to the Commission. *Id.*, at 767. Second, the court continued, the Commission "may have impermissibly delegated the taxing power to private entities" by involving the Administrator in setting contribution amounts. *Id.*, at 756. The court posited that the FCC had "*de facto* abdicate[d]" governmental responsibilities to the Administrator by giving it the "final say" on how much carriers pay into the Fund. *Id.*, at 771. Again, however, the court demurred as to the bottom line, reserving judgment on whether the Administrator's role in the contribution scheme violates the Constitution. See *id.*, at 778.

The dispositive constitutional problem, the Fifth Circuit ultimately held, is "*the combination* of Congress's sweeping delegation to FCC and FCC's unauthorized subdelegation" to the Administrator. *Ibid.* (emphasis in original). Relying heavily on this Court's decision in *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477 (2010), the court opined that "two or more things that are not independently unconstitutional *can combine* to violate the Constitution's separation of powers." 109 F. 4th, at 778 (emphasis in original). And that was true here for a pair of reasons. The "double-layered delegation," the court thought, had "no foothold in history or tradition." *Id.*, at 782. And, the court went on, that delegation "undermine[s] democratic accountability" by obscuring whether Congress, the FCC, or the Administrator bears responsibility for the amount of contributions. *Id.*, at 783–784.

Opinion of the Court

We granted certiorari, 604 U. S. ___ (2024), and now reverse the decision below.[1]  In this Court, Consumers' Research separates what the Fifth Circuit combined.  It contends (as it did below) that Congress's delegation to the FCC violates the Constitution, and that the FCC's delegation to the Administrator does so too.  We reject each argument, and also reject the Fifth Circuit's combination theory.

## II

Article I of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."  §1.  Accompanying that assignment of power to Congress is a bar on its further delegation: Legislative power, we have held, belongs to the legislative branch, and to no other.  See *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 472 (2001).  At the same

---

[1] When we granted certiorari, we asked the parties to address whether this case is moot.  The parties agree that it is not moot, and we do too.  The relevant facts are as follows.  Consumers' Research filed suit to avoid payments arising from the contribution factor that the FCC set for the first quarter of 2022.  But by now Consumers' Research has made those payments, and a court might not be able to order a refund.  Assuming not, the case would be moot—*except* that it qualifies as "capable of repetition, yet evading review." *Kingdomware Technologies, Inc.* v. *United States*, 579 U. S. 162, 170 (2016).  A given contribution factor is in effect for only three months, a period "too short to complete judicial review of [its] lawfulness." *Ibid.*  And "it is reasonable to expect" that Consumers' Research will have to make the same kind of payments again. *Ibid.*  So the case, as the Fifth Circuit concluded, is not moot.  See 109 F. 4th 743, 753 (2024).  Several other courts of appeals would have arrived at the opposite conclusion, because they require a party to seek preliminary relief in order to avail itself of the capable-of-repetition rule.  See, *e.g.*, *Newdow* v. *Roberts*, 603 F. 3d 1002, 1008–1009 (CADC 2010), cert. denied, 563 U. S. 1001 (2011).  But our decisions have never hinted at such a requirement.  See, *e.g.*, *Kingdomware Technologies*, 579 U. S., at 170; *SEC* v. *Sloan*, 436 U. S. 103, 108–110 (1978).  And for good reason: The "capable of repetition" rule applies because of the nature of some controversies, not because of the parties' litigating decisions.

time, we have recognized that Congress may "seek[] assistance" from its coordinate branches to secure the "effect intended by its acts of legislation." *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394, 406 (1928). And in particular, Congress may "vest[] discretion" in executive agencies to implement and apply the laws it has enacted—for example, by deciding on "the details of [their] execution." *Ibid.*; see *Wayman* v. *Southard*, 10 Wheat. 1, 46 (1825) ("[T]he maker of the law may commit something to the discretion of the other departments"); *Whitman*, 531 U. S., at 474–475 (A "degree of policy judgment" can "be left to those executing or applying the law").

To distinguish between the permissible and the impermissible in this sphere, we have long asked whether Congress has set out an "intelligible principle" to guide what it has given the agency to do. *J. W. Hampton*, 276 U. S., at 409. Under that test, "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman*, 531 U. S., at 475. The "guidance" needed is greater, we have explained, when an agency action will "affect the entire national economy" than when it addresses a narrow, technical issue (*e.g.*, the definition of "country [grain] elevators"). *Ibid.* But in examining a statute for the requisite intelligible principle, we have generally assessed whether Congress has made clear both "the general policy" that the agency must pursue and "the boundaries of [its] delegated authority." *American Power & Light Co.* v. *SEC*, 329 U. S. 90, 105 (1946). And similarly, we have asked if Congress has provided sufficient standards to enable both "the courts and the public [to] ascertain whether the agency" has followed the law. *OPP Cotton Mills, Inc.* v. *Administrator of Wage and Hour Div., Dept. of Labor*, 312 U. S. 126, 144 (1941). If Congress has done so—as we have almost always found—then we will not disturb its grant of authority.

Opinion of the Court

A

Although the intelligible-principle standard has focused our nondelegation doctrine for a century, Consumers' Research and the dissent primarily argue that we must apply a different test here. Section 254, as just described, authorizes the Commission to raise revenue in the form of carrier "contribut[ions]" for universal-service programs. §254(d); see *supra*, at 4. Consumers' Research views those required contributions as taxes. See Brief for Respondents 25–29; see also *post*, at 12–13, 29–30 (GORSUCH, J., dissenting). And it argues that tax statutes—and probably all revenue-raising statutes—have to satisfy a special nondelegation rule. For those statutes, Congress must set a "definite" or "objective limit" on how much money an agency can collect—a numeric cap, a fixed rate, or the equivalent. Brief for Respondents 32, 36; see *id.*, at 33–35; see also *post*, at 14–16 (stating that a "tax rate" is likely required, but a "cap" may also suffice). Without such a limit, Consumers' Research claims, no intelligible principle (however constraining) will do. See Brief for Respondents 46, 66. And all agree that Section 254 contains no determinate cap or formula. So, on Consumers' Research's telling, it effects an unconstitutional delegation.[2]

But this Court's precedents foreclose that argument. Twice before, we have rejected a party's request to create a special nondelegation rule for revenue-raising legislation. In *J. W. Hampton*, a taxpayer contended that when Congress is "exercis[ing] the power to levy taxes and fix customs duties," it lacks the usual leeway to confer discretion on agencies. 276 U. S., at 409. "The [legal] authorities," the

_____

[2] Although endorsing the same rule as Consumers' Research, the dissent claims that the rule is merely an application of the intelligible-principle test. See *post*, at 14. That is mistaken: The intelligible-principle test requires an intelligible principle, not a "prescribed . . . tax rate." *Ibid.* So what we say about the Consumers' Research position generally goes as well for the dissent's.

JA49

Court responded, "make no such distinction." *Ibid.* And then the Court set out the "intelligible principle" standard as the universal method for assessing delegations. *Ibid.* More than sixty years later, we reiterated that holding. In *Skinner* v. *Mid-America Pipeline Co.*, 490 U. S. 212, 220 (1989), another litigant urged that "Congress' taxing power" can be delegated only "with much stricter guidelines" than are normally used. Citing *J. W. Hampton*, we again—and unanimously—rejected that "two-tiered theory of nondelegation." 490 U. S., at 220–221. "[N]othing" in the Constitution's text or structure, *Skinner* explained, "distinguish[es] Congress' power to tax from its other enumerated powers" "in terms of the scope and degree of discretionary authority that Congress may delegate to the Executive." *Ibid.* Nor, the Court added, did history at all distinguish the two. See *id.*, at 221 ("From its earliest days to the present, Congress, when enacting tax legislation," has at times delegated "discretionary authority" to the Executive). So whether or not a tax is at issue—so say our cases—the usual nondelegation standard applies. And that standard is, again, trained on intelligible principles, not on numeric caps and "mathematical formula[s]." *United States* v. *Rock Royal Co-operative, Inc.*, 307 U. S. 533, 577 (1939); see *supra*, at 11.[3]

---

[3] The dissent's attempt to deal with these precedents is not successful. Relegating discussion of *J. W. Hampton* to a footnote, the dissent refuses to acknowledge that decision's categorical rejection of a different nondelegation standard for tax statutes than for others. See *post*, at 28, n. 15. The dissent contends that the tax at issue there could have met its own rate-or-cap test, but glosses over that the Court instead asked only about intelligible principles. See *ibid.* And although the dissent suggests otherwise, *J. W. Hampton*'s holding that the statute had an intelligible principle in no way hinged on the existence of a numeric rate or cap. See 276 U. S., at 404–405. The dissent's discussion of *Skinner* is not much better. Our holding there compels the dissent to say that it is not proposing a "different and stricter" test for "when Congress delegates the power to tax." *Post*, at 14. But in the same paragraph, the dissent

The alternative test Consumers' Research and the dissent propose also would throw a host of federal statutes into doubt. Relying on this Court's nondelegation precedents, Congress has often enacted statutes empowering agencies to raise revenue without specifying a numeric cap or tax rate. See Reply Brief for Federal Petitioners 7–9 (listing nine "example[s]"). Indeed, such statutes are endemic in the sphere of financial regulation. The Federal Reserve Board, for instance, funds its operations by levying on Federal Reserve Banks "an assessment sufficient to pay its estimated expenses." 12 U. S. C. §243. The Office of the Comptroller of the Currency (OCC) likewise "collect[s]" from OCC-chartered banks an "assessment, fee, or other charge" as the Office "determines is necessary or appropriate to carry out [its] responsibilities." §16. And the Deposit Insurance Fund of the Federal Deposit Insurance Corporation (FDIC), which protects the savings of millions of Americans, is financed through charges on banks "which the Corporation may by regulation prescribe, after giving due consideration to the need to establish and maintain the [Fund's] reserve ratio." §1815(d)(1). In none of those (or many other) revenue-raising statutes does a number appear. So all would be on the constitutional chopping block under Consumers' Research's reasoning.

Consumers' Research is conflicted about how to approach that problem, but sometimes tries to draw a line between taxes and fees. Our decision in *National Cable Television Assn., Inc.* v. *United States*, 415 U. S. 336 (1974) (*NCTA*), recognized that distinction, as Consumers' Research notes. See Brief for Respondents 28. We there described "fees" as "bestow[ing]" a reciprocal "benefit on the [payor], not shared by other members of society." *NCTA*, 415 U. S., at

---

does just that: It asserts that a delegation involving the taxing power "must supply more significant limits on an agency's discretion" than one involving other Government powers. *Ibid.* And so the dissent collides with both *J. W. Hampton* and *Skinner*.

341. By contrast, "taxes" are expected to "inure[] to the benefit" of the wider public. *Id.*, at 343. In its brief, Consumers' Research argues that its numeric-cap standard applies to both taxes and fees: As to either, Congress's delegation to an agency must include an "objective upper limit[]." Brief for Respondents 37; see *id.*, at 36–38. At argument, however, Consumers' Research relied on the tax vs. fee distinction to get out from under the long list of statutes its position places in jeopardy. Most of those statutes, it argued, involve not taxes but fees, where the charge reflects simply "the value of the benefit to the" payor. Tr. of Oral Arg. 134; see *id.*, at 148. So, Consumers' Research suggested, if we label carrier contributions "taxes" and then make only taxes subject to the numeric-limit requirement, there would be minimal fallout from adopting its position. See *ibid.* The dissent joins Consumers' Research in pressing that argument. See *post*, at 25–30.

But the problems with going down that road are substantial. First and as already shown, precedent forecloses it. Indeed, in rejecting a stricter test for delegations made "under Congress' taxing power," *Skinner* specifically noted that its position rendered irrelevant the question (which, we noted, "so exercised the District Court") whether the charges there were "user fees" or a "form of taxation." 490 U. S., at 223. Either way, the Court held, the delegation inquiry was just the same, and just the usual one. See *ibid.*[4]

---

[4] The dissent once again does not know what to do with *Skinner*. See *supra*, at 13–14, n. 3. According to the dissent, *Skinner* "did not invite courts" to "disregard the basic distinction" between fees and taxes in considering the permissibility of delegations. *Post*, at 28. But we do not know what else the *Skinner* Court did when it said the following: "In light of th[e] conclusion" that the usual nondelegation test applies to tax legislation, "we need not concern ourselves with the threshold question" whether the "pipeline safety users 'fees'" at issue "are more properly thought of as a form of taxation." 490 U. S., at 223. Fees or taxes—it just did not matter. And that was so, contra the dissent, irrespective of

Opinion of the Court

Second, Consumers' Research offers no argument for *why* categorizing something as a fee rather than a tax should matter for delegation purposes. To the contrary, its brief suggests the difference should make no difference—that instead all revenue-raising measures should be treated the same. Brief for Respondents 36–38; Tr. of Oral Arg. 132–133 (repeating the point). The distinction is proposed only as an artificial method for limiting the effects of a holding in Consumers' Research's favor, should the court be too squeamish to go all the way.

And third, the distinction between taxes and fees, even if occasionally needed, is a morass—or as the Government (which levies both) puts it, "unbelievably murky in practice." Tr. of Oral Arg. 52. A charge is a "fee," according to *NCTA*, when it is for a "benefit" granted to the payor that is "not shared by other members of society." 415 U. S., at 341. But articulating that test is a fair bit easier than applying it, because it is often hard to say whether a benefit is so "shared." Consider the charge that banks pay to obtain FDIC Deposit Insurance. See *supra*, at 14. The banks benefit from that insurance (it helps them attract money and prevents bank runs). So maybe the charge looks like a fee? But then again, depositors also benefit (because the insurance protects their money) and so does the wider public (because everyone gains from having a stable banking system). So maybe the charge instead looks like a tax? Or take another example: the OCC's assessments on banks. See *ibid.* Are they fees because a bank must pay them to hold an OCC-issued charter? Or are they taxes because the OCC uses the funds collected for regulatory programs benefiting the public? Consumers' Research does not know. See Tr. of Oral Arg. 134 (describing the OCC statute as "kind of on the

---

whether the charge at issue was numeric—a feature that *Skinner*'s treatment of the purported fee/tax distinction never thought to mention.

JA53

line," "tough," and "maybe . . . questionable").[5]

Or finally and most relevantly: What category do carriers' contributions belong in? Universal service is of course a public benefit. But carriers gain in tangible ways from having an all-inclusive network, and they often receive direct subsidies from the FCC's universal-service programs. For those reasons, the carriers' main trade associations view the contributions as fees. See Tr. of Oral Arg. 76, 80. The Government, by contrast, sees "genuine ambiguity" on the issue, but "assum[es]" they are taxes. *Id.*, at 52–53. It is a good thing for the state of the law that we do not have to decide between the two, in this case or others raising a delegation challenge.[6]

---

[5] The dissent responds by replacing the test from *NCTA*—our leading case on the subject—with a different one, which asks as well whether a charge is for a cost imposed by the payor. *Post*, at 29. That alternative test, the dissent promises, reveals that all the financial charges we have discussed are fees, whereas universal-service contributions are taxes. But even spotting the dissent its preferred test, the guaranteed clarity fails to emerge. Take the dissent's description of the OCC's assessments: They are fees because they "offset the costs the OCC incurs in fulfilling its statutory mandate to supervise, regulate, and charter national banks." *Post*, at 27, n. 14. Yet much the same can be said of universal-service contributions: They pay for the costs of the programs the FCC is mandated by statute to implement. Or similarly, consider the dissent's description of Federal Reserve levies: They are fees because they pay for "regulatory costs," rather than providing general Government revenues. *Ibid.* But again, that is also what carriers' contributions do, in funding the costs of universal-service regulatory programs. So the dissent's new test does not much clear away the mire.

[6] The dissent's case for characterizing contributions as taxes only underscores the difficulty. Carriers, the dissent first says, "do not gain any special benefit" from the contributions they make. *Post*, at 29. But as just noted, that would be news to the carriers: Although they pay the bill, they are lined up here to defend universal service, because (in their lawyer's words) they "benefit[] quite considerably" from the program. Tr. of Oral Arg. 76. So next the dissent tries this one: The statutory scheme creates a tax because it "takes money from some (carriers) and gives it to others (libraries, schools, and the like)." *Post*, at 29–30. But again, carriers both give and receive; the program, as it has from its beginnings,

Opinion of the Court

And yet a greater problem inheres in the shared position of Consumers' Research and the dissent: Whatever it applies to (just taxes or fees as well), its focus on numeric limits produces absurd results, divorced from any reasonable understanding of constitutional values. Under that view, a revenue-raising statute containing non-numeric, qualitative standards can never pass muster, no matter how much guidance those standards provide and how tight the constraints they impose. But a revenue-raising statute with a numeric limit will always pass muster, even if it effectively leaves an agency with boundless power. Consider a hypothetical raised at oral argument: Congress tells the FCC it can demand payments from carriers of any amount it wants up to $5 trillion. (The actual cost of universal service is, of course, a tiny fraction of that amount.) According to Consumers' Research, that statute is permissible because . . . well, because Congress has set the $5 trillion figure. See *id.*, at 124 ("[T]hen we would know that Congress itself has made that determination"); see *id.*, at 123–127; Brief for Respondents 5, 63, 66; see also *post*, at 34–35. But so what? The purpose of the nondelegation doctrine is to enforce limits on the "degree of policy judgment that can be left to those executing or applying the law." *Mistretta* v. *United States*, 488 U. S. 361, 416 (1989) (Scalia, J., dissenting). The any-where-up-to-$5-trillion tax statute would not do that, whereas a statute with qualitative limits well might. In ap-

_____

reallocates money among them. See *supra*, at 3–4. And even putting that fact aside, the dissent's test would turn some things it labels fees into taxes. Consider FDIC insurance charges: They are funds the FDIC takes from some (banks) and gives to others (depositors of failed banks). See *post*, at 26, 29, 30, n. 17. The dissent asserts in response that the FDIC's redistribution is different because "[t]he FDIC program is an insurance plan." *Post*, at 30, n. 17. But in proposing yet one more distinction to get everything lined up right, the dissent unwittingly proves the point: The fee/tax distinction is a difficult one, and *Skinner* was right not to make the nondelegation inquiry ride on it.

Case: 25-60535    Document: 89    Page: 61    Date Filed: 04/03/2026

Opinion of the Court

proving the former and precluding the latter, the Consumers' Research approach does nothing to vindicate the nondelegation doctrine or, more broadly, the separation of powers.

## B

We therefore return to the usual intelligible-principle test to decide whether the universal-service contribution scheme violates the Constitution's nondelegation rule. The question is, again, whether Section 254 adequately guides the FCC in requiring contributions from carriers—whether it expresses the "general policy" the FCC must pursue in setting contribution amounts, as well as the "boundaries" it cannot cross. *American Power & Light*, 329 U. S., at 105. Here, that inquiry into the nature of the FCC's discretion involves what turn out to be two closely related questions. First, how much money can the FCC raise through contributions?  And second, on what things can it spend those funds?  We consider each in turn, and find that Congress answered both.  Congress, that is, imposed ascertainable and meaningful guideposts for the FCC to follow when carrying out its delegated function of collecting and spending contributions from carriers.

## 1

As Consumers' Research notes, Section 254 imposes no quantitative but only qualitative limits on how much money the FCC can raise from carriers for universal service.  There is not a number or a rate in sight.  Instead, the statute directs the FCC to collect the amount that is "sufficient" to support the universal-service programs Congress has told it to implement.  §§254(b)(5), (d), (e).  That language replicates or resembles the statutory terms Congress has used in other revenue-raising statutes, as described above.  See *supra*, at 14; see, *e.g.*, 12 U. S. C. §243 (instruct-

JA56

Opinion of the Court

ing the Federal Reserve Board to levy on banks "an assessment sufficient to pay its estimated expenses").

Consumers' Research argues that, even under our usual nondelegation test, the term "sufficient" does not do enough. That is because, in the Consumers' Research view, it sets only "a floor—not a ceiling—on the FCC's revenue-raising power." Brief for Respondents 56. Or to put the point differently, Consumers' Research thinks that the statute gives the FCC power, all on its own, to raise our hypothetical $5 trillion. See *supra*, at 18–19. And not unreasonably, it thinks that would pose a constitutional problem.

But in fact the word "sufficient" sets a floor and a ceiling alike. An amount of money is "sufficient" for a purpose if it is "[a]dequate" or "necessary" to achieve that purpose. Black's Law Dictionary 1447 (7th ed. 1999). That means, of course, that the FCC cannot raise *less* than is adequate or necessary to finance the universal-service programs Congress wants. But it also means that the FCC cannot raise *more* than that amount. Were the FCC to raise, say, twice as much as needed, the revenue would not be "sufficient" but instead excessive. Cf. *Whitman*, 531 U. S., at 475–476 (similarly understanding the term "requisite" to mean "not lower or higher than is necessary"). Take another hypothetical from oral argument. If you told a friend to order a "sufficient" amount of food for five people and 500 boxes of pizza showed up at your house, you would not think he had followed instructions. See Tr. of Oral Arg. 135. So too with Congress and the Commission. Budgeting, to be sure, is not an exact science, so in one quarter the Commission may collect a bit more than it needs and in another a bit less. See 47 CFR §§54.709(b), (c) (telling the Administrator that if it collects "excess" or "inadequate" funds in a given quarter, it should compensate in the next one). But the Commission's mandate is to raise what it takes to pay for universal-service programs; if the Commission raises much beyond, as if it raises much below, it violates the statute.

JA57

And the Commission has long viewed the statute in just that way. For many years, the Commission has construed the sufficient-funding directive to call for raising "an affordable and sustainable amount of support that is adequate, but no greater than necessary, to achieve the goals of the universal service program." *In re High-Cost Universal Serv. Support*, 25 FCC Rcd. 4072, 4074 (2010); see Tr. of Oral Arg. 4 (Solicitor General explaining that Congress has authorized the FCC to collect "only what's sufficient to achieve universal service, so no more than needed to support specified programs"). The Commission, in other words, sets the contribution factor to raise just enough money—a "sufficient" amount—to implement universal service as Congress directed.

2

To say that much, though, takes us only halfway, because it raises the question: Sufficient for what? If Section 254's universal-service program is itself indeterminate—so that the FCC can turn it into anything the FCC wants—then the "sufficiency" ceiling will do no serious work. The FCC could operate—and collect contributions "sufficient" for—either the most barebones or the most extravagant program. But if Congress has given appropriate guidance about the nature and content of universal service, then that plus the "sufficiency" ceiling will defeat this challenge to the contribution system. For Congress will have provided intelligible principles to guide the FCC as it raises funds.

On this further, "for what" question, our nondelegation precedents provide context—showing what kinds of statutory schemes have passed, and what kinds have failed, the demand that Congress give adequate guidance. Those that have failed are fewer in number—in fact, only two—but offer object lessons about the amount of latitude Congress can confer. In one case, the statute empowered the President

to bar the transport of petroleum products while "establish[ing] no criterion" and "declar[ing] no policy" for whether, when, or how he should do so. *Panama Refining Co.* v. *Ryan*, 293 U. S. 388, 415 (1935). The statute in the second case was even worse. It authorized the President to approve "codes of fair competition" for "the government of trade and industry throughout the country," yet imposed "few restrictions" and "set[] up no standards" aside from a "statement of the general aims of rehabilitat[ing], correct[ing,] and expand[ing]" the economy. *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U. S. 495, 521–522, 541–542 (1935). The law thus gave the President "virtually unfettered" authority to govern the Nation's trades and industries. *Id.*, at 542.

At the same time, we have found intelligible principles in a host of statutes giving agencies significant discretion. So, for example, we upheld a provision enabling an agency to set air quality standards at levels "requisite to protect the public health." *Whitman*, 531 U. S., at 472. We sustained a delegation to an agency to ensure that corporate structures did not "unfairly or inequitably distribute voting power" among security holders. *American Power & Light*, 329 U. S., at 104. And we affirmed authorizations to regulate in the "public interest" and to set "just and reasonable" rates, because we thought the discretion given was not unbridled. See, *e.g.*, *National Broadcasting Co.* v. *United States*, 319 U. S. 190, 225–226 (1943); *FPC* v. *Hope Natural Gas Co.*, 320 U. S. 591, 600 (1944); see *supra*, at 3. Of course, our cases did not examine those statutory phrases in isolation but instead looked to the broader statutory contexts, which informed their interpretation and supplied the content necessary to satisfy the intelligible-principle test. See, *e.g.*, *National Broadcasting*, 319 U. S., at 226 ("It is a mistaken assumption" that the phrase "public interest" is "a mere general reference to public welfare without any standard to guide determinations"; rather, "[t]he purpose of

the Act, the requirements it imposes, and the context of the provision in question show the contrary"); see also *infra*, at 29.

Section 254, for its part, provides the FCC with determinate standards for operating the universal-service program. The statute makes clear whom the program is intended to serve: those in rural and other high-cost areas (with a special nod to rural hospitals), low-income consumers, and schools and libraries. See §§254(b)(3), (6), (h)(1); see *supra*, at 4–6. And in provisions defining universal service and stating the program's core "principles," the statute provides specific criteria for which services those statutory beneficiaries should receive. §§254(b), (c)(1). In deciding whether a service falls within the program's ambit, the FCC must consider whether the service has "been subscribed to by a substantial majority of residential customers." §254(c)(1)(B). If that objective criterion is not met, the FCC generally may not subsidize the service. So too, the service must be one that can be made available to all consumers in all regions at "reasonable[] and affordable rates"—so more a basic than a budget-busting good. §§254(b)(1), (3).[7] And still more, the service must be "essential to education, public health, or public safety"—a necessity, not a luxury, in order to live in the world. §254(c)(1)(A). The conditions, each alone and together, have bite, creating a bounded program. Section 254 instructs the Commission to provide to an identified set of recipients a defined sort of benefit— widely used, generally affordable, and essential telecommunications services.

That limited conception of universal service is rooted in its history—except that the new statute, as compared with

---

[7] Of course, if a subsidy were high enough, even a luxury service could be provided to the Act's beneficiaries at an "affordable" rate. But that would require setting contributions so high as to interfere with carriers' ability to provide other services, to other customers, affordably. The affordability principle precludes that result. See §§254(b)(1), (3).

the old, holds the FCC to more specific requirements. As earlier explained, the 1934 Act charged the FCC with pursuing universal service—that is, with making available to all Americans telecommunications services "at reasonable charges." §151. As then understood, that objective did not reach for the stars: Though quite important, it was also "relatively modest." Benjamin, Telecommunications Law and Policy §18.2, at 863. The idea was to "reduc[e] the costs of basic telephone service and, in that way, increas[e] national subscribership." *Ibid.* By the time of the 1996 amendments, though, new telecommunications technologies and services had emerged. And so Congress enabled the FCC, in carrying out universal-service programs, to do more. See *id.*, at 863–864; see, *e.g.*, §§254(b)(6), (h)(1). But still the statute's policy was a circumscribed one: to provide to all (especially, the rural and poor) the services that most already had, if those services were both necessary and affordable. The key difference between the original statute and the amended one is a matter of means, and on that score, the latter provides far greater congressional guidance. Under the 1934 Act, the FCC gave implicit (and often obscure) subsidies under its general (*i.e.*, "just and reasonable") rate-making authority. See *supra*, at 3; see also *post*, at 3 (explaining that in the pre-1996 regime, "[r]egulators manipulated rates" to fund universal service). Under the 1996 Act, the FCC gives explicit (and transparent) subsidies in accord with the detailed criteria described above. See *supra*, at 4, 23. So today, when the FCC carries out Congress's century-old commitment to universal service, the statutory policy is clear and the statutory boundaries specific.

The proof is in the pudding: Each of the four programs the FCC now operates under Section 254 reflects Congress's choices about universal service's scope and content. The Lifeline program, which began under the original Act, advances a basic commitment. Now codified, it helps make phone service affordable to all Americans by providing a

modest monthly subsidy. See §254(j); 47 CFR §§54.400–54.424; *supra*, at 4, 6. The High Cost program similarly implements a longstanding principle—to integrate rural communities into the Nation's communications network. See §151; §§54.302–54.322; *supra*, at 3–4, 6. And it does so now in accordance with the statutory directive to ensure that rural and other high-cost areas have access to roughly the same needed services, at the same affordable prices, as urban areas do. §254(b)(3). The Commission's other two programs, E-Rate and Rural Health, are of a piece. Specifically authorized in the amended Act, they underwrite services essential to education and healthcare, with a focus on underserved populations. §254(h)(1); §§54.500–54.523, 54.600–54.633; *supra*, at 6–7. Not one of those important but decidedly ordinary programs suggests an agency vested with unbridled discretion. Each provides communications services satisfying the Act's listed criteria to the Act's identified beneficiaries. And maybe surprisingly (given what we are used to when it comes to government programs), they have done so at roughly constant inflation-adjusted dollars. Compare USAC, 2000 Annual Report 5 (charging carriers $7.4 billion in 1999 when so adjusted), with USAC, 2024 Annual Report 18 (charging carriers $8.4 billion in 2024).[8] That is because in the amended Act, Congress made

---

[8] The dissent's more dramatic figures rely on using the wrong baseline year—1998 instead of 1999. According to the dissent: "In 1998, universal-service disbursements totaled about $2.29 billion" whereas in 2024 they were about $8.59 billion—"nearly double, adjusted for inflation." *Post*, at 9, 17. But that is because in 1998, some of the new statute's universal-service programs were just getting off the ground. The Rural Health program, for example, did not even begin accepting applications for funding until May of that year. USAC, 1999 Annual Report 6. The right benchmark instead comes from the next year, when the programs Congress authorized were up and running. Only after that point can the increase in costs provide information about whether Congress adequately guided the FCC's discretion—or instead allowed the FCC to run rampant—going forward.

Opinion of the Court

clear the parameters of the programs, and the FCC has operated within them.[9]

Consumers' Research and the dissent tell a different story—that the Act gives the FCC boundless authority—but the provisions they point to show nothing of the kind. They first pluck out a few words to argue that the criteria for subsidizing services, described above, are not "real limit[s]." Brief for Respondents 55; *supra*, at 23. On affordability, both contend that because Section 254(b) states that services "should"—rather than "shall"—be made available at "reasonable[] and affordable rates," there is in fact no such requirement. Brief for Respondents 47–48; see *post*, at 20–21. But that reading starts in the middle. The provision, starting from the start, says that the FCC "shall" base all universal-service policies on the principle (among others) that services "should be available" at "reasonable[] and affordable rates." §254(b)(1). The mandatory "shall" requires the FCC to follow the affordability principle—which means providing all services at "reasonable[] and affordable rates." And similarly as to whether a service is widely used and essential. Per Consumers' Research and the dissent, Section 254(c)(1) says only that the FCC must "consider" those criteria and thus establishes no more than a "weak[] procedural requirement." Brief for Respondents 54; see *post*, at 6–7, 19–22. But the list of criteria the FCC "shall" consider resides in the very "definition" of the "ser-

---

[9] Two provisions of Section 254 authorize the FCC to fund "advanced" and "additional" services. §§254(c)(3), (h)(2); see *post*, at 7, 17, 23–24. We have no occasion to address any nondelegation issues raised by Sections 254(c)(3) and (h)(2) in particular. Consumers' Research does not argue that Sections 254(c)(3) and (h)(2) are unconstitutional, and it does not advance any arguments that are specific to those provisions. Instead, it argues that the contribution scheme generally is unconstitutional, and that the contribution factor should be set to zero. The Fifth Circuit adopted that view as well, and to decide this case, we need say no more than that those conclusions are wrong.

Opinion of the Court

vices" it can subsidize. §254(c)(1). The statute, read sensibly, does not tell the FCC to muse on those criteria before developing its own. Rather, it tells the FCC to "consider," as to any given service, whether it satisfies the listed criteria (and therefore can be subsidized). And that is, indeed, how the Solicitor General, representing the FCC, understands the provision. See Tr. of Oral Arg. 10, 27–29, 177–178.

The dissent therefore fails in its related claim that the FCC can balance different universal-service criteria against each other—so, for example, fund a service because it is "essential to education" even though it has not been adopted "by a substantial majority" of customers. *Post*, at 6–7; see *post*, at 18–19; *supra*, at 23. Again, the Solicitor General has represented in this Court that each of the criteria has to be met. Tr. of Oral Arg. 10, 27–29, 177–178. In any event, and yet more important, we must "exercise [our] independent judgment in deciding" what power Congress has conferred. *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. 369, 412 (2024). And for all the reasons given above, we view the statutory criteria—which, contra the dissent, *post*, at 18, define universal service—as separately mandatory. See §254(c)(1); *supra*, at 23, 26–27. Of course, the Commission may still have to strike balances in addressing those criteria, along with the statute's other provisions. It may, for example, have to decide whether to make a service more affordable (by giving a larger subsidy) or instead extend it to a broader swathe of recipients. But that kind of discretion—balancing or no—does not raise a constitutional problem: A "degree of policy judgment," as we have explained, "can be left to those executing or applying the law." *Whitman*, 531 U. S., at 474–475.

We likewise see no constitutional issue in Section 254(c)(1)'s description of universal service as an "evolving level of telecommunications services that the Commission

JA64

Opinion of the Court

shall establish periodically" in light of "advances in telecommunications and information" services. According to Consumers' Research and the dissent, that language enables the FCC to "redefine universal service" over time as it and only it "sees fit." Brief for Respondents 8, 54; see *post*, at 18. But Congress's statement that universal service should "evolve" is itself a direction—and a near-inevitable one, given the reality of technological change. If universal service did not evolve—if Congress had defined it as, say, a landline in every home (or, as the dissent would have it, "touch-tone [phone] service," *post*, at 19)—the program would have long since become obsolete. The Act's embrace of evolution—the permission it gives the FCC to subsidize different services now than 30 years ago—ensures that the universal-service program will be of enduring utility. But that conferral of discretion does not strip the statute of standards and constraints. The Commission still may fund only essential, widely used, and affordable services, for the benefit of only designated recipients. See *supra*, at 23. So Congress has ensured that the Commission will continue to carry out the same objectives according to the same criteria and principles, even as it has allowed adaptation to a changing technological landscape.

Finally, we do not view as Consumers' Research does the provision in Section 254 enabling the FCC to articulate "[a]dditional principles," beyond the six listed, to guide its universal-service programs. §254(b)(7); see *supra*, at 6. Recall that the added principles are ones the FCC "determine[s] are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter." See *supra*, at 6. As Consumers' Research sees it, the FCC can, through devising those principles, "rewrite its own authority." Brief for Respondents 50 (capitalization altered); see *post*, at 18. But that is not so because, again, the added principles must be "consistent with" the rest of the statute. They cannot change any of the

statute's other principles, much less its conditions on what subsidies can go toward and who can receive them. The new principles can only operate, within those statutory parameters, to further channel the FCC's discretion. So they are a way to superimpose self-restraint on congressional restraint, which is hardly improper. And the provision's broadly framed reference to the "public interest" suggests nothing to the contrary. The public-interest requirement lies on top of the consistency requirement—connected with an "and," not an "or"—and anyway is complementary to it. For we have long held that "the words 'public interest' in a regulatory statute" do not encompass "the general public welfare" but rather "take meaning from the purposes of the regulatory legislation." *NAACP* v. *FPC*, 425 U. S. 662, 669 (1976); see *New York Central Securities Corp.* v. *United States*, 287 U. S. 12, 24–25 (1932); see *supra*, at 22–23. So the whole of the "[a]dditional principles" provision supplies a means of further implementing, rather than dispensing with, Congress's instructions.

In a sense, each of the arguments Consumers' Research and the dissent make about Section 254 suffers from the same flaw. At every turn, they read Section 254 extravagantly, the better to create a constitutional problem. As earlier seen, "sufficient" means to Consumers' Research as much as the FCC wants, a floor without a ceiling. See *supra*, at 20. The statute's mandatory conditions on funding services are instead mere suggestions, for the FCC to observe or not as it chooses. See *supra*, at 26–27. The phrase "evolving level" of service licenses the FCC to create a whole new program, unhindered by the statute's existing standards and boundaries. See *supra*, at 27–28. And the possibility of "[a]dditional principles" coming from the FCC somehow subverts the limiting principles Congress put on the FCC, so that everything about universal service is up for grabs. See *supra*, at 28–29. All in all, the arguments do not show statutory construction at its best. Nor, relatedly,

Opinion of the Court

do they show proper respect for a coordinate branch of Government. Statutes (including regulatory statutes) should be read, if possible, to comport with the Constitution, not to contradict it. See, *e.g.*, *Ashwander* v. *TVA*, 297 U. S. 288, 348 (1936) (Brandeis, J., concurring); *Industrial Union Dept., AFL–CIO* v. *American Petroleum Institute*, 448 U. S. 607, 646 (1980) (plurality opinion); *West Virginia* v. *EPA*, 597 U. S. 697, 722–723 (2022). That disposition nowhere appears in the efforts Consumers' Research and the dissent make to force Section 254 past the Constitution's breaking point.

Properly understood, the universal-service contribution scheme clears the nondelegation bar. The policy it expresses is clear and limiting. If, says the statute, a substantial majority of Americans has access to a communications service that is both affordable and essential to modern life, then other Americans should have access to that service too. And to make that happen, the statute continues, carriers should kick in the needed funds. At bottom, that is all the contribution scheme challenged here accomplishes. Through that statutory mechanism, the FCC raises sufficient funds (neither more nor less than needed) to bring to underserved Americans, mainly in rural and low-income communities, a bounded and commonplace set of communications services. The FCC no doubt exercises significant discretion in carrying out that charge. But it is discretion tethered to legislative judgments about the scope and content of the universal-service program. And so the main delegation at issue here, from Congress to the Commission, does not offend the Constitution.

III

The next question Consumers' Research raises is whether a different delegation, now from the Commission to the Administrator (which, recall, is a private, not-for-profit corporation), independently flouts a constitutional command.

Here, Consumers' Research invokes what is commonly called the private nondelegation doctrine. See Brief for Respondents 74–75. In the leading case of *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 310–311 (1936), this Court struck down a statute authorizing certain coal producers to set maximum hours and minimum wages for the rest of the industry. We explained that the statute involved "delegation in its most obnoxious form" because it was made to "private persons whose interests" are often "adverse to the interests of others." *Id.*, at 311; see *Schechter Poultry*, 295 U. S., at 537. Consumers' Research contends that the FCC has in like manner conferred governmental power on a private party, by (in its description) giving the Administrator *carte blanche* to set the contribution factor, which then determines what individual carriers pay into the Fund. See Brief for Respondents 3–4, 75; *supra*, at 7–8.

*Carter Coal*, though, has a counterpart case, addressing how Government agencies may rely on advice and assistance from private actors. In *Sunshine Anthracite Coal Co.* v. *Adkins*, 310 U. S. 381, 388 (1940), this Court considered a statute, enacted in response to *Carter Coal*, permitting boards of coal companies to propose minimum coal prices to a Government agency for "approv[al], disapprov[al], or modifi[cation]." That arrangement, we held, was "unquestionably valid." 310 U. S., at 399. After all, we explained, the private boards "function[ed] subordinately to" the agency and were subject to its "authority and surveillance." *Ibid.* As long as an agency thus retains decision-making power, it may enlist private parties to give it recommendations.

Here, the Administrator is broadly subordinate to the Commission. The FCC appoints the Administrator's Board of Directors and approves its budget. See 47 CFR §§54.703(b)–(c), 54.715(c). The Administrator "may not make policy," and must carry out all its tasks "consistent with" the FCC's rules, "orders, written directives, and other instructions." §54.702(c); Memorandum of Understanding

Between the Federal Communications Commission and the Universal Service Administrative Company 2 (Oct. 17, 2024) (Memorandum of Understanding).  And anyone aggrieved by an action of the Administrator may seek *de novo* review by the Commission.  §§54.719–54.725.  So in the relationship between the two, the Commission dominates.

And critically, that is as true in determining the contribution factor as in other matters: Although the Administrator plays an advisory role, the Commission alone has decision-making authority.  Recall that each quarter's contribution factor is a function of the carriers' projected revenues and the Fund's projected expenses.  See *supra*, at 7.  The Administrator makes the initial projections.  On the revenue side, that means just doing arithmetic: The carriers submit their projections on FCC forms and the Administrator adds them up.  See §§54.709(a)(2)–(3), 54.711(a).  On the expense side, the Administrator's estimates involve considerably greater effort—but still no policy-making.  The FCC's rules implementing the Act dictate the programs' scope: For example, they set eligibility criteria for beneficiaries, provide formulas for calculating subsidies, and impose some funding caps.  See, *e.g.*, §§54.410, 54.507, 54.604– 54.606.[10]  Working within those rules, the Administrator estimates the programs' cost.  It then publicly reports those projections, along with supporting documents, to the Commission—on the revenue side, at least 30 days before a quarter starts, on the expense side, at least 60.  See §54.709(a)(3).  That gives the Commission a chance to review—and, if needed, to revise—the projections before approving final figures.  See *ibid.*  When the review process is complete, the Commission sets the contribution factor and

---

[10] If anything in the rules, or the Act itself, is "unclear, or do[es] not address a particular situation, the Administrator shall seek guidance from the Commission."  47 CFR §54.702(c).  So if the Administrator confronts an unsettled issue as it makes projections, it must ask the Commission rather than resolve the problem itself.

posts it in a public notice. See *ibid.* The Commission then has 14 days to make additional changes before the factor is "deemed approved." *Ibid.* So the Commission is, throughout, the final authority—just as the agency was in *Sunshine Anthracite.* The Administrator, following the FCC's rules, makes recommendations. But the Commission decides whether or how to use them in setting the contribution factor.

In contending otherwise, Consumers' Research misunderstands the regulatory scheme. Its primary argument rests on the words "deemed approved" in the FCC's regulations. Consumers' Research takes that to mean that the Administrator's projections can "take legal effect" just by the "deem[ing]" mechanism—that is, without receiving "formal FCC approval." Brief for Respondents 80. But that account ignores everything that happens before the 14-day period following public notice. Prior to that time, the Commission reviews the Administrator's projections, and either revises or approves them. Then, the Commission sets the contribution factor based on the vetted projections and issues it to the public. So the Administrator's projections can have only the legal (or, indeed, practical) effect the Commission decides they should. Not the Administrator, but the Commission endorses final projections, converts them into a contribution factor, and formally promulgates them. At the end of all that action, the "deemed approved" provision just operates to shut off an additional two-week opportunity the Commission has to revise the published contribution factor—because something (including public comments like Consumers' Research submitted) has caused it to change its mind. That provision does nothing to negate the Commission decision-making that has already taken place.

The alternative argument Consumers' Research makes does not fare any better. Here, Consumers' Research appears to concede that the FCC approves the projections going into the contribution factor; the problem instead is that

the approval is too often automatic—simply "rubber-stamp[ing]." *Id.*, at 82. But the relevant legal question is not how often the FCC revises the Administrator's projections, just as in *Sunshine Anthracite* it was not how often the agency rejected the coal companies' pricing advice. It is sufficient in such schemes that the private party's recommendations (as is true here) cannot go into effect without an agency's say-so, regardless of how freely given. See 310 U. S., at 399. This case suggests at least one reason why: It may not be clear what the ratio of approvals to rejections actually means. On the view of Consumers' Research, the infrequency with which the Commission changes the Administrator's publicly submitted projections shows that it simply is not paying attention. But an *amicus* brief submitted by former FCC Commissioners offers an alternative explanation—that the Administrator "informally shares its projections" with the Commission before it publicly submits them, so that much of the discussion between the two occurs behind the scenes. See Brief for Bipartisan Former Commissioners of the FCC as *Amici Curiae* 11; see also Memorandum of Understanding 7 (establishing that informal procedure). And yet a third account might suggest that the absence of frequent dispute reflects the limited role the Administrator performs in estimating the expenses of programs whose contours FCC regulations precisely define. See *supra*, at 32–33. The explanation, that is, would lie in the narrow scope of the assignment the FCC has given to the Administrator.

So the Commission's transfer of accounting functions to the Administrator offers no reason for holding the universal-service contribution scheme invalid. In every way that matters to the constitutional inquiry, the Commission, not the Administrator, is in control.

IV

Consumers' Research almost wholly ignores the basis of

the decision below: that the "*combination*" of Congress's grant of authority to the FCC and the FCC's reliance on the Administrator for financial projections violates the Constitution, even if neither one does so alone. See 109 F. 4th, at 778 (emphasis in original). But because that theory accounts for the decision we are reviewing, we cannot close without addressing it briefly.

The Fifth Circuit, as noted earlier, founded its combination theory—that a constitutional non-violation plus a constitutional non-violation may equal a constitutional violation—on this Court's decision in *Free Enterprise Fund*. See *supra*, at 9. There, we struck down a statute because it gave an executive officer two "layers of protection" from the President's removal authority: The President was "restricted in his ability to remove a principal officer, who [was] in turn restricted in his ability to remove an inferior officer." 561 U. S., at 483–484. Even granting that each layer of good-cause protection was alone permissible, we thought the combination was too much. The two together, more than either alone, insulated the officer from the President's firing power, thus super-charging the officer's "independence." *Id.*, at 496. That holding, in the Fifth Circuit's view, gave rise to a "general principle": "[T]wo constitutional parts do not necessarily add up to a constitutional whole." 109 F. 4th, at 779. And the court thought that principle applied here. Even if Congress lawfully conferred discretion on the Commission and the Commission lawfully sought assistance from the Administrator, the combination was both "unprecedented" and "incompatible" with "democratic accountability." *Id.*, at 779, 783–784. So what the Fifth Circuit called "the universal service contribution mechanism's double-layered delegation" had to go. *Id.*, at 784.

But the court's analogy and associated logic do not work. In *Free Enterprise Fund*, each of the two layers of for-cause protection limited the same thing—the President's power to

remove executive officers. And when combined, each compounded the other's effect, so that the President was left with no real authority. Or otherwise said, the two layers of restrictions operated on a single axis with the one exacerbating (we thought exponentially) the other. But that reasoning has no bearing here. A law violates the traditional (or call it, for comparison's sake, "public") nondelegation doctrine when it authorizes an agency to legislate. And a law—whether a statute or, as here, a regulation—violates the private nondelegation doctrine when it allows non-governmental entities to govern. Those doctrines do not operate on the same axis (save if it is defined impossibly broadly). So a measure implicating (but not violating) one does not compound a measure implicating (but not violating) the other, in a way that pushes the combination over a constitutional line. "Two wrong claims do not make one that is right." *Pacific Bell Telephone Co.* v. *linkLine Communications, Inc.*, 555 U. S. 438, 457 (2009). If a regulatory scheme authorizes neither executive legislation nor private governance, it does not somehow authorize an unlawful amalgam. Contra the Fifth Circuit, a meritless public nondelegation challenge plus a meritless private nondelegation challenge cannot equal a meritorious "combination" claim.

And indeed *Sunshine Anthracite* as well as said so before. As earlier noted, that case involved a private nondelegation challenge—that a board of coal companies advising an agency played too great a role in setting industry prices. See 310 U. S., at 399; *supra*, at 31. In addition, the case involved a public nondelegation challenge—that even the agency could not set prices because Congress had failed to provide it with sufficient guidance. See 310 U. S., at 397–399. The Court discussed and rejected the one challenge; and then it discussed and rejected the other. See *ibid.* And then the Court stopped. It did not think some further "combination" analysis was required. That was because (1) an executive agency exercising only executive power, plus (2) a

private entity exercising no government power (but merely giving advice) equals (3) a permissible constitutional arrangement.

### V

When Congress amended the Communications Act in 1996, it provided the Commission with clear guidance on how to promote universal service using carrier contributions. Congress laid out the "general policy" to be achieved, the "principle[s]" and standards the FCC must use in pursuing that policy, and the "boundaries" the FCC may not cross. *J. W. Hampton*, 276 U. S., at 409; *American Power & Light*, 329 U. S., at 105. Our precedents do not require more. Nor do they prevent the Commission, in carrying out Congress's policy, from obtaining the Administrator's assistance in projecting revenues and expenses, so that carriers pay the needed amount. For nearly three decades, the work of Congress and the Commission in establishing universal-service programs has led to a more fully connected country. And it has done so while leaving fully intact the separation of powers integral to our Constitution.

We accordingly reverse the judgment of the Court of Appeals for the Fifth Circuit and remand for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

---

Nos. 24–354 and 24–422

---

FEDERAL COMMUNICATIONS COMMISSION, ET AL.,
PETITIONERS
24–354                         *v.*
CONSUMERS' RESEARCH, ET AL.


SCHOOLS, HEALTH & LIBRARIES BROADBAND
COALITION, ET AL., PETITIONERS
24–422                         *v.*
CONSUMERS' RESEARCH, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 27, 2025]

JUSTICE KAVANAUGH, concurring.

This case presents a narrow but important nondelegation question:   May Congress authorize the Federal Communications Commission to determine the monetary amount "sufficient" to fund certain telecommunications services, which in turn is the amount that telecommunications carriers must contribute to the Universal Service Fund?   Applying the longstanding "intelligible principle" test set forth by this Court's precedents, the Court today upholds that congressional delegation to the FCC.   See *Skinner* v. *Mid-America Pipeline Co.*, 490 U. S. 212 (1989); *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394 (1928).

I join the Court's opinion and write separately to make two points.   First, I will briefly outline what I understand to be the background and rationale behind the intelligible principle test that the Court has long used to assess

JA75

KAVANAUGH, J., concurring

congressional delegations of authority to the Executive Branch. Second, I will explain why congressional delegations to *independent* agencies—as distinct from delegations to the President and *executive* agencies—raise substantial questions under Article II of the Constitution.

## I
### A

From the start in 1789, Congress has delegated to the President the power to exercise discretion and policymaking authority when implementing legislation.[1] Those delegations have been a regular feature of American Government ever since.[2]

---

[1] In this opinion, I will refer to congressional delegations *to the President*, although statutes sometimes delegate to executive officers or agencies rather than to the President. Those delegations to executive officers and agencies, in my view, are not analytically distinct for present purposes from delegations to the President because the President controls, supervises, and directs those executive officers and agencies. See *Myers* v. *United States*, 272 U. S. 52, 163–164 (1926). Delegations to executive officers and agencies are thus *de facto* delegations to the President.

[2] Delegations of various kinds began almost immediately after the new Congress first convened in 1789—although, to be sure, the Federal Government did not regulate private conduct in as many areas or as extensively as it does today. See, *e.g.*, Act of Sept. 29, 1789, ch. 24, 1 Stat. 95 (directing the payment of military pensions to wounded Revolutionary War soldiers "under such regulations as the President of the United States may direct"); Act of Apr. 10, 1790, ch. 7, §1, 1 Stat. 109–110 (authorizing the Secretary of State, Secretary of War, and Attorney General to issue patents "if they shall deem the invention or discovery sufficiently useful and important"); Act of July 22, 1790, ch. 33, §1, 1 Stat. 137 (authorizing executive officials to issue licenses "to carry on any trade or intercourse with the Indian tribes . . . to any proper person," and stipulating that the officials and licensees "shall be governed in all things touching the said trade and intercourse, by such rules and regulations as the President shall prescribe"); Act of Feb. 20, 1792, §3, 1 Stat. 234 (granting the Postmaster General discretion to choose among post roads and means of carrying mail); Act of June 4, 1794, ch. 41, §1,

The Court has generally permitted such delegations. As to the text of the Constitution, the Court has rejected arguments that the President impermissibly wields legislative power when exercising discretion or policymaking authority delegated by Congress. Instead, the Court has reasoned that the President ordinarily exercises "executive Power" under Article II when implementing legislation—even if he employs discretion or policymaking authority when doing so and even if the Executive Branch issues legally binding regulations. See, *e.g.*, *Mistretta* v. *United States*, 488 U. S. 361, 386, n. 14 (1989) ("[R]ulemaking power originates in the Legislative Branch and becomes an executive function only when delegated by the Legislature to the Executive Branch"); see also *Loving* v. *United States*, 517 U. S. 748, 777 (1996) (Scalia, J., concurring in part and concurring in judgment) ("What Congress does is to *assign responsibilities* to the Executive; and when the Executive undertakes those assigned responsibilities it acts, not as the 'delegate' of Congress, but as the agent of the People"); J. Manning, The Nondelegation Doctrine as a Canon of Avoidance, 2000 S. Ct. Rev. 223, 240, n. 90 ("The Court apparently believes that when a statute sets down an intelligible principle, the agency can be thought of as implementing legislative directions, rather than exercising legislative authority. . . . Under that view, the agency is engaged in law 'execution,'

---

1 Stat. 372 (granting the President authority to lay embargoes "whenever, in his opinion, the public safety shall so require," and "under such regulations as the circumstances of the case may require"); Act of May 27, 1796, ch. 31, 1 Stat. 474 (authorizing the President to direct officers "to aid in the execution of quarantine . . . in such manner as may to him appear necessary"); Act of July 9, 1798, §22, 1 Stat. 589 (empowering federal tax commissioners to change property tax assessments "as shall appear to be just and equitable").

KAVANAUGH, J., concurring

rather than receiving delegated legislative authority").[3]

The history of congressional delegations and the Court's understanding of Article II's text correspond to what the Court has described as the practicalities of legislative and executive action. Congress delegates at least in part because it must adapt legislation to "complex conditions involving a host of details with which the national legislature cannot deal directly." *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U. S. 495, 530 (1935); *Panama Refining Co.* v. *Ryan*, 293 U. S. 388, 421 (1935). And the Constitution "has never been regarded as denying to Congress the necessary resources of flexibility and practicality." *Schechter Poultry*, 295 U. S., at 530; *Panama Refining*, 293 U. S., at 421. That flexibility enables Congress "to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply." *Schechter Poultry*, 295 U. S., at 530; *Panama Refining*, 293 U. S., at 421. Even when the legislature might want to legislate more specifically in certain circumstances, a "certain degree of discretion, and thus of lawmaking, inheres in most executive . . . action." *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 475 (2001) (quotation marks omitted).

_____

[3] In *INS* v. *Chadha*, the Court similarly explained the point: The "Attorney General acts in his presumptively Art. II capacity when he administers the Immigration and Nationality Act. Executive action under legislatively delegated authority that might resemble 'legislative' action in some respects is not subject to the approval of both Houses of Congress and the President for the reason that the Constitution does not so require. That kind of *Executive action* is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review as well as the power of Congress to modify or revoke the authority entirely." 462 U. S. 919, 953–954, n. 16 (1983) (emphasis added).

JA78

KAVANAUGH, J., concurring

Although the Court has ruled that congressional delegations to the President are permissible as a matter of constitutional text and history, the Court has not said that "anything goes" with respect to those delegations. As JUSTICE GORSUCH rightly says, Congress may not give "the President or an executive agency a blank check to legislate." *Post*, at 12 (dissenting opinion). So "Members of Congress could not, even if they wished, vote all power to the President and adjourn *sine die*." *Mistretta*, 488 U. S., at 415 (Scalia, J., dissenting). Congress likewise cannot merely assign the President to take over the legislative role as to a particular subject matter. See *Schechter Poultry*, 295 U. S., at 537–542; *Panama Refining*, 293 U. S., at 430. Rather, the Court has said, any congressional grant of authority must supply some guidance to the President—otherwise the President would no longer be exercising "executive Power" when implementing legislation.

But the question of where to draw that line can be difficult: At what point does a broad statutory delegation transform from (i) a permissible grant of discretion or policymaking authority for the President to exercise when implementing legislation into (ii) an impermissible delegation of legislative power? Justice Scalia phrased the issue this way: "Once it is conceded, as it must be, that no statute can be entirely precise, and that some judgments, even some judgments involving policy considerations, must be left to the officers executing the law . . . , the debate over unconstitutional delegation becomes a debate not over a point of principle but over a question of degree." *Mistretta*, 488 U. S., at 415 (dissenting opinion).

To address that question of degree and ensure that the President is exercising executive power when implementing legislation, the Court in 1928 adopted the "intelligible principle" test. In its unanimous opinion in *J. W. Hampton, Jr., & Co.* v. *United States*, the Court speaking through Chief Justice (and former President) Taft

stated: "If Congress shall lay down by legislative act an *intelligible principle* to which the person or body authorized to [act] is directed to conform, such legislative action is not a forbidden delegation of legislative power." 276 U. S. 394, 409 (1928) (emphasis added). Rather, when implementing legislation that contains an intelligible principle, the President is exercising executive power. The inverse is also true: When Congress grants authority to the President *without* an intelligible principle to confine his action, Congress has impermissibly delegated legislative power, although the Court has found that to occur only "rarely." *Mistretta*, 488 U. S., at 419 (Scalia, J., dissenting).

The intelligible principle test recognizes that "[a]t some point the responsibilities assigned can become so extensive and so unconstrained that Congress has in effect delegated its legislative power." *Loving*, 517 U. S., at 777 (Scalia, J., concurring in part and concurring in judgment). But "until that point of excess is reached there exists . . . no delegation" of legislative power "at all." *Ibid.*

For 97 years, the intelligible principle test set forth in *J. W. Hampton* has formed the foundation of the Court's nondelegation doctrine. Under the test, as then-Justice Rehnquist succinctly framed it, Congress may "lay down the general policy and standards that animate the law, leaving the agency to refine those standards, 'fill in the blanks,' or apply the standards to particular cases." *Industrial Union Dept., AFL–CIO* v. *American Petroleum Institute*, 448 U. S. 607, 675 (1980) (opinion concurring in judgment).

To be clear, the intelligible principle test is not toothless. But it does operate in a way that respects the President's Article II authority to execute the laws—that is, to exercise discretion and policymaking authority within the limits set by Congress and without undue judicial interference. See, *e.g.*, *Whitman*, 531 U. S., at 472–476; *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 635 (1952) (Jackson, J.,

KAVANAUGH, J., concurring

concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate"). Notably, the intelligible principle test was accepted and applied over the years by Justice Scalia, Chief Justice Rehnquist, and Chief Justice Taft—three jurists who, based on their Executive Branch experience and judicial philosophies, deeply appreciated the risks of undue judicial interference with the operations of the Presidency. See *Whitman*, 531 U. S., at 472–476 (Scalia, J., joined by Rehnquist, C. J., among others); *Mistretta*, 488 U. S., at 371–379 (majority opinion joined by Rehnquist, C. J.); *id.*, at 415–416 (Scalia, J., dissenting); *Industrial Union*, 448 U. S., at 673–676, 685–686 (Rehnquist, J., concurring in judgment); *J. W. Hampton*, 276 U. S., at 409 (Taft, C. J.); cf. W. Kelley, Justice Scalia, the Nondelegation Doctrine, and Constitutional Argument, 92 Notre Dame L. Rev. 2107 (2017). The intelligible principle test has had staying power—perhaps because of the difficulty of agreeing on a workable and constitutionally principled alternative, or because it has been thought that a stricter test could diminish the President's longstanding Article II authority to implement legislation.[4]

In any event, there of course can be difficult questions about how to apply the intelligible principle test to particular statutes. See *Industrial Union*, 448 U. S., at 646 (plurality opinion of Stevens, J.); *id.*, at 685–686

---

[4] Presidents of varying policy views and political affiliations have accepted or advocated in favor of the intelligible principle test. See, *e.g.*, Reply Brief for United States 3–6 (Trump); Brief for United States 19–38 (Biden); Brief for United States in *Gundy* v. *United States*, O. T. 2018, No. 17–6086, pp. 14–22 (Trump); Brief for United States in *Whitman* v. *American Trucking Assns., Inc.*, O. T. 2000, No. 99–1257 etc., pp. 21–26 (Clinton); Brief for United States in *Mistretta* v. *United States*, O. T. 1988, No. 87–7028 etc., pp. 20–25 (Reagan).

KAVANAUGH, J., concurring

(Rehnquist, J., concurring in judgment). But I agree with how the Court has applied the test in this case.

B

I see no need in this case to try to spell out a definitive guide for applying the intelligible principle test, and it would probably not be possible to do so anyway. It is important, however, to emphasize three points.

*First*, as both the Court and JUSTICE GORSUCH agree, under the intelligible principle test, "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman*, 531 U. S., at 475; see *ante*, at 11; *post*, at 12 (dissenting opinion). Congressional delegations of authority to the President "must be judged 'according to common sense and the inherent necessities of the governmental co-ordination.'" *Industrial Union*, 448 U. S., at 675 (Rehnquist, J., concurring in judgment) (quoting *J. W. Hampton*, 276 U. S., at 406).

*Second*, many of the broader structural concerns about expansive delegations have been substantially mitigated by this Court's recent case law in related areas—in particular (i) the Court's rejection of so-called *Chevron* deference and (ii) the Court's application of the major questions canon of statutory interpretation. Cf. *Paul* v. *United States*, 589 U. S. ___ (2019) (statement of KAVANAUGH, J., respecting denial of certiorari).

To elaborate: Although the nondelegation doctrine's intelligible principle test has historically not packed much punch in constricting Congress's authority to delegate, the President generally must act within the confines set by Congress when he implements legislation. So the President's actions when implementing legislation *are* constrained—namely, by the scope of Congress's authorization and by any restrictions set forth in that statutory text. See *Loper Bright Enterprises* v. *Raimondo*,

603 U. S. 369, 394–396, 404 (2024).

On top of that, when interpreting a statute and determining the limits of the statutory text, courts presume that Congress, in the domestic sphere, has not delegated authority to the President to issue major rules—that is, rules of great political and economic significance—unless Congress clearly says as much. See *West Virginia* v. *EPA*, 597 U. S. 697, 721–724 (2022). Courts "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.*, at 723 (quotation marks omitted). That major questions canon reflects both background separation of powers understandings and the commonsense interpretive maxim that Congress does not usually "hide elephants in mouseholes" when granting authority to the President. *Whitman*, 531 U. S., at 468; see, *e.g.*, *Biden* v. *Nebraska*, 600 U. S. 477, 501–506 (2023); *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 159–160 (2000); *Industrial Union*, 448 U. S., at 645 (plurality opinion); *ICC* v. *Cincinnati, N. O. & T. P. R. Co.*, 167 U. S. 479, 494–495, 509 (1897).

*Third*, in the national security and foreign policy realms, the nondelegation doctrine (whatever its scope with respect to domestic legislation) appropriately has played an even more limited role in light of the President's constitutional responsibilities and independent Article II authority. See *Loving*, 517 U. S., at 772–773; *Youngstown*, 343 U. S., at 636, n. 2 (Jackson, J., concurring); *Zemel* v. *Rusk*, 381 U. S. 1, 17–18 (1965); *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 319–322 (1936); *Marshall Field & Co.* v. *Clark*, 143 U. S. 649, 691 (1892). In "the area of foreign affairs, Congress 'must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved.'" *Industrial Union*, 448 U. S., at 684 (Rehnquist, J., concurring in judgment) (quoting *Curtiss-Wright*, 299 U. S., at 320).

KAVANAUGH, J., concurring

In addition, the major questions canon has not been applied by this Court in the national security or foreign policy contexts, because the canon does not reflect ordinary congressional intent in those areas. On the contrary, the usual understanding is that Congress intends to give the President substantial authority and flexibility to protect America and the American people—and that Congress specifies limits on the President when it wants to restrict Presidential power in those national security and foreign policy domains. See *Youngstown*, 343 U. S., at 635–638 (Jackson, J., concurring); see also *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 519 (2004) (plurality opinion); *Dames & Moore* v. *Regan*, 453 U. S. 654, 678–679 (1981); *Zemel*, 381 U. S., at 8–9; *Al–Bihani* v. *Obama*, 619 F. 3d 1, 38–41, 48–52 (CADC 2010) (Kavanaugh, J., concurring in denial of rehearing en banc); C. Bradley & J. Goldsmith, Foreign Affairs, Nondelegation, and the Major Questions Doctrine, 172 U. Pa. L. Rev. 1743, 1789–1801 (2024). The canon does not translate to those contexts because of the nature of Presidential decisionmaking in response to ever-changing national security threats and diplomatic challenges. Moreover, in those areas, the President possesses at least some independent constitutional power to act even without congressional authorization—that is, in *Youngstown* category 2.[5]

## II

Congressional delegations to *independent* agencies, as distinct from delegations to the President and *executive* agencies, raise substantial Article II issues.

---

[5] The *Youngstown* category 2 situation is distinct from the far narrower set of circumstances where a President can lawfully act even over a congressional prohibition—that is, in *Youngstown* category 3. See *Hamdan* v. *Rumsfeld*, 548 U. S. 557, 638–639 (2006) (Kennedy, J., concurring in part); *Youngstown*, 343 U. S., at 637–638, 640–647 (Jackson, J., concurring).

KAVANAUGH, J., concurring

Critiques of broad congressional delegations sometimes focus on officials described as "unaccountable bureaucrats." But that label does not squarely fit delegations to *executive* agencies. In those circumstances, the President and his subordinate executive officials maintain control over the executive actions undertaken pursuant to a delegation. And the President is elected by and accountable to all the American people. See *Myers* v. *United States*, 272 U. S. 52, 123 (1926).

Rather, the problems with delegations to "unaccountable" officials primarily arise from delegations to *independent* agencies. Independent agencies are headed by officers who are not removable at will by the President and who thus operate largely independent of Presidential supervision and direction. Those independent agency heads are not elected by the people and are not accountable to the people for their policy decisions. Unlike executive agencies supervised and directed by the President, independent agencies sit uncomfortably at the outer periphery of the Executive Branch. Although this Court has thus far allowed such agencies in certain circumstances, they belong to what has been aptly labeled a "headless Fourth Branch." *Freytag* v. *Commissioner*, 501 U. S. 868, 921 (1991) (Scalia, J., concurring in part and concurring in judgment) (quotation marks omitted); see *Humphrey's Executor* v. *United States*, 295 U. S. 602, 628–629 (1935); see also *In re Aiken Cty.*, 645 F. 3d 428, 439–446 (CADC 2011) (Kavanaugh, J., concurring).

This case involves a congressional delegation of authority to the FCC. The FCC has commonly been viewed as an independent agency headed by five Commissioners. But at oral argument in this case, the Government correctly pointed out that the FCC formally is not an independent agency because "the FCC does not have statutory for-cause removal protections"—in other words, no statutory text restricts the President's authority to remove FCC

KAVANAUGH, J., concurring

Commissioners at will. Tr. of Oral Arg. 54. And as the Government indicated, this Court's usual practice, given the text and structure of Article II, is not to infer for-cause removal protections from statutory silence. See *Kennedy* v. *Braidwood Management, Inc.*, 606 U. S. ___, ___ –___ (2025) (slip op., at 19–20); *Shurtleff* v. *United States*, 189 U. S. 311, 314–315 (1903). For those reasons, I tend to agree with the Government that the FCC, in light of the statutory text, should not be considered an independent agency.

If the FCC were an independent agency, however, then a serious Article II delegation problem would arise, in my view. When Congress delegates authority to the President or an executive agency, the exercise of that delegated authority is controlled by the President who was elected by and is accountable to the people. See *Myers*, 272 U. S., at 123, 163–164. But when Congress delegates authority to an independent agency, no democratically elected official is accountable. Whom do the people blame and hold responsible for a bad decision or policy adopted by an independent agency? Such a system of disembodied independent agencies with enormous power over the American people and American economy operates in substantial tension with the principle of democratic accountability incorporated into the Constitution's text and structure, as well as historical practice and foundational Article II precedents. "The Constitution requires that a President chosen by the entire Nation oversee the execution of the laws." *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 499 (2010); see *Myers*, 272 U. S., at 163–164; see also *Morrison* v. *Olson*, 487 U. S. 654, 724–727 (1988) (Scalia, J., dissenting).

There are at least two possible solutions to the problem caused by congressional delegations of authority to independent agencies. One is to overrule (or significantly narrow) *Humphrey's Executor* so that the heads of all or most independent agencies are removable at will by the

JA86

President, and thus supervised and directed by the President. A second option would be to apply a more stringent version of the nondelegation doctrine to delegations to independent agencies. For example, to take one possibility, independent agencies might need to first submit proposed rules to Congress for approval in the legislative process before the rules can take effect.

I will not prolong the point here. Congressional delegations of policymaking authority to independent agencies raise significant Article II issues. In an appropriate case, this Court should address that problem.

\*  \*  \*

As the Court explains, Congress has delegated authority to the FCC with respect to the Universal Service Fund in accordance with the longstanding intelligible principle test. If the FCC were an independent agency, however, the question would be more difficult. Because that issue is not presented in this case, I join the Court's opinion in full.

JACKSON, J., concurring

# SUPREME COURT OF THE UNITED STATES

———

Nos. 24–354 and 24–422

———

FEDERAL COMMUNICATIONS COMMISSION, ET AL.,
PETITIONERS
24–354          *v.*
CONSUMERS' RESEARCH, ET AL.


SCHOOLS, HEALTH & LIBRARIES BROADBAND
COALITION, ET AL., PETITIONERS
24–422          *v.*
CONSUMERS' RESEARCH, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 27, 2025]

JUSTICE JACKSON, concurring.

Respondents in this case have challenged the Federal Communications Commission's universal-service program under both the traditional nondelegation doctrine and the private nondelegation doctrine. The Court properly rejects both challenges today, and I join the Court's opinion in full. I write separately to express my skepticism that the private nondelegation doctrine—which purports to bar the Government from delegating authority to private actors—is a viable and independent doctrine in the first place. Nothing in the text of the Constitution appears to support a *per se* rule barring private delegations. And recent scholarship highlights a similar lack of support for the doctrine in our history and precedents. See, *e.g.*, A. Volokh, The Myth of the Federal Private Nondelegation Doctrine, 99 Notre Dame L. Rev. 203 (2023).

JA88

JACKSON, J., concurring

In today's case, none of the parties addressed these concerns, and the Court had no reason to consider them *sua sponte* because respondents' private nondelegation claim failed on its own terms. But we should tread carefully before entertaining challenges under this theory in the future. "When the Constitution's text does not provide a limit to a coordinate branch's power, we should not lightly assume that Article III implicitly directs the Judiciary to find one." *Consumer Financial Protection Bureau* v. *Community Financial Services Assn. of America, Ltd.*, 601 U. S. 416, 446 (2024) (JACKSON, J., concurring).

JA89

GORSUCH, J., dissenting

# SUPREME COURT OF THE UNITED STATES

---

Nos. 24–354 and 24–422

---

FEDERAL COMMUNICATIONS COMMISSION, ET AL.,
PETITIONERS
24–354          *v.*
CONSUMERS' RESEARCH, ET AL.

SCHOOLS, HEALTH & LIBRARIES BROADBAND
COALITION, ET AL., PETITIONERS
24–422          *v.*
CONSUMERS' RESEARCH, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 27, 2025]

JUSTICE GORSUCH, with whom JUSTICE THOMAS and JUSTICE ALITO join, dissenting.

Within the federal government, Congress "alone has access to the pockets of the people." The Federalist No. 48, p. 334 (J. Cooke ed. 1961) (J. Madison). The Constitution affords only our elected representatives the power to decide which taxes the government can collect and at what rates. See Art. I, §8, cl. 1. Throughout the Nation's history, Congress has almost invariably respected this assignment. As this Court observed some decades ago, it would represent "a sharp break with our traditions" for Congress to abdicate its responsibilities and "besto[w] on a federal agency the taxing power." *National Cable Television Assn., Inc.* v. *United States*, 415 U. S. 336, 341 (1974).

Today, the Court departs from these time-honored rules. When it comes to "universal service" taxes, the Court concludes, an executive agency may decide for itself what rates

GORSUCH, J., dissenting

to apply and how much to collect. In upholding that arrangement, the Court defies the Constitution's command that Congress "may not transfer to another branch 'powers which are strictly and exclusively legislative.'" *Gundy* v. *United States*, 588 U. S. 128, 135 (2019) (plurality opinion) (quoting *Wayman* v. *Southard*, 10 Wheat. 1, 42–43 (1825)).

Still, things could be worse. Because today's misadventure "sits unmoored from surrounding law," I have reason to hope its approach will not stand the test of time. *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. 369, 425 (2024) (GORSUCH, J., concurring) (internal quotation marks omitted). And even as the Court swallows a delegation beyond anything yet seen in the U. S. Reports, it also signals, unmistakably, that there are some abdications of congressional authority, including in the very statute before us, that the present majority isn't prepared to stomach.

I

If you look closely at your phone bill, you will likely notice a charge for "universal service." Perhaps you have wondered what that is and why you are paying for it. As it turns out, in 47 U. S. C. §254, Congress has authorized the Federal Communications Commission (FCC) to subsidize a number of disparate programs under the umbrella of "universal service." The FCC selects which programs to pursue and how much they should cost. To fund them, the agency taxes telecommunications companies at a rate it controls. By regulation, those companies are then free to pass the charges along to consumers like you. This case involves a challenge to that scheme. To appreciate the questions it poses for us, some background helps.

A

The phrase "universal service" has carried different meanings at different times. Originally, it referred to "a telephone network that covers all of a country." M. Mueller,

JA91

Universal Service: Competition, Interconnection, and Monopoly in the Making of the American Telephone System 1 (1997). And it meant one network in particular: the Bell System owned by the American Telephone and Telegraph Company (AT&T). AT&T's president coined the slogan in 1907—"One System, One Policy, Universal Service"—to boost Bell's nascent monopoly. *Id.*, at 4, 96. "Universal," as AT&T used it, focused less on telephone service for all than on making sure AT&T provided all the service. And the slogan proved apt: By the 1920s, the Bell System, fighting "under the banner of universal service," had conquered the U. S. telephone market. *Id.*, at 146.

Over time, "the term 'universal service' took on a new meaning." P. Huber, M. Kellogg, & J. Thorne, Federal Telecommunications Law §6.1.1.2 (3d ed. Supp. 2022) (Huber). For much of the 20th century, it referred to a policy aimed at making landline local phone service "available to all consumers at a reasonable cost." *Ibid.* Even so, AT&T's monopoly remained at the heart of it all. As with other monopolistic public utilities, federal and state governments regulated the rates the Bell System could charge. See *Verizon Communications Inc.* v. *FCC*, 535 U. S. 467, 477 (2002). And, for decades, that was the key to universal service: Regulators manipulated rates to expand Americans' access to telephones. See Huber §6.1.1.2. So, for example, "[l]ong-distance rates were used to subsidize local rates, business rates to subsidize residential rates, and urban rates to subsidize rural rates." *Ibid.*

That system of implicit subsidies worked as long as the same family of companies served all telephone customers. See *Verizon Communications*, 535 U. S., at 480–481. But the scheme began to falter in the 1970s and 1980s, as new long-distance carriers entered the picture, and an antitrust consent decree spun off AT&T's long-distance business into a separate company, with newly independent "Baby Bells" now providing local service. See *NYNEX Corp.* v. *Discon,*

*Inc.*, 525 U. S. 128, 130–131 (1998); *Bell Atlantic Corp.* v. *Twombly*, 550 U. S. 544, 549 (2007). At that point, regulators could no longer depend on the Bell System to subsidize local rates by inflating long-distance rates. See Huber §6.2.1.2.

Still, parts of the old universal-service regime hung on. Because the Baby Bells continued to enjoy regional monopolies over local phone service, regulators could still rely on them to provide some implicit subsidies, charging higher rates to some customers while offering below-cost service to others. See *id.*, §6.2.1. The FCC pitched in, too, by requiring long-distance carriers to subsidize local providers, and by establishing a "Lifeline" program to help low-income households afford local phone service. See *Rural Telephone Coalition* v. *FCC*, 838 F. 2d 1307, 1311–1312 (CADC 1988); Huber §6.2.2.3; *ante*, at 4.

Eventually, however, Congress decided that universal service had to be "ripped apart and rebuilt afresh." Huber §2.10. In the Telecommunications Act of 1996, 110 Stat. 56, Congress "fundamentally restructure[d]" the local telephone market. *AT&T Corp.* v. *Iowa Utilities Bd.*, 525 U. S. 366, 371 (1999). No more, Congress declared, should the Baby Bells enjoy regional monopolies over local phone service; now, they must face competition, too. See *ibid.* To achieve that objective, Congress required the Baby Bells to share their networks with new entrants seeking to offer landline local phone services. See *Twombly*, 550 U. S., at 549.[1] But Congress also recognized that its new approach

---

[1] That solution may seem quaint today, when three quarters of American adults live in households without a landline telephone. See S. Blumberg & J. Luke, National Center for Health Statistics, Wireless Substitution 2 (June 2024). But in 1996, things looked different. Local phone service depended on a network of copper wires connecting each home and business. See Huber §1.2.2. That network seemed impossible to duplicate, and for decades, "local phone service was thought to be a natural monopoly." *AT&T Corp.* v. *Iowa Utilities Bd.*, 525 U. S. 366, 371 (1999).

GORSUCH, J., dissenting

would deal "a fatal blow" to "the preexisting system of universal service," for there would no longer be monopolies whose rates regulators could adjust to subsidize some customers at the expense of others. R. Krotoszynski, Reconsidering the Nondelegation Doctrine: Universal Service, the Power To Tax, and the Ratification Doctrine, 80 Ind. L. J. 239, 282 (2005).

So Congress had to reimagine "universal service" again. In §254 of the Telecommunications Act, Congress used the term "universal service" for the first time and invested it with a new meaning. See Huber §6.3. Gone was Bell's old idea that universal service meant a single network of wires covering the country. Gone, too, was the idea that the Bell monopoly should subsidize basic telephone service by inflating other customers' rates. Repurposing the slogan of universal service once more, Congress told the FCC to decide for itself what the concept meant and to fund programs consistent with its understanding. See §254(c)(1). And to pay for those programs, Congress authorized the agency to tax a broad base of interstate "telecommunications carrier[s]" and "provider[s]." §254(d).

## B

### 1

To understand how the scheme works, start with the programs the FCC may fund. Section 254 describes "universal service" as "an evolving level of telecommunications services" that the agency must both "preserve" and "advance." §§254(b)(5), (c)(1). To determine which specific services to fund and at what level, §254(c)(1) directs the FCC to "consider" four factors. Those factors look to "the extent to which" a service (A) is "essential to education, public health,

--------

Congress responded by requiring the Baby Bells to share their infrastructure with new rivals. See Huber §1.11.2. As it turned out, of course, cell phones soon became ubiquitous, and that web of copper became less relevant. See *id.*, §10.1.

GORSUCH, J., dissenting

or public safety," (B) has "been subscribed to by a substantial majority of residential customers," (C) is "being deployed . . . by telecommunications carriers," and (D) is "consistent with the public interest, convenience, and necessity." §§254(c)(1)(A)–(D).

On top of those four factors, the statute supplies six further "principles" in §254(b). So, for instance, the agency must "base" its funding decisions on the principles that "[q]uality services should be available at just, reasonable, and affordable rates," §254(b)(1), and that "[a]ccess to advanced telecommunications and information services should be provided in all regions of the Nation," §254(b)(2). In addition, the FCC may adopt other new "principles" that it "determine[s]" to be "necessary and appropriate." §254(b)(7). To date, the FCC has exercised that authority twice. One new principle requires "competitive neutrality" among providers and technologies,[2] and the other encourages "support for advanced services" including "broadband networks."[3]

From this mash of four factors and six (now eight) principles, the FCC must discern which programs it wishes to fund and to what degree. And it falls to the FCC to "'balance'" these "factors" and "'principles'" "'against one another when they conflict.'" Reply Brief for Federal Petitioners 11–12 (quoting *Qwest Corp.* v. *FCC*, 258 F. 3d 1191, 1200 (CA10 2001)). So, for instance, if the FCC finds that

––––––––––

[2] "COMPETITIVE NEUTRALITY—Universal service support mechanisms and rules should be competitively neutral. In this context, competitive neutrality means that universal service support mechanisms and rules neither unfairly advantage nor disadvantage one provider over another, and neither unfairly favor nor disfavor one technology over another." *In re Federal-State Joint Bd. on Universal Serv.*, 12 FCC Rcd. 8776, 8801 (1997).

[3] *In re Connect America Fund*, 26 FCC Rcd. 17663, 17679 (2011); see also *ibid.* ("'Support for Advanced Services—Universal service support should be directed where possible to networks that provide advanced services, as well as voice services'").

GORSUCH, J., dissenting

a particular service is "essential to education," §254(c)(1)(A), but not "subscribed to by a substantial majority of residential customers," §254(c)(1)(B), the agency must pick which part of the statute prevails. As the FCC has long put it: "[A]ll four criteria enumerated in section 254(c)(1) must be considered, but not each necessarily met." *In re Federal-State Joint Bd. on Universal Serv.*, 12 FCC Rcd. 8776, 8809 (1997).

Still, that is not quite the end of it. At least when it comes to schools, libraries, and healthcare providers, two additional provisions—§254(c)(3) and §254(h)(2)—permit the agency to pay for "advanced" and "additional" services that go "above the baseline of what's been considered universal service." Tr. of Oral Arg. 42, 47. Consistent with these provisions, the FCC has funded programs without regard to whether they satisfy the four factors outlined in §254(c)(1). See 12 FCC Rcd., at 9008–9011.

Over time, the services the agency has funded have evolved considerably. So, for example, in 1996 the FCC debated whether to subsidize "touch-tone service," not just old rotary phones. 61 Fed. Reg. 10503 (1996). (The answer: Yes. 12 FCC Rcd., at 8809.) By 2011, the FCC "comprehensively reform[ed] and modernize[d]" its universal-service goals to include expanding access to internet services nationwide. *In re Connect America Fund*, 26 FCC Rcd. 17663, 17667 (2011). More recently, the agency has announced that the Universal Service Fund will help put Wi-Fi on school buses. *In re Modernizing the E-Rate Program for Schools and Libraries*, FCC No. 23–84 (2023) (declaratory ruling).

2

Once the FCC decides which programs to support, it must figure out how to pay for them. On that score, §254(d) offers this instruction: "Every telecommunications carrier that

GORSUCH, J., dissenting

provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service." §254(d); see §254(b)(4). In addition to those "mandatory" contributions from common carriers, the statute also grants the FCC "permissive" authority to compel contributions from "[a]ny other provider of interstate telecommunications," including noncommon carriers, "if the public interest so requires." §254(d); 12 FCC Rcd., at 9178. Essentially, the agency must figure out whom to tax and how much.

Taking up the question whom to tax, the agency has said that every telecommunications carrier must "contribute" a share of its revenue from interstate and international telecommunications services (think long-distance calls). 47 CFR §54.706 (2024). But over time, the FCC has also expanded the roster of companies who must contribute, so that it now includes providers of prepaid calling cards and internet-based calling. See 71 Fed. Reg. 38781, 43667 (2006). Currently, the FCC does not tax carriers' broadband revenues (think internet). But some have suggested that, too, should change. See *In re Report on the Future of the Universal Serv. Fund*, 37 FCC Rcd. 10041, 10088–10094 (2022).

After deciding whom to tax, the agency must determine how much to collect from each carrier. For that, the FCC relies on the Universal Service Administrative Company, a Delaware not-for-profit corporation. Congress has not expressly authorized the FCC to outsource its responsibilities under §254. But in 1997, the FCC directed an association of carriers to create the Administrative Company, and the agency has assumed the task of defining that company's structure and role. See Brief for Federal Petitioners 4; 47 CFR §§54.703, 54.705; *ante*, at 7–8. Among other things, FCC regulations ensure that a supermajority of the Admin-

GORSUCH, J., dissenting

istrative Company's board consists of directors who represent industry insiders (like carriers) and groups that benefit financially from universal-service programs (like libraries and schools). §54.703(b)(1).

How does the Administrative Company help calculate the tax each carrier must pay? Each quarter, the company estimates the upcoming expenses of the FCC's universal-service programs. §54.709(a)(3). Once the FCC approves that figure, the company next estimates carriers' total revenues from interstate telecommunications, based on their self-reported figures. This is known as the "contribution base." *Ibid.* Finally, the FCC calculates the ratio of projected expenses to the contribution base, which yields the "contribution factor," or the percentage of its revenue each carrier must pay. §54.709(a)(2); *ante*, at 7.

As the scope of the FCC's programs has expanded, so have the taxes the agency collects to fund them. In 1998, universal-service disbursements totaled about $2.29 billion. Universal Service Administrative Co., 1999 Annual Report 2. In 2024, that figure swelled to about $8.59 billion—nearly double, adjusted for inflation. Universal Service Administrative Co., 2024 Annual Report 4. To pay for that increase, the "contribution factor" (or tax rate) has risen, too. In 1998, carriers paid less than 4% of their revenue from interstate and international telecommunications. 63 Fed. Reg. 35931 (1998). Today, that figure is nearly 37%. FCC, Public Notice, DA 25–223 (Mar. 13, 2025).[4]

_____

[4] The skyrocketing contribution factor is attributable in part—but only in part—to a shrinking contribution base. To fund its programs, remember, the FCC presently taxes revenue from interstate and international telecommunications, such as long-distance calling. Over time, carrier revenue from phone service has shrunk. As a result, tax rates must rise just to keep receipts constant. But this is only a partial explanation for the rising contribution factor. As we have seen, FCC receipts have done far more than keep constant. Seeking to downplay the growth of the FCC's programs, the Court fiddles with the figures. It suggests that we

GORSUCH, J., dissenting

One might wonder why the Administrative Company, dominated as it is by industry insiders, has allowed universal-service contributions to grow so dramatically. FCC regulations supply at least a partial explanation: "Federal universal service contribution costs may be recovered . . . through a line item on a customer's bill." 47 CFR §54.712(a). So, in the end, it is consumers who pay for the agency's universal-service programs.

## II
### A

In 2022, a carrier, a non-profit group, and several consumers (collectively, respondents) challenged the present universal-service scheme. Under the Constitution, they observed, Congress must set the federal government's tax policies. And, they argued, §254 offends that rule because it allows the FCC and the Administrative Company to decide how much tax to collect and at what rate. The Fifth Circuit largely agreed with respondents' submissions. See 109 F. 4th 743 (2024) (en banc). The FCC, an association of carriers, and others (collectively, petitioners) then sought our review.

As the dispute comes to us, it presents three questions. First, did Congress violate the Constitution by delegating to the FCC the power to tax? Second, did the FCC violate the Constitution by subdelegating some of its authority to the private Administrative Company? And third, even if

---

should treat 1999, rather than 1998, as the baseline, "because in 1998, some of the new statute's universal-service programs were just getting off the ground." *Ante*, at 25, and n. 8. But I would have thought that's the point. To assess whether the FCC's program contains anything resembling a "cap" on total tax collections, as the Court maintains, surely it helps to understand exactly how much the agency has grown that program in the years since Congress acted. See *ante*, at 21–26. Really, using 1998 as the baseline spots the FCC a good bit of ramp-up time, too: After all, Congress enacted the Telecommunications Act in 1996.

neither of those features independently offends the Constitution, does their combination? As I see it, this case begins and ends with the first question. Section 254 impermissibly delegates Congress's taxing power to the FCC, and knowing that is enough to know the Fifth Circuit's judgment should be affirmed.[5]

Even when it comes to that first question, there is much we need not address. Elsewhere, I have urged the Court to reconsider its approach to assessing legislative delegations in light of the Constitution's original meaning and historic practice. See *Gundy*, 588 U. S., at 149 (dissenting opinion). But respondents tell us we need not do so here. Instead, they argue, §254's delegation of authority to the FCC cannot survive even the most forgiving standard this Court has devised for analyzing delegations: The modern version of the "intelligible principle" test. See Brief for Respondents 65–66. So I will focus on that test, how it applies here, and why §254 fails it.[6]

---

[5] When granting certiorari, we also asked the parties to address whether this dispute is moot. I agree with the Court that it is not. See *ante*, at 10, n. 1.

[6] Before proceeding further, note some of the questions this case does *not* present. First, while respondents argue that the FCC's subdelegation to the Administrative Company offends the Constitution, they do not press a *statutory* argument that the FCC lacks authority under §254 to pass some of its responsibilities on to a private corporation. See 109 F. 4th 743, 774–777, and n. 21 (CA5 2024) (en banc). Second, the Administrative Company's directors overwhelmingly represent entities with a financial stake in expanding universal service: those who benefit from universal-service programs (like schools and hospitals) and those who get paid to supply the benefits (the carriers). See Part I–B–2, *supra*. Some *amici* suggest that seemingly conflicted arrangement may offend the Fifth Amendment's Due Process Clause. See, *e.g.*, Brief for Reason Foundation as *Amicus Curiae* 18–23. But neither the court of appeals nor respondents took up that argument. See 109 F. 4th, at 768, n. 14. Third, one might ask whether the Administrative Company's leaders qualify as officers of the United States and, if so, whether their role complies with the Appointments Clause, U. S. Const., Art. II, §2, cl. 2. See

GORSUCH, J., dissenting

The Court and I approach our task from common ground. As the Court acknowledges, the Constitution vests "[a]ll" federal legislative power in Congress. Art. I, §1; see *ante*, at 10. Necessarily, that assignment means "no other" branch of government may exercise legislative power. *Ante*, at 10. To enforce that rule, this Court has developed the "intelligible principle" test. *Ante*, at 11 (internal quotation marks omitted); cf. *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394 (1928). All agree, too, that the test must do *something* to stop Congress from giving the President or an executive agency a blank check to legislate. See *ibid.*

On top of all that, the Court and I agree that the intelligible principle test is not one size fits all. *Ante*, at 11. Instead, "contex[t]" matters. *Ante*, at 22. Among other things, that means that the "'degree of agency discretion that is acceptable'" depends on "'the scope of the power congressionally conferred.'" *Ante*, at 11 (quoting *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 475 (2001)). So, for instance, Congress might permissibly give an agency wide leeway in designing a tax stamp. See *In re Kollock*, 165 U. S. 526, 537 (1897). But Congress must give far more detailed instructions if it wants an agency to regulate an entire industry. See *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U. S. 495, 541–542 (1935).

B

From that common ground, however, my path and the Court's begin to diverge. I would start by examining the nature of the power Congress assigned to the FCC. Under §254, the FCC may compel carriers to "contribute" money to support what everyone agrees is a government program. See *Wisconsin Bell, Inc.* v. *United States ex rel. Heath*, 604 U. S. ___, ___ (2025) (slip op., at 2). That is a quintessential

––––––––––

Brief for Reason Foundation as *Amicus Curiae* 13–18. But, again, neither the court of appeals nor the parties addressed those questions.

tax—a "compulsory contribution to the support of government." 17 Oxford English Dictionary 677 (2d ed. 1989) (defining "tax"). Several FCC commissioners, including at least two FCC chairmen, have seen it the same way, referring to universal-service "contributions" as "taxes."[7] So have academics and other informed commentators.[8] Before us, as well, the FCC has said that it is "willing" to have this Court treat universal-service contributions "as a tax." Tr. of Oral Arg. 53. Really, if this compulsory contribution is not a tax, "[w]hat else would you call it?" *Bondi* v. *VanDerStok*, 604 U. S. ___, ___ (2025) (slip op., at 19).

Taxation ranks among the government's greatest powers. Indeed, it is arguably the federal government's "most important . . . authorit[y]." The Federalist No. 33, p. 205 (A. Hamilton). As this Court has put it, the "power to tax is the one great power upon which the whole national fabric is based." *Nicol* v. *Ames*, 173 U. S. 509, 515 (1899); see also *McCulloch* v. *Maryland*, 4 Wheat. 316, 431 (1819) ("[T]he power to tax involves the power to destroy"). Reflecting as much, the Constitution provides that all legislation "for raising Revenue" must "originate in the House of Representatives," the only popularly elected chamber at the time of the Constitution's adoption. Art. I, §7, cl. 1; see Amdt.

---

[7] See, *e.g.*, B. Carr, Ending Big Tech's Free Ride, Newsweek, May 24, 2021, https://www.newsweek.com/ending-big-techs-free-ride-opinion-1593696; *In re Lifeline and Link Up Reform and Modernization*, 31 FCC Rcd. 3962, 4165 (2016) (Comm'r Pai, dissenting); *In re Federal-State Joint Bd. on Universal Serv.*, 13 FCC Rcd. 14915, 14980 (1998) (Comm'r Furchtgott-Roth, dissenting).

[8] See, *e.g.*, S. Benjamin, B. Richman, & J. Speta, Internet and Telecommunications Regulation 225–226 (2d ed. 2023); T. Narechania & E. Stallman, Internet Federalism, 34 Harv. J. L. & Tech. 547, 612 (2021); W. Rogerson, New Economic Perspectives on Telecommunications Regulation, 67 U. Chi. L. Rev. 1489, 1502–1503 (2000); G. Gekas & J. Harper, Annual Regulation of Business Focus: Regulation of Electronic Commerce, 51 Admin. L. Rev. 769, 782 (1999).

GORSUCH, J., dissenting

17. As the framers saw it, "the Chamber that is more accountable to the people should have the primary role in raising revenue." *United States* v. *Munoz-Flores*, 495 U. S. 385, 395 (1990).

That context matters. To survive the intelligible principle test, a delegation involving such a significant power must supply more significant limits on an agency's discretion than when Congress confers some lesser authority. That is not to say some "different and stricter" test applies when Congress delegates the power to tax. See *Skinner* v. *Mid-America Pipeline Co.*, 490 U. S. 212, 222–223 (1989). It is instead to recognize that what qualifies as an intelligible principle depends on "context" and "the nature of the particular constitutional powers" at issue. *Lichter* v. *United States*, 334 U. S. 742, 778 (1948).

What exactly does the intelligible principle test require in this context? Surely, history must count for something. And it supplies at least one clear standard. As far as I can tell, and as far as petitioners have informed us, this Court has never approved legislation allowing an executive agency to tax domestically unless Congress itself has prescribed the tax rate. See, *e.g.*, *Michigan Central R. Co.* v. *Powers*, 201 U. S. 245, 297 (1906) (suggesting that "a direct legislative determination of the rate" avoids "abdication of the legislative function"); 1 T. Cooley & C. Nichols, Law of Taxation 194 (4th ed. 1924) (Cooley & Nichols) ("The nondelegable powers . . . include . . . the fixing of the rate of taxation"); J. Hines & K. Logue, Delegating Tax, 114 Mich. L. Rev. 235, 239 (2015) (Hines & Logue) ("[D]elegating some control over income tax rates . . . would be unprecedented in U. S. history"); cf. Tr. of Oral Arg. 39–40, 57, 78.[9]

---

[9] The first federal income tax statute, the Revenue Act of 1861, created a flat tax of 3% on income exceeding $800. 12 Stat. 309. The first income tax created after the Sixteenth Amendment's ratification provided for progressive rates ranging from 1% to 7%. 38 Stat. 166. Income tax rates have become more complicated over time, but Congress still sets them.

GORSUCH, J., dissenting

Applying that insight here poses petitioners with a serious problem. "[A]ll agree" that Congress has not set the rate at which the FCC may exact contributions. *Ante*, at 12. Instead, §254 delegates to the FCC the power to determine which services to fund and thus the amount of money to collect. See Part I–B–1, *supra*. To secure those funds, the agency uses the Administrative Company to set a "contribution factor"—*i.e.*, the percentage of its revenues a carrier must pay. See Part I–B–2, *supra*. That's a tax rate. And, remember, that rate has grown from less than 4% of carriers' applicable revenues in 1998 to nearly 37% today—all based on the agency's say-so and without any change to the statute. *Ibid.* Nothing in the U. S. Reports suggests that an executive agency may exercise that kind of power over taxation.

To be sure, petitioners identify an exception to the historic rule that only Congress may set tax rates. Sometimes, they point out, Congress has declined to supply a rate and instead opted to cap the total sum the Executive may collect. See Brief for Petitioner SHLB Coalition et al. 38–39; Brief for Respondents 33–36; Reply Brief for Federal Petitioners 6–7; see *Veazie Bank* v. *Fenno*, 8 Wall. 533, 542 (1869). But none of this solves petitioners' problem. For one thing, petitioners identify no example of a lump-sum delegation outside of direct taxes on property—a unique context where the Constitution's apportionment requirement makes it practically impossible for Congress to set taxes by rate.[10] For another, and even setting aside that

---

See, *e.g.*, 26 U. S. C. §1. The same pattern holds true for other kinds of taxes. In 1791, for instance, the first federal excise on distilled spirits set rates to the penny. 1 Stat. 202–203. So do excise taxes today. See, *e.g.*, §§4251(a)–(b) (imposing a 3% excise tax on local telephone service). In some cases, Congress has set the tax as a dollar amount rather than a percentage rate. See, *e.g.*, §4481(a) ($550 tax on the use of highway motor vehicles with a gross weight over 75,000 pounds).

[10] Congress must apportion direct taxes among the States according to population. Art. I, §2, cl. 3; §9, cl. 4. That requirement makes it difficult

GORSUCH, J., dissenting

difficulty, the lump-sum exception still would not save §254. As the Court acknowledges, the statute before us "contains no determinate cap." *Ante*, at 12. Instead, the FCC gets to decide for itself how much to collect—and, over time, has exercised that authority to double that amount. See Part I–B, *supra*.

### III

Having failed to identify a single example where this Court has approved a tax delegation like this one, petitioners and the Court propose a workaround. Yes, they concede, §254 "imposes no quantitative . . . limits on how much money the FCC can raise." *Ante*, at 19. But, they contend, Congress has provided guidance that amounts to a "qualitative" cap. *Ibid.*; see, *e.g.*, Brief for Federal Petitioners 29–30. To support that claim, petitioners and the Court emphasize that §254(d) requires the FCC to collect taxes "sufficient . . . to preserve and advance universal service." The word "sufficient," they submit, "imposes an obligation" on the FCC "to ensure that the [Universal Service] Fund is large enough, but not too large, to achieve the statutory

------

to set uniform tax rates across the Nation, since a State's share of the national population rarely corresponds to its share of wealth. See *Moore* v. *United States*, 602 U. S. 572, 582 (2024). But that challenge does not extend to "indirect" taxes, such as the tax before us, which need not be apportioned. See *id.*, at 582–583. And because the Uniformity Clause, Art. I, §8, cl. 1, requires indirect taxes to apply "at the same rate" across the country, *United States* v. *Ptasynski*, 462 U. S. 74, 84 (1983), it is not clear that Congress could simply cap receipts from an indirect tax, without also providing guidance to ensure it applies equally everywhere. That uniformity requirement might explain why petitioners have identified no historical example, outside the direct tax arena, where Congress declined to set a tax rate. Note, too, that even when Congress has employed a lump-sum approach, it has usually supplied significant guidance in addition to the cap. See N. Parrillo, A Critical Assessment of the Originalist Case Against Administrative Regulatory Power, 130 Yale L. J. 1288, 1324, 1449–1455 (2021).

GORSUCH, J., dissenting

goals" Congress supplied. Brief for Petitioner SHLB Coalition et al. 23. And, they continue, Congress has laid out those goals in a "detailed" way that "cabin[s] the FCC's exercise of delegated authority." *Id.*, at i.

Even taken on its own terms, I find that response unpersuasive. For argument's sake, assume that, instead of fixing the rate at which the FCC can tax, Congress may permissibly impose a numerical limit on receipts. Assume, too, that "qualitative" instructions may sometimes provide guidance functionally equivalent to a numerical limit. Even then, §254's "qualitative" instructions hardly measure up. Really, the numbers speak for themselves. Recall that in 1998, the FCC disbursed about $2.29 billion. Part I–B–2, *supra.* A quarter century later, that figure hit about $8.59 billion. *Ibid.* Even adjusting those figures for inflation, the FCC has nearly doubled the amount of tax it collects. *Ibid.* Far from supplying "qualitative" directions akin to a numerical cap, §254 supplies little more than a blank check.

Truth be told, the Court does not find its own response entirely persuasive, either. It upholds the ability of the FCC to tax and spend for universal-service programs under §254(c)(1). See *ante*, at 21–26. But, recall, §§254(c)(3) and (h)(2) also allow the FCC to support "advanced" and "additional" services without regard to §254(c)(1)'s factors. See Part I–B–1, *supra.* And in a remarkable footnote, the Court scruples to say those two provisions sufficiently constrain the agency's taxing power. See *ante*, at 26, n. 9. All the Court is willing to defend, in other words, is whatever level of taxation suffices to support universal service as defined under §254(c)(1), and no more. Consider each of these moves in turn.

A

Start with the parts of §254 the Court does defend—the

GORSUCH, J., dissenting

programs the FCC supports pursuant to §254(c)(1). Together with §254(d), that provision merely tells the FCC to tax carriers in an amount "sufficient" to "preserve and advance universal service." To my eyes, it's hard to see how that direction might be fairly analogized to a numerical cap. The statute, remember, does not say what "universal service" is, and the phrase bears no established meaning. To be sure, I have a good sense of what "universal service" meant when the Bell System used it to protect its monopoly. See Part I–A, *supra*. I have an idea, too, of what the phrase came to mean later, as a shorthand for the practice of regulating rates so most Americans could afford basic phone service. See *ibid*. But, as we have seen, the 1996 Act "ripped apart" the old notion of universal service. Huber §2.10. Going forward, Congress declared, the meaning of universal service would "evolv[e]." §254(c)(1). In what directions? Congress left that for the FCC to work out.

Of course, the statute proceeds to offer *some* direction to the agency about what qualifies as "universal service," and thus how much it can tax and spend. But, even viewed charitably, that guidance can hardly be described as the functional equivalent of a numerical cap. Just recall what the statute actually says. It instructs the FCC to discern the "evolving" meaning of "universal service" from the primordial soup of four factors found in §254(c)(1), as supplemented by six principles discussed in §§254(b)(1)–(6), as well as whatever further principles (two and counting) the agency chooses to devise under §254(b)(7). See Part I–B–1, *supra*. Many of these factors and principles address competing goods, and any effort to weigh them all can yield no more certainty than asking "'whether a particular line is longer than a particular rock is heavy.'" *National Pork Producers Council* v. *Ross*, 598 U. S. 356, 381 (2023) (plurality opinion). Recognizing as much, the FCC acknowledges that it falls to the agency to decide how best to proceed (and therefore how much to tax) when the statute's abundance

JA107

GORSUCH, J., dissenting

of factors and principles "conflict." Brief for Federal Petitioners 31 (internal quotation marks omitted). In no way can this "preface of generalities as to permissible aims" be fairly compared to a firm cap. *Schechter Poultry*, 295 U. S., at 537.

Experience proves the point. In 1996, recall, the hot debate was whether to subsidize "touch-tone service." 61 Fed. Reg. 10503. But in 2011, the FCC steered the Universal Service Fund away from simply making basic telephone service available and toward expanding access to "broadband, both fixed and mobile." 26 FCC Rcd., at 17670. By 2019, the FCC's Connect America Fund was spending nearly $5 billion annually on high-speed internet services for "rural or remote areas that are costly to serve." GAO, A. Von Ah, Telecommunications, FCC Should Enhance Performance Goals and Measures for Its Program To Support Broadband Service in High-Cost Areas 1 (GAO–21–24, Oct. 2020). And why stop there? Nothing, it seems, would prevent the FCC from choosing to tax and spend to provide a mobile satellite internet device (like Starlink) to everyone who owns a business, home, or hunting cabin in rural America. Cf. *In re Application for Review of Starlink Servs., LLC*, 38 FCC Rcd. 12201, 12205–12206 (2023) (revoking a previous $885 million award to Starlink).

Searching for some way (any way) to support the notion that §254(c)(1) contains a "qualitative" cap on how much the FCC can tax and spend, the Court eventually resorts to rewriting the statute. Now, it says, the FCC can fund a service only if it meets *all* of subsection (c)(1)'s four factors. *Ante*, at 23, 27. So, the Court stresses, subsection (c)(1)(B) asks whether a particular service "has 'been subscribed to by a substantial majority of residential customers.'" *Ibid.* As a result, the Court reasons, the FCC cannot fund any service unless most Americans already have it. *Ibid.* Likewise, the Court asserts, §254(b)'s instruction that the FCC

GORSUCH, J., dissenting

"shall base" its funding decisions on the principles discussed there means that the FCC "must" satisfy *all* of those principles before funding any program. See *ante*, at 23, 26.

It's a nice theory. But it bears no resemblance to the law Congress adopted. By its terms, §254(c)(1) requires the FCC only to "consider the extent to which" each factor applies. The statute nowhere says each (or any) of those criteria "has to be met" before the agency can fund a particular service. *Ante*, at 27. In fact, the FCC has long and consistently understood the statute to mean the opposite: "[A]ll four criteria enumerated in section 254(c)(1) must be considered, *but not each necessarily met*." 12 FCC Rcd., at 8809 (emphasis added).[11]

The same goes for subsection (b). It says that the FCC "shall base" funding decisions on various "principles." But each of those principles is framed as a "should," not a "must." So, for example, subsection (b)(1) provides that the FCC "should" make "[q]uality services . . . . available at . . . affordable rates." And subsection (b)(2) says that the FCC "should" ensure "[a]ccess to advanced . . . services" is "provided in all regions of the Nation." In this context, "[t]he term 'should' indicates a recommended course of action, but does not itself imply the obligation associated with 'shall.'" *Qwest Corp.*, 258 F. 3d, at 1200. Reflecting that understanding, the FCC has long read §254(b) as requiring it to consult all of that provision's various principles, but not as "impos[ing] inflexible requirements" on universal-service programs. *Connect America Fund Phase II Auction*, 33 FCC

---

[11] That statement reflects the FCC's consistent reading of the statute over nearly two decades. See, *e.g.,* FCC, Public Notice, Rural Digital Opportunity Fund Phase I Auction, 35 FCC Rcd. 6077, 6121, and n. 278 (2020); *In re Uniendo a Puerto Rico Fund and Connect USVI Fund*, 34 FCC Rcd. 9109, 9184–9185, and n. 523 (2019); *In re Connect America Fund*, 32 FCC Rcd. 1624, 1631 (2017); *In re Requests for Waiver of Decisions*, 31 FCC Rcd. 7731, 7734, n. 22 (2016); *In re Federal-State Joint Bd. on Universal Serv.*, 18 FCC Rcd. 15090, 15091 (2003).

Rcd. 1428, 1468, n. 229 (2018). Instead, each provision supplies "'only a principle, not a statutory command,'" which the agency may "'ignore'" in service of other principles found in the statute. *Rural Digital Opportunity Fund Phase I Auction*, 35 FCC Rcd. 6077, 6119, n. 262 (2020) (quoting *Alenco Communications, Inc.* v. *FCC*, 201 F. 3d 608, 621 (CA5 2000)); see also *In re Lifeline & Link Up Reform & Modernization*, 27 FCC Rcd. 6656, 6759, n. 636 (2012); *Rural Cellular Assn.* v. *FCC*, 588 F. 3d 1095, 1103 (CADC 2009).[12]

In its zeal to save subsection (c)(1) programs (why else ignore what the statute actually says?), the Court throws all that aside and seizes the drafting pen. So the meaning of "universal service" evolves once more. Only now, it is the Court's creation through and through. And if that were not bad enough, the Court's late-night rewrite hardly helps its

---

[12] The Court suggests that, at oral argument, the government endorsed its novel reading of subsections (b) and (c). *Ante*, at 27. But what does that prove? Courts must exercise independent judgment when interpreting the law. *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. 369, 394 (2024). Traditionally, too, this Court has accorded special respect not to advocacy from the podium, but to a coordinate branch's "consistent" and "contemporaneous construction" of a law. See *id.*, at 386; *id.*, at 430 (GORSUCH, J., concurring). And here, the FCC's historic understanding of §254 is the only one the statute's language tolerates. Notably, too, the government's arguments before us ran both ways. See, *e.g.*, Reply Brief for Federal Petitioners 11 ("The word 'should' [in §254(b)] allows the FCC to balance the principles against one another when they conflict" (internal quotation marks omitted)); *id.*, at 12 ("The FCC [has] argued that it need not implement a particular principle in light of other valid statutory objectives. . . . That comports with the government's position here" (emphasis deleted; alteration and internal quotation marks omitted)). Nor can I discern any sensible reason why we should prefer one strand of the government's present (inconsistent) submissions over the FCC's longstanding (consistent) views that honor the statute's actual terms. "[W]hen the government (or any litigant) speaks out of both sides of its mouth, no one should be surprised if its latest utterance isn't the most convincing one." *Bittner* v. *United States*, 598 U. S. 85, 97–98, n. 5 (2023).

GORSUCH, J., dissenting

cause. Even as revised, the statute still falls well short of imposing anything like a numerical cap on how much the FCC can tax and spend. Suppose tomorrow the agency decides to ensure "every American [has] a cell phone and a cell phone plan." Tr. of Oral Arg. 62–63. Could anyone complain that "a substantial majority of residential customers" do not use cell phones? §254(c)(1)(B). I doubt it.

Not only does the Court's new statute fail to deliver on its only assignment, it promises to backfire, too. Rather than preserve the status quo, as the Court so clearly desires, its revisions threaten to render existing programs illegal—all while leaving the FCC (and program beneficiaries) guessing about the implications for future initiatives. Take an example. Back in 2017, the FCC launched a multibillion-dollar effort to promote "broadband service in unserved high-cost areas." *In re Connect America Fund*, 32 FCC Rcd. 1624 (2017). Among other things, the program subsidizes certain high-speed services that, the FCC has acknowledged, are not yet embraced by "a substantial majority of residential customers." *Id.*, at 1631 (internal quotation marks omitted). If we had simply confessed the obvious—that this statute is unconstitutional—Congress could have responded easily with the simple addition of a rate or, perhaps, a cap. But now? Now, the FCC can fund a program only if it satisfies *all* subsection (b) principles and *all* subsection (c) factors— a novel requirement that calls existing programs into question and promises profound implications for future ones as well. Far from avoiding any short-term disruption, the Court's new statute promises plenty of chaos of its own.[13]

─────────

[13] By interpreting "shall consider the extent to which," §254(c)(1), to mean "shall ensure that," the Court threatens chaos well beyond universal service, too. "As a general rule," courts have long thought that "when a statute requires an agency to 'consider' a factor, the agency must reach an express and considered conclusion about the bearing of the factor, but need not give any specific weight" to it. *Central Vermont R., Inc.* v. *ICC*,

GORSUCH, J., dissenting

## B

So much for the Court's renovation of §254(c)(1). Now consider the two provisions the Court cannot bring itself to defend. Sections 254(c)(3) and (h)(2), recall, permit the FCC to fund "additional" and "advanced" services for "schools, libraries, and health care providers." See Part I–B–1, *supra*. Even the Court is unwilling to say that these provisions impose a "qualitative" cap—and understandably so. When it comes to deciding what programs to fund under §254(c)(3) and §254(h)(2), the FCC is unconstrained by any of the subsection (c)(1) factors the Court rewrites and leans on so heavily today. See *In re Federal-State Joint Bd. on Universal Serv.*, 12 FCC Rcd., at 9008–9011; Tr. of Oral Arg. 42, 47. Subsection (c)(3) makes that explicit: The FCC may designate services for support under that provision "[i]n addition to the services included in the definition of universal service under paragraph (1)."

Here, too, experience illustrates just how uncapped the FCC's §254(c)(3) and §254(h)(2) programs really are. For some years, the FCC has relied on those provisions to fund internet access at schools and libraries. 89 Fed. Reg. 67304–67305 (2024). But, in 2024, the FCC announced that it would also begin funding "Wi-Fi hotspots and services to be used off-premises by students, school staff, and library patrons." *Id.*, at 67304, 67318. As far as the FCC sees it, subsections (c)(3) and (h)(2) might allow it to collect enough taxes to supply take-home hotspots to anyone with a library

---

711 F. 2d 331, 336 (CADC 1983) (internal quotation marks and alteration omitted); see *Covad Communications Co.* v. *FCC*, 450 F. 3d 528, 539 (CADC 2006) ("[W]hen the [FCC] is obligated to consider certain factors, that means only that the FCC must reach an express and considered conclusion about the bearing of a factor, but is not required to give any specific weight to it" (internal quotation marks and alteration omitted)). Does all that case law now get thrown out the window? Has the Court transformed every instruction to "consider" some criterion into a mandate the agency must satisfy? What a gift to regulated industries, or at least to their lawyers.

GORSUCH, J., dissenting

card. See Tr. of Oral Arg. 43–44. Or maybe even take-home Starlink devices for library patrons nationwide, to help shrink the "digital divide between [Americans] with access to broadband at home and those without." *In re Addressing the Homework Gap Through the E-Rate Program*, FCC No. 24–76, p. 12 (2024).

Rather than address the constitutionality of the FCC's power to tax and spend for §254(c)(3) and §254(h)(2) programs, the Court dodges the question. Buried in a footnote midway through its opinion, it offers this: "We have no occasion to address any nondelegation issues raised by Sections 254(c)(3) and (h)(2)," the Court says, because while respondents challenged "the contribution scheme generally," they did not name those provisions "in particular." *Ante*, at 26, n. 9.

It is a perplexing maneuver, and I suspect the parties will find it quite the surprise. Not one of them suggested cleaving off portions of the statute in this way. Still, the Court's late-breaking move is, in one sense, to its credit. Though it is unwilling to say aloud that any part of §254 fails the intelligible principle test, neither can the Court bring itself to bless such a lavish delegation of taxing authority. As a result, respondents remain free on remand, or in a future proceeding, to renew their attack on the constitutionality of whatever contributions the FCC demands for its subsection (c)(3) and (h)(2) programs. And that in itself is a notable development: Today marks the first time in a long time that the Court has confronted a statutory delegation and found no way to save it.

IV

Return, now, to the portion of §254 the Court is willing to defend—the programs the FCC supports pursuant to subsection (c)(1). No one disputes that part of the statute lacks a tax rate or a numerical cap. And rewritten or not, that provision lacks anything approaching a "qualitative" cap as

GORSUCH, J., dissenting

well. Faced with these difficulties, in the end petitioners and the Court resort to changing the conversation. Now, they say, look to other fields. The Court has allowed agencies "to raise revenue" through fees "without specifying a numeric cap or . . . rate." *Ante*, at 14. The Court has allowed agencies to set "'just and reasonable' rates" and to regulate in the "'public interest.'" *Ante*, at 22. And, petitioners and the Court reason, if those delegations are permissible, this one must be, too. *Ante*, at 22–23; Brief for Federal Petitioners 11. Failing all else, petitioners and the Court add that they see no practical value in requiring Congress to speak more clearly about the scope of permissible universal-service taxes. *Ante*, at 18–19; Tr. of Oral Arg. 8–9.

But the Court's comparisons disregard its own insight that context matters in applying the intelligible principle test. *Ante*, at 11, 22. Nor, in my view, is it any answer to say that legislation supplying a rate or real cap might still leave the FCC with some measure of discretion. Though the Constitution does not require Congress to make every decision, there are some choices that belong to Congress alone—including setting a tax's rate or, at least, capping receipts.

A

Start with the Court's assertion that "Congress has often enacted statutes empowering agencies to raise revenue without specifying a numeric cap or tax rate." *Ante*, at 14. To sustain that point, the Court relies on a list of nine examples offered by the government. *Ibid.* (citing Reply Brief for Federal Petitioners 7–9). The private petitioners highlight the same provisions, which, it seems, provide "the best precedents" for §254. Tr. of Oral Arg. 82–84; see *id.*, at 8, 31, 37–38.

Those provisions all have something in common: Each describes a fee. And that makes them poor benchmarks for a

GORSUCH, J., dissenting

tax delegation. Fees, by definition, are payments made in "compensation for a service provided to, or alternatively compensation for a cost imposed by, the person charged the fee." *Mueller* v. *Raemisch*, 740 F. 3d 1128, 1133 (CA7 2014); accord, *Pace* v. *Burgess*, 92 U. S. 372, 375–376 (1876). For that reason, fees carry a built-in intelligible principle: The government cannot collect more money than it needs to offset a real-world cost or benefit. See *National Cable Television Assn.*, 415 U. S., at 341–342.

Consider one of the government's examples, the Federal Deposit Insurance Corporation (FDIC). See *ante*, at 16. The FDIC finances its Deposit Insurance Fund through "[i]nsurance fees" paid by FDIC-insured banks. 12 U. S. C. §1815(d). By statute, the fee each bank pays must be "keyed to the risk of the bank's insolvency." M. Ricks, Money as Infrastructure, 2018 Colum. Bus. L. Rev. 757, 803 (citing §1817(b)). In other words, the fees offset a cost the banks impose on the FDIC—namely, their risk of failure, which the FDIC's insurance must underwrite. That need to compensate for a particular cost provides an intelligible principle cabining the FDIC's discretion and limiting the fees it can charge to what the agency needs to cover insurance payouts. See *id.*, at 803–804.

A similar principle explains the fee-setting authority of federal courts. See Reply Brief for Federal Petitioners 8. By statute, courts of appeals may charge "fees" in amounts "prescribed from time to time by the Judicial Conference of the United States." 28 U. S. C. §1913. As the Judicial Conference has recognized, that provision authorizes courts to "charg[e] for services provided," such as docketing an appeal or admitting an attorney to practice. Report of the Proceedings of the Judicial Conference of the United States 12, 14 (Sept. 16, 2008). So here, too, fee levels reflect a cost imposed or a benefit received by the payor.

Take one more example from the government's brief. See

JA115

GORSUCH, J., dissenting

Reply Brief for Federal Petitioners 8–9. Congress has authorized the Animal and Plant Health Inspection Service to charge fees "sufficient" "to cover the cost of providing agricultural . . . inspection" for certain "commercial aircraft." 21 U. S. C. §136a(a)(1)(A). That provision might sound broad because it lacks a numerical limit. In context, though, it leaves little for the agency to do except arithmetic: To set the fee, it "divid[es] the total costs of inspecting Commercial Aircraft by the total number of Commercial Aircraft." *Air Transp. Assn. of Am., Inc.* v. *United States Dept. of Agriculture*, 37 F. 4th 667, 675 (CADC 2022).[14]

Petitioners and the Court would set all that to the side. In their telling, this Court's decision in *Skinner* "rendered irrelevant" the question whether a particular exaction involves a tax or a fee. *Ante*, at 15 (citing 490 U. S., at 223). Not so. *Skinner*, to be sure, indicated that the intelligible principle test applies to tax delegations. *Id.*, at 223. And under that test, *Skinner* presented an easy case. The statute at issue there told the government (numerically) how much money it could raise. *Id.*, at 219–220 ("the ceiling on aggregate fees . . . is set at 105 percent of the aggregate appropriations made by Congress for that fiscal year"). In

---

[14] The Court discusses two other examples from "the sphere of financial regulation." *Ante*, at 14. Both follow a by-now familiar pattern. Congress has authorized the Office of the Comptroller of the Currency (OCC) to fund its operations by "collect[ing] an assessment, fee, or other charge" from the banks it supervises. 12 U. S. C. §16. While these fees are not assessed in exchange for specific transactions, they offset the costs the OCC incurs in fulfilling its statutory mandate to supervise, regulate, and charter national banks. See §§1, 21, 24. Funding for the Federal Reserve Board reflects a similar dynamic. The Board may levy upon Federal Reserve Banks "an assessment sufficient to pay its estimated expenses . . . for the half year succeeding the levying of such assessment." §243. Again, such fees offset the Federal Reserve Board's regulatory costs. Cf. *Trump* v. *Wilcox*, 605 U. S. ___, ___ (2025) (slip op., at 2) (noting the historically exceptional structure of the Federal Reserve).

GORSUCH, J., dissenting

light of that and other instructions, the Court held, the statute provided an intelligible principle regardless of whether it imposed a tax or a fee. *Id.*, at 220–223. That is all the decision held. It certainly did not invite courts to ignore relevant context or disregard the basic distinction between fees (which incorporate an intelligible principle by nature) and taxes (which do not).[15]

Perhaps sensing as much, the Court ultimately retreats from precedent into pragmatism. Trying to distinguish taxes from fees, it contends, would risk plunging the Court into "a morass." *Ante*, at 16. But the job is hardly some feat fit for Hercules alone. Courts must, and do, routinely distinguish between taxes and fees in many contexts. See, *e.g.*, *United States* v. *United States Shoe Corp.*, 523 U. S. 360, 366–370 (1998) (distinguishing between fees and taxes for purposes of the Export Clause, U. S. Const., Art. I, §9, cl. 5).

---

[15] The Court charges me with downplaying *J. W. Hampton.* *Ante*, at 13, n. 3. But I do not see how casting a spotlight on that decision improves the picture for the Court. To start, *J. W. Hampton* involved a tariff, which arguably raises distinct nondelegation questions from domestic taxes. See *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394, 400 (1928); n. 19, *infra.* Even setting that complication aside, the statute in question imposed a tariff on barium dioxide at four cents per pound—and thus employed a straightforward tax rate. 42 Stat. 860. After setting the rate, Congress then authorized the President to adjust it by up to 50%, as needed to "'equalize . . . differences in costs of production'" between the United States and "'competing foreign countries.'" *J. W. Hampton*, 276 U. S., at 401 (quoting 42 Stat. 941). In other words, the statutory rate could move only within numerically defined bounds and only if the President found specific facts. *That* is what sufficed to provide an "intelligible principle" when the Court first used the phrase. And nobody could compare that arrangement to §254's open-ended tax-and-spend scheme. See *Gundy* v. *United States*, 588 U. S. 128, 158–159 (2019) (GORSUCH, J., dissenting) (observing the traditional rule that Congress may make the effect of statutes conditional on facts found by the Executive). If lining this case up against *J. W. Hampton* proves anything, it is only that the phrase "intelligible principle" has taken on an entirely different meaning than it once held. See *Gundy,* 588 U. S*.,* at 163–166 (GORSUCH, J., dissenting).

GORSUCH, J., dissenting

Besides, any morass here is of the Court's own making. In its view, the tax/fee distinction depends on whether the charge "is for a 'benefit' granted to the payor that is 'not shared by other members of society.'" *Ante*, at 16 (quoting *National Cable Television Assn.*, 415 U. S., at 341). But that formulation is not the usual one. In defining fees, the typical question is whether the fee compensates for a benefit *or cost* that sets the payor apart. See, *e.g.*, *United States* v. *Sperry Corp.*, 493 U. S. 52, 60–61 (1989); *Massachusetts* v. *United States*, 435 U. S. 444, 462–463, and n. 19 (1978); *Pace*, 92 U. S., at 375–376; *Mueller*, 740 F. 3d, at 1133; Hines & Logue 257, n. 107; GAO, S. Irving, Federal User Fees: A Design Guide 4, n. 4 (GAO–08–386SP, May 2008); 1 Cooley & Nichols 97–98, 109–110.[16] Think back to the FDIC. The public undoubtedly benefits from the fees banks pay for deposit insurance; we all enjoy a safer banking system. But banks impose a cost on the FDIC (their risk of failure) that distinguishes them from the general public. Insurance fees compensate for that special cost. That is why they are fees, not taxes.

Once we understand fees correctly, the category plainly includes all the government's examples and excludes §254 contributions. When carriers pay into the Universal Service Fund, they do not gain any special benefit, such as permission "to practice law or medicine or construct a house or run a broadcast station." *National Cable Television Assn.*, 415 U. S., at 340. (A different provision, 47 U. S. C. §158, authorizes "application fees.") Nor do §254 contributions offset some regulatory cost that carriers impose on the FCC or on society. (That falls to "regulatory fees" the FCC collects under §159.) Instead, §254 takes money from some (carriers) and gives it to others (libraries, schools, and the

---

[16] In *National Cable Television Assn.*, the Court focused only on the benefits side of the formulation because that sufficed to make sense of the statute before it. See 415 U. S., at 342–343 ("The phrase 'value to the recipient' is, we believe, the measure of the authorized fee").

GORSUCH, J., dissenting

like).  See *In re Incomnet, Inc.*, 463 F. 3d 1064, 1066–1067
(CA9 2006).  In short: Section 254 creates a classic tax-and-
spend scheme, not a fee.  Even the FCC does not dispute the
point.  Tr. of Oral Arg. 53; see Part II–A, *supra*.[17]

B

Beyond fees, petitioners and the Court offer a second rea-
son to ignore the fact that §254(c)(1) programs can be
funded through taxes without a rate or fixed cap.  After all,
they observe, this Court has rejected nondelegation attacks
on "authorizations to regulate in the 'public interest' and to
set 'just and reasonable' rates."  *Ante*, at 22 (quoting *Na-
tional Broadcasting Co.* v. *United States*, 319 U. S. 190,
225–226 (1943), and *FPC* v. *Hope Natural Gas Co.*, 320
U. S. 591, 600 (1944)).  And, set next to those vague stand-
ards, petitioners and the Court suggest, §254 offers "clear
and limiting" guidance.  *Ante*, at 30.

This argument neglects the Court's own admonition that
the intelligible principle test is context dependent.  See
*ante*, at 11, 22.  It begins by asking "what instructions" the
statute in question provides to constrain an agency's discre-
tion.  *Gundy*, 588 U. S., at 136 (plurality opinion).  Answer-
ing that question is a matter of statutory interpretation.
*Ibid.*  And "[i]t is a fundamental canon of statutory con-
struction that the words of a statute must be read in their

_____

[17]The Court never denies that universal-service "contributions" are
taxes, but suggests in a footnote that they are not so different from FDIC
fees because carriers enjoy a "special benefit" from them.  See *ante*, at 17,
n. 6.  I do not see it.  The FDIC program is an insurance plan that charges
fees (premiums) in return for a service (payouts in the event of default).
Universal-service contributions are nothing like that.  To be sure, the
FCC pays some carriers—and other vendors—to help it implement uni-
versal-service programs.  But those are payments for services rendered,
not a "special benefit" given in proportion to a fee payment, as with a
broadcast license or FDIC insurance.  Often, in fact, carriers that "con-
tribute large sums" to the Universal Service Fund receive few universal-
service payments, while those that "contribute little" end up receiving
large ones.  App. 98.

context," *West Virginia* v. *EPA*, 597 U. S. 697, 721 (2022) (internal quotation marks omitted), because language used in one setting may carry a meaning it does not have in others, see *Yates* v. *United States*, 574 U. S. 528, 537 (2015) (plurality opinion). So even if a particular statutory term evokes "well-known and generally acceptable standards" in one domain, that does not mean the same term will necessarily supply similar guidance when used in other "uncharted fields." *Fahey* v. *Mallonee*, 332 U. S. 245, 250 (1947); see also *Schechter Poultry*, 295 U. S., at 534 (new context may give terms "a much broader range and a new significance").

This Court has recognized this point many times, including when it comes to phrases like "public interest." So, for example, the Court has held that phrase may contain enough "concrete" meaning to survive the intelligible principle test in the "context" of broadcast licensing, where the government has to allocate a limited spectrum of publicly owned airwaves. *National Broadcasting Co.*, 319 U. S., at 216, 226 (internal quotation marks omitted); see M. McConnell, The President Who Would Not Be King 334 (2020) (McConnell). But, the Court has also found, the same "public interest" criterion offers inadequate guidance to the FCC when it comes to raising revenue. *National Cable Television Assn.*, 415 U. S., at 341.

The same goes for the phrase "'just and reasonable.'" *Ante*, at 22. This Court has sometimes found that phrase satisfies the intelligible principle test when it comes to setting rates for regulated monopolies like public utilities—a context where it incorporates "concepts with a long history at common law." H. Friendly, The Federal Administrative Agencies: The Need for Better Definition of Standards, 75

GORSUCH, J., dissenting

Harv. L. Rev. 863, 873, n. 53 (1962); see, *e.g.*, *ICC* v. *Cincinnati, N. O. & T. P. R. Co.*, 167 U. S. 479, 501 (1897).[18] Accordingly, in that sphere, the "traditional regulatory notion of the 'just and reasonable' rate" may mean *something*. *Verizon*, 535 U. S., at 481. But outside that sphere, the same phrase may amount to little more than an instruction to go forth and do good. See *Schechter Poultry*, 295 U. S., at 539–540; G. Lawson, Delegation and Original Meaning, 88 Va. L. Rev. 327, 386 (2002).

Here's the point: Just because a phrase carries a well-understood historic meaning in one context does not mean the same phrase "'in the abstract'" will suffice in every other setting to satisfy the intelligible principle test. Reply Brief for Federal Petitioners 3. So the fact that petitioners and the Court can point to past decisions approving the use of a broad phrase in a different domain proves nothing. Instead, it falls to petitioners and the Court to show that the statutory terms presently before us, properly understood in their particular context, do in fact provide significant constraints on the FCC as it exercises a significant power.

That is a burden petitioners and the Court have not carried and cannot carry. When §254(c)(1) speaks of "universal service," it does not invoke "'concepts with a long history at common law.'" *Supra*, at 31. To the contrary, everyone agrees that §254 "ripped apart" the old understanding of "universal service" and cleared the ground for a new one. Huber §2.10; see Part I–A, *supra*; Brief for Federal Petitioners 3; Brief for Petitioner SHLB Coalition et al. 3. Worse, even if one term or another in §254(c)(1) or §§254(b)(1)–(7) might claim some meaning-giving ancestry, the statute's

---

[18] As a rule, the "just and reasonable" standard requires agencies to balance "the investor and the consumer interests," *FPC* v. *Hope Natural Gas Co.*, 320 U. S. 591, 603 (1944), in order to approximate the "bounds that would be drawn by market forces in a non-monopolistic market," *Jersey Central Power & Light Co.* v. *FERC*, 810 F. 2d 1168, 1190 (CADC 1987) (Starr, J., concurring).

mix of four factors and six (or more) principles lacks any such pedigree. Whether those factors and principles need only be considered, as the statute says, or whether they must always be met, as the Court now suggests, the FCC truly must blaze its own trail.

Notice, too, where trails like this lead. If context could be cast aside, and a phrase like "just and reasonable" might suffice in every season, nothing would stop Congress from granting agencies limitless legislative power. Congress might delegate to the Secretary of Education the authority to set a "just and reasonable" tax on university endowments in order to fund universal education—defined, of course, according to four factors and six (or more) incommensurable principles. Congress might instruct the Secretary of Health and Human Services to impose a "just and reasonable" tax on pharmaceutical sales in order to subsidize "universal health coverage," defined as an "evolving level" of care that should be available "at just, reasonable, and affordable rates" to patients "in all regions of the Nation." Or Congress might let the Treasury Department set whatever "just and reasonable" income tax rates were needed to trim the national debt to a level "consistent with the public interest, convenience, and necessity." If these possibilities strike you as unhinged, it is because you appreciate that the permissible scope of delegation must depend on context and the nature and scope of the power conferred.[19]

---

[19] The Court declines to defend two other arguments petitioners advance. First, petitioners point to a tax enacted in 1798 as an early instance of broad tax delegation. Brief for Federal Petitioners 23; Brief for Petitioner Competitive Carriers Association et al. 27–28. But the 1798 tax was a direct tax, and it included an explicit numerical cap on total receipts ($2 million), apportioned by State. 1 Stat. 597–598; see also Part II–A; n. 10, *supra*. So it provides no precedent for §254. Second, petitioners point to statutes "granting the President broad authority to set or change tariffs." Brief for Federal Petitioners 36; see Reply Brief for Petitioner Competitive Carriers Association et al. 10–11. But it may be, as the Court's failure to invoke this argument suggests, that tariffs and

GORSUCH, J., dissenting

C

Running out of precedents to work with, the Court suggests, finally, that it would be "absurd" to ask Congress to provide more guidance than it has. *Ante*, at 18. The argument runs this way. Respondents suggest, and I agree, that Congress could readily cure §254's nondelegation problem. All it needs to do is set a tax rate or (perhaps) specify a numerical cap or its equivalent. The Court does not dispute that a legislatively defined tax rate would amount to meaningful guidance. But, the Court contends, some hypothetical caps could be pointless. What if Congress capped receipts at $5 trillion? *Ibid.* To suggest that such a law would provide an "intelligible principle," while insisting that §§254(b) and (c)(1) do not, strikes the Court as mindless formalism. *Ibid.*

Up to a point, I agree. It may well be that a rate is usually required to give a domestic tax law an intelligible principle outside the context of direct taxes. See Part II–A, *supra*. Imagine, for instance, that Congress told the IRS to collect $50 trillion of income tax from the American people and left it at that. Few, I suspect, would suggest that instruction supplies sufficient guidance. But even assuming that a cap alone might be permissible when it comes to §254, the Court too readily dismisses its constitutional value.

Forcing Congress to supply some cap, any cap, would advance the nondelegation doctrine's purpose of ensuring "that the lines of accountability [remain] clear." *Gundy*, 588 U. S., at 155 (GORSUCH, J., dissenting). If Congress adopted the Court's ludicrously hypothetical $5 trillion universal-service tax, the American people would at least know whom to thank when the corresponding charges showed up

_____

domestic taxes present different contexts when it comes to the problem of delegation. Cf. *Department of Transportation* v. *Association of American Railroads*, 575 U. S. 43, 80 (2015) (THOMAS, J., concurring in judgment); *Gundy*, 588 U. S., at 159–160 (GORSUCH, J., dissenting).

GORSUCH, J., dissenting

on their phone bills. Even if the FCC chose to collect only a fraction of that amount, every Member of Congress would have to explain to his constituents where he stood on a potential $5 trillion tax. Far more realistically, of course, Congress would never contemplate such a silly law, precisely to avoid those awkward conversations (and the electoral consequences that could follow).

And that's exactly the point. The framers divided power among legislative, executive, and judicial branches not out of a desire for formal tidiness, but to ensure ours would indeed be a Nation ruled by "We the People." See *id.*, at 152. By vesting executive power in a single President, the framers hoped to ensure vigorous enforcement of the laws. See *United States* v. *Arthrex, Inc.*, 594 U. S. 1, 28 (2021) (GORSUCH, J., concurring in part and dissenting in part). And by vesting judicial power in life-tenured judges, they hoped to ensure laws would be applied fairly by those insulated from political pressure. See *SEC* v. *Jarkesy*, 603 U. S. 109, 147–148 (2024) (GORSUCH, J., concurring). But, as the framers saw it, the power to make the laws that govern our society belongs to elected representatives more accountable to the people in whose name they act. See *Gundy*, 588 U. S., at 154–157 (GORSUCH, J., dissenting). And nowhere did the framers see that principle as applying with greater force than in the field of taxation. See Part II–A, *supra*.

In so many other arenas, this Court vigorously polices the Constitution's allocation of power. We have refused to tolerate congressional intrusions on powers reserved to the President. See *Gundy*, 588 U. S., at 168 (GORSUCH, J., dissenting). We have prohibited the Executive from encroaching on power vested in Congress. *Ibid.* We have found unconstitutional, too, legislation seeking to confer judicial power on the other branches. *Ibid.*

Yet there is one exception. When Congress has willingly surrendered its power to the Executive Branch, this Court's responses can only be described as feeble. Always, to be

GORSUCH, J., dissenting

sure, the Court dutifully recites the creed that "[l]egislative power . . . belongs to the legislative branch, and to no other." *Ante*, at 10. Too often, though, these professions amount (at most) to faith without works, and the results are not hard to see. Today, the "vast majority" of the rules that govern our society are not made by Congress, but by Presidents or agencies they struggle to superintend. J. Adler & C. Walker, Delegation and Time, 105 Iowa L. Rev. 1931, 1975 (2020). Those rules reflect not the public deliberations of elected representatives, but the concerns of small cadres of elites. And as those cadres turn over from administration to administration, the rules revolve, too, inflicting whiplash on those who must live under them. If there is any consistency over time, it may be because Presidents and their deputies do not always call the shots: Lower level officials, unknown to the public and sometimes even to the White House, now make many of the rules we live by. See N. Rao, The Hedgehog & the Fox in Administrative Law, 150 Daedalus 220, 228–229 (Summer 2021).

To its credit, the Court has sometimes mitigated its failure to police legislative delegations by deploying other tools, like the major questions doctrine and *de novo* review of statutory terms, to ensure the Executive "act[s] within the confines set by Congress." *Ante*, at 8 (KAVANAUGH, J., concurring); see *Gundy*, 588 U. S., at 166–168 (GORSUCH, J., dissenting). But every doctrine has its limits. What happens when Congress, weary of the hard business of legislating and facing strong incentives to pass the buck, cedes its lawmaking power, clearly and unmistakably, to an executive that craves it? See *id.*, at 156. No canon of construction can bar the way. Then, our anemic approach to legislative delegations leaves the Court with a choice. It can permit the delegation to stand and move us all one step further from being citizens in a self-governing republic and one step closer to being subjects of quadrennial kings and long-tenured bureaucrats. Or the Court can, as it does today, usurp

GORSUCH, J., dissenting

legislative power, rewrite the statute, and dictate its own terms for Congress's surrender.  Either way, we wind up in much the same place, only now with judges, rather than Presidents or bureaucrats, making our laws.

There is another way.  The Constitution promises that our elected representatives in Congress, and they alone, will make the laws that bind us.  To honor that commitment, historical practice and our cases suggest other guides, beyond the intelligible principle test, for assessing when Congress has impermissibly ceded legislative power, as I have pointed out before.  See *id.*, at 157–162.  As I have observed, too, when Chief Justice Taft first used the phrase "intelligible principle," he did not aim to displace those traditional guides, only to summarize them.  *Id.*, at 162 (citing *J. W. Hampton*, 276 U. S., at 409); see also n. 15, *supra.* Someday, soon, we should find our way back.  By employing the modern, enfeebled form of the intelligible principle test, we do the Constitution no favors.  And by approving a delegation of Congress's taxing power unprecedented in this Court's history, we risk making matters worse yet.[20]

---

[20] JUSTICE KAVANAUGH submits that delegations to the President "have been a regular feature of American Government" since the founding. *Ante*, at 2 (concurring opinion).  But in drawing conclusions from those precedents, precision matters.  Like the modern intelligible principle test, traditional nondelegation doctrine paid close attention to the kind of power at stake.  For instance, delegations posed fewer problems in the field of foreign affairs, where many "powers are constitutionally vested in the president under Article II." *Gundy*, 588 U. S., at 159 (GORSUCH, J., dissenting); see *ante*, at 9 (KAVANAUGH, J., concurring).  More generally, while Congress could not delegate "powers which are strictly and exclusively legislative," *Wayman* v. *Southard*, 10 Wheat. 1, 42–43 (1825), it could assign other branches "certain non-legislative responsibilities," particularly powers historically within the Executive's prerogative. *Gundy*, 588 U. S., at 159 (GORSUCH, J., dissenting); see McConnell 328–335.  So, for instance, Congress could give the President broad "authority to lay embargoes" during a congressional recess. *Ante*, at 2–3, n. 2 (KAVANAUGH, J., concurring) (citing Act of June 4, 1794, 1 Stat. 372); see

Still, there is room for some optimism. The Court today cannot bring itself to say that §§254(c)(3) and (h)(2) survive even its milquetoast version of the intelligible principle test. The Court also refuses to sustain §254(c)(1) as enacted, feeling obliged instead to rewrite that provision before upholding it. I can imagine worse outcomes than those small steps toward home. But we can and should do better. When it comes to other aspects of the separation of powers, we have found manageable ways to honor the Constitution's design. This one requires no less of us.

Respectfully, I dissent.

---

McConnell 99. Likewise, Congress could grant the President broad discretion over "military pensions," "patents," and "post roads"—for none of those things implicated traditionally legislative functions. *Ante*, at 2, n. 2 (KAVANAUGH, J., concurring); see McConnell 154, 331–333. And even within the heartland of legislative power, Congress could authorize the executive to find facts and "'fill up the details'" of whatever policies Congress had set. See *Gundy*, 588 U. S., at 157–159 (GORSUCH, J., dissenting); cf. G. Lawson, A Private-Law Framework for Subdelegation, in The Administrative State Before the Supreme Court: Perspectives on the Nondelegation Doctrine 123 (P. Wallison & J. Yoo eds. 2022). So, historically, Congress could empower the executive and judicial branches to do quite a lot—except make the laws that govern us.

# EXHIBIT B

# REPORT OF DR. GEORGE S. FORD

## EXPERT REPORT OF DR. GEORGE S. FORD

**Professional Qualifications & Experience**

My name is George S. Ford.  I am the President of Applied Economic Studies—an economic consulting firm.  I hold a Ph.D. in Economics from Auburn University.  After receiving a Ph.D. in Economics in 1994, I have worked as a professional economist in government, industry, the non-profit sector, and as a private consultant.  In 1994, I became an economist in the Competition Division of the Federal Communications Commission, an organization located in the General Counsel's Office that provided legal and economic analysis to the many bureaus of the Commission.  My work at the Commission covered a wide range of topics from multichannel video services, broadcasting policies, wireline and wireless telecommunications services, international policy, radio interference standards, and general financial, statistical, and econometric analysis.   After my government tenure, I became an economist at MCI Communications, a large provider of local and long-distance telecommunications services to households and businesses, where my work focused on telecommunications regulation and policy at both the federal and state levels.  I also conducted analysis of entry into new markets and merger and acquisition activity.  In April 2000, I became the Chief Economist of Z-Tel Communications in Tampa, Florida, a small competitive telephone company.  At Z-Tel, I performed regulatory and business analysis, overseeing a team that ensured the company's compliance with regulatory requirements and cost management.  I also participated in the development of financial models for business plans and investments and represented the company as an expert in proceedings before state regulatory commissions and at the Federal Communications Commission.   In the summer of 2004, I founded Applied Economic Studies, a private consulting firm.

I am also the Chief Economist of the Phoenix Center for Advanced Legal & Economic Policy Studies, a Washington, D.C. based 501(c)(3) research organization that specializes in the legal and economic analysis of public policy issues involving the communications, technology, and infrastructure industries.  The Phoenix Center does not do consulting work, and the views expressed in this testimony do not represent the views of the Phoenix Center or its staff.  For several years I served as an Adjunct Professor at Samford University where I taught Economics to graduate students.

My areas of specialty are the application of microeconomics and econometrics to industry and public policy with particular emphasis on the telecommunications industry.  Over the years I have written many papers on a variety of topics, publishing over eighty papers in economic and law journals including the *Antitrust Bulletin*, the *Journal of Law & Economics*, *Energy Economics*, *Telecommunications Policy*, the *Journals of Gerontology*, *Empirical Economics*, the *Journal of Business*, the *Journal of Regulatory Economics*, the *Southern Economic Journal*, the *Quarterly Review of Economics and Finance*, the *Journal of Public Choice and Finance*, *Communications in Statistics*, the *Yale Journal on Regulation*, the *Federal Communications Law Journal*, and many others.  My work has been cited in nearly 1,900 articles (according to Google Scholar).  I have also published book chapters on telecommunications policy and financial econometrics.  My curriculum vitae is attached.

**Assignment**

I was retained as an expert by Boyden Gray & Associates to provide my expert opinion as an economist on the question of whether levies on telecommunications providers by the Federal Communications Commission (FCC) for purposes of its Universal Service Fund Programs possess the characteristics of a "fee," or a "tax."

**Summary of Opinions**

In both law and economics, the difference between a "tax" and a "fee" goes to the question of whether the payer or the public benefits most from the levies. A "fee" bestows benefits on the payer not shared by other members of the public. A fee is paid for a business license or a passport. Contrariwise, a "tax" defrays the costs of programs that benefit the public, and the payer may receive no benefit at all. Today, the FCC uses the USF Program to subsidize schools to "promote digital learning," to subsidize rural health care providers "to improve the quality of health care," and subsidizes individuals and corporations to promote "economic growth" and "jobs." These are public benefits that offer no special benefit to the telecommunications providers whose revenues support such expenditures. It is my opinion, therefore and at the present time, that the collection of levies from telecommunications providers for some if not all USF Programs possess the characteristics of a "tax" rather than a "fee."

**Background:  The USF Programs**

The Universal Service Fund Program (USF), authorized by Section 254 of the Telecommunications Act of 1996, directs the Federal Communications Commission (FCC) to implement policies that ensure that all regions of the Nation have access to advanced telecommunications and information services at just, reasonable, and affordable rates.[1]  Congress provided the Commission wide discretion to determine both how to collect and spend the dollars necessary to support the program.

The USF Program existed prior to the Telecommunications Act of 1996. The program was then limited to subsidizing the deployment and maintenance of voice-grade services in high-cost rural areas and stimulating adoption by low-income Americans through subsidized, discounted services. The revenues required to support the subsidies were collected in a complex regulatory scheme including many implicit cross subsidies among telecommunications providers and their customers. After the passage of the Telecommunications Act of 1996, the FCC modernized the USF Program in several ways. First, at the direction of the 1996 Act, the Commission established two new subsidy programs: (1) the *Schools & Libraries Program* (or the *E-Rate Program*), which provided financial support to obtain discounted telecommunications and Internet services for schools and libraries; and (2) the *Rural Healthcare Program*, which provided financial support to rural health providers for telecommunications and Internet services. Second, in 2011, the Commission extended USF subsidy support to Internet services (or "broadband service") to those USF programs previously limited to voice-grade services.[2]  These reforms, among other factors,

---

[1]      Prior to the 1996 Telecommunications Act, "universal service" was funded through a complex system of cross-subsidies among service providers.  In the 1996 Act, Congress replaced the regulatory cross-subsidies with direct subsidies.  The universal service program is administered for the FCC by the Universal Service Administrative Company (or USAC), a not-for-profit corporation (http://www.usac.org/).
[2]      Recipients of these subsidy dollars must also provide voice-grade services.

expanded the size of the USF Program as the FCC began pursuing broad, social goals beyond increasing telephone subscriptions. Between 1995 and 2005, the budget of the USF Program increased from $1.37 billion to $8.4 billion in 2019 dollars.[3]

In 2019, the USF Program redistributed $8.35 billion in subsidy dollars across four programs:[4]

(1) the *High-Cost Program* provides subsidies to providers serving high-cost, mostly rural areas;

(2) the *Lifeline Program* provides subsidies to providers offering monthly discounts to qualifying low-income consumers for voice and broadband services;

(3) the *Schools and Libraries Program* provides subsidies to eligible schools and libraries for telecommunications and Internet services; and

(4) the *Rural Health Care Program* that provides subsidies rural healthcare providers for providing telecommunications and Internet services.[5]

Funding levels for each program are summarized in Table 1. The largest program is the High-Cost Fund accounting for 61.6% of funding dollars with Schools & Libraries Program in second at 23.6% of funding.

**Table 1. USF Funding by Program (2019)**

| Program | Funding ('000) | Share |
|---|---|---|
| High-Cost | $5,146,679 | 61.6% |
| Schools & Libraries | $1,968,776 | 23.6% |
| Lifeline/Linkup | $982,005 | 11.8% |
| Rural Healthcare | $251,516 | 3.0% |
| Total | $8,348,976 | 100% |
| * Source: Table 1.9. Numbers may not sum due to rounding. | | |

Where do these billions in subsidies come from? The revenues required to support these four subsidy programs are collected using an ad valorem assessment (the "contribution factor") on the interstate and international revenues of nearly all telecommunications providers. In 2019, retail interstate and international revenues (the contribution base) equaled 9.2% of total industry revenues.[6] Providers are neither required nor prohibited from passing these costs onto their customers, though collections from consumers may not exceed the provider's contributions. Most providers directly pass these costs through to consumers as a line-item on their bills. In many respects, the providers serve as a collection agent of the government, in the same way a retail store collects sales taxes for state and local governments.[7]

---

[3]    *Universal Service Monitoring Reports*, Federal-State Joint Board on Universal Service (1996, 2020), (available at: https://www.fcc.gov/general/federal-state-joint-board-monitoring-reports). Nominal values are $1.4 billion and $6.5 billion. The Gross Domestic Product deflator is used for the conversion: https://fred.stlouisfed.org/series/USAGDPDEFAISMEI.

[4]    Is some years, the subsidy levels approached $10 billion. *Universal Service Monitoring Report*, Federal-State Joint Board on Universal Service (Sept. 2020), at Table 1.2 (available at: https://docs.fcc.gov/public/attachments/DOC-369262A1.pdf).

[5]    For a description of the programs, see https://www.fcc.gov/general/universal-service.

[6]    *Universal Service Monitoring Report* (2020), *supra* n. 3, at Tables 1.1 and 1.2.

[7]    Passing the contributions through to consumers as a line-item (or in the form of higher prices) does not imply that providers are unharmed by the levies. Higher levies increase costs, reduce quantity demanded, and thus reduce

With the rapid growth of Internet-based communications, the contribution base of voice-grade interstate and international service revenues materially declined but USF obligations rose. Between 2001 and 2019, the contribution base for the USF Program (interstate and international revenues) declined by 40% while the USF subsidies rose by 83%. Consequently, the contribution factor (the ad valorem levy) increased sharply. In 2001, the contribution factor averaged 6.8% while in 2021 the average assessment averaged 31.5%, a near five-fold increase.[8] The high assessment rate has furthered the decline in the contribution base by reducing demand for interstate and international voice services and incentivizing consumers and providers to find alternative modes of communication not subject to the levies. The declining contribution base, rising contribution factor, and high subsidy levels of the USF Program have led many analysts and policymakers to worry about the sustainability of the current program.[9]

**Distinguishing a Tax from a Fee**

Among other reasons, the increasing burden on the interstate and international voice services and the expanding scope of the USF Program have led to questions about whether the USF Program's levies constitute a "fee" or a "tax." In legal matters, it is often important to distinguish between different kinds of government levies, mainly because taxation is a legislative function.[10] In distinguishing between a "fee" and "tax," whether a legislature or government agency labels a particular levy a "fee" or a "tax" is largely immaterial.[11] Rather, it is the characteristics of the levy that determines its nature, and those characteristics may change over time when a government agency lacks clear legislative guidance, oversight, or constraint.

Definitions of "tax" and "fee" are common between law and economics. A tax, as defined by Pflen in the classic *Introduction to Public Finance*, is a compulsory contribution of wealth levied upon persons or corporations "to defray the expenses incurred in conferring a common benefit upon the residents of the State. A tax is justified, but not necessarily measured, by the common benefit conferred."[12] Similarly, Seligman defines a tax as a "compulsory contribution from a person to the government to defray the expenses incurred in the common interest of all."[13] Dalton defines a "tax" as "a compulsory contribution imposed by the public authority, irrespective of the exact amount of service rendered to the taxpayer in return."[14] A tax, therefore, is a

---

profits. Also, if the ad valorem levy leads providers to lower service prices (excluding the levy), the providers will bear some of the burden of the levies. But empirical evidence indicates that telecommunications consumers are price insensitive, implying the consumer will bear the bulk of the levies through higher gross prices (net prices plus the levy). Also, as time progresses and consumers and providers divert traffic away from the contribution base, what is left is consumers with few options and thus very inelastic demands. On tax incidence, *see, e.g.*, C.R. McConnell, S.L. Brue, and S.M. Flynn, ECONOMICS: PRINCIPLES, PROBLEMS, AND POLICIES (2015), at pp. 416-423.

[8]    Data available at: https://www.fcc.gov/general/contribution-factor-quarterly-filings-universal-service-fund-usf-management-support.

[9]    *See, e.g.*, C.D. Jarrett, *Nearing a Tipping Point on USF Contribution Reform*? 11 NATIONAL LAW REVIEW (Feb. 19, 2021) (available at: https://www.natlawreview.com/article/nearing-tipping-point-usf-contribution-reform).

[10]    *See, e.g.*, J. Henchman, *How Is the Money Used? Federal and State Cases Distinguishing Taxes and Fees*, National Tax Foundation, Background Paper No. 63 (2013) (available at: https://files.taxfoundation.org/20190103161206/TaxesandFeesBook.pdf).

[11]    Henchman, *id.*; *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012) ("Congress cannot change whether an exaction is a tax or a penalty for constitutional purposes simply by describing it as one or the other.").

[12]    C.C. Pflen, INTRODUCTION TO PUBLIC FINANCE (1891), at p. 87.

[13]    M.M.J. Kennedy, PUBLIC FINANCE (2012), at p. 34.

[14]    *Id.*

compulsory contribution to the state for services rendered by the state for the general benefit of its people.[15]  That is, taxes benefit the public, not necessarily the taxpayer.

In contrast, a fee, is a payment to the government by an entity seeking a beneficial service from the government.  Pflen states a fee "has a different justification from a tax.  A fee never exceeds the cost of the special service rendered [and] confirms a special benefit" on the payer.[16]  Seligman defines a fee as a "payment to defray the cost of each recurring service undertaken by the government primarily in the public interest, but conferring a measurable special advantage on the fee payer."[17]  Or, a "fee" is "only paid by those persons who enjoy the special benefit of the services rendered by the state."[18]  For instance, the "Application Fee" for a U.S. passport is $110 and applicants may pay an "Expedite Fee" of $60.[19]  Revenue from these fees offset the cost of processing a passport (at least, in part), the benefits of which are "not shared by other members of society."

From the economic perspective, the distinction between a "tax" and a "fee" turns on whether the benefits supported by levies flow to the payer (a fee), or to the public (a tax).  The same distinction appears in the law.  For instance, in *National Cable Television Association v. U.S.* (1974), the Supreme Court observed, "A fee . . . is incident to a voluntary act, e. g., a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station. The public agency performing those services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society."[20] Similarly, in *Skinner v. Mid-Am. Pipeline Co.* (1989), the Court observes that a levy may be more like a "tax" than a "fee" when "some of the administrative costs at issue inure[] to the benefit of the public, rather than directly to the benefit of those parties."[21]  A "fee" benefits the payer and not the public.

There are two conditions, therefore, that permit one to distinguish between a tax and a fee.  First, to qualify as a "fee," the payer of the levy must be the primary, if not the exclusive, beneficiary of the services justifying the levy.  The more the benefits of the government expenditures advantage the public, the less the levy has the character of a fee.  Second, an economists would characterize a "fee" by saying that, on average at least, there should be a positive increasing relationship (or a "monotonic" relationship) between payer liability and the benefits the payer expects from the program(s) the fee is designed to support.  A "tax" does not have this property; a tax has no particular relationship between payer liability and the benefits the payer expects from that liability.  For example, tax dollars used to fund food stamps levy taxes on higher income Americans that do not qualify for food stamps to the benefit of lower-income Americans that often pay no income tax at all.

---

[15]     *Types of Taxes*, economicconcepts.com (last viewed Sept. 22, 2021).
[16]     Pflen, *supra* n. 12, at p. 88.
[17]     Kennedy, *supra* n. 13.
[18]     *Types of Taxes*, supra n. 15.
[19]     https://travel.state.gov/content/dam/passports/forms-fees/Passport%20Fees%20Chart_TSG_JAN2021.pdf.
[20]     *National Cable Television Association v. U.S.*, 415 U.S. 336, 340-41 (1974).
[21]     *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 214 (1989).

**Do USF Liabilities Possess the Characteristics of Taxes, or of Fees?**

Given the above, whether the levies on telecommunications providers constitute a "fee" or a "tax," or at least lean one way or the other, depends on the distribution of liabilities and benefits. Who pays and who benefits? If the benefits largely accrue to the public at large rather than to the telecommunications providers or the specific telecommunications services funding the program, then USF liabilities have the properties of tax.

Telecommunications providers are the immediate payers in the USF Program. Their liabilities are equal to the contribution factor (now about 30%) multiplied by telecommunications providers' revenues obtained only from the sale of interstate and international telecommunications services.[22] At present, the liabilities are just over $8 billion dollars. For these liabilities to have the character of a fee, then almost all the benefits of the $8 billion in expenditures must accrue to the payers. Also, the relationship between the liability and the benefits must be monotonically positive. If these conditions do not apply, then the USF liabilities have the characteristics of a tax.

There are two possible channels from which telecommunications providers—the parties immediately liable for the subsidy funds—may benefit from their liabilities. First, there is the issue of network effects. That is, a network is more valuable as more consumers are connected to it, so expanding the size of the Public Switched Telephone Network (PSTN) arguably benefits providers and their customers. Today, network effects are likely to be small if not zero. Second, providers making contributions to the program may benefit directly by receiving payments from the one or more of the four USF programs.

Aside from telecommunications providers, there may be benefits that flow to third parties — schools and libraries, rural health care providers, employers, job seekers—and such benefits to the public give the levies the character of a tax. Moreover, since liability adheres only to interstate and international revenues, and the mix of such revenues vary by provider, there may be third-party benefits even among telecommunications providers. Some providers receiving direct payments from the program pay little to nothing into the system, so that liabilities and benefits may not be monotonically related.

*Network Effects*

A larger communications network is sometimes (but not always) more valuable than a smaller one. These network effects (or network externalities), to the extent they exist, are subject to diminishing marginal returns. A small increase in subscribers to a small network has a larger network effect than does a small increase in subscribers to a network that is nearly universally adopted. While network effects may have been important at the turn of 20th century when telecommunications networks were not always interconnected, for several reasons the presence

---

[22]    Larger providers typically face large liabilities. In 2019, the largest ten payers accounted for 78% of USF liabilities and 76% of total telecommunications revenues. *Universal Service Monitoring Report* (2020), *supra* n. 3, Tables 1.3 and 1.7.

of sizable network effects today is questionable, especially for the voice-grade services that fund the USF Program.[23]

The presence or magnitude of network effects is an empirical question. The FCC has made no attempt to quantify the presence or magnitude of network effects as a benefit to telecommunications providers, and there are reasons to suspect the size of such effects is now small. Academic research suggests that the USF Programs have done little, if anything, to increase the adoption of telecommunications services beyond the market outcome.[24] Also, given the high adoption rates absent such programs, the network effects created by such programs are likely absent or small.[25]

Also, the liabilities to the USF Program need not bear a direct relation to a network effect. Say, for instance, a customer of a telecommunications provider makes one more interstate call, thereby increasing the liability of the provider. The caller and the called are both on the network, so there is no network effect from expanded adoption but there is an increase in liability.

Furthermore, today about 97% of American adults (about 258.3 million persons) have a cellphone, which permits nearly everyone to be contacted over the PSTN.[26] There are about 6.2 million Lifeline accounts and almost all are mobile wireless accounts. Thus, about 95% of Americans have a cellphone absent any subsidy, assuming Lifeline subscribers would not have service absent the program.[27] With near universal adoption absent USF support, network effects are presumably very small or possibly zero. With a near universal adoption of mobile services, neither the High-Cost Fund nor the Lifeline Program can be said to produce meaningful network effects. As far as I am aware, there is no claim that the Schools & Libraries Fund or the Rural Healthcare Fund produce network effects for the telecommunications providers.

*Receipt of Subsidies*

Given the confidentiality of USF liabilities, it not possible to directly evaluate the relationship between liability and USF support for individual providers. Assuming that interstate and

---

[23]    G. Woroch, *Local Network Competition*, in HANDBOOK OF TELECOMMUNICATIONS ECONOMICS (eds. M. Cave, S. Majundar, and I. Vogelsang) (2012); M.K. Kellog, J. Thorne, and P.W. Huber, FEDERAL TELECOMMUNICATIONS LAW (1992).

[24]    D.L. Kaserman, J.W. Mayo, and J.E. Flynn, *Cross-Subsidization in Telecommunications: Beyond the Universal Service Fairytale*, 2 JOURNAL OF REGULATORY ECONOMICS 231-249 (1990); J. Hausman, T. Tardiff, and A. Belinfante, *The Effects of the Breakup of AT&T on Telephone Penetration in the United States*, 83 AMERICAN ECONOMIC REVIEW 178-184 (1993); C. Garbacz and H.G. Thompson, Jr., *Assessing the Impact of FCC Lifeline and Link-Up Programs on Telephone Penetration*, 11 JOURNAL OF REGULATORY ECONOMICS 67-78 (1997).

[25]    A.H. Barnett and D.L. Kaserman, *The Simple Welfare Economics of Network Externalities and the Uneasy Case for Subscribership Subsidies*, 13 JOURNAL OF REGULATORY ECONOMICS 245-524 (2998).

[26]    Mobile penetration is from Pew Research (https://www.pewresearch.org/internet/fact-sheet/mobile/); Adult population from the U.S. Census Bureau (https://www.census.gov/library/stories/2021/08/united-states-adult-population-grew-faster-than-nations-total-population-from-2010-to-2020.html#:~:text=In%202020%2C%20the%20U.S.%20Census,from%20234.6%20million%20in%202010).

[27]    Lifeline Subscribers is from Universal Service Administrative Company (USAC) (https://www.usac.org/lifeline/resources/program-data/#Participation). The FCC's Mobility Fund subsidizes mobile wireless network deployment in rural areas but only small distributions have been made to date. More meaningful distributions are planned for Phase II of the program. *See, e.g.*, *FCC Should Improve the Accountability and Transparency of High-Cost Program Funding*, Government Accountability Office, GAO-14-587 (July 2014) (available at: https://www.gao.gov/assets/gao-14-587.pdf).

international revenues are correlated with total revenues, it becomes possible to say something about the relationship between liability and benefits. In Table 2, the total revenues and High-Cost support received by several providers is summarized.[28] The list includes companies with public financial data; many recipients of High-Cost funding are cooperatives or privately-held small companies that do not report formal financial results.

| Table 2. Examples of Liability and High-Cost Support | | | |
|---|---|---|---|
| Company | Total Revenues | High-Cost Support | Support/Revenues |
| AT&T | 181,193,000,000 | 548,000,000 | 0.30% |
| Verizon | 131,868,000,000 | 72,000,000 | 0.05% |
| CenturyLink | 22,401,000,000 | 516,000,000 | 2.30% |
| Frontier | 8,107,000,000 | 339,000,000 | 4.18% |
| TDS | 5,176,000,000 | 211,000,000 | 4.08% |
| Consolidated Comm. | 1,336,542,000 | 60,000,000 | 4.49% |
| LICT Corp. | 117,958,000 | 36,000,000 | 30.5% |

For the nation's largest providers of telecommunications services, AT&T and Verizon, the High-Cost support is a trivially small share of revenues—about 0.3% for AT&T and 0.05% for Verizon. For smaller providers that serve more rural markets, the share of High-Cost support to revenues is much higher. Setting aside network effects, the companies that contribute large sums to the program receive few benefits, and companies that contribute little to the fund receive large benefits. In terms of direct benefits, there is no monotonic relationship between liabilities and subsidy receipts.

The subsidization of broadband service introduces third-party benefits in the subsidy scheme. Revenues from broadband services are not subject to the USF levy. Only retail interstate and international services are in the contribution base. Consequently, a service that provides no financial support to the USF Program is a beneficiary of the subsidy program. Since the revenue sources of providers vary, often substantially, the discrepancy between the source of subsidy dollars and the recipients of subsidy dollars gives the USF levies the character of taxes. Broadband service is a "third party" beneficiary to levies placed on voice-grade service.

Making matters worse, the funding of broadband services creates additional substitutes for the voice-grade services that support the USF Program, reducing the demand for interstate and international calling. Providers with relatively high shares of interstate and international revenues are subject to liabilities the proceeds of which are used to harm their interstate and international businesses. Those liable for USF contributions are harmed by the program. Like taxation, liabilities may be spent in ways that harm the taxpayer.

*Third Party Beneficiaries*

When the FCC modernized the USF Program after the Telecommunications Act of 1996, the Commission largely abandoned the notion that it was telecommunications providers that benefit from the programs' subsidies. Today, USF spending represents a galaxy of policy concerns with

---

[28]    *Universal Service Monitoring Report* (2020), *supra* n. 3, at Table 3.7. Revenues from Yahoo Finance or company Annual Reports.

no obvious connection to carrier liabilities so that a large portion of the benefits of USF payments go to third parties.

Take, for instance, the Schools & Libraries Fund and the Rural Healthcare Fund. The FCC's stated goal of the Schools & Libraries Fund is "to support digital learning in schools and robust connectivity for all libraries."[29] The FCC's stated goal of the Rural Healthcare Fund is "to improve the quality of health care available to patients in rural communities."[30] These are broad social goals that benefit the public, not the telecommunications providers that support the program by paying levies. For these programs, there is no linkage between liabilities and benefits; the benefits are for the public at large. This inclusive perspective is not limited to these programs. The Commission's stated goal of the USF Program broadly is to promote "economic growth, jobs and opportunities."[31] Such concerns are not benefits to telecommunications providers but to the public at large.

**Conclusion**

From the economic perspective, it seems clear that the contributions to the USF Program, and especially for certain of its components, possess the characteristics of a "tax" rather than a "fee." Today, USF spending represents a galaxy of policy concerns with no obvious connection to providers' liabilities. In distributing the program's funds, the FCC aims "to support digital learning," "to improve the quality of health care," to promote "economic growth" and "jobs," and to provide "educational, employment, civic, social, and other benefits." Such broad goals are beyond the scope of a fee-based system as the benefits accrue to the public at large and not those responsible for funding the program. The primary benefit of USF Programs that may accrue to telecommunications providers is from the network effects of a more connected society, but such effects, if any, are likely to be small in modern times as consumers are able to communicate across a variety of broadly-deployed and widely-adopted communications modalities. Whether in whole or in part, the modern USF Program is social policy, the benefits of which largely serve the public and not the telecommunications providers that immediately pay for the scheme.

---

[29]     *Summary of the E-Rate Modernization Order*, Federal Communications Commission (2014) (available at: https://www.fcc.gov/general/summary-e-rate-modernization-order#:~:text=The%20Order%20adopts%20three%20goals,making%20the%20E%2Drate%20application).

[30]     *Rural Health Care Program*, Federal Communications Commission (undated) (available at: https://www.fcc.gov/general/rural-health-care-program).

[31]     *In the Matter of Universal Service Contribution Methodology; A National Broadband Plan For Our Future*, Federal Communications Commission, WC Docket No. 06-122, FCC 12-46 (Rel. April 30, 2012), at ¶ 1.

I declare under penalty of perjury that the foregoing testimony is true and correct.

September 23, 2021
_____
Date

_____
George S. Ford

# EXHIBIT B

# CURRICULUM VITAE OF DR. GEORGE S. FORD

# George S. Ford, Ph.D.
ford@phoenix-center.org

Phoenix Center for Advanced Legal &
Economic Public Policy Studies
5335 Wisconsin Avenue NW, Suite 440
Washington, DC 20015
www.phoenix-center.org

## EDUCATION:

Ph.D., Economics, Auburn University, 1994.

B.S., Economics (magna cum laude), Auburn University, 1990.

## EXPERIENCE:

| | |
|---|---|
| 2000 - Present | **PHOENIX CENTER FOR ADVANCED LEGAL AND ECONOMIC PUBLIC POLICY STUDIES**<br>**Washington, DC**<br>Chief Economist |
| 2016 - Present | **AUBURN UNIVERSITY, Auburn, Alabama**<br>Adjunct Professor |
| 2004 – Present | **APPLIED ECONOMIC STUDIES, Birmingham, Alabama**<br>President |
| 2006 - 2016 | **SAMFORD UNIVERSITY, Birmingham, Alabama**<br>Adjunct Professor |
| 2000 – 2004 | **Z-TEL COMMUNICATIONS**<br>**Tampa, FL**<br>Chief Economist, Strategic Policy and Planning |
| 1996 - 2000 | **MCI WORLDCOM CORPORATION**<br>**Washington, D.C.**<br>Senior Economist, Office of Policy and Strategic Planning |
| 1994 - 1996 | **FEDERAL COMMUNICATIONS COMMISSION**<br>**Washington, D.C.**<br>Economist, Office of the General Counsel & Cable Bureau, Competition Division |

JA140

**PUBLISHED RESEARCH:**

"Testing the Economics of the Net Neutrality Debate: A Comment," *Telecommunications Policy*, Vol. 45, 2021.

"Spatial Competition in Automobile Retailing," with T.R. Beard and L.J. Spiwak, *Applied Economics*, Vol. 53, 2021.

"Confusing Relevance and Price: Interpreting and Improving Surveys On Internet Non-Adoption," *Telecommunications Policy*, Vol. 45, 2021.

"Subsidies and Substitution: An Empirical Study of The Lifeline Program," *Telecommunications Policy*, Vol. 45, 2021.

"Interference, Sunk investment, and the Repurposing of Radio Spectrum," with T.R. Beard and M.L. Stern, *Information & Communications Technology Law*, Vol. 29, 2020.

"Net Neutrality and Investment in the US: A Review of Evidence from the 2018 Restoring Internet Freedom Order," *Review of Network Economics*, Vol. 17, 2019.

"Promotional Effects and the Determination of Royalty Rates for Music," with T.R. Beard and M. Stern, *Journal of Media Economics*, Vol. 31, 2018.

"Regulation and Investment in the U.S. Telecommunications Industry," *Applied Economics*, Vol. 50, 2018.

"Is Faster Better? Quantifying the Relationship Between Broadband Speed and Economic Growth," *Telecommunications Policy*, Vol. 42, 2018.

"Regulating, Joint Bargaining, and the Demise of Precedent," with T.R. Beard, L.J. Spiwak, and M. Stern, *Managerial and Decision Economics*, Vol. 39, 2018.

"Safe Harbors and the Evolution of Online Platform Markets: An Economic Analysis," with T.R. Beard and M. Stern, *Cardozo Arts & Entertainment Law Journal*, Vol. 36, 2018.

"Fair Use in the Digital Age," with T.R. Beard and M. Stern, *Journal of the Copyright Society of the USA*, Vol. 65, 2018.

"Piracy, Imitation, and Optimal Copyright Policy," with T.R. Beard and G. Sorek, *Southern Economic Journal*, Vol. 84, 2018.

"Private Solutions to Broadband Adoption: An Economic Analysis, forthcoming," with T.R. Beard, L.J. Spiwak, and M. Stern, *Federal Communications Law Journal*, Vol. 69, 2017.

2

"Taxation by Regulation: Spectrum Repurposing at the FCC and the Prolonging of Spectrum Exhaust," with T.R. Beard, L.J. Spiwak, and M. Stern, *Hastings Journal of Law & Technology*, Vol. 8, 2016.

"Reflecting on Twenty Years Under the Telecommunications Act of 1996," *Federal Communications Law Journal*, Vol. 68, 2016.

"Lessons Learned from the U.S. Unbundling Experience," with Lawrence J. Spiwak, *Federal Communications Law Journal*, Vol. 68, 2016.

"Value-based Pricing of Music," with T.R. Beard and M. Stern, *Review of Economic Research on Copyright Issues*, Vol. 12 (2015).

"Tariffing Internet Termination: Pricing Implications of Classifying Broadband as a Title II Telecommunications Service," with Lawrence J. Spiwak, *Federal Communications Law Journal*, Vol. 67, 2015.

"Section 10 Forbearance: Asking the Right Questions to Get The Right Answers," with Lawrence J. Spiwak, *CommLaw Conspectus*, Vol. 23, 2014.

"Market Mechanisms and the Efficient Use and Management of Scarce Spectrum Resources," with T. Randolph Beard, Lawrence J. Spiwak, and Michael Stern, *Federal Communications Law Journal*, Vol. 66, 2014.

"Market Definition and the Economic Effects of Special Access Price Regulation," with T. Randolph Beard and Lawrence J. Spiwak, *Commlaw Conspectus*, Vol. 22, 2014.

"Internet Use and Depression among Retired Older Adults in the U.S.: A Longitudinal Analysis," with S. Cotten, S. Ford, and T. Hale, *Journals of Gerontology: Social Sciences*, Vol. 69, 2014.

"Capital Investment and Employment in the Information Sector," with T. Randolph Beard and H. Kim, *Telecommunications Policy*, Vol. 38, 2014.

"Secularism, Religion and Political Choice," with R. Ekelund Jr., T. R. Beard, R. Gaskins, and R. Tollison, *Politics & Religion*, Vol. 6, 2013.

"Theft and Welfare in General Equilibrium: A Theoretical Note," with T. R. Beard, M. Stern, and L. Stern, *Theoretical Economic Letters*, Vol. 2, 2012.

"Justifying the Ends: Section 706 and the Regulation of Broadband," with L. J. Spiwak, *Journal of Internet Law*, Vol. 16, 2013.

"Wobbling Back to the Fire: Economic Efficiency and the Creation of a Retail Market for Set-Top Boxes," with T. R. Beard, L. J. Spiwak, and M. Stern, *Commlaw Conspectus*, Vol. 21, 2012.

"Wireless Competition Under Spectrum Exhaust," with T. R. Beard, L. J. Spiwak, and M. Stern, *Federal Communications Bar Journal*, Vol. 65, 2012.

3

"Endogenous Sunk Costs, Quality Competition and Welfare," with M. Stern, *Theoretical Economic Letters*, Vol. 1, 2011.

"Internet Use and Job Search," with T. R. Beard, R. Seals, and R. Saba, *Telecommunications Policy*, Vol. 36, 2012.

"Internet Use and Depression Among Older Adults," with S. Cotten, S. Ford, and T. Hale, *Computers in Human Behavior*, Vol. 28, 2012.

"The Economics of Religious Schism and Switching," with T. R. Beard, R. B. Ekelund Jr., and R. D. Tollison (Forthcoming in *Oxford Handbook on the Economics of Religion* 2012).

"Broadband Expectations and the Convergence of Ranks," *Telecommunications Policy*, Vol. 35, 2011.

"The Frontier of Broadband Adoption Across the OECD: A Comparison of Performance," *International Economic Journal*, Vol. 25, 2011.

"The Pricing of Pole Attachments: Implications and Recommendations," with T. R. Beard and L. J. Spiwak, *Review of Network Economics*, Vol. 9, 2010.

"The Broadband Credibility Gap," with L. J. Spiwak and M. L. Stern, *Commlaw Conspectus*, Vol. 75, 2010.

"The Burden of Network Neutrality Mandates on Rural Broadband Deployment," with T. M. Koutsky and L. J. Spiwak, *Journal of Applied Economy*, 2010.

"An Investigation into the Relationship of Retail Gas Prices on Oil Company Profitability," *Applied Economics*, Vol. 43, 2011.

"The Need for Better Analysis of High Capacity Services," with L. J. Spiwak. *John Marshall Journal of Computer & Information Law*, Vol. 28, 2010.

"Tort Liability for Software Developers: A Law & Economics Perspective," with T. R. Beard, T. M. Koutsky and L. J. Spiwak, *John Marshall Journal of Computer & Information Law*, XXVII, 2010.

"Quantifying the Cost of Substandard Patents: Some Preliminary Evidence," with T. R. Beard, T. M. Koutsky and L. J. Spiwak, *Yale Journal on Law and Technology*, Vol. 12, 2010.

"The Broadband Adoption Index: Improving Measurements and Comparisons of Broadband Deployment and Adoption," with T. R. Beard, L. J. Spiwak, and M. L. Stern, *Federal Communications Bar Journal*, Vol. 62, 2010.

4

"A Valley of Death in the Innovation Sequence," with T. R. Beard, T. M. Koustky, and L. J. Spiwak, *Research Evaluation*, Vol. 18, 2009.

"A Policy and Economic Exploration of Wireless Carterfone Regulation," with T. M. Koutsky, and L. J. Spiwak, *Santa Clara Computer & High Technology Law Journal*, Vol. 25, 2009.

"HAC Standard Errors and the Event Study Methodology: A Cautionary Note," with J. Jackson. *Applied Economics Letters*, Vol. 16, 2009.

"Sample Size and the Accuracy of the Generalized Lambda Distribution," with S. Skinner. *Communications in Statistics - Simulation and Computation*, Vol. 38, 2009.

"Network Neutrality and Foreclosing Market Exchange," with T. R. Beard, T. M. Koutsky, and L. J. Spiwak. *International Journal of Management and Network Economics*, Vol. 1, 2009.

"Developing a National Wireless Regulatory Framework: A Law and Economics Approach," with T. R. Beard, T. M. Koutsky, and L. J. Spiwak. *Commlaw Conspectus*, Vol. 16, 2008.

"Constituency Size and the Growth of Public Expenditures: The Case of the United Kingdom," with M. Thornton and M. Ulrich. *Journal of Public Choice and Finance*, Vol. 24, 2006 (published in 2008).

"The Competitive Effects of Quantity Discounts," with T. R. Beard and D. L. Kaserman. *Antitrust Bulletin*, Vol. 52, 2007.

"Network Neutrality and Industry Structure," with T. R. Beard, Thomas M. Koutsky and Lawrence J. Spiwak. *Hastings Communications and Entertainment (Comm/Ent) Law Journal*, Vol. 29, 2007.

"A La Carte and 'Family Tiers' as a Response to a Market Defect in the Multichannel Video Programming Market," with T. R. Beard and Thomas M. Koutsky. *CommLaw Conspectus*, Vol. 15, 2006.

"The Impact of Video Service Regulation on the Construction of Broadband Networks to Low-Income Households," with Thomas M. Koutsky and Lawrence J. Spiwak. *I/S: A Journal of Law and Policy for the Information Society*, Vol. 3, 2007.

"Competition After Unbundling: Entry, Industry Structure and Convergence," with Thomas M. Koutsky and Lawrence J. Spiwak. *The Federal Communications Law Journal*, Vol. 59, 2007.

"Does Municipal Supply of Communications Crowd-Out Private Communications Investment? An Empirical Study," *Energy Economics*, Vol. 29, 2007.

5

"Broadband and Economic Development: A Municipal Case Study from Florida," with T. M. Koutsky. *Review of Urban and Regional Development Studies*, Vol. 17, 2006.

"The Economics of Build-out Rules in Cable Television," with T. M. Koutsky and L. W. Spiwak. *Hastings Communications and Entertainment (Comm/Ent) Law Journal*, Vol. 28, 2006.

"Issues in Empirical Merger Analysis," with T. Randolph Beard Introductory article by the Guest Editors in a Special Issue of the *International Journal of the Economics of Business*, Vol. 13, 2006.

"Empirical Simulation of Mergers: The Cingular and AT&T Wireless Merger," with T. Randolph Beard and Richard P. Saba. *International Journal of the Economics of Business*, Vol. 13, 2006.

"Event Studies for Merger Analysis: An Evaluation of the Effects of Non-Normality on Hypothesis Testing," with Audrey D. Kline. In *Antitrust Policy Issues*, Nova Publishers, 2006.

"Are Unbundled and Self-Supplied Telecommunications Switching Substitutes? An Empirical Study," with T. Randolph Beard. *International Journal of the Economics of Business*, Vol. 12, 2005.

"Misleading Inferences from Panel Unit-Root Tests: A Comment," with John Jackson and Audrey Kline. *Review of International Economics*, Vol. 14, 2006.

"Splitting the Baby: An Empirical Test of Rules of Thumb in Regulatory Price Setting," with T. Randolph Beard. *Kyklos*, Vol. 58, 2005.

"Mandated Access and the Make-or-Buy Decision: The Case of Local Telecommunications Competition," with T. Randolph Beard and Thomas W. Koutsky. *Quarterly Review of Economics and Finance*, Vol. 45, 2005. Presented at *The Drivers and Significance of Local Telecommunications Competition*, United States Department of Justice, July 23, 2002 as "Facilities-based Entry in Local Telecommunications: An Empirical Investigation").

"On the Relationship between Telecommunications Investment and Economic Growth: Three Empirical Studies," with R. Beil and J. Jackson. In *Economic Growth Issues*, Nova Publishers, 2005.

"On the Relationship between Telecommunications Investment and Economic Growth in the United States," with R. Beil and J. Jackson. *International Economic Journal*, Vol. 19, 2005.

6

"Access Charge Reductions and Long Distance Rates: A Bootstrap Analysis," with T. Randolph Beard, R. Carter Hill, and Richard P. Saba. *Empirical Economics*, Vol. 30, 2005.

"Fragmented Duopoly: A Conceptual and Empirical Investigation," with T. Randolph Beard, R. Carter Hill, and R. Saba. *Journal of Business*, Vol. 78, 2005.

"Competition and Investment in Telecommunications," with John D. Jackson. *Atlantic Economic Journal*, Vol. 32, 2004.

"Pursuing Competition in Local Telephony: The Law and Economics of Unbundling and Impairment," with T. R. Beard and R. B. Ekelund Jr., *Journal of Law, Technology and Policy*, Vol. 2003, Fall 2003.

The Financial Implications of the UNE-Platform: A Review of the Evidence," with T. Randolph Beard and Christopher C. Klein *CommLaw Conspectus: Journal of Communications Law and Policy*, Vol. 12, 2004. Also published in the handbook for the 21st *Annual Institute on Telecommunications Policy & Regulation*, Practicing Law Institute, New York, 2003.

"Innovation, Investment, and Unbundling: An Empirical Update," with Robert B. Ekelund Jr., *Yale Journal on Regulation*, Vol. 20, 2003.

"Discrimination and Minority Ownership in Radio Broadcasting," with Audrey B. Davidson and Barry Hayworth, *International Journal of the Economics of Business*, Vol. 10, 2003.

"Preliminary Evidence on the Demand for Unbundled Elements in Telephony," with Robert B. Ekelund, Jr., *Atlantic Economic Journal*, Vol. 30, 2002.

"Demand Elasticities for International Message Telephone Service," with John D. Jackson, *Applied Economics*, Vol. 36, 2004.

"Competition and Market Structure in Local Exchange and Long Distance Telecommunications Markets," with T. Randolph Beard. *International Handbook on Telecommunications Economics*, Vol. I, Ch. 6, Gary Madden ed., Edward Elgar: 2002.

"Why Adco? Why Now? An Economic Exploration into the Future of Industry Structure in Local Telecommunications Markets," with T. Randolph Beard and Lawrence Spiwak. *Federal Communications Law Journal*, Vol. 54, 2002.

7

"Price, Quality, and Consumer Welfare in the Cable Television Industry," with T. Randolph Beard, Robert B. Ekelund, Jr., and Richard P. Saba. *Journal of Regulatory Economics*, Vol. 20, 2001

"The Fallacy of Regulatory Symmetry: An Economic Analysis of the "Level Playing Field" in Cable TV Franchising Statutes," with Thomas W. Hazlett. *Business & Politics*, Vol. 3, 2001.

"The Measurement of Merger Delay in Regulated and Restructuring Industries," with Robert B. Ekelund Jr. and Mark Thornton. *Applied Economics Letters*, Vol. 8, 2001.

"Changing Industry Structure: The Economics of Entry and Price Competition" with Jerry B. Duvall. *Telecommunications and Space Journal*, Vol. 7, 2000.

"Market Power in Radio Markets: An Empirical Analysis of Local and National Concentration," with Robert B. Ekelund, Jr. and Thomas Koutsky. *Journal of Law and Economics*, Vol. XLIII, 2000.

"TV Advertising, Local Markets and Merger Guidelines: An Empirical Study," with Robert B. Ekelund, Jr. and John D. Jackson. *International Journal of the Economics of Business*, Vol. 7, 2000.

"Preserving Free Television? Some Empirical Evidence on the Efficacy of Must Carry," with John D. Jackson. *Journal of Media Economics*, Vol. 13, 2000.

"Is Radio Advertising a Distinct Local Market: An Empirical Analysis," with R. B. Ekelund, Jr. and John D. Jackson. *Review of Industrial Organization*, Vol. 14, 1999.

"On the Interpretation of Policy Effects from the Estimates of Simultaneous Systems of Equations," with John D. Jackson. *Applied Economics*, Vol. 30, 1998.

"Information Costs and Nirvana Revisited: Edwin Chadwick on Nineteenth Century Urban Funeral Markets," with Robert B. Ekelund, Jr. *Journal of Regulatory Economics*, Vol. 12, 1997. Reprinted in the *The Foundations of Regulatory Economics*, Ed. R. B. Ekelund, Jr., Edward Elgar Publishing.

"Horizontal Concentration and Vertical Integration in the Cable Television Industry" with John D. Jackson. *Review of Industrial Organization*, Vol. 12, 1997.

8

**EXAMPLES OF LITIGATION, REGULATORY DOCUMENTS, TESTIMONY:**

*Testimony in Madison County Communications District, et al., v. Earthlink Business, LLC, Civil Action CV-2014-904855* (2018).

*Testimony on SDARS Royalties* (Multiple proceedings in years 2009-17): Client: SoundExchange, Inc.

"The Impact of Government-Owned Broadband Networks on Private Investment and Consumer Welfare," written for the State Government Leadership Foundation (April 6, 2016).

*Alabama Attorney General, Consumer Advocate Office* (Rate Proceeding before the Alabama Public Service Commission, Summer 2013, 2018).

*Testimony of Phoenix Center Chief Economist Dr. George S. Ford before the United States Senate Committee on Commerce, Science and Transportation - Subcommittee on Communications, Technology, and the Internet, Hearing on the "State of Wireless Communications"* (June 4, 2013).

*Testimony of Phoenix Center Chief Economist Dr. George S. Ford before the United States the House of Representatives Committee on Energy and Commerce Subcommittee Communications and Technology, Hearing on "Health Information Technologies: Harnessing Wireless Innovation"* (March 19, 2013).

*A Legal and Economic Review of the U.S. Unbundling Experience,* Prepared for USAID under contract No. EEM-I-00-07-00009-00; Order No. AID-527-TO-10-00002, for the Peru Andean Trade Capacity Building (PATCB) (May 2012). Presentation of the Report to OSIPTEL in Lima, Peru, in a two-day seminar in October 2012.

*Testimony on Copyright Royalties* (Proceeding in 2012, Canada): Client: Re:Sound.

*Testimony on Webcasting Copyright Royalties* (Multiple proceedings in years 2009-12): Client: Soundexchange, Inc.

*Testimony on Cable Retransmission Copyright Royalties 2004-2005* (Proceeding in years 2009-10), Client: Motion Picture Association of America.

*National Telecommunications and Information Administration: Broadband Data Transparency Workshop,* U.S. Department of Commerce, National Telecommunications and Information Administration, Herbert C. Hoover Building, Washington, DC (October 30, 2009).

*Business News Network's Market Morning Talk Time: How Much Americans and Canadians Really Pay for Cell Phone Use,* Television Appearance, (September 18, 2009).

9

*Federal Communications Commission Workshop: Deployment Unserved/Underserved*, Federal Communications Commission, Washington, DC (August 12, 2009).

*OECD Expert Workshop on Measuring Mobile/Wireless Service Data, Evaluating Broadband Adoption*, Lisbon, Portugal (February 19-20, 2009).

*Autoridade Nacional de Comuniçacões (ANACOM), Agência Nacional de Telecomunicações (ANATEL)* (Broadband Adoption Project, 2009).

*17th ANACOM Seminar, Study and Presentation, The Broadband Efficiency Index: What Really Drives Broadband Adoption Across the OECD* (September 25, 2009).

*Developing a "National Broadband Strategy" - Understanding the OECD Rankings and the Drivers of Broadband Adoption.* Presentation at the U.S. Congress Rayburn House Office Building (July 28, 2008).

*Testimony Before the Federal Communications Commission's Open Meeting on Network Neutrality and Broadband Network Management*, Stanford University (April 17, 2008).

*A Valley of Death in the Innovation Sequence: An Economic Investigation,* United States Department of Commerce, Technology Administration (September 2007).

*Testimony Before the House Committee on Commerce and Energy - Subcommittee on Telecommunications and the Internet Hearing on "Digital Future of the United States: Part IV: Broadband Lessons from Abroad"* (April 24, 2007).

*Testimony Before the House Committee on Commerce and Energy - Subcommittee on Telecommunications:  A Discussion Draft Addressing Broadband Mapping and Data Collection* (May 17, 2007).

*Capitol Hill Inter-Active Workshop: Sound Internet Policy for the 21st Century: Understanding the Economic Fundamentals* (Feb. 2007).

*Broadband Connectivity Competition Policy, Federal Trade Commission* (Feb. 2007).

*3rd Annual State of the Net Conference 2007, Advisory Committee to the Congressional Internet Caucus* (Jan. 2007).

*Carter Estate v. CSXT, Louisville, Kentucky* (2006).

*Ken Hecht v. Comcast of Indiana, Inc., et al, Indianapolis, Indiana* (2005/6).

10

*"Crummy Duopoly" or Vigorous Inter-Modal Competition? The Impact of Cable Franchise Requirements on New Fiber Builds.* Phoenix Center Congressional Briefing (July 21, 2005).

*Florida Bill HB 1325 and SB 1322* (Municipal Broadband). Testimony before numerous Committees of the Florida House of Representatives (Spring 2005).

*Z-Tel Communications, Inc. v. SBC Communications, Inc.,* Texarkana, Texas (2003).

*A Response to Olbeter and Robinson's 'Breaking the Backbone',* released by MCI Worldcom (August 1999).

*An Economic Analysis of the FCC's Notice of Inquiry on Flat Rate Charges in the Long Distance Industry,* filed in CC Docket No. 99-249 (September 1999).

*Further Thoughts on Payphone Compensation,* filed in CC Docket No. 96-128 (November 1998).

*Effective Enforcement of Non-Discriminatory Performance by Incumbent Local Exchange Carriers,* with John D. Jackson (filed with New York Public Service Commission, October 1999).

*A Review of the Texas Performance Plan,* with John D. Jackson filed with the Federal Communications Commission (2000).

*Investigation into Pricing of Unbundled Network Elements,* Testimony filed before the State of Florida Public Service Commission, Docket No. 990649-TP (2000).

*Investigation into Pricing of Unbundled Network Elements,* Testimony filed before the State of Florida Public Service Commission, Docket No. 990649-TP (2000).

*Investigation into Pricing of Unbundled Network Elements,* Testimony filed before the State of New York Public Service Commission, Docket No. 98-C-1357 (2000).

*In the Matter of US West Communications, Inc.'s Compliance with Sec 271 of the Telecommunications Act of 1996,* Statement before the Arizona Corporation Commission, Docket No. T-00000B-97-0238 (2000).

*Performance Measurements for Telecommunications Interconnection, Unbundling and Resale,* Testimony before the Georgia Public Service Commission, Docket No. 7892-U (2000).

11

*Investigation and Generic Proceeding on Ameritech Indiana's rates for Interconnection, Service, Unbundled Elements, and Transport and Termination,* Declaration and Reply before the Indiana Public Service Commission, Cause No. 40611 (2000 2000).

*Inquiry by the Department of Telecommunications and Energy Pursuant to Section 271 of the Telecommunications Act of 1996,* Comments filed before the Massachusetts Department of Telecommunications and Energy, Docket No. DTE 99-271 (2000).

*Commission Review of Various Submissions of Ameritech Indiana to Show Compliance with Section 271(C) of the Telecommunications Act of 1996,* Multiple filings before the Indiana Utility Regulatory Commission (2000).

*In the Matter of US West Communications, Inc.'s, Compliance with §271 of the Telecommunications Act of 1996,* Comments and studies filed before the Arizona Corporation Commission (2000).

*In the Matter of Investigation into US West Communications, Inc.'s Compliance with Certain Wholesale Pricing Requirements for Unbundled Network Elements and Resale Discounts,* Docket No. T-00000A-00-0194 (2001).

*In the Matter of the Commission Investigation and Generic Proceeding on Ameritech Indiana's Rates for Interconnection, Service, Unbundled Elements, and Transport and Termination Under the Telecommunications Act of 1996 and Related Indiana Statutes,* Cause No. 40611-S1 (2001).

*In the Matter of the Petition of Indiana Bell Telephone Company, Incorporated d/b/a Ameritech Indiana Pursuant to I.C. 8-1-2-61 For a Three Phase Process For Commission Review of Various Submissions of Ameritech Indiana to Show Compliance with Section 271(c) of The Telecommunications Act of 1996,* Cause No. 41657 (2001).

*Application by Bell Atlantic New York for Authorization Under Section 271 of the Communications Act To Provide In-Region, InterLATA Service in the State of New York,* Federal Communications Commission, CC Docket No. 99-295 (1999).

*Application by SBC Communications Inc., Southwestern Bell Telephone Company, And Southwestern Bell Communications Services, Inc. d/b/a Southwestern Bell Long Distance Pursuant to Section 271 of the Telecommunications Act of 1996 To Provide In-Region, InterLATA Services In Texas,* Federal Communications Commission, CC Docket No. 00-65 (2000)

*Joint Application by SBC Communications Inc., Southwestern Bell Telephone Company, and Southwestern Bell Communications Services, Inc. d/b/a Southwestern Bell Long Distance for Provision of In-Region, InterLATA Services*

12

*in Kansas and Oklahoma*, Federal Communications Commission, CC Docket No. 00-217 (2000/2001).

*Joint Application by SBC Communications Inc., Southwestern Bell Telephone Company, and Southwestern Bell Communications Services, Inc. d/b/a Southwestern Bell Long Distance Pursuant to Section 271 of the Telecommunications Act of 1996 To Provide In-Region, InterLATA Services in Arkansas and Missouri*, Federal Communications Commission, CC Docket No. 01-194 (2001).

*Joint Application by BellSouth Corporation, BellSouth Telecommunications, Inc., And BellSouth Long Distance, Inc for Provision of In-Region, InterLATA Services In Georgia and Louisiana*, Federal Communications Commission, CC Docket No. 02-35 (2002).

*Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, Federal Communications Commission, CC Docket No. 01-338 (2003).

*In Through the Back Door: Embedded Cost and the FLC*, Working Paper (June 2002).

*How Many Days in a Year? Creative Cost Modeling and the Cost to Competition*, Working Paper (June 2002).

*A Fox in the Hen House: An Evaluation of Bell Company Proposals to Eliminate Their Monopoly Positions in Local Telecommunications*, Working Paper, June 2002.

## PHOENIX CENTER WORKS (Author/Co-Author):

*Policy Papers*

"Bridging the Digital Divide: What Has Not Worked But What Just Might," PHOENIX CENTER POLICY PAPER No. 56 (June 2020).

"A Fresh Look at the Lifeline Program," PHOENIX CENTER POLICY PAPER No. 55 (July 2019).

"The Rewards of Municipal Broadband: An Econometric Analysis of the Labor Market," PHOENIX CENTER POLICY PAPER No. 54 (May 2019).

"Quarry Operations and Property Values: Revisiting Old and Investigating New Empirical Evidence," PHOENIX CENTER POLICY PAPER No. 53 (March 2018).

"Fixing Safe Harbor: An Economic Analysis," PHOENIX CENTER POLICY PAPER No. 52 (August 2016).

13

"Fair Use in the Digital Age," PHOENIX CENTER POLICY PAPER No. 51 (September 2016).

"How (and How Not) to Measure Market Power Over Business Data Services," PHOENIX CENTER POLICY PAPER No. 50 (September 2016).

"Eroding the Rule of Law: Regulation as Cooperative Bargaining at the FCC," PHOENIX CENTER POLICY PAPER No. 49 (October 2015).

"The Price Effects of Intra-Brand Competition in the Automobile Industry: An Econometric Analysis," PHOENIX CENTER POLICY PAPER No. 48 (March 2015).

"An Economic Framework for Retransmission Consent," PHOENIX CENTER POLICY PAPER No. 47 (December 2013).

"Market Mechanisms and the Efficient Use and Management of Scarce Spectrum Resources," PHOENIX CENTER POLICY PAPER No. 46 (December 2013).

"Lessons Learned from the U.S. Unbundling Experience," PHOENIX CENTER POLICY PAPER No. 45 (June 2013).

"Taxation by Condition: Spectrum Repurposing at the FCC and the Prolonging of Spectrum Exhaust," PHOENIX CENTER POLICY PAPER No. 44 (September 2012).

"Wireless Competition Under Spectrum Exhaust," PHOENIX CENTER POLICY PAPER No. 43 (February 2012).

"A Policy Framework for Spectrum Allocation in Mobile Communications," PHOENIX CENTER POLICY PAPER No. 42 (March 2011).

Wobbling Back to the Fire: Economic Efficiency and the Creation of a Retail Market for Set-Top Boxes," PHOENIX CENTER POLICY PAPER No. 41 (December 2010).

"The Broadband Credibility Gap," PHOENIX CENTER POLICY PAPER No. 40 (June 2010).

"Internet Use and Job Search," PHOENIX CENTER POLICY PAPER No. 39 (January 2010).

"Internet Use and Depression Among the Elderly," PHOENIX CENTER POLICY PAPER No. 38 (October 2009).

"Market Definition and the Economic Effects of Special Access Price Regulation," PHOENIX CENTER POLICY PAPER No. 37 (October 2009).

14

"The Broadband Adoption Index: Improving Measurements and Comparisons of Broadband Deployment and Adoption," PHOENIX CENTER POLICY PAPER No. 36 (July 2009).

"The Need for Better Analysis of High-Capacity Services," PHOENIX CENTER POLICY PAPER No. 35 (June 2009).

"The Pricing of Pole Attachments: Implications and Recommendations," PHOENIX CENTER POLICY PAPER No. 34 (December 2008).

"The Broadband Efficiency Index: What Really Drives Broadband Adoption Across the OECD?" PHOENIX CENTER POLICY PAPER No. 33 (May 2008).

"The Welfare Impacts of Broadband Network Management: Can Broadband Service Providers Be Trusted?" PHOENIX CENTER POLICY PAPER No. 32 (March 2008).

"The Demographic and Economic Drivers of Broadband Adoption in the United States," PHOENIX CENTER POLICY PAPER No. 31 (November 2007).

"Quantifying the Cost of Substandard Patents: Some Preliminary Evidence," PHOENIX CENTER POLICY PAPER No. 30 (September 2007).

"The Broadband Performance Index: A Policy-Relevant Method of Comparing Broadband Adoption Among Countries," PHOENIX CENTER POLICY PAPER No. 29 (July 2007).

"Network Neutrality and Foreclosing Market Exchange: A Transaction Cost Analysis," PHOENIX CENTER POLICY PAPER No. 28 (March 2007).

"Tort Liability for Software Developers: A Law & Economics Perspective," PHOENIX CENTER POLICY PAPER No. 27 (January 2007).

"An Investigation into the Influence of Retail Gas Prices on Oil Company Profits," PHOENIX CENTER POLICY PAPER No. 26 (August 2006).

"The Burden of Network Neutrality Mandates on Rural Broadband Deployment," PHOENIX CENTER POLICY PAPER No. 25 (July 2006).

"Network Neutrality and Industry Structure," PHOENIX CENTER POLICY PAPER No. 24 (April 2006).

"The Impact of Video Service Regulation on the Construction of Broadband Networks to Low-Income Households," PHOENIX CENTER POLICY PAPER No. 23 (September 2005).

15

"The Consumer Welfare Cost of Cable "Build-out" Rules," PHOENIX CENTER POLICY PAPER No. 22 (July 2005).

"Competition After Unbundling: Entry, Industry Structure and Convergence," PHOENIX CENTER POLICY PAPER No. 21 (July 2005).

"Quantity-Discount Contracts as a Barrier to Entry," PHOENIX CENTER POLICY PAPER No. 20 (November 2004).

"The Positive Effects of Unbundling on Broadband Deployment," PHOENIX CENTER POLICY PAPER No. 19 (September 2004).

"Set It and Forget It? The Consequences of Market Power and Deregulation in Telecommunications Markets Services," PHOENIX CENTER POLICY PAPER No. 18 (June 2003).

"What Determines Wholesale Prices for Network Elements in Telephony? An Econometric Evaluation," PHOENIX CENTER POLICY PAPER NO. 16 (September 2002).

"A Fox in the Hen House: An Evaluation of Bell Company Proposals to Eliminate their Monopoly Position in Local Telecommunications Markets," PHOENIX CENTER POLICY PAPER No. 15 (September 2002).

"Make or Buy? Unbundled Elements as Substitutes for Competitive Facilities in the Local Exchange Network," PHOENIX CENTER POLICY PAPER No. 14 (September 2002).

"Why Adco? Why Now? An Economic Exploration into the Future of Industry Structure in Local Telecommunications Markets," PHOENIX CENTER POLICY PAPER No. 12 (November 2001).

"An Economic Analysis of the FCC's Notice of Inquiry on Flat Rate Charges in the Long Distance Industry," PHOENIX CENTER POLICY PAPER No. 11 (May 2001).

"Changing Industry Structure: The Economics of Entry and Price Competition" PHOENIX CENTER POLICY PAPER No. 10 (April 2001).

"Flow Through and Competition in the International Message Telephone Service Market," PHOENIX CENTER POLICY PAPER No. 7 (September 2000).

*Policy Bulletins*

"The Day the Music Died (in California): An Analysis of California Assembly Bill AB-1385," PHOENIX CENTER POLICY BULLETIN No. 51 (May 2021).

16

"Innovation, Exit, and Restrictions on Tech Mergers and Acquisitions," PHOENIX CENTER POLICY BULLETIN No. 50 (March 2021).

"COVID-19 and Broadband Speeds: A Multi-Country Analysis," PHOENIX CENTER POLICY BULLETIN No. 49 (May 2020).

"'Relevance' and 'Price' as Determinants of Internet Non-Adoption: A Review of the Evidence, PHOENIX CENTER POLICY BULLETIN No. 48 (April 2020).

"Innovation in Spectrum Repurposing: The C-Band as A Principal-Agent Problem," PHOENIX CENTER POLICY BULLETIN No. 47 (September 2019).

"Addressing Spectrum Holdouts with A Transaction Threshold: A Theoretical Analysis," PHOENIX CENTER POLICY BULLETIN No. 46 (July 2019).

"Infrastructure Investment and Franchise Fee Abuse: A Theoretical Analysis," PHOENIX CENTER POLICY BULLETIN No. 45 (April 2019).

"Is Faster Better? Quantifying the Relationship between Broadband Speed and Economic Growth," PHOENIX CENTER POLICY BULLETIN No. 44 (February 2018).

"A Retrospective Analysis of Vertical Mergers in Multichannel Video Programming Distribution Markets: The Comcast-NBCU Merger," PHOENIX CENTER POLICY BULLETIN No. 43 (December 2017).

"Safe Harbors and the Evolution of Music Retailing," PHOENIX CENTER POLICY BULLETIN No. 41 (March 2017).

"Skin in the Game: Interference, Sunk Investment, and the Repurposing of Radio Spectrum," PHOENIX CENTER POLICY BULLETIN No. 40 (March 2017).

"Promotional Effects and the Determination of Royalty Rates for Music," PHOENIX CENTER POLICY BULLETIN No. 39 (November 2016).

"Private Solutions to Broadband Adoption: An Economic Analysis," PHOENIX CENTER POLICY BULLETIN No. 38 (September 2016).

"Section 10 Forbearance: Asking the Right Questions to Get the Right Answers," PHOENIX CENTER POLICY BULLETIN No. 37 (November 2014).

"Tariffing Internet Termination: Pricing Implications of Classifying Broadband as a Title II Telecommunications Service," PHOENIX CENTER POLICY BULLETIN No. 36 (September 2014).

17

"Will Bidder Exclusion Rules Lead to Higher Auction Revenue? A Review of the Evidence," PHOENIX CENTER POLICY BULLETIN No. 34 (April 2014).

"Equalizing Competition Among Competitors: A Review of the DOJ's Spectrum Screen Ex Parte Filing," PHOENIX CENTER POLICY BULLETIN No. 33 (May 2013).

"Social Well-Being and IP Theft: A Dynamic Economic Analysis," PHOENIX CENTER POLICY BULLETIN No. 32 (March 2012).

"Can Government Spending Get America Working Again? An Empirical Investigation," PHOENIX CENTER POLICY BULLETIN No. 31 (November 2011).

"Shocks to the Broadband Ecosystem: Implications for Competition and Market Structure," PHOENIX CENTER POLICY BULLETIN No. 30 (September 2011).

"Ending the Section 629 Problem: A Law and Economics Argument," PHOENIX CENTER POLICY BULLETIN No. 29 (June 2011).

"Regulatory Expenditures, Economic Growth and Jobs: An Empirical Study," PHOENIX CENTER POLICY BULLETIN No. 28 (April 2011).

"Challenges in Using the National Broadband Map's Data, PHOENIX CENTER POLICY BULLETIN No. 27 (March 2011).

"Public Safety or Commercial Use? A Cost/Benefit Framework for the D Block," PHOENIX CENTER POLICY BULLETIN No. 26 (March 2011).

"Jobs, Jobs, Jobs: Communications Policy and Employment Effects in the Information Sector," PHOENIX CENTER POLICY BULLETIN No. 25 (October 2010).

"Evaluating Broadband Stimulus and the National Broadband Plan: Establishing Expectations for Broadband Rankings," PHOENIX CENTER POLICY BULLETIN No. 24 (March 2010).

"Expanding the Digital Divide: Network Management Regulations and the Size of Providers," PHOENIX CENTER POLICY BULLETIN No. 23 (October 2009).

"Do High Call Termination Rates Deter Broadband Deployment?" PHOENIX CENTER POLICY BULLETIN No. 22 (October 2008).

"Consumers and Wireless Carterfone: An Economic Perspective," PHOENIX CENTER POLICY BULLETIN No. 21 (September 2008).

18

"Using Auction Results to Forecast the Impact of Wireless Carterfone Regulation on Wireless Networks," PHOENIX CENTER POLICY BULLETIN No. 20 (May 2008).

"An Economic Approach to Evaluating a National Wireless Regulatory Framework," PHOENIX CENTER POLICY BULLETIN No. 19 (October 2007).

"Wireless Net Neutrality:  From Carterfone to Cable Boxes," PHOENIX CENTER POLICY BULLETIN No. 17 (April 2007).

"The Efficiency Risk of Network Neutrality Rules," PHOENIX CENTER POLICY BULLETIN No. 16 (May 2006).

"Unnecessary Regulations and the Value of Spectrum: An Economic Evaluation of Lease Term Limits for the Educational Broadband Service," PHOENIX CENTER POLICY BULLETIN No. 15 (February 2006).

"A La Carte and 'Family Tiers' as a Response to a Market Defect in the Multichannel Video Programming Market," PHOENIX CENTER POLICY BULLETIN No. 14 (February 2006).

"In Delay There Is No Plenty:  The Consumer Welfare Cost of Franchise Reform Delay," PHOENIX CENTER POLICY BULLETIN No. 13 (January 2006).

"Franchise Fee Revenues After Video Competition: The 'Competition Dividend' for Local Governments," PHOENIX CENTER POLICY BULLETIN No. 12 (November 2005).

"Higher Prices Expected from the Cingular/AT&T Wireless Merger," PHOENIX CENTER POLICY BULLETIN No. 11 (May 26, 2004).

"Fixed-Mobile "Intermodal" Competition in Telecommunications: Fact or Fiction?," PHOENIX CENTER POLICY BULLETIN No. 10 (March 30, 2004).

"Federalism in Telecommunications Regulation: Effectiveness and Accuracy of State Commission Implementation of TELRIC in Local Telecoms Markets," PHOENIX CENTER POLICY BULLETIN No. 9 (March 9, 2004).

"The $10 Billion Benefit of Unbundling: Consumer Surplus Gains from Competitive Pricing Innovations," PHOENIX CENTER POLICY BULLETIN No. 8 (January 27, 2004).

"The Positive Effects of Competition on Employment in the Telecommunications Industry," PHOENIX CENTER POLICY BULLETIN No. 7 (October 15, 2003).

19

"UNE-P Drives Bell Investment – A Synthesis Model," PHOENIX CENTER POLICY BULLETIN No. 6 (September 17, 2003).

"Competition and Bell Company Investment in Telecommunications Plant: The Effects of UNE-P," PHOENIX CENTER POLICY BULLETIN No. 5 (Originally released July 9, 2003 and updated September 17, 2003).

"The Truth About Telecommunications Investment after the Telecommunications Act of 1996," PHOENIX CENTER POLICY BULLETIN No. 4 (June 24, 2003).

*Policy Perspectives*

"Form 477, Speed-Tests, and the American Broadband User's Experience," PHOENIX CENTER POLICY PERSPECTIVE No. 21-03 (March 31, 2021).

"Updating the Minimum Wage: Setting a Uniform Wage Across a Diverse America," PHOENIX CENTER POLICY PERSPECTIVE No. 21-01 (February 16, 2021).

"Are Broadband Prices Declining? A Look at the FCC's Price Survey Data," PHOENIX CENTER POLICY PERSPECTIVE No. 20-07 (October 26, 2020).

"The Open Technology Institute's Cost of Connectivity 2020 Report: A Critical Review," PHOENIX CENTER POLICY PERSPECTIVE No. 20-06 (July 20, 2020).

"Subsidizing Broadband: Price, Relevance, and the Digital Divide," PHOENIX CENTER POLICY PERSPECTIVE No. 20-05 (July 7, 2020).

"Trends in Lifeline Reform: A Look at the Evidence, Not the Politics," PHOENIX CENTER POLICY PERSPECTIVE No. 20-04 (July 1, 2020).

"Is France a Broadband Nirvana? A Look at the Data," PHOENIX CENTER POLICY PERSPECTIVE No. 20-03 (June 18, 2020).

"Could Acceleration Payments Increase Funding for Broadband? A Review of the FCC's C-Band Plan," PHOENIX CENTER POLICY PERSPECTIVE No. 20-01 (February 18, 2020).

"Infrastructure Investment in the Railroad Industry: An Econometric Analysis," PHOENIX CENTER POLICY PERSPECTIVE No. 19-07 (December 9, 2019).

"Does Title II Reduce Infrastructure Investment? Repairing Hooton's Analysis," PHOENIX CENTER POLICY PERSPECTIVE No. 19-06 (October 15, 2019).

20

"Statistical Negligence in Title II Impact Analysis," PHOENIX CENTER POLICY PERSPECTIVE No. 19-05 (October 1, 2019).

"Cost-Benefit Analysis at the FCC: A Look at the 900 MHz Band," PHOENIX CENTER POLICY PERSPECTIVE No. 19-04 (September 16, 2019).

"Quantifying the Overstatement in Broadband Availability from the Form 477 Data: An Econometric Approach," PHOENIX CENTER POLICY PERSPECTIVE No. 19-03 (July 11, 2019).

"Broadband as a Source of Rural Decline: A Look at the Data," PHOENIX CENTER POLICY PERSPECTIVE No. 19-02 (June 13, 2019).

"Estimating Betas in Practice: Alternatives that Matter and Those that Do Not," PHOENIX CENTER POLICY PERSPECTIVE No. 19-01 (January 9, 2019).

"Addressing Holdouts in the Repurposing of Spectrum for Broadband Services," PHOENIX CENTER POLICY PERSPECTIVE No. 18-10 (December 19, 2018).

"Infrastructure Investment After Title II," PHOENIX CENTER POLICY PERSPECTIVE No. 18-09 (November 1, 2018).

"Expediting Spectrum Repurposing Through Market Transactions," PHOENIX CENTER POLICY PERSPECTIVE No. 18-08 (October 12, 2018).

"Rhetoric Aside: What the Data Actually Say About Broadband Deployment," PHOENIX CENTER POLICY PERSPECTIVE No. 18-07 (September 4, 2018).

"Potential Implications of the Sprint/T-Mobile Merger on Wholesale Markets," PHOENIX CENTER POLICY PERSPECTIVE No. 18-06 August 27, 2018).

"Fair Use and the Economy: A Review of CCIA's Estimate," PHOENIX CENTER POLICY PERSPECTIVE No. 18-05 (June 27, 2018).

"Stock Market Reactions to the Sprint-TMO Merger," PHOENIX CENTER POLICY PERSPECTIVE No. 18-04 (May 23, 2018).

"Comcast's Capital Spending After Reclassification: A Check on Claims," PHOENIX CENTER POLICY PERSPECTIVE No. 18-03 (April 25, 2018).

"Reclassification and the Availability of 'Broadband' Service: A Counterfactual Check on Recent Claims," PHOENIX CENTER POLICY PERSPECTIVE No. 18-02 (April 19, 2018).

21

"A Review of the Berkman Center's Price Survey of Municipal Broadband Markets," PHOENIX CENTER POLICY PERSPECTIVE No. 18-01 (January 24, 2018).

"The Vanishing Benefits of Fair Use: A Review of the Flynn-Palmedo Study on 'User Rights' in Copyright Law," PHOENIX CENTER POLICY PERSPECTIVE No. 17-12 (December 18, 2017).

"Financial Implications of Opelika's Municipal Broadband Network," PHOENIX CENTER POLICY PERSPECTIVE No. 17-11 (August 24, 2017).

"A Further Review of the Internet Association's Empirical Study on Network Neutrality and Investment," PHOENIX CENTER POLICY PERSPECTIVE No. 17-10 (August 14, 2017).

"A Review of the Internet Association's Empirical Study on Network Neutrality and Investment," PHOENIX CENTER POLICY PERSPECTIVE No. 17-09 (July 24, 2017).

"Reclassification and Investment: A Statistical Look at the 2016 Data," PHOENIX CENTER POLICY PERSPECTIVE No. 17-08 (July 13, 2017).

"Broadband Speeds Post-Reclassification: An Empirical Approach," PHOENIX CENTER POLICY PERSPECTIVE No. 17-07 (June 27, 2017).

"Below the Belt: A Review of Free Press and the Internet Association's Investment Claims," PHOENIX CENTER POLICY PERSPECTIVE No. 17-06 (June 20, 2017).

"Regulatory Revival and Employment in Telecommunications," PHOENIX CENTER POLICY PERSPECTIVE No. 17-05 (June 12, 2017).

"Reclassification and Investment: An Analysis of Free Press' 'It's Working' Report," PHOENIX CENTER POLICY PERSPECTIVE No. 17-04 (May 22, 2017).

"Net Neutrality, Reclassification and Investment: A Further Analysis," PHOENIX CENTER POLICY PERSPECTIVE No. 17-03 (May 16, 2017).

"Net Neutrality, Reclassification and Investment: A Counterfactual Analysis," PHOENIX CENTER POLICY PERSPECTIVE No. 17-02 (April 25, 2017).

"What is the "Cost per Regulator" on GDP and Private Sector Job Creation? An Update on Prior Research," PHOENIX CENTER POLICY PERSPECTIVE No. 17-01 (February 22, 2017).

22

"Learning from Bad Technique: The WIK-Consult Report on Business Data Services," PHOENIX CENTER POLICY PERSPECTIVE No. 16-07 (August 4, 2016).

"State Automobile Franchise Laws: Public or Private Interests?" PHOENIX CENTER POLICY PERSPECTIVE No. 16-06 (July 12, 2016).

"Proper Incentives? The Economics of Spam Management by the Mobile Wireless Industry," PHOENIX CENTER POLICY PERSPECTIVE No. 16-05 (May 4, 2016).

"Cost or Benefit? A Review of the Consumer Federation of America's Report on Regulating Special Access Services," PHOENIX CENTER POLICY PERSPECTIVE No. 16-04 (April 18, 2016).

"Are Government-Owned Networks Abusing Market Power in the Set-Top Box Market? A Review of Rates," PHOENIX CENTER POLICY PERSPECTIVE No. 16-03 (April 14, 2016).

"The Road to Nowhere: Regulatory Implications of the FCC's Special Access Data Request," PHOENIX CENTER POLICY PERSPECTIVE No. 16-02 (February 23, 2016).

"The Economic Impact of Expanding Fair Use in Singapore: More Junk Science for Copyright Reform," PHOENIX CENTER POLICY PERSPECTIVE No. 16-01 (February 16, 2016).

"Ugly is Only Skin Deep: An Analysis of the DE Program in Auction 97," PHOENIX CENTER POLICY PERSPECTIVE No. 15-04 (July 20, 2015).

"The Lisbon Council's 2015 Intellectual Property and Economic Growth Index: A Showcase of Methodological Blunder," PHOENIX CENTER POLICY PERSPECTIVE No. 15-03 (June 29, 2015).

"Auction 97 and the Value of Spectrum," PHOENIX CENTER POLICY PERSPECTIVE No. 15-02 (February 4, 2015).

"Why Chattanooga is not the "Poster Child" for Municipal Broadband," PHOENIX CENTER POLICY PERSPECTIVE No. 15-01 (January 20, 2015).

"Movie Leaks, Box Office Success and Child's Play: Using an On-Line Game is No Way to Quantify the Effects of Piracy," PHOENIX CENTER POLICY PERSPECTIVE No. 14-07 (October 28, 2014).

"Have We Got It All Wrong? Forecasting Mobile Data Use and Spectrum Exhaust," PHOENIX CENTER POLICY PERSPECTIVE No. 14-06 (October 21, 2014).

23

"The Unpredictable FCC: Politicizing Communications Policy and its Threat to Broadband Investment," PHOENIX CENTER POLICY PERSPECTIVE No. 14-05 (October 14, 2014).

"Free Markets, Monopolies, and Copyright," PHOENIX CENTER POLICY PERSPECTIVE No. 14-04 (June 25, 2014).

"Should the Internet Tax Moratorium be Made Permanent?" PHOENIX CENTER POLICY PERSPECTIVE No. 14-03 (June 2, 2014).

"What is the Effect of File Sharing on the Creation of New Music? A Critical Review of *A Case Study of File Sharing and Music Output*," PHOENIX CENTER POLICY PERSPECTIVE No. 14-02 (March 6, 2014).

"Do Municipal Networks Offer More Attractive Service Offerings than Private Sector Providers? A Review and Expansion of the Evidence," PHOENIX CENTER POLICY PERSPECTIVE No. 14-01 (January 27, 2014).

"Piracy and Movie Revenues: A Critical Review of "A Tale of the Long Tail," PHOENIX CENTER POLICY PERSPECTIVE No. 13-05 (September 16, 2013).

"The Economics of Bidder Exclusion Rules: A Response to Dr. Baker," PHOENIX CENTER POLICY PERSPECTIVE No. 13-04 (July 18, 2013).

"Will Bidder Exclusions Increase Auction Revenue? A Review of the Arguments," PHOENIX CENTER POLICY PERSPECTIVE No. 13-03 (June 11, 2013).

"Revisiting Internet Use and Depression Among the Elderly," PHOENIX CENTER POLICY PERSPECTIVE No. 13-02 (June 7, 2013).

"Searching for a New Regulatory Paradigm: A Comment on AT&T's Petition for Wire Center Trials," PHOENIX CENTER POLICY PERSPECTIVE No. 13-01 (February 25, 2013).

"What is the Effect of Regulation on Broadband Investment? Regulatory Certainty and the Expectation of Returns," PHOENIX CENTER POLICY PERSPECTIVE No. 12-05 (September 19, 2012).

"Justifying the Ends: Section 706 and the Regulation of Broadband," PHOENIX CENTER POLICY PERSPECTIVE No. 12-04 (August 13, 2012).

"Approximating the Distribution of Broadband Usage from Publicly-Available Data," PHOENIX CENTER POLICY PERSPECTIVE No. 12-03 (May 31, 2012).

24

JA163

"A Most Egregious Act? The Impact on Consumers of Usage-Based Pricing," PHOENIX CENTER POLICY PERSPECTIVE No. 12-02 (May 23, 2012).

"Regulatory Expenditures, Economic Growth and Jobs: A Reply to Comments," PHOENIX CENTER POLICY PERSPECTIVE No. 12-01 (April 24, 2012).

"On the Road to More Efficient Pricing of Telecommunications Services: A Look at the Evidence," PHOENIX CENTER POLICY PERSPECTIVE No. 11-06 (October 5, 2011).

"What is the Effect of Regulation on Broadband Investment? Regulatory Certainty and the Expectation of Returns," PHOENIX CENTER POLICY PERSPECTIVE No. 12-05 (September 19, 2011).

"Mobile Broadband and Job Search: An Empirical Test," PHOENIX CENTER POLICY PERSPECTIVE No. 11-05 (September 6, 2011).

"Internet Use and Labor Market Participation: Additional Insights from New and Old Data," PHOENIX CENTER POLICY PERSPECTIVE No. 11-04 (August 18, 2011).

"Justifying the Ends: Section 706 and the Regulation of Broadband," PHOENIX CENTER POLICY PERSPECTIVE No. 12-04 (August 13, 2011).

"Re-Auction of the D Block: A Review of the Arguments," PHOENIX CENTER POLICY PERSPECTIVE No. 11-03 (May 24, 2011).

"Wireless Mergers and Employment: A Look at the Evidence," PHOENIX CENTER PERSPECTIVE No. 11-02 (May 10, 2011).

"The Impossible Dream: Forbearance After the Phoenix Order," PHOENIX CENTER PERSPECTIVE No. 10-08 (December 2010).

"Endogenous Sunk Costs, Quality Competition and Welfare: A Technical Note," PHOENIX CENTER PERSPECTIVE No. 10-07 (December 2010).

"Be Careful What You Ask For (Redux): A Comment on the New America Foundation's Mobile Price Metrics," PHOENIX CENTER PERSPECTIVE No. 10-06 (November 2010).

"Fabricating a Broadband Crisis? More Evidence on the Misleading Inferences from OECD Rankings," PHOENIX CENTER PERSPECTIVE No. 10-05 (July 2010).

"Substantial Profits in the Broadband Ecosystem: A Look at the Evidence," PHOENIX CENTER PERSPECTIVE No 10-04 (April 2010).

25

"Non-Discrimination or Just Non-Sense: A Law and Economics Review of the FCC's New Net Neutrality Principle," PHOENIX CENTER PERSPECTIVE No. 10-03 (March 2010).

"Sabotaging Content Competition: Do Proposed Net Neutrality Regulations Promote Exclusion?" PHOENIX CENTER PERSPECTIVE No. 10-02 (March 2010).

"Internet Use and Job Search: More Evidence," PHOENIX CENTER PERSPECTIVES No. 10-01 (January 2010).

"Internet Use and Job Search: More Evidence," PHOENIX CENTER PERSPECTIVE No. 10-01 (January 2010).

"Whoops! Berkman Study Shows "Open Access" Reduces Broadband Consumption," PHOENIX CENTER PERSPECTIVES No. 09-05 (November 2009).

"Finding the Bottom: A Review of Free Press's Analysis of Network Neutrality and Investment," PHOENIX CENTER PERSPECTIVES No. 09-04 (October 2009).

"Expanding the Digital Divide: Network Management Regulations and the Size of Providers," PHOENIX CENTER POLICY BULLETIN No. 23 (October 2009).

"Be Careful What You Ask For: A Comment on the OECD's Mobile Price Metrics," PHOENIX CENTER PERSPECTIVES No. 09-03 (September 16, 2009).

"Econometric Analysis of Broadband Subscriptions: A Note on Specification," PHOENIX CENTER PERSPECTIVES No. 09-02 (May 12, 2009).

"Normalizing Broadband Connections," PHOENIX CENTER PERSPECTIVES No. 09-01 (May 12, 2009).

"Broadband Expectations and the Convergence of Ranks," PHOENIX CENTER PERSPECTIVES No. 08-03 (October 1, 2008).

"Valuing the AWS-3 Spectrum: A Response to Comments," PHOENIX CENTER POLICY PERSPECTIVE No. 08-02 (July 2008).

"Calculating the Value of Unencumbered AWS-III Spectrum," PHOENIX CENTER POLICY PERSPECTIVE No. 08-01 (June 2008).

"University of Florida Study Shows Only Winners from Network Neutrality Regulation to be Content Providers, Consumers Lose." PHOENIX CENTER POLICY PERSPECTIVE No. 07-01 (March 2007).

26

OTHER WRITINGS:

"The Perils of a $15 Federal Minimum Wage," *Delaware Valley Journal* (February 22, 2021).

"Beware of Calls for a New Digital Regulator," *Notice & Comment – Yale Journal on Regulation* (February 19, 2021).

"INSIGHT: FCC Must Move Quickly on 12 GHz Mid-Band Spectrum for 5G Goals," *Bloomberg Law* (July 30, 2020).

"Getting Broadband Subsidies Right This Time," *Federalist Society Blog* (July 8, 2020).

"INSIGHT: Clock Ticks on Congress and STELAR Reauthorization," *Bloomberg Law* (November 21, 2019).

"Proposed Reforms to FCC's Lifeline Program Require A Bit More Thought," *Federalist Society Blog* (July 22, 2019).

"Insight: Is the Sprint, T-Mobile Merger Deal Dead?" *Bloomberg Law* (April 25, 2019).

"Should Electric Co-Ops Provide Broadband?" *Federalist Society Blog* (March 21, 2019).

"Sometimes 'No' is the Right Answer for Market Transactions," *Federalist Society Blog* (July 17, 2018)

"Putting 'Fair' Back in 'Fair Use'," *Federalist Society Blog* (June 26, 2018).

"'Hipster' Antitrust Meets Two-Sided Markets," *Bloomberg Law* (April 17, 2018).

"Kentucky Wired – Get Out, And Get Out Now," *TheLevisaLazer.com* (March 26, 2018).

"Let's Not Leave America's Small Businesses Behind in Tax Reform," *The Hill* (November 27, 2017).

"Repurposing Spectrum for Mobile Broadband Is Great, But Interference Issues Must Be Resolved First," *Bloomberg BNA* (October 16, 2017).

"FCC Must Dump Obama's Net Neutrality Rules for Broadband," *The Hill* (September 5, 2017).

"Public Broadband Projects Can Leave Taxpayers Holding the Bag," *AL.com* (August 30, 2017).

"Overbroad Safe Harbors — A Threat to a Healthy Internet," *Bloomberg BNA* (August 30, 2017).

27

"Not Ready to Ride into the Sunset: Chairman Wheeler and the Fight for Internet Regulation," *Bloomberg BNA* (August 10, 2017).

"Revisiting the 'Virtuous Circle' Two Years Later," *Bloomberg BNA* (July 10, 2017).

"The Real Story Behind Internet Regulation," *Real Clear Policy* (June 29, 2017).

"Is Now the Right Time to Expand Opelika's Broadband Service?" *AL.com* (April 11, 2017).

"Stopping the Surface Transportation Board from Running off the Rails," *The Hill* (January 18, 2017).

"Fair Use Does Not Mean a Fair Market," *Content Café* (September 19, 2016).

"Questionable Economic Benefits of Chattanooga's Gig," *The Tennessean* (August 17, 2016).

"What is the True Cost of a Set-Top Box?" *Bloomberg BNA* (May 31, 2016).

"Statutory Damages are a Vital Part of the Copyright System," *The Hill* (May 25, 2016).

"The Obama Administration is Misleading Consumers on Set-Top Box Prices," *The Hill* (April 22, 2016).

"The FCC's Cynical Set-Top Box Play," *The Hill* (February 3, 2016).

"FTC Staff Bias on Intra-Brand Car Competition is a Bad Deal for Consumers," *The Hill* (January 19, 2016).

"Is the FCC's Regulatory Revival Deterring Infrastructure Investment?" *Bloomberg BNA* (November 13, 2015).

"How Congress Lost Control of the Regulators," *The Hill* (October 27, 2015).

"Bait-and-Switch—Or Why the FCC's 'Virtuous Circle' Theory is Nonsense," *Bloomberg BNA* (May 18, 2015).

"Tax Unfairness Is A Job Killer," *The Hill* (December 3, 2014).

"The Unpredictable FCC: Politicizing Communications Policy and its Threat to Broadband Investment," *Bloomberg BNA* (October 30, 2014).

"Will Net Neutrality Politics Scuttle the FCC's Upcoming Incentive Auction?" *The Hill* (September 3, 2014).

28

"Congressional Gridlock Threatens to Tax the Internet," *The Hill* (June 05, 2014).

"FCC Puts Funding for Public Safety Network and Debt Reduction in Jeopardy," *The Hill* (April 24, 2014).

"Shared Spectrum is a Pipe Dream," *The Hill* (February 6, 2014).

"Opportunities for Local Exchange Competition Are Greatly Exaggerated." *Electric Light & Power* (April 1998).

"Book Review: Welfare Economics and Externalities in an Open-Ended Universe: A Modern Austrian Perspective," by Roy E. Cordato. *Southern Economic Journal* (April 1994).

"Book Review: Toward Competition in Local Telephony," by William J. Baumol and Gregory Sidak. *Southern Economic Journal* (April 1996).

"Competition Will Decrease Cable Rates: On Curbing Cable Costs," with Audrey B. Davidson. *Business First* (September 6, 1993).

"TKR Cable Not Living Up to Promises To Cut Rates," with Audrey B. Davidson. *The Louisville Cardinal* (September 2, 1993).

"The Cable Television Industry: An Annotated Bibliography" Published and Funded by the *Auburn Utilities Research Center* (Summer 1994).

29

# EXHIBIT C

## OPINIONS OF JUDGES NEWSOM AND LAGOA

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13315

_____

CONSUMERS' RESEARCH,
CAUSE BASED COMMERCE, INC.,
EDWARD J. BLUM,
KERSTEN CONWAY,
SUZANNE BETTAC, et al.,

Petitioners,

*versus*

FEDERAL COMMUNICATIONS COMMISSION,
UNITED STATES OF AMERICA,

Respondents,

BENTON INSTITUTE FOR BROADBAND & SOCIETY, et al.,

JA170

Intervenors.

_____

Petition for Review of a Decision of the
Federal Communications Commission
Agency No. 96-45

_____

Before WILSON, NEWSOM, and LAGOA, Circuit Judges.

WILSON, Circuit Judge:

In this petition for review of final agency action, the Petitioners ask us to declare 47 U.S.C. § 254—the Telecommunications Act of 1996's universal service requirements—unconstitutional as a violation of the nondelegation doctrine. Additionally, they argue that the Federal Communications Commission (FCC), the agency Congress put in charge of § 254, has impermissibly delegated authority over the universal service fund to a private entity in violation of the private nondelegation doctrine.

Because § 254 provides an intelligible principle and the FCC maintains control and oversight of all actions by the private entity, we hold that there are no unconstitutional delegations and therefore **DENY** the petition.

## I.    Background

The FCC was created in 1934 "[f]or the purpose of regulating interstate . . . commerce in communication . . . so as to make

JA171

available, so far as possible, to all the people of the United States, without discrimination . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151. In 1996, Congress instructed the FCC to establish and maintain a universal service fund in furtherance of this purpose. *Id.* § 254. Congress enacted § 254 to provide equitable universal services. *Id.* The Act instructs the FCC to determine the requisite level of universal service based on an "evolving" evaluation of four statutory factors. *Id.* § 254(c). The FCC requires contributors to submit a specified amount of money to the Fund per quarter. *Id.* § 254(d).

The FCC depends on the Universal Service Administrative Company (USAC), a private entity, to carry out Congress' instruction. The USAC assists the FCC in determining the amount each contributor must provide to the fund. *See* 47 C.F.R. §§ 54.701, 54.709. The USAC uses the FCC's detailed formulas to determine projections and demand for the universal service fund per quarter. *See id.* §§ 54.303, 54.901, 54.1301, 54.711(a). The USAC must submit its "projections of demand for the federal universal service support mechanisms" to the FCC 60 days before the start of the quarter, and then submit the total contribution base (i.e., the percentage of revenues that each carrier will have to pay) to the agency at least 30 days before the start of the quarter. *Id.* § 54.709(a)(3). Only after the FCC approves the USAC's proposal is the USAC's valuation used to calculate that quarter's contribution factor. *Id.* Then, the contribution factor is used to determine the amount of individual contributions. *Id.*

JA172

On appeal, the Petitioners—a nonprofit organization that aims to increase consumer knowledge of issues, a corporation that resells telecommunications services, and various individuals who pay into the universal service fund through monthly phone bills—challenge the FCC's and USAC's roles in creating the 4th Quarter 2022 Contribution Factor.  They argue that the actions taken by both entities are unconstitutional under nondelegation doctrine jurisprudence.

## II.    Jurisdiction

Because we have "an independent obligation to ensure that subject-matter jurisdiction exists before reaching the merits of a dispute," we begin with a jurisdictional analysis before addressing the Petitioners' claims. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020).

The FCC challenges our jurisdiction to hear this appeal under the Hobbs Act.  A "proceeding to enjoin, set aside, annul, or suspend any order of the Commission . . . shall be brought as provided by and in the manner prescribed in [the Hobbs Act]."  47 U.S.C. § 402(a).[1]  The Hobbs Act gives Courts of Appeal exclusive jurisdiction to "determine the validity of . . . all final orders of the Federal Communications Commission."  28 U.S.C. § 2342(1); *see also FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984) ("Exclusive jurisdiction for review of final FCC orders . . . lies in the

---

[1] This direction is subject to exclusions not applicable in the case before us.  *See* 47 U.S.C. § 402(b).

Court of Appeals."). However, the aggrieved party has only 60 days after the order's entry to file a petition for review. 28 U.S.C. § 2344.

The FCC argues that the Hobbs Act bars us from exercising jurisdiction for two reasons. First, because the Petitioners' true challenge is to the constitutionality of the entire statutory delegation scheme, and not the 4th Quarter Contribution Factor specifically. The FCC asserts that analyzing jurisdiction under the Hobbs Act requires looking at the impact of a proceeding rather than the reason a plaintiff brought a suit. Thus, because the statute was last amended in 2011, the Petitioners are far beyond their 60-day jurisdictional limit to file this petition. Second, the FCC argues that a challenge to a Contribution Factor is an invalid pre-enforcement challenge because the Petitioners will not be harmed by the announcement of the Contribution Factor since it has not yet been applied to them. We disagree on both points.

First, even if Petitioners challenge the entire statutory scheme, we agree with the Sixth and D.C. Circuits that administrative regulations "are capable of continuing application." *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C. Cir. 1958); *see also Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *Rettig v. State*, 987 F.3d 518, 529 (5th Cir. 2021). When considering a challenge to FCC rules under the Hobbs Act, the D.C. Circuit reasoned that the 60-day limit does not affect review of the validity of agency action that re-applies a rule. *See Functional Music*, 274 F.2d at 546. This is true because "limiting the right of review of the underlying rule would

JA174

effectively deny many parties ultimately affected by a rule an opportunity to question its validity." *Id.* Such is the case here. The Fourth Quarter Contribution Factor re-applies the statutory delegation in § 254. Thus, "Petitioners' challenge to the FCC's constitutional authority to implement § 254, reapply its prior regulations, and issue the [4th Quarter 2022 Contribution Factor] restarts the sixty-day clock." *Consumers' Rsch. v. FCC*, 67 F.4th 773, 786 (6th Cir. 2023).

Here, the challenge is timely. The Petitioners filed their challenge to the 4th Quarter Contribution Factor twenty-one days after public notice, and seven days after the Contribution Factor was deemed approved by the FCC and therefore became effective. The Petitioners were well within their 60-day jurisdictional limit.

Second, we find that the Contribution Factor is ripe for review. The Contribution Factor itself is a final and judicially reviewable agency action—Petitioners need not wait for "harm." According to FCC regulations, "Commission action shall be deemed final, for purposes of seeking reconsideration at the Commission *or judicial review*, on the date of public notice." 47 C.F.R. § 1.103(b) (emphasis added); *see also Bennett*, 520 U.S. at 177–78; *Consumers' Rsch.*, 67 F.4th at 785 (finding the text of 47 C.F.R. § 1.103(b) to be sufficient indication that an FCC contribution factor is final and reviewable). Further, as we have explained, "[o]rders 'adopted by the Commission in the avowed exercise of its rule-making power' that 'affect or determine rights generally . . . have the force of law and are orders reviewable under the' Hobbs Act." *Mais v. Gulf Coast*

JA175

*Collection Bureau, Inc.*, 768 F.3d 1110, 1121 (11th Cir. 2014) (quoting *Columbia Broad. Sys. v. United States*, 316 U.S. 407, 417 (1942)). Here, the challenge is properly brought because the Petitioners filed their challenge after the Contribution Factor's public notice date, and the Contribution Factor affects or determines their rights.

Even it was not ripe for review, however, Petitioners have demonstrated that their appeal presents a proper pre-enforcement review. A threatened enforcement of a law creates an Article III injury "[w]hen an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). "[I]t is not necessary that petitioner first expose himself to actual [harm] to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). The Supreme Court has "permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent." *Driehaus*, 573 U.S. at 159. Here, Petitioners have met this bar. Accordingly, we possess jurisdiction and proceed to the merits.

### III.   Standard of Review

"We review questions of constitutional law *de novo*." *United States v. Brown*, 364 F.3d 1266, 1268 (11th Cir. 2004).

### IV.   Traditional Nondelegation Doctrine

Although all legislative powers granted by the Constitution "shall be vested in a Congress of the United States," U.S. Const. art. I, "the Constitution does not deny to the Congress the necessary

JA176

resources of flexibility and practicality that enable it to perform its functions." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality opinion) (alterations adopted) (internal quotation marks omitted). Consequently, Congress may "obtain the assistance of its coordinate Branches—and in particular, may confer substantial discretion on executive agencies to implement and enforce the laws." *Id.* (cleaned up). Thus, "a statutory delegation is constitutional as long as Congress lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Id.* (alterations adopted) (internal quotation marks omitted).

The standards necessary to satisfy the nondelegation doctrine "are not demanding." *Id.* at 2129; *see also Brown*, 364 F.3d at 1271 ("The government does not bear an onerous burden in demonstrating the existence of an intelligible principle."). "[A] delegation of legislative power will be 'constitutionally sufficient if Congress clearly delineates [1] the general policy, [2] the public agency which is to apply it, and [3] the boundaries of this delegated authority.'" *Brown*, 364 F.3d at 1271 (alterations in original) (quoting *Mistretta v. United States*, 488 U.S. 361, 372–73 (1989)).

The Petitioners argue that because there is no limit on how much the FCC can raise for the Fund, the statutory grant lacks any concrete, objective guidance. The FCC responds that § 254 has multiple standards.[2] "[A] nondelegation inquiry always begins (and

---

[2] The general policy of § 254 is clear: it exists to make sure "[a]ccess to advanced telecommunications and information services [are] provided in all

often almost ends) with statutory interpretation." *Gundy*, 139 S. Ct. at 2123. An analysis of § 254 confirms that Congress' delegation provides an intelligible principle and therefore passes constitutional muster.

Section 254(b) expressly states many of the principles the FCC must adhere to. We begin with the general principles that guide the FCC. The FCC shall create "policies for the preservation and advancement of universal service." 47 U.S.C. § 254(b). Those policies must be based on specifically identified principles: quality services should be made available at just and reasonable rates; advanced services should be provided to the entire United States; and "low-income consumers and those in rural, insular, and high cost areas" should have access to advanced services at reasonably comparable rates to those in urban areas. *Id*. § 254(b)(1)–(3).

Next, § 254(b)'s limiting principles. All policies the FCC creates relating to the fund must be "specific, predictable and sufficient . . . to preserve and advance universal service." *Id*. § 254(b)(5). Congress assigns the responsibility for contributions to the fund to "telecommunications carrier[s] that provide[] interstate telecommunications services." *Id*. § 254(d). It instructs the FCC to charge contributors in an equitable and nondiscriminatory

---

regions of the Nation." 47 U.S.C. § 254(b)(2). The agency to implement it is likewise clear: the FCC must act to carry out this general policy. *See id*. § 254(a)(2). The parties disagree only on whether Congress has properly delineated "the boundaries of th[e] delegated authority." *Brown*, 364 F.3d at 1271.

JA178

manner. *Id.* § 254(b)(4), (d). The FCC must provide access to "[e]lementary and secondary schools and classrooms, health care providers, and libraries," *id.* § 254(b)(6), and the funds can only be disbursed to statutorily designated eligible telecommunications carriers to provide support for universal services, *id.* § 254(e).

The last of the § 254(b) principles is more open ended, and Petitioners take specific issue with it. Under § 254(b)(7), the FCC "shall base policies . . . on . . . "[s]uch other principles as the . . . [FCC] determine[s] are necessary and appropriate for the protection of the public interest, convenience, and necessity, and are consistent with this chapter." *Id.* § 254(b)(7). The Petitioners contend that paragraph (b)(7) is proof of the FCC's boundless authority. But the grant itself comes with specific limits: the FCC may only add principles that "are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter." *Id.* Because Congress is afforded wide latitude to delegate authority to executive agencies, these limits suffice. *Gundy*, 139 S. Ct. at 2129; *Brown*, 364 F.3d at 1271. We agree with the Sixth Circuit that the principles in § 254 collectively

> direct the FCC on (1) what it must pursue: accessible, quality, and affordable service. (2) How the FCC must fund these efforts: by imposing carrier contributions. (3) The method by which the FCC must effectuate the goals of accessible, sound-quality, and affordable service: by creating specific mechanisms for the Fund. And (4) to whom to direct the programs: by identifying the USF's mechanisms' beneficiaries.

*Consumers' Rsch.*, 67 F.4th at 791 (emphases omitted).  Thus, we hold that 47 U.S.C. § 254 is permissible under the nondelegation doctrine.

### V.   Private Nondelegation Doctrine

"[I]f people outside government could wield the government's power—then the government's promised accountability to the people would be an illusion. . . .  This commonsense principle has come to be known as the 'private non-delegation doctrine.'" *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022).  As the Fifth Circuit aptly explained, the application of the doctrine is derived from an 80-year-old Supreme Court analysis in *Carter v. Carter Coal Co.*, 298 U.S. 238, 311–12 (1936) and *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388, 399 (1940):

> In *Carter Coal*, the Court invalidated a federal law that authorized a majority of coal producers to fix wages and hours for all producers.  Giving regulatory power to "private persons whose interests may be and often are adverse to the interests of others in the same business" was, the Court held, an unconstitutional "legislative delegation" of a "governmental function." Congress then rewrote the law and, four years later, the Court upheld it in *Adkins*.  Under the new law, private boards only proposed prices—and those prices now had to be "approved, disapproved, or modified by the [agency]."  The private entities "operate[d] as an aid" to the agency "but [were] subject to its pervasive surveillance and authority."  The Court found the

JA180

new scheme "unquestionably valid." The Court em-
phasized that the private entities "function[ed] subor-
dinately to the [agency]," that the agency and not the
private entities "determine[d] the prices," and that the
agency had "authority and surveillance over the [pri-
vate entities]."

*Nat'l Horsemen's Benevolent & Protective Ass'n*, 53 F.4th at 880–81 (al-
terations in original) (internal citations omitted).

From the Supreme Court's guidance, our sister circuits have
held that there is no violation of the private nondelegation doctrine
where the private entity functions subordinate to an agency, and
the agency has authority and surveillance over the entity. *See, e.g.,*
*United States v. Frame*, 885 F.2d 1119, 1128–29 (3rd Cir. 1989) ("[N]o
law-making authority has been entrusted to" the private entity and
therefore "the [statute] does not constitute an unlawful delegation
of legislative authority. In essence, the [private entities] serve an
advisory function, and in the case of collection of assessments, a
ministerial one."), *abrogated on other grounds*, *Cochran v. Veneman*,
359 F.3d 263 (3rd Cir. 2004); *Pittston Co. v. United States*, 368 F.3d
385, 396 (4th Cir. 2004) (holding that the private entity merely car-
ried out the ministerial tasks of doing calculations and collecting
funds, thus the "powers given to the [private entity] are of an ad-
ministrative or advisory nature, and delegation of them to the [pri-
vate entity] does not, we conclude, violate the nondelegation doc-
trine"); *Ass'n of Am. R.R. v. U.S. Dep't of Transp.*, 721 F.3d 666, 671
(D.C. Cir. 2013) (stating that private "entities may . . . help a gov-
ernment agency make its regulatory decisions" and "Congress may

JA181

formalize the role of private parties in proposing regulations so long as that role is merely 'as an aid' to a government agency that retains the discretion to 'approve[], disapprove[], or modif[y]' them" (alterations in original)), *vacated and remanded on other grounds*, *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43 (2015); *Nat'l Horsemen's Benevolent & Protective Ass'n*, 53 F.4th at 881 ("If the private entity does not function subordinately to the supervising agency, the delegation of power is unconstitutional."); *Oklahoma v. United States*, 62 F.4th 221, 228–29 (6th Cir. 2023) ("*Adkins* shows that a private entity may aid a public federal entity that retains authority over the implementation of federal law. But if a private entity creates the law or retains full discretion over any regulations . . . it is an unconstitutional exercise of federal power." (internal citation omitted)).

Today we join our sister circuits in holding that a government agency may delegate statutory authority to private entities without violating the private nondelegation doctrine so long as (1) the entity "function[s] subordinately" to the agency, and (2) the agency retains "authority and surveillance over the activities" of the private entity. *Adkins*, 310 U.S. at 399 (alteration in original).

Private entities "may aid [a federal agency] that retains authority over the implementation of federal law" by serving "as advisors that propose regulations[,] . . . undertak[ing] ministerial functions, . . . gather[ing] facts for the agency, or advis[ing] on or mak[ing] policy recommendations to the agency." *Consumer's Rsch.*, 67 F.4th at 795 (internal citations omitted). Likewise, "a

statute does not violate the private nondelegation doctrine if it 'imposes a standard to guide' the private party." *Consumers' Rsch. v. FCC*, 63 F.4th 441, 451 (5th Cir. 2023) (quoting *Texas v. Rettig*, 987 F.3d 518, 532 (5th Cir. 2021),[3] *vacated & reh'g en banc granted*, 72 F.4th 107 (5th Cir. 2023) (mem.)).

The Petitioners argue that the FCC has impermissibly delegated its statutory authority under § 254 to the USAC in violation of the private nondelegation doctrine. Because the USAC functions subordinately to the FCC, and the FCC maintains authority, we disagree and hold that the USAC's role in carrying out the universal service fund does not violate the private nondelegation doctrine.

### a.   The USAC's Functions

In considering an identical private nondelegation challenge to a previous FCC Contribution Factor, the Sixth Circuit found that the USAC is "subordinate to the FCC and performs ministerial and fact-gathering functions." *Consumers' Rsch.*, 67 F.4th at 795–96. We agree. The USAC cannot make policy or interpret unclear provisions or rules. 47 C.F.R. § 54.702(c). Where there is confusion about how it should act, it must seek direction from the FCC. *Id.* The USAC must act in accordance with FCC regulations, and those regulations expressly limit the USAC's functions to ministerial functions like "billing contributors, collecting contributions to the

[3] The Fifth Circuit mistakenly attributed the quoted portion to *Rettig*. It properly appears in *Boerschig v. Trans-Pecos Pipeline, LLC*, 872 F.3d 701, 708 (5th Cir. 2017).

universal service support mechanisms, and disbursing universal service support funds." *Id.* § 54.702(b). The USAC must file annual reports with the FCC and Congress that conform to specifications outlined by the FCC. *Id.* § 54.702(g). The reports must detail the USAC's "operations, activities, and accomplishments" from the prior year and all "administrative action intended to prevent waste, fraud, and abuse." *Id.* The report must also "include all expenses, receipts, and payments associated with the administration of the universal service support programs." *Id.* Each year, the USAC must consult with the FCC "to determine the scope and content of the annual report." *Id.*

The USAC's actions are ministerial. It gathers facts to determine the Fund's needs each quarter, then proposes a dollar amount that would ensure those needs are met. *Consumer's Rsch.*, 67 F.4th at 796. As discussed below, it collects and disburses the funds pursuant to statutory and FCC instruction. Finally, every decision concerning the fund is submitted for review to both the FCC and Congress. Therefore, the USAC is properly subordinate to the FCC.

### b. *The FCC's Authority*

The Petitioners argue that the FCC's use of the USAC violates the private nondelegation doctrine because: the USAC decides how much money to raise and how to spend it, and the FCC exercises no meaningful oversight of these decisions. We disagree. A review of the regulations governing each point in the Petitioners

JA184

argument reveals that the FCC maintains substantial authority over the USAC.

First, the USAC's projection for the 2022 Fourth Quarter Contribution Factor is only a proposal. *See id.* ("[T]he FCC is not bound by USAC's projections."). The regulations make clear that "the quarterly universal service contribution factor *shall be determined by the Commission.*"   47 C.F.R. § 54.709(a)(2) (emphasis added).   Consequently, the USAC cannot "decide" how much money the fund will make per quarter.   Instead, it submits quarterly projected costs that "must be approved" by the FCC. *Id.* § 54.709(a)(3).   The FCC has the right to adjust the projection, set its own, or take no action (in which case the USAC's projection will be deemed approved by the FCC). *Id.*   If approved, the projected expenses "are used to calculate the quarterly contribution factor." *Id.*   Importantly, the USAC cannot apply the contribution factor to the fund contributors until the factor has been approved by the FCC. *Id.*

The Petitioners take issue with the FCC's option to deem a proposal approved through inaction. *See id.* ("If the Commission take no action within fourteen (14) days of the date of release of the public notice announcing the projections . . . the contribution factor shall be deemed approved by the Commission.").   But "an agency exercises its policymaking discretion with equal force when it makes policy by either deciding to act or deciding *not* to act." *Consumer's Rsch.*, 67 F.4th at 796 (alterations adopted) (internal quotation marks omitted).   Thus, the USAC simply acts as an advisor

that proposes regulations subject to government approval. *Adkins* 310 U.S. at 388 (explaining that private entities that aid government agencies "but [that are] subject to [the agency's] pervasive surveillance and authority" are permissible); *see also Consumer's Rsch.*, 67 F.4th at 795–96.

Second, the USAC must disburse the funds collected in the manner prescribed by statute and FCC regulation.[4]  The FCC mandates that the USAC "shall account for the financial transactions of the Universal Service Fund in accordance with generally accepted accounting principles . . . and maintain the accounts of the Universal Service Fund in accordance with the United States Government Standard General Ledger."  47 C.F.R. § 54.702(n).  Under the implementing statute, the funds can *only* be disbursed to an eligible telecommunications carrier.  47 U.S.C. § 254(e).  The USAC must report on the disbursement of the Fund to the FCC on a quarterly basis. 47 C.F.R. § 54.702(g)–(h).  If a party is aggrieved by the USAC's decision making, that party may seek review by the FCC, *id.* § 54.719(b), and any decision rendered by the FCC becomes binding on the USAC for future decisions.  Thus, any discretion the USAC purports to exercise in fund distribution is ultimately

---

[4] The USAC also collects the Universal Service Fund contributions, but this action is clearly ministerial and therefore permissible. *Oklahoma*, 62 F.4th at 229 (stating that decisions from courts of appeals hold that "[p]rivate entities . . . may undertake ministerial functions, such as fee collection"); *Pittston*, 368 F.3d at 397 ("[T]he mere ability to receive governmental monies is clearly ministerial, so that the power to receive taxes (premiums) and other federal revenues . . . does not violate the nondelegation doctrine.").

reviewable by the FCC to ensure it has been used in the manner prescribed by the FCC and Congress.

Last, the FCC maintains deep and meaningful control over the USAC. In addition to the ways the FCC maintains final decision-making authority regarding the universal service fund, the FCC always maintains control of the USAC as an entity. It sets requirements for selection and selects each of the USAC's nineteen directors, *id.* § 54.703(b)–(c), and the Chairman of the FCC must approve or appoint the USAC's Chief Executive Officer, *id.* § 54.704(b). A review of the USAC's involvement with calculating the contribution factor process reveals no unconstitutional delegation of legislative authority. The USAC submits proposed projections of the fund's needs, and the FCC reviews the USAC's proposal. If the FCC approves the projection, it is then used in the FCC's calculation of the contribution factor. The USAC collects and disburses the funds but must do so according to statutory and administrative directions. Parties can appeal any USAC action to the FCC, and the FCC's decisions in these cases bind USAC. In sum, under § 254, the USAC is subordinate to and remains subject to the authority of the FCC. Consequently, "[s]ince law-making is not entrusted to the [USAC], this statutory scheme is unquestionably valid." *Adkins*, 310 U.S. at 399.

## VI.    Conclusion

Today we hold that there are no unconstitutional delegations under 47 U.S.C. § 254 because Congress has laid out the principles the FCC must follow in bringing universal service to our

JA188

Nation.  Additionally, because all USAC action is subordinate to the FCC, and the FCC retains ultimate decision-making power, we further hold that there is no violation of the private nondelegation doctrine.  For these reasons, we **DENY** the petition.

NEWSOM, Circuit Judge, concurring in judgment:

Although I concur in the judgment denying the petition for review, I do so reluctantly. I'm deeply skeptical that today's result can be squared with constitutional first principles. And even under existing precedent, I'm not sure how the case would come out had it been framed differently. Let me explain.

**I**

First, a brief tour of the statutory and regulatory landscape. Congress has tasked the FCC with administering a program designed to make telecommunications services widely available throughout the United States. *See generally* 47 U.S.C. § 254. This "universal service" program is funded through mandatory exactions on telecom companies—euphemistically called "contributions"—that are then redistributed to cash-strapped carriers that serve hard-to-reach areas, like rural and insular communities. *Id.* § 254(b), (d). The FCC determines the program's size and scope by prescribing what "universal service" should entail, guided by an "evolving" consideration of several statutory criteria. *Id.* § 254(c)(1). Having done so, the agency proceeds to decide how much carriers should have to pay into the pot in order to make "universal service" a reality. *Id.* § 254(d).

The FCC relies on a private entity called the Universal Service Administrative Company to assist it in administering the universal-service program. USAC projects universal-service funding demands, proposes contribution rates, bills and collects money from carriers, and then disburses those funds to eligible providers.

JA189

*See* 47 U.S.C. § 254(e) (describing the basic requirements for disbursement); *id.* §§ 54.701–02, 54.706, 54.708, 54.709, 54.712 (designating USAC as the administrator of the universal-service program and outlining the rules for contributions and distribution). To calculate demand, USAC uses detailed FCC-promulgated formulas, inputting companies' self-reported operating expenses and other values. *See* 47 C.F.R. §§ 54.303, 54.901, 54.1301. After crunching the numbers, USAC submits "projections of demand" to the agency 60 days before the start of each quarter. *Id.* § 54.709(a)(3). Thirty days later, the FCC publishes USAC's proposed contribution rate for all telecommunications carriers. *Id.*

If the FCC fails to countermand USAC's contribution rate within two weeks, the rate goes into effect for the quarter, and carriers are charged accordingly. *Id.* The agency apparently exercises its oversight authority sparingly; so far as I can tell, it has disapproved or modified USAC's rate only three times in the last 25 years. *See First Quarter 1998 Universal Service Contribution Factors Revised and Approved*, CC Docket No. 96-45, Public Notice, 12 FCC Rcd. 21881, 21886 (1997); *Revised Second Quarter 2003 Universal Service Contribution Factor*, CC Docket No. 96-45, Public Notice,18 FCC Rcd. 5097 (2003); *Proposed Third Quarter 2023 Universal Service Contribution Factor*, DA 23-507, 2023 WL 4012359 (June 14, 2023). In one instance, the FCC rounded the rate up fifty-six one-thousandths of a percentage point, from 9.044% to 9.1%. *See Revised Second Quarter 2003*, 18 FCC Rcd. 5097. Another occurred (serendipitously or otherwise) during the pendency of this litigation and, in fact, involved nothing more than a minor front-end adjustment

carrying unspent funds forward to a new quarter. *See Proposed Third Quarter 2023,* 2023 WL 4012359; *see also Proposed Fourth Quarter 2023*¸CC Docket No. 96-45, Public Notice, DA 23-843 (Sept. 13, 2023) (also noting the carryover funds for the fourth quarter).

USAC's collections activity brings in real money. The record indicates that USAC was projected to collect nearly $2 billion from carriers *in the final quarter of 2022 alone*, a figure that dwarfs the FCC's entire annual budget. *Compare* FCC, *Proposed Fourth Quarter 2022 Universal Service Contribution Factor*, Public Notice, 2022 WL 424497 (Sept. 13, 2022) (projecting $1.914 billion in universal-service program collection for the quarter), *with* FCC, *2022 Budget Estimates to Congress*, DA 22-946, 2021 WL 2190014 (May 1, 2021) (requesting approximately $500 million for the year).

## II

Petitioners principally contend that in 47 U.S.C. § 254 Congress has unconstitutionally delegated its "legislative Powers" to the FCC. *See* U.S. Const. art. I, § 1, cl. 1. As an original matter, I suspect they may well be right. Their challenge fails, as I see it, only because non-delegation doctrine has become a punchline.

First off, what exactly is "legislative Power[]"? In short, it's the authority "to adopt generally applicable rules of conduct governing future actions by private persons." *Gundy v. United States*, 139 S. Ct. 2116, 2133 (2019) (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting); *accord Department of Transp. v. Association of Am. R.Rs.*, 575 U.S. 43, 70 (2015) (Thomas, J., concurring) (similar). By that measure, the FCC is almost *certainly* exercising

JA191

legislative power when it decides, among other things, how big the universal-service program should be, what it should entail, and how much carriers should have to chip in to bring it to fruition.

The contribution scheme, in particular, seems suspect. In practical effect, the universal-service "contributions" are probably taxes, in that they are exacted from all telecom carriers but are re-distributed only to the subclass of those that are "eligible" on the ground that they serve high-cost and underserved areas. *See* 47 U.S.C. § 254(d)–(e); 47 C.F.R. § 54.701(c)(1); *see also National Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 341–42 (1974) (distinguishing a tax from a fee on the ground that the latter "bestows a benefit on the applicant, not shared by other members of society").[1] Setting tax rates sure seems like a legislative power to me. *See* The Federalist No. 56 at 1 (James Madison or Alexander Hamilton) (Clinton Rossiter ed., 1961) ("What are to be the objects of federal legislation?  Those which are of most importance, and which seem most to require local knowledge, are commerce, taxation, and the militia."); *National Cable*, 415 U.S. at 341–42 ("Taxation is a legislative function and Congress . . . is the sole organ for levying taxes.").[2]  Likewise, prescribing the universal-service

---

[1] It also seems to me relevant to the contributions' "tax" status that the statute itself designates the American public—writ large, rather than the payor carriers—as the universal-service program's principal beneficiary.  *See* 47 U.S.C. § 254(b)(2).

[2] I recognize that two other circuits have concluded that the universal-service contributions constitute fees rather than taxes.  *See Rural Cellular Ass'n v. FCC*, 685 F.3d 1083, 1091 (D.C. Cir. 2012); *Texas Off. Pub. Util. Couns. v. FCC (TOPUC*

program's sweep and scope—determining what it should accomplish, to what extent, and where—strikes me as the sort of "policy judgment[]" that "Congress, and not the Executive Branch, [should] make." *Gundy*, 139 S. Ct. at 2141 (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting).

Section 254 gives the FCC only the faintest, most vacuous guidance about how to exercise its authority. For instance, in crafting "policies for the preservation and advancement of universal service," the statute directs the agency to consider a handful of "principles." 47 U.S.C. § 254(b). Among them, the agency shall—

- aim to make "[q]uality services" available at "just, reasonable, and affordable rates," *id.* § 254(b)(1);

- endeavor to make telecom services available to "[c]onsumers in all regions of the Nation" at rates that are "reasonably comparable to rates charged for similar services in urban areas," *id.* § 254(b)(3);

*I*), 183 F.3d 393, 440 (5th Cir. 1999). Respectfully, I'm not so sure. Notably, one of those courts deemed the contributions fees in order to avoid the constitutional difficulties that would arise were they instead deemed taxes. *See TOPUC I*, 183 F.3d at 440 (stating that the "FCC's decision to extend universal service support to internet access and internal connections raises grave doubts as to whether § 254(h) creates an unconstitutional tax" and accordingly "constru[ing] the statute narrowly to avoid raising these constitutional problems"). In any event, the Supreme Court's decision in *Skinner v. Mid-America Pipeline Co.* indicates that the tax-fee distinction shouldn't affect the nondelegation analysis. 490 U.S. 212, 222–23 (1989) (rejecting "the application of a different and stricter nondelegation doctrine in cases where Congress delegates discretionary authority to the Executive under its taxing power").

- require all telecom carriers to make "an *equitable and nondiscriminatory* contribution to the preservation and advancement of universal service," *id.* § 254(b)(4); and

- ensure that there are "specific, predictable and sufficient Federal and State mechanisms" to preserve and advance universal service, *id.* § 254(b)(5).

Those hazy "principles"—grounded in terms like "just," "reasonable," "affordable," "reasonably comparable," "equitable," "predictable," and "sufficient"—cannot possibly constrain the FCC's policymaking discretion in any meaningful way. They leave the agency all the room it needs to do essentially whatever it wants. And to make matters even worse—even more open-ended— § 254(b) adds a catch-all clause, which authorizes the FCC to consider "[s]uch other principles" as it "determine[s] are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter." *Id.* § 254(b)(7).

Further diminishing the likelihood of any real guidance, the term "universal service"—the very object of the entire program— is defined only in the most ambiguous way. "Universal service," the statute says, is an "evolving" concept that should "tak[e] into account advances in telecommunications and information technologies and services." *Id.* § 254(c)(1). In specifying the content of that concept, the statute vaguely directs the FCC to "consider the extent to which such telecommunications services" (a) are "essential to education, public health, or public safety," (b) "have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers," (c) are "being

deployed in public telecommunications networks by telecommunications carriers," and—the kicker—(d) are "consistent with the public interest, convenience, and necessity." *Id*.

Finally, § 254 provides similarly squishy (which is to say essentially no) direction about how much telecom companies should actually be charged: "Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service." *Id*. § 254(d). Candidly, I have *no* idea what that means.

As a matter of first principles—as in real life—such empty, mealymouthed shibboleths provide no meaningful constraint; to the contrary, they confer front-line law- and policymaking power on unelected, unaccountable agency bureaucrats. *See* Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 369 (2002) (suggesting that a statute that allows a "ratemaking agency" to "choose its own standard for the rate base" would be "invalid[]").[3]

---

[3] I'm aware of Founding-era evidence indicating that agency boards sometimes set real-estate valuations that served as the baselines for the imposition of taxes. But I see that as a fact-finding exercise appropriate to Executive Branch determination, not as the articulation of any generally applicable policy. *Cf*. Nicholas Parrillo, *A Critical Assessment of the Originalist Case Against Administrative Regulatory Power: New Evidence from the Federal Tax on Private Real Estate in the 1790s*, 130 Yale L.J. 1288, 1313 & n.102 (2021) (presenting "skeptics'" argument that setting valuations is a fact-finding exercise). In the cited

But—and herein lies the problem—I don't think I can say that the so-called "principles" that § 254 articulates are any less "intelligible" than those that the Supreme Court has explicitly sanctioned as sufficiently clear to forestall a non-delegation challenge. *See Gundy*, 139 S. Ct. at 2123 (2019) ("[W]e have held, time and again, that a statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). To take just one example, the Court has upheld a statute directing the FCC to act in the "public interest, convenience, or necessity" on the ground that it wasn't "so indefinite as to confer an unlimited power" and didn't leave the agency wholly "at large in performing this duty." *National Broad. Co. v. United States*, 319 U.S. 190, 216 (1943); *see also, e.g.*, *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 475–76 (2001) ("requisite" "to protect the public health"); *Yakus v. United States*, 321 U.S. 414, 421, 427 (1944) ("so far as practicable," "fair and equitable"). In light of the decidedly "not demanding" standards that the Court has tolerated to date, *Gundy*, 139 S. Ct. at 2129, I think the majority here is correct to conclude that, under existing precedent, § 254 probably passes constitutional muster.

To be clear, I'm not at all "convinced that the intelligible principle doctrine serves to prevent all cessions of legislative

example, Congress set the tax rates via statute; the assessors merely determined the taxed property's value. *See id.* at 2020–21.

JA196

power." *Whitman*, 531 U.S. at 487 (Thomas, J., concurring). But taking the intelligible-principle standard as I find it, I feel constrained to conclude that § 254 satisfies it.

### III

Petitioners separately raise a "private nondelegation" challenge. *See* Br. of Petrs. at 64–70; Reply Br. of Petrs. at 43–49. I'll have to say, though, that it's hard to discern precisely what they mean by that. Clearly, they object to USAC's participation in the universal-service program. What's less clear to me is on exactly what ground. As I understand their position, petitioners contend that USAC—the private entity that the FCC has tapped to help it run the program—is impermissibly exercising *legislative* power. Thus, for instance, petitioners conclude their brief by arguing that USAC's involvement "violates the private nondelegation doctrine, *contrary to Article I of the U.S. Constitution.*" Br. of Petrs. at 70 (emphasis added); *see also id.* at 64 ("But that is exactly what has happened here—'[w]hat [i]s essentially a *legislative* determination' is now 'made not by Congress or even by the Executive Branch but by a private group.'" (emphasis added) (alterations in original).

To the extent that's the gist of petitioners' private-delegation challenge, I disagree with it. I don't think that USAC is exercising legislative power. So far as I can tell, the majority is right that the FCC establishes the formulas from which USAC derives the contribution rate. *See* Maj. Op. at 3; 47 C.F.R. §§ 54.303, 54.901, 54.1301. Accordingly, to the extent that rate-setting is a legislative function—and I think it is, *see supra* at 3–5—it's the FCC that's exercising

legislative power.  As I've said, as a first-principles matter, I think that the agency is violating the Constitution in doing so.  *See supra* at 3–7.  But if under existing precedent I'm stuck with the fiction that the FCC isn't acting legislatively when it sets the rates, then I think it follows *a fortiori* that USAC isn't doing so either.  *Cf.* 47 C.F.R. § 54.702(c) ("[USAC] may not make policy . . . .").

Even so, it might yet be the case that USAC is operating ultra vires—for either of at least two reasons.  Because petitioners haven't teed up either objection, I offer only a few preliminary observations.

## A

First, it may be that USAC is operating in contravention of the governing statute, 47 U.S.C. § 254, which conspicuously never even *mentions* USAC, let alone authorizes its involvement in the universal-service program.  As already explained, the statute charges the FCC with establishing "mechanisms" to "preserve and advance universal service" such that "[e]very telecommunications carrier" will "contribute" to the program.  47 U.S.C. § 254(d).  But it says nary a word about USAC.  That alone seems a pretty good reason to think that USAC shouldn't be exercising governmental power. *Cf. Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (deeming delegation of governmental power to a private entity "obnoxious" even where Congress *had* explicitly authorized it).[4]  For

---

[4] At oral argument, the FCC asserted that § 254(j) contains what is, in effect, a veiled acknowledgement of USAC's role.  *See* Oral Arg. at 23:08–24:25.  I'm not convinced.  All subsection (j) says is that "[n]othing in this section shall

whatever reason, though, petitioners haven't framed their challenge in statutory terms, so I won't pursue the matter further.[5]

affect the contribution, distribution, or administration of the Lifeline Assistance Program . . . ." 47 U.S.C. § 254(j). That program was originally run by the National Exchange Carrier Association, another private organization that preceded USAC. *See Allnet Comm. Serv., Inc. v. National Exch. Carrier Ass'n, Inc.*, 965 F.2d 1118, 1119 (D.C. Cir. 1992) (observing that NECA collected access charges for the Lifeline Assistance Program). Conspicuously, though, § 254(j) never mentions NECA, much less sanctions a private entity's involvement in the program's administration. I think it strains credulity to read subsection (j) as authorizing USAC's participation in the universal-service scheme.

[5] I realize that some of my colleagues have found the lack of statutory authorization relevant to the question whether a private-delegation arrangement violates the Constitution. *See Texas v. Rettig*, 993 F.3d 408, 413–15 (5th Cir. 2021) (Ho, J., dissenting from denial of rehearing en banc). To be sure, when the operative statute requires an agency to act, as ours does, *see* 47 U.S.C. § 254(d), and yet doesn't authorize further subdelegation to a private entity, that subdelegation violates the statute. *See, e.g.*, *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565–66 (D.C. Cir. 2004). I'm less convinced, though, that congressional authorization (or the lack thereof) has any real bearing on the *constitutional* question, if only because we generally don't take Congress's word for whether a scheme is constitutional. For the same essential reason, I think that *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974), is largely inapposite—to the constitutional question, I mean. That case merely holds, as a statutory matter, that when a provision says that the "applicable federal agency must bear the responsibility for the ultimate work product," the agency "must independently perform its reviewing, analytical and judgmental functions and participate actively and significantly in the preparation and drafting process." *Id.* (internal quotation omitted). I don't think it bears on the constitutionality of the agency's subdelegation to a private party.

**B**

Second, and separately, even if USAC isn't impermissibly exercising legislative power, its involvement in the universal-service program may yet violate the Constitution. "[B]ound to apply [the] 'intelligible principle' test," and thus to conclude that there's been no unlawful delegation of *legislative* power, *Association of Am. R.Rs.*, 575 U.S. at 90 (Thomas, J., concurring), I'm left to ask two follow-on questions, neither of which the parties here have squarely teed up: Is USAC exercising *executive* power, and if so, is it "constitutionally eligible" to do so? *Id.*

The answer to the first of those two follow-ons is clear. The majority opinion accurately describes USAC's role in the universal-service program: "The FCC depends on [USAC], a private entity, to carry out Congress's instruction[s]." Maj. Op. at 3; *see also id.* at 14 (referring to "USAC's role in carrying out the universal service fund"). And that description perfectly describes the "executive" function. The term "execute" has long meant—and means today—"to carry out or into complete effect." *Webster's New International Dictionary* (2d ed. 1944); *accord* Noah Webster, *An American Dictionary of the English Language* (1828) ("to carry into complete effect"); 1 Samuel Johnson, *Dictionary of the English Language* (6th ed. 1785) ("[t]o put in act; to do what is planned or determined"). So yes, it seems obvious to me that in collecting de facto taxes and distributing benefits USAC is exercising "executive" power.

JA200

The critical question, then, is whether the Constitution permits it to do so.[6] Let's start with what we know for sure. First, "[u]nder our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take care that the Laws be

[6] So far as I can tell, none of the pertinent Supreme Court decisions have tackled the question whether a private party was impermissibly exercising executive power; rather, all have addressed the allegedly unlawful exercise of *legislative* authority. In 1936, the Court in *Carter Coal* invalidated a statute that authorized a group of private business owners to set maximum work hours. 298 U.S. at 311. In so doing, the Court called the scheme "*legislative* delegation in its most obnoxious form." *Id.* (emphasis added). Several years later, after the infamous "switch in time" the Court twice upheld statutes that conferred authority on private entities against challenges that they "involve[d] any delegation of *legislative* authority." *Currin v. Wallace*, 306 U.S. 1, 15 (1939) (emphasis added); *accord Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 398 (1940) ("Nor has Congress delegated its *legislative* authority to the industry. . . . Since *law-making* is not entrusted to the industry, this statutory scheme is unquestionably valid." (emphasis added)).

Our sister circuits' decisions have likewise focused on the question whether private entities were unconstitutionally exercising legislative (rather than executive) authority. *See, e.g.*, *Frame v. United States*, 885 F.2d 1119, 1128–29 (3d Cir. 1989) (observing that because "no law-making authority ha[d] been entrusted to" the private entity, the statute in question did "not constitute an unlawful delegation of legislative authority"); *National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880–83 (5th Cir. 2022) (criticizing a scheme that gave "rulemaking power" to a private entity); *cf. Pittston Co. v. United States*, 368 F.3d 385, 397 (4th Cir. 2004) (stating, without citation, that "the mere ability to receive governmental monies is clearly ministerial"). Only the Sixth Circuit in *Oklahoma v. United States* acknowledged the "[d]ifficult and fundamental questions" that may "arise when private entities enforce federal law." 62 F.4th 221, 233 (6th Cir. 2023) (internal quotation omitted). Notably, though, because the parties there (like those here) hadn't "engaged with this feature of the Act," the court declined to do so. *Id.*

faithfully executed.'"   *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020) (quoting U.S. Const. art. II, § 1, cls. 1; *id.* § 3); *see also id.* at 2197 ("The entire 'executive Power' belongs to the President alone.").  Second, "[b]ecause no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance"—provided, at least, that he maintains sufficient supervisory authority over them.  *Id.* at 2191; *see also, e.g.,* Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 U. Ill. L. Rev. 701, 795 (2003); Tara Leigh Grove, *Standing as an Article II Nondelegation Doctrine*, 11 J. Const. L. 781, 790 (2009).

Beyond that, things get hazier.  In particular, the question whether (and to what extent) a private party or entity may share in the Executive Branch's implementation of federal policy is, to use a buzzphrase du jour, undertheorized.  There is, I think it's fair to say, evidence pointing in both directions.

On the one hand, the Constitution's text and structure indicate—admittedly without saying so explicitly—that private parties may not be tasked with exercising governmental power *of any sort*. Justice Thomas has explained the point well:  "Although no provision of the Constitution expressly forbids private entities from exercising government authority," the "so-called 'private nondelegation doctrine' flows logically from the three Vesting Clauses":

> Because a private entity is neither Congress, nor the President or one of his agents, nor the Supreme Court or an inferior court established by Congress, the Vesting Clauses would categorically preclude it

> from exercising the legislative, executive, or judicial powers of the Federal Government. In short, the "private nondelegation doctrine" is merely one application of the provisions of the Constitution that forbid Congress to allocate power to an ineligible entity, whether governmental or private.

*Association of Am. R.Rs.*, 575 U.S. at 87–88 (Thomas, J., concurring); *see also Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting) (emphasizing that the three parallel Vesting Clauses lodge "the authority to exercise different aspects of the people's sovereign power in distinct entities"). Put simply, "when it comes to private entities" exercising governmental power, "there is not even a fig leaf of constitutional justification." *Association of Am. R.Rs.*, 575 U.S. at 62 (Alito, J., concurring).

And to be clear, it's not all form and structure. Delegation of government power to private entities also raises practical and fairness concerns. As the Supreme Court said almost a century ago, delegation of official power to a private party is "delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." *Carter Coal*, 298 U.S. at 311. Emphasizing the Court's rationale there, at least two commentators have described *Carter Coal* as turning, fundamentally, on the due-process concerns that attend allowing one private, self-interested party to harness the coercive power of the state to regulate others. *See* Eugene Volokh, *New Private-Regulation Skepticism: Due Process,*

*Non-Delegation, and Antitrust Challenges*, 37 Harv. J. L. & Pub. Pol'y, 932, 980–81 (2014); *see also* Alexander Volokh, *The Myth of the Federal Private Nondelegation Doctrine*, 99 Notre Dame L. Rev. 203, 257 (2023)

All of this squares with what I've said before about the prospect of private parties exercising *executive* power, in particular—namely, that they can't. That is so, I've said, for both "formal, structural reasons—in particular, Article II's explicit vesting of federal 'executive Power' in the President"—and "instrumental ones"—specifically, the risks inherent in giving enforcement power to those not "subject to political and legal constraints." *Laufer v. Arpan LLC*, 29 F.4th 1268, 1294–95 (11th Cir. 2022) (Newsom, J., concurring), *vacated*, 77 F.4th 1366, 2023 (11th Cir. 2023); *accord Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1133 (11th Cir. 2021) (Newsom, J., concurring) ("From [Article II's] explicit vesting, it follows that the 'executive Power' can't be exercised by private parties.").

Now, in the interest of completeness, I should acknowledge some historical counterevidence—areas and instances in which private parties and entities seemingly *have* been allowed to exercise what would certainly seem to be executive authority. One obvious example: The Constitution itself contemplates that private individuals—in essence, mercenaries—might play a role in international law enforcement. *See* U.S. Const. art. 1 § 8, cl. 11 (allowing Congress to "grant Letters of Marque and Reprisal"). There's also a fairly long history in this country of private entities managing prisons. *See, e.g.*, Gillian Metzger, *Privatization as Delegation*, 103

JA204

Colum. L. Rev. 1367, 1392–93 (2003) (noting that "[e]xtensive privatization characterized incarceration in the nineteenth century," waned during the early twentieth century, and has since come back into vogue). The nation's early years saw private parties bringing criminal prosecutions—a practice that, needless to say, has died out—and qui tam actions—a practice that has persisted. *See, e.g.*, Zachary Price, *Enforcement Discretion and Executive Duty*, 67 Vand. L. Rev. 671, 720–22 (2014); *but see United States ex rel. Polansky v. Executive Health Res., Inc.*, 599 U.S. 419, 449 (Thomas, J., dissenting) ("There are substantial arguments that the qui tam device is inconsistent with Article II . . . ."). And most recently, the Supreme Court recognized that "[f]or as long as the eminent domain power has been exercised by the United States, it has also been delegated to private parties." *PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2255 (2021).

As best I can tell, the history of private-party involvement in tax collection—a role roughly analogous to one that USAC seems to play in § 254's universal-service scheme—is mixed. In the Founding era, private parties seem not to have been involved. The First Congress created the Treasury Department in 1789 to, among other things, collect federal taxes, and it has been doing so ever since. *See* U.S. Dep't of the Treasury, *History Overview*, https://home.treasury.gov/about/history/history-overview (last visited Sept. 22, 2023) (listing "collecting income and excise taxes" as one of the Treasury's "activities," "formally established as an executive department by the First Session of Congress in 1789"); Prakash, *Essential Meaning*, at 747 (citing Montesquieu for the

proposition that tax collection is a quintessential government task); *see also, e.g.*, Act of July 11, 1798, ch. 71, §§ 1–16, 1 Stat. 591, 591–94 (repealed) (setting compensation for tax collectors during the Fifth Congress); *id.*, ch. 70, §§ 2–9, 28–30, 1 Stat. 580, 583, 590–91 (1798) (setting compensation and requiring oaths for federal real-estate assessors); Act of July 14, 1798, ch. 75, § 2, 1 Stat. 597, 598 (1798) ("That the said tax shall be collected by the supervisors, inspectors, and collectors of the internal revenues of the United States . . . ."); Act of Mar. 3, 1804, ch. 20, §§ 1–7, 2 Stat. 262, 262–64 (1804) (using tax collectors for the direct tax); Oliver Wolcott, Compensation of Officers of the Revenue (Apr. 17, 1798), *in* 1 American State Papers, Finance 576, 576–79 (1832) (encouraging Congress to accept a proposed "augmentation of compensation" for tax collectors to "prevent the greatest embarrassments").

For a brief period in the 1870s, and again more recently, the federal government experimented with privatized tax collection. The 19th-century effort failed spectacularly—and very publicly—and was scrapped after just two years. *See, e.g.*, H.R. Rep. No. 559 at 9 (1874) ("The committee are of [the] opinion that any system of farming the collection of any portion of the revenues of the Government is fundamentally wrong; that no necessity for such laws exist[s], for the reason that the Secretary of the Treasury and the head of the Internal-Revenue Bureau are fully empowered by law to make all collections of taxes . . . ."); 2 Cong. Rec. 2121 (1874) (statement of Sen. Hale) ("[I]n [this law's] inception it was, in my view, wholly, radically, violently, wickedly wrong."); *The President and the Sanborn Business*, N.Y. Times, May 5, 1874 (describing one

of the private tax collectors as a "superlative rogue who has swindled the Government from one month's end to another with amazing impunity"). The more modern experiment began about 20 years ago and remains ongoing. IRS, *Private Debt Collection* (July 5, 2023), https://www.irs.gov/businesses/small-businesses-self-employed/private-debt-collection; Emily Rockwood, *Privatizing Tax Collection: A Case Study in the Outsourcing Debate*, 36 Pub. Cont. L.J. 423, 427 (2007).

Candidly, I'm not quite sure what to make of all this—the textual, structural, and historical indicators seem to point in different (or multiple) directions. But of this much I'm confident: To the extent that delegation of executive power to a private entity outside the government is permissible at all, it is permissible *only* if that entity "is adequately subject to Presidential control." *Assoc. of Am. R.Rs.*, 575 U.S. at 91 (Thomas, J., concurring). So if I'm right that USAC is exercising executive power, *see supra* at 12, then the question becomes, at the very least, whether USAC is subject to the sort of control that Article II demands. *See generally* Alexander Volokh, *supra*, at 248, 254.

That, to my mind, is far from clear. To be sure, USAC operates under *some* supervision. For example, it has to file annual reports detailing its activities. *See* 47 C.F.R. 54.702(g). The FCC retains the formal authority to reject USAC determinations, and a party wishing to challenge one of those determinations is entitled to a hearing before the agency. *See id.* §§ 54.709(a)(3); 54.719; 54.722. Critically, though, with respect to the proposed universal-

service "contribution factor," in particular—the primary and most direct way that USAC executes congressional directives—the FCC needn't (and overwhelmingly doesn't) do anything at all. *See supra* 2–3. Unless and until the agency steps in to affirmatively countermand USAC's proposed exaction within 14 days, it goes into effect by sheer force of inertia. *Id.* Accordingly, while the FCC maintains a patina of control over USAC's most important function, the fact that agency approval can be entirely passive—and in fact, is effectively presumed—calls into question how meaningful its control really is.

In any event, the key isn't the degree of the FCC's control, but the *President's*. And in that connection, the Supreme Court's decisions "treat appointment and removal powers as the primary devices of executive control." *Assoc. of Am. R.Rs.,* 575 U.S. at 91 (Thomas, J., concurring) (citing *Free Enter. Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477, 492 (2010)). The removal issues vis-à-vis USAC, it seems to me, are doubly fraught. First, the only word regarding USAC's removal comes from its own bylaws, which authorize the entity's board to remove one of its members by a majority vote and with the approval of the FCC's chairman. *See* By-Laws of Univ. Serv. Admin. Co., art. 2 § 7 https://www.usac.org/wp-content/uploads/about/documents/leadership/usacbylaws.pdf. So far as the bylaws are concerned, then, USAC is essentially in charge of its own continuance in office. Second, and to compound matters, because the FCC is an independent agency, whose commissioners may be removed only for cause, *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,* 537

JA208

F.3d 667, 695–96 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), *aff'd in part, rev'd in part and remanded*, 561 U.S. 477 (2010), USAC's board members enjoy something akin to the double-for-cause-removal protection that the Supreme Court has recently held to be unconstitutional. *See Seila Law*, 140 S. Ct. at 2197; *Free Enter. Fund*, 561 U.S. 477 at 484 (2010). And, it seems to me, the removal-and-control-related considerations that attend delegation of executive power to a private entity are at least as acute as—if not demonstrably more acute than—those that attend delegation to an administrative agency. Delegation to a private entity breaks the ordinary chain of accountability that our "carefully calibrated" system of government is designed to uphold. *Seila Law*, 140 S. Ct. at 2203.[7]

★ ★ ★

Because petitioners didn't squarely present either a statutory or an executive-delegation challenge, I won't go any further. Suffice it to say, though, that nondelegation issues do not necessarily

---

[7] I suppose the FCC (although *not* the President) retains some modicum of authority over the appointment of USAC's directors. *See* 47 C.F.R. § 54.703. Even there, though, the agency's oversight is minimal and is filtered through private groups' preferences: The FCC Chairman's initial selection comes from the "nominations submitted by industry and non-industry groups"; he can make his own selection in the event they can't "reach consensus on a nominee or fail[] to submit a nomination." *Id.* § 54.703(c)(3). USAC's Chief Executive Officer is selected in much the same way: first, the board forwards names for the FCC Chairman's review; then, if no consensus is reached, the Chairman makes the selection. *Id.* § 54.704(b).

JA209

end with Article I. Article II provides important limits, as well, however uncertain under current doctrine.

### III

Bound by precedent and the parties' framing of the issues, I concur in the majority's judgment. But this case illuminates deeper problems in nondelegation precedent. After all, "[l]iberty requires accountability." *Ass'n of Am. R.Rs.*, 575 U.S. at 57 (Alito, J., concurring). But with each successive delegation—from Congress to agencies, and then from agencies to private parties—we drift further and further from the locus of democratic accountability. The Constitution imposes important limits on how the government goes about doing its job. If it can't do everything it wants to do—such that it has to outsource responsibilities to private parties—that may indicate it's trying to do too much.

LAGOA, Circuit Judge, concurring:

I concur in the majority opinion. But I share much of the same concerns expressed by Judge Newsom in his concurring opinion about how the current nondelegation doctrine, which requires courts to look to "whether Congress has supplied an intelligible principle to guide the delegee's use of discretion," *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality opinion), has strayed from constitutional first principles, *see* Newsom Conc. at 3–9; *see also Gundy*, 139 S. Ct. at 2133–42 (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting). However, we are bound to apply the intelligible principle test as set forth by Supreme Court precedent. And given how both the Supreme Court and this Court have applied the intelligible principle test in rejecting nondelegation challenges to other statutes, *see, e.g.*, *Nat'l Broad. Co. v. United States*, 319 U.S. 190 (1943); *Yakus v. United States*, 321 U.S. 414 (1944); *Am. Power & Light Co. v. SEC*, 329 U.S. 90 (1946); *Lichter v. United States*, 334 U.S. 742 (1948); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001); *United States v. Brown*, 364 F.3d 1266 (11th Cir. 2004), I believe that those cases require us to find that 47 U.S.C. § 254's statutory language likewise satisfies the intelligible principle test, as the majority opinion concludes.

With this understanding, I concur.

JA211

# EXHIBIT D

# EN BANC OPINION OF THE FIFTH CIRCUIT

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 24, 2024

Lyle W. Cayce
Clerk

———————

No. 22-60008

———————

CONSUMERS' RESEARCH; CAUSE BASED COMMERCE, INCORPORATED; KERSTEN CONWAY; SUZANNE BETTAC; ROBERT KULL; KWANG JA KERBY; TOM KIRBY; JOSEPH BAYLY; JEREMY ROTH; DEANNA ROTH; LYNN GIBBS; PAUL GIBBS; RHONDA THOMAS,

*Petitioners*,

*versus*

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,

*Respondents.*

———————————————

Petition for Review from the
Federal Communications Commission
Agency No. 96-45

———————————————

ON PETITION FOR REHEARING EN BANC

JA213

No. 22-60008

Before Richman, *Chief Judge*, and Jones, Smith, Stewart, Elrod, Southwick, Haynes, Graves, Higginson, Willett, Ho, Duncan, Engelhardt, Oldham, Wilson, and Douglas, *Circuit Judges*.[*]

Andrew S. Oldham, *Circuit Judge*, joined by Jones, Smith, Elrod, Willett, Ho, Duncan, Engelhardt, and Wilson, *Circuit Judges*:

In the Telecommunications Act of 1996, Congress delegated its taxing power to the Federal Communications Commission. FCC then subdelegated the taxing power to a private corporation. That private corporation, in turn, relied on for-profit telecommunications companies to determine how much American citizens would be forced to pay for the "universal service" tax that appears on cell phone bills across the Nation. We hold this misbegotten tax violates Article I, § 1 of the Constitution.

I.

A.

Congress has long "pursued a policy of providing 'universal' [telecommunications] service to all residents and businesses in the United States." Ronald J. Krotoszynski, Jr., *Reconsidering the Nondelegation Doctrine: Universal Service, the Power to Tax, and the Ratification Doctrine*, 80 Ind. L.J. 239, 279 (2005). For half a century Congress pursued this policy through a complicated cross-subsidy regime. Back when the old AT&T was a regulated monopoly, Congress allowed it to charge supra-competitive rates to urban customers in exchange for requiring it to provide services it might not otherwise provide to high-cost rural customers. But "[f]or obvious reasons, this system of implicit subsidies can work well only under regulated

---

[*] Judge Ramirez joined the court after this case was submitted and did not participate in the decision.

JA214

conditions. In a competitive environment, a carrier that tries to subsidize below-cost rates to rural customers with above-cost rates to urban customers is vulnerable to a competitor that offers at-cost rates to urban customers." *Tex. Off. of Pub. Util. Couns. v. FCC* ("*TOPUC I*"), 183 F.3d 393, 406 (5th Cir. 1999). So when Congress deregulated AT&T and other telecommunications companies, it had to abandon the old way of pursuing universal service.

Congress's new way is 47 U.S.C. § 254. Section 254 authorizes FCC to establish "specific, predictable, and sufficient . . . mechanisms to preserve and advance universal service." *Id.* § 254(b)(5). Pursuant to this grant of authority, FCC levies "contributions" to a Universal Service Fund ("USF") from telecommunications carriers, *id.* § 254(b)(4), and it distributes the monies raised to people, entities, and projects to expand and advance telecommunications services. FCC regulations expressly permit carriers to pass these "contributions" through to their customers, *see* 47 C.F.R. § 54.712(a), and the overwhelming majority of carriers do so, *see* FCC, FCC 22-67, Report on the Future of the Universal Service Fund 10084–85 , (Aug. 15, 2022) ("Report to Congress").

Notably, Congress declined to define "universal service" itself. Instead, it delegated to FCC the responsibility to periodically "establish" the concept of "universal service" by "taking into account advances in telecommunications and information technologies and services." 47 U.S.C. § 254(c)(1). In making this determination, Congress directed FCC to:

> consider the extent to which such telecommunications services—
>> (A) are essential to education, public health, or public safety;

> (B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;
> (C) are being deployed in public telecommunications networks by telecommunications carriers; and
> (D) are consistent with the public interest, convenience, and necessity.

*Id.* § 254(c)(1).

Section 254(b) also suggests principles for FCC to "base policies for the preservation and advancement of universal service." Telecommunications services "should" be "available at just, reasonable, and affordable rates"; accessible "in all regions of the Nation"; and available to "low-income consumers and those in rural, insular, and high cost areas" at rates "reasonably comparable to rates charged for similar services in urban areas." *Id.* § 254(b)(1)–(3). FCC also may develop "such other [universal service principles it] determine[s] are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter." *Id.* § 254(b)(7).

Section 254 further provides that "[e]lementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services." *Id.* § 254(b)(6). Accordingly, "telecommunications carrier[s] shall, upon receiving a bona fide request, provide telecommunications services which are necessary for the provision of health care services in a State . . . to any public or nonprofit health care provider that serves persons who reside in rural areas in that State at rates that are reasonably comparable to rates charged for similar services in urban areas in that State." *Id.* § 254(h)(1)(A). And "telecommunications carriers . . . shall, upon a bona fide request for any of its services that are within the [FCC's] definition of universal service . . . , provide such services to elementary schools, secondary schools, and libraries for educational

4

JA216

purposes at rates less than the amounts charged for similar services to other parties." *Id.* § 254(h)(1)(B). FCC then reimburses telecommunications providers for the costs of providing this subsidized service. *Id.* § 254(h)(1)(A), (B)(i)–(ii).

B.

Presently, USF supports telecommunications projects through four major programs: the High-Cost Program (*see* 47 C.F.R. §§ 54.302–54.322), the Lifeline Program (*see id.* §§ 54.400–54.423), the E-rate Program (*see id.* §§ 54.500–54.523), and the Rural Health Care Program (*see id.* §§ 54.600–54.633).

Each program has a laudable objective. The High-Cost Program subsidizes the provision of voice and internet services in rural communities. The Lifeline Program subsidizes the provision of phone service to low-income consumers. The E-Rate Program subsidizes the provision of broadband connectivity and Wi-Fi to schools and libraries. And the Rural Health Care Program subsidizes the provision of telecommunications services to rural healthcare providers.

FCC regulations establish the services supported by each of these programs and the eligibility criteria applicants must satisfy to obtain assistance. But FCC does not administer all these universal service programs itself. Instead, it relies on a private company called the Universal Service Administrative Company ("USAC"). USAC is managed by representatives from "interest groups affected by and interested in universal service programs" who are "nominated by their respective interest groups." *See Leadership*, Universal Serv. Admin. Co., https://perma.cc/9W92G4Z9 (last accessed Sept. 11, 2023); *see also* 47 C.F.R. § 54.703(b) (providing for the composition of USAC's board of directors). FCC has charged USAC with myriad tasks: "billing contributors,

5

collecting contributions to the universal service support mechanisms, and disbursing universal service support funds." 47 C.F.R. § 54.702(b).

Most prominently, though, USAC is responsible for deciding the quarterly USF contribution amount—a projection of the dollar value of demand for universal support programs and the costs of administering them. *See id.* § 54.709(a)(3). The contribution amount dictates the size of the universal service contributions levied on telecommunications carriers and, in turn, American telecommunications consumers. To set the contribution amount, USAC relies on "information from universal service program participants" to "estimate[] how much money will be needed each quarter to provide universal service support." *See Universal Service*, Universal Serv. Admin. Co., https://perma.cc/B5NN-AVF8 (last accessed Oct. 10, 2023). In other words, the contribution amount ultimately derives from the universal service demand projections of private, for-profit telecommunications carriers, all of whom have "have financial incentives" to increase the size of universal service programs. U.S. Gov't Accountability Off., GAO-17-538, Additional Action Needed to Address Significant Risks in FCC's Lifeline Program 1 (2017), https://perma.cc/K5J9-L89K ("FCC's Lifeline Program").

FCC then uses USAC's contribution amount to impose a tax on America's telecommunications carriers. (FCC calls this tax the USF "contribution factor"; but we call it what it is—the "USF Tax.") The USF Tax is the percentage of end-user telecommunications revenues each carrier must contribute to USF in a particular quarter. As a practical matter, USAC sets the USF Tax—subject only to FCC's rubber stamp. True, FCC "reserves the right to set projections of demand and administrative expenses at amounts that [it] determines will serve the public interest." *See* 47 C.F.R. § 54.709(a)(3). But FCC never made a substantive revision to USAC's

proposed contribution amount prior to this litigation,[1] and it does not even have a documented process for checking USAC's work. Instead, FCC has provided that if it "take[s] no action within fourteen (14) days of the date of release of the public notice announcing [USAC's] projections of demand and administrative expenses, the projections of demand and administrative expenses . . . shall be *deemed approved* by the Commission." *See ibid.* (emphasis added). So FCC has delegated to USAC responsibility—*de facto* if not *de jure*—for imposing the USF Tax.

## C.

In 1995, the USF Tax was $1.37 billion. JA62. But by the end of 2021, USAC ballooned the USF to over $9 billion. *See* Universal Serv. Admin. Co., 2021 Annual Report 20 (2023) https://perma.cc/9CPT-H5LM. The proposed USF Tax at issue in this case is 25.2%, up from just over 5% in 2000. *See* FCC, DA 00-517, Proposed Second Quarter 2000 Universal Service Contribution Factor (Mar. 7, 2000), https://perma.cc/4BSK-6QZR. Recent USF Taxes have been set as high as 34.5%. *See* FCC, DA 23-843, Proposed Fourth Quarter 2023 Universal Service Contribution Factor (Sep. 13, 2023), https://perma.cc/Y2QW-6HBD.

Many of the billions injected into the USF have undoubtedly been deployed to support the important goal of universal service. But waste and fraud have also contributed to the USF's astronomical growth. For example, in 2004, FCC's Inspector General affirmed that schools view the E-Rate Program as "a big candy jar" of "free money." Sam Dillon, *School Internet*

---

[1] FCC claims it has made three alterations to USF projections. But one of those was a ministerial change of the rate from .09044 to .091 because some carriers' computers could not handle five decimal places. And the other two were not even initiated by FCC. *See* Petrs' EB Br. 63.

No. 22-60008

*Program Lacks Oversight, Investigator Says*, N.Y. Times (June 18, 2004), https://perma.cc/9PZY-ED3K. The Inspector General's primary concern was FCC's heavy and longstanding reliance on self-certified eligibility determinations in the E-rate Program. *See* U.S. Gov't Accountability Off., GAO-20-606, FCC Should Take Action to Better Manage Persistent Fraud Risks in the Schools and Libraries Program18 (Sep. 2020), https://perma.cc/5EK4-Q8V8 ("FCC's E-rate Program"). A 2008 GAO report demonstrated that, in a single year, USAC made almost a billion dollars of High-Cost Program payments that "should not have been made, or were not made, in the correct amount, when viewed from the perspective of applicable Federal Communications Commission rules, orders and interpretative opinions." Off. of the Inspector Gen., FCC, The High Cost Program 2 (Nov. 26, 2008), https://perma.cc/WJG3-6PJ6 ("The High-Cost Program"). In 2013, one Congressman noted:

> The [Lifeline] fund [] increased 266 percent [between 2008 and 2013], . . . all while the cost of phone service [went] down. Despite the limit of one subsidized subscriber per household, published reports suggest some subscribers have eight or more phones with subsidized service, with one woman saying that to get one "she just goes across the street and gets it." One man has claimed to have a bag full of 20 phones on the program that he sells "for about 10, 15, 20 bucks" each.

*The Lifeline Fund: Money Well Spent?: Hearing Before the H. Subcomm. on Commc'n & Tech., H. Comm. On Energy & Comm.*, 113th Cong. 2 (2013) (opening statement of Chairman Greg Walden), https://perma.cc/4DAWUERW. And in 2018, FCC's managing director reported a GAO audit that uncovered gross improper payments of $336.39 million in the Lifeline Program alone. *See* Letter from Mark Stephens, Managing Director, FCC, to Ron Johnson, Chairman, S. Comm. On

8

No. 22-60008

Homeland Sec. & Gov't Affs. (Aug. 27, 2019), https://perma.cc/VNQ6-N3WB. While earth's only two certainties are death and taxes, the USF Tax manages to cheat the grave: It is well-documented that FCC disburses USF money to dead people. *See* FCC's Lifeline Program, *supra*, at 43.

USAC's role in perpetuating USF waste is equally well known. In 2010, GAO concluded that USAC "lacks key features of effective internal controls." U.S. Gov't Accountability Off., GAO-11-11, Improved Management Can Enhance FCC Decision Making for the Universal Service Fund Low-Income Program i (Oct. 2010), https://perma.cc/9YHE-8YE9 ("FCC's Low-Income Program"); *see also* FCC's E-rate Program, *supra*, at 20–21. The Low-Income Program report noted that while USAC primarily uses audit findings to monitor compliance with USF rules, "the number and scope of USAC's audits have been limited and there is no systematic process in place to review the findings of those audits that are conducted." FCC's Low-Income Program, *supra*, at cover page. Moreover, the GAO noted USAC had not even considered "the possibility that multiple carriers may claim support for the same telephone line and that households may receive more than one discount, contrary to program rules." *Ibid.* In 2017, GAO explained that USAC "relies on over 2,000 Eligible Telecommunication Carriers that are Lifeline providers to implement key program functions, such as verifying subscriber eligibility," which is problematic because "companies may have financial incentives to enroll as many customers as possible." FCC's Lifeline Program*, supra*, at cover page. And in 2019, FCC acknowledged that USAC was out of compliance with improper payment reporting requirements. *See* Letter from Mark Stephens, *supra*, at 1.

\*     \*     \*

9

No. 22-60008

Section 254 reflects a policy goal of making telecommunications services available to all Americans. It is emphatically the province of Congress to make such policy choices. But it is our judicial duty to ensure that Congress pursued its goal through lawful means. And in that regard, our brief survey of the USF's history makes three things clear. First, Congress's instructions are so ambiguous that it is unclear whether Americans should contribute $1.37 billion, $9 billion, or any other sum to pay for universal service. Second, private entities bear important responsibility for universal service policy choices. And third, it is impossible for an aggrieved citizen to know who bears responsibility for the USF's serious waste and fraud problems. All three of those things implicate bedrock constitutional principles.

## II.

### A.

On November 2, 2021, USAC proposed its Q1 2022 USF contribution amount. A subset of the Petitioners in this action filed a comment with FCC challenging the constitutionality of the universal service contribution mechanism on November 19. On December 13, 2021, FCC issued a public notice of its Proposed Q1 2022 USF Tax, which was derived directly from USAC's proposed contribution amount. Petitioners re-filed their comment on December 22. FCC took no action with respect to USAC's proposed contribution amount, so on December 27 the contribution factor was deemed approved. *See* 47 C.F.R. § 54.709(a)(3). Petitioners then filed a timely petition for review in our court.

10

JA222

No. 22-60008

B.

We have statutory jurisdiction under 47 U.S.C. § 402 and 28 U.S.C. § 2342.[2] FCC does not contest our constitutional jurisdiction, but we have an obligation to consider jurisdictional questions *sua sponte* even when they are not raised by the parties. *See E.T. v. Paxton*, 41 F.4th 709, 718 n.2 (5th Cir. 2022).

Consistent with that obligation, we note that at least one petitioner—Cause Based Commerce—had Article III standing when the petition was filed. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) ("If at least one plaintiff has standing, the suit may proceed."); *Advanced Mgmt. Tech., Inc. v. FAA*, 211 F.3d 633, 636 (D.C. Cir. 2000) ("Standing is assessed at the time the action commences." (citation and quotation omitted)). Cause Based Commerce incurred a classic pocketbook injury as a result of its legal obligation to pay the USF Tax. Its injury is fairly traceable to the challenged conduct because the size of its Q1 2022 USF liability was controlled by the contribution factor set by USAC. And, at the time the petition was filed, its injury could have been redressed by a favorable judicial decision because vacatur of FCC's approval of the proposed contribution factor would have prevented collection of the USF Tax. *See* 47 C.F.R. § 54.709(a)(3) ("[T]he Administrator shall apply the quarterly contribution factor, *once approved by the Commission*, to contributor's interstate and international end-user telecommunications revenues to calculate the amount of individual contributions." (emphasis added)).

---

[2] Before the panel, FCC argued that we lack statutory jurisdiction because the petition was not timely filed. The panel rejected that argument, *see Consumers' Rsch. v. FCC*, 63 F.4th 441, 446 (5th Cir. 2023), *reh'g en banc granted, opinion vacated*, 72 F.4th 107 (5th Cir. 2023), and FCC has abandoned it.

11

It is not clear that Cause Based Commerce's pocketbook injury is still redressable because sovereign immunity may bar recovery of the monies it paid into USF pursuant to the Q1 2022 USF Tax. *See* 5 U.S.C. § 702 (waiving sovereign immunity for actions against agencies seeking relief "other than money damages"). If that is right, Cause Based Commerce's challenge might be moot because no court-ordered relief could redress the injuries it incurred as a result of the Q1 2022 USF Tax. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) ("A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." (quotation and citation omitted)).

We need not reach that question, however, because even assuming Cause Based Commerce's injury is no longer redressable, it is nonetheless justiciable because it is capable of repetition yet evading review. *See, e.g.*, *S. Pac. Terminal Co. v. Interstate Com. Comm'n*, 219 U.S. 498, 515 (1911) (establishing the exception and noting that jurisdiction "ought not to be . . . defeated, by short term orders, capable of repetition, yet evading review" because otherwise the government and regulated parties would "have their rights determined by the Commission without a chance of [judicial] redress"). The Q1 2022 USF Tax evades review because it was in force for just one quarter—"too short [a] duration to be fully litigated in the United States Supreme Court before it expire[d]." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 321 (D.C. Cir. 2014); *see ibid.* ("As a rule of thumb, agency actions of less than two years' duration cannot be fully litigated prior to cessation or expiration, so long as the short duration is typical of the challenged action." (quotation and citation omitted)). And it is capable of repetition because there is "a reasonable expectation"—indeed, a near certainty—"that [Cause Based Commerce] will be subjected to the same action again." *Id.* at 323; *see id.* at 324 ("The same action generally refers to

12

JA224

. . . recurrent identical agency actions." (quotation and citations omitted));
*see also* 47 C.F.R. § 54.709(a)(3) (providing that a new contribution factor is
calculated each quarter).

Accordingly, we have jurisdiction to decide the merits of petitioners'
constitutional claims.

## C.

We must decide one more threshold issue. On June 17, 2024, FCC
filed a motion to dismiss on the that ground issue preclusion bars the petition
for review. In FCC's view, that is because petitioners raised identical
challenges to different USF quarterly contribution factors in the Sixth and
Eleventh Circuits, and those courts rejected petitioners' arguments. But
even if there were something to FCC's issue preclusion argument, it fails
because FCC forfeited it.

"[I]ssue preclusion[] is an affirmative defense." *Taylor v. Sturgell*, 553
U.S. 880, 907 (2008). That means the party asserting preclusion ordinarily
must timely raise it. *Ibid.*; *see* 18A Charles Alan Wright, Arthur
R. Miller, & Edward H. Cooper, Federal Practice &
Procedure § 4405 (3d ed. 2017). Where, as here, an allegedly preclusive
judgment is rendered after suit is filed, the party "wishing to raise
[preclusion] is obliged to assert it at the earliest moment practicable." *Home
Depot, Inc. v. Guste*, 773 F.2d 616, 620 n. 4 (5th Cir. 1985); *see Evans v.
Syracuse City Sch. Dist.*, 704 F.2d 44, 47 (2d Cir. 1983) ("[T]he party wishing
to raise [preclusion as a] defense is obliged to plead it at the earliest possible
moment." (quotation omitted)); *Aetna Cas. & Sur. Co. v. Gen. Dynamics
Corp.*, 968 F.2d 707, 711 (8th Cir. 1992) (issue preclusion must be raised "at
the first reasonable opportunity after the rendering of the decision having the
preclusive effect"); *Davignon v. Clemmey*, 322 F.3d 1, 15 (1st Cir. 2003)
(holding that district court abused its discretion by allowing defendant to

assert preclusion defense "at the eleventh hour"); *Georgia Pac. Consumer Prod., LP v. Von Drehle Corp.*, 710 F.3d 527, 533 (4th Cir. 2013) ("Even when a preclusion defense is not available at the outset of a case, a party may waive such a defense arising during the course of litigation by waiting too long to assert the defense after it becomes available."); *Arizona v. California*, 530 U.S. 392, 413 (2000) (holding that party could not raise preclusion as a defense when party could have raised the defense earlier in the proceedings but did not, "despite ample opportunity and cause to do so").

That makes sense. The policy underlying issue preclusion is based primarily on a "defendant's interest in avoiding the burdens of twice defending a suit" and "the avoidance of unnecessary judicial waste." *Arizona*, 530 U.S. at 412 (quoting *United States v. Sioux Nation*, 448 U.S. 371, 432 (1980) (Rehnquist, J., dissenting)). Issue preclusion cannot serve either of those purposes if it is raised in the eleventh hour of proceedings, after the defendant and the court have already carried all the burdens necessary to decide the case. So even assuming FCC could defeat petitioners' claims on the ground the Sixth and the Eleventh Circuits have rendered preclusive judgments, FCC was obliged to raise that issue "at the earliest moment practicable." *Guste*, 773 F.2d at 620 n.4.

It did not. The first allegedly preclusive judgment FCC cites is the Sixth Circuit's judgment in *Consumers' Research v. FCC*. *See* 67 F.4th 773 (6th Cir. 2023), *cert. denied Consumers' Rsch. v. FCC*, No. 23-456, 2024 WL 2883753 (U.S. June 10, 2024). That judgment bound six of the named petitioners in this case.[3] And it was final on June 7, 2023. *See* Mandate Issued, *Consumers' Rsch.*, 67 F.4th 773 (No. 21-3886) (Jun. 7, 2023). True, the

---

[3] Consumers' Research, Cause Based Commerce, Deanna Roth, Jeremy Roth, Joseph Bayly, Lynn Gibbs, and Paul Gibbs.

petitioners sought certiorari in that case. But "the general rule in American jurisprudence [is] that a final judgment of a court . . . can be given [preclusive] effect even while an appeal is pending." *Prymer v. Ogden*, 29 F.3d 1208, 1213 n.2 (7th Cir. 1994); *see* Wright & Miller, *supra*, § 4433 ("[I]t is . . . held in federal courts that the preclusive effects of a lower court judgment cannot be suspended simply by taking an appeal that remains undecided."); Restatement (Second) of Judgments § 13, cmt. f (explaining a "judgment otherwise final" for purposes of the law of res judicata should "remain[] so despite the taking of an appeal").

That means FCC could have asserted preclusion against six petitioners on June 7, 2023. At the very least, FCC could have raised preclusion in its supplemental brief, which it filed on August 30, 2023. But FCC did not do so. Instead, it waited more than a year and then filed a tardy motion to dismiss at the eleventh hour. FCC therefore forfeited its preclusion defense with respect to at least six petitioners.[4] So there is no doubt we may proceed to the merits of those petitioners' claims.

FCC also cites the Eleventh Circuit's judgment in *Consumers' Rsch. v. FCC*, 88 F.4th 917, 923 (11th Cir. 2023), *cert. denied Consumers' Rsch. v. FCC*, No. 23-743, 2024 WL 2883755 (U.S. June 10, 2024). That judgment bound all the petitioners in this case, including the six who were parties to the Sixth Circuit proceeding. But that another allegedly preclusive judgment was rendered during the course of this proceeding does not change the fact that FCC had a purported preclusion defense against six petitioners as of June 7, 2023. And even if the Eleventh Circuit's judgment somehow gave FCC a new window to raise a preclusion defense against those petitioners, the window closed before FCC raised it. The Eleventh Circuit's judgment was final (and

---

[4] Including Cause Based Commerce, who certainly has standing. *See supra*, at 11.

therefore had preclusive effect) on February 5, 2024. *See* Mandate Issued, *Consumers' Research v. FCC*, 88 F.4th 917 (No. 22-13315) (Feb. 5, 2024). FCC nonetheless waited to file a motion to dismiss on the basis of that judgment until June 17, 2024—more than four months later.

There may sometimes be ambiguity about whether a defendant carried its obligation to raise a preclusion defense "at the earliest moment practicable." *Guste*, 773 F.2d at 620 n.4. But this is not a close case. Litigants ordinarily have 21 days to plead an affirmative defense. *See* Fed. R. Civ. P. 12(a)(1)(A)(ii); *see also* Wright & Miller, *supra*, § 1394 (noting affirmative defenses are forfeited if they are not raised in responsive pleadings). There is no reason a party should have six times that many days to raise an affirmative defense to a petition for review. So even if we thought FCC could have asserted preclusion against all the petitioners within a reasonable time after the Eleventh Circuit rendered judgment, we would hold FCC failed to do so.

In sum, FCC forfeited any preclusion defense. True, we have discretion to forgive a forfeiture in "extraordinary circumstances"—as where "a miscarriage of justice would result from our failure to consider" the forfeited argument. *See, e.g.*, *AG Acceptance Corp. v. Veigel*, 564 F.3d 695, 700 (5th Cir. 2009). But FCC does not supply any reason to think a miscarriage of justice would result from our reaching the merits of petitioners' claims. *See ibid.* (explaining the burden of establishing extraordinary circumstances is on the party seeking review). And we cannot think of one. In fact, if we do not decide the constitutional questions presented in this case, we will have to decide them in a pending challenge that includes petitioners who were not parties to the Sixth or Eleventh Circuit proceedings. *See* Petition for Review,

No. 22-60008

*Consumers' Research v. FCC*, No. 24-60330 (5th Cir. Jun. 27, 2024). It effects no injustice to hold FCC to its forfeiture.[5]

\* \* \*

We therefore proceed to the merits. Our review is de novo. *See Huwaei Tech. USA, Inc. v. FCC*, 2 F.4th 421, 434 (5th Cir. 2021).

III.

Petitioners contend the universal service contribution mechanism violates the Legislative Vesting Clause. *See* U.S. CONST. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."). We agree. We (A) explain that the power to levy USF "contributions" is the power to tax—a quintessentially legislative power. Then we (B) explain that Congress through 47 U.S.C. § 254 may have delegated legislative power to FCC because it purported to confer upon FCC the power to tax without supplying an intelligible principle to guide FCC's discretion. Next, we (C) explain that FCC may have impermissibly delegated the taxing power to private entities. Finally, we (D) explain that we need not definitively answer either delegation question because even if § 254 contains an intelligible principle, and even if FCC was permitted to enlist private entities to

---

[5] FCC convinced the Supreme Court to deny certiorari in the Sixth and Eleventh Circuit cases in part by explaining the Court would have another chance to consider the constitutionality of the USF after this court's en banc ruling. *See* Br. in Opp'n 17–18, *Consumers' Rsch. v. FCC*, Nos. 23-456, 23-743 (U.S. May 3, 2024) ("[T]he en banc Fifth Circuit has not yet issued its decision in that case. Once it does so, the parties can determine whether to seek, and this Court can determine whether to grant, certiorari to review that decision."). Had FCC told the Supreme Court it thought petitioners' claims in this court were issue precluded, the Court might have granted certiorari in those other cases. It would be unjust to allow FCC to raise an issue to evade en banc review so soon after it hid that issue to evade Supreme Court review.

17

determine how much universal service tax revenue it should raise, the combination of Congress's broad delegation to FCC and FCC's subdelegation to private entities certainly amounts to a constitutional violation.

## A.

Section 254(d) provides that "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service." 47 U.S.C. § 254(d). Pursuant to this authority, FCC mandates that "telecommunications carriers . . . must contribute to the universal service support mechanisms." 47 C.F.R. § 54.706(a). USAC determines carriers' USF contribution obligations on a quarterly basis by "apply[ing] the quarterly contribution factor . . . to [each carriers'] interstate and international end-user telecommunications revenues." *Id.* § 54.709(a)(3). The result is a USAC-fashioned USF Tax.

FCC's principal defense of the USF scheme is that the USF Tax is not really a *tax* at all. Rather, FCC contends, it is a *fee*. That is because, FCC reasons, a fee is a charge that "bestows a benefit on the [payor], not shared by other members of society." *Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 341 (1974). And FCC thinks universal service contributions comport with that definition because telecommunications carriers pay them, and because they are used to fund the universal service program, which "confers special benefits on contributing carriers by (among other things) expanding the network such carriers can serve." FCC EB Br. 51.

But FCC misunderstands the nature of the inquiry. A fee has three characteristics: First, fees are incurred "incident to a voluntary act." *Nat'l Cable*, 415 U.S. at 341; *see also* Krotoszynski, Jr., *Reconsidering the*

No. 22-60008

*Nondelegation Doctrine*, *supra*, at 270 ("A 'fee' constitutes a charge that an agency exacts in return for a benefit voluntarily sought by the payer."). For example, "[a] public agency might charge a user fee to visit a public park, tour a museum, or enter a toll road." *Trafigura Trading LLC v. United States*, 29 F.4th 286, 293 (5th Cir. 2022) (Opinion of Ho, J.); *see also ibid.* (noting that fees "arise in the context of value-for-value transactions" between individuals and government). The government may also charge fees designed to defray the cost of providing benefits to a regulated party, but only if the fees charged represent a "fair approximation of services, facilities, or benefits furnished." *United States v. U.S. Shoe Corp.*, 523 U.S. 360, 363 (1998). Second, a fee generally is "imposed by an administrative agency upon only those persons, or entities, subject to its regulation for regulatory purposes." *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000). And third, the revenue the government raises through its collection of fees is used to supply benefits inuring to the persons or entities paying them rather than to the public generally. *See Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 223 (1989) (quoting *Nat'l Cable*, 415 U.S. at 343).

Universal service contributions do not have any of these characteristics. First, they are not incident to a voluntary act but rather are a condition of doing business in the telecommunications industry. *See* 47 U.S.C. § 254(d). Nor do they represent a fair approximation of the benefits conferred by government regulation on telecommunications carriers. In fact, they are not related to regulatory costs at all. They are designed to fund telecommunications subsidies to schools, libraries, healthcare facilities, and low-income individuals. Second, the cost of universal service contributions is not borne by parties FCC regulates. While FCC formally imposes the charges on telecommunications carriers, carriers overwhelmingly pass the cost of contributions on to consumers, as is expressly permitted by FCC regulation. *See* FCC, REPORT TO CONGRESS, *supra*, at 45–46; 47 C.F.R.

19

§ 54.712(a). So the cost of universal service contributions is widely shared by the population in a manner reminiscent of a "classic tax." *See Valero*, 205 F.3d at 134 ("The 'classic tax' is imposed by the legislature upon a large segment of society."). And third, the benefits associated with universal service contributions "inure to the benefit of the public"—or more accurately to the benefit of those fortunate enough to receive subsidies from USAC—rather than to the benefit of the persons who pay them. *Skinner*, 490 U.S. at 223 (quoting *Nat'l Cable*, 415 U.S. at 343). There is no overlap at all between the class of USF beneficiaries (recipients of subsidized telecommunications services) and the class of USF contributors (American telecommunications consumers who see USF charges on their phone bills each month).

Think about the consequences of FCC's position:

- Congress could fund Medicare and Medicaid without "taxing" anyone. It could simply allow hospital executives to set the Medicare-Medicaid budget, then have HHS rubber-stamp the hospitals' healthcare taxes, which could then be passed through to consumers' hospital bills.

- Congress could fund the Supplemental Nutrition Assistance Program ("SNAP") without "taxing" anyone. It could simply allow grocery store executives to set the SNAP budget, then have USDA rubber-stamp the grocers' SNAP taxes, which could then be passed through to consumers at the checkout register.

- Congress could fund affordable housing without "taxing" anyone. It could simply allow real estate companies to set the affordable housing budget, then have HUD rubber-stamp the companies affordable-housing taxes, which could then be passed through to consumers as new line items at closing or in monthly surcharges for rent.

We could go on. But you get the point: All of these are obviously taxes. So while "[d]istinguishing a tax from a fee often is a difficult task," *Tex. Ent.*

JA232

*Ass'n, Inc. v. Hegar*, 10 F.4th 495, 505 (5th Cir. 2021) (citation omitted), the analysis here is straightforward. Congress has bestowed upon FCC the power to levy taxes, and we accordingly conclude that it has delegated its taxing power.[6]

### B.

In § 254 of the Telecommunications Act, Congress delegated its taxing power to FCC. The power to tax is a quintessentially legislative one. *See* U.S. Const. art. 1, § 8, cl. 1; *see also Nat'l Cable*, 415 U.S. at 340 ("Taxation is a legislative function, and Congress . . . is the sole organ for levying taxes."); Michael W. McConnell, The President Who Would Not Be King 334 (2020) (noting that domestic taxation is "especially central to the legislative branch"). So § 254 is constitutional only if it passes nondelegation muster. We (1) explain the nondelegation doctrine as articulated by the Supreme Court. Then we (2) explain the breadth of Congress's delegation to FCC. Lastly, we (3) explain that the Supreme Court has never upheld a delegation of core legislative power as sweeping as the one contained in § 254.

### 1.

The Constitution vests "[a]ll legislative Powers herein granted" " in a Congress of the United States." U.S. Const. art. I, § 1. "Accompanying that assignment of power to Congress is a bar on its further delegation." *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality op.). Moreover, "the principle of separation of powers that underlies our tripartite system of

---

[6] The fact that Congress euphemistically labeled these universal service charges "contribution[s]," 47 U.S.C. § 254(d), is irrelevant. "Congress cannot change whether an exaction is a tax . . . *for constitutional purposes* simply by" relabeling it. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012) (emphasis in original).

Government" independently compels the conclusion that Congress, not agencies, must make legislative decisions. *Mistretta v. United States*, 488 U.S. 361, 371 (1989); *see Gundy*, 588 U.S. at 153 (Gorsuch, J., dissenting) ("[I]t would frustrate the system of government ordained by the Constitution if Congress could merely announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals." (quotation omitted)). So there is no doubt that "the lawmaking function belongs to Congress," *Loving v. United States*, 517 U.S. 748, 758 (1996), and that Congress "may not constitutionally delegate that power to another" constitutional actor, *Touby v. United States*, 500 U.S. 160, 165 (1991).

But "[t]he Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function." *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 421 (1935). So the Supreme Court has held that delegations are constitutional so long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized [to exercise the delegated authority] is directed to conform." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

Still, "there are limits of delegation which there is no constitutional authority to transcend." *Panama Refin.*, 293 U.S. at 430. And for good reason. Vague congressional delegations undermine representative government because they give unelected bureaucrats—rather than elected representatives—the final say over matters that affect the lives, liberty, and property of Americans. *See Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 674 (6th Cir. 2021) (Thapar, J., concurring) ("By shifting responsibility to a less accountable branch, Congress . . . deprives the people of the say the framers intended them to have."). Overly broad delegations also obscure accountability: When elected representatives shirk hard choices, constituents do not know whom to hold accountable for government action.

*See Gundy*, 588 U.S. at 156 (Gorsuch, J., dissenting). And they offend the deliberation-forcing features of the constitutionally prescribed legislative process. *See* U.S. Const. art. I, § 7; John Manning, *Lawmaking Made Easy*, 10 Green Bag 2d 191, 202 (2007) ("[B]icameralism and presentment make lawmaking difficult *by design*." (emphasis in original)); *see also* The Federalist No. 73 (A. Hamilton) (noting that the Constitution prescribed elaborate procedures for lawmaking because "[t]he oftener the measure is brought under examination, the greater the diversity in the situations of those who are to examine it, the less must be the danger of those errors which flow from want of due deliberation, or of those missteps which proceed from the contagion of some common passion or interest.").

So while "the Supreme Court has not in the past several decades held that Congress failed to provide a requisite intelligible principle," *Jarkesy v. SEC*, 34 F.4th 446, 462 (5th Cir. 2022), *aff'd on other grounds*, 144 S. Ct. 2117 (2024), "[t]hat does not mean . . . we must rubber-stamp all delegations of legislative power," *Big Time Vapes, Inc. v. FDA.*, 963 F.3d 436, 443 (5th Cir. 2020). Rather, "[w]e ought not to shy away from our judicial duty to invalidate unconstitutional delegations." *Ibid.* (quotation omitted).

2.

Nondelegation inquiries "always begin[] . . . with statutory interpretation" because the constitutional question is whether Congress has supplied a sufficiently intelligible principle to guide an agency's discretion. *Gundy*, 588 U.S. at 135 (plurality op.). So we must construe "the challenged statute to figure out what task it delegates and what instructions it provides." *Id.* at 136. Petitioners challenge the USF's funding mechanism, so we must consider whether 47 U.S.C. § 254 sufficiently instructs FCC regarding how much it should tax Americans to pay for the universal service program.

Two of § 254's subsections are relevant: § 254(d) provides that USF funding should be "sufficient . . . to preserve and advance universal service," and § 254(b)(1) suggests that telecommunications services "should be available at . . . affordable rates."

These statutory phrases supply no principle at all. Start with sufficiency. That funding should be "sufficient . . . to preserve and advance universal service" is meaningful only if the concept of universal service is sufficiently intelligible. It is not. Rather, universal service is "an evolving level of telecommunications services that the Commission shall establish periodically" by determining what telecommunications services are "essential to education, public health, or public safety"; are "subscribed to by a substantial majority of residential customers"; are "deployed . . . by telecommunications carriers"; or are otherwise "consistent with the public interest, convenience, and necessity." 47 U.S.C. § 254(c). That is a lot of words, but they amount to a concept of universal service so amorphous that Congress's instruction to raise "sufficient" funds amounts to a suggestion that FCC exact as much tax revenue for universal service projects as FCC thinks is good. *Cf.* Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 339–40 (2002) (describing consequences of congressional enactment that requires "'goodness and niceness'").

That § 254(b) supplies minimal guidance on the contours of Congress's idea of an ideal universal service policy is no answer. That is for three reasons. First, we have previously accepted FCC's contention that "nothing in [§ 254] defines 'sufficient' to mean that universal service support must equal the actual costs incurred by" telecommunications carriers contributing to the USF. *TOPUC I*, 183 F.3d at 412. So FCC's universal service taxation is not formally limited by the amount it disburses on universal service projects. Nothing in the statute precludes FCC from, for example, imposing the USF Tax to create an endowment that it could use to

fund whatever projects it might like. FCC has never done so, but the fact "that the recipients of illicitly delegated authority opted not to make use of it is no antidote. It is *Congress's* decision to delegate that is unconstitutional." *Dep't of Transp. v. Ass'n of Am. Railroads* ("*Amtrak II*"), 575 U.S. 43, 62 (2015) (Alito, J., concurring) (emphasis in original) (quotation omitted) (quoting *Ass'n of Am. Railroads v. U.S. Dep't of Transp.* ("*Amtrak* I"), 721 F.3d 666, 674 (D.C. Cir. 2013), *vacated and remanded sub nom. Amtrak II*, 575 U.S. 43); *see Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 472 (2001) ("We have never suggested that an agency can cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute.").

Second, even if FCC's power to levy taxes were limited by the amount it disburses on universal service projects, subsection (b) still would not curb FCC's discretion because we have explained it sets out "aspirational" principles rather than "inexorable statutory command[s]." *TOPUC I*, 183 F.3d at 421; *see also Tex. Off. of Pub. Util. Couns. v. FCC*, 265 F.3d 313, 321 (5th Cir. 2001). And even if the principles in subsection (b) were more than aspirational, they still would not meaningfully limit FCC because § 254(b)(7) vests FCC with discretion to formulate "other principles" so long as it considers the additional principles to be "necessary and appropriate for the protection of the public interest, convenience, and necessity and . . . consistent with" the rest of Chapter 5 of Title 47 of the United States Code. In other words, FCC "may roam at will," *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 538 (1935), disregarding § 254(b)'s enumerated principles altogether when it thinks the "public interest" warrants the journey. 47 U.S.C. § 254(c)(1)(D); *id.* § 254(b)(7).

Third, even if the principles in § 254(b) in some way bind FCC, they are contentless in important respects. For example, § 254(b)(6) suggests that "[e]lementary and secondary schools and classrooms . . . and libraries should

have access to advanced telecommunications services as described in subsection (h)." But subsection (h) says only that "elementary schools, secondary schools, and libraries" should have access to telecommunications services "for educational purposes at rates less than the amounts charged for similar services to other parties." *Id.* § 254(h)(1)(B). Which services? Presumably those FCC thinks are "essential to education" or otherwise within the ambit of its self-defined universal service utopia. *Id.* § 254(c). But how is FCC to make that determination? And which schools and libraries should receive subsidized services? And how much less should they pay?

Congress never said. FCC has answered some of these questions, *see* 47 C.F.R. §§ 54.501, .502, .505, but it remains a mystery how we are supposed to "ascertain whether the will of Congress has been obeyed." *Mistretta*, 488 U.S. at 379 (citation omitted). Each of the "aspirational" universal service principles in § 254(b) & (c) is inapposite.[7] So apparently your guess is as good as ours is as good as FCC's is as good as any random American taxpayer's. And funding for schools and libraries is not merely an

---

[7] Section 254(c)(1)(B) suggests low-income consumers should have access to telecommunications services comparable to those subscribed to by unsubsidized residential customers. And § 254(b)(3) tells FCC to make telecommunications services available in rural areas at rates comparable to those charged in urban areas. Those provisions may supply sufficient guidance for FCC to execute certain aspects of the universal service program. But nothing in the statute remotely suggests FCC should provide universal service funding only to low-income or rural schools. So §§ (b)(3) and (c)(1)(B) cannot supply the limiting principle that § (h)(1)(B) lacks. And the fact that FCC has limited universal service funding to low-income schools is, once again, irrelevant. *See Am. Trucking*, 531 U.S. at 472. The question is whether the statute itself in any way limits FCC's discretion to supply universal service funding for educational programs, and it plainly does not.

interstitial gap in the statutory scheme. It constituted more than a third of the contribution amount that gave rise to these proceedings. *See* JA.101.[8]

So if § 254(b) binds at all, it is apparent that the only real constraint on FCC's discretion to levy excise taxes on telecommunications carriers (and American consumers in turn) is that rates "should" remain "affordable." 47 U.S.C. § 254(b)(1); *see Consumers' Rsch.*, 67 F.4th at 794 ("[E]xcess subsidization in some cases may detract from universal service by causing rates unnecessarily to rise, thereby pricing some consumers out of the market." (citation omitted)). But saying telecommunications services "should" remain "affordable" amounts to "*no guidance* whatsoever." *Jarkesy*, 34 F.4th at 462 (emphasis in original). How is FCC to determine whether the USF Tax it mandates has made telecommunications services unaffordable? The demand for cell phones is uncommonly inelastic because cell phones are essential to participation in the modern world. *See Carpenter v. United States*, 138 S. Ct. 2206, 2220 (2018) ("[C]ell phones and the services they provide are such a pervasive and insistent part of daily life that carrying one is indispensable to participation in modern society." (citation and quotation omitted)). That means the FCC could impose eye-watering USF Taxes while also arguing with a straight face that cell phones remain "affordable" in the sense that most Americans would choose to keep using them. And that means § 254 leaves FCC—and as importantly reviewing courts[9]—utterly at sea. Is a 25% excise tax excessively burdensome under §

---

[8] Both dissenting opinions contend 47 U.S.C. § 254 is loaded with intelligible principles. *See post*, at 77–82 (Stewart, J., dissenting); *id.* at 101–02 (Higginson, J., dissenting). But neither identifies any principle that might guide FCC in determining how much less schools and libraries should pay for telecommunications services.

[9] *See Mistretta*, 488 U.S. at 379 (noting courts are "justified" in invalidating delegations where it would be "impossible in a proper proceeding to ascertain whether the

254(b)(1)? 250%? 2500%? There are no answers because Congress never gave them.

Finally, the breadth of § 254's delegation is especially troubling because the statute insulates FCC from the principal tool Congress has to control FCC's universal service decisions—the appropriations power. *See* U.S. CONST. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."). Ordinarily, when Congress delegates broadly, it retains a residuum of control over agency action because the agency is powerless to act without a congressional appropriation of funds. *See CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 232 (5th Cir. 2022) (Jones, J., concurring) ("Congress's supremacy in fiscal matters makes the executive branch dependent on the legislative branch for subsistence, thereby forging a vital line of accountability between the executive branch and the legislative branch and, therefore, the people. Recent history confirms that Congress's appropriations powers have proven a forcible lever of accountability: Congress has tightened the purse strings to express displeasure with an agency's nefarious activities and even to end armed combat."). So even when statutes vest agencies with significant discretion, the appropriations process generally ensures agencies remain subservient to the will of the people as expressed through their elected representatives. *See* Jonathan H. Adler & Christopher J. Walker, *Delegation and Time*, 105 IOWA L. REV. 1931, 1957 (2020) (cataloguing examples and noting that "[l]imiting appropriations is an effective way to limit an agency's exercise of delegated power").

---

will of Congress has been obeyed") (quoting *Yakus v. United States*, 321 U.S. 414, 425–26 (1944)).

No. 22-60008

Here, though, Congress cannot exercise control by limiting appropriations because the whole point of USF is to fund universal service *outside* the regular appropriations process.[10] And since FCC commissioners are removable by the President only for-cause, *see* 47 U.S.C. § 154(c)(1)(A), the connection between FCC policy decisions made pursuant to § 254 and *any* democratically accountable federal official is extremely attenuated.

3.

The Supreme Court has "over and over upheld even very broad delegations." *Gundy*, 588 U.S. at 146 (plurality op.). But it has also suggested the scope of permissible delegation varies with context. *See Am. Trucking*, 531 U.S. at 475 ("[T]he degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred."); *J.W. Hampton*, 276 U.S. at 406 ("In determining what [Congress] may do in seeking assistance from another branch, the extent and character of that assistence [*sic*] must be fixed according to common sense and the inherent necessities of the governmental co-ordination."); *Loving*, 517 U.S. at 768 (noting the general rule that "*a constitutional power* implies a power of

---

[10] FCC has concluded that 47 U.S.C. § 254 constitutes "a permanent indefinite appropriation." GAO-05-151, Greater Involvement Needed by FCC in the Management and Oversight of the E-Rate Program 11 (2005), https://perma.cc/QNU6-YEFS. If we had to decide whether § 254 comports with the Appropriations Clause, U.S. Const. art. I, § 1, cl. 9, we would apply the Supreme Court's decision in *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024). But we need not decide that question because Petitioners did not formally raise an Appropriations Clause challenge. Our point is only that, to the extent Congress's ability to control agencies through regular appropriations supplies some justification for broad delegations, *see, e.g.*, Christopher J. Walker, *Restoring Congress's Role in the Modern Administrative State*, 116 Mich. L. Rev. 1101, 1116 (2018) (explaining the tools Congress has, including the appropriations power, "to rein in the administrative state and prevent federal agencies from abusing their consolidated lawmaking and law-execution powers"), that justification is absent here.

delegation of authority under *it* sufficient to effect *its* purposes" (emphasis added)) (quoting *Lichter v. United States*, 334 U.S. 742, 778 (1948)); *Lichter*, 334 U.S. at 778–79 (suggesting Congress may delegate its war powers more broadly); *Panama Refin.*, 293 U.S. at 422 (same). So the fact that the Court has upheld certain broad delegations does not necessarily dictate that we uphold § 254's delegation of power to FCC to levy taxes on American consumers. And § 254 appears unlike any delegation the Court has ever blessed.

For starters, the Supreme Court's nondelegation "jurisprudence has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more *technical* problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta*, 488 U.S. at 372 (emphasis added). So the Court has deemed it constitutionally sufficient for Congress to make a policy judgment and then direct an agency to give that judgment effect through the application of technical knowledge.

For example, in *American Trucking*, 531 U.S. 457, the Court considered a congressional directive to EPA to set ambient air quality standards for certain pollutants. *Id.* at 472. It held that the statute supplied an intelligible principle because it required EPA to set air quality standards "requisite to protect the public health" "for a discrete set of pollutants" based on "the latest scientific knowledge." *Id.* at 472–73. In other words, the statute was constitutional because Congress made the crucial policy judgment—that the public should be protected from harmful pollutants— and then relied on EPA to give effect to that judgment through the

30

application of its scientific expertise.[11] *See Gundy*, 588 U.S. at 166 (Gorsuch, J., dissenting) (explaining that the "most important[]" question in the intelligible principle inquiry is whether "Congress, and not the Executive Branch, ma[d]e the policy judgments").

Here, in contrast, Congress did not delegate because FCC has some superior technical knowledge about the optimal amount of universal service funding. No such knowledge exists because determining the ideal size of a welfare program involves policy judgments, not technical ones. And under our Constitution, those judgments usually are Congress's to make.

In fact, in every case where the Court has upheld a congressional delegation of its prerogative to make significant policy judgments, there has been some special justification. In *Mistretta*, for example, the Court considered a congressional delegation of authority to Article III judges to promulgate sentencing guidelines. Few things are more policy-laden than criminal sentencing decisions, but the Court found the delegation permissible because "the Judiciary always has played, and continues to play, [a role] in sentencing." *Mistretta*, 488 U.S. at 391; *see also ibid.* ("Just as the rules of procedure bind judges and courts in the proper management of the cases before them, so the Guidelines bind judges and courts in the exercise of their uncontested responsibility to pass sentence in criminal cases. In other words, the Commission's functions, like this Court's function in promulgating procedural rules, are clearly attendant to a central element of the historically acknowledged mission of the Judicial Branch.").

---

[11] The Court upheld the delegation only after deciding that the statute in question "unambiguously bar[red] cost considerations from the NAAQS-setting process." *Id.* at 471; *see also id.* at 473–74 (noting the statute "did not permit economic costs to be considered").

No. 22-60008

Similarly, in *National Broadcasting Co. v. United States*, 319 U.S. 190 (1943), the Court upheld a delegation to FCC to regulate broadcasting "as public convenience, interest, or necessity requires . . . ." *Id.* at 214. But licensing of broadcasting rests on the principle "that the public . . . own[s] the airwaves," and that private people may use that resource only on terms the government sets. John Harrison, *Executive Administration of the Government's Resources and the Delegation Problem*, *in* The Administrative State Before the Supreme Court 232, 250 (Peter J. Wallison & John Yoo eds., 2022); *see also* McConnell, The President Who Would Not Be King, *supra*, at 334 (noting that the Communications Act of 1934 "can be seen as merely a transfer back to the executive branch of a power to manage public property"). "[S]ecur[ing] the maximum benefits of" a public resource "to all the people of the United States," *Nat'l Broad. Co.*, 319 U.S. at 217, is "within the core of the executive power," Harrison, *Executive Administration*, *in* The Administrative State Before the Supreme Court, *supra*, at 238. And "when a congressional statute confers wide discretion to the executive, no separation-of-powers problem may arise if the discretion is to be exercised over matters already within the scope of executive power." *Gundy*, 588 U.S. at 159 (Gorsuch, J., dissenting) (citation and quotation omitted); *see Wayman v. Southard*, 23 U.S. 1, 42–43 (1825) ("It will not be contended that Congress can delegate . . . powers which are strictly and exclusively legislative. But Congress may certainly delegate to others, powers which the legislature may rightfully exercise itself."); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319–20 (1936) (explaining that Congress may delegate more broadly in the foreign affairs context because "the President [is] the sole organ of the federal government in the field of international relations."); *see also* McConnell, The President Who Would Not Be King, *supra*, at 334 ("[S]ome of Congress's enumerated powers are strictly and

exclusively legislative but some are not, and Congress may either exercise the latter powers itself or delegate them."); Phillip Hamburger, *Nondelegation Blues*, 91 Geo. Wash. L. Rev. 1083, 1148 (2023) (noting that "the shared reach of the" legislative, executive, and judicial "powers occasionally allows different branches to do the same thing even under their different and separated powers.").

Section 254, in contrast, did not delegate to the executive any power even remotely executive in character. It delegated the power to tax, which "is a legislative function." *Nat'l Cable*, 415 U.S. at 340.

True, the Supreme Court has upheld seemingly broad congressional delegations of core legislative functions. *See, e.g.*, *Yakus*, 321 U.S. at 420 (upholding a delegation to the agency to fix the prices of commodities at a level that "will be generally fair and equitable and will effectuate the purposes of the Act." (citation omitted)); *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 97 (1946) (upholding a delegation to SEC to modify the structure of holding company systems so as to ensure that they are not "unduly or unnecessarily complicated" and do not "unfairly or inequitably distribute voting power among security holders." (citation omitted)). But careful consideration reveals that the statutes considered in all these cases limited agency discretion enough that, at the very least, reviewing courts could "ascertain whether the will of Congress ha[d] been obeyed." *Mistretta*, 488 U.S. at 379 (quoting *Yakus*, 321 U.S. at 425–26).

In *Yakus*, for example, Congress directed the administrator responsible for ensuring "fair and equitable" prices to "ascertain and give due consideration to the prices prevailing" in a particular two-week period, and to make adjustments for relevant factors including "[s]peculative fluctuations, general increases or decreases in costs of production, distribution, and transportation, and general increases or decreases in profits

earned by sellers of the commodity or commodities, during and subsequent to the year ended October 1, 1941." 321 U.S. at 421 (citation omitted). It can hardly be contended that the executive wanted for legislative direction under this statute, or that reviewing courts lacked workable standards. *See id.* at 426 (noting that "the standards prescribed by the . . . Act" were "sufficiently definite and precise to enable Congress, the courts and the public to ascertain whether the Administrator, in fixing the designated prices, has conformed to those standards"). Similarly in *American Power & Light Co.*, the Court found that "a veritable code of rules" set out in other sections of the statute clarified the ambiguities inherent in the phrases "unduly or unnecessarily complicate[d]" and "unfairly or inequitably distribute[d]" such that courts would have no trouble testing SEC's policies against the law. 329 U.S. at 104–05.

The Court's other nondelegation precedents are in accord. The statute considered in *J.W. Hampton*, 276 U.S. 394, simply directed the President to impose tariffs that would "equalize" the relative costs of production for American companies and their foreign counterparts—a fact-finding role. *Id.* at 401; *see also Gundy*, 588 U.S. at 163 (Gorsuch, J., dissenting) (noting that the statute may have required the President to make "intricate calculations, but it could be argued that Congress had made all the relevant policy decisions, and the Court's reference to an 'intelligible principle' was just another way to describe the traditional rule that Congress may leave the executive the responsibility to find facts and fill up details."). And the term "public interest" in § 407 of the Transportation Act of 1920 was shorthand for a congressional instruction to the Interstate Commerce Commission to ensure that proposed railroad consolidation would not result in deteriorating service quality or unreasonable or discriminatory rates—an instruction with discernible content in light of the common law of common carriers. *See N.Y. Cent. Sec. Corp. v. U.S.*, 287 U.S. 12, 25 (1932); *see also id.*

34

at 24 ("It is a mistaken assumption that [the term 'public interest'] is a mere general reference to public welfare without any standard to guide determinations. The purpose of the Act, the requirements it imposes, and the context of the provision in question show the contrary."); Herbert Hovenkamp, *Regulatory Conflict in the Gilded Age: Federalism and the Railroad Problem*, 97 Yale L.J. 1017, 1045 (1988) ("As early as the 17th century, the common law had derived the duty to charge reasonable rates from the common carrier's obligation to serve everyone . . . ."). And the statute considered in *Touby* "meaningfully constrain[ed] the Attorney General's discretion" because it directed the Attorney General to ban drugs only after making a factual determination that there was a history of significant abuse that threatened the public health. *See* 500 U.S. at 166; *see also Gundy*, 588 U.S. at 166 (Gorsuch, J., dissenting) (noting that in *Touby* the Court "stressed all [the statutory] constraints on the Attorney General's discretion . . . to indicate that the statute supplied an 'intelligible principle' *because* it assigned an essentially fact-finding responsibility to the executive." (emphasis in original)). And the statute considered in *Lichter*, 334 U.S. 742—which authorized the executive to recoup "excessive profits" on wartime government contracts—was likewise judicially workable. As the Court noted, 'excessive' simply means "[g]reater than the usual amount or degree." *Id.* at 785 n.37 (quoting Webster's New International Dictionary (2d ed. 1938)). A reviewing court would thus have no trouble discerning whether a contractor reaped in excess because it could easily compare his profits to those of his peers.[12] And so on and so forth.

---

[12] Moreover, as we have noted, context matters to the intelligible-principle inquiry. So assuming *arguendo Lichter* blessed a delegation more sweeping than any other (we think it did not), it is surely relevant that the Court emphasized that the statute in question came about because of the necessities of war, "sprang from [Congress's] war powers," and

No. 22-60008

\*    \*    \*

So amidst all the statutes that have survived nondelegation challenges, § 254 stands alone. Unlike delegations implicating special agency expertise, § 254 delegates to FCC the power to make important policy judgments, and to make them while wholly immunized from the oversight Congress exercises through the regular appropriations process. Unlike delegations implicating the power to impose criminal sentences, taxation has always been an exclusively legislative function. Unlike the power to impose conditions on the use of public property, taxation involves the conversion of private property. And unlike other congressional delegations implicating core legislative functions, § 254 is a hollow shell that Congress created for FCC to fill—so amorphous that no reviewing court could ever possibly invalidate any FCC action taken in its name.[13]

---

operated only for "the duration of the war or . . . a short time thereafter." *Id.* at 755; 787. As the Court explained, because "[t]he power to wage war is the power to wage war successfully," "[r]easonable regulations to safeguard the resources upon which we depend for military success must be regarded as being within the powers confided to Congress to enable it to prosecute a successful war." *Id.* at 780–81. The *Panama Refining* Court similarly deemed the wartime posture of certain broad delegations meaningful to the delegation inquiry because the President himself has war powers "cognate to the conduct by him of the foreign relations of the government." 293 U.S. at 422.

[13] Section 254 also implicates the taxing power, which makes the nondelegation concerns it raises especially salient. *See Nat'l Cable*, 415 U.S. at 341 ("It would be such a sharp break with our traditions to conclude that Congress had bestowed on a federal agency the taxing power that we read [the relevant statute] narrowly as authorizing not a 'tax' but a 'fee.'"). That is because limitations on the taxing power have long been the mechanism through which the people curb the excesses of unelected power. *See* THE FEDERALIST No. 58 (J. Madison) ("[The House], in a word, hold[s] the purse that powerful instrument by which we behold, in the history of the British Constitution, an infant and humble representation of the people gradually enlarging the sphere of its activity and importance, and finally reducing, as far as it seems to have wished, all the overgrown prerogatives of the other branches of the government.").

No. 22-60008

We therefore have grave concerns about § 254's constitutionality under the Supreme Court's nondelegation precedents. *See Gundy*, 588 U.S. at 136 (plurality op.) (noting that the Court "*would* face a nondelegation question" if the statutory provision at issue had "grant[ed] the Attorney General plenary power to determine [the statute's] applicability to pre-Act offenders—to require them to register, or not, as she sees fit, and to change her policy for any reason and at any time" (emphasis added) (citation omitted)). Nevertheless, we need not hold the agency action before us unconstitutional on that ground alone because the unprecedented nature of the delegation combined with other factors is enough to hold it unlawful. *See infra*, Part III.D.

---

For that reason, the framers through the Origination Clause took special care to ensure that the taxing power remained intimately connected with the people. *See* U.S. CONST. art. I, § 7, cl.1 ("All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills."); 1 THE RECORDS OF THE FEDERAL CONVENTION OF 1787 544 (Max Farrand ed., 2d ed. 1937) (George Mason) ("[T]he consideration which weighed with the Committee [when drafting the Origination Clause] was that the [House] would be the immediate representatives of the people, the [Senate] would not."). In fact, "vesting the origination power with the House was an integral part of the deal that resolved the conflict over congressional apportionment: seats in the Senate would not be apportioned based on population, but only the House of Representatives would have the power to initiate legislation that raises or spends money." Krotoszynksi, Jr., *Reconsidering the Nondelegation Doctrine*, *supra*, at 252. Benjamin Franklin, among others, noted that "the two clauses, the originating of money bills, and the equality of votes in the Senate, [are] essentially connected by the compromise which had been agreed to." 2 THE RECORDS OF THE FEDERAL CONVENTION, *supra*, at 233.

So the Constitution's original meaning would seem to compel a more restrictive test for delegations of the taxing power. Nevertheless, the Supreme Court has declined to apply heightened scrutiny to tax-related delegations, *see Skinner*, 490 U.S. at 223, and we are not authorized to depart from that holding.

37

No. 22-60008

C.

The Q1 2022 USF Tax is not only difficult to square with the Supreme Court's public nondelegation precedents. It was also formulated by private entities. That raises independent but equally serious questions about its compatibility with Article I, § 1, which requires "[a]ll legislative Powers herein granted shall be vested in a Congress." We (1) explain that the scope of FCC's delegation to private entities may violate the Legislative Vesting Clause by allowing private entities to exercise government power. Then we (2) explain that even if FCC's delegation could be constitutionally justified, FCC may have violated the Legislative Vesting Clause by delegating government power to private entities without express congressional authorization.

1.

a.

The Supreme Court has held Congress has broad discretion to empower executive agencies to "execute" the law. *See City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013). "When it comes to private entities, however, there is not even a fig leaf of constitutional justification. Private entities are not vested with legislative Powers. Nor are they vested with the executive Power, which belongs to the President." *Amtrak II*, 575 U.S. at 62 (Alito, J., concurring) (quotation and citations omitted). So it is clear that delegations to private entities raise constitutional concerns entirely distinct from delegations to the executive.

38

JA250

Only four times has the Supreme Court considered whether a delegation to private entities violates Article I's Vesting Clause.[14]

First, in *Schechter Poultry*, the Court considered a constitutional challenge to the National Industrial Recovery Act ("NIRA") of 1933, 48 Stat. 195. *See* 295 U.S. at 519–21. That statute delegated to trade or industrial groups the authority to develop codes defining "unfair method[s] of competition." *Id.* at 521 n.4 (quotation omitted). If the codes were approved by the President, they were to become law under "such exceptions to and exemptions from the provisions of such code, as the President in his discretion deem[ed] necessary to effectuate the policy" of the NIRA. *Ibid.* The Court held that the statute was unconstitutional. In part, it reasoned the idea that "Congress could delegate its legislative authority to trade or industrial associations or groups so as to empower them to enact the laws they deem to be wise and beneficent for the rehabilitation and expansion of their trade or industries," or that "trade or industrial associations or groups be constituted legislative bodies for that purpose because such associations or groups are familiar with the problems of their enterprises" was "utterly inconsistent with the constitutional prerogatives and duties of Congress." *Id.* at 537.

The next year, in *Carter v. Carter Coal Company*, 298 U.S. 238, 278 (1936), the Court considered a delegation challenge to the Bituminous Coal Conservation Act of 1935, 49 Stat. 991 (repealed 1937). That statute authorized the district board in local coal districts (the "code authority") to

_____

[14] The parties in *Amtrak II* raised a private delegation challenge, but the Court did not reach it because it determined that, for relevant purposes, Amtrak was a governmental entity. *See* 575 U.S. at 55. The Court has also several times considered whether state delegations of legislative power to private entities violated due process, *see* Paul J. Larkin, *The Private Delegation Doctrine*, 73 Fʟᴀ. L. Rᴇᴠ. 31, 45–47 (2021), but those cases present a question different from the one before us.

adopt a code that included agreed-upon minimum prices for coal. *Carter Coal*, 298 U.S. at 282–83. It also allowed an agreement between producers of more than two-thirds of the annual tonnage of coal and a majority of mine workers to set industry-wide minimum wage and maximum working-hour agreements. *Id.* at 283–84. Both the minimum price codes and the labor codes bound producers—*i.e.*, obtained legal force—without approval by any federal official. *Id.* at 282, 284. The Court explained the statute amounted to "delegation in its most obnoxious form" because it purported to delegate regulatory power not "to an official or an official body, presumptively disinterested," but rather "to private persons whose interests . . . often are adverse" to those whom the statute authorized them to regulate. *Id.* at 311. That, the Court held, was "an intolerable and unconstitutional interference with personal liberty and private property." *Ibid.*[15]

In *Currin v. Wallace*, 306 U.S. 1, 5–6 (1939), the Court considered a delegation challenge to the Tobacco Inspection Act of 1935, 49 Stat. 731 which authorized the Secretary of Agriculture to designate markets in which no tobacco could be sold unless it had "been inspected and certified by an authorized representative of the Secretary according to the established standards." One of the bases for the challenge was that the Secretary could not designate a market unless two-thirds of the growers voting at a prescribed referendum favored the designation. *See Currin*, 306 U.S. at 6, 15. But the producers had no power to designate the markets in which classification would be required; only the Secretary could do that. Nor did the statute even

---

[15] The Court did not clearly specify which constitutional provision—the Legislative Vesting Clause or the Fifth Amendment Due Process Clause—the statute offended. *See id.* at 310–12; *see also Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 881 n.23 (5th Cir. 2022). But because the relevant portion of the *Carter Coal* cited *Schechter Poultry*, a Vesting Clause case, alongside Due Process cases, the Court presumably held the delegation was unlawful on both grounds.

provide that the producers would help craft regulations. So unlike the private bodies in *Carter Coal*, the tobacco producers had no power to "make the law and force it upon a minority." *Id.* at 15–16 (citation omitted). Congress merely gave them the ability to prevent certain regulations from taking effect. *See ibid.* The Court accordingly rejected the challenge on the ground that the statute did not delegate *any* legislative power to private entities. *Ibid.*

Finally, in *Sunshine Anthracite Coal Company v. Adkins*, 310 U.S. 381, 387 (1940), the Court considered a private delegation challenge to The Bituminous Coal Act of 1937, 50 Stat. 72 (repealed 1966), a revised version of the statute the Court held unlawful in *Carter Coal*. Congress's most important revision was to relegate the code authorities from lawmakers to "aid[s]" subject to the "pervasive surveillance and authority" of the National Bituminous Coal Commission. *Sunshine Anthracite*, 310 U.S. at 388. Under the revised statute, code authorities could "propose" minimum prices, but their proposals were legal nullities until they were expressly "approved, disapproved, or modified" by the Coal Commission. *Ibid.* Thus, the Court concluded that the Commission, "not the code authorities, determine[d] [coal] prices," *id.* at 399, and it therefore held that the statute did not unconstitutionally delegate government power to private entities.

Lower courts have discerned from these cases the "cardinal constitutional principle [] that federal power can be wielded only by the federal government." *Black*, 53 F.4th at 872. Private delegations are thus constitutional only on three conditions. First, government officials must have final decision-making authority. *See* Larkin, *The Private Delegation Doctrine*, *supra*, at 50–51 (noting that in every case in which the Supreme Court has upheld a private delegation, "the law[] at issue . . . left final decision-making authority in the hands of a government official"). Second, agencies must *actually exercise* their authority rather than "reflexively rubber stamp [work product] prepared by others." *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir.

41

1974); *see State v. Rettig*, 987 F.3d 518, 531 (5th Cir. 2021), *cert. denied, Tex. v. Comm'r of Internal Revenue*, 142 S. Ct. 1308 (2022) ("A federal agency may not abdicate its statutory duties by delegating them to a private entity." (quotation and citation omitted)).[16] And third, the private actors must always remain subject to the "pervasive surveillance and authority" of some person or entity lawfully vested with government power. *Sunshine Anthracite*, 310 U.S. at 388.

In light of these strictures on private delegations, we held unconstitutional a statute that vested a private entity with the power to make rules regulating an industry where those rules were subject only to limited agency review. *See Black*, 53 F.4th at 884–89. And the D.C. Circuit similarly held unconstitutional a statute that empowered Amtrak to work jointly with the Federal Railroad Administration to develop binding railroad performance standards because the statute did not vest FRA with complete regulatory control. *See Amtrak I*, 721 F.3d at 670–74, *vacated and remanded sub nom. Amtrak II*, 575 U.S. 43; *see also Black*, 53 F.4th at 889–90 (relying on *Amtrak I*).

In contrast, where courts have deemed delegations to private entities constitutional, they have uniformly emphasized the agency's actual decision-making authority and control. For example, when the Third Circuit approved the National Association of Securities Dealers' role in securities regulation, it explained industry self-regulation raises "serious constitutional

---

[16] *Lynn* arose under the National Environmental Policy Act ("NEPA"), not the Constitution. But *Rettig* repeatedly cited *Lynn* to expound the level of control agencies must retain over private actors wielding governmental power for constitutional purposes. *Rettig*, 987 F.3d at 532. The central question in *Lynn* was whether an agency bore ultimate responsibility for work product prepared by a private entity, *see* 502 F.2d at 59, which is required not only by NEPA but also by the Legislative Vesting Clause, *see, e.g.*, *Black*, 53 F.4th at 881.

challenges." *Todd & Co. v. SEC*, 557 F.2d 1008, 1014 (3d Cir. 1977). Accordingly, the Court held securities self-regulation was constitutional only after emphasizing that SEC was obliged to "insure fair treatment of those disciplined by" NASD. *Ibid.* It also stressed that SEC was statutorily required to review NASD orders, make de novo findings, and come to an "independent decision on" securities' violations and penalties. *See id.* at 1012; *see also id.* at 1012–13 ("[NASD's] rules and its disciplinary actions were subject to full review by the S.E.C., a wholly public body, which *must* base its decision on its own findings." (emphasis added)). Similarly, when we approved a private entity's role in drafting an environmental impact statement, we emphasized that "the applicable federal agency [bore] the responsibility for the ultimate work product" and "independently perform[ed] its reviewing, analytical and judgmental functions." *Lynn*, 502 F.2d at 59 (quotation and citation omitted); *see also Rettig*, 987 F.3d at 531–32 (citing *Lynn* in an Art. I, § 1 challenge).

b.

FCC has delegated government power—the power to dictate the size of the universal service contribution amount, which controls the size of a tax levied on American consumers—to USAC and private telecommunications carriers. That delegation is lawful only if FCC (1) has final decision-making authority, (2) actually exercises that authority, and (3) exercises "pervasive surveillance and authority" over the private entities exercising power in its name. *Black*, 53 F.4th at 884 (quoting *Sunshine Anthracite*, 310 U.S. at 388).

FCC's subdelegation of its taxing power violates this test in two ways. The first problem is that FCC regulations provide that USAC's projections take legal effect without formal FCC approval. *See* 47 C.F.R. § 54.709(a)(3). FCC has, in effect, given private entities the final say with respect to the size of the USF Tax. That FCC retains discretion to revise the proposed

43

contribution amount, *see ibid.*, is insufficient. Congress could not say: "The defense budget is whatever Lockheed Martin wants it to be, unless Congress intervenes to revise it." To make law, Congress must affirmatively adopt the statutory text, pass it bicamerally, and present it to the President for signature. *INS v. Chadha*, 462 U.S. 919, 959 (1983). Legislation requires action not acquiescence. Similarly, while FCC may solicit advice from USAC and private carriers, it must affirmatively act to give legal effect to that advice because it alone has constitutional authority to execute 47 U.S.C. § 254.

The second problem is that FCC does not appear to "independently perform[] its reviewing, analytical and judgmental functions" with respect to the privately supplied universal service contribution amount. *Rettig*, 987 F.3d at 532 (quoting *Lynn*, 502 F.2d at 59). FCC has not pointed us to anything that suggests it *even checks* USAC's work. Instead, it appears to "reflexive[ly] rubber stamp" whatever contribution amount USAC proposes. *Lynn*, 502 F.2d at 59. The record before us shows that, before this litigation started, FCC *never made a single substantive change* to the contribution amounts proposed by USAC. *See supra*, at 6 & n.1.[17]

That is a *de facto* abdication. And when an agency *de facto* abdicates to a private entity its responsibility to make governmental decisions, that entity becomes more than a mere "aid" to the agency. *See Black*, 53 F.4th at 881 (quoting *Sunshine Anthracite*, 310 U.S. at 388). The private company becomes a lawmaker in its own right. So *de jure* approval alone is not enough. If FCC is going to rely on a non-governmental actor to supply a revenue requirement that dictates the size of a tax levied on American consumers, it

---

[17] Even if FCC wanted to change USAC's proposals, it is not at all clear it could. Petitioners contend, and FCC does not dispute, that the "approval" process for USAC's proposals plays out just days before the new quarter begins. With such a short time window, it appears FCC has no real choice but to accept USAC's proposed figures.

44

must at the very least do something to demonstrate that it applied its independent judgment.

c.

The Government's principal counterargument is that FCC—not USAC—is exercising governmental power. Its argument goes like this: FCC sets out detailed regulations specifying who is eligible for what kinds of universal service subsidies. Private companies merely project the costs they will incur supplying the FCC-specified subsidized services and report that information to USAC. And then USAC merely aggregates that information into a contribution amount, which FCC turns into the contribution factor that is levied on telecommunications revenues as a USF Tax. FCC regulations even preclude USAC from making policy. So in determining the contribution amount, which directly controls the size of the tax levied on American telecommunications consumers, USAC and private carriers perform a simple, ministerial task—a mere "fact gathering function for the FCC." FCC EB Br. 56 (quotation omitted).

But FCC obfuscates how the universal service sausage is really made. FCC would have us believe its universal service policy necessarily dictates the size of the contribution amount, and so FCC really controls the size of the USF Tax. But that cannot be right because USF disbursements often do not comply with FCC policy. *See supra*, Part I.C. Instead, large swaths of USF funds—perhaps at one point close to one-quarter—are disbursed to ineligible recipients. *See, e.g.*, THE HIGH-COST PROGRAM, *supra*, at 2. That FCC sets universal service policy obviously does nothing to limit the revenue FCC allows private entities to exact from consumers to fund payments made *in violation of* FCC's universal service policy.

Put differently, FCC policy would dictate the contribution amount only if it in fact dictated how private companies raised and spent USF

45

JA257

monies. The problem is that FCC has abdicated responsibility for ensuring compliance to the very entities whose universal service demand projections dictate the size of the contribution amount. *See, e.g.*, FCC's Lifeline Program, *supra*, at executive summary page (noting that FCC "relies on over 2,000 Eligible Telecommunication Carriers that are Lifeline providers to implement key program functions, such as verifying subscriber eligibility," which is problematic because "companies may have financial incentives to enroll as many customers as possible"); FCC's E-rate Program, *supra*, at 21–22 (noting that telecommunications service providers have opportunities to "make misrepresentations . . . during the funding phase" that "may not be discovered due to the self-certifying nature of the program").

Moreover, the entity most responsible for snuffing out wasteful or fraudulent disbursements—USAC—is run almost entirely by stakeholders who stand to benefit financially when universal service subsidies grow. *See Leadership*, Universal Serv. Admin. Co., *supra*; *see also* FCC's E-rate Program, *supra*, at 15 (noting that FCC relies on USAC to ensure compliance carrier compliance with FCC rules). And that is no accident. USAC is run by self-interested stakeholders because FCC regulations *require* it. *See* 47 C.F.R. § 54.703(b). FCC mandates that nine of USAC's nineteen directors represent companies in the telecommunications industry who are compensated by the very same USF funds they raise. *See id.* § 54.703(b)(1)–(6). It mandates that another seven represent the schools, libraries, health care providers, and low-income consumers who are direct recipients of USF funds. *See id.* § 54.703(b)(7)–(10).

Because the telecommunications industry polices its own compliance with FCC universal service policy, and responsibility for monitoring the industry falls most heavily on a board composed of industry representatives and consumer groups with a direct financial interest in the size of USF taxes,

private entities have a far more important and discretionary role in determining the size of the contribution amount (which controls the level of universal service taxation) than FCC would have you believe. For example, a carrier could (intentionally or unintentionally) project and then supply USF-subsidized service costing twenty-five percent more than its USF-subsidized service would cost if it strictly complied with FCC rules. And FCC offers us *zero* reason to think it would even discover the discrepancy—let alone that FCC would do *anything* about it. FCC has in effect said to carriers: "Here is our universal service policy and a blank check. We're not going to pay any attention to what you put in the dollar box. We know you have financial incentives to juice the number, but we trust you'll follow our policy to the letter anyways. Just fill it out however you see fit, take it to the bank, and the money will be drawn from the accounts of American telecommunications consumers." We do not doubt that most of the industry is staffed by individuals of the utmost integrity, but we cannot agree that private entities are no more than ministerial bean counters when it comes to setting the USF Tax.

Moreover, even if we put the compliance issue to one side, we would still disagree that private companies have merely "ministerial" control over the contribution amount. As we have noted, FCC's counterargument turns on the Commission's nominal control over universal service policy. But setting a policy is not the same as allocating funds to execute that policy. That much is evident from the constitutional requirement that Congress appropriate money to execute the government programs it establishes. *See* U.S. CONST. art. I, § 9, cl. 7. Thus, FCC's argument fails because it impermissibly collapses universal service funding decisions into universal service policy decisions. The decision of how much money should be set aside to execute FCC's universal service policies—the very decision FCC has delegated to USAC and private carriers—is an independent decision that

47

requires independent judgment. And surely discretion inheres in decisions about how much money to allocate to a massive federal welfare program. *See Gaines v. Thompson*, 74 U.S. (7 Wall.) 347, 353 (1868) ("A ministerial duty . . . is one in respect to which nothing is left to discretion." (quotation omitted)). So even if we thought FCC correctly described the role of private entities, we would still conclude that dictating the contribution amount is an exercise of government power.

\* \* \*

FCC has not delegated to private entities a trivial, fact-gathering role. It has delegated the power to dictate the amount of money that will be exacted from telecommunications carriers (and American consumers in turn) to promote "universal service." In other words, it has delegated the taxing power. And the delegation is not even "to an official or an official body, presumptively disinterested," but rather to private persons vested with no government power and with interests that "often are adverse" to those whom they are taxing. *Carter Coal*, 298 U.S. at 311; *see also Ass'n of Am. Railroads v. U.S. Dep't of Transp.* ("*Amtrak III*"), 821 F.3d 19, 29 (D.C. Cir. 2016) ("Delegating legislative authority to official bodies is inoffensive because we presume those bodies are disinterested, that their loyalties lie with the public good, not their private gain. But here, the majority producers may be and often are adverse to the interests of others in the same business." (citation and quotation omitted)). We accordingly have serious trouble squaring FCC's subdelegation with Article I, § 1 of the Constitution.[18]

---

[18] Judge Newsom recently expressed skepticism that the private entities involved in USF may constitutionally exercise the power FCC delegated to them. *See Consumers' Rsch.*, 88 F.4th at 932 (Newsom, J., concurring). But Judge Newsom voted to deny a petition for review that is almost identical to the one before us because in his view, these private entities exercise executive rather than legislative power, and petitioners did

No. 22-60008

2.

Even if the Constitution does not categorically forbid FCC's delegation to USAC and private telecommunications carriers, 47 U.S.C. § 254 does not authorize it. And there is no precedent establishing that federal agencies may subdelegate powers in the absence of statutory authorization. To the contrary, the *only* Supreme Court cases blessing private delegations involved explicit statutory authorizations.

a.

At the Founding, the maxim that *delegata potestas non potest delegari*—no delegated powers can be further delegated—was widely accepted. The maxim has its roots in the civil law. *See* Patrick W. Duff & Horace E. Whiteside, Delegata Potestas Non Potest Delegari*: A Maxim of American Constitutional Law*, 14 Cornell L.Q. 168, 171 (1929). Lord Coke enshrined the maxim as a common law doctrine. *See id.* at 170–71 (citations omitted). And the doctrine endured through the founding generation, as evidenced by treatises of the great 19th-century scholars. Samuel Livermore, for example, noted that "[a]n authority given to one person cannot in general be delegated by him to another; for being a personal trust and confidence it is not in its nature transmissible, and if there be such a power to one person, to exercise his judgment and discretion, he cannot say, that the trust and confidence reposed in him shall be exercised at the discretion of another person." A Treatise on the Law of Principal and Agent and of Sales by Auction 54 (1818). Likewise, James Kent wrote that "[a]n agent, ordinarily and without express authority, has not power to employ a

---

not raise an Article II challenge. *Ibid.* With utmost respect to our distinguished colleague, private entities do play a legislative role in the USF because their projections directly control the size of USF tax rates, and setting tax rates is unquestionably a legislative function. *See supra*, Part III.B.

49

sub-agent to do the business, without the knowledge or consent of his principle. The maxim is, that *delegatus non potest delegare*, and the agency is generally a personal trust and confidence which cannot be delegated." 2 Commentaries on American Law 496 (1827). And Joseph Story agreed, explaining that "[o]ne, who has a bare power or authority from another to do an act, must execute it himself, and cannot delegate his authority to another; for this being a trust or confidence reposed in him personally, it cannot be assigned to a stranger, whose ability and integrity might not be known to the principal or who, if known, might not be selected by him for such a purpose." Commentaries on the Law of Agency, as a Branch of Commercial and Maritime Jurisprudence 66–67 (1844).

As with most rules, this one had exceptions. Common lawyers assumed that ministerial tasks could be subdelegated. *See* Gary Lawson & Guy Seidman, "A Great Power of Attorney": Understanding the Fiduciary Constitution 115 (2017). And a fiduciary document could specifically authorize subdelegations of delegated authority. *Ibid.*

But as a general matter, "[t]he founding-era rule against subdelegation of delegated agency authority is as clearly established as any proposition of law can be established." *Id.* at 114. And it was not merely a proposition of agency law. In fact, the Supreme Court once noted that the maxim "has had wider application in the construction of our federal and state Constitutions than it has in private law." *J.W. Hampton*, 276 U.S. at 405–06; *see also* Duff & Whiteside, Delegata Potestas Non Potest Delegari, *supra*, at 175 ("[I]n cases which involve a supposed delegation to an independent board or commission, as well as those where the delegation is to the executive or judiciary, the maxim *delegata potestas non potest delegari*, or its English

50

equivalent, has been the chief reliance of the courts, and has attained in their eyes the dignity of a principle of constitutional law.").

So the Founders' law prohibited unauthorized subdelegations of non-ministerial delegated authority, and the Supreme Court has recognized that as a constitutional principle. *See J.W. Hampton*, 276 U.S. at 405–06; *cf. Gundy*, 588 U.S. at 135 (plurality op.) ("Article I of the Constitution provides that '[a]ll legislative Powers herein granted shall be vested in a Congress of the United States.' § 1. Accompanying that assignment of power to Congress is a bar on its further delegation."). We think the clear implication is that the Constitution imposes upon federal agencies—acting as agents of the people's representatives in Congress—a duty to wield delegated power unless Congress authorizes subdelegation or the subdelegation involves no more than ministerial tasks. In other words, "*Congress* may formalize [a limited] role [for] private parties" in executing its laws, *Amtrak I*, 721 F.3d at 671 (emphasis added) (citing *Sunshine Anthracite*, 310 U.S. at 388), but agencies may not.

b.

This rule does not just accord with law at the Founding; it also accords with Supreme Court precedent.

The Court has emphasized the "vital constitutional principle" that "[l]iberty requires accountability." *Amtrak II*, 575 U.S. at 57 (Alito, J., concurring). Every executive branch official is in some way accountable to the people because every executive branch official may be removed—for good cause at least—by the President, who is himself "the most democratic and politically accountable official in Government." *Seila L. LLC v. CFPB*, 591 U.S. 197, 224 (2020). Private persons, in contrast, may not be removed by the President because private persons do not wield any portion of "the executive Power" our Constitution vests "in a President of the United States

51

of America." U.S. CONST. art. II, § 1, cl. 1. There is no reason to lightly infer that Congress intends to insulate law execution from democratic accountability in this way.[19]

In accordance with these principles, both Supreme Court cases authorizing private entities to wield anything like government power involved express authorizations from Congress. The Tobacco Inspection Act considered in *Currin* expressly provided that regulations would take effect only with the support of two-thirds of the tobacco growers in the relevant market. *See* 306 U.S. at 6, 15. And the Bituminous Coal Act considered in *Sunshine Anthracite* created the very private boards that proposed minimum prices and labor codes to the Coal Commission. *See* 310 U.S. at 387–88 (noting that the statute provided for "[s]ome twenty district boards of code members . . . which are to operate as an aid to the Commission" and "specifie[d] in detail the methods of their organization and operation, the scope of their functions, and the jurisdiction of the Commission over them.").[20]

c.

Section 254, by contrast, makes no mention of the fact that private entities might be responsible for determining the size of the tax FCC levies

---

[19] Deciding who should exercise governmental power can be as important as deciding whether governmental power should be delegated in the first place. If it were not, we would not care so deeply about Presidential elections. So democratic accountability is frustrated when decisions about who should exercise governmental power are made by bureaucrats—whose connection to the people is real but highly attenuated—rather than Congress, whose members are directly "accountable to [their] constituents through regular popular elections." *Jarkesy*, 34 F.4th at 459 (citation omitted).

[20] Likewise the Maloney Act, which the Third Circuit considered in *Todd & Co.*, specifically authorized registered organizations to self-regulate over-the-counter securities markets. *See* 557 F.2d at 1012.

52

on American consumers. It does not *even mention* USAC, a Delaware corporation FCC established without congressional authorization.

When asked at oral argument to identify the portion of § 254 that authorizes FCC to subdelegate administration of the universal service contribution mechanism to private entities, the Government's counsel could point only to subsection § 254(b)(5). *See* Oral Arg. at 46:40–48:55. That subsection directs FCC to establish "mechanisms to preserve and advance universal service." § 254(b)(5). But a directive to establish "mechanisms" plainly does not imply that those "mechanisms" may be controlled by a private, non-governmental entity incorporated by FCC without any involvement from Congress.

In fact, § 254(b)(5) seems to suggest precisely the opposite. Rather than directing FCC to establish private mechanisms, it specifically instructs FCC to establish "Federal and State mechanisms," *ibid.*, which indicates Congress intended to make government entities responsible for administering universal service programs. So subsection (b)(5) is unavailing.

The closest § 254 comes to contemplating that a non-governmental entity might play any role in executing the statute is to incorporate by reference some of the preexisting regulations governing the Lifeline Program. *See* § 254(j) ("Nothing in this section shall affect the collection, distribution, or administration of the Lifeline Assistance Program provided for by the Commission under regulations set forth in section 69.117 of title 47, Code of Federal Regulations, and other related sections of such title."). Those regulations made the National Exchange Carrier Association ("NECA") responsible for calculating the Lifeline Assistance charges levied on local exchange carriers. *See* 47 C.F.R. § 69.117 (10-1-95 ed.). And they gave local exchange carriers a small role in determining the size of Lifeline Assistance charges because carriers could obtain subsidies for their self-reported costs

53

incurred in waiving one kind of regulatory fee. *See id.* § 69.104(j) (10-1-95 ed.).

But the fact that § 254 incorporated certain pre-1996 Lifeline Assistance program regulations does not suggest Congress authorized FCC's abdication of responsibility for the USF Tax to private entities. That is for three reasons.

First, NECA's role under 47 C.F.R. § 69.117 in 1995 was not remotely analogous to USAC's current role of administering the entire USF. Section 69.117 charged NECA only with two simple, ministerial tasks: (1) Calculating Lifeline Assistance charges by "dividing the sum of one-twelfth of the projected annual Lifeline Assistance revenue requirement and one-twelfth of the projected annual revenue requirement calculated by all telephone companies pursuant to § 69.104(l) by the number of common lines presubscribed to interexchange carriers . . . ." *Id.* § 69.117(b) (10-1-95 ed.). And (2) "bill[ing] and collect[ing] the charge, and disburs[ing] associated revenue." *Ibid.* USAC's role as USF administrator, by contrast, involves far more than ministerial tasks. *See supra*, Part III.C.1.c.

Second, the carriers' role under 47 C.F.R. § 69.117 (and associated regulations) in 1995 was not analogous to their role in 2023. Before the 1996 Act, FCC regulations authorized certain carriers to bill the Lifeline Program for costs associated with waiving certain minor, regulatorily imposed end user common line charges for certain means-tested subscribers pursuant to a carrier-developed plan certified by FCC. *Id.* § 69.104(j) (10-1-95 ed.). But carriers could waive end user charges only if they reduced their own service rate charges by an equivalent amount. *Ibid.* That is nothing like the modern universal service regime, which allows a greatly expanded class of carriers to bill USF for a broad range of subsidized services provided at no cost to themselves.

54

Third, even if the role NECA and telecommunications carriers played in administering Lifeline Assistance charges before § 254 was analogous to the role they play in administering the modern Lifeline Program, there is no evidence Congress contemplated private entities would play the same role in administering the three other major universal service programs FCC has established pursuant to its § 254 authority. That Congress provided a narrow role for certain private entities in administering a small government program subsidizing one kind of telecommunications service says nothing about whether Congress authorized a broadly expanded class of private entities to play a central role in administering a nine-billion-dollar welfare fund offering subsidies for technologies no one could have imagined when § 254 was enacted. If anything, the text of § 254 suggests Congress actually meant to *preclude* private entities from administering USF programs other than Lifeline. That is because NECA did administer the pre-1996 USF. *See* 47 C.F.R. § 69.116 (10-1-95 ed.). But NECA's USF responsibilities were distinct from its Lifeline Assistance responsibilities; the former were spelled out in § 69.116, and the latter in § 69.117. Congress referenced § 69.117 in § 254, but it conspicuously did not reference § 69.116. Congress's explicit recognition of one relatively minor aspect of private companies' participation in the pre-1996 Lifeline Assistance regime thus evinces that Congress knew how to empower private companies and chose not to empower them to administer other aspects of the USF.

So if Congress authorized FCC to delegate sweeping universal service responsibilities to private entities, it did not say so very clearly. Indeed, it speaks volumes that the only plausible statutory justification for FCC's subdelegation—§ 254(j)—is so ambiguous that FCC, which should be more familiar with § 254 than anyone, did not even think to point to it as justification for its reliance on private companies to set the USF Tax.

55

No. 22-60008

\*      \*      \*

FCC subdelegated the power to determine the universal service contribution amount to USAC, who further subdelegated it to private, for-profit telecommunications carriers. That subdelegation was not authorized. *See supra*, Part III.C.2.c. And the tasks FCC subdelegated are not ministerial. *See supra*, Part III.C.1.b–c. So even if Article I, § 1 does not categorically forbid USAC and private telecommunications carriers from exercising the kind of power FCC has vested in them, it may forbid them from doing so absent express congressional authorization.[21]

### D.

We are highly skeptical that the contribution factor before us comports with the bar on congressional delegations of legislative power. And we are similarly skeptical that it comports with the general rule that private entities may not wield governmental power, especially not without express and unambiguous congressional authorization. But we need not resolve either question in this case. That is because *the combination* of Congress's sweeping delegation to FCC and FCC's unauthorized subdelegation to USAC violates the Legislative Vesting Clause in Article I, § 1.

---

[21] Petitioners certainly could have framed their private nondelegation challenge in statutory terms. *See Consumers' Rsch*, 88 F.4th at 933 (Newsom, J., concurring) ("[I]t may be that USAC is operating in contravention of the governing statute, 47 U.S.C. § 254, which conspicuously never even *mentions* USAC, let alone authorizes its involvement in the universal-service program." (emphasis in original)). But assuming private entities are permitted to exercise government power at all, the decision to delegate government power to a private entity is itself a legislative one. And since agencies may not wield legislative power, we are persuaded FCC's unauthorized decision to delegate government power to a private actor likely violates not only § 254 but also Article I, § 1 of the Constitution. *But see id.* at 933 n.5 (Newsom, J., concurring) (expressing skepticism that the lack of statutory authorization for a delegation to a private entity "has any real bearing on the *constitutional* [private nondelegation] question" (emphasis in original)).

56

No. 22-60008

We (1) explain the Supreme Court's cases instructing that separation-of-powers jurisprudence is done holistically, with an eye to constitutional history and structure, not by dissecting government programs into their component parts. Then we (2) explain why an agency action involving a broad congressional delegation *and* an unauthorized agency subdelegation to private entities violates the Constitution even if neither of those features does so independently.

1.

The Supreme Court has instructed us to review separation-of-powers challenges holistically. And it has held that two or more things that are not independently unconstitutional *can combine* to violate the Constitution's separation of powers.

Take for example *Seila Law*, 591 U.S. 197. The question presented in that case was whether a for-cause removal restriction unconstitutionally infringed the President's power to remove the Director of the Consumer Financial Protection Bureau. *See id.* at 204. Two lines of precedent seemed to converge to suggest the removal restriction at issue posed no constitutional problem. First, *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), established that Congress may constitutionally grant for-cause removal protections to a group of agency directors that wield executive power. *See also Seila L.*, 591 U.S. at 216 n.2 (noting that FTC has always exercised executive power). Second, *Morrison v. Olson*, 487 U.S. 654 (1988), established that Congress may constitutionally give for-cause removal protection to a single official vested with executive authority. *See also Seila L.*, 591 U.S. at 217 (noting that the independent counsel wielded executive power). The Court of Appeals accordingly reasoned that *Humphrey's Executor* and *Morrison* controlled and that the statutory provision limiting the President's power to

57

JA269

remove the CFPB director was constitutional. *CFPB v. Seila L. LLC*, 923 F.3d 680, 684 (9th Cir. 2019).

The Supreme Court reversed. It granted that some for-cause removal restrictions are not problematic. *See Seila L.*, 591 U.S. at 215. And it granted that for-cause removal restrictions applied to single-member directorships are sometimes constitutionally permissible. *See id.* at 217. But it held the combination of (1) for-cause removal, (2) a one-member CFPB Director, and (3) the capacious powers of the CFPB created a constitutional problem. *Id.* at 224–25; *see also id.* at 258 (Thomas, J., concurring in part) ("The constitutional violation results from, at a minimum, the *combination* of the removal provision and the provision allowing the CFPB to seek enforcement of a civil investigative demand." (emphasis added) (citations omitted)). In other words, three features of the CFPB—each independently constitutional—combined to create a "new situation" that could not be decided by reference to precedents that concerned only one aspect of the problem. *Id.* at 220 (citation omitted).

The same kind of reasoning guided the Court in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010). In that case, the question presented was whether "the President [may be] restricted in his ability to remove a principal officer, who is in turn restricted in his ability to remove an inferior officer, even though that inferior officer determines the policy and enforces the laws of the United States[.]" *Id.* at 483–84. The Court noted its previous holding that Congress may provide for restrictions on the President's ability to remove the directors of independent agencies like SEC. *See id.* at 483; *see also Humphrey's Executor*, 295 U.S. 602. It also noted its previous holding that Congress may provide for restrictions on the power of principal executive officers to remove their own inferiors. *See ibid.*; *see also United States v. Perkins*, 116 U.S. 483 (1886). But the Court held that the *combination* of two separate layers of removal protections created "a

new situation not yet encountered by the Court." *Free Enter. Fund*, 561 U.S. at 483. And that combination, the Court held, violated the Constitution. *Id.* at 484.

*Seila Law* and *Free Enterprise Fund* thus evince a general principle that, with respect to the separation of powers at least, two constitutional parts do not necessarily add up to a constitutional whole. *Cf.* Aristotle, *Metaphysics*, *in* 1 Works of Aristotle 569 (Mortimer J. Adler ed., W. D. Ross trans., 1990) (observing "the whole is" often "something besides the parts"). Rather, reviewing courts must consider a government program holistically, with an eye toward its compatibility with our constitutional history and structure. *See Seila L.*, 591 U.S. at 222.

### 2.

Here, history and structure both point in the same direction: the universal service contribution mechanism is unconstitutional.

### a.

"Perhaps the most telling indication of a severe constitutional problem" with the structure of a government program "is a lack of historical precedent to support it." *Id.* at 220 (quotation omitted) (quoting *Free Enter. Fund*, 561 U.S. at 505). And USF's double-layered delegation is unprecedented.

First, there is no record of any government program like USF in all the U.S. Reports. The only case that even remotely resembles USF's combination of a broad congressional delegation with significant industry involvement is *Sunshine Anthracite*, 310 U.S. 381. *See supra*, Part III.C.1.a.

While *Sunshine Anthracite* is the closest analogue, it is not really that close. Unlike USAC and private telecommunications carriers, which *de facto* decide the USF contribution amount, the code authorities under the

59

JA271

Bituminous Coal Act of 1937 only had the power to *recommend* minimum coal prices. *See* 310 U.S. at 399 ("[The Coal Commission], not the code authorities, determines the prices."). And the only recommendations the code authorities could make were cabined by a clear rule: Congress provided that minimum coal prices were to be fixed at a level which "reflect[ed] as nearly as possible the relative market values at points of delivery taking into account specifically enumerated factors," *id.* at 397—namely labor, supplies, power, taxes, insurance, workmen's compensation, royalties, depreciation and depletion and all other direct expenses of production, coal operators' association dues, district board assessments for Board operating expenses only levied under the code, and reasonable costs of selling and the cost of administration. *See* The Bituminous Coal Act of 1937, 50 Stat. at 78. Those enumerated factors, "consistently with the process of coordination, yield a return to each area approximating its weighted average cost per ton." *Sunshine Anthracite*, 310 U.S. at 397.[22]

That case is nothing like ours. To make *Sunshine Anthracite* apposite, the Coal Commission's discretion to set minimum prices would have had to have been unfettered (it was not); the Coal Commission's passive acquiescence would have had to make the code authorities' price recommendations legally binding (it did not); and there would have to have been evidence that the Coal Commission *always* agreed with the code authorities' price recommendations (there was not).

Second, FCC has not pointed to any historical analogue outside the U.S. Reports. That is hardly surprising. USF combines a sweeping delegation of the taxing power, *see supra*, Part III.B, with a subdelegation of that power

---

[22] The statute also authorized the Commission to fix maximum coal prices under certain circumstances, but the code authorities had no role in formulating those maximums. *See ibid.*

to private entities with a personal financial interest in the size of the tax, *see supra*, Part III.C. It is difficult to imagine early Congresses would have authorized a similarly dual-layered delegation of the taxing power.

True, Congress has always relied on the executive to execute tax laws. For example, in 1798 Congress vested tax assessors with authority to value real estate for the purpose of administering a nationwide direct tax. *See* Act of July 14, 1798, ch. 75, 1 Stat. 597 (1798); *see also* Nicholas R. Parrillo, *A Critical Assessment of the Originalist Case Against Administrative Regulatory Power: New Evidence from the Federal Tax on Private Real Estate in the 1790s*, 130 YALE L.J. 1288 (2021). But the 1798 direct tax is no precedent for the USF Tax because the 1798 direct tax is nothing like the USF Tax. That is for three reasons.

First, the 1798 Congress itself decided the amount of revenue the Government would levy from American citizens. *See* Parrillo, *New Evidence*, *supra*, at 1303 ("Congress decided to raise $2 million nationwide and, per the Constitution's requirement for direct taxes, apportioned that sum among the states according to each state's free population plus three-fifths of its slave population."). In contrast, Congress through § 254 delegated to FCC the power to decide how much revenue the Government will raise via USF taxes. And FCC's revenue-raising discretion is limited only by the most amorphous of standards. *See supra*, Part III.B.2. So while the 1798 Executive Branch only had authority to raise $2 million, the present-day FCC can levy taxes practically *ad infinitum* based on little more than its own conception of the public interest. *See ibid.* It thus strains credulity to analogize the 1798 direct tax to the USF Tax.

Second (and relatedly), unlike the Congress that enacted § 254, the 1798 Congress made all the relevant tax policy decisions. It decided to raise $2 million, it decided to levy the $2 million through direct taxes on property

61

(mostly real estate), and it decided how the tax burden would be allocated: mainly in proportion to the value of citizens' property in money. Parrillo, *New Evidence*, *supra*, at 1303; *see supra*, Part III.B.2 (explaining the policy decisions § 254 leaves for FCC). That makes sense because tax decisions—including decisions about rates—traditionally implicated the legislative power and so could not be made by officials in the executive branch. *See* PHILLIP HAMBURGER, IS ADMINISTRATIVE LAW UNLAWFUL 57–64 (2014).

Obviously a direct tax on land could not be administered without a fair accounting of the value of citizens' property, so Congress provided for assessors and gave them authority to assess the value of citizens' property. Congress did not provide detailed instructions about how assessors were to go about their business, but that is of no significance. At common law, "[d]eterminations of facts, *including assessments*, were understood . . . to be judicial in nature, not legislative. Although not actually exercises of judicial power, they were expected to mimic judicial decisions at least in being exercises of judgment" as opposed to legislative will. Hamburger, *Nondelegation Blues*, *supra*, at 1211 (emphasis added). In other words, the making of assessments has never involved legislative power because it has always been assumed that assessors must accurately characterize the facts on the ground and fairly apply the law to the facts.

For example, in 1598 the English Court of Common Pleas heard a case concerning the power of the sewers commissioners, who were tasked with repairing riverbanks and assessing the costs to nearby landowners. *See Rooke's Case*, 77 Eng. Rep. 209 (C.P. 1598) (Coke, J.). The commissioners repaired a riverbank and then assessed the entire cost to one nearby landowner. The landowner sued, and Lord Coke held the commissioners acted unlawfully because they were supposed to assess repair costs to "all who had land in danger." *Id.* at 210. Coke explained that while "[t]he words

of the commission [gave] authority to the commissioners to do according to their discretions," the commissioners could "not [act] according to their wills and private affections" but rather were "limited and bound with the rule of reason and law." *Id.* at 210. Thus, the discretion possessed by the commissioners was merely the discretion "to discern between falsity and truth." *Ibid.* In other words, the commissioners had the power to determine whose land was truly endangered by damaged riverbanks, but they could not use that discretion to make policy judgments about which landowners should bear the cost of repairing those banks. *See* HAMBURGER, IS ADMINISTRATIVE LAW UNLAWFUL, *supra*, at 97–100 (describing the nature of assessments at common law).

Like the common law assessors, the tax assessors at the founding had discretion merely "to discern between falsity and truth" in property values. *Rooke's Case*, 77 Eng. Rep. at 210. Federal officials assumed all property had a "correct valuation." Parrillo, *New Evidence*, *supra*, at 1366 (quoting OLIVER WOLCOTT, JR., DIRECT TAXES 441 (1796)). The task of officials executing the direct tax was merely to make the factual determinations necessary to unearth that correct valuation. Congress told the assessors to do this "just[ly] and equitab[ly]" — "a familiar measure of the conduct of government officials making judicial or judicial-like determinations, including assessments." Hamburger, *Nondelegation Blues*, *supra*, at 1212. The assessors accordingly had no power to make tax policy, at least not legitimately. And the kinds of factual findings Congress charged the assessors with making have never been thought to involve legislative power. *See, e.g.*, *Panama Refin.*, 293 U.S. at 426 ("[A]uthorizations given by Congress to selected instrumentalities for the purpose of ascertaining the existence of facts to which legislation is directed have constantly been sustained.").

63

JA275

It is possible that assessors sometimes mischaracterized the value of property so as to shift the tax burden from one group of citizens to another. *See* Hamburger, *Nondelegation Blues*, *supra*, at 1212 (noting "assessments and other determinations of fact have often been misused to exercise a disguised legislative power"). If that is right, some assessors may have exercised will rather than judgment and so acted in a legislative rather than an executive capacity. But in doing so, the assessors abused the power the 1798 Congress gave them, and abuses of a power do not change the nature of the power itself. For example, it is commonly said that the Supreme Court in *Lochner* abused the judicial power. *See, e.g.*, Kermit Roosevelt III, *What if* Slaughter-House *had been Decided Differently?*, 45 IND. L. REV. 61, 84 (2011) (noting in *Lochner* the court committed "the sin . . . of substituting judicial for legislative policymaking"). But no one contends that in light of *Lochner's* abuses the Court in fact exercises legislative power when it rules in constitutional cases. So too with the assessors.

Thus, we can find no historical precedent for broad delegations of Congress's power to tax. But even if there were—even if the 1798 direct tax suggests Congress may delegate the Taxing Power to the Executive Branch— there is still no historical precedent for the USF Tax. That is because it is utterly inconceivable that the first Treasury, upon receiving from Congress broad powers to levy taxes on American citizens, would have abdicated responsibility for determining tax rates to privately employed bounty hunters who had a personal financial interest in the amount of tax revenue collected. And that is exactly what FCC has done here. *See supra*, Part III.C.

Accordingly, USF's double-layered delegation "is an innovation with no foothold in history or tradition." *Seila L.*, 591 U.S. at 222.

No. 22-60008

b.

In addition to being a historical anomaly, USF's double-layered delegation "is incompatible with our constitutional structure." *Ibid.*

Both the public and the private nondelegation doctrines exist to ensure that Congress exercises its legislative powers—the greatest of the powers vested by the Constitution in the federal government—"in a way that comports with the People's will."[23] *Jarkesy*, 34 F.4th at 459; *see* The Federalist No. 51 (J. Madison) ("A dependence on the people is, no doubt, the primary control on the government[.]"). As we previously noted:

> Every member of Congress is accountable to his or her constituents through regular popular elections. And a duly elected Congress may exercise the legislative power only through the assent of two separately constituted chambers (bicameralism) and the approval of the President (presentment). This process, cumbersome though it may often seem to eager onlookers, ensures that the People can be heard and that their representatives have deliberated before the strong hand of the federal government raises to change the rights and responsibilities attendant to our public life.

---

[23] The private nondelegation doctrine also likely applies to delegations of the executive power to private entities, *see Amtrak II*, 575 U.S. at 62 (Alito, J., concurring) ("[I]t raises 'difficult and fundamental questions' about the 'delegation of Executive power' when Congress authorizes citizen suits.") (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 197 (2000) (Kennedy, J., concurring), but petitioners did not raise an Article II challenge. If they had, we might also conclude that FCC has unconstitutionally delegated the executive power to private entities. *See Consumers' Rsch*, 88 F.4th at 934 (Newsom, J., concurring) ("[I]t seems obvious to me that in collecting de facto taxes and distributing benefits USAC is exercising 'executive' power.").

65

*Jarkesy*, 34 F.4th at 459–60 (citations and footnote omitted). "But that accountability evaporates if a person or entity other than Congress," whether public or private, "exercises legislative power." *Id.* at 460 (citation omitted).

Broad congressional delegations to the executive undermine democratic accountability for at least three reasons. First, they allow Congress to circumvent the "many accountability checkpoints" inherent in the Constitutional lawmaking process. *Amtrak II*, 575 U.S. at 61 (Alito, J., concurring). Second, they obscure lines of accountability the Framers intended to be clear. *See Gundy*, 588 U.S. at 155 (Gorsuch, J., dissenting) ("[B]y directing that legislating be done only by elected representatives in a public process, the Constitution sought to ensure that the lines of accountability would be clear: The sovereign people would know, without ambiguity, whom to hold accountable for the laws they would have to follow."); *id.* at 156 (Gorsuch, J., dissenting) ("Legislators might seek to take credit for addressing a pressing social problem by sending it to the executive for resolution, while at the same time blaming the executive for the problems that attend whatever measures he chooses to pursue. In turn, the executive might point to Congress as the source of the problem. These opportunities for finger-pointing might prove temptingly advantageous for the politicians involved, but they would also threaten to disguise responsibility for the decisions." (citations and quotation omitted)). And third, they render the promise of recourse to the judiciary illusory because they give reviewing courts no standard against which to measure the compatibility of executive action with the prescriptions of the people's elected representatives. *See id.* at 167–68 (Gorsuch, J., dissenting) (noting the similarity of the questions raised in vagueness challenges and delegation challenges).

Delegations to private entities undermine accountability for different reasons. Most obviously, private entities are "neither legally nor politically accountable to . . . government officials or to the electorate." Larkin, *The*

66

*Private Delegation Doctrine*, *supra*, at 20; *see Black*, 53 F.4th at 880 ("[I]f people outside government could wield the government's power[ ]then the government's promised accountability to the people would be an illusion."). Unlike officers of the United States, who "must take an oath or affirmation to support the Constitution," *Amtrak II*, 575 U.S. at 57 (Alito, J., concurring) (citing U.S. Const. art. VI, cl. 3), directors of private entities owe no fealty to the Constitution and instead owe legal obligations to their shareholders. *See* 2 Bus. & Com. Litig. Fed. Cts. § 13:77 (5th ed.) ("Under Delaware law, directors, officers, and controlling shareholders owe a duty of loyalty to the company and to its shareholders or owners."). Moreover, "passing off a Government operation as an independent private concern" allows "Government officials [to] wield power without owning up to the consequences" because the people might not associate bad results with the Government at all. *Amtrak II*, 575 U.S. at 57 (Alito, J., concurring).

USF combines these features, meaning accountability is undermined twice over. First, the public cannot tell whether it is being taxed by the FCC or USAC. *See Universal Service*, Universal Serv. Admin. Co., *supra* ("Using information from universal service program participants, *USAC* estimates how much money will be needed each quarter to provide universal service support." (emphasis added)). And if some sleuthing member of the public suspected the federal government was behind the mysterious USF charge on his phone bill, how could he determine which governmental official to blame? Not only could Congress and FCC point fingers at each other, *see Gundy*, 588 U.S. at 156 (Gorsuch, J., dissenting), but both could offload responsibility onto the private entities (USAC and its private, for-profit, constituents) to which FCC delegated the USF Tax without congressional authorization. *See Free Enter. Fund*, 561 U.S. at 497–98 ("The diffusion of power carries with it a diffusion of accountability . . . Without a clear and effective chain of command, the public cannot determine on whom the blame

or the punishment of a pernicious measure, or series of pernicious measures ought really to fall." (citation omitted)). And even as government officials are immunized from public oversight by this "Matryoshka doll" of delegations and subdelegations, *id.* at 497, important governmental responsibilities are carried out by private entities with a legal obligation not to serve the public but rather to reap profits from it. And last but not least, reviewing courts are handicapped from redressing the injuries of aggrieved citizens by the complete absence of a judicially workable standard in 47 U.S.C. § 254.

Thus, just as the added layer of tenure protection at issue in *Free Enterprise Fund* "ma[de] a difference" to the President's ability control the executive branch, *id.* at 495, so too do the myriad obfuscations of the USF Tax make a difference to the Legislative Vesting Clause. Accordingly, we hold that the universal service contribution mechanism's double-layered delegation "is incompatible with our constitutional structure." *Seila L.*, 591 U.S. at 222.

### IV.

Finally, a brief word about the dissenting opinions. The principal dissent spills much ink on the distinction between fees and taxes only to conclude the distinction does not matter because all "revenue-raising delegation[s]" are the same. *Post*, at 96 (Stewart, J., dissenting). And how does the Constitution permit *double* insulation of a revenue-raising delegation like the USF? The principal dissent does not say.

The second dissenting opinion calls the majority opinion an "unannounced" and "unprecedented" "sleight of hand." *Post*, at 98, 105 (Higginson, J., dissenting). Worse, it is a usurpation that leaves "the political branches powerless to govern." *Post*, at 101, 105. With deepest respect for

our esteemed colleagues who see this case differently, the dissenting opinion's legal authorities do not support its conclusions.

For example, it repeatedly accuses us of contravening Supreme Court precedent. *Post*, at 98, 99, 100, 101, 103, 105 (Higginson, J., dissenting). But which precedent, precisely, are we flouting? The dissenting opinion does not say. The closest it comes is to contend that the Supreme Court has considered cases involving both a "delegation of legislative power and a[ ] delegation of government power to a private entity, yet the Court has never instructed . . . that a different standard applies." *Id.* at 98–99 (Higginson, J., dissenting). But in which case did the Supreme Court consider a double delegation problem like the one presented here? The statutory provision at issue in *Carter Coal* did not feature a combined public/private delegation; it delegated power directly to private enterprise. *See* 298 U.S. at 283–84. And the Court found that violated the Constitution. *Id.* at 311. Having found that statute unconstitutional, it would have been quite peculiar for the Court to proceed to render an advisory opinion on whether a nonexistent double delegation would also violate the Constitution.

Meanwhile, in *Currin* and *Sunshine Anthracite*, the Court found the Government had not delegated any legislative power to any private entity. *See Currin*, 306 U.S. at 15 ("So far as growers of tobacco are concerned, the required referendum does not involve any delegation of legislative authority."); *Sunshine Anthracite*, 310 U.S. at 399 ("Since law-making is not entrusted to the industry, this statutory scheme is unquestionably valid."). There cannot be a combined public/private delegation without a private delegation. We obviously agree with our esteemed colleagues in dissent that Supreme Court precedent binds us and binds us absolutely. But we do not understand how the dissenting opinions can say this case is controlled by Supreme Court precedent without disputing that the double delegation at issue here is unprecedented.

69

The second dissenting opinion also contends we have mischaracterized the Supreme Court's separation-of-powers precedents. On its telling, *Seila Law* does not evince a general principle that two constitutional parts can converge to create an unconstitutional whole. Rather, it says the *Seila Law* Court simply declined to recognize an exception to the President's removal power for single principal officers who wield significant executive authority. *Post*, at 100 (Higginson, J., dissenting). Even if that were right, it would not explain *Free Enterprise Fund*. In that case the Court unquestionably held that two independently constitutional removal restrictions—one that fit squarely within the *Humphrey's Executor* exception, and one that fit squarely within the *Morrison* exception—combined to create a constitutional violation. The dissenting opinion offers no explanation for that holding.

Finally, the second dissenting opinion contends our decision leaves the political branches "powerless to govern." *Post*, at 105 (Higginson, J., dissenting). That is quite an assertion, but with greatest respect, it is untrue. Today's decision applies to a narrow question, implicating just one federal program that is doubly insulated from political accountability. The parties before us have not pointed to other federal programs that have the same or similar constitutional defects. And as to the USF particularly, Congress could obviate the constitutional problem by simply ratifying USAC's decisions about how much American citizens should contribute to the goal of universal service. *Cf.* Saikrishna Bangalore Prakash, *The Sky Will Not Fall: Managing the Transition to a Revitalized Nondelegation Doctrine*, *in* The Administrative State Before the Supreme Court, *supra*, at 290 ("Legislative ratification of agency law would wholly preclude a nondelegation challenge[.]").

The second dissenting opinion contends otherwise because, in its view, the Federal Government will grind to a halt if Congress, or even FCC,

were required to do more than wield a Russian veto over the USF tax. As evidence, it points to private contractors who perform ministerial functions on behalf of the Centers for Medicare and Medicaid Services. *Post*, at 103 (Higginson, J., dissenting). But if anything, Medicare and Medicaid prove the opposite. *Congress*—not a federal agency, and certainly not executives of private companies—decides how much Americans should be taxed to fund federal healthcare programs. *See, e.g.*, Louise Sheiner, Lorae Stojanovic, & David Wessel, *How does Medicare work? And how is it financed?*, BROOKINGS (Mar. 20, 2024), https://perma.cc/D7LN-DHYW (explaining the Government's contributions to Medicare come from a combination of general revenues and payroll taxes); 26 U.S.C. § 3101 (setting the Medicare payroll tax rate). The unconstitutionality of the USF says nothing about other tax programs, like Medicare and Medicaid, that Congress administers.

\*     \*     \*

American telecommunications consumers are subject to a multi-billion-dollar tax nobody voted for. The size of that tax is *de facto* determined by a trade group staffed by industry insiders with no semblance of accountability to the public. And the trade group in turn relies on projections made by its private, for-profit constituent companies, all of which stand to profit from every single tax increase. This combination of delegations, subdelegations, and obfuscations of the USF Tax mechanism offends Article I, § 1 of the Constitution.

For the foregoing reasons, we hold unconstitutional the Q1 2022 USF Tax. Accordingly, we GRANT the petition and REMAND to FCC for further proceedings.

No. 22-60008

Jennifer Walker Elrod, *Circuit Judge*, joined by Ho and Engelhardt, *Circuit Judges*, concurring:

I concur in the majority opinion in full. The majority correctly and thoroughly identifies the concerns that make this double delegation unconstitutional. I write separately to say that I would go one step further and address the lawfulness of each individual delegation. For the reasons explained in the majority's thorough opinion, Congress's delegation of legislative power to the FCC and the FCC's delegation of the taxing power to a private entity each individually contravene the separation of powers principle that undergirds our Constitutional Republic.

As James Madison put it, "[t]he accumulation of all powers legislative, executive, and judiciary in the same hands, . . . may justly be pronounced the very definition of tyranny." *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 74 (2015) (Thomas, J., concurring) (quoting The Federalist No. 47, p. 301 (C. Rossiter ed. 1961)); *see also* Baron de Montesquieu, *The Spirit of the Laws*, bk. XI, ch. VI (1748) ("When the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty; . . . .").

To ensure that the legislative power remains separate from the executive power, the Constitution "provides strict rules to ensure that Congress exercises the legislative power in a way that comports with the People's will." *Jarkesy v. Sec. and Exch. Comm'n*, 34 F.4th 446, 459 (5th Cir. 2022) *aff'd*, No. 22-859, 2024 WL 3187811 (U.S. June 27, 2024). Each member of Congress is accountable to his or her constituents through regular popular elections. U.S. Const. art I, §§ 2, 3; *id.* amend. XVII, cl. 1. And Congress may exercise legislative power (including the power to tax) only by going through the arduous process of bicameralism and presentment. U.S. Const. art. I, § 7. This "ensures that the People can be heard and that their

72

representatives have deliberated before the strong hand of the federal government raises to change the rights and responsibilities attendant to our public life." *Jarkesy*, 34 F.4th at 459–60. Each of the delegations here, viewed independently, violates this principle.

Justifying the Congressional delegation on the grounds that Congress has enlisted the "expertise" of the FCC in the undefined area of Universal Service rings hollow given that the FCC relies on the determinations of private industry leaders to determine the USF tax.

The second dissent states that the federal government is rendered "powerless to govern" by the majority's holding. *Post*, at 101 (Higginson, J., dissenting). That is a *non sequitur*. Congress can always act by passing duly enacted legislation through bicameralism and presentment. The assertion that delegations of legislative power are necessary for effective and efficient governance in the modern world does not authorize Congress to violate Article I, Section I's vesting clause. Congress's inability to implement and oversee the program itself might even suggest that the program should not exist. Regardless, Congress must implement, or at least approve, the USF tax. That way, the power of the people to oversee those they have chosen to govern is rightfully restored.[1]

With this in mind, I join the thorough and well-reasoned opinion of the court in full.

_____

[1] They are, after all, the ones ultimately footing the bill for Universal Service.

73

JA285

No. 22-60008

JAMES C. HO, *Circuit Judge*, concurring:

Our court today holds that the delegation of Congress's taxing power, first to a federal agency, and then to a private entity, violates the Vesting Clause of Article I of the Constitution. I agree and accordingly concur.

In reaching this decision, the court distinguishes *Texas v. Rettig*, 987 F.3d 518 (5th Cir. 2021). I would also disavow *Rettig* altogether, for the reasons noted in *Texas v. Rettig*, 993 F.3d 408, 408 (5th Cir. 2021) (Ho, J., dissenting from denial of rehearing en banc).

The delegations of taxing authority at issue in *Rettig* present the same challenges to our constitutional democracy—and to the founding principle of taxation without representation—that are presented here. It's just as true in *Rettig* as here that "[t]he right to vote means nothing if we abandon our constitutional commitments and allow the real work of lawmaking to be exercised by private interests colluding with agency bureaucrats, rather than by elected officials accountable to the American voter." *Id.* at 410-11.

And both in *Rettig* and here, the threats to democracy presented by the administrative state are not inadvertent, but intentional—a deliberate design to turn consent of the governed into an illusion. "[T]he expansion of the electorate has been accompanied by the growth of administrative law. . . . [W]hether in 1870, 1920, or 1965 . . . each time, after representative government became more open to the people, legislative power increasingly has been sequestered to a part of government that is largely closed to them." PHILIP HAMBURGER, IS ADMINISTRATIVE LAW UNLAWFUL? 369 (2014). "[A]lthough [members of the knowledge class] mostly supported expanded suffrage, they also supported the removal of legislative power to administrative agencies staffed by persons who shared their outlook." *Id.* at 374. "The development of administrative power thus . . . must be recognized as . . . a profoundly disturbing shift of power. As soon as the people secured

74

the power to vote, a new class cordoned off for themselves a sort of legislative power that they could exercise without representation." *Id.* Another scholar recently put it this way: "However much [administrative] agencies may emphasize their formal openness, in practice well-organized, directly interested parties dominate comment processes. Normal people do not perceive these proceedings as 'democratic.'" Philip A. Wallach, Why Congress? 231 (2023). With Congress, by contrast, at least "the electorate still has the chance, crude as it may be, to pass judgment on the elected official and convince other members of their community of the importance of doing so. Against . . . the bureaucracy, citizens have no such recourse." *Id.*

We devote significant energy and resources to securing the right to vote for every citizen. But our right to vote only matters if our elected officials matter. There's no point in voting if the *real* power rests in the hands of unelected bureaucrats—or their private delegates. If you believe in democracy, then you should oppose an administrative state that shields government action from accountability to the people. I concur.

JA287

No. 22-60008

CARL E. STEWART, *Circuit Judge*, joined by RICHMAN, *Chief Judge*, and SOUTHWICK, HAYNES, GRAVES, HIGGINSON, and DOUGLAS, *Circuit Judges*, dissenting:

I dissent because the Universal Service Fund ("USF") is not unconstitutional. Section 254 of the Telecommunications Act of 1996 provides an intelligible principle and the Federal Communications Commission ("FCC") maintains control over the Universal Service Administrative Company ("USAC"), the private entity entrusted to aid its administration of the USF. The majority's exhaustive exegesis about policy, history, and assorted doctrines does not eclipse the consistent holding of three sister circuits that have addressed constitutional challenges to Section 254. All have held it constitutional under the intelligible principle test. The majority has created a split in a sweeping opinion that (1) crafts an amorphous new standard to analyze delegations, (2) overturns—without much fanfare—circuit precedent holding that this program collects administrative fees and not taxes, (3) blurs the distinction between taxes and fees, and (4) rejects established administrative law principles and all evidence to the contrary to create a private nondelegation doctrine violation.

## I. THE NONDELEGATION DOCTRINE

Petitioners and the majority contend that § 254 violates the nondelegation doctrine. Notably, the Supreme Court has denied petitions for review of the Sixth Circuit's and the Eleventh Circuit's decisions rejecting these contentions. *Consumers' Rsch. v. FCC*, No. 23-456, 2024 WL 2883753 (U.S. June 10, 2024) (Mem.); *Consumers' Rsch. v. FCC*, No. 23-743, 2024 WL 2883755 (U.S. June 10, 2024) (Mem.). In line with our colleagues in the Sixth, Eleventh, and D.C. Circuits, I would reject this challenge and hold that § 254 satisfies the intelligible principle test as articulated by the Supreme Court.

No. 22-60008

*a. Section 254 Sufficiently Delimits the FCC's Discretion*

The nondelegation doctrine is based on the central principle that the separation of powers underlies our system of Government. *See Mistretta v. United States*, 488 U.S. 361, 371 (1989). Article I, Section 1 of the U.S. Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const., art. I, § 1. The Court has long acknowledged that Congress "may confer *substantial discretion* on executive agencies to implement and enforce the laws" where it "has supplied an intelligible principle to guide the delegee's use of discretion." *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality opinion) (emphasis added). It has consistently held that a delegation is constitutional if "Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Id.* at 2123. Under this framework, the Court has approved narrow and broad delegations, acknowledging that "in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta*, 488 U.S. at 372; *see Am. Power Light & Co. v. SEC*, 329 U.S. 90, 105 (1946) ("The judicial approval accorded [to] these 'broad' standards for administrative action is a reflection of the necessities of modern legislation dealing with complex economic and social problems."); *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 398 (1940). It has further explained that the nondelegation inquiry "always begins (and often almost ends) with statutory interpretation." *Gundy*, 588 U.S. at 135.

As such, we begin our nondelegation inquiry not with a long discourse about the history of the USF's shortcomings, but with statutory interpretation. *See id.* In 47 U.S.C. § 254, Congress clearly set out both the general policy—ensuring "[a]ccess to advanced telecommunications and information services [are] provided in all regions of the Nation," *id.* at

77

JA289

§ 254(b)(2)—and the agency entrusted to execute that policy, the FCC, *see Am. Power*, 329 U.S. at 105. All that leaves is the question of whether Congress delineated "the boundaries of this delegated authority." *Id.* Petitioners argue that because § 254 sets no definite limits on how much the FCC can raise for the USF that it lacks any concrete, objective guidance limiting this authority. The Court has rejected this argument in several formulations in challenges to delegations implicating the authority to raise revenue. *See, e.g.*, *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 222–23 (1989); *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). For similar reasons, Petitioners' argument should fail here. Examining the plain language of § 254, it becomes clear that Congress has sufficiently limited the FCC's ability to raise revenue in a way other than imposing a statutory cap on how much can be raised.

Section 254(b) lays out the principles that the FCC *must* adhere to. It sets out the specific directive that the FCC "*shall* [create] policies for the preservation and advancement of universal service." 47 U.S.C. § 254(b) (emphasis added). It further establishes that the FCC is required to do so pursuant to certain enumerated principles that: "quality services should be made available at just and reasonable rates; advanced services should be provided to the entire United States; and 'low-income consumers and those in rural, insular, and high cost areas' should have access to advanced services at reasonably comparable rates to those in urban areas." 47 U.S.C. § 254(b)(1)–(3). Section 254(b)(5) limits the FCC to only enact universal service policies that are "specific, predictable and sufficient" to "preserve and advance universal service." *Id.* 254(b)(5). The statute further charges telecommunications carriers with the duty to provide access that meets minimum standards of universal service to "[e]lementary and secondary schools and classrooms, healthcare providers, and libraries." *Id.* 254(b)(6).

78

As the panel noted, § 254(b)(7) "enables, and likely *obligates*, [the FCC] to add principles 'consistent with' § 254's overall purpose." *Consumers' Rsch. v. FCC*, 63 F.4th 441, 448 (5th Cir. 2023) (quoting 47 U.S.C. § 254(b)(7)), *reh'g en banc granted, opinion vacated*, 72 F.4th 107 (5th Cir.). In line with our colleagues at the Sixth Circuit, I view § 254(b) as Congress laying out "a high-level goal for universal service" and then going further to "enumerate[] specific principles of universal service." *Consumers' Rsch. v. FCC*, 67 F.4th 773, 790–91 (6th Cir. 2023), *cert. denied*, 2024 WL 2883753 (June 10, 2024) (Mem.). Section 254(b) contains limiting principles that impose "a mandatory duty on the FCC" to consider the listed universal service principles when it updates its universal service policies. *Qwest Corp. v. FCC*, 258 F.3d 1191, 1200 (10th Cir. 2001); *see, e.g.*, *Consumers' Rsch.*, 67 F.4th at 791; *Consumers' Rsch.*, 88 F.4th 917, 924 (11th Cir. 2023), *cert. denied*, 2024 WL 2883755 (June 10, 2024) (Mem.). By its plain language, Congress ordered in § 254 that the FCC "*shall* base policies for the preservation and advancement of universal service on the principles" enumerated in § 254(b). 47 U.S.C. § 254(b). This imposition of a duty to weigh the enumerated universal service principles is reminiscent of constitutional statutory delegations that provided an intelligible principle in the form of "guidance that the [agency] cannot disregard." *Allstates Refractory Contractors, LLC v. Su*, 79 F.4th 755, 775 (6th Cir. 2023) (Nalbandian, J., dissenting) (citing *Mistretta*, 488 U.S. at 375–76).

Reading § 254(b)'s provisions together, as our sister circuits have, "indicates that Congress *required* that the FCC base its efforts to preserve and advance universal service on the enumerated principles while allowing the FCC to then '*balance* [each] principle[] against one another when they conflict.'" *Consumers' Rsch.*, 67 F.4th at 791 (quoting *Qwest Corp.*, 258 F.3d at 1200); *see also Tex. Off. of Pub. Util. Couns. v. FCC* ("*TOPUC I*"), 183 F.3d 393, 412 (5th Cir. 1999) ("[W]e agree that the use of the word 'shall'

indicates a congressional command . . . .”). Thus, contrary to Petitioners' and the majority's contentions, § 254(b)(7)'s grant of authority to the FCC to devise new universal service policies based on principles that it "determine[s] are necessary and appropriate for the protection of the public interest, convenience, and necessity" *does not* render the other principles meaningless. Nor does it "strip away the intelligible principle and the limits on the FCC's discretion that Congress imposed in the first six principles and throughout" the remainder of § 254's other provisions. *See Consumers' Rsch. v. FCC*, 67 F.4th at 792. Rather, § 254(b)(7) allows the FCC to comply with [Congress's] mandate to account for the advances to the world of 'evolving' telecommunications," as stated in § 254(c)(1). *See id.* (quoting 47 U.S.C. § 254(c)(1)).[1]

The majority's holding to the contrary here contravenes the rationale that "underpins the nondelegation doctrine." *Id.* at 793 (citing *Gundy*, 588 U.S. at 135–36). Section 254's strictures set out from whom funds are exacted, 47 U.S.C. § 254(d), who receives the benefit of the funds, 47 U.S.C. § 254(e), and what minimum standards of service must be provided in order to satisfy the longstanding goal of providing universal service. *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 614 (5th Cir. 2000) ("Universal service has been a fundamental goal of federal telecommunications regulation since the passage of the Communications Act of 1934."). With this context, it becomes clear that this is not a situation in which Congress has "left the matter to the [FCC] without standard or rule, to be dealt with as [it] please[s]." *Panama Refining Co. v. Ryan*, 293 U.S. 388, 418 (1935).

---

[1] This intent is consistent with Congress's longstanding aim to ensure reliable and affordable universal service for all and is clearly discernible from "the context, purpose, and history" of the Communications Act of 1934 and the Telecommunications Act of 1996. *See Gundy*, 588 U.S. at 136.

Petitioners' and the majority's assertions that § 254(b) and its limits are insufficient or vague place far too much weight on prior litigating positions in the context of *Chevron* doctrine questions arising out of different actions taken by the FCC. Thus, any assertion that the USF's goals are "aspirational" has no bearing on its constitutionality. Maj. Op. at 20–21. Thus, any reference to this dicta from *Texas Office of Public Utility Counsel v. FCC* ("*TOPUC II*"), 265 F.3d 313 (5th Cir. 2001) is misplaced. A closer look at *TOPUC II* reveals how a strained interpretation of our prior utterances does not support a determination that § 254 contains "no guidance whatsoever." *Jarkesy v. SEC*, 34 F.4th 446, 462 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023).

In *TOPUC II*, we examined whether the FCC's CALLS Order, which raised a price cap on the amount that "end-users of basic local service," 265 F.3d at 318, paid on their telephone bills, violated § 254's "requirement of affordable universal access." *Id.* at 320. Undertaking a *Chevron* analysis, we asked "whether Congress has spoken directly on the precise question at issue," and then turned to whether the FCC's interpretation of § 254 was based upon a permissible construction. *Id.* at 320–21. Notably, we did *not* evaluate the constitutionality of Congress's delegation there, but considered whether the Order's price cap violated the Act's principles of ensuring "just, reasonable, and affordable rates" of universal service. *Id.* at 321 (quoting 47 U.S.C. § 254(b)(1), (i)). Given the full scope of our prior interpretation of § 254(b), Petitioners' overreliance on these unrelated considerations to carry the day in a nondelegation doctrine inquiry is unfounded.

Section 254's other provisions provide further checks on the FCC's discretion. Section 254(c) limits the FCC in determining which telecommunications services will receive support from the USF. In § 254(c)(1), Congress specifically ordered the FCC to revise its definition of supported services only to account for "advances in telecommunications and

information technologies and services." Some have said that § 254(c) does not limit the FCC's discretion to raise revenue because it only addresses the spending of USF money. However, that contention neglects the direct link between the collection of universal service contributions and the disbursement of USF money. Section 254(d) requires "telecommunications carrier[s] that provide[] interstate telecommunications services" to "contribute, on an equitable and nondiscriminatory basis" to the "mechanisms established by the [FCC] to preserve and advance universal service." *Id.* § 254(d).[2] As the FCC points out, the less money the telecommunications carriers require to effectively provide universal service results in "less revenue the FCC must raise to finance those mechanisms."

With respect to dispersing any money from the USF, the FCC is restricted to dispersing credits to statutorily designated eligible telecommunications carriers that provide support for universal services. *Id.* § 254(e); *see TOPUC I*, 183 F.3d at 412 ("The term 'sufficient' appears in § 254(e), and the plain language of § 254(e) makes sufficiency of universal service support *a direct statutory command* rather than a statement of one of several principles." (emphasis added)). On more than one occasion, we have held that § 254(e) "*requires* that universal service support be 'explicit and sufficient.'" *Alenco*, 201 F.3d at 614 (emphasis added). As a practical matter, it is worth noting that USF program disbursements have "remained relatively stable over the past decade" and even decreased from 2012 to 2020. FCC, FCC 22-67, REPORT ON THE FUTURE OF THE

---

[2] As I explain in Part III, *infra*, that telecommunications carriers typically pass through the cost of their quarterly contributions in the form of line-item charges on consumers' bills on their own volition is irrelevant to our constitutional analysis. *Cf. J.W. Hampton*, 276 U.S. at 406 (describing that Congress's delegations must be analyzed for the specificity and extent of vestment of discretion yielded to the appropriate co-ordinate branch of government).

UNIVERSAL SERVICE FUND 10084–85, ¶ 92 (Aug. 15, 2022) ("Report to Congress"). This fact flatly contradicts Petitioners' assertions that the FCC has acted from a position "that it has a free hand to overcharge" for universal service. Thus, I would deny the petition for review because § 254 satisfies the intelligible principle test as articulated by the Supreme Court.

### b. Section 254's Context, Purpose, and History

In *Gundy*, the Court stated that the intelligible principle analysis requires examination of "[t]he [statute's] text, considered alongside its context, purpose, and history." 588 U.S. at 136. Congress's consistent intention to preserve and advance universal service for nearly a century,[3] combined with § 254's articulated purpose provide further evidence of the existence of an intelligible principle. *Consumers' Rsch.*, 67 F.4th at 790–95; *see Am. Power*, 329 U.S. at 104; *TOPUC I*, 183 F.3d at 405–06. The majority's disagreement with Congress's policy choices, Maj. Op. at 26, does not transform the USF into a constitutional or statutory violation. *See Consumers' Rsch.*, 63 F.4th at 449 n.4. As the panel held, § 254 does not leave the FCC with "no guidance whatsoever," *id.* at 448–49, and more befittingly, it accords with the statute's purpose, and "Congress's history of pursuing universal service" to clearly enunciate an intelligible principle that sufficiently cabins the FCC's discretion. *See Consumers' Rsch.*, 67 F.4th at 795; *Gundy,* 588 U.S. at 135–36. In sum, I would hold that the context,

---

[3] Congress passed the FCC's organic statute in 1934 and modernized the agency's regulatory role in passing the Telecommunications Act of 1994 "to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151.

purpose, and history surrounding § 254 evinces a clear intelligible principle delimiting agency discretion.

## II. The Private Nondelegation Doctrine

An agency may obtain the assistance of private parties in implementing its mandate under federal law so long as those private parties are subordinate to the agency and subject to the agency's "surveillance" and guidance. *Adkins*, 310 U.S. at 388, 399; *see also Boerschig v. Trans-Pecos Pipeline, LLC*, 872 F.3d 701, 708 (5th Cir. 2017) (noting same). Petitioners and the majority assert however, that the FCC "reflexively rubberstamps" USAC's proposals to determine the contribution rates charged to telecommunications carriers. They further posit that USAC maintains final decision-making power because "the FCC has never reversed USAC's projections of demand." Neither of these arguments is supported by the statute or applicable regulations nor do they consider well-established principles of administrative law. As described below, these arguments follow from misstatements of record facts.

The FCC determines a quarterly contribution factor "based on the ratio of total projected quarterly expenses of the universal service support mechanisms to the total end-user interstate and international telecommunications revenues." 47 C.F.R. § 54.709(a)(2). Sixty days in advance of this determination, USAC submits its "projections of demand"—the projected expenses to ensure the operation of the USF programs—to the FCC. *Id.* § 54.709(a)(3). These projections of demand for USF support are subject to the FCC's imposed caps. *See, e.g.*, *Interim Cap Order*, 23 FCC Rcd. 8834 (2008) (adopting caps on disbursements of USF contributions that eligible telecommunications carriers may receive to "rein in the explosive growth in high-cost universal service support disbursements"). Considering the FCC's limitations on USAC's proposed

84

"projections of demand," USAC compiles the total revenues and expenses of the contributing carriers based on their Reporting Worksheets. 47 C.F.R. § 54.709(a)(2). These worksheets, created by the FCC, *id.* § 54.711, must be submitted for review at least thirty days before the start of the quarter. *Id.* § 54.709(a)(2). USAC then calculates the contribution factor from the Reporting Worksheets and then the ratio is publicly noticed and made available on the FCC's website. *See id.* § 54.709(a)(3). The FCC then may approve the projections or administrative expense estimates or exercise its "right to set projections of demand and administrative expenses." *Id.* Where the FCC does not act within fourteen days of the release of the projections of demand, then the projections and contributions are deemed approved by the FCC. *Id.*

The USF and its programs receive funding only after the execution of a detailed, multistep process devised by the FCC. Petitioners and the majority assert that this framework is evidence that the FCC merely sits on its hands while USAC drives the boat in determining how much is raised. This ignores the established principle that "an agency exercises its policymaking discretion with equal force when it makes policy by either 'decid[ing] to act' or 'decid[ing] *not* to act.'" *Consumers' Rsch.*, 67 F.4th at 796 (quoting *Oklahoma v. United States*, 62 F.4th 221, 230 (6th Cir. 2023)). Significantly, the structural relationship between the agency and the private party is the focus of the private nondelegation doctrine inquiry. *See Texas v. Rettig*, 987 F.3d 518, 531 (5th Cir. 2021). A closer look at the relationship here leads to the conclusion that the FCC has not ceded control of the USF to USAC.

USAC is fully subordinate to the FCC as its functions are strictly ministerial. *See Consumers' Rsch.*, 63 F.4th at 451–52. Here is a short list of what USAC *can* do. USAC is tasked with "billing contributors, collecting contributions to the universal service support mechanisms, and disbursing

universal service support funds." 47 C.F.R. § 54.702(b). It collects information and facts from the contributing telecommunications companies and tabulates the companies' contribution factors based on that information and the formulas that the FCC furnishes for USAC to apply. *See, e.g.*, 47 C.F.R. §§ 54.1304(b) (establishing formula to calculate safety net additive support), 54.901(a) (explaining Connect America Fund Broadband Loop Support), 54.303(a)(1) (setting formula to determine total eligible operating expenses), 54.702(n). USAC contribution determinations are mere *proposals* subject to government approval. *See Consumers' Rsch.*, 88 F.4th at 927. As the Court held in *Adkins*, a private entity's participation in ministerial functions under the agency "pervasive surveillance and authority" does not violate the Constitution. 310 U.S. at 388. Here, all of this is done under the FCC's watch *and* is conducted only with the FCC's approval. *See Universal Service Contribution Methodology*, 34 FCC Rcd. 4143, 4144–45 (2019) (citing *Connect America Fund*, 26 FCC Rcd. 17663, 17847 (2011)) (directing USAC to make specific contribution collections "regardless of the projected quarterly demand" calculated from the FCC-supplied formulas).

With respect to the FCC's control over USAC, the list of what USAC *cannot* do is instructive. USAC cannot make policy. 47 C.F.R § 54.702(c). It cannot interpret unclear provisions or rules. *Id.* It cannot unilaterally give its proposals the force of law. 47 C.F.R. § 54.709(a)(2). The very agency action addressed in the instant petition for review is the FCC's "*Proposed* First Quarter 2022 Universal Service Contribution Factor." Consequently, it is inaccurate to state that USAC definitively determines how much money the USF will collect each quarter. *See* 47 C.F.R. § 54.709(a)(3). The FCC is not bound by USAC's projections. *Id.* USAC acts no differently than an advisor or policy aide that proposes regulations subject to government approval. *See Adkins*, 310 U.S. at 388. Upon receiving USAC's proposals, the FCC issues

86

a Public Notice, publishing the proposed contribution factor and soliciting public comment. 47 C.F.R. § 54.709(a)(3).

What occurs after the FCC approves the quarterly contribution factor further supports the notion that USAC is fully subservient to the FCC. The FCC maintains supervision and review over USAC proposals well after it issues the approved quarterly contribution factor.[4] Any party that is aggrieved by a ministerial act of USAC—typically the issuance of an invoice to collect contributions—may seek review from the FCC. 47 C.F.R. § 54.719(b); *Universal Serv. Contribution Methodology*, 31 FCC Rcd. 13220 (2016) (holding that USAC overcharged Cisco WebEx through an improper revenue calculation). The FCC quite routinely adjusts USAC proposals that deny discount rate status to public libraries and schools. *See, e.g.*, *Streamlined Resol. of Requests Related to Actions by the Universal Serv. Admin. Co.,* 37 FCC Rcd. 5442 (2022); *Alpaugh Unified Sch. Dist.,* 22 FCC Rcd. 6035, 6036–37 (2007) (remanding USAC proposals that reduced or denied discounted rates to public libraries and schools for further fact finding). USAC is not charged with reviewing applications to receive subsidized universal service from qualified hospitals, libraries, low-income consumers, rural consumers, and

---

[4] Hospitals in rural areas and libraries and schools can apply for discounted telecommunications services under the E-Rate program. 47 U.S.C. § 254(h)(1)(A)–(B). The hospitals, schools, and libraries must post their applications on USAC's website, undergo a technology assessment, and comply with strenuous bidding requirements as outlined by the FCC. *See Bishop Perry Middle Sch. New Orleans*, 21 FCC Rcd. 5316, 5317–18 (2006) (listing the requirements for the E-Rate program as set out by Congress in § 254(h) and the FCC in 47 C.F.R. §§ 54.504, 54.511(a)). Where a party fails to comply with the statutory and regulatory requirements necessary to obtain the discount, it may seek review with the FCC. *See generally id.* Notably, the FCC issues the final orders that analyze the requests and either grants them outright, remands them to USAC for further fact-finding, or denies them. *See id.* at 5327–28 (ordering clauses).

schools. The FCC fulfills that role. *See* 47 U.S.C. § 254(h)(1)(A)–(B). We could continue to illustrate the other places in § 254 and the Code of Federal Regulations that demonstrate that the FCC is in the driver's seat. But, all of this shows that the FCC maintains complete control over USAC and holds final decision-making authority regarding the USF and its programs.

A comparison to a recent case where we held that a violation of the private nondelegation doctrine occurred further underscores this point. Take our recent decision in *National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869 (5th Cir. 2022). There, this court was confronted with Congress's delegation of rulemaking authority to a private entity, the Horseracing Integrity and Safety Authority (the "Authority"). *Id.* at 872. The statute at issue "nationalize[d] the governance of the thoroughbred horseracing industry," placing substantial unchecked rulemaking power in the Authority's hands. *Id.* at 872. The statute ordered the Authority—and not the Federal Trade Commission ("FTC")—to establish anti-doping, medication, and racetrack safety programs and a scheme of sanctions, among many other rules carrying the force of law. *Id.* at 882–83. The FTC was then *required by statute* to affirm the Authority's proposed regulations if deemed consistent with the statute. *Id.* at 884–85. This essentially placed the FTC and the Authority on the same ground with respect to enacting rules regulating the horseracing industry that carried the force of law. *See id.* at 883. Specifically, we stated that "[a]n agency does not have meaningful oversight if it does not write the rules, cannot change them, and cannot second-guess their substance." *Id.* at 872.

That is not the case here. Unlike the FTC in *National Horsemen's*, the FCC sets the rules and policy determinations under which USAC operates and retains final approval and review of USAC's proposals. *See Consumers' Rsch.*, 63 F.4th at 451; *Consumers' Rsch.*, 67 F.4th at 796–97; *Consumers' Rsch.*, 88 F.4th at 927–28. "Contributions to [universal service] mechanisms

. . . *shall* be based on contributors' projected collected end-user telecommunications revenues, and on a contribution factor determined quarterly *by the* [*FCC*]." 47 C.F.R. § 54.709(a) (emphasis added). This case differs from instances where courts have analyzed whether an agency was statutorily authorized to rely on a private entity for matters that exceeded ministerial tasks. *See Sierra Club v. Lynn*, 502 F.2d 43 (5th Cir. 1974). As an initial matter, those cases are inapt comparisons because USAC serves solely ministerial functions. And the majority can point to no binding jurisprudence requiring Congress to specifically designate a private entity to aid an agency to avoid a constitutional violation.

Put another way, this court is confronted with a classic case where an agency enlists a private entity to assist with ministerial support in the form of fee calculation and collection. *See, e.g.*, *Adkins*, 310 U.S. at 399 (holding a private subdelegation of ministerial or fact collecting functions is valid); *Oklahoma*, 62 F.4th at 229 ("Private entities may serve as advisors that propose regulations. And they may undertake ministerial functions, such as fee collection." (internal citations omitted)). Furthermore, the private entity holds not even a modicum of final decision-making power. Regrettably, the majority has adopted Petitioners' exaggerated conception of USAC's role and discretion to create a private nondelegation doctrine violation where none exists. To the contrary, I would hold, as the panel did, that there is no private-nondelegation doctrine violation.

### III. Examining Revenue-Raising Delegations

I conclude with a point of clarification regarding USF contributions in the instant regulatory scheme. Section 254 establishes a system of fees, not taxes. It refers to these sums as contributions—a fee for telecommunications providers to pay as a cost of doing business. However, whether the contributions are a fee has no bearing on the nondelegation doctrine analysis

because delegations of the taxing power are not subject to stricter scrutiny. *See Skinner*, 490 U.S. at 222. The majority's holding presents an unnecessary narrowing—or perhaps even elimination—of the distinction of pass-through fees and taxes and drastically breaks with our prior precedent to proclaim that the instant case involves a delegation of the power to tax.

### a. The Difference Between Pass-Through Fees and Taxes

The Supreme Court has long differentiated taxes from fees or other efforts to generate revenue. *See, e.g.*, *Twin City Nat'l Bank of New Brighton v. Nebecker*, 167 U.S. 196, 202 (1897); *United States v. Munoz-Flores*, 495 U.S. 385, 398 (1990). In *National Cable Television Ass'n v. United States*, 415 U.S. 336, 340–41 (1974), the Court distinguished fees as costs incurred "incident to a voluntary act," that "bestow[] a benefit on the applicant, not shared by other members of society." *Id.* Even in cases requiring "heightened scrutiny," we have similarly analyzed costs assessed to entities engaged in the course of business by legislative bodies and divined our own analysis for whether costs are fees or taxes. *See Neinast v. Texas*, 217 F.3d 275, 278 (5th Cir. 2000). An examination of both the law of this circuit and the Court's cases addressing this important distinction reveals that the majority's analysis distinguishing taxes and fees invites future line-drawing that will prove to be unworkable.

### i. Analyzing this Distinction under Circuit Precedent

The majority errs by misapplying its standard to determine what constitutes a tax to the USF contributions at issue. The majority erases the established distinctions between fees, which do not implicate the Taxing Clause, and taxes. *See Nat'l Cable*, 415 U.S. at 340–41. I cannot condone the patent overriding of established precedent from this court and our sister circuits that have long held that USF contributions are fees without substantial consideration of those determinations.

No. 22-60008

In *TOPUC I*, we considered a constitutional challenge from several wireless telecommunications companies asserting that the USF contribution scheme violated the Origination Clause. 183 F.3d at 426. There, the petitioning companies specifically argued that the constitutional violation flowed from the FCC's requirement that paging carriers make contributions to the USF. *Id.* at 426–27. The panel rejected this challenge, noting that the Court has made clear that "a statute [] creat[ing] a particular governmental program and [] rais[ing] revenue to support that program . . . is not a 'Bil[l] for raising Revenue' within the meaning of the Origination Clause." 183 F.3d at 426–27 (quoting *Munoz-Flores*, 495 U.S. at 398). As to the waived Tax Clause argument, the panel explained in dicta that "[e]ven if [the petitioner]'s Taxing Clause argument were properly before us, we find no basis for reversal" because "the universal service contribution qualifies as a fee because it is a payment in support of a service (managing and regulating the public telecommunications network) that confers special benefits on the [telecommunications carrier] payees." *TOPUC I*, 183 F.3d at 427 n.52 (first citing *Nat'l Cable*, 415 U.S. at 340; and then citing *Rural Tele. Coalition v. FCC*, 838 F.2d 1307, 1314 (D.C. Cir. 1988) (holding universal service contributions as a fee supporting allocations between interstate and intrastate jurisdictions)).

Even though the Taxing Clause and Origination Clause analyses differ, they require consideration of essentially the same factors—namely, "whether the revenues are used to primarily defray the expenses of regulating the act" or whether "the revenues generated from the assessment are for general revenues or for a particular program." *Id.* at 427 n.51. Nearly fifteen years after *TOPUC I*, the D.C. Circuit rejected the same arguments presented under the Tax Clause in *Rural Cellular Ass'n v. FCC*, 685 F.3d 1083, 1089–90 (D.C. Cir. 2012). It held that § 254 could not reasonably be "interpreted" as "an unconstitutional delegation of Congress's authority

91

JA303

under the Taxing Clause . . . because the assessment of contributions from carriers is not a tax." 685 F.3d at 1091. The en banc court should have reached this same determination here, as this dicta from *TOPUC I* applies in equal force.

The conclusion that USF contributions are valid fees and not impermissible taxes follows even under heightened scrutiny borrowed from different constitutional and statutory frameworks. *See* discussion *infra* Part II.a–b, pp. 20–23. For instance, in *Texas Entertainment Ass'n, Inc. v. Hegar*, 10 F.4th 495 (5th Cir. 2021), we set out the governing factors to determine whether an assessed contribution is a fee or a tax for the purposes of the Tax Injunction Act ("TJA"). Under the TJA, we have favored a "broad construction of 'tax'" out of respect of preventing delays in reviewing challenges to revenue raising efforts of state and local governments. *See Home Builders Ass'n of Miss. v. City of Madison*, 143 F.3d 1006, 1011 (5th Cir. 1998). Despite the differences in the analysis presented in the TJA and taxing power inquiries, any distinction does not impact the fact that USF contributions are not taxes under either test.

The *Hegar* panel stated that a fee: "is imposed (1) by an agency, not the legislature; (2) upon those it regulates, not the community as a whole; and (3) for the purposes of defraying regulatory costs, not simply for general revenue-raising purposes." *Id.* at 505–06 (quoting *Neinast*, 217 F.3d at 278). We considered whether the Texas legislature's enactment of a "sexually oriented business" fee was a fee or a tax. *Id.* at 502, 505–06. We noted that while the cost assessed to each "sexually oriented business" was imposed by the legislature, the text made clear that the cost was imposed only on "sexually oriented businesses" to finance a program for the prevention of sexual assault in that industry. *Id.* at 506. Ultimately, we concluded that a charge by a legislative body is a fee, and not a tax, where the charge is levied

92

JA304

against a specific industry sector, serves a regulatory purpose, and raises funds for a specific regulatory program. *Id.* at 506–07.

All of the same factors are present here. In § 254, Congress set out that a charge must be collected from "[e]very *telecommunications carrier* that provides interstate telecommunications services." 47 U.S.C. § 254(d) (emphasis added). The contributions collected from telecommunications carriers are directed to a specific fund and "not general revenue." *See Hegar*, 10 F.4th at 506–07. In fact, § 254(e) provides that these funds are not universally distributed but paid only to eligible telecommunications carriers that provide universal service. USF contributions are imposed upon a specific industry—telecommunications carriers—and not the general public. *See id.*; *see also TOPUC I*, 183 F.3d at 427–28 (holding that all telecommunications carriers—including those that are exempt from contributing—are the beneficiaries of the program receiving the primary benefit in the form of the expansion of universal service). The best support for this lies in the plain language of § 254(b)(4), (d).

But one need not rely solely on Congress's word as expressed in § 254. A look at the USF contribution system in practice confirms who the true payors are. The class of entities that Congress orders to contribute—those that are compelled by congressional act to actually pay this fee—are the telecommunications providers themselves. A close review of the list of entities that must contribute, reproduced on USAC's website, includes landline providers, prepaid calling card providers, coaxial cable providers, telex companies, and other types of telecommunications service providers.[5] Conspicuously absent from § 254, this list, or from any material or orders of

---

[5] *See* 47 U.S.C. § 254(d); Univ. Serv. Admin. Co., *Who Must Contribute*, https://www.usac.org/service-providers/contributing-to-the-usf/who-must-contribute/ (last visited May 24, 2024).

Congress or the FCC is any listing of the American populace as contributors. Thus, the majority errs in categorizing the class of contributors as "American telecommunications consumers who see USF charges on their phone bills each month." Maj. Op. at 15. Whether or not the telecommunications carriers pass through that cost to consumers in the form of a line-item on their bills is irrelevant to our analysis because we are concerned with the constitutionality of Congress's action, not the action of independent third parties that choose to pass costs along to their customers. This degree of separation between the governmental act and the consumers' payments should end the inquiry.

But if we continue, it becomes even clearer that there *is* complete overlap between the class of USF contributors are the payors and the beneficiaries. The general public then receives an ancillary benefit in the form of more affordable, standardized service. However, the telecommunications carriers receive the primary benefit in the forms of both direct dispersals of USF money and positive network economic effects that result from the proliferation of universal service. *See* 47 U.S.C. § 254(e); *TOPUC I*, 183 F.3d at 427–28 & n.52; *Rural Cellular Ass'n*, 685 F.3d at 1091–92; *see also* Mark A. Lemley & David McGowan, *Legal Implications of Network Economic Effects*, 86 Calif. L. Rev. 479, 551 (1998). As we said in *TOPUC I*, "universal service contributions are part of a particular program supporting the expansion of, and increased access to, the public institutional telecommunications network. . . . Each [] carrier *directly benefits* from a *larger and larger network* and, with that in mind, Congress designed the universal service scheme to exact payments from those companies benefiting from the provision of universal service." 183 F.3d at 427–28 (emphasis added).

In *Rural Cellular*, the D.C. Circuit reached the exact same conclusion regarding enhanced access to broadband services. 685 F.3d at 1091–92. It held that as telecommunications providers advance universal service "they

will benefit from the increased utility of the [basic] Internet [and cell services] that come[] with a greater number of users having enhanced access to" those services. *Id.* at 1090–91. It concluded that the FCC "collected these [universal service] contributions to support the expansion of universal service and no other use was ever contemplated." *Id.* at 1091.

The majority makes much ado of the benefit that the general public and the rural area consumers, schools, hospitals, and public libraries receive from USF programs. Maj. Op. at 15 ("There is no overlap at all between the class of USF beneficiaries (recipients of subsidized telecommunications services) and the class of USF contributors."). But, the majority mistakes the recipients of an ancillary benefit derived from the exaction of a fee with the payor that primarily benefits from the fees exacted for the purposes of funding regulatory efforts. Curiously, the majority cites *Trafigura Trading LLC v. United States*, for the proposition that a common fee arises "in the context of 'value-for-value transaction[s].'" 29 F.4th 286, 289 (5th Cir. 2022) (quoting Erik M. Jensen, *The Export Clause*, 6 Fla. Tax Rev. 1, 8 (2003)).

Its reliance on *Trafigura* is misplaced. The majority omits that we reviewed that case under the Export Clause of the Constitution, which requires "apply[ing] 'heightened scrutiny' . . . [to] strictly enforce the Export's Clause ban on taxes by 'guard[ing] against . . . the imposition of a [tax] under the pretext of fixing a fee.'" *Id.* at 282 (citation omitted). Looking at the precedent set forth by this court and our sister circuits, it should be apparent that USF contributions are fees. *TOPUC I*, 183 F.3d at 427–28 & n.52; *Rural Cellular*, 685 F.3d at 1091–92. Nonetheless, some remain unmoved to apply our established precedent and venture into crafting new formulations to analyze whether a certain charge is a fee or not. Once again, noting our role not to directly contravene Supreme Court jurisprudence, I would hold that § 254 does not implicate the taxing power.

95

No. 22-60008

### b. At Every Level of Scrutiny, USF Contributions are Fees

The majority's framing of the fee inquiry misconstrues language from the Court's decision in *National Cable* and numerous persuasive authorities to reach its result. It describes fees as costs: (1) "incurred 'incident to a voluntary act'"; (2) "imposed by an administrative agency upon only those persons, or entities, subject to its regulation for regulatory purposes"; and (3) revenues the government raises to supply a benefit that inures to the persons or entities paying them rather than to the public generally. *See* Maj. Op. at 14.

USF contributions have nearly all of these characteristics. First, they are incurred by telecommunications carriers incident to the voluntary act of doing business. In *National Cable*, the Court categorized charges incurred as a result of a request to obtain a state license to practice law or medicine, or to run a broadcast station, as fees because they were incident to "a voluntary act." *See* 415 U.S. at 340–41. Thus, telecommunications providers' willing choice to engage in the industry, like the cost paid for professional licensure, fits within the Court's formulation of costs incurred incident to a voluntary act. Second, USF contributions are imposed by the legislature on telecommunications providers, and not society at large for the purposes of maintaining a system of universal service that they benefit from. *See* 47 U.S.C. § 254(d), (e) (imposing the contribution on telecommunications carriers for the benefit of qualified telecommunications carriers). In this case, the majority can point to nowhere in § 254 or the Code of Federal Regulations where Congress, the FCC, or even USAC order or direct telecommunications providers to pass along the cost to their customers. At most, the majority points to a regulation enacted by the FCC that merely notes that is not unlawful for carriers to pass on the costs to consumers. Maj. Op. at 15 (citing 47 C.F.R. § 54.712(a)). That simply is not sufficient for our constitutional analysis that examines Congress's action and scrutinizes what

96

it has set out in delegating authority. *Cf. J.W. Hampton*, 276 U.S. at 406 (analyzing what *Congress* "may do in seeking assistance from another branch" through the delegation of authority).

The majority cites *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000), for the proposition that the fact that carriers pass along the cost of contributions to consumers makes it "reminiscent of a 'classic tax'" with obligations shared by the population at large. Maj. Op. at 15. As mentioned above, this determination relies on the baked-in assumption that Congress or the FCC has imposed the cost on consumers. Again, this simply is not supported by the plain language of the statute. Section 254(d) specifically provides that "[e]very *telecommunications carrier* that provides interstate telecommunications services" must make contributions. 47 U.S.C. § 254(d). Costs incurred by entities and passed down to consumers through the entities' independent business judgment are not taxes.[6]

In my view, a strained interpretation of our applicable law and liberties taken to broadly expand the definition of a tax using distinguishable authorities should not stand. But regardless of the outcome of this analysis, the Court has made clear that whether a revenue-raising delegation implicates the taxing power is irrelevant to a nondelegation doctrine challenge. *See Skinner*, 490 U.S. at 223. I remain unpersuaded that we should create a sharp split with our precedent concluding that USF contributions are fees, along with our sisters circuits' same conclusions. Nor do I support our departure from the sound reasoning of the Court that any distinction of a

---

[6] *See, e.g.*, *Edye v. Robertson*, 112 U.S. 580, 595 (1884) (holding that a per-head charge imposed on ship owners that brought immigrants to American was a processing fee or mitigation charge, and not a tax); Hugh D. Spitzer, *Taxes vs. Fees: A Curious Confusion*, 38 Gonz. L. Rev. 335, 337–50, 364–65 (2002) (detailing differences between taxes and different types of user charges, commodities charges, and the like).

charge as a fee or tax is of little relevance as it pertains to the nondelegation doctrine analysis.

## IV. Conclusion

In sum, § 254 represents Congress's effort to "obtain[] the assistance of its coordinate Branches"[7] in an extensive and vastly changing subject matter area. In so doing, Congress has provided the FCC with an intelligible principle that sufficiently delimits the FCC's discretion based on the established universal service principles. Petitioners' argument that this revenue-raising delegation is subject to a higher standard of scrutiny has been consistently rejected by the Supreme Court. Because I am not persuaded that we should deviate from Supreme Court precedent, deviate from our precedent, and create a split with the Sixth, Eleventh, and D.C. Circuits by departing from the solid reasoning offered in their denials of those nondelegation doctrine challenges, I would affirm our original holding that § 254 satisfies the intelligible principle test and that no constitutional violation arises from the FCC's subdelegation of ministerial tasks to USAC.

---

[7] *Mistretta*, 488 U.S. at 372.

No. 22-60008

Stephen A. Higginson, *Circuit Judge*, joined by Stewart, Southwick, Graves, and Douglas, *Circuit Judges*, dissenting:

The majority finds neither an unconstitutional delegation of legislative power nor an unconstitutional exercise of government power by a private entity. Supreme Court precedent dictates these answers, which is why every other circuit to consider these questions stopped there and the Supreme Court denied petitions for review of those decisions. *Consumers' Rsch. v. FCC*, No. 23-456, 2024 WL 2883753 (U.S. June 10, 2024) (Mem.); *Consumers' Rsch. v. FCC*, No. 23-743, 2024 WL 2883755 (U.S. June 10, 2024) (Mem.).

But our court does not stop there, going beyond even petitioners' arguments to adopt a novel theory that it is "the combination" of these two *non*-violations that "violates the Legislative Vesting Clause in Article I, § 1." Maj. Op. at 55. That is, according to the majority, when Congress provides an intelligible principle to channel agency discretion (constitutional) and a private entity performs calculations under the agency's supervision (also constitutional), it becomes—pursuant to an undefined, unannounced, and unprecedented test—unconstitutional. Make no mistake, there is nothing narrow about this ruling. This decision invites lower courts to leapfrog the Supreme Court; creates a split with all other circuits to have considered the issue; ignores statutory criteria and regulations; and upends the political branches' decades-long engagement with each other, industry, and consumers to address the technology divide.

I.

The majority argues that the "combination" theory on which its holding rests is nothing new. But the Supreme Court has considered cases that, like this one, involved challenges on the grounds that there was both an unconstitutional delegation of legislative power and an unconstitutional

99

JA311

delegation of government power to a private entity, yet the Court never instructed, as the majority does now, that a different standard applies. *See, e.g.*, *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *Currin v. Wallace*, 306 U.S. 1, 15-16 (1939); *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940).

In *Sunshine Anthracite*, for example, challengers argued that there was both an impermissible delegation of legislative power to an executive commission and an impermissible delegation of government power to a private entity because that commission relied on private actors. 310 U.S. at 397-99. The Supreme Court rejected the legislative delegation challenge after concluding that "in the hands of experts the criteria which Congress ha[d] supplied [we]re wholly adequate for carrying out the general policy and purpose of the Act." *Id.* at 398. It then rejected the private delegation challenge after concluding that the private actors "function subordinately to the Commission," which had "authority and surveillance" over them. *Id.* at 399. It ended its analysis of both delegation challenges there. If the majority were correct that a different standard applies, the Supreme Court would have instead asked whether, despite constituting neither a delegation of legislative power nor a delegation of government power to a private entity, there was still a constitutional problem. It did not. The majority attempts to distinguish on the ground that the Supreme Court "found the Government had not delegated any legislative power to any private entity" and "[t]here cannot be a combined public/private delegation without a private delegation." Maj. Op. at 68. But that is no answer. Indeed, it directly undermines the majority's conclusion because the majority *also* does not find a private delegation. *Id.* at 17 (explaining the court "need not definitively answer either delegation question").

The majority points to presidential removal authority precedent but ignores how the Supreme Court itself has characterized that precedent. In

No. 22-60008

*Seila Law LLC v. CFPB*, a decade after *Free Enterprise Fund*, it explained that there were only two exceptions to the president's otherwise "unrestricted removal power." 591 U.S. 197, 204 (2020). The CFPB's structure fit into neither exception. *Id.* The Court declined to create a new one and, unlike the majority here, applied precedent. *Id.* It was not, as the majority recasts it, a situation in which "[t]wo lines of precedent seemed to converge to suggest the removal restriction at issue posed no constitutional problem" but "the combination" of features was unconstitutional. Maj. Op. at 56.[1] And, as discussed above, the Supreme Court has considered this combination of features and, applying the legislative delegation and private delegation tests the majority disregards, has found no constitutional defect.

Even if the majority were correct that the presidential removal authority cases now suggest that a different standard could apply in this case, the Supreme Court has been clear that, where its precedent "has direct application in a case," "the Court of Appeals should follow the case which directly controls, leaving to [it] the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quoting *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989)); *see also Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 352 (5th Cir. 2024) ("[O]ur role in the judicial architecture requires us only to map— not adjust—the borders" of Supreme Court precedent). The majority ignores this repeated instruction.

II.

---

[1] In doing so, the majority quotes Justice Thomas's separate writing in which he disagreed with seven Justices that severing the removal provision cured the CFPB's constitutional defect. But that analysis, joined by only one other Justice, about when severance is a proper remedy has little purchase here in determining whether there has been a constitutional violation in the first place.

No. 22-60008

The majority cannot prevail under legislative delegation or private delegation precedent, and so it concocts a theory to rewrite both. In doing so, it offers no test for determining when something that is neither an unconstitutional delegation of legislative power from Congress to an agency nor an unconstitutional delegation of government power to a private entity becomes unconstitutional, leaving the political branches powerless to govern.

On the issue of legislative delegation, the majority acknowledges that "the Supreme Court's nondelegation 'jurisprudence has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives.'" Maj. Op. at 29 (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (added emphasis omitted)). It then asserts, without explanation, that "Congress did not delegate because FCC has some superior technical knowledge about the optimal amount of universal service funding" as "[n]o such knowledge exists because determining the ideal size of a welfare program involves policy judgments, not technical ones." *Id.* at 30.

But Congress designed a vital, nationwide program in an area—telecommunications—where the only constant has been rapid change in both technology and markets. This is exactly the type of "ever changing" and "technical problem[]" that the Supreme Court has held Congress can address with "broad general directives" to expert agencies. *Mistretta*, 488 U.S. at 372. Congress chose not to freeze in place precise rates for different types of customers in different regions nor to impose service technology standards that would almost immediately become obsolete. Instead, Congress made policy decisions about how those precise answers should be reached, and regularly revisited, by the expert agency it had created. To determine which services to fund, FCC is required to account for which services "are essential to education, public health, or public safety";

102

"subscribed to by a substantial majority of residential customers"; "being deployed in public telecommunications networks by telecommunications carriers"; and "consistent with the public interest, convenience, and necessity." 47 U.S.C. § 254(c)(1). Congress provided additional principles to guide FCC. For example, Congress made the policy decision that rural Americans should not be abandoned on the wrong side of the technology divide. Without the ability to predict what types of services urban Americans would have access to and what rates they would pay, Congress decided to require FCC to ensure that rural Americans have "access to telecommunications and information services" "reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas." *Id.* § 254(b)(3). The majority offers Congress no guidance on how it should address this rapidly evolving area, or any number of others, differently.

The majority is mistaken to suggest that these are issues that have been withdrawn from congressional scrutiny—and attendant public debate—because Congress has enlisted FCC's expertise to address them. There have been congressional hearings, reports, proposed bills, and engagement with FCC over every aspect of the Universal Service Fund (USF), ranging from revising the High Cost Program's performance goals to expanding the list of eligible entities for the Rural Health Care Program to broadening the contribution base for the USF. Patricia Figliola, Cong. Rsch. Serv., R47621, The Future of the Universal Service Fund and Related Broadband Programs 12-16 (2024) ("Future of the Universal Service Fund"). The USF remains subject to extensive congressional efforts to weigh competing policy priorities and interests, balancing concerns of different consumers and industries.

No. 22-60008

On private delegation, too, the majority ignores both precedent and facts. The Universal Service Administrative Company (USAC), constrained by comprehensive regulations, "bill[s] contributors, collect[s] contributions to the universal service support mechanisms, and disburs[es] universal service support funds." 47 C.F.R. § 54.702(b). In performing these administrative functions, USAC "may not make policy, interpret unclear provisions of the statute or rules, or interpret the intent of Congress." *Id.* § 54.702(c).

Yet, the majority asserts that FCC has "*de facto* if not *de jure*" abdicated government power to USAC because FCC has rarely rejected the contribution factor that USAC calculates based on collected inputs. Maj. Op. at 7. But the relevant question is what the majority discounts as only the "*de jure*" one: Whether FCC has the "authority" to do so. *Sunshine Anthracite*, 310 U.S. at 399. And even the majority acknowledges that FCC does have that authority. *See* Maj. Op. at 6 ("True, FCC 'reserves the right to set projections of demand and administrative expenses at amounts that [it] determines will serve the public interest.' *See* 47 C.F.R. § 54.709(a)(3)."). Certainly, any number of private entities that perform administrative roles at government direction and under government control would fail this rewritten test. *See, e.g., What's a MAC*, Ctr. for Medicare & Medicaid Servs., https://www.cms.gov/medicare/coding-billing/medicare-administrative-contractors-macs/whats-mac (last modified Mar. 13, 2024) (describing how Medicare Administrative Contractors—private insurers—process claims, make and account for Medicare payouts, and establish local coverage determinations).

Furthermore, as Judge Stewart explains, it is hardly surprising that FCC should approve USAC's calculation of the contribution factor when it is entirely the product of inputs that FCC regulates at every turn, from the detailed worksheets that FCC requires telecommunications companies

104

JA316

submit to calculate projected revenue to the caps that FCC imposes on projected expenses. If anything, it is evidence of the efficacy of FCC's "pervasive surveillance and authority" exercised over USAC. *Sunshine Anthracite*, 310 U.S. at 388. That authority is maintained through processes that allow parties disagreeing with USAC's math to seek further FCC review, 47 C.F.R. § 54.719(b), and audits to ensure "proper[] administrat[ion] [of] the universal service support mechanisms to prevent fraud, waste, and abuse," *id.* § 54.717. That those audits reveal errors and waste is concerning but this has never been enough to declare a coequal political branch's act unconstitutional. Nor does it convert USAC's accounting role into a constitutional violation.[2]

Additionally, the majority overlooks the fact that the increasing contribution factor is not caused by the scope of USAC's authority but is instead driven "in large part [by] a decline in the contributions revenue base, i.e., providers are reporting a declining share of telecommunications revenues and an increasing share of non-telecommunications revenues." Future of the Universal Service Fund at 9. Crucially, Congress has responded with a number of legislative proposals, from members of both parties, to potentially expand the revenue base by including broadband providers and online content and services providers. *Id.* at 9-10 (citing Senator Markwayne Mullin's Lowering Broadband Costs for Consumers Act, Senator Roger Wicker's FAIR Contributions Act, and the Reforming

---

[2] The majority separately argues that Congress was required to expressly authorize USAC's role under founding-era agency law principles. But, even granting that this were historically accurate and the relevant question, the majority acknowledges that there was an "assum[ption] that ministerial tasks could be subdelegated," and so this argument fails because, as discussed above, USAC performs only ministerial tasks. Maj. Op. at 49 (citing Gary Lawson & Guy Seidman, "A Great Power of Attorney": Understanding the Fiduciary Constitution 115 (2017)).

No. 22-60008

Broadband Connectivity Act proposed by Senator Amy Klobuchar and Representative Joe Neguse). Put differently, the body constitutionally tasked with addressing the policy problem the majority identifies is doing just that.

As our unanimous panel and every other court to have considered these issues held, each challenge fails under binding Supreme Court legislative delegation and private delegation precedent. Yet the majority, in undermining both lines of precedent, offers no test for determining at what point something that is neither an unconstitutional delegation of legislative power nor an unconstitutional delegation of government power to a private entity still becomes, convergingly, unconstitutional. Congress, the Executive, and courts in our circuit are left only with the implication that the bar for what is an intelligible principle is raised—by how much is unclear— when an agency enlists a private entity to perform accounting tasks. Conversely, tasks performed by private entities that have long been considered ministerial will be elevated—at what point, again, is unclear—to exercises of government power when Congress legislates with otherwise permissibly intelligible principles that limit agency discretion.

This convergence sleight of hand not only undoes Supreme Court precedent but also leaves the political branches powerless to address this perceived constitutional deficiency, ignorant as to how to legislate and regulate in ways that will survive judicial review. Here, Article III nullifies a program that has served millions of Americans for over a quarter of a century, which Congress, FCC experts, industry, and consumers revisit yearly in the face of changing technology and markets. Our court should not constitutionalize policy disagreements nor, worse still, do so with an amorphous standard, not urged by petitioners and contrary to precedent, that leaves the coequal, political branches without stability or clarity. In announcing its new constitutional theory, our court creates a greater threat to the separation of powers than the one it purports to address.

106

No. 22-60008

\*        \*        \*

For these reasons, and those stated by Judge Stewart, I respectfully dissent.

# TAB 2

# PUBLIC NOTICE

Federal Communications Commission
45 L Street NE
Washington, DC 20554

News Media Information 202-418-0500
Internet: www.fcc.gov

**DA 25-840**
**Released: September 15, 2025**

### Proposed Fourth Quarter 2025 Universal Service Contribution Factor

CC Docket No. 96-45

In this Public Notice, the Office of Managing Director (OMD) announces that the proposed universal service contribution factor for the fourth quarter of 2025 will be 0.381 or 38.1 percent.[1]

**Rules for Calculating the Contribution Factor**

Contributions to the federal universal service support mechanisms are determined using a quarterly contribution factor calculated by the Federal Communications Commission (FCC or Commission).[2] The Commission calculates the quarterly contribution factor based on the ratio of total projected quarterly costs of the universal service support mechanisms to contributors' total projected collected end-user interstate and international telecommunications revenues, net of projected contributions.[3]

**USAC Projections of Demand and Administrative Expenses**

Pursuant to section 54.709(a)(3) of the Commission's rules,[4] the Universal Service Administrative Company (USAC) submitted projections of demand and administrative expenses for the fourth quarter of 2025.[5] Under the Commission's direction and the Commission's rules[6], the Wireline Competition Bureau (WCB), in consultation with OMD, directed USAC to apply $100 million in unused Schools & Libraries (E-Rate) program funds to offset the $628.68 million projected E-Rate program demand for the quarter. This offset reduces the fourth quarter 2025 contribution factor to a level below what the contribution factor would have been based on USAC's filings.[7]

Accordingly, the projected demand and expenses are as follows:

---

[1] *See* 47 C.F.R. § 54.709(a).

[2] *See id.*

[3] *See* 47 C.F.R. § 54.709(a)(2).

[4] *See* 47 C.F.R. § 54.709(a)(3).

[5] *See* Federal Universal Service Support Mechanisms Quarterly Fund Size Projections and Contribution Base available at www.usac.org/fcc-filings.

[6] *See* 47 C.F.R. § 54.619(a)(5).

[7] *See* Federal Universal Service Support Mechanisms Quarterly Fund Size Projections available at www.usac.org/fcc-filings.

| Dollars in Millions | | | | |
|---|---|---|---|---|
| **USF Programs** | **Demand** | **Administrative Expenses** | **Prior Period Adjustment** | **Contribution Requirement** |
| Schools & Libraries | $528.68 | $22.60 | $0.61 | $551.89 |
| Rural Health Care | $171.64 | $9.33 | $0.12 | $181.09 |
| High Cost | $1,139.11 | $20.03 | $17.62 | $1,176.76 |
| Lifeline | $270.41 | $23.63 | -$50.37 | $243.67 |
| **TOTAL** | **$2,109.84** | **$75.59** | **-$32.02** | **$2,153.41** |

## USAC Projections of Industry Revenues

USAC submitted projected collected end-user telecommunications revenues for October 2025 through December 2025 based on information contained in the Telecommunications Reporting Worksheet (FCC Form 499-Q)[8]. Accordingly, the total projected collected interstate and international end-user telecommunications revenues for the fourth quarter 2025 is as follows:

$7.870473 billion

## Adjusted Contribution Base

To determine the quarterly contribution base, the FCC decreases the fourth quarter 2025 estimate of projected collected interstate and international end-user telecommunications revenues by the projected revenue requirement to account for circularity and decrease the result by one percent to account for uncollectible contributions. Accordingly, the quarterly contribution base for the fourth quarter of 2025 is as follows:

Adjusted Quarterly Contribution Base for Universal Service Support Mechanism

= (Fourth Quarter 2025 Revenues - Projected Revenue Requirement) * (100% - 1%)
= ($7.870473 billion - $2.153410 billion) * 0.99
= $5.659892 billion

## Unadjusted Contribution Factor

Using the above-described adjusted contribution base and the total program collection (revenue requirement) from the table above, the proposed unadjusted contribution factor for the fourth quarter of 2025 is as follows:

---

[8] *USAC Filings of Quarterly Contribution Base* at 5.

Contribution Factor for Universal Service Support Mechanisms

= Total Program Collection / Adjusted Quarterly Contribution Base
= $2.153410 billion / $5.659892 billion
= 0.380468

**Unadjusted Circularity Factor**

USAC will reduce each provider's contribution obligation by a circularity discount approximating the provider's contributions in the upcoming quarter. Accordingly, the proposed unadjusted circularity factor for the fourth quarter of 2025 is as follows:

Unadjusted Circularity Factor for Universal Service Support Mechanisms

= Total Program Collection / Projected Fourth Quarter 2025 Revenues
= $2.153410 billion / $7.870473 billion
= 0.273606

**Proposed Contribution Factor**

The Commission has directed OMD to announce the contribution factor as a percentage rounded up to the nearest tenth of one percent.[9] Accordingly, the proposed contribution factor for the fourth quarter of 2025 is as follows:

38.1%

**Proposed Circularity Discount Factor**

The Commission also has directed OMD to account for contribution factor rounding when calculating the circularity discount factor.[10] Accordingly, the proposed circularity factor for the fourth quarter of 2025 is as follows:

0.274620[11]

**Conclusion**

If the Commission takes no action regarding the projections of demand and administrative expenses and the proposed contribution factor within the 14-day period following release of this Public

---

[9] *See Federal-State Joint Board on Universal Service, 1998 Biennial Regulatory Review – Streamlined Contributor Reporting Requirements Associated with Administration of Telecommunications Relay Service, North American Numbering Plan, Local Number Portability, and Universal Service Support Mechanisms, Telecommunications Services for Individuals with Hearing and Speech Disabilities, and the Americans with Disabilities Act of 1990, Administration of the North American Numbering Plan and North American Numbering Plan Cost Recovery Contribution Factor and Fund Size, Number Resource Optimization, Telephone Number Portability, Truth-in-Billing and Billing Format*, CC Docket Nos. 96-45, 98-171, 90-571, 92-237, 99-200, 95-116, 98-170, Order and Second Order on Reconsideration, 18 FCC Rcd 4818, 4826, para. 22 (2003) (*Second Order on Reconsideration*).
[10] *Id*.
[11] The proposed circularity discount factor = 1 + [(unadjusted circularity discount factor – 1) * (unadjusted contribution factor / proposed contribution factor)]. The proposed circularity discount factor is calculated in a spreadsheet, which means that internal calculations are made with more than 15 decimal places.

Notice, they shall be deemed approved by the Commission.[12]  USAC shall use the contribution factor to calculate universal service contributions for the fourth quarter of 2025.  USAC will reduce each provider's contribution obligation by a circularity discount approximating the provider's contributions in the upcoming quarter.[13]  USAC includes contribution obligations less the circularity discount in invoices sent to contributors.  Contribution payments are due on the dates shown on the invoice.  Contributors will pay interest for each day for which the payments are late.  Contributors failing to pay contributions in a timely fashion may be subject to the enforcement provisions of the Communications Act of 1934, as amended, and any other applicable law.  In addition, contributors may be billed by USAC for reasonable costs of collecting overdue contributions.[14]

The FCC also emphasizes that carriers may not markup federal universal service line-item amounts above the contribution factor.[15]  Thus, carriers may not, during the fourth quarter of 2025, recover through a federal universal service line item an amount that exceeds 38.1 percent of the interstate telecommunications charges on a customer's bill.

In addition, under the limited international revenues exception (LIRE) in section 54.706(c) of the Commission's rules, a contributor to the universal service fund whose projected collected interstate end-user telecommunications revenues comprise less than 12 percent of its combined projected collected interstate and international end-user telecommunications revenues shall contribute based only on projected collected interstate end-user telecommunications revenues, net of projected contributions.[16]  The rule is intended to exclude from the contribution base the international end-user telecommunications revenues of any entity whose annual contribution, based on the provider's interstate and international end-user telecommunications revenues, would exceed the amount of its interstate end-user revenues.[17]  The proposed contribution factor exceeds 12 percent, which the FCC recognizes could result in a contributor being required to contribute to the universal service fund an amount that exceeds its interstate end-user telecommunications revenue.  Should a contributor face this situation, the contributor may petition the Commission for waiver of the LIRE threshold.[18]

For further information, please contact Daniel Daly at (202) 418-1832, in the Office of Managing Director.

---

[12] *See* 47 C.F.R. § 54.709(a)(3).

[13] USAC will calculate each individual contributor's contribution in the following manner: (1-Circulatory Factor) * (Contribution Factor*Revenue)

[14] *See* 47 C.F.R. § 54.713.

[15] *See* 47 C.F.R. § 54.712.

[16] *See* 47 C.F.R. § 54.706.

[17] *See Federal-State Joint Board on Universal Service*, Sixteenth Order on Reconsideration, CC Docket No. 96-45, Eighth Report and Order, CC Docket No. 96-45, Sixth Report and Order, Docket No. 96-262, 15 FCC Rcd 1679, 1687-1692, paras. 17-29 (1999) (*Fifth Circuit Remand Order*).

[18] Generally, the Commission's rules may be waived for good cause shown.  47 C.F.R. § 1.3.  The Commission may exercise its discretion to waive a rule where the particular facts make strict compliance inconsistent with the public interest.  *Northeast Cellular Telephone Co. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir. 1990) (*Northeast Cellular*).  In addition, the Commission may consider considerations of hardship, equity, or more effective implementation of overall policy on an individual basis.  *WAIT Radio v. FCC*, 418 F.2d 1153, 1159 (D.C. Cir. 1969); *Northeast Cellular*, 897 F.2d at 1166.  Waiver of the Commission's rules is therefore appropriate only if special circumstances warrant a deviation from the general rule, and such deviation will serve the public interest.  *Northeast Cellular*, 897 F.2d at 1166; 47 C.F.R. § 54.802(a).

# TAB 3

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C.**

## UNIVERSAL SERVICE ADMINISTRATIVE COMPANY

Federal Universal Service Support Mechanisms
Quarterly Contribution Base for the Fourth Quarter 2025

UNIVERSAL SERVICE
ADMINISTRATIVE COMPANY
700 12TH STREET N.W., SUITE 900
WASHINGTON, D.C.  20005
VOICE:  202.776.0200
FAX:  202.776.0080
www.usac.org

August 29, 2025

JA324

JA325

**INTRODUCTION**............................................................................... 1

**CONTRIBUTION BASE** ............................................................... 3

**FOURTH QUARTER 2025 PROJECTED COLLECTED REVENUE BASE TO BE USED FOR 2025 CONTRIBUTIONS**................................................. 4

**TELECOMMUNICATIONS ENTITIES THAT REPORTED ON FORM 499-Q AS OF AUGUST 20, 2025** ....................................................... **M05**

**BEFORE THE FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, D.C.**

**FEDERAL UNIVERSAL SERVICE SUPPORT MECHANISMS
FUND SIZE QUARTERLY CONTRIBUTION BASE
FOR THE FOURTH QUARTER 2025**

---

### *INTRODUCTION*

---

The Universal Service Administrative Company (USAC) is the not-for-profit corporation appointed by the Federal Communications Commission (FCC or Commission) to administer the federal Universal Service Fund (USF) and the four federal Universal Service Support Mechanisms:  High Cost, Lifeline, Rural Health Care, and Schools and Libraries and the Connected Care Pilot Program.[1]  USAC hereby submits the contribution base amount to be used for the fourth quarter of calendar year 2025 (4Q2025) in accordance with Section 54.709 of the Commission's rules.[2]  USAC is filing this contribution base report pursuant to the Commission's 2002 *Projected Collected Contribution Methodology Order*, updating the 2001 *Contribution Methodology Order*.[3] In the 2002 Order, the Commission changed the universal service contribution base methodology from actual contributor revenues billed to projected collected revenues.[4] On March 14, 2003, the Commission released an *Order and Second Order on*

---

[1] *See* 47 C.F.R. § 54.701(a)*; see also Changes to the Board of Directors of the National Exchange Carrier Association, Inc. et al.,* CC Docket Nos. 97-21 *et al.*, Third Report and Order, Fourth Order on Reconsideration and Eighth Order on Reconsideration, 13 FCC Rcd 25058 (1998); *Access Charge Reform et al.*, CC Docket Nos. 96-262 *et al.*, Sixth Report and Order, Report and Order, Eleventh Report and Order, 15 FCC Rcd 12962 (2000) (*CALLS Order*); *Federal-State Joint Board on Universal Service et al.*,  CC Docket No. 96-45, 16 FCC Rcd 5748 (2001) (*Contribution Methodology Order*).

[2] *See* 47 C.F.R. § 54.709(a)(3).

[3] *See Contribution Methodology Order*, 16 FCC Rcd at 5752-53, paras. 10-13; *Federal-State Joint Board on Universal Service et al.*, CC Docket Nos. 96-45 *et al.*, Report and Order and Second Further Notice of Proposed Rulemaking, 17 FCC Rcd 24952 (2002) (*Projected Collected Contribution Methodology Order*).

[4] *Projected Collected Contribution Methodology Order*, 17 FCC Rcd at 24952, 24969, paras. 1, 29-30.

*Reconsideration*, which, *inter alia,* directed the Wireline Competition Bureau (WCB) to announce the universal service contribution factor as a percentage rounded up to the nearest tenth of one percent.[5]  The Commission also directed the Wireline Competition Bureau to account for contribution factor rounding when calculating the "circularity" discount factor.[6]

On June 23, 2006, the Commission issued an order realigning oversight responsibilities within the FCC for the USF, the universal service support mechanisms and USAC.[7]  Pursuant to that order, the FCC's Office of the Managing Director is now responsible for calculating the quarterly contribution factor and issuing related public notices.[8]

Consistent with Commission regulations and orders, on August 1, 2025, USAC filed the Federal Universal Service Support Mechanisms Fund Size and Administrative Cost Projections for 4Q2025.

Upon approval of the universal service support mechanisms quarterly funding requirements, projected administrative costs and the contribution base, the Commission will establish a quarterly contribution factor and a circularity factor.[9]  USAC will then bill contributors monthly for their individual obligations based on the approved contribution factor.[10]

---

[5] *See Federal-State Joint Board on Universal Service et al.*, CC Docket Nos. 96-45 *et al.*, Order and Second Order on Reconsideration, 18 FCC Rcd 4818*,* 4826, para. 22 (2003) *(Second Order on Reconsideration)*; *see also Revised Second Quarter 2003 Universal Service Contribution Factor*, CC Docket No. 96-45, Public Notice, 18 FCC Rcd 5097, 5097 n.3 (Wireline Comp. Bur. 2003.)
[6] *Second Order on Reconsideration*, 18 FCC Rcd at 4826, para. 22.
[7] *See Amendment of Part 54 of the Commission's Rules*, Order, 21 FCC Rcd 7422, 7423, and para. 4 (2006).
[8] *Id.*
[9] *See* 47 C.F.R. § 54.709(a)(3).
[10] *Id.*

## *CONTRIBUTION BASE*

USAC collects interstate and international projected revenue information from carriers on the FCC Form 499-Q (Form 499-Q) four times yearly and submits aggregate information quarterly to the FCC.[11]

Carriers also file the FCC Form 499-A (Form 499-A) in April of each year to report actual annual revenues from the prior year. USAC uses revenue data provided by carriers on the FCC Form 499-A to perform annual true-ups of actual revenue to the quarterly projected revenue data submitted by carriers on FCC Form 499-Q during the prior calendar year.[12] As necessary, USAC will refund or collect from carriers any over-payments or underpayments. As mandated by the Commission, if the combined quarterly revenues reported by a carrier on its Forms 499-Q are greater than those reported on its annual revenue report on Form 499-A, then a refund will be provided to the carrier based on an average of the two lowest contribution factors for the year.[13] If the combined quarterly revenues reported by a carrier are less than those reported on its annual revenue report on Form 499-A, then USAC will collect the difference from the carrier using an average of the two highest contribution factors from that year.[14]

Carriers were required to file the Form 499-Q with 4Q2025 projected collected revenue information on or before August 1, 2025.[15] By August 29, 2025, USAC is

---

[11] The FCC Form 499-Q includes a box for each of the quarterly filing submissions. Carriers check the appropriate box to indicate the quarter for which revenue information is being reported. Data is due to USAC approximately one month before the filing is due to the FCC.

[12] In addition, carriers may file a revised Form 499-Q within 45 days of the original filing due date for the current quarter. *See Projected Collected Contribution Methodology Order*, 17 FCC Rcd at 24972, para. 36.

[13] *Id.*

[14] *Id.*

[15] *See* FCC Form 499-Q, *available at* https://www.usac.org/service-providers/contributing-to-the-usf/forms-to-file/; *see also* 47 C.F.R. § 54.711.

required to file revenue data with the FCC based on the August 1, 2025, carrier filings.[16]

The Commission will use the program demand data and the projected collected revenue

to calculate the universal service contribution factor for 4Q2025.[17]  The following chart

provides the current Form 499-Q filing schedule:

| Due Dates | Projected Collected Revenue for USF contributions |
|---|---|
| August 1, 2025 | 4Q: October – December 2025 |
| November 3, 2025 | 1Q: January - March 2026 |
| February 2, 2026 | 2Q: April - June 2026 |
| May 1, 2026 | 3Q: July-August 2026 |

Telecommunications providers qualifying for the *de minimis* exemption from

contribution requirements are not required to complete the Form 499-Q.[18]  However, for

providers required to contribute to the Universal Service support mechanisms, the

Form 499-Q must be submitted by the due date for each quarter listed above.[19]

---

### *FOURTH QUARTER 2025 PROJECTED COLLECTED REVENUE BASE TO BE USED FOR FOURTH QUARTER 2025 CONTRIBUTIONS*

---

The total projected collected interstate and international end-user revenue base to

determine the contribution factor for the Universal Service support mechanisms for

4Q2025 is $7,870,472,879.  This amount was derived using the projected collected

revenue reported on the FCC Form 499-Q submissions.  USAC has included complete

revenue data from 3,164 contributors who filed the required Form 499-Q and estimated

revenue for the 188 non-*de minimis* service providers that had previously submitted

---

[16]  *See* 47 C.F.R. § 54.709(a).
[17] *Id.*  USAC files projected program demand data at least 60 days prior to the start of a quarter and total contribution base revenue data at least 30 days prior to the start of a quarter.
[18] *See* 47 C.F.R. § 54.708.
[19] 47 C.F.R. §§ 54.711, 54.713.

information to USAC. For the FCC's review of the 4Q2025 funding base for the support mechanisms, USAC includes estimated revenues based on prior submissions for those carriers that failed to submit a Form 499-Q.[20]

Appendix M05 lists non-*de minimis* companies that have or should have filed the August 1, 2025 Form 499-Q data as of August 20, 2025.

Respectfully submitted,

UNIVERSAL SERVICE
ADMINISTRATIVE COMPANY

Michelle Garber,
Interim CEO

# TAB 4

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | § |
| | § |
| Proposed Fourth Quarter 2025 | §    CC Docket No. 96-45 |
| Universal Service Contribution Factor | § |

---

**COMMENTS AND OBJECTIONS OF CONSUMERS' RESEARCH, CAUSE BASED COMMERCE, INC., EDWARD J. BLUM, KERSTEN CONWAY, SUZANNE BETTAC, ROBERT KULL, KWANG JA KIRBY, TOM KIRBY, JOSEPH BAYLY, JEREMY ROTH, DEANNA ROTH, LYNN GIBBS, PAUL GIBBS, RHONDA THOMAS, JAMES ROMEO, CODY CARNETT, PHILLIP ARONOFF, AND JACQUELINE KLEIN**

---

Commenters Consumers' Research, Cause Based Commerce, Inc., Edward J. Blum, Kersten Conway, Suzanne Bettac, Robert Kull, Kwang Ja Kirby, Tom Kirby, Joseph Bayly, Jeremy Roth, Deanna Roth, Lynn Gibbs, Paul Gibbs, Rhonda Thomas, James Romeo, Cody Carnett, Phillip Aronoff, and Jacqueline Klein (together, "Commenters") respectfully submit these comments and objections in response to the Universal Service Administrative Company ("USAC")'s *Federal Universal Service Support Mechanisms Fund Size Projections for Fourth Quarter 2025*,[1] which the Office of Managing Director ("OMD") will use to prepare a *Public Notice of Proposed Fourth Quarter 2025 Universal Service Contribution Factor*. 47 C.F.R. § 54.709(a). OMD should set the *Proposed Fourth Quarter 2025 Contribution Factor* at 0.000 or reduce the Factor by the amount accounted for by any unlawful portions.

---

[1] *Available at* https://www.usac.org/fcc-filings/2025/fourth-quarter/financials/USAC%204Q2025%20Federal%20Universal%20Service%20Mechanism%20Quarterly%20Demand%20Filing.pdf.

<u>JA332</u>

# I. INTRODUCTION

Commenters previously submitted comments and commenced litigation arguing that various aspects of the Universal Service Fund ("USF") are unlawful. The Supreme Court recently rejected some of those arguments but expressly left others open, did not address others at all, and announced a new interpretation of the relevant statute—47 U.S.C. § 254—that is contrary to thirty years of FCC rules, litigation positions, and practice. *See FCC v. Consumers' Rsch.*, 145 S. Ct. 2482 (2025).

Several important arguments remain for why the USF, either in whole or in part, is unlawful, including in its application by the Commission.

(1)    The Supreme Court majority expressly declined to rule whether 47 U.S.C. §§ 254(c)(3) and (h)(2) are unconstitutional under the nondelegation doctrine. *See* 145 S. Ct. at 2505 n.9. The dissenting Justices explained that those provisions are unconstitutional because they do not impose even qualitative restrictions on the Commission's ability to raise money for covered programs. *Id.* at 2531 (Gorsuch, J., dissenting). Because those provisions are unconstitutional, the Commission should reduce the Contribution Factor by the amount accounted for those unlawful provisions and the programs derived from them.

(2)    The Supreme Court majority held that the criteria in §§ 254(b)(1)–(6) and (c)(1) are *each* mandatory. 145 S. Ct. at 2506. But the Commission has denied that interpretation for thirty years. The Commission must (1) expressly acknowledge and respond to this drastic change in statutory meaning, and (2) substantively comply

with the statute as interpreted by the Supreme Court. The Commission cannot simply go about its business as if nothing ever changed.

(3)    The Supreme Court held that the involvement of USAC in determining the Contribution Factor did not violate Article I private nondelegation principles, but the Court did not address the separate argument, raised by Judge Newsom in the Eleventh Circuit, that USAC's involvement in collecting and spending money on the back end amounts to an unconstitutional delegation of Article II executive powers. It does, and that warrants setting the Contribution Factor at 0.000.

(4)    The Commission lacks statutory authority to appoint USAC as the permanent administrator of the USF, which means USAC cannot collect or spend USF moneys for the challenged quarter.

(5)    USAC violates the Government Corporation Control Act, which bars agencies from creating new corporate agents without express authorization from Congress.

(6)    USAC's and private carriers' self-interest violates due process.

## II. COMMENTERS

Commenter Consumers' Research is an independent educational 501(c)(3) nonprofit organization whose mission is to increase the knowledge and understanding of issues, policies, products, and services of concern to consumers and to promote the freedom to act on that knowledge and understanding. Consumers' Research believes that the cost, quality, availability, and variety of goods and services used or desired by American consumers—from both the private and public sectors—

are improved by greater consumer knowledge and freedom. Consumers' Research has Verizon phone service in its own name, paid with its own funds. The monthly bill contains the Universal Service Charge as a separate line item entitled "Federal Universal Service Fee."

Commenter Cause Based Commerce, Inc., is a reseller of telecommunications services. Caused Based Commerce sends 5% of customers' monthly plan price to a cause/charity of the customer's choosing. As a reseller of telecommunications services, Cause Based Commerce collects from consumers money associated with the Universal Service Fund, and pays into the Universal Service Fund.

Commenter Edward J. Blum lives in Florida, has Verizon phone service in his own name, pays the monthly bill himself, and his charge contains the Universal Service Charge tax as a separate line item.

Commenter Kersten Conway is an art teacher who resides in League City, Texas. She has Verizon phone service in her own name and pays the monthly bill herself. Her monthly bill contains the Universal Service Charge tax as a separate line-item titled "Fed Universal Service Charge." Ms. Conway has been a teacher for 35 years across Texas, rural South Dakota, and Minnesota. Many of her former students are from the Lakota Sioux Nation and still keep in contact with her. She has been divorced for almost 20 years and is currently co-raising three young grandchildren. Every penny counts, and retirement is not an option for her at this time.

Commenter Suzanne Bettac lives in San Antonio, Texas, and has Sprint/T-Mobile phone service in her own name and pays the monthly bill herself. Her monthly bill contains the Universal Service Charge tax as a separate line-item titled "Federal Univ. Service Assess Non-LD."

Commenter Robert Kull lives in San Antonio, Texas, and has Verizon phone service in his own name and pays the monthly bill himself. His monthly bill contains the Universal Service Charge tax as a separate line-item titled "Fed Universal Service Charge."

Commenters Kwang Ja Kirby and Tom Kirby live in San Antonio, Texas, and have AT&T phone service in Kwang Ja's name and pay the monthly bill using their joint credit card. Their monthly bill contains the Universal Service Charge tax as a separate line-item titled "Federal Universal Service Charge."

Commenter Joseph Bayly is a pastor and editor who resides in Maineville, Ohio, with his wife and six children. He has spent more than a decade in ministry in the Midwest, and currently serves as the founding pastor of Christ Church in Cincinnati. Mr. Bayly provides the sole income for his family. He has AT&T phone service in his own name and pays the bill himself. His monthly bill contains the Universal Service Charge as a separate line item entitled "Federal Universal Service Charge."

Commenters Jeremy and Deanna Roth are a married couple who reside in Akron, Ohio. Mr. Roth is a civil designer who provides the sole income for his family. Mrs. Roth is a homemaker and mother of their two young children. Like many

families, they have numerous financial demands, and every penny counts. The Roths have T-Mobile phone service in Jeremy's name. They pay the bill from their mutual checking account. The monthly bill contains the Universal Service Charge as a separate line-item entitled "Federal Universal Service Fund."

Commenters Lynn and Paul Gibbs are a retired couple that reside in the city of Oregon, Ohio. They are in their late sixties and have had their cell phone service for years, most recently over two years with AT&T. They use Auto-pay tied to their checking account to pay their monthly bill, which contains the Universal Service Charge as a separate line item entitled "Federal Universal Service Charge."

Commenter Rhonda Thomas resides in Milton, Georgia. She has Cricket phone service in her own name, and her monthly bill includes the Federal Universal Service "fee."

Commenter James Romeo resides in Texas. He has AT&T phone services in his own name, and his monthly bill includes a line item for "Federal Universal Service Charge."

Commenter Cody Carnett resides in Texas. He has phone services in his own name, and his monthly bill includes the Federal Universal Service "fee."

Commenter Phillip Aronoff resides in Texas. He has phone services in his own name, and his monthly bill includes the Federal Universal Service "fee."

Commenter Jacqueline Klein resides in Texas. She has phone services in her own name, and her monthly bill includes the Federal Universal Service "fee."

## III. ARGUMENTS

The majority and dissenting opinions at the Supreme Court—which are attached as Exhibit A and incorporated herein—provide a lengthy history of the USF program and Commenters' challenges to it. Commenters pick up where those opinions left off.

**A.    Sections 254(c)(3) and (h)(2) Violate the Nondelegation Doctrine.**

The government acknowledged at the Supreme Court that USF contributions are taxes and that only Congress may impose taxes. *See* 145 S. Ct. at 2525 (Gorsuch, J., dissenting) (citing Tr. of Oral Arg. 53). The majority never disagreed, *see id.* at 2535 n.17 ("The Court never denies that universal-service 'contributions' are taxes ...."), and longstanding precedent supports that proposition because "some of the administrative costs at issue 'inure[] to the benefit of the public,'" *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 223 (1989); *see* Expert Report of Dr. George Ford (attached as Exhibit B). Because taxing is a legislative function (and USF charges would be legislative even if they were not taxes—a point never disputed by the Commission in years of litigation), the intelligible-principle doctrine applies to the USF statutory provisions related to raising revenue for the USF Contribution Factor. *NCTA v. United States*, 415 U.S. 336, 340 (1974) ("Taxation is a legislative function, and Congress ... is the sole organ for levying taxes.").

The Supreme Court's majority opinion rejected the argument that the Universal Service Fund's "contribution scheme generally is unconstitutional" under the intelligible-principle test, but the majority acknowledged it had "no occasion to address any nondelegation issues raised by Sections 254(c)(3) and (h)(2) in particular"

because doing so was unnecessary to reverse the Fifth Circuit's rationale, 145 S. Ct. at 2505 n.9, and the government's merits briefing at the Supreme Court never cited those particular subsections, let alone as a basis for overturning the Fifth Circuit's decision.

Sections 254(c)(3) and (h)(2) "authorize the FCC to fund 'advanced' and 'additional' services," *id.*, which "go 'above the baseline of what's been considered universal service'" and "without regard to whether they satisfy the four factors outlined in § 254(c)(1)," which the majority had construed to impose meaningful "qualitative" limitations on the Commission's otherwise-broad power to raise revenue, *id.* at 2522 (Gorsuch, J., dissenting).

The dissent correctly explained that "the Court is unwilling to say that [§§ 254(c)(3) and (h)(2)] impose a 'qualitative' cap—and understandably so," because "[w]hen it comes to deciding what programs to fund under § 254(c)(3) and § 254(h)(2), the FCC is unconstrained by any of the subsection (c)(1) factors the Court rewrites and leans on so heavily today." *Id.* at 2531.

In other words, the majority had saved most of §§ 254 by "rewrit[ing]" it to impose meaningful, substantive requirements, but the majority could not do so for §§ 254(c)(3) and (h)(2)—and thus left those matters for subsequent proceedings. *Id.* "[T]hat in itself is a notable development: Today marks the first time in a long time that the Court has confronted a statutory delegation and found no way to save it." *Id.*

Commenters agree with and adopt in full that argument. Sections 254(c)(3) and 254(h)(2) violate the intelligible-principle test. Section 254(c)(3) expressly states

that the Commission can designate "additional services" for USF funding "[i]n addition to the services included in the definition of universal service." 47 U.S.C. § 254(c)(3). In other words, the Commission is fully freed from the limits imposed by the scope of "universal service" in § 254(c)(1). The Commission need not even limit itself to telecommunications services. As it argued to the Fifth Circuit, "there is no language restricting these 'additional' services to telecommunications services." *TOPUC v. FCC*, 183 F.3d 393, 441 (5th Cir. 1999) ("*TOPUC I*").

To be sure, the Commission is required to raise only "sufficient" funds to pay for its USF programs—but, as the Supreme Court noted, simply saying the Commission can raise "sufficient" funds means nothing if the object of that funding is not also meaningfully delimited. *See* 145 S. Ct. at 2502 (saying the Commission can raise "sufficient" funds "takes us only halfway, because it raises the question: Sufficient for what?"). The Court found such limits for other aspects of § 254, but not for §§ 254(c)(3) or (h)(2). Fundraising for programs authorized pursuant to those sections accordingly is not limited by any historical understanding of "universal service" nor textual limits in its definition in § 254(c)(1). As the Fifth Circuit held years ago, § 254(c)(3) allows the Commission "to authorize a broad class of services," including "'designating' all commercially available telecommunications service." *TOPUC I*, 183 F.3d at 445.

The Commission itself has described the authority granted by Congress under these provisions as "broad." *Universal Service*, 62 Fed. Reg. 32862, 32898 (June 17, 1997). As Justice Gorsuch explained: "experience illustrates just how uncapped the

FCC's § 254(c)(3) and § 254(h)(2) programs really are. For some years, the FCC has relied on those provisions to fund internet access at schools and libraries. 89 Fed. Reg. 67304–05 (2024). But, in 2024, the FCC announced that it would also begin funding 'Wi-Fi hotspots and services to be used off-premises by students, school staff, and library patrons.' *Id.* at 67304, 67318. As far as the FCC sees it, subsections (c)(3) and (h)(2) might allow it to collect enough taxes to supply take-home hotspots to anyone with a library card. *See* Tr. of Oral Arg. 43–44. Or maybe even take-home Starlink devices for library patrons nationwide, to help shrink the 'digital divide between [Americans] with access to broadband at home and those without.' *In re Addressing the Homework Gap Through the E-Rate Program*, FCC No. 24-76 (2024)." 145 S. Ct. at 2491 (Gorsuch, J., dissenting).

Further, § 254(h)(2) is the primary basis for the Commission's extensive rural healthcare programs. One example relying on the vast § 254(h)(2) authority includes the funding of entire broadband facilities for healthcare providers, either common or private carrier. *See Rural Health Care Support Mechanism*, 78 Fed. Reg. 13936, 13943 ¶ 55 (Mar. 1, 2013); *id.* at 13946 ¶ 78 ("Pursuant to [§ 254(h)(2)(A)], we will provide support for services … [to include] reasonable and customary one-time installation charges for such services, and network equipment necessary to make the broadband service functional.").

The Commission itself has acknowledged that §§ 254(c)(3) and (h)(2) authorize programs that § 254 otherwise does not permit. For example, pursuant to § 254(h)(2)(A), the Commission permitted funding initial studies for Rural

JA341

Healthcare pilot programs while recognizing that such funding "goes beyond" what is normally eligible for services under § 254, but under § 254(h)(2)(A) the studies support the "public interest" and are "economically reasonable." Order, *In re Rural Healthcare Support Mechanism*, FCC 06-144, at 6 ¶ 15 (rel. Sept. 29, 2006), https://www.fcc.gov/ecfs/document/5513674933/1. The Commission has found similar exceptions for the E-Rate program. For example, the Commission found that state telecommunications networks, when providing telecommunications services, are not eligible for reimbursement for under § 254(h)(1), as these statewide entities did not meet the definition of a "telecommunications carrier," but the Commission concluded that when these carriers provide services to eligible schools and libraries, § 254(h)(2) permits them to receive direct reimbursement from support mechanisms. Mem. Op. & Order, *In re Federal-State Joint Board on Universal Service*, FCC 99-268, at 4–5 ¶ 5–6 (rel. Oct. 8, 1999), https://www.fcc.gov/ecfs/document/5004809338/1.

To be sure, § 254(h)(2) uses language saying "to the extent technically feasible and economically reasonable." 47 U.S.C. § 254(h)(2)(A). The first clause certainly imposes no real limit: the Commission can proceed all the way to the point of literally being impossible to carry out. *See Feasible*, Merriam-Webster, https://www.merriam-webster.com/dictionary/feasible ("capable of being done or carried out"). The second clause imposes no limit, either. As Justice Gorsuch explained, phrases like "reasonable" or "just and reasonable" might have a sufficient meaning when it comes "to setting rates for regulated monopolies like public utilities—a context where it incorporates 'concepts with a long history at common law.'" 145 S. Ct. at 2535–36

(Gorsuch, J., dissenting). "But outside that sphere, the same phrase may amount to little more than an instruction to go forth and do good." *Id.* at 2536. That latter case is certainly true here, where Congress expressly unmoored the Commission from all historical and textual limits applicable to *other* USF services.

\* \* \*

Because §§ 254(c)(3) and (h)(2) are unconstitutional, the Commission should reduce the Contribution Factor by the amount represented by programs and revenue-raising purportedly authorized by those provisions.

**B.    The Commission Must Address and Comply With the Supreme Court's Changed Interpretation of Sections 254(b) and (c).**

The Supreme Court's majority opinion salvaged § 254 from Commenters' nondelegation challenge by interpreting it drastically differently than any prior court or the Commission itself ever had. The Supreme Court held that "each of the criteria" in §§ 254(b) and (c) is "separately mandatory" and "has to be met." 145 S. Ct. at 2505–06.

In other words:

- "Quality services [*must*] be available at just, reasonable, and affordable rates";

- "Access to advanced telecommunications and information services [*must*] be provided in all regions of the Nation";

- "Consumers in all regions of the Nation … [*must*] have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are

available at rates that are reasonably comparable to rates charged for similar services in urban areas";

- Universal service *is* that level of service that is "essential to education, public health, or public safety";

- Universal service *is* those services that "have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers"; and

- Universal service *is* those services that "are being deployed in public telecommunications networks by telecommunications carriers."

47 U.S.C. §§ 254(b)(1)–(6), (c)(1).

That drastically novel interpretation presents two problems for the Commission: one procedural and one substantive.

*First*, the Commission has long contended and operated under its view that each § 254(b) criteria is "only a principle, not a statutory command," which the agency may "ignore" in service of other principles found in the statute. *Rural Digital Opportunity Fund Phase I Auction*, 35 FCC Rcd. 6077, 6119 n.262 (2020). The Commission has said the same to Courts for decades, insisting "the seven principles identified in section 254(b) were not statutory requirements." Br. for FCC at 12, *U.S. W. Commc'ns, Inc. v. FCC*, Nos. 99-9546 et al. (10th Cir. May 26, 2000); Br. for FCC at *26–27, *TOPUC v. FCC* ("*TOPUC II*"), 2000 WL 34430695 (Nov. 30, 2000) (same). In proceedings involving Commenters, the Commission told the *en banc* Fifth Circuit that the Commission are not "mandatory," and the Commission only must "take the

principles into account." FCC *En Banc* Br. at 28, *Consumers' Rsch. v. FCC*, No. 22-60008 (5th Cir. Aug. 30, 2023). The Commission told the Supreme Court the same thing, at least at the certiorari stage, insisting that the agency could "balance the [§ 254(b)] principles against one another when they conflict," meaning it could ignore any particular factor(s) so long as it did "not depart from them altogether." Cert. Pet. at 13, *FCC v. Consumers' Rsch.*, No. 24-354 (U.S. Sept. 30, 2024). The lower courts have long concurred, holding the § 254(b) principles were "aspirational only" and thus not mandatory. *TOPUC II*, 265 F.3d at 321.

The Commission has long said the same for the § 254(c)(1) criteria, too: "[A]ll four criteria enumerated in section 254(c)(1) must be considered, but not each necessarily met." *In re Federal-State Joint Board on Universal Service*, 12 FCC Rcd. 8776, 8809 (1997). And, again, the Commission told the Supreme Court the same thing, at least at the certiorari stage, insisting that § 254(c) requires the Commission only "to *consider* certain factors." Cert. Pet. at 3, *Consumers' Rsch.*, No. 24-354, *supra*; *id.* at 13 (same); *id.* at 15 (same).

But the Supreme Court adopted a construction of §§ 254(b) and (c) that is dramatically different from how the Commission has long construed and implemented those provisions. When it comes to the binding nature of each of those elements, "the FCC has long and consistently understood the statute to mean the opposite" of what the Supreme Court just held. 145 S. Ct. at 2529 (Gorsuch, J., dissenting). The majority even held that while prior Commission interpretations were entitled to deference, that is no more, as the Court "exercis[ing] our independent

judgment" concluded the relevant factors are now mandatory. *Id.* at 2491 (majority op.) (cleaned up).

This seismic shift "calls existing programs into question and promises profound implications for future ones as well." *Id.* at 2530 (Gorsuch, J., dissenting). The Commission therefore must expressly acknowledge this shift in the law and explain how it has changed its operation of the USF in response. *See Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (an agency must "acknowledge and account for a changed regulatory posture"). If the Commission simply continues about its business and pretends the Supreme Court's changed interpretation never happened, that is necessarily arbitrary and capricious. *See id.*

If the Commission does change its approach, that is not the end of the story. It still must "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

The Commission also "must consider and respond to significant comments received during the period for public comment," *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015), and Commenters' arguments here are as "significant" as it gets: the Supreme Court has rejected the Commission's longstanding interpretation of §§ 254(b) and (c), and this threatens to upend large swaths of the USF program. The Commission therefore must expressly acknowledge that its prior interpretation has been rejected, explain its framework going forward, and explain how the current Contribution Factor allegedly satisfies the Supreme Court's opinion.

Relatedly, the Commission cannot "ignore" that its "prior policy has engendered serious reliance interests that must be taken into account," given the longstanding nature of its now-erroneous interpretation, and the Commission must acknowledge those reliance interests and explain how they will be addressed. *Mortg. Bankers Ass'n*, 575 U.S. at 106; *see also DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020) (agency was "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns").

*Second*, the Commission must *actually and substantively* comply with the Supreme Court's interpretation of §§ 254(b) and (c). "Now, the FCC can fund a program only if it satisfies all subsection (b) principles and *all* subsection (c) factors," which admittedly "calls existing programs into question and promises profound implications for future ones as well." 145 S. Ct. at 2530 (Gorsuch, J., dissenting). The Supreme Court's reinterpretation of the statute "threaten[s] to render existing programs illegal—all while leaving the FCC (and program beneficiaries) guessing about the implications for future initiatives." *Id.*

We already know the Commission is not complying. "Take an example. Back in 2017, the FCC launched a multibillion-dollar effort to promote 'broadband service in unserved high-cost areas.' Among other things, the program subsidizes certain high-speed services that, the FCC has acknowledged, are not yet embraced by 'a substantial majority of residential customers.'" *Id.* (citations omitted).

JA347

There are undoubtedly other programs that do not comply. Given its prior insistence for decades that it need not *actually and substantively satisfy* every §§ 254(b) and (c) criteria, and its express acknowledgments that it in fact was *not* doing so for at least some programs, the Commission assuredly is not magically in compliance with a binding Court opinion that says every §§ 254(b) and (c) criteria indeed *is* mandatory.

## C. USAC's Involvement in Collecting and Spending Contributions Violates Article II, Including the Appointments Clause.

The Supreme Court's majority opinion rejected the argument that USAC's role in "setting the contribution factor" violates the private nondelegation doctrine. 145 S. Ct. at 2509. The Court did not address, however, whether USAC's role in collecting and spending that money on the backend violates Article II (including the Appointments Clause) by delegating executive power to a private entity. *See id.* at 2524 n.6 (Gorsuch, J., dissenting) (noting this issue was not addressed in the prior proceedings).

Without any express statutory authority to do so, the Commission "appointed" USAC as "the permanent Administrator of the federal universal service support mechanisms." 47 C.F.R. § 54.701(a). USAC takes legal title to the contributions it receives from carriers and deposits them into the Universal Service Fund, then disburses funds to subsidize the general welfare via provision of service to libraries, schools, rural areas, and high-cost areas. *In re Incomnet, Inc.*, 463 F.3d 1064, 1072 (9th Cir. 2006). USAC generally divides these funds among its High-Cost and Low-Income Program, the Schools and Libraries Program, and the Rural Health Care

Program. 47 C.F.R. §§ 54.101, 54.701(c); *see also id.* §§ 54.304, 54.308, 54.404, 54.501, 54.601.

USAC does not simply hold funds in the Universal Service Fund as the Commission's agent. *Incomnet*, 463 F.3d at 1074 (citing 47 C.F.R. § 54.715(c)). The Commission exercises power over the fund only indirectly, essentially by overseeing USAC. *Id.* The Commission has no ability to control the funds in the Universal Service Fund through direct seizure or discretionary spending. *Id.* USAC thus "decides if, when, and how it disburses funds on behalf of the [Fund's] beneficiaries." *Id.* at 1076 (citing 47 C.F.R. §§ 54.701(a), 54.704(a), 54.705, 54.715).

As explained in the attached concurring opinion by Judge Newsom (attached as Exhibit C), it is "clear" that USAC is "exercising *executive* power." *Consumers' Rsch. v. FCC*, 88 F.4th 917, 933–34 (11th Cir. 2023) (Newsom, J., concurring in judgment). "The FCC depends on [USAC], a private entity, to carry out Congress's instructions," and "that description perfectly describes the 'executive' function." *Id.* at 921 (majority op.); *id.* at 934 (Newsom, J., concurring in judgment). "The term 'execute' has long meant—and means today—'to carry out or into complete effect,'" or "'to put in act; to do what is planned or determined.'" *Id.* (Newsom, J., concurring in judgment) (cleaned up). "So yes, it seems obvious … that in collecting de facto taxes and distributing benefits USAC is exercising 'executive' power." *Id.*

Although the Executive Branch can delegate at least some executive powers *within* that Branch, it "can't" do the same simply by letting "private parties exercis[e] *executive* power." *Id.* at 935. That is so "for both formal, structural reasons—in

particular, Article II's explicit vesting of federal 'executive Power' in the President—and instrumental ones—specifically, the risks inherent in giving enforcement power to those not subject to political and legal constraints." *Id.* (cleaned up) "Delegation to a private entity breaks the ordinary chain of accountability that our 'carefully calibrated' system of government is designed to uphold." *Id.* at 938.

Further, "[l]iberty requires accountability." *DOT v. Ass'n of Am. R.R.s*, 575 U.S. 43, 57 (2015) (Alito, J., concurring). Every executive branch official is in some way accountable to the people because every executive branch official may be removed—for good cause at least—by the President, who is himself "the most democratic and politically accountable official in Government." *Seila L. LLC v. CFPB*, 591 U.S. 197, 224 (2020). Private persons, in contrast, may not be removed by the President because private persons do not wield any portion of "[t]he executive Power" our Constitution vests "in a President of the United States of America." U.S. Const. art. II, § 1, cl. 1. Accordingly, "[t]here is no reason to lightly infer that Congress intends to insulate law execution from democratic accountability in this way." *Consumers' Rsch. v. FCC*, 109 F.4th 743, 775 (5th Cir. 2024) (*en banc*) (attached as Exhibit D).

Thus, at the very least, USAC's role in collecting and spending contributions is unconstitutional because of USAC's insulation from presidential oversight. *See* 145 S. Ct. at 2517 (Kavanaugh, J., concurring) (noting particular concerns with delegations to those "who are not removable at will by the President and who thus operate largely independent of Presidential supervision and direction"). Under that framework, "the key isn't the degree of the FCC's control, but the *President's*. And in

that connection, the Supreme Court's decisions treat appointment and removal powers as the primary devices of executive control. The removal issues vis-à-vis USAC … are doubly fraught. First, the only word regarding USAC's removal comes from its own bylaws, which authorize the entity's board to remove one of its members by a majority vote and with the approval of the FCC's chairman. So far as the bylaws are concerned, then, USAC is essentially in charge of its own continuance in office. Second, and to compound matters, because the FCC is an independent agency, whose commissioners may be removed only for cause, USAC's board members enjoy something akin to the double-for-cause-removal protection that the Supreme Court has recently held to be unconstitutional." *Consumers' Rsch.*, 88 F.4th at 937–38 (Newsom, J., concurring in judgment) (citations omitted).

Accordingly, USAC's role violates Article II's prohibition on delegation of executive power outside the executive branch.

For similar reasons, USAC violates Article II's Appointments Clause, which requires that those who exercise executive power be, at the very least, appointed pursuant to law (i.e., a federal statute) and take an Article VI oath. But USAC board members and employees are not appointed pursuant to Article II (no statute authorizes USAC at all, let alone appointment of its employees) and do not take an oath to uphold the Constitution. Rather, USAC has a 20-member Board of Directors comprised of individuals from various "interest groups affected by and interested in universal service programs" and who were nominated "by their respective interest groups." *Leadership*, Universal Serv. Admin. Co., https://www.usac.org/about/

leadership/ (last visited Aug. 8, 2025); 47 C.F.R. § 54.703(b). After their nomination by these interest groups, USAC board members are approved by the chair of the Commission, but not by the entire Commission, in violation of Article II. 47 C.F.R. § 54.703(c)(3); *see Free Enter. Fund v. PCAOB*, 561 U.S. 477, 511–12 (2010) (the FCC as a whole is a "Head of Department" for Article II purposes). Board directors are not nominated by the President nor confirmed by the Senate. Further, the FCC Chair is required to appoint members nominated by particular groups of constituents under § 54.703(c)(3) unless "an industry or non-industry group does not reach consensus on a nominee or fails to submit a nomination." 47 C.F.R. § 54.703(c)(3).

Justice Gorsuch flagged this issue as one remaining for later resolution: "one might ask whether the Administrative Company's leaders qualify as officers of the United States and, if so, whether their role complies with the Appointments Clause." 145 S. Ct. at 2524 n.6 (Gorsuch, J., dissenting). As explained above, it does not. Accordingly, USAC's role is unconstitutional, and the Commission can neither collect USF money nor spend it so long as USAC is involved.

**D.    The Commission Lacks Statutory Authority to Appoint USAC the Permanent Administrator of the USF.**

As noted above, the Commission "appointed" USAC as "the permanent Administrator of the federal universal service support mechanisms," 47 C.F.R. § 54.701(a), and USAC plays a critical role in collecting and spending USF money on the backend.

But USAC's role is not authorized by any statute, and "there is no precedent establishing that federal agencies may subdelegate powers in the absence of statutory

JA352

authorization." *Consumers' Rsch.*, 109 F.4th at 774. The government has previously argued that § 254(b)(5) authorizes USAC's role, but in reality that provision "seems to suggest precisely the opposite" because it "specifically instructs FCC to establish 'Federal and State mechanisms,' which indicates Congress intended to make government entities responsible for administering universal service programs." *Id.* at 776.

To be sure, Congress did expressly authorize the involvement of a different private entity in one small aspect of USF, but "Congress's explicit recognition of one relatively minor aspect of private companies' participation in the pre-1996 Lifeline Assistance regime thus evinces that Congress knew how to empower private companies and chose not to empower them to administer other aspects of the USF." *Id.* at 777.

In short, however one describes USAC's role in administering the USF, there is no express statutory authority for it. And there is no reason to believe the Commission possesses some inherent power to involve USAC, especially for the backend collection and spending activities unaddressed in the Supreme Court's opinion. As the Supreme Court announced long ago in a case against the FCC: "an agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

There is every reason to believe that Congress has *not* authorized USAC to carry out the USF as its permanent administrator. Accordingly, USAC's actions are

void and unlawful—and the Commission violates the Telecommunications Act and the APA by relying on USAC.

## E.    USAC Violates the Government Corporation Control Act.

The Government Corporation Control Act ("GCCA") provides that "[a]n agency may establish or acquire a corporation to act as an agency only by or under a law of the United States specifically authorizing the action." 31 U.S.C. § 9102. The statute "prohibit[s] [the] creation of new Government corporations without specific congressional authorization." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 390 (1995); *see Wisconsin Bell, Inc. v. United States ex rel. Heath*, 145 S. Ct. 498, 513 (2025) (Thomas, J., concurring).

The Commission previously "ask[ed] Congress for 'specific statutory authority to create or designate one or more entities, such as the Universal Service Administrative Company, to administer the federal universal service support mechanisms.'" 145 S. Ct. at 514 (Thomas, J., concurring) (cleaned up) (quoting *Report in Response to Senate Bill 1768 and Conference Report on H.R. 3579*, 13 FCC Rcd. 11810, 11819 (1998)). But "Congress refused the agency's request." *Id.*

"To this day, Congress has never passed a law approving the Administrative Company as a government corporation, nor has it authorized the FCC to formally label the Administrative Company a subagency." *Id.* But USAC acts as "an agent of the United States"—and thus its actions are unlawful and void under the GCCA. *Id.*

In fact, USAC has long been recognized as even more than an agent for the Commission: the Commission exercises power over the fund only indirectly, essentially by overseeing USAC. *Incomnet*, 463 F.3d at 1074 (citing 47 C.F.R.

§ 54.715(c)). The Commission has no ability to control the funds in the Universal Service Fund through direct seizure or discretionary spending. *Id.*

And nothing in the Supreme Court's recent decision changes that. If anything, it confirms it. USAC uses the Commission's "rules" to "estimate[] the programs' cost," "then publicly reports those projections, along with supporting documents." 145 S. Ct. at 2509. And when it comes to spending, USAC exerts "considerably greater effort" to determine "the programs' scope" and—perhaps most importantly—decides *which particular entities* receive all those billions of dollars, as explained above. *Id.* at 2508.

Thus, in all aspects but especially in calculating and spending USF money, USAC acts as the Commission's agent. But Congress never authorized USAC, and thus USAC's role violates the GCCA. Accordingly, USAC's actions are void and unlawful—and the Commission violates the GCCA and the APA by relying on USAC.

## F.　USAC's and Carriers' Self-Interest Violates Due Process.

Justice Gorsuch noted that USAC's "directors overwhelmingly represent entities with a financial stake in expanding universal service: those who benefit from universal-service programs (like schools and hospitals) and those who get paid to supply the benefits (the carriers)." 145 S. Ct. at 2524 n.6 (Gorsuch, J., dissenting). This "seemingly conflicted arrangement may offend the Fifth Amendment's Due Process Clause." *Id.*

Indeed it does. As the D.C. Circuit has explained, "it violates due process for Congress to give a self-interested entity rulemaking authority over its competitors." *Ass'n of Am. R.R.s v. DOT*, 821 F.3d 19, 27 (D.C. Cir. 2016). "[I]n the very nature of things, one person may not be intrusted with the power to regulate the business of

another, and especially of a competitor." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (invoking due process).

Like in *Carter Coal*, here the "power conferred upon the majority is, in effect, the power to regulate the affairs of an unwilling minority." *Id.* Unlike government officials, who are at least "presumptively disinterested," the decisionmakers here are entities "whose interests may be and often are adverse to the interests of others in the same business." *Id.*

The Supreme Court majority itself agreed "carriers submit their projections on FCC forms and the Administrator adds them up" to form the Contribution Factor. 145 S. Ct. at 2508. The carriers and USAC thus both have an incentive to make the Factor as large as possible so there's more money overall to put back in their pockets. When it comes to spending, USAC exerts "considerably greater effort" to determine "the programs' scope" and—perhaps most importantly—decides *which particular entities* receive all those billions of dollars, as explained above. *Id.* All this from a self-interested Board to self-interested carriers (by contrast, Commenter Cause Based Commerce does not receive USF money on the back end). This gross self-interest violates due process.

## G.    Additional APA and Federal Register Act Violations.

In a final insult to transparency and the democratic process, the Commission has never previously complied with the Administrative Procedure Act ("APA")'s requirements when issuing proposed quarterly rates for the Universal Service Fund. The APA establishes the procedures federal administrative agencies use for "rule making," defined as the process of "formulating, amending, or repealing a rule." 5

U.S.C. § 551(5). "Rule," in turn, is defined broadly to include "statement[s] of general or particular applicability and future effect" that are designed to "implement, interpret, or prescribe law or policy." *Id.* § 551(4). That definition expressly includes "the approval or prescription for the future of rates." *Id.* Any forthcoming *Proposed Fourth Quarter 2025 Universal Service Contribution Factor* would be a rule (at least upon its becoming effective after 14 days) because it has future effect and general applicability—indeed, by its very terms, it has nearly "universal" applicability and involves billions of dollars in forced contributions.

Accordingly, the Commission would be required to follow the three-step procedure for notice-and-comment rulemaking: (1) "the agency must issue a general notice of proposed rule making, ordinarily by publication in the Federal Register"; (2) if "notice is required, the agency must give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," and the "agency must consider and respond to significant comments received during the period for public comment"; (3) "when the agency promulgates the final rule, it must include in the rule's text a concise general statement of its basis and purpose." *Mortg. Bankers Ass'n*, 575 U.S. at 95–96 (cleaned up).

If past is prelude, the Commission will perform none of these steps for the *Proposed Fourth Quarter 2025 Universal Service Contribution Factor*, nor will the Commission find that any limited exception applies. *See* 5 U.S.C. § 553(b)(4)(A)–(B).

*First*, there presumably will be no Federal Register notice.

*Second*, the Commission presumably will not formally open the process to public comment. Commenters are filing this particular Comment with the Commission despite the lack of any dedicated docket or invitation to do so. And even after OMD acts, the window for comments is an illegally short 14 days, which will prejudice Commenters by forcing them to rush to finalize any Comment within that short period. And presumably the Commission will not respond to "significant comments" before the 14-day "deemed approved" period passes. *See* 47 C.F.R. § 54.709(a)(3)

*Third*, the Commission's decision to establish such a shortened review process does not excuse the Commission from issuing a reasoned decision for its action, although it presumably will not comply with this requirement, either, as the Commission has apparently never done so for prior quarterly reviews. Indeed, under *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), the Commission can defend its action in court only on those grounds provided by the Commission itself in its administrative decision—which presumably will not exist here despite this Comment's attempt to trigger the Commission into complying with the basic safeguards of the APA.

The Commission has no one to blame but itself for any difficulty in responding to comments in such a short period, given that it established this entire process, including the 14-day window and the "deemed approved" provision.

For all these reasons, the Commission has repeatedly violated the APA for past Contribution Factors and will do so again unless it complies with the requirements

outlined above for any *Proposed Fourth Quarter 2025 Universal Service Contribution Factor*.

Relatedly, if the Commission does not publish its proposal in the Federal Register, the Commission would also violate the Federal Register Act. *See* 44 U.S.C. § 1505. And the Commission presumably will violate the Federal Register Act again by failing to publish any Proposed Factor after the expiration of the 14-day "deemed approved" period (assuming the Commission did not issue its own order on the matter, which itself would then need to be published in the Federal Register). *Id.*

Dated: August 8, 2025

**Submitted via ECFS**

Respectfully submitted,

/s/ R. Trent McCotter

R. Trent McCotter
Jonathan Berry
Michael Buschbacher
Jared M. Kelson
BOYDEN GRAY PLLC
800 Connecticut Ave. NW
Suite 900
Washington, DC 20006
(202) 706-5488
tmccotter@boydengray.com

# TAB 5

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C.**

UNIVERSAL SERVICE ADMINISTRATIVE COMPANY

Federal Universal Service Support Mechanisms Fund Size
Projections for Fourth Quarter 2025

UNIVERSAL SERVICE
ADMINISTRATIVE COMPANY
700 12TH STREET N.W., SUITE 900
WASHINGTON, D.C. 20005
VOICE: 202.776.0200
FAX: 202.776.0080
www.usac.org

August 1, 2025

JA360

INTRODUCTION ................................................................................... 1

ADMINISTRATIVE EXPENSES AND INTEREST INCOME PROJECTION ..... 2

   ADMINISTRATIVE EXPENSES ........................................................... 2

   FUND ACTIVITY ............................................................................. 3

   EFFORTS TO PREVENT AND REDUCE IMPROPER PAYMENTS ...................... 3

FUNDING REQUIREMENTS .................................................................. 10

   HIGH COST SUPPORT MECHANISM ..................................................... 10

      Connect America Fund Phase II ................................................. 10

      Connect America Fund Phase II Auction .................................... 11

      Connect America Fund/Intercarrier Compensation Support ................... 12

      Rural Broadband Experiments .................................................. 12

      Mobility Fund Phase I ............................................................ 13

      Rate-of-Return Carriers ......................................................... 13

      High Cost Loop Support (including Safety Net Additive and Safety Valve Support) ....................................................................... 13

      Alaska Plan Support/Alaska Connect Fund ................................. 14

      Connect America Broadband Loop Support ................................. 14

      Alternative Connect America Model (A-CAM) .............................. 15

      A-CAM II ........................................................................... 15

      enhanced ACAM connect America cost model (E-ACAM) ...................... 16

      Price Cap Carriers ................................................................ 16

      Competitive Eligible Telecommunications Carriers ....................... 16

      Uniendo a Puerto Rico Fund/Connect USVI Fund ............................ 17

      Rural Digital Opportunity Fund ............................................... 17

      High Cost Support Mechanism Summary ..................................... 18

   LOW INCOME SUPPORT MECHANISM .................................................. 19

      Lifeline Support .................................................................... 19

      Link-up Support .................................................................... 19

      LOW INCOME SUPPORT MECHANISM SUMMARY ........................... 20

   RURAL HEALTH CARE SUPPORT MECHANISM ...................................... 20

      Funding Year 2009 ................................................................ 21

      Funding Year 2010 ................................................................ 21

      Funding Year 2011 ................................................................ 22

      Funding Year 2012 ................................................................ 22

      Funding Year 2013 ................................................................ 23

      Funding Year 2014 ................................................................ 23

      Funding Year 2015 ................................................................ 24

      Funding Year 2016 ................................................................ 24

      Funding Year 2017 ................................................................ 24

      Funding Year 2018 ................................................................ 25

      Funding Year 2019 ................................................................ 25

      Funding Year 2020 ................................................................ 26

      Funding Year 2021 ................................................................ 27

Funding Year 2022 ............................................................................ 27
Funding Year 2023 ............................................................................ 28
Funding Year 2024 ............................................................................ 28
Funding Year 2025 ............................................................................ 29
**RURAL HEALTH CARE SUPPORT MECHANISM SUMMARY**.......................... 29
**CONNECTED CARE PILOT PROGRAM**.................................................. 30
**CONNECTED CARE PILOT PROGRAM SUMMARY**.................................... 30
**SCHOOLS AND LIBRARIES SUPPORT MECHANISM**...................................... 30
Funding Year 1998 ............................................................................ 31
Funding Year 1999 ............................................................................ 31
Funding Year 2000 ............................................................................ 32
Funding Year 2001 ............................................................................ 32
Funding Year 2002 ............................................................................ 33
Funding Year 2003 ............................................................................ 33
Funding Year 2004 ............................................................................ 34
Funding Year 2005 ............................................................................ 34
Funding Year 2006 ............................................................................ 35
Funding Year 2007 ............................................................................ 35
Funding Year 2008 ............................................................................ 36
Funding Year 2009 ............................................................................ 36
Funding Year 2010 ............................................................................ 37
Funding Year 2011 ............................................................................ 37
Funding Year 2012 ............................................................................ 38
Funding Year 2013 ............................................................................ 38
Funding Year 2014 ............................................................................ 39
Funding Year 2015 ............................................................................ 40
Funding Year 2016 ............................................................................ 41
Funding Year 2017 ............................................................................ 41
Funding Year 2018 ............................................................................ 42
Funding Year 2019 ............................................................................ 42
Funding Year 2020 ............................................................................ 43
Funding Year 2021 ............................................................................ 44
Funding Year 2022 ............................................................................ 44
Funding Year 2023 ............................................................................ 45
Funding Year 2024 ............................................................................ 46
FCC Decisions and Unused Funds......................................................... 46
SCHOOLS AND LIBRARIES SUPPORT MECHANISM SUMMARY ....... 60
**AUTHORIZATION TO FILE WITH THE COMMISSION** ............................. 60

## HIGH COST

High Cost Support Projected by State by Study Area – 4Q2025...................HC01

High Cost Support Projected by State – 4Q2025...........................................HC02

Alaska Plan Support Projected by State by Study Area – 4Q2025 ...............HC03

High Cost Loop Support Projected by State by Study Area – 4Q2025.........HC04

Safety Valve Support Projected by State by Study Area – 4Q2025 ..............HC05

Frozen High-Cost Support Projected by State by Study Area – 4Q2025......HC06

Connect America Fund Broadband Loop Support Projected by State by
Study Area – 4Q2025...................................................................................HC07

Connect America Fund Broadband Loop Support Projected by
State – 4Q2025............................................................................................HC08

Connect America Fund Intercarrier Compensation Support Projected by
State by Study Area – 4Q2025 ....................................................................HC09

Mobility Fund Phase I by State by Study Area – 4Q2025.......................... HC10

Connect America Fund Phase II Frozen Support (ACS) Projected by State by
Study Area – 4Q2025 ..................................................................................HC11

Rural Broadband Experiments Support Projected by State by Study
Area – 4Q2025.............................................................................................HC12

Alternative Connect America Cost Model Support Projected by State by
Study Area – 4Q2025 ..................................................................................HC13

[RESERVED] ...............................................................................................HC14

Connect America Fund Broadband Loop Support by State by Study
Area – 2022 True – Up – 4Q2025...............................................................HC15

Connect America Fund Phase II Auction Support Projected by State by Study
Area – 4Q2025.............................................................................................HC16

Alternative Connect America Cost Model II Support Projected by State by Study
Area – 4Q2025.............................................................................................HC17

Uniendo Puerto Rico Fund Support Projected by State by Study
Area – 4Q2025.............................................................................................HC18

Connect USVI Fund Support Projected by State by Study Area – 4Q2025.. HC19

Rural Digital Opportunity Fund Projected by State by Study
Area – 4Q2025.............................................................................................HC20

Enhanced Alternative Connect America Cost Model Support Projected by State
by Study Area – 4Q2025..............................................................................HC21

**LOW INCOME**

Low Income Support Projected by State by Study Area – 4Q2025.................LI01

[RESERVED] ........................................................................................LI02

Eligible Telecommunications Carriers – 2Q2025.............................................LI03

Quarterly Low Income Disbursement Amounts by Company – 2Q2025 .......LI04

Annual Low Income Support Claimed by State and Company –
        January 2022 through June 2025 .......................................................LI05

Historical Data:  Support Claimed by ETCs Each Month –
        January 1998 through June 2025 .......................................................LI06

Low Income Support Claimed by State or Jurisdiction –
        January 2022 through June 2025........................................................LI07

Lifeline Subscribers by State or Jurisdiction –
        January 2025 through June 2025 .......................................................LI08

Link-Up Beneficiaries by State or Jurisdiction –
        January 2025 through June 2025 .......................................................LI09

[RESERVED] ........................................................................................LI10

**RURAL HEALTH CARE**

Funding Year 2009 Disbursements to Service Providers through – 2Q2025.. RH01

Funding Year 2010 Disbursements to Service Providers through – 2Q2025.. RH02

Funding Year 2011 Disbursements to Service Providers through – 2Q2025.. RH03

Funding Year 2012 Disbursements to Service Providers through – 2Q2025.. RH04

Funding Year 2013 Disbursements to Service Providers through – 2Q2025.. RH05

Funding Year 2014 Disbursements to Service Providers through – 2Q2025.. RH06

Funding Year 2015 Disbursements to Service Providers through – 2Q2025.. RH07

Funding Year 2016 Disbursements to Service Providers through – 2Q2025.. RH08

Funding Year 2017 Disbursements to Service Providers through – 2Q2025.. RH09

Funding Year 2018 Commitments – 2Q2025 ................................................ RH10

Funding Year 2018 Authorizations – 2Q2025 ............................................... RH11

Funding Year 2018 Disbursements to Service Providers through – 2Q2025.. RH12

Funding Year 2019 Disbursements to Service Providers through – 2Q2025.. RH13

Funding Year 2020 Commitments – 2Q2025 ................................................ RH14

Funding Year 2020 Authorizations – 2Q2025  .............................................. RH15

Funding Year 2020 Disbursements to Service Providers through – 2Q2025.. RH16

Funding Year 2021 Commitments – 2Q2025 ................................................ RH17

Funding Year 2021 Authorizations – 2Q2025 .............................................. RH18

Funding Year 2021 Disbursements to Service Providers through – 2Q2025.. RH19

Funding Year 2022 Commitments – 2Q2025 ................................................ .RH20
Funding Year 2022 Authorizations – 2Q2025 ............................................. RH21
Funding Year 2022 Disbursements to Service Providers through – 2Q2025.. RH22
Funding Year 2023 Commitments – 2Q2025 ............................................... RH23
Funding Year 2023 Authorizations – 2Q2025 ............................................. RH24
Funding Year 2023 Disbursements to Service Providers through – 2Q2025.. RH25
Funding Year 2024 Commitments – 2Q2025 ............................................... RH26
Funding Year 2024 Authorizations – 2Q2025 ............................................. RH27
Funding Year 2024 Disbursements to Service Providers through – 2Q2025.. RH28

## SCHOOLS AND LIBRARIES

Funding Year 2003 Commitments – 2Q2025 .................................................SL01
Funding Year 2004 Commitments – 2Q2025 .................................................SL02
Funding Year 2006 Commitments – 2Q2025 .................................................SL03
Funding Year 2007 Commitments – 2Q2025 .................................................SL04
Funding Year 2008 Commitments – 2Q2025 .................................................SL05
Funding Year 2010 Commitments – 2Q2025 .................................................SL06
Funding Year 2011 Commitments – 2Q2025 .................................................SL07
Funding Year 2012 Commitments – 2Q2025 .................................................SL08
Funding Year 2013 Commitments – 2Q2025 .................................................SL09
Funding Year 2014 Commitments – 2Q2025 .................................................SL10
Funding Year 2015 Commitments – 2Q2025 .................................................SL11
Funding Year 2016 Commitments – 2Q2025 .................................................SL12
Funding Year 2016 Authorizations – 2Q2025.................................................SL13
Funding Year 2016 Disbursements to Service Providers through – 2Q2025 .SL14
Funding Year 2017 Commitments – 2Q2025 .................................................SL15
Funding Year 2018 Commitments – 2Q2025 .................................................SL16
Funding Year 2018 Authorizations – 2Q2025.................................................SL17
Funding Year 2018 Disbursements to Service Providers through – 2Q2025 .SL18
Funding Year 2019 Commitments – 2Q2025 .................................................SL19
Funding Year 2019 Authorizations – 2Q2025.................................................SL20
Funding Year 2019 Disbursements to Service Providers through – 2Q2025 .SL21
Funding Year 2020 Commitments – 2Q2025 .................................................SL22
Funding Year 2020 Authorizations – 2Q2025.................................................SL23
Funding Year 2020 Disbursements to Service Providers through – 2Q2025 .SL24
Funding Year 2021 Commitments – 2Q2025 .................................................SL25
Funding Year 2021 Authorizations – 2Q2025.................................................SL26
Funding Year 2021 Disbursements to Service Providers through – 2Q2025 .SL27

Funding Year 2022 Commitments – 2Q2025 .................................................SL28
Funding Year 2022 Authorizations – 2Q2025...............................................SL29
Funding Year 2022 Disbursements to Service Providers through – 2Q2025 .SL30
Funding Year 2023 Commitments – 2Q2025 .................................................SL31
Funding Year 2023 Authorizations – 2Q2025...............................................SL32
Funding Year 2023 Disbursements to Service Providers through – 2Q2025 .SL33
Funding Year 2024 Commitments – 2Q2025 .................................................SL34
Funding Year 2024 Authorizations – 2Q2025...............................................SL35
Funding Year 2024 Disbursements to Service Providers through – 2Q2025 .SL36

## OTHER APPENDICES

Universal Service Administrative Company 4Q2025 Budget...........................M01
Fund Size Projection for 4Q2025 ...................................................................M02
Schedule of USF Receipts, Interest Income, and Cash Outlays:
    January 1 through June 30, 2025 – Cash Basis............................................ M03
    January 1 through June 30, 2025 – Accrual Basis....................................... M04

**BEFORE THE FEDERAL, COMMUNICATIONS COMMISSION
WASHINGTON, D.C.**

**FEDERAL UNIVERSAL SERVICE SUPPORT MECHANISMS FUND
SIZE PROJECTIONS FOR FOURTH QUARTER 2025**

## *INTRODUCTION*

The Universal Service Administrative Company (USAC) hereby submits the federal Universal Service Support Mechanisms fund size and administrative cost projections for the fourth quarter of calendar year 2025 (4Q2025), in accordance with Section 54.709 of the Federal Communications Commission's (FCC or Commission) rules.[1]

USAC is the not-for-profit corporation responsible for administering the federal Universal Service Fund (USF) and the following Universal Service Support Mechanisms (also referred to as "Support Mechanisms" or "Programs"):  High Cost, Low Income, Rural Health Care, Schools and Libraries, and Connected Care Pilot.[2]  USAC also performs the billing, collection, and disbursement functions for the Support Mechanisms.[3]

Upon approval of the quarterly funding requirements for the Support Mechanisms, the projected administrative expenses, and the submission of the contribution base amount, the Commission will establish a quarterly contribution factor.  USAC will bill USF contributors monthly for their individual obligations based on the approved contribution factor, collect amounts owed from contributors, and distribute funds to eligible recipients based on the schedules filed herein.[4]

---

[1] 47 C.F.R. § 54.709(a)(3).
[2] 47 C.F.R. § 54.701.
[3] 47 C.F.R. § 54.702(b)
[4] *See* 47 C.F.R. §§ 54.709(a)(3), 54.201, 54.203, 54.301-54.307, 54.407, 54.413, 54.515.

---

*ADMINISTRATIVE EXPENSES AND INTEREST INCOME PROJECTION*

---

**ADMINISTRATIVE EXPENSES**

Section 54.709(a)(3) of the Commission's rules requires USAC to submit its projected quarterly budget at least 60 days prior to the start of the quarter.[5] USAC includes any costs that can be directly attributed to the High Cost, Low Income, Rural Health Care, and Schools and Libraries Support Mechanisms, as well as the Connected Care Pilot Program, in the projected administrative expenditures of each mechanism. USAC's remaining joint and common costs, including costs associated with the billing, collection, and disbursement of funds, are included in the projected administrative expenditures of the respective support mechanisms based on USAC's methodology for allocating costs submitted to the Commission.[6]

USAC projects a consolidated budget of $75.59 million for 4Q2025. Direct costs for all support mechanisms total $32.76 million and are listed for each mechanism in the chart provided below. Joint and common costs (including billing, collection, and disbursement activities) total $42.83 million and are listed in the chart below based on the allocation methodology on file with the Commission.

---

[5] 47 C.F.R. § 54.709(a)(3).

[6] On January 1, 2006, USAC implemented a revised methodology for allocating joint and common costs that was filed with the Commission on October 3, 2005. *See* Letter from D. Scott Barash, USAC, to Marlene Dortch, FCC, CC Docket Nos. 97-21 *et al.* (Oct. 3, 2005) (explaining revisions to USAC's method for allocating joint and common administrative costs among the four Universal Service Support Mechanisms). On January 1, 2021, USAC applied this methodology to the Connected Care Pilot Program. *See* Letter from Charles Salvator, USAC, to Marlene Dortch, FCC, CC Docket Nos. 97-21 *et al.* (Dec. 21, 2020) (confirming the method for allocating USAC common costs among the four universal service support mechanisms and the Connected Care Pilot Program).

*4Q2025 Administrative Expenses (in millions) – Budgeted*

| USF Mechanism | Direct Costs | USAC Common Costs | Total |
|---|---|---|---|
| High Cost | $5.64 | $14.39 | $20.03 |
| Low Income | $12.91 | $10.72 | $23.63 |
| Rural Health Care | $4.68 | $4.65 | $9.33 |
| Schools & Libraries | $9.53 | $13.07 | $22.60 |
| Connected Care Pilot | $0.00 | $0.00 | $0.00 |
| Total | $32.76 | $42.83 | $75.59 |

Appendix M01 provides USAC's administrative expenditures budget for 4Q2025.

## FUND ACTIVITY

Appendix M02 provides the fund size projections for 4Q2025. Appendices M03 and M04 provide 2025 year-to-date statements of fund activity on a cash and accrual basis, respectively.

## EFFORTS TO PREVENT AND REDUCE IMPROPER PAYMENTS

USAC has established a foundation of processes, systems, procedures, and outreach activities to prevent or reduce "improper" payments as defined by the Improper Payments Information Act of 2002 (Pub. L. No. 107-300).[7] USAC initiated efforts, consistent with its February 28, 2008 letter to the Commission, to identify additional measures to prevent or reduce potential improper payments and to allocate the additional resources needed to implement such measures.[8] Commission staff directed USAC to report its progress in implementing proposed actions to prevent or reduce improper payments and to project the anticipated administrative costs of such actions on a quarterly basis.[9]

---

[7] *See* Improper Payments Information Act of 2002, Pub. L. No. 107-300, 116 Stat 2350 (2002).
[8] *See* Letter from D. Scott Barash, Acting Chief Executive Officer, USAC, to Anthony Dale, FCC Managing Director (Feb. 28, 2008) (concerning suggested additional steps to reduce or prevent improper payments).
[9] *See* Letter from Anthony Dale, FCC Managing Director, to D. Scott Barash, Acting Chief Executive Officer, USAC (Aug. 18, 2008).

JA369

The steps initiated by USAC include additional oversight and managerial controls, strengthened audit and investigative techniques, improved information technology tools, and more effective use of outreach resources.  In 4Q2025, USAC will continue efforts identified and initiated during the previous years.  These efforts include, but are not limited to the following:

1.  *Assessing and strengthening USAC's internal controls*

USAC's Finance Division Internal Controls Team is responsible for testing key controls of USAC's processes.  USAC's Audit and Assurance Division (AAD) has a Strategic Audit function that is responsible for assessing business operations.  USAC's Shared Services Division Enterprise Process Improvement team (EPI) tracks the completion of the remediation activities and corrective action plans for all control deficiencies developed in response to internal and external testing results.  EPI established a framework for an Enterprise Risk Management (ERM) program at USAC.  The Finance, EPI, and AAD groups meet with USAC Leadership quarterly through the Risk Management Council to report on risk-related functions in the enterprise.

2.  *Strengthening audit and investigative techniques*

The FCC's Office of Managing Director (OMD) directed USAC to implement an assessment program to determine the rate of improper payments made to universal service support mechanism beneficiaries to support the FCC's improper payment reporting requirements and to assess universal service support mechanism beneficiary compliance with FCC regulations.[10]  USAC successfully implemented an assessment program, known as the

---

[10] Letter from Steven Van Roekel, FCC Managing Director, to Scott Barash, USAC Acting Chief Executive Officer (Feb. 12, 2010) (discussing the implementation of the Improper Payments Information Act of 2002 (IPIA) assessment program and companion audit program).  Although not subject to improper payment reporting, USF contributor compliance with FCC regulations is assessed as part of the Beneficiary and Contributor Audit Program (BCAP).

Payment Quality Assurance (PQA) Program, in August 2010.

The FCC also directed USAC to establish a comprehensive Beneficiary and USF contributor audit program, known as BCAP ("Beneficiary and Contributor Audit Program"). The BCAP plans are designed to:

- Assess beneficiaries' and contributors' compliance with FCC Rules;

- Identify correct contribution obligations (for contributor audits);

- Identify overpayments that must be recaptured (for beneficiary audits);

- Deter waste, fraud, and abuse; and

- Identify FCC Rules that may require the attention of USAC or FCC management.

In 2024, AAD, OMD and WCB developed an audit plan for fiscal year 2025 that incorporates a hybrid approach for selecting beneficiaries and contributors for audit. The selection methodology is based on a combination of high risk factors, high dollar, random selection, and targeted entities, because of whistleblower allegations or FCC request.

The status of all audits in process as of June 30, 2025 is summarized in the table below.

| Audit Status As of June 30, 2025 | | | | |
|---|---|---|---|---|
| Program | Announced | Fieldwork | Reporting | Total |
| Contributor Revenue | 0 | 18 | 13 | 31 |
| High Cost | 0 | 37 | 32 | 69 |
| Low Income | 0 | 21 | 21 | 42 |
| Schools & Libraries | 1 | 25 | 43 | 69 |
| Rural Health Care | 0 | 14 | 22 | 36 |
| Total | 1 | 115 | 131 | 247 |

As noted above, USAC implemented the PQA Program in 2010 to test improper

JA371

payments and compliance with FCC regulations. The testing results for the two most recent years are noted below. Using a statistically drawn sample, support mechanism disbursements are selected each month and reviewed to verify that payments were made at the correct amount in accordance with FCC rules. The table below summarizes the error rates noted and the estimated improper payment amounts reported for fiscal years (FYs) 2024 and 2023:

| Support Mechanism | FY 2024 | | FY 2023 | |
|---|---|---|---|---|
| | Estimated Improper Payment Rate | Estimated Improper Payment Amount (millions) | Estimated Improper Payment Rate | Estimated Improper Payment Amount (millions) |
| High Cost | 4.45% | $81.75 | 2.88% | $51.71 |
| Low Income | 5.98% | $46.90 | 2.18% | $11.50 |
| Schools & Libraries | 1.27% | $31.11 | 1.59% | $32.90 |
| Rural Health Care | NA | NA | NA | NA |

The sample size and status of FY 2025 PQA assessments in process as of June 30, 2025 are summarized in the table below.

| PQA Testing Status As of June 30, 2025 | | | | |
|---|---|---|---|---|
| Program | Sample Size | Announced[11] | In Process | Completed |
| High Cost[12] | 150 | 0 | 45 | 105 |
| Low Income | 225 | 0 | 43 | 182 |
| Schools & Libraries | N/A | N/A | N/A | N/A |
| Rural Health Care | N/A | N/A | N/A | N/A |
| Total | 375 | 0 | 88 | 287 |

3. *Improving information technology tools*

On October 1, 2024, USAC deployed a new Enterprise Resource Planning (ERP)

---

[11] Additional PQAs to be announced.

[12] High Cost FY23 numbers were completed and reported in FY24. High Cost FY24 PQA assessments are in progress.

tool to modernize its financial systems (named UNIFi). UNIFi integrates financial information across our operational systems, reduces manual reconciliation efforts, and ensures a clear end-to-end view of financial activity in a timely and accurate manner.

*Expanding and enhancing outreach and education*

In the second quarter of 2025, USAC conducted extensive outreach. The activity details are described below.

The High Cost program conducted comprehensive outreach and provided extensive customer service support in the second quarter of 2025 to help carriers comply with FCC performance measures testing rules, which require carriers to conduct quarterly speed and latency testing of broadband networks supported by the Connect America Fund (CAF) program and submit and certify the test results with USAC, and help carriers obtain compliance reports to track their progress in meeting FCC network performance metrics. This included considerable engagement with carriers to help them submit and certify their test data from all four quarters of 2024 testing by July 1, 2025 (under FCC previous rules requiring annual filing of test data), and help carriers transition to mandatory quarterly filing deadlines starting in 2025. In addition, High Cost conducted comprehensive outreach and provided extensive customer service support in the second quarter to help carriers navigate the annual July 1 deadline to submit and certify FCC Form 481, which collects financial and operations information used to validate carrier support. The High Cost Program conducted one webinar in the second quarter of the year.

The Rural Health Care (RHC) program conducted outreach and supported a successful window close for Healthcare Connect Fund (HCF) and Telecommunications (Telecom) Program participants. The Funding Year (FY) 2025 filing window closed on June 2, 2025. Additionally, the RHC team maintained associated materials and webpages that assist RHC

program participants with the modernized FCC Forms 461, 462, 463, 465, 466, 469, and post commitment change functionality. This included seven webinars, website updates to improve applicant experience in RHC Connect, and refreshed resources for HCF and Telecom Program participants. RHC conducted separate outreach to Connected Care Pilot Program (CCPP) selectees, including one CCPP funding request best practices webinar. The RHC program continued to communicate important funding process information to the selectees through email and the CCPP Learn page. In addition, the RHC program exhibited at an in-person telehealth resource center symposium. During this symposium, the RHC program shared resources for both programs and first-hand success stories demonstrating how participants benefit from the RHC programs.

The Schools and Libraries (E-Rate) program staff attended the Consortium for School Networking (Washington, D.C.), NTTA National Tribal Broadband Summit (Gila River, Arizona), and the American Libraries Association (ALA) Conference (Pennsylvania) during Q2 2025 to provide school and library applicants with opportunities to ask questions about program requirements for FY2025.  E-Rate held four webinars in the second quarter of 2025 – Program Integrity Assurance (PIA) Review and Selective Review Process, Beginning E-Rate Services, Invoicing: Applicants & Service Providers Training, and E-Rate Service Providers and issued three monthly news briefs covering current topics in the E-Rate life cycle.  E-Rate also continued outreach efforts for the Schools and Libraries Cybersecurity Pilot Program (Pilot Program) and issued three monthly newsletters.

The Lifeline program released a new suite of English and Spanish standard benefit flyers to promote consumer awareness and understanding of the Lifeline benefit and how to apply. A new user-friendly Representative Accountability Database (RAD) Acceptable Documentation Guide that highlights examples of acceptable documents that may be

submitted as proof of identification for service providers establishing access to Lifeline systems was also released. A new and streamlined Continued Eligibility Status Report in the National Lifeline Accountability Database (NLAD) was announced that enables service providers to easily locate subscribers undergoing continued eligibility. Lifeline also communicated about updates made to forms, systems, and resources to reflect the 2025 Federal Poverty Guidelines (FPGs) which are used to help determine if a consumer qualifies for the Lifeline program based on their income. The program also released several announcements reminding service providers of the annual FCC Form 481 filing deadline. The program conducted outreach for the Lifeline survivor benefit which included a survey to evaluate the effectiveness of the benefit to over 6,900 organizations who work with victims of domestic violence, human trafficking, related crimes and Lifeline service providers. Additional outreach was also sent to individuals and organizations who work with Tribal communities. Lifeline conducted four live training events that included three monthly webinars; and one Tribal teleconference webinar for Lifeline Tribal partners.

The Contributors team hosted the regularly scheduled monthly webinar topics, including the new 499 Filer ID requirements and how to complete the FCC Form 499-Q. 318 participants joined the six Q2 2025 Contributors webinars. In summary, USAC conducted 23 webinars in Q2 2025:

- One for High Cost participants.

- Eight for Rural Health Care participants (including service providers and CCPP selectees).

- Four webinars for Schools and Libraries' audiences.

- Four for Lifeline audiences.

- Six for Contributors.

---

*FUNDING REQUIREMENTS*

---

## HIGH COST SUPPORT MECHANISM

Appendix HC01 provides projected High Cost support by state by study area for 4Q2025.  HC01 also provides the projected amount of individual company support, and projected per-month amounts for the components of High Cost support that each Eligible Telecommunications Carrier (ETC)[13] may be eligible to receive.  HC02 provides the total projected amount of annualized High Cost support for 4Q2025 for each state.

### CONNECT AMERICA FUND PHASE II

The FCC released an Order on June 10, 2014, adopting rules, among other things, to institute the foundation for the award of Phase II (model-based) support through a competitive bidding process in price cap areas where the price cap carrier declines the offer of model-based support.[14]  The Order also permitted price cap carriers that declined model-based support to participate in the 2016 competitive bidding process.[15]  On April 29, 2015, the FCC released a Public Notice announcing the offers of model-based Phase II support to price cap carriers to fund voice and broadband-capable networks in their service areas.[16]  The total offer was $1.675 billion annually, for six calendar years, 2015-2020.[17]  Next, on June 16, 2015, the Bureau released a Public Notice announcing acceptance by Frontier Communications of model-based support for each of the 28 states it serves.[18]  For states where their model-based support is greater than Phase I Frozen support, Frontier elected to

---

[13] *See* 47 C.F.R. § 54.1310; 47 C.F.R. §§ 54.301-54.303.

[14] *See generally Connect America Fund Omnibus Order and FNPRM*, WC Docket Nos. 10-90 *et al.*, Report and Order, Declaratory Ruling, Order, Memorandum Opinion and Order, Seventh Order on Reconsideration, and Further Notice of Proposed Rulemaking, 29 FCC Rcd 7051 (2014) (*CAF Omnibus Order*).

[15] *Id.* at 7062-7063, para. 37.

[16] *See Wireline Competition Bureau Announces Connect America Phase II Support Amounts Offered to Price Cap Carriers to Expand Rural Broadband*, WC Docket No. 10-90, Public Notice, 30 FCC R cd 3905 (2015).

[17] *Id.*

[18] *See Wireline Competition Bureau Authorizes Frontier Communications Corporation to Receive $283 Million in Connect America Phase II Support to Serve 1.3 million Rural Americans in 28 States*, WC Docket No. 10-90, Public Notice, 30 FCC Rcd 6310 (2015).

receive the lump sum payment associated with prior months that reflects the difference between Phase II model support and Phase I Frozen support.  In August 2015, the Bureau released public notices for Consolidated Communications, AT&T, CenturyTel, Inc. dba CenturyLink, Cincinnati Bell, Fairpoint Communications, Inc., Hawaiian Telecom, Inc., Micronesian, and Windstream Corporation for announcement of acceptance of model-based support.[19]  On July 29, 2019, the Commission announced a process by which price cap carrier receiving CAF Phase II support could elect to receive an additional, seventh year of support.[20]  All eligible carriers elected to receive support.

Finally, on October 31, 2016, the Commission adopted service obligations for Alaska Communications Systems (ACS).[21]  ACS will receive Phase II frozen support for a 10-year term and is required to offer voice service and broadband service at the same speed, latency, usage, and pricing metrics as established for Phase II model-based carriers. ACS will continue to receive CAF Phase II frozen support until 2025.

For 4Q2025, CAF Phase II projected support is estimated to be $6.40 million. Appendix HC11 provides projected CAF Phase II frozen support by state by study area for 4Q2025.

**CONNECT AMERICA FUND PHASE II AUCTION**

The Wireline Competition Bureau released a Public Notice on August 28, 2018,

---

[19] *See* Wireline Competition Bureau Authorizes Windstream to Receive Over $ 174 Million in Connect America Phase II Support in 17 States, WC Docket No. 10-90, Public Notice, 30 FCC Rcd 8245 (2015); Wireline Competition Bureau Authorizes Fairpoint to Receive Over $37 Million in Connect America Phase II Support in 14 States, WC Docket No. 10-90, 30 FCC Rcd 8245 (2015); Wireline Competition Bureau Authorizes the Micronesian Telecommunications Corporation to Receive Over $2.5 Million and Hawaiian Telecom, Inc. to Receive Over $ 4 Million in Connect America Phase II Support, WC Docket No. 10-90, 30 FCC Rcd 8471 (2015); Wireline Competition Bureau Authorizes Additional Cap Carriers to Receive Almost $950 Million in Phase II Connect America Support *et al.*, WC Docket No. 10-90, Public Notice, 30 FCC Rcd 8577 (2015).

[20] See *Wireline Competition Bureau Announces Deadline for Price Cap Carriers to Elect Seventh Year of Connect America Fund Phase II Model Based Support*, DA-20-800, July 29, 2019.

[21] See *FCC Adopts CAF Phase II Service Obligations for ACS*, WC Docket 10-90, DA FCC 16-143, 31 FCC Rcd 12086 (2016)

announcing the winners of the Connect America Fund Phase II auction.[22]

For 4Q2025, the total CAF Phase II auction projected support is estimated to be $36.60 million. Appendix HC16 provides projected CAF Phase II auction support by state by study area for 4Q2025.

### CONNECT AMERICA FUND/INTERCARRIER COMPENSATION SUPPORT

In the *USF/ICC Transformation Order*, the FCC adopted a transitional recovery mechanism with an effective date of July 1, 2012, to facilitate incumbent carriers' gradual transition away from intercarrier compensation (ICC) revenues.[23] Eligible incumbent carriers may receive additional support through this recovery mechanism.

For 4Q2025, total CAF/ICC support is estimated to be $84.29 million. Appendix HC09 provides projected CAF/ICC support by state by study area for 4Q2025.

### RURAL BROADBAND EXPERIMENTS

On July 11, 2014, the FCC adopted the *Rural Broadband Experiments* (RBE) *Order* to advance the deployment of voice and broadband networks in high-cost areas and help design the Phase II competitive bidding process and Remote Areas Fund.[24] The FCC established a budget of $100 million over ten years for funding experiments in price cap areas that are not served by unsubsidized competitors.[25]

For 4Q2025, total RBE support is estimated to be $0.07 million, all of which will be paid from cash reserved in the High Cost account. Thus, there is no 4Q2025 collection requirement for RBE. Appendix HC12 provides projected RBE support by state by study area for 4Q2025.

---

[22] *See Connect America Fund Phase II Auction (Auction 903) Closes Winning Bidders Announced FCC Form 683 Due October 15, 2018*, WC Docket Nos. 10-90 *et al.*, Public Notice, 29 FCC Rcd 7051 (2018).
[23] *See* 47 C.F.R. § 54.304(b).
[24] *See Connect America Fund, ETC Annual Reports and Certifications*, WC Docket No. 10-90 *et al.*, Report and Order and Further Notice of Proposed Rulemaking, 29 FCC Rcd 8769 (2014) (*Rural Broadband Experiments Order*).
[25] *See id.* at 8772, para. 9.

**MOBILITY FUND PHASE I**

In accordance with the Public Notice issued by the Wireline Competition Bureau on November 1, 2017, Mobility Fund Phase I support of $6.78 million for 4Q2025 will be paid from cash reserved in the High Cost account.  Thus, there is no 4Q2025 collection requirement for Mobility Fund Phase I.[26]  Appendix HC10 provides Mobility Fund Phase I support by state by study area for 4Q2025.

**RATE-OF-RETURN CARRIERS**

Rate-of-return carriers not affiliated with price cap carriers may continue to receive legacy High Cost Program support.[27]  In the *December 2018 Rate-of-Return Reform Order*, the FCC established a new budget for legacy carriers of $1.42 billion, to be increased annually by inflation.[28]

**HIGH COST LOOP SUPPORT (INCLUDING SAFETY NET ADDITIVE AND SAFETY VALVE SUPPORT)**

HCL support is calculated based on the results of the annual collection of 2012 incumbent local exchange carrier (LEC) loop cost and expense adjustment data submitted to the FCC and USAC on October 1, 2013.[29]  Growth in total HCL support for rural carriers is limited under Section 54.1302 of the Commission's rules to the current level of funding adjusted yearly by the annual growth in supported rural loops.[30]  The *Rural Task Force (RTF) Order* increased HCL support for rural carriers effective July 1, 2001.[31]

---

[26] *See Wireline Competition Bureau Provides Guidance to the Universal Service Administrative Company Regarding the High-Cost Universal Services Mechanism Budget*, WC Docket No. 10-90, Public Notice, 32 FCC Rcd 9243 (WCB 2017).

[27] *See USF/ICC Transformation Order*, 26 FCC Rcd at 17740, para. 206.

[28] *See Connect America Fund et al.*, WC Docket Nos. 10-90 et al., Report and Order, Further Notice of Proposed Rulemaking, and Order on Reconsideration, FCC 18-176, para. 79, 84 (2018) (*December 2018 Rate of Return Reform Order*

[29] Universal Service Fund (USF) 2012 Submission of 2011 Study Results (filed Oct. 1, 2012) (*USF Data Submission*).

[30] 47 C.F.R § 54.1302(a); *see also* 47 C.F.R. § 54.1303.

[31] *Federal-State Joint Board on Universal Service et al.*, CC Docket Nos. 96-45 *et al.*, Fourteenth Report and Order, Twenty-Second Order on Reconsideration, and Further Notice of Proposed Rulemaking, and Report and Order, 16 FCC Rcd 11244 (2001) (*RTF Order*).

For 4Q2025, projected HCL support is $49.36 million, which includes $0.02 million for Safety Valve Support (SVS).  Appendix HC04 provides projected monthly HCL support payments by state by study area for 4Q2025.  Appendix HC05 displays projected SVS payments by state by study area for 4Q2025.

### ALASKA PLAN SUPPORT/ALASKA CONNECT FUND

In the *Alaska Plan Order*, the FCC approved frozen support for Alaska rate-of-return carriers for 10 years and obligated those carriers to offer voice and broadband services at specified speeds to a specified number of locations while meeting certain service obligations.[32]

The FCC released an Order on November 4, 2024, to provide ongoing and certain support to mobile and fixed carriers receiving USF High Cost support in Alaska through 2034, with increased support amounts reflecting the transition to higher speed service goals for the Alaska Connect Fund (ACF).

Beginning January 1, 2025, the FCC has directed the USAC to make a one-time 30% upward adjustment of current support amounts for USF High Cost fixed recipients to prepare for the transition to the ACF in 2029.  The ACF begins on January 1, 2029, through December 31, 2034, for a total amount of $107.6 million annually.[33]

For 4Q2025, Alaska Plan support is projected to $41.70 million.  Appendix HC03 provides 4Q2025 projections for Alaska Plan support by state by study area.

### CONNECT AMERICA BROADBAND LOOP SUPPORT

 Connect America Broadband Loop Support (CAF BLS) replaces what was previously known as Interstate Common Line Support (ICLS).[34]  The FCC made

---

[32] See WC-Docket Nos. 10-90 and 16-271 DA 16-425
[33] See PN-FCC 24-116

[34] *See Rate-of-Return Reform Order*, 31 FCC Rcd at 3091, para. 5.

modifications to modernize ICLS rules to provide support in situations where the customer no longer subscribes to traditional regulated local exchange voice service.[35]  CAF BLS will provide support for broadband-capable loops, regardless of whether the customer chooses traditional voice, bundle of voice and broadband, or only broadband.[36]

For 4Q2025, CAF BLS is projected to be $302.10 million. Appendix HC07 provides USAC's 4Q2025 projections of CAF BLS by state by study area and Appendix HC08 provides USAC's 4Q2025 projections of CAF BLS by state.  Appendix HC15 provides USAC's 4Q2025 projections of the CAF BLS true-up by state by study area.

### ALTERNATIVE CONNECT AMERICA MODEL (A-CAM)

Alternative Connect America Model (A-CAM) allows carriers the option of electing a set amount of monthly support over a fixed term or remaining with a reformed version of legacy support mechanisms with CAF-BLS and HCL support.

For 4Q2025, A-CAM support is projected to be $43.73 million, of which $0.41 million will be paid from funds available in the High Cost account.  Appendix HC13 provides A-CAM support projected by state by study area for 4Q2025.

### A-CAM II

On December 13, 2018, the FCC released the *December 2018 Rate-of-Return Order*, which directed the FCC to make model offers of up to $200.00 per location to all legacy rate-of-return carriers that did not previously elect model support or support pursuant to the Alaska Plan.[37]  To implement the increase, the FCC released a Public Notice with the support amounts.[38]

---

[35] *Id.*
[36] *Id.*
[37] *See Id.*, para. 34.
[38] *See Wireline Competition Bureau Authorizes 171 Rate-Of-Return Companies to Receive $491 Million Annually in Alternative Connect America Cost Model II Support to Expand Rural Broadband*, WC Docket No. 10-90, Public Notice, 34 FCC Rcd at 7271 (2019).

For 4Q2025, A-CAM II support is projected to be $55.56 million. Appendix HC17 provides projected A-CAM II support by state by study area for 4Q2025.

### ENHANCED ACAM CONNECT AMERICA COST MODEL (E-ACAM)

On July 24, 2023, the FCC released a Report and Order announcing the establishment of the Enhanced Alternative Connect America Cost Model (E-ACAM) that will support deployment of 100/20 Mbps service (or greater) through rural areas served by carriers currently receiving A-CAM support and in areas served by legacy rate-of-return support recipients within a budget of $1.27 billion annually, or no more than $1.33 billion annually if certain conditions are met, over a 15-year term beginning January 1, 2024.[39]

For 4Q2025, E-ACAM support is projected to be $314.41 million, of which $44.78 million will be paid with cash in the High Cost Account. Appendix HC21 provides E-ACAM cost model support projected by state by study area for 4Q2025.

### PRICE CAP CARRIERS

For 4Q2025, total frozen High Cost support for price cap carriers is estimated to be $2.81 million. Appendix HC06 provides frozen High Cost support for price cap carriers by state by study area for 4Q2025.

### COMPETITIVE ELIGIBLE TELECOMMUNICATIONS CARRIERS

The *USF/ICC Transformation Order* transitioned existing Competitive Eligible Telecommunications Carriers (CETCs) support to the CAF over a five-year period beginning January 1, 2012.[40] For the transition, the FCC set each CETC's baseline support at its total 2011 support in a given study area, or an amount equal to 3,000 times the number of reported lines as of year-end 2011, whichever was lower.[41] That monthly baseline amount

---

[39]*See Enhanced A-CAM Order,* WC Docket No. 10-90, at 31-33, paras. 73-75).

[40] *See id.* at 17830, para. 513.
[41] *See id.* at 17831, para. 515.

was provided from January 1, 2012, to September 30, 2012.[42]  Beginning July 1, 2012, each CETC's support was reduced by 20 percent for each July to June time period.[43]  However, consistent with FCC rules, Mobility Fund Phase II was not implemented by September 30, 2014, and CETC support was not subject to an additional 20 percent reduction in support beginning July 2014.[44]

For 4Q2025, total frozen High Cost support for CETCs is $88.05 million.  Appendix HC06 provides frozen High Cost support for CETCs by state by study area for 4Q2025.

### UNIENDO A PUERTO RICO FUND/CONNECT USVI FUND

On September 30, 2019, the FCC released the Uniendo a Puerto Rico Fund and the Connect USVI Fund Order, which allocated nearly a billion dollars in federal universal service support to Puerto Rico and the U.S. Virgin Islands.  These funds will facilitate the improvement and expansion of existing fixed and mobile networks in Puerto Rico and the U.S. Virgin Islands.45

For 4Q2025, Uniendo a Puerto Rico Fund/Connect USVI Fund support is projected to be $10.68 million.  Appendix HC18 provides the Uniendo Puerto Rico Fund mobile and fixed support projected by state by study area for 4Q2025.  Appendix HC19 provides the Connect USVI Fund mobile and fixed support projected by state by study area for 4Q2025.

### RURAL DIGITAL OPPORTUNITY FUND

On February 7, 2020, the FCC released the *Rural Digital Opportunity Fund Order*, which provided up to $20.4 billion to fund the deployment of up to gigabit speed broadband

---

[42] *See id.*
[43] *See id.*
[44] *USF/ICC Transformation Order*, 26 FCC Rcd at 17831, para. 515; *see also* 47 C.F.R. § 54.307.
[45] *See The Uniendo a Puerto Rico Fund and the Connect USVI Fund et al.,* WC Docket No. 18-143 et al., Report and Order and Order on Reconsideration, FCC 19-95, para. 3 (2019) *(Uniendo a Puerto Rico Fund and the Connect USVI Fund Order).*

networks in unserved rural communities through a two-phase reverse auction mechanism.[46]

For 4Q2025, Rural Digital Opportunity Fund support is projected to be $148.61 million. Appendix HC20 provides the Rural Digital Opportunity Fund support projected by state by study area for 4Q2025.

### HIGH COST SUPPORT MECHANISM SUMMARY

The 4Q2025 High Cost Support Mechanism funding requirements are projected as follows: $49.36 million for HCL support, $302.10 million for CAF BLS, $2.81 million for frozen Price Cap Carrier Support, $6.40 million for CAF Phase II, $36.60 million for CAF Phase II Auction, $88.05 million for frozen CETC Support, $84.29 million for CAF/ICC Support, $41.70 million for Alaska Plan Support, $43.32 million for A-CAM, $55.56 million for A-CAM II, $269.63 million for E-ACAM, $10.68 million for Uniendo a Puerto Rico/Connect USVI, and $148.61 million for Rural Digital Opportunity Fund. This results in base projected demand of $1,139.11 million.

The following funding requirements will be paid from funds available in the High Cost account: Rural Broadband Experiments $0.07 million, Mobility Fund Phase I $6.78 million, incremental A-CAM support $0.41 million, and E-ACAM support $44.78 million.

The total base demand of $1,139.11 million is adjusted as follows: increased by prior period adjustments of $17.62 million[47] and increased by administrative costs of $20.03 million; resulting in a total projected 4Q2025 funding requirement for the High Cost Support Mechanism of $1,176.76 million.

---

[46] *See Rural Digital Opportunity Fund et al.*, WC Docket No. 19-126 et al., Report and Order, FCC 20-5 (2020) (*Rural Digital Opportunity Fund Order*).

[47] Prior period adjustments reconcile projections to actual results and include adjustments for billings, interest income, bad debt, and administrative expenses.

## LOW INCOME SUPPORT MECHANISM

### LIFELINE SUPPORT

ETCs providing Lifeline support are entitled to receive funding for the waiver of charges and reduced rates provided to qualified low-income subscribers.[48]  In the *Lifeline Reform Order*, non-tribal Lifeline support was set at a flat rate of $9.25 for all subscribers.[49] As established in the *Tribal Order,* tribal support makes available each month up to an additional $25 per low-income subscriber to eligible residents of tribal lands.[50]  The *2016 Lifeline Order* extended Lifeline support to broadband services and adopted a phase-down of support for voice-only services beginning in 2019.[51]

For 4Q2025, USAC projects $270.37 million will be required for Lifeline support.

### LINK-UP SUPPORT

Link-Up support is available for ETCs that provide support on tribal lands but is limited to those ETCs receiving High Cost Program support.[52]  ETCs may claim a 100 percent reduction up to $100 of the customary charge for commencing telephone service for a single telecommunication connection at a subscriber's principal place of residence.[53]

For 4Q2025, USAC projects that $0.04 million will be required for Link-Up support.

---

[48] 47 C.F.R. §§ 54.401-54.417.

[49] *See Lifeline and Link Up Reform and Modernization et al.,* WC Docket Nos. 11-42 *et al.*, CC Docket No. 96-45, Report and Order and Further Notice of Proposed Rule Making, 27 FCC Rcd 6656, 6683, para. 58 (2012) (*Lifeline Reform Order*).

[50] *See* 47 C.F.R. § 54.400(e); *Federal-Joint Board on Universal Service et al.*, CC Docket 96-45, Twenty-Fifth Order on Reconsideration, Report and Order, Order, and Further Notice of Proposed Rulemaking, 18 FCC Rcd 10958 (2003) (*Tribal Order*).  On August 31, 2000, the FCC stayed the implementation of the federal Lifeline and Link-up rule amendments only to the extent that they apply to qualifying low-income consumers living near reservations.

[51] *See Lifeline and Link Up Reform and Modernization, et al.*, WC Docket Nos. 11-42, Third Report and Order and Further Report and Order, and Order on Reconsideration, 31 FCC Rcd 3962, 3985-87, paras. 62-66 (2016) (*2016 Lifeline Order*).

[52] *See id.* at 6767, para. 254.

[53] 47 C.F.R. § 54.413(a)(1).

**LOW INCOME SUPPORT MECHANISM SUMMARY**

The estimated 4Q2025 Low Income Support Mechanism funding requirements are projected as follows: $270.37 million for Lifeline and $0.04 million for Link-Up, resulting in a total funding requirement of $270.41 million.

The total fund requirement of $270.41 million is adjusted as follows: decreased by prior period adjustments of $50.37 million[54] and increased for administrative costs of $23.63 million; resulting in a total projected 4Q2025 funding requirement for the Low Income Support Mechanism of $243.67 million.

Appendix LI01 provides projected Low Income support amounts by state and study Area for 4Q2025.[55] LI03 provides a list of ETCs for 2Q2025.[56] LI04 provides detail on company specific Low Income disbursement amounts for 2Q2025. LI05 provides detail on annual company-specific Low Income support claimed by state and company for January 2022 through June 2025. LI06 provides historical data of monthly support amounts claimed by ETCs from January 1998 through June 2025. LI07 provides details on Low Income support claimed by state or jurisdiction for January 2022 through June 2025. LI08 and LI09 provide subscriber and beneficiary information by state or jurisdiction for Lifeline and Link-Up support, respectively, for January 2025 through June 2025.

**RURAL HEALTH CARE SUPPORT MECHANISM**

In the *2018 Rural Health Care Program Funding Cap Order*, the Commission amended its rules to allow unused funds from previous funding years to be carried forward for use in

---

[54] Prior period adjustments reconcile projections to actual results and include adjustments for billings, disbursements, interest income, bad debt, and administrative expenses.
[55] Companies that are no longer ETCs have been removed from LI01.
[56] Companies that are no longer ETCs have been removed from LI03.

subsequent funding years, beginning in Funding Year 2018.[57]  On an annual basis, unused funds will be made available in the second quarter of each calendar year for use in the next full funding year of the Rural Health Care Program.[58]

In the *2018 Rural Health Care Program Funding Cap Order*, the Commission also required USAC to file quarterly estimates of unused funds that will be available for carryover in subsequent funding years.[59]  The following is a summary of estimated unused funds as of June 30, 2025 for Funding Years 2009 through 2024.  Funding years prior to Funding Year 2009 are closed.

**FUNDING YEAR 2009**

Funding Year 2009 began on July 1, 2009 and ended on June 30, 2010.  Balances as of June 30, 2025 are as follows:

| Funding Year 2009 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $211.02 |
| Amount Carried Forward / Backward | $146.18 |
| Amount Authorized for Disbursement | ($355.62) |
| Reserve for Outstanding Obligations | ($0.32) |
| Reserve for Pending Applications | $0.00 |
| Reserve for USAC Appeals | $0.00 |
| Reserve for FCC Appeals | ($1.26) |
| **Estimated Remaining Balance** | $0.00 |

Cumulative payments to service providers through 2Q2025 are listed in Appendix RH01.

**FUNDING YEAR 2010**

Funding Year 2010 began on July 1, 2010 and ended on June 30, 2011.  Balances as of June 30, 2025 are as follows:

---

[57] *Promoting Telehealth in Rural America,* WC Docket No. 17-310, Report and Order, FCC 18-82, para. 25 (2018) *(2018 Rural Health Care Program Funding Cap Order).*
[58] *Id.*, para. 27.
[59] *Id.,* para. 26.

| Funding Year 2010 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $87.39 |
| Amount Carried Forward / Backward | $0.00 |
| Amount Authorized for Disbursement | ($87.33) |
| Reserve for Outstanding Obligations | ($0.06) |
| Reserve for Pending Applications | $0.00 |
| Reserve for USAC Appeals | $0.00 |
| Reserve for FCC Appeals | $0.00 |
| **Estimated Remaining Balance** | $0.00 |

Cumulative payments to service providers through 2Q2025 are listed in Appendix RH02.

**FUNDING YEAR 2011**

Funding Year 2011 began on July 1, 2011 and ended on June 30, 2012.  Balances as

of June 30, 2025 are as follows:

| Funding Year 2011 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $101.33 |
| Amount Carried Forward / Backward | $0.00 |
| Amount Authorized for Disbursement | ($101.29) |
| Reserve for Outstanding Obligations | ($0.04) |
| Reserve for Pending Applications | $0.00 |
| Reserve for USAC Appeals | $0.00 |
| Reserve for FCC Appeals | $0.00 |
| **Estimated Remaining Balance** | $0.00 |

Cumulative payments to service providers through 2Q2025 are listed in Appendix RH03.

**FUNDING YEAR 2012**

Funding Year 2012 began on July 1, 2012 and ended on June 30, 2013.  Balances as

of June 30, 2025 are as follows:

| Funding Year 2012 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $118.32 |
| Amount Carried Forward / Backward | ($1.32) |
| Amount Authorized for Disbursement | ($116.87) |
| Reserve for Outstanding Obligations | $0.00 |
| Reserve for Pending Applications | $0.00 |
| Reserve for USAC Appeals | $0.00 |
| Reserve for FCC Appeals | ($0.09) |

| Estimated Remaining Balance | $0.04 |
|---|---|

Cumulative payments to service providers through 2Q2025 are listed in Appendices RH04.

**FUNDING YEAR 2013**

Funding Year 2013 began on July 1, 2013 and ended on June 30, 2014.  Balances as of June 30, 2025 are as follows:

| Funding Year 2013 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $178.76 |
| Amount Carried Forward / Backward | ($3.57) |
| Amount Authorized for Disbursement | ($175.13) |
| Reserve for Outstanding Obligations | $0.00 |
| Reserve for Pending Applications | $0.00 |
| Reserve for USAC Appeals | $0.00 |
| Reserve for FCC Appeals | ($0.03) |
| **Estimated Remaining Balance** | $0.03 |

Cumulative payments to service providers through 2Q2025 are listed in Appendix RH05.

**FUNDING YEAR 2014**

Funding Year 2014 began on July 1, 2014 and ended on June 30, 2015.  Balances as of June 30, 2025 are as follows:

| Funding Year 2014 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $232.88 |
| Amount Carried Forward / Backward | ($2.89) |
| Amount Authorized for Disbursement | ($218.03) |
| Reserve for Outstanding Obligations | $0.00 |
| Reserve for Pending Applications | $0.00 |
| Reserve for USAC Appeals | $0.00 |
| Reserve for FCC Appeals | ($6.27) |
| **Estimated Remaining Balance** | $5.69 |

Cumulative payments to service providers through 2Q2025 are listed in Appendix RH06.

**FUNDING YEAR 2015**

Funding Year 2015 began on July 1, 2015 and ended on June 30, 2016. Balances as of June 30, 2025 are as follows:

| Funding Year 2015 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $294.16 |
| Amount Carried Forward / Backward | ($16.17) |
| Amount Authorized for Disbursement | ($267.96) |
| Reserve for Outstanding Obligations | $0.00 |
| Reserve for Pending Applications | $0.00 |
| Reserve for USAC Appeals | $0.00 |
| Reserve for FCC Appeals | ($9.82) |
| **Estimated Remaining Balance** | $0.21 |

Cumulative payments to service providers through 2Q2025 are listed in Appendix RH07.

**FUNDING YEAR 2016**

Funding Year 2016 began on July 1, 2016 and ended on June 30, 2017. Balances as of June 30, 2025 are as follows:

| Funding Year 2016 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $402.70 |
| Amount Carried Forward / Backward | ($68.25) |
| Amount Authorized for Disbursement | ($307.66) |
| Reserve for Outstanding Obligations | ($0.86) |
| Reserve for Pending Applications | $0.00 |
| Reserve for USAC Appeals | ($0.01) |
| Reserve for FCC Appeals | ($13.64) |
| Administrative Expenses | ($12.29) |
| **Estimated Remaining Balance** | ($0.01) |

Cumulative payments to service providers through 2Q2025 are listed in Appendix RH08.

**FUNDING YEAR 2017**

Funding Year 2017 began on July 1, 2017 and ended on June 30, 2018. Balances as of June 30, 2025 are as follows:

| Funding Year 2017 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $367.59 |
| Amount Carried Forward / Backward | ($7.23) |
| Amount Authorized for Disbursement | ($333.22) |
| Reserve for Outstanding Obligations | ($0.20) |
| Reserve for Pending Applications | ($2.81) |
| Reserve for USAC Appeals | ($0.20) |
| Reserve for FCC Appeals | ($12.96) |
| Administrative Expenses | ($10.37) |
| **Estimated Remaining Balance** | $0.60 |

Cumulative payments to service providers through 2Q2025 are listed in Appendix RH09.

**FUNDING YEAR 2018**

Funding Year 2018 began on July 1, 2018 and ended on June 30, 2019.  Balances as of June 30, 2025 are as follows:

| Funding Year 2018 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $581.28 |
| Amount Carried Forward / Backward | ($260.66) |
| Amount Authorized for Disbursement | ($298.36) |
| Reserve for Outstanding Obligations | ($0.18) |
| Reserve for Pending Applications | ($1.64) |
| Reserve for USAC Appeals | ($6.82) |
| Reserve for FCC Appeals | ($2.47) |
| Administrative Expenses | ($12.09) |
| **Estimated Remaining Balance** | ($0.94) |

Funding commitments made to applicants during 2Q2025 are included in Appendix RH10.  Authorized funding by applicants during 2Q2025 and cumulative payments to service providers through 2Q2025 are listed in Appendices RH11 and RH12, respectively.

**FUNDING YEAR 2019**

Funding Year 2019 began on July 1, 2019 and ended on June 30, 2020.  Balances as of June 30, 2025 are as follows:

| Funding Year 2019 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $594.07 |
| Amount Carried Forward / Backward | ($156.70) |
| Amount Authorized for Disbursement | ($413.69) |
| Reserve for Outstanding Obligations | ($0.95) |
| Reserve for Pending Applications | ($0.85) |
| Reserve for USAC Appeals | ($1.71) |
| Reserve for FCC Appeals | ($4.62) |
| Administrative Expenses | ($16.34) |
| **Estimated Remaining Balance** | ($0.79) |

Cumulative payments to service providers through 2Q2025 are listed in Appendix RH13.

**FUNDING YEAR 2020**

Funding Year 2020 began on July 1, 2020 and ended on June 30, 2021.  Balances as of June 30, 2025 are as follows:

| Funding Year 2020 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $604.76 |
| Amount Carried Forward / Backward | ($160.75) |
| Amount Authorized for Disbursement | ($409.20) |
| Reserve for Outstanding Obligations | ($0.73) |
| Reserve for Pending Applications | ($4.36) |
| Reserve for USAC Appeals | ($3.49) |
| Reserve for FCC Appeals | ($6.81) |
| Administrative Expenses | ($19.80) |
| **Estimated Remaining Balance** | ($0.38) |

Funding commitments made to applicants during 2Q2025 are included in Appendix RH14.  Authorized funding by applicants during 2Q2025 and cumulative payments to service providers through 2Q2025 are listed in Appendices RH15 and RH16, respectively.

**FUNDING YEAR 2021**

Funding Year 2021 began on July 1, 2021 and ended on June 30, 2022. Balances as of June 30, 2025 are as follows:

| Funding Year 2021 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $306.02 |
| Amount Carried Forward / Backward | $169.91 |
| Amount Authorized for Disbursement | ($428.89) |
| Reserve for Outstanding Obligations | ($3.73) |
| Reserve for Pending Applications | ($1.16) |
| Reserve for USAC Appeals | ($1.62) |
| Reserve for FCC Appeals | ($2.67) |
| Administrative Expenses | ($26.48) |
| **Estimated Remaining Balance** | $11.38 |

Funding commitments made to applicants during 2Q2025 are included in Appendix RH17. Authorized funding by applicants during 2Q2025 and cumulative payments to service providers through 2Q2025 are listed in Appendices RH18 and RH19, respectively.

**FUNDING YEAR 2022**

Funding Year 2022 began on July 1, 2022 and ended on June 30, 2023. Balances as of June 30, 2025 are as follows:

| Funding Year 2022 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $367.35 |
| Amount Carried Forward / Backward | $175.70 |
| Amount Authorized for Disbursement | ($459.95) |
| Reserve for Outstanding Obligations | ($48.73) |
| Reserve for Pending Applications | ($0.28) |
| Reserve for USAC Appeals | ($0.39) |
| Reserve for FCC Appeals | ($2.92) |
| Administrative Expenses | ($27.20) |
| **Estimated Remaining Balance** | $3.58 |

Funding commitments made to applicants during 2Q2025 are included in Appendix RH20. Authorized funding by applicants during 2Q2025 and cumulative payments to service providers through 2Q2025 are listed in Appendices RH21 and RH22, respectively.

**FUNDING YEAR 2023**

Funding Year 2023 began on July 1, 2023 and ended on June 30, 2024. Balances as of

June 30, 2025 are as follows:

| Funding Year 2023 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $504.20 |
| Amount Carried Forward / Backward | $187.39 |
| Amount Authorized for Disbursement | ($480.03) |
| Reserve for Outstanding Obligations | ($84.56) |
| Reserve for Pending Applications | ($0.17) |
| Reserve for USAC Appeals | ($0.98) |
| Reserve for FCC Appeals | ($2.91) |
| Administrative Expenses | ($32.83) |
| Reserve for Carry Forward | ($50.00) |
| **Estimated Remaining Balance** | $40.11 |

Funding commitments made to applicants during 2Q2025 are included in Appendix

RH23. Authorized funding by applicants during 2Q2025 and cumulative payments to

service providers through 2Q2025 are listed in Appendices RH24 and RH25, respectively.

**FUNDING YEAR 2024**

Funding Year 2024 began on July 1, 2024 and ended on June 30, 2025. Balances as of

June 30, 2025 are as follows:

| Funding Year 2024 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $477.68 |
| Amount Carried Forward / Backward | $262.13 |
| Amount Authorized for Disbursement | ($236.32) |
| Reserve for Outstanding Obligations | ($388.00) |
| Reserve for Pending Applications | ($3.51) |
| Reserve for USAC Appeals | ($40.14) |
| Reserve for FCC Appeals | ($5.83) |
| Administrative Expenses | ($35.13) |
| Reserve for Carry Forward | $0.00 |
| **Estimated Remaining Balance** | $30.88 |

JA394

Funding commitments made to applicants during 2Q2025 are included in Appendix RH26. Authorized funding by applicants during 2Q2025 and cumulative payments to service providers through 2Q2025 are listed in Appendices RH27 and RH28, respectively.

**FUNDING YEAR 2025**

On March 7, 2025, the Commission announced a funding cap for Funding Year 2025 of $723.89 million for the Rural Health Care Program.[60] This reflects a 2.4 percent inflation-adjusted increase in the $706.93 million cap from Funding Year 2024. The filing window for Funding Year 2025 closed on June 2, 2025.

Based on the applications received within the filing window, USAC estimates total program demand for Funding Year 2025 of $823.08 million, including administrative costs. For Funding Year 2025, USAC will collect an amount equal to one quarter of the Rural Health Care funding cap of $723.89 million.

Per FCC guidance, USAC will carry forward up to $129.30 million in unused funds from prior funding years to the extent necessary to satisfy funding year 2025 RHC Program demand above the cap.

## RURAL HEALTH CARE SUPPORT MECHANISM SUMMARY

The 4Q2025 Rural Health Care Support Mechanism collection requirement of $180.97 million is adjusted as follows: increased by a prior period adjustment of $0.12 million[61] resulting in a total projected 4Q2025 funding requirement for the Rural Health Care Support Mechanism of $181.09 million.

---

[60] *See Wireline Competition Bureau Announces E-Rate and RHC Programs' Inflation-Based Caps for Funding Year 2025,* CC Docket No. 02-6, WC Docket No. 02-60, Public Notice, DA 25-199 (Mar. 7 2025).
[61] Prior period adjustments reconcile projections to actual results and include adjustments for billings, interest income, and bad debt.

**CONNECTED CARE PILOT PROGRAM**

On April 2, 2020, the FCC issued Order FCC 20-44, establishing the Connected Care Pilot Program within the USF, making $100 million available over three years to help defray health care providers' qualifying costs of providing connected care services, which focused primarily on low-income or veteran patients.[62] The Order authorized collections of $100 million over three years (12 quarters) at $8.33 million per quarter beginning in 4Q2020.[63] The Order states that the purpose of the Pilot Program is to examine how the Fund can help support the trend towards connected care services, particularly for low income consumers and veterans.[64] The Order indicates that $100 million funding for the Pilot Program will be separate from the budgets of the other existing universal service programs and directs USAC to separately collect funds for the Pilot Program.[65]

**CONNECTED CARE PILOT PROGRAM SUMMARY**

USAC collected $100 million to fund the Connected Care Pilot Program. No additional collections are required.

**SCHOOLS AND LIBRARIES SUPPORT MECHANISM**

Following is a summary of Schools and Libraries Support Mechanism net commitments[66] and payments[67] by Funding Year as of June 30, 2025.

---

[62] *See Promoting Telehealth for Low-Income Consumers, COVID-19 Telehealth Program,* WC Docket Nos. 18-213 and 20-89, Report and Order, FCC 20-44, para. 37 (2020).
[63] *Id*, para. 42.
[64] *Id*, para. 5.
[65] *Id*, paras. 38, 42.
[66] Net Commitments are the amount of total funding commitments (including appeals, less funding commitment adjustments (COMADs) and other recaptures) reduced by the remaining dollar amount of commitments that had not been fully disbursed by their invoicing deadline.
[67] Net authorized for payment is the amount of total approved invoices less any returned funds. Authorized payments may be greater than net commitments due to recoveries in the process of collection.

**FUNDING YEAR 1998**

| FUNDING YEAR 1998 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $495.96 | 30.62% | $368.53 | 26.34% | 74.31% |
| Internet Access | $91.11 | 5.62% | $67.74 | 4.84% | 74.35% |
| Internal Connections | $1,032.79 | 63.76% | $962.70 | 68.81% | 93.21% |
| TOTAL | $1,619.86 | 100.00% | $1,398.97 | 100.00% | 86.36% |
| Deobligations due to Expired FRNs | ($220.89) | | | | |
| Net Commitments | $1,398.97 | | | | |

**FUNDING YEAR 1999**

| FUNDING YEAR 1999 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $418.63 | 21.36% | $305.67 | 18.53% | 73.02% |
| Internet Access | $100.13 | 5.11% | $63.90 | 3.87% | 63.82% |
| Internal Connections | $1,440.79 | 73.53% | $1,280.36 | 77.60% | 88.87% |
| TOTAL | $1,959.55 | 100.00% | $1,649.93 | 100.00% | 84.20% |
| Deobligations due to Expired FRNs | ($309.62) | | | | |
| Net Commitments | $1,649.93 | | | | |

**FUNDING YEAR 2000**

| FUNDING YEAR 2000 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $486.62 | 25.27% | $332.74 | 20.20% | 68.38% |
| Internet Access | $146.49 | 7.61% | $96.53 | 5.86% | 65.90% |
| Internal Connections | $1,292.59 | 67.12% | $1,217.67 | 73.94% | 94.20% |
| TOTAL | $1,925.70 | 100.00% | $1,646.94 | 100.00% | 85.52% |
| Deobligations due to Expired FRNs | ($278.76) | | | | |
| Net Commitments | $1,646.94 | | | | |

**FUNDING YEAR 2001**

| FUNDING YEAR 2001 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $533.02 | 26.78% | $384.40 | 22.93% | 72.12% |
| Internet Access | $149.70 | 7.52% | $106.53 | 6.35% | 71.16% |
| Internal Connections | $1,307.99 | 65.70% | $1,185.73 | 70.72% | 90.65% |
| TOTAL | $1,990.71 | 100.00% | $1,676.66 | 100.00% | 84.22% |
| Deobligations due to Expired FRNs | ($314.05) | | | | |
| Net Commitments | $1,676.66 | | | | |

JA398

**FUNDING YEAR 2002**

| FUNDING YEAR 2002 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $592.73 | 30.16% | $437.43 | 27.44% | 73.80% |
| Internet Access | $175.58 | 8.94% | $126.17 | 7.91% | 71.86% |
| Internal Connections | $1,196.70 | 60.90% | $1,030.59 | 64.65% | 86.12% |
| TOTAL | $1,965.01 | 100.00% | $1,594.19 | 100.00% | 81.13% |
| Deobligations due to Expired FRNs | ($370.82) | | | | |
| Net Commitments | $1,594.19 | | | | |

**FUNDING YEAR 2003**

| FUNDING YEAR 2003 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $628.32 | 26.69% | $473.33 | 24.43% | 75.33% |
| Internet Access | $191.80 | 8.15% | $149.25 | 7.70% | 77.82% |
| Internal Connections | $1,533.73 | 65.16% | $1,314.93 | 67.87% | 85.73% |
| TOTAL | $2,353.85 | 100.00% | $1,937.51 | 100.00% | 82.31% |
| Deobligations due to Expired FRNs | ($416.30) | | | | |
| Net Commitments | $1,937.55 | | | | |

Funding commitments made to applicants during 2Q2025 are included in Appendix SL01.

**FUNDING YEAR 2004**

| FUNDING YEAR 2004 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $649.93 | 34.95% | $490.16 | 31.93% | 75.42% |
| Internet Access | $168.44 | 9.06% | $137.83 | 8.98% | 81.83% |
| Internal Connections | $1,041.04 | 55.99% | $907.25 | 59.09% | 87.15% |
| TOTAL | $1,859.41 | 100.00% | $1,535.24 | 100.00% | 82.57% |
| Deobligations due to Expired FRNs | ($324.17) | | | | |
| Net Commitments | $1,535.24 | | | | |

Funding commitments made to applicants during 2Q2025 are included in Appendix SL02.

**FUNDING YEAR 2005**

| FUNDING YEAR 2005 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $699.02 | 37.01% | $559.09 | 34.44% | 79.98% |
| Internet Access | $186.21 | 9.86% | $156.98 | 9.67% | 84.30% |
| Internal Connections | $918.31 | 48.62% | $838.48 | 51.65% | 91.31% |
| Internal Connections-Maint | $85.32 | 4.52% | $68.79 | 4.24% | 80.63% |
| TOTAL | $1,888.86 | 100.00% | $1,623.34 | 100.00% | 85.94% |
| Deobligations due to Expired FRNs | ($265.06) | | | | |
| Net Commitments | $1,623.80 | | | | |

**FUNDING YEAR 2006**

<table>
<tr><th colspan="6">FUNDING YEAR 2006</th></tr>
<tr><th></th><th colspan="2">Net Commitments</th><th colspan="2">Net Authorized for Payment</th><th>Auth/Com</th></tr>
<tr><th></th><th>Millions of Dollars</th><th>% of Total Commitments</th><th>Millions of Dollars</th><th>% of Total Authorized for Payment</th><th>% of Committed Authorized for Payment</th></tr>
<tr><td>Telecommunications</td><td>$750.92</td><td>41.05%</td><td>$606.64</td><td>38.72%</td><td>80.79%</td></tr>
<tr><td>Internet Access</td><td>$213.21</td><td>11.66%</td><td>$175.55</td><td>11.20%</td><td>82.34%</td></tr>
<tr><td>Internal Connections</td><td>$783.43</td><td>42.83%</td><td>$722.61</td><td>46.12%</td><td>92.24%</td></tr>
<tr><td>Internal Connections-Maint</td><td>$81.57</td><td>4.46%</td><td>$61.96</td><td>3.95%</td><td>75.96%</td></tr>
<tr><td>TOTAL</td><td>$1,829.13</td><td>100.00%</td><td>$1,566.76</td><td>100.00%</td><td>85.66%</td></tr>
<tr><td>Deobligations due to Expired FRNs</td><td>($262.34)</td><td></td><td></td><td></td><td></td></tr>
<tr><td>Net Commitments</td><td>$1,566.79</td><td></td><td></td><td></td><td></td></tr>
</table>

Funding commitments made to applicants during 2Q2025 are included in Appendix SL03.

**FUNDING YEAR 2007**

<table>
<tr><th colspan="6">FUNDING YEAR 2007</th></tr>
<tr><th></th><th colspan="2">Net Commitments</th><th colspan="2">Net Authorized for Payment</th><th>Auth/Com</th></tr>
<tr><th></th><th>Millions of Dollars</th><th>% of Total Commitments</th><th>Millions of Dollars</th><th>% of Total Authorized for Payment</th><th>% of Committed Authorized for Payment</th></tr>
<tr><td>Telecommunications</td><td>$815.29</td><td>36.73%</td><td>$669.33</td><td>34.27%</td><td>82.10%</td></tr>
<tr><td>Internet Access</td><td>$221.93</td><td>10.00%</td><td>$188.53</td><td>9.65%</td><td>84.95%</td></tr>
<tr><td>Internal Connections</td><td>$1,073.31</td><td>48.36%</td><td>$1,010.51</td><td>51.74%</td><td>94.15%</td></tr>
<tr><td>Internal Connections-Maint</td><td>$108.93</td><td>4.91%</td><td>$84.53</td><td>4.33%</td><td>77.60%</td></tr>
<tr><td>TOTAL</td><td>$2,219.46</td><td>100.00%</td><td>$1,952.90</td><td>100.00%</td><td>87.99%</td></tr>
<tr><td>Deobligations due to Expired FRNs</td><td>($266.48)</td><td></td><td></td><td></td><td></td></tr>
<tr><td>Net Commitments</td><td>$1,952.98</td><td></td><td></td><td></td><td></td></tr>
</table>

Funding commitments made to applicants during 2Q2025 are included in Appendix SL04.

**FUNDING YEAR 2008**

| FUNDING YEAR 2008 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $899.70 | 40.51% | $735.19 | 38.16% | 81.72% |
| Internet Access | $239.86 | 10.80% | $201.80 | 10.48% | 84.13% |
| Internal Connections | $1,001.45 | 45.09% | $927.41 | 48.14% | 92.61% |
| Internal Connections-Maint | $80.03 | 3.60% | $61.99 | 3.22% | 77.46% |
| TOTAL | $2,221.04 | 100.00% | $1,926.39 | 100.00% | 86.73% |
| Deobligations due to Expired FRNs | ($294.65) | | | | |
| Net Commitments | $1,926.39 | | | | |

Funding commitments made to applicants during 2Q2025 are included in Appendix SL05.

**FUNDING YEAR 2009**

| FUNDING YEAR 2009 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $948.77 | 35.67% | $788.02 | 33.77% | 83.06% |
| Internet Access | $245.96 | 9.25% | $208.73 | 8.95% | 84.86% |
| Internal Connections | $1,334.62 | 50.17% | $1,240.17 | 53.15% | 92.92% |
| Internal Connections-Maint | $130.84 | 4.92% | $96.31 | 4.13% | 73.61% |
| TOTAL | $2,660.19 | 100.00% | $2,333.23 | 100.00% | 87.71% |
| Deobligations due to Expired FRNs | ($326.96) | | | | |

| Net Commitments | $2,333.23 | | | | |
|---|---|---|---|---|---|

**FUNDING YEAR 2010**

| FUNDING YEAR 2010 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $1,007.14 | 35.82% | $840.18 | 34.29% | 83.42% |
| Internet Access | $271.00 | 9.64% | $228.99 | 9.34% | 84.50% |
| Internal Connections | $1,397.11 | 49.69% | $1,279.96 | 52.23% | 91.61% |
| Internal Connections-Maint | $136.56 | 4.86% | $101.34 | 4.14% | 74.21% |
| TOTAL | $2,811.81 | 100.00% | $2,450.47 | 100.00% | 87.15% |
| Deobligations due to Expired FRNs | ($361.12) | | | | |
| Net Commitments | $2,450.69 | | | | |

Funding commitments made to applicants during 2Q2025 are included in Appendix SL06.

**FUNDING YEAR 2011**

| FUNDING YEAR 2011 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $1,018.44 | 40.97% | $834.62 | 38.80% | 81.95% |
| Internet Access | $320.58 | 12.89% | $269.16 | 12.51% | 83.96% |
| Internal Connections | $1,061.98 | 42.72% | $994.91 | 46.25% | 93.68% |
| Internal Connections-Maint | $85.11 | 3.42% | $52.59 | 2.44% | 61.79% |
| TOTAL | $2,486.11 | 100.00% | $2,151.28 | 100.00% | 86.53% |
| Deobligations due to Expired FRNs | ($333.98) | | | | |

JA403

| Net Commitments | $2,152.13 | | | | |
|---|---|---|---|---|---|

Funding commitments made to applicants during 2Q2025 are included in Appendix SL07.

**FUNDING YEAR 2012**

| FUNDING YEAR 2012 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $1,051.43 | 37.89% | $855.44 | 36.04% | 81.36% |
| Internet Access | $398.40 | 14.36% | $325.51 | 13.71% | 81.70% |
| Internal Connections | $1,236.30 | 44.55% | $1,137.92 | 47.94% | 92.04% |
| Internal Connections-Maint | $89.05 | 3.21% | $55.00 | 2.32% | 61.76% |
| **TOTAL** | $2,775.18 | 100.00% | $2,373.87 | 100.00% | 85.54% |
| Deobligations due to Expired FRNs | ($401.30) | | | | |
| **Net Commitments** | $2,373.88 | | | | |

Funding commitments made to applicants during 2Q2025 are included in Appendix SL08.

**FUNDING YEAR 2013**

| FUNDING YEAR 2013 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $1,096.50 | 53.26% | $881.52 | 50.28% | 80.39% |
| Internet Access | $462.66 | 22.47% | $371.87 | 21.21% | 80.38% |
| Internal Connections | $499.77 | 24.27% | $499.77 | 28.51% | 100.00% |

JA404

| | | | | | |
|---|---|---|---|---|---|
| Internal Connections-Maint | $0.00 | 0.00% | $0.00 | 0.00% | 0.00% |
| **TOTAL** | $2,058.93 | 100.00% | $1,753.16 | 100.00% | 85.15% |
| Deobligations due to Expired FRNs | ($305.61) | | | | |
| **Net Commitments** | $1,753.32 | | | | |

Funding commitments made to applicants during 2Q2025 are included in Appendix

SL09.

**FUNDING YEAR 2014**

| FUNDING YEAR 2014 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $1,158.66 | 52.66% | $937.13 | 50.04% | 80.88% |
| Internet Access | $521.65 | 23.71% | $415.75 | 22.20% | 79.70% |
| Internal Connections | $519.82 | 23.63% | $519.82 | 27.76% | 100.00% |
| Internal Connections-Maint | $0.00 | 0.00% | $0.00 | 0.00% | 0.00% |
| **TOTAL** | $2,200.13 | 100.00% | $1,872.70 | 100.00% | 85.12% |
| Deobligations due to Expired FRNs | ($327.26) | | | | |
| **Net Commitments** | $1,872.87 | | | | |

Funding commitments made to applicants during 2Q2025 are included in Appendix

SL10.

JA405

**FUNDING YEAR 2015**

| FUNDING YEAR 2015 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Telecommunications | $623.74 | 20.08% | $542.93 | 19.43% | 87.04% |
| Internet Access | $507.42 | 16.34% | $421.82 | 15.10% | 83.13% |
| Internal Connections | $1,593.86 | 51.32% | $1,550.20 | 55.49% | 97.26% |
| Internal Connections-Maint | $16.06 | 0.52% | $12.42 | 0.44% | 77.33% |
| MIBS | $19.70 | 0.63% | $10.02 | 0.36% | 50.86% |
| Voice | $345.07 | 11.11% | $256.40 | 9.18% | 74.30% |
| **TOTAL** | $3,105.85 | 100.00% | $2,793.79 | 100.00% | 89.95% |
| Deobligations due to Expired FRNs | ($311.84) | | | | |
| **Net Commitments** | $2,794.01 | | | | |

Funding commitments made to applicants during 2Q2025 are included in Appendix

SL11.

**FUNDING YEAR 2016**

| FUNDING YEAR 2016 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Internet Access | $1,647.09 | 59.51% | $1,371.32 | 58.37% | 83.26% |
| Internal Connections | $801.85 | 28.97% | $737.82 | 31.41% | 92.01% |
| Internal Connections-Maint | $23.30 | 0.84% | $15.41 | 0.66% | 66.14% |
| MIBS | $23.03 | 0.83% | $20.43 | 0.87% | 88.71% |
| Voice | $272.49 | 9.85% | $204.34 | 8.70% | 74.99% |
| TOTAL | $2,767.76 | 100.00% | $2,349.32 | 100.00% | 84.88% |
| Deobligations due to Expired FRNs | ($417.99) | | | | |
| Net Commitments | $2,349.77 | | | | |

Funding commitments made to applicants during 2Q2025 are included in Appendix SL12. Authorized funding by applicants during 2Q2025 and cumulative payments to service providers through 2Q2025 are listed in Appendices SL13 and SL14, respectively.

**FUNDING YEAR 2017**

| FUNDING YEAR 2017 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Internet Access | $1,651.87 | 69.76% | $1,391.79 | 69.44% | 84.26% |
| Internal Connections | $543.29 | 22.94% | $489.38 | 24.42% | 90.08% |
| Internal Connections-Maint | $22.68 | 0.96% | $11.26 | 0.56% | 49.65% |
| MIBS | $25.27 | 1.07% | $20.12 | 1.00% | 79.62% |
| Voice | $124.74 | 5.27% | $91.72 | 4.58% | 73.53% |
| TOTAL | $2,367.85 | 100.00% | $2,004.27 | 100.00% | 84.65% |
| Deobligations due to Expired FRNs | ($363.56) | | | | |
| Net Commitments | $2,004.29 | | | | |

Funding commitments made to applicants during 2Q2025 are included in Appendix SL15.

**FUNDING YEAR 2018**

| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
|---|---|---|---|---|---|
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Internet Access | $1,742.51 | 75.96% | $1,513.24 | 75.69% | 86.84% |
| Internal Connections | $487.28 | 21.24% | $438.38 | 21.93% | 89.96% |
| Internal Connections-Maint | $21.70 | 0.95% | $12.97 | 0.65% | 59.77% |
| MIBS | $20.07 | 0.87% | $18.92 | 0.95% | 94.27% |
| Voice | $22.30 | 0.97% | $15.66 | 0.78% | 70.22% |
| **TOTAL** | $2,293.86 | 100.00% | $1,999.17 | 100.00% | 87.15% |
| Deobligations due to Expired FRNs | ($293.21) | | | | |
| **Net Commitments** | $2,000.65 | | | | |

*(Table title: FUNDING YEAR 2018)*

Funding commitments made to applicants during 2Q2025 are included in Appendix SL16. Authorized funding by applicants during 2Q2025 and cumulative payments to service providers through 2Q2025 are listed in Appendices SL17 and SL18, respectively.

**FUNDING YEAR 2019**

| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
|---|---|---|---|---|---|
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Internet Access | $1,581.07 | 66.87% | $1,348.84 | 66.57% | 85.31% |
| Internal Connections | $737.98 | 31.21% | $646.05 | 31.88% | 87.54% |
| Internal Connections-Maint | $24.72 | 1.05% | $12.15 | 0.60% | 49.15% |
| MIBS | $20.75 | 0.88% | $19.22 | 0.95% | 92.63% |

*(Table title: FUNDING YEAR 2019)*

JA408

| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
|---|---|---|---|---|---|
| Voice | $0.00 | 0.00% | $0.00 | 0.00% | 0.00% |
| **TOTAL** | $2,364.52 | 100.00% | $2,026.26 | 100.00% | 85.69% |
| Deobligations due to Expired FRNs | ($326.90) | | | | |
| **Net Commitments** | $2,037.62 | | | | |

Funding commitments made to applicants during 2Q2025 are included in Appendix SL19. Authorized funding by applicant during 2Q2025 and cumulative payments to service providers through 2Q2025 are listed in Appendices SL20 and SL21, respectively.

**FUNDING YEAR 2020**

| FUNDING YEAR 2020 | | | | | |
|---|---|---|---|---|---|
| | **Net Commitments** | | **Net Authorized for Payment** | | **Auth/Com** |
| | **Millions of Dollars** | **% of Total Commitments** | **Millions of Dollars** | **% of Total Authorized for Payment** | **% of Committed Authorized for Payment** |
| Internet Access | $1,577.03 | 61.81% | $1,304.46 | 63.82% | 82.72% |
| Internal Connections | $917.30 | 35.95% | $702.14 | 34.35% | 76.54% |
| Internal Connections-Maint | $28.66 | 1.12% | $12.44 | 0.61% | 43.41% |
| MIBS | $28.39 | 1.11% | $24.89 | 1.22% | 87.67% |
| **TOTAL** | $2,551.38 | 100.00% | $2,043.93 | 100.00% | 80.11% |
| Deobligations due to Expired FRNs | ($418.93) | | | | |
| **Net Commitments** | $2,132.45 | | | | |

Funding commitments made to applicants during 2Q2025 are included in Appendix SL22. Authorized funding by applicant during 2Q2025 and cumulative payments to service providers through 2Q2025 are listed in Appendices SL23 and SL24, respectively.

JA409

**FUNDING YEAR 2021**

| FUNDING YEAR 2021 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Internet Access | $1,551.33 | 59.94% | $1,292.28 | 57.71% | 83.30% |
| Internal Connections | $980.77 | 37.89% | $898.29 | 40.11% | 91.59% |
| Internal Connections-Maint | $21.25 | 0.82% | $15.99 | 0.71% | 75.25% |
| MIBS | $34.80 | 1.34% | $32.73 | 1.46% | 94.05% |
| **TOTAL** | $2,588.15 | 100.00% | $2,239.29 | 100.00% | 86.52% |
| Deobligations due to Expired FRNs | ($296.91) | | | | |
| **Net Commitments** | $2,291.24 | | | | |

Funding commitments made to applicants during 2Q2025 are included in Appendix SL25. Authorized funding by applicants during 2Q2025 and cumulative payments to service providers through 2Q2025 are listed in Appendices SL26 and SL27, respectively.

**FUNDING YEAR 2022**

| FUNDING YEAR 2022 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Internet Access | $1,555.31 | 57.80% | $1,305.07 | 56.55% | 83.91% |
| Internal Connections | $1,074.17 | 39.92% | $950.92 | 41.21% | 88.53% |
| Internal Connections-Maint | $22.73 | 0.84% | $15.95 | 0.69% | 70.17% |
| MIBS | $38.54 | 1.43% | $35.77 | 1.55% | 92.81% |
| **TOTAL** | $2,690.75 | 100.00% | $2,307.71 | 100.00% | 85.76% |
| Deobligations due to Expired FRNs | ($270.80) | | | | |
| **Net Commitments** | $2,419.95 | | | | |

Funding commitments made to applicants during 2Q2025 are included in Appendix SL28.  Authorized funding by applicant during 2Q2025 and cumulative payments to service providers through 2Q2025 are listed in Appendices SL29 and SL30, respectively.

**FUNDING YEAR 2023**

| FUNDING YEAR 2023 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Internet Access | $1,536.38 | 58.47% | $1,216.96 | 57.91% | 79.21% |
| Internal Connections | $1,029.10 | 39.16% | $835.45 | 39.75% | 81.18% |
| Internal Connections-Maint | $23.17 | 0.88% | $15.42 | 0.73% | 66.55% |
| MIBS | $39.11 | 1.49% | $33.81 | 1.61% | 86.45% |
| **TOTAL** | $2,627.76 | 100.00% | $2,101.64 | 100.00% | 79.98% |
| Deobligations due to Expired FRNs | ($247.71) | | | | |
| **Net Commitments** | $2,380.05 | | | | |

Funding commitments made to applicants during 2Q2025 are included in Appendix SL31.  Authorized funding by applicant during 2Q2025 and cumulative payments to service providers through 2Q2025 are listed in Appendices SL32 and SL33, respectively.

JA411

**FUNDING YEAR 2024**

| FUNDING YEAR 2024 | | | | | |
|---|---|---|---|---|---|
| | Net Commitments | | Net Authorized for Payment | | Auth/Com |
| | Millions of Dollars | % of Total Commitments | Millions of Dollars | % of Total Authorized for Payment | % of Committed Authorized for Payment |
| Internet Access | $1,646.61 | 61.42% | $807.65 | 55.67% | 49.05% |
| Internal Connections | $961.26 | 35.86% | $608.64 | 41.95% | 63.32% |
| Internal Connections-Maint | $26.11 | 0.97% | $6.36 | 0.44% | 24.36% |
| MIBS | $46.90 | 1.75% | $28.18 | 1.94% | 60.09% |
| **TOTAL** | $2,680.88 | 100.00% | $1,450.83 | 100.00% | 54.12% |
| Deobligations due to Expired FRNs | $0.00 | | | | |
| **Net Commitments** | $2,680.88 | | | | |

Funding commitments made to applicants during 2Q2025 are included in Appendix SL34.  Authorized funding by applicant during 2Q2025 and cumulative payments to service providers through 2Q2025 are listed in Appendices SL35 and SL36, respectively.

**FCC DECISIONS AND UNUSED FUNDS**

In the *Schools and Libraries Third Report and Order*, the Commission amended its rules to allow unused funds from prior Funding Years to be carried forward on an annual basis in the second quarter of each calendar year for use in the next full Funding Year.[68]  The Commission required USAC to file quarterly estimates of unused funds from prior Funding Years in submitting its projection of Schools and Libraries Support Mechanism demand for the upcoming quarter.

---

[68]  Schools and Libraries Universal Service Support Mechanism, CC Docket No. 02-6, Third Report and Order and Second Further Notice of Proposed Rulemaking, 18 FCC Rcd 26912, paras. 52-57 (2003) (*Schools and Libraries Third Report and Order*).

The following is a summary of estimated unused funds as of June 30, 2025 for each funding year, including adjustments made by the Commission and projections of unused funds as required by Commission rules.

*Funding Year 1998*

Funding Year 1998 began on July 1, 1998 and ended on June 30, 1999.  Balances as of June 30, 2025 are as follows:

| FY 1998 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $1,925.00 |
| Amount Authorized for Disbursement | ($1,398.97) |
| Administrative Expenses (21 months) | ($41.79) |
| Amount Carried Forward / Backward | ($6.69) |
| Amount Applied to Adjust 2000, 2001, and 2002 Collections | ($477.16) |
| Potential Additional Disbursements on Committed FRNs | $0.00 |
| Reserve for USAC Appeals | ($0.01) |
| Reserve for FCC Appeals | ($0.38) |
| **Estimated Remaining Balance** | $0.00 |

*Funding Year 1999*

Funding Year 1999 began on July 1, 1999 and ended on June 30, 2000.  Balances as of June 30, 2025 are as follows:

| FY 1999 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($1,649.93) |
| Administrative Expenses | ($32.32) |
| Amount Applied to Adjust Third Quarter 2002 Collections | ($256.16) |
| Amount Applied to Adjust Fourth Quarter 2002 Collections | ($212.93) |
| Amount Carried Forward / Backward | ($94.00) |
| Amount Received from Rollover | $0.00 |
| Reserve for USAC Appeals | ($0.02) |
| Reserve for FCC Appeals | ($4.64) |
| **Estimated Remaining Balance** | $0.00 |

*Funding Year 2000*

Funding Year 2000 began on July 1, 2000 and ended on June 30, 2001.  Balances as

of June 30, 2025 are as follows:

| FY 2000 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($1,646.94) |
| Administrative Expenses | ($32.24) |
| Amount Applied to Adjust Fourth Quarter 2002 Collections | ($136.85) |
| Amount Applied to Adjust First Quarter 2003 Collections | ($246.18) |
| Amount Carried Forward / Backward | ($183.14) |
| Reserve for USAC Appeals | ($0.01) |
| Reserve for FCC Appeals | ($4.64) |
| **Estimated Remaining Balance** | $0.00 |

*Funding Year 2001*

Funding Year 2001 began on July 1, 2001 and ended on June 30, 2002.  Balances as

of June 30, 2025 are as follows:

| FY 2001 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($1,676.66) |
| Administrative Expenses | ($30.56) |
| Amount Carried Forward / Backward | ($489.39) |
| Remaining Uncommitted Requests | ($20.33) |
| Reserve for USAC Appeals | ($8.76) |
| Reserve for FCC Appeals | ($24.30) |
| **Estimated Remaining Balance** | $0.00 |

*Funding Year 2002*

Funding Year 2002 began on July 1, 2002 and ended on June 30, 2003.  Balances as

of June 30, 2025 are as follows:

JA414

| FY 2002 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($1,594.19) |
| Administrative Expenses | ($38.53) |
| Amount Carried Forward / Backward | ($594.66) |
| Potential Additional Disbursements on Committed FRNs | $0.00 |
| Remaining Uncommitted Requests | ($0.93) |
| Reserve for USAC Appeals | ($0.01) |
| Reserve for FCC Appeals | ($21.68) |
| **Estimated Remaining Balance** | $0.00 |

### Funding Year 2003

Funding Year 2003 began on July 1, 2003 and ended on June 30, 2004.  Balances as

of June 30, 2025, are as follows:

| FY 2003 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($1,937.51) |
| Administrative Expenses | ($44.19) |
| Amount Carried Forward / Backward | ($638.22) |
| Amount Received from Rollover | $420.00 |
| Potential Additional Disbursements on Committed FRNs | ($0.04) |
| Remaining Uncommitted Requests | ($32.83) |
| Reserve for USAC Appeals | ($0.01) |
| Reserve for FCC Appeals | ($16.83) |
| **Estimated Remaining Balance** | $0.37 |

### Funding Year 2004

Funding Year 2004 began on July 1, 2004 and ended on June 30, 2005.  Balances as

of June 30, 2025 are as follows:

| FY 2004 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($1,535.24) |
| Administrative Expenses | ($55.75) |
| Amount Carried Forward / Backward | ($723.72) |

| | |
|---|---|
| Amount Received from Rollover | $150.00 |
| Amount Applied to Adjust Collections | ($550.00) |
| Adjustment for Reduction in Collections | $550.00 |
| Potential Additional Disbursements on Committed FRNs | $0.00 |
| Reserve for USAC Appeals | ($2.36) |
| Reserve for FCC Appeals | ($82.64) |
| **Estimated Remaining Balance** | $0.29 |

## *Funding Year 2005*

Funding Year 2005 began on July 1, 2005 and ended on June 30, 2006.  Balances as

of June 30, 2025 are as follows:

| **FY 2005** | **Amounts in Millions** |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($1,623.34) |
| Administrative Expenses | ($64.99) |
| Amount Carried Forward / Backward | ($534.11) |
| Potential Additional Disbursements on Committed FRNs | ($0.46) |
| Remaining Uncommitted Requests | ($0.16) |
| Reserve for USAC Appeals | ($0.02) |
| Reserve for FCC Appeals | ($25.53) |
| **Estimated Remaining Balance** | $1.39 |

## *Funding Year 2006*

Funding Year 2006 began on July 1, 2006 and ended on June 30, 2007.  Balances as

of June 30, 2025, are as follows:

| **FY 2006** | **Amounts in Millions** |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($1,566.76) |
| Administrative Expenses | ($80.74) |
| Amount Carried Forward / Backward | ($586.54) |
| Potential Additional Disbursements on Committed FRNs | ($0.03) |
| Remaining Uncommitted Requests | $0.00 |
| Reserve for USAC Appeals | ($0.06) |
| Reserve for FCC Appeals | ($15.53) |

| | |
|---|---|
| **Estimated Remaining Balance** | $0.34 |

## Funding Year 2007

Funding Year 2007 began on July 1, 2007 and ended on June 30, 2008.  Balances as

of June 30, 2025 are as follows:

| FY 2007 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($1,952.90) |
| Administrative Expenses | ($81.24) |
| Amount Carried Forward / Backward | ($850.01) |
| Potential Additional Disbursements on Committed FRNs | ($0.08) |
| Amount Received from Rollover | $650.00 |
| Remaining Uncommitted Requests | ($0.94) |
| Reserve for USAC Appeals | ($0.02) |
| Reserve for FCC Appeals | ($14.55) |
| **Estimated Remaining Balance** | $0.26 |

## Funding Year 2008

Funding Year 2008 began on July 1, 2008 and ended on June 30, 2009.  Balances as

of June 30, 2025 are as follows:

| FY 2008 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($1,926.39) |
| Administrative Expenses | ($125.59) |
| Amount Carried Forward / Backward | ($777.48) |
| Amount Received from Rollover | $600.00 |
| Potential Additional Disbursements on Committed FRNs | $0.00 |
| Remaining Uncommitted Requests | $0.00 |
| Reserve for USAC Appeals | ($0.10) |
| Reserve for FCC Appeals | ($10.78) |
| **Estimated Remaining Balance** | $9.66 |

## Funding Year 2009

Funding Year 2009 began on July 1, 2009 and ended on June 30, 2010. Balances as

of June 30, 2025 are as follows:

| FY 2009 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($2,333.23) |
| Administrative Expenses | ($81.27) |
| Amount Carried Forward / Backward | ($725.42) |
| Amount Received from Rollover | $900.00 |
| Potential Additional Disbursements on Committed FRNs | $0.00 |
| Reserved for Invoices Awaiting Approval Expired FRNs | $0.00 |
| Remaining Uncommitted Requests | ($0.02) |
| Reserve for USAC Appeals | ($0.12) |
| Reserve for FCC Appeals | ($9.80) |
| **Estimated Remaining Balance** | $0.14 |

## Funding Year 2010

Funding Year 2010 began on July 1, 2010 and ended on June 30, 2011. Balances as

of June 30, 2025 are as follows:

| FY 2010 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,270.25 |
| Amount Authorized for Disbursement | ($2,450.47) |
| Administrative Expenses | ($75.33) |
| Amount Carried Forward / Backward | ($740.81) |
| Amount Received from Rollover | $1,150.00 |
| Amount Applied to Adjust Collections FY2004 | ($140.00) |
| Potential Additional Disbursements on Committed FRNs | ($0.22) |
| Reserved for Invoices Awaiting Approval Expired FRNs | $0.00 |
| Reserve for USAC Appeals | ($0.02) |
| Reserve for FCC Appeals | ($13.32) |
| **Estimated Remaining Balance** | $0.08 |

*Funding Year 2011*

Funding Year 2011 began on July 1, 2011 and ended on June 30, 2012.  Balances as of June 30, 2025 are as follows:

| FY 2011 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,290.68 |
| Amount Authorized for Disbursement | ($2,151.28) |
| Administrative Expenses | ($69.17) |
| Amount Carried Forward / Backward | ($651.27) |
| Amount Received from Rollover | $850.00 |
| Amount Applied to Adjust Collections FY2004 | ($250.00) |
| Potential Additional Disbursements on Committed FRNs | ($0.85) |
| Reserved for Invoices Awaiting Approval Expired FRNs | $0.00 |
| Remaining Uncommitted Requests | $0.00 |
| Reserve for USAC Appeals | $0.00 |
| Reserve for FCC Appeals | ($17.85) |
| **Estimated Remaining Balance** | $0.26 |

*Funding Year 2012*

Funding Year 2012 began on July 1, 2012 and ended on June 30, 2013.  Balances as of June 30, 2025 are as follows:

| FY 2012 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,338.80 |
| Amount Authorized for Disbursement | ($2,373.87) |
| Administrative Expenses | ($67.31) |
| Amount Carried Forward / Backward | ($896.08) |
| Amount Received from Rollover | $1,050.00 |
| Amount Applied to Adjust Collections FY2004 | ($40.00) |
| Potential Additional Disbursements on Committed FRNs | ($0.01) |
| Reserved for Invoices Awaiting Approval Expired FRNs | $0.00 |
| Remaining Uncommitted Requests | $0.00 |
| Reserve for USAC Appeals | $0.00 |
| Reserve for FCC Appeals | ($10.90) |
| **Estimated Remaining Balance** | $0.63 |

## Funding Year 2013

Funding Year 2013 began on July 1, 2013 and ended on June 30, 2014. Balances as of June 30, 2025 are as follows:

| FY 2013 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,380.30 |
| Amount Authorized for Disbursement | ($1,753.16) |
| Administrative Expenses | ($62.90) |
| Amount Carried Forward / Backward | ($880.76) |
| Amount Received from Rollover | $450.00 |
| Amount Applied to Adjust Collections FY2004 | ($120.00) |
| Potential Additional Disbursements on Committed FRNs | ($0.16) |
| Reserved for Invoices Awaiting Approval Expired FRNs | $0.00 |
| Remaining Uncommitted Requests | $0.00 |
| Reserve for USAC Appeals | $0.00 |
| Reserve for FCC Appeals | ($13.13) |
| **Estimated Remaining Balance** | $0.19 |

## Funding Year 2014

Funding Year 2014 began on July 1, 2014 and ended on June 30, 2015. Balances as of June 30, 2025 are as follows:

| FY 2014 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,413.82 |
| Amount Authorized for Disbursement | ($1,872.70) |
| Administrative Expenses | ($74.94) |
| Amount Carried Forward / Backward | ($650.09) |
| Amount Received from Rollover | $200.00 |
| Potential Additional Disbursements on Committed FRNs | ($0.17) |
| Reserved for Invoices Awaiting Approval Expired FRNs | $0.00 |
| Remaining Uncommitted Requests | ($0.02) |
| Reserve for USAC Appeals | ($0.60) |
| Reserve for FCC Appeals | ($14.60) |
| **Estimated Remaining Balance** | $0.70 |

*Funding Year 2015*

Funding Year 2015 began on July 1, 2015 and ended on June 30, 2016.  Balances as of June 30, 2025 are as follows:

| FY 2015 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,250.00 |
| Amount Authorized for Disbursement | ($2,793.79) |
| Administrative Expenses | ($103.04) |
| Amount Carried Forward / Backward | ($916.80) |
| Amount Received from Rollover | $1,575.05 |
| Potential Additional Disbursements on Committed FRNs | ($0.22) |
| Reserved for Invoices Awaiting Approval Expired FRNs | ($0.01) |
| Remaining Uncommitted Requests | $0.00 |
| Reserve for USAC Appeals | ($0.42) |
| Reserve for FCC Appeals | ($10.65) |
| **Estimated Remaining Balance** | $0.12 |

*Funding Year 2016*

Funding Year 2016 began on July 1, 2016 and ended on June 30, 2017.  Balances as of June 30, 2025 are as follows:

| FY 2016 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $1,842.25 |
| Amount Authorized for Disbursement | ($2,349.32) |
| Administrative Expenses | ($120.35) |
| Amount Carried Forward / Backward | ($1,252.70) |
| Amount Received from Rollover | $1,900.00 |
| Potential Additional Disbursements on Committed FRNs | ($0.45) |
| Reserved for Invoices Awaiting Approval Expired FRNs | $0.00 |
| Remaining Uncommitted Requests | $0.00 |
| Reserve for USAC Appeals | ($0.37) |
| Reserve for FCC Appeals | ($18.32) |
| **Estimated Remaining Balance** | $0.74 |

*Funding Year 2017*

Funding Year 2017 began on July 1, 2017 and ended on June 30, 2018. Balances as of June 30, 2025 are as follows:

| FY 2017 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,064.22 |
| Amount Authorized for Disbursement | ($2,004.27) |
| Administrative Expenses | ($110.67) |
| Amount Carried Forward / Backward | ($1,133.91) |
| Amount Received from Rollover | $1,200.24 |
| Potential Additional Disbursements on Committed FRNs | ($0.02) |
| Reserved for Invoices Awaiting Approval Expired FRNs | ($0.01) |
| Remaining Uncommitted Requests | $0.00 |
| Reserve for USAC Appeals | ($0.80) |
| Reserve for FCC Appeals | ($14.40) |
| **Estimated Remaining Balance** | $0.38 |

*Funding Year 2018*

Funding Year 2018 began on July 1, 2018 and ended on June 30, 2019. Balances as of June 30, 2025 are as follows:

| FY 2018 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $1,629.45 |
| Amount Authorized for Disbursement | ($1,999.17) |
| Administrative Expenses | ($97.28) |
| Amount Carried Forward / Backward | ($702.68) |
| Amount Received from Rollover | $1,200.00 |
| Potential Additional Disbursements on Committed FRNs | ($1.48) |
| Reserved for Invoices Awaiting Approval Expired FRNs | ($0.08) |
| Remaining Uncommitted Requests | $0.00 |
| Reserve for USAC Appeals | ($0.01) |
| Reserve for FCC Appeals | ($29.05) |
| **Estimated Remaining Balance** | ($0.30) |

*Funding Year 2019*

Funding Year 2019 began on July 1, 2019 and ended on June 30, 2020.  Balances as

of June 30, 2025 are as follows:

| FY 2019 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $1,699.18 |
| Amount Authorized for Disbursement | ($2,026.26) |
| Administrative Expenses | ($74.11) |
| Amount Carried Forward / Backward | ($532.80) |
| Amount Received from Rollover | $1,000.00 |
| Potential Additional Disbursements on Committed FRNs | ($11.36) |
| Reserved for Invoices Awaiting Approval Expired FRNs | ($0.03) |
| Remaining Uncommitted Requests | $0.00 |
| Reserve for USAC Appeals | $0.00 |
| Reserve for FCC Appeals | ($49.50) |
| **Estimated Remaining Balance** | $5.12 |

*Funding Year 2020*

Funding Year 2020 began on July 1, 2020 and ended on June 30, 2021.  Balances as

of June 30, 2025 are as follows:

| FY 2020 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,313.05 |
| Amount Authorized for Disbursement | ($2,043.93) |
| Administrative Expenses | ($69.83) |
| Amount Carried Forward / Backward | ($585.32) |
| Amount Received from Rollover | $500.00 |
| Potential Additional Disbursements on Committed FRNs | ($88.52) |
| Reserved for Invoices Awaiting Approval Expired FRNs | $0.00 |
| Remaining Uncommitted Requests | $0.00 |
| Reserve for USAC Appeals | ($0.54) |
| Reserve for FCC Appeals | ($20.68) |
| **Estimated Remaining Balance** | $4.23 |

*Funding Year 2021*

Funding Year 2021 began on July 1, 2021 and ended on June 30, 2022.  Balances as

of June 30, 2025 are as follows:

| FY 2021 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,373.25 |
| Amount Authorized for Disbursement | ($2,239.29) |
| Administrative Expenses | ($66.61) |
| Amount Carried Forward / Backward | ($301.50) |
| Amount Received from Rollover | $500.00 |
| Potential Additional Disbursements on Committed FRNs | ($51.95) |
| Reserved for Invoices Awaiting Approval Expired FRNs | $0.00 |
| Remaining Uncommitted Requests | ($2.23) |
| Reserve for Cybersecurity Pilot | ($200.00) |
| Reserve for USAC Appeals | ($1.06) |
| Reserve for FCC Appeals | ($6.61) |
| **Estimated Remaining Balance** | $4.00 |

*Funding Year 2022*

Funding Year 2022 began on July 1, 2022 and ended on June 30, 2023.  Balances as

of June 30, 2025 are as follows:

| FY 2022 | Amounts in Millions |
|---|---|
| Amount Authorized and Actually Collected | $2,447.11 |
| Amount Authorized for Disbursement | ($2,307.71) |
| Administrative Expenses | ($73.93) |
| Amount Carried Forward / Backward | ($439.05) |
| Amount Received from Rollover | $500.00 |
| Potential Additional Disbursements on Committed FRNs | ($112.24) |
| Reserved for Invoices Awaiting Approval Expired FRNs | ($0.01) |
| Remaining Uncommitted Requests | ($3.79) |
| Reserve for USAC Appeals | ($0.34) |
| Reserve for FCC Appeals | ($13.84) |
| **Estimated Remaining Balance** | ($3.80) |

*Funding Year 2023*

Funding Year 2023 began on July 1, 2023 and ended on June 30, 2024.  Balances as

of June 30, 2025 are as follows:

| FY 2023 | Amounts in Millions |
| --- | ---: |
| Amount Authorized and Actually Collected | $2,549.30 |
| Amount Authorized for Disbursement | ($2,101.64) |
| Administrative Expenses | ($86.91) |
| Amount Carried Forward / Backward | ($121.48) |
| Amount Received from Rollover | $250.00 |
| Potential Additional Disbursements on Committed FRNs | ($278.41) |
| Reserved for Invoices Awaiting Approval Expired FRNs | $0.00 |
| Remaining Uncommitted Requests | ($6.49) |
| Reserve for USAC Appeals | ($8.24) |
| Reserve for FCC Appeals | ($11.07) |
| **Estimated Remaining Balance** | $185.06 |

*Funding Year 2024*

Funding Year 2024 began on July 1, 2024 and ended on June 30, 2025.  Balances as

of June 30, 2025 are as follows:

| FY 2024 | Amounts in Millions |
| --- | ---: |
| Amount Authorized and Actually Collected | $2,606.79 |
| Amount Authorized for Disbursement | ($1,450.83) |
| Administrative Expenses | ($82.07) |
| Amount Carried Forward / Backward | ($26.64) |
| Amount Received from Rollover | $490.00 |
| Potential Additional Disbursements on Committed FRNs | ($1,230.05) |
| Reserved for Invoices Awaiting Approval Expired FRNs | $0.00 |
| Remaining Uncommitted Requests | ($144.74) |
| Reserve for USAC Appeals | ($6.77) |
| Reserve for FCC Appeals | ($10.86) |
| **Estimated Remaining Balance** | $144.83 |

**SCHOOLS AND LIBRARIES SUPPORT MECHANISM SUMMARY**

On March 7, 2025, the FCC announced the funding cap for Funding Year 2025 of $5,058.64 million.[69] This reflects a 2.4 percent inflation-adjusted increase to the $4,940.07 million cap from Funding Year 2024.[70] The filing window for Funding Year 2025 closed on March 26, 2025. Based on applications received, USAC estimates demand for Funding Year 2025 will be $3,014.72 million (net of projected post window close adjustments).

FCC approved a carry-forward to Funding Year 2025 of $500 million from prior funding years as follows, 2000: $0.50; 2001: $32.69 million; 2006: $0.61 million; 2007: $0.02 million; 2010: $0.68 million; 2013: $0.36 million; 2015: $4.21 million; 2017: $9.73 million; 2018: $4.64 million; 2019: $11.42 million; 2020: $23.23 million; 2021: $60.90 million; 2022: $204.20 million; 2023: $121.48 million; and 2024: $25.33 million; (net of funds carried back to funding years with a negative carry forward balance). Based on an estimated demand of $3,014.72 million and funds carried forward of $500 million, the 4Q2025 collection requirement for the Funding Year 2025 is $628.68 million.

The net fund requirement of $628.68 million is adjusted as follows: increased by the prior period adjustments of $0.61 million[71] and increased by $22.60 million for administrative expenses; resulting in a total projected 4Q2025 funding requirement for the Schools and Libraries Support Mechanism of $651.89 million.

*AUTHORIZATION TO FILE WITH THE COMMISSION*

At their July 28, 2025 meeting, USAC's High Cost & Low Income, Schools and Libraries, and Rural Health Care Committees adopted resolutions authorizing USAC staff to

---

[69] *See Wireline Competition Bureau Announces E-Rate and RHC Programs' Inflation-Based Caps for Funding Year 2025,* CC Docket No. 02-6, WC Docket No. 02-60, Public Notice, DA 25-427 (2025).
[70] *Id.*
[71] Prior period adjustments reconcile projections to actual results and include adjustments for billings, interest income, and bad debt.

file the 4Q2025 projected support mechanism funding requirements for those programs with the Commission.  At its July 29, 2025 meeting, the USAC Board of Directors adopted a resolution authorizing USAC staff to file the 4Q2025 projected support mechanism funding requirements and include the projected 4Q2025 common administrative expenses in this report to the Commission.

Respectfully submitted,

UNIVERSAL SERVICE
ADMINISTRATIVE COMPANY
Michelle Garber, Vice President of Finance, and
Chief Financial Officer

August 1, 2025

JA427

# **CERTIFICATE OF SERVICE**

I hereby certify that on April 3, 2026, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

Dated: April 3, 2026

*/s/ Laura B. Ruppalt*
Laura B. Ruppalt
BOYDEN GRAY PLLC
800 Connecticut Ave. NW,
 Suite 900
Washington, DC 20006
(202) 955-0620