No. 25-60535

In the United States Court of Appeals
for the Fifth Circuit

CONSUMERS' RESEARCH; CAUSE BASED COMMERCE, INC.;
EDWARD J. BLUM; KERSTEN CONWAY; SUZANNE BETTAC;
ROBERT KULL; KWANG JA KIRBY; TOM KIRBY; JOSEPH
BAYLY; JEREMY ROTH; DEANNA ROTH; LYNN GIBBS; PAUL
GIBBS; RHONDA THOMAS; JAMES ROMEO; CODY CARNETT;
PHILLIP ARONOFF; JACQUELINE KLEIN,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,

*Respondents.*

Petition for Review of an Order of the
Federal Communications Commission
Agency No. 96-45

**REPLY BRIEF FOR PETITIONERS**

Michael Buschbacher
Jared M. Kelson
James R. Conde
Laura B. Ruppalt
  *Counsel of Record*
BOYDEN GRAY PLLC
800 Connecticut Ave. NW, Suite 900
Washington, DC 20006
202-955-0620
lruppalt@boydengray.com
*Counsel for Petitioners*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................i

TABLE OF AUTHORITIES...................................................iii

INTRODUCTION AND SUMMARY ....................................... 1

ARGUMENT ...................................................................... 3

    I.    FCC and Intervenors Identify No Meaningful Limits on FCC's Power Under Sections 254(c)(3) and (h)(2) ................. 3

    II.    FCC Must Show the Contribution Factor Satisfies § 254 Under *Consumers' Research* ................................... 13

        A.    FCC Is Obligated to Consider *Consumers' Research* ..14

        B.    FCC Had Notice, Petitioners Have Standing, and the Controversy is Ripe ..................................................... 16

        C.    Petitioners Were Not Required to Identify Particular Programs, And FCC Didn't Address the Programs Petitioners Did Identify ............................................ 20

    III.    Congress Did Not Authorize FCC to Create and Appoint USAC as Permanent Administrator................................... 24

        A.    Congress Did Not Impliedly Authorize USAC ............ 25

        B.    Congress Did Not Impliedly Ratify USAC ................. 28

        C.    Sections 254 and 154(i) Do Not Specifically or Expressly Authorize USAC........................................ 30

        D.    Petitioners' GCCA Challenge to USAC Is Not Time-Barred.................................................................. 31

    IV.    USAC Directors and CEO Are Officers Because They Exercise Discretion In Important Government Functions ..33

V.   USAC's Involvement Renders The Contribution Factor Unlawful ........................................................................ 37

VI.  The Contribution Factor Is a Rulemaking and Petitioners' Comments Were Significant ............................................. 42

     A.   FCC's Contribution Factor is a Rulemaking ............... 42

     B.   FCC was Required to Respond to Petitioners' Comments ................................................................... 44

CONCLUSION ............................................................................... 48

# TABLE OF AUTHORITIES

<strong>Page(s)</strong>

**Cases**

*Ala.-Tombigbee Rivers Coal. v. Dep't of Interior,*
  26 F.3d 1103 (11th Cir. 1994)..............................................................41

*Am. Power & Light Co. v. SEC,*
  329 U.S. 90 (1946).............................................................................6

*Biden v. Nebraska,*
  600 U.S. 477 (2023)...........................................................................6

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps. of
  Eng'rs,* 781 F.3d 1271 (11th Cir. 2015)..........................................39

*Brock v. Pierce County,*
  476 U.S. 253 (1986)...........................................................................9

*Cargill, Inc. v. United States,*
  173 F.3d 323 (5th Cir. 1999).............................................................41

*CFTC v. Schor,*
  478 U.S. 833 (1986).....................................................................28, 30

*Chamber of Com. v. SEC,*
  443 F.3d 890 (D.C. Cir. 2006)...........................................................47

*Chamber of Com. v. SEC,*
  85 F.4th 760 (5th Cir. 2023).............................................................44

*Choice Inc. of Tex. v. Greenstein,*
  691 F.3d 710 (5th Cir. 2012).............................................................19

*City of Arlington v. FCC,*
  668 F.3d 229 (5th Cir. 2012).............................................................43

*Coinbase, Inc. v. SEC,*
  126 F.4th 175 (3d Cir. 2025).............................................................21

*Collins v. Yellen,*
594 U.S. 220 (2021)........................................................38

*Consumers' Rsch. v. FCC,*
109 F.4th 743 (5th Cir. 2024) ...................................... 40, 42

*Consumers' Rsch. v. FCC,*
67 F.4th 773 (6th Cir. 2023) .............................................33

*Consumers' Rsch. v. FCC,*
88 F.4th 917 (11th Cir. 2023) ............................... 19, 32, 43

*Deanda v. Becerra,*
96 F.4th 750 (5th Cir. 2024) ............................................18

*FCC v. Consumers' Research,*
606 U.S. 656 (2025)...........................1, 2, 6, 11, 13, 14, 20, 21, 24, 41

*FDA v. Wages & White Lion Invs., LLC,*
604 U.S. 542 (2025).................................................. 47, 48

*Freytag v. Comm'r,*
501 U.S. 868 (1991)................................................ 33, 34, 37

*Functional Music, Inc. v. FCC,*
274 F.2d 543 (D.C. Cir. 1958) .........................................32

*G4S Tech. LLC v. United States,*
779 F.3d 1337 (Fed. Cir. 2015) ..........................................9

*Huawei Techs. USA, Inc. v. FCC,*
2 F.4th 421 (5th Cir. 2021) .............................................47

*Int'l Dark-Sky Ass'n, Inc. v. FCC,*
106 F.4th 1206 (D.C. Cir. 2024)........................................39

*Jennings v. Rodriguez,*
583 U.S. 281 (2018)........................................................13

*Kennedy v. Braidwood Mgmt.,*
606 U.S. 748 (2025)........................................................38

*King v. Burwell,*
576 U.S. 473 (2015) ........................................................................6

*Lebron v. Nat'l R.R. Passenger Corp.,*
513 U.S. 374 (1995) ......................................................................25

*Lucia v. SEC,*
585 U.S. 237 (2018) ......................................................................36

*Marx v. Gen. Revenue Corp.,*
568 U.S. 371 (2013) ......................................................................27

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.,*
606 U.S. 146 (2025) ......................................................................20

*MCR Oil Tools, LLC v. DOT,*
110 F.4th 677 (5th Cir. 2024) ......................................................24

*Med. Ctr. Pharmacy v. Mukasey,*
536 F.3d 383 (5th Cir. 2008) ......................................................28

*Moser v. FCC,*
46 F.3d 970 (9th Cir. 1995) ........................................................45

*Nat'l Ass'n of Priv. Fund Managers v. SEC,*
151 F.4th 252 (5th Cir. 2025) ................................................15, 20

*Nat'l Religious Broads. v. FCC,*
138 F.4th 282 (5th Cir. 2025) ................................................28, 31

*Ohio v. EPA,*
603 U.S. 279 (2024) ......................................................................16

*Panama Refining Co. v. Ryan,*
293 U.S. 388 (1935) ........................................................................5

*Perez v. Mortgage Bankers Ass'n,*
575 U.S. 92 (2015) ........................................................................44

*Red Lion Broad. Co. v. FCC,*
395 U.S. 367 (1969) ......................................................................29

*Seila Law LLC v. CFPB,*
  591 U.S. 197 (2020)..................................................................38

*Tex. Off. of Pub. Util. Counsel v. FCC,*
  183 F.3d 393 (5th Cir. 1999)...................................................4

*Thunder Basin Coal Co. v. Reich,*
  510 U.S. 200 (1994)................................................................45

*U.S. Telecom Ass'n v. FCC,*
  359 F.3d 554 (D.C. Cir. 2004) ...............................................26

*United States v. Vargas,*
  74 F.4th 673 (5th Cir. 2023) .................................................27

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001)................................................................10

*Worldcall Interconnect, Inc. v. FCC,*
  907 F.3d 810 (5th Cir. 2018)................................... 16, 17, 23

*Yesler Terrace Comm. Council v. Cisneros,*
  37 F.3d 442 (9th Cir. 1994)...................................................43

## Constitutional Provisions

U.S. Const. art. II, § 2, cl. 2..................................................2

## Statutes

5 U.S.C. § 551(4)....................................................................42

5 U.S.C. § 551(5)....................................................................43

5 U.S.C. § 1001(2)(A)(iii) .......................................................40

5 U.S.C. § 1002(b)(6)..............................................................40

5 U.S.C. § 1004(b)(2)..............................................................40

5 U.S.C. § 1006(a)...................................................................41

5 U.S.C. § 1006(d)(1)(A)..........................................................41

5 U.S.C. § 1008(b) ........................................................................ 40

5 U.S.C. § 1009 ............................................................................ 41

15 U.S.C. § 3411 .......................................................................... 31

16 U.S.C. § 590z-9 ....................................................................... 31

28 U.S.C. § 2344 .......................................................................... 32

31 U.S.C. § 9102 ........................................................ 25, 26, 27, 31

42 U.S.C. § 7607(d)(7)(B) ............................................................ 17

43 U.S.C. § 2242 .......................................................................... 31

47 U.S.C. § 153(24) ....................................................................... 7

47 U.S.C. § 154(i) ....................................................... 24, 26, 31

47 U.S.C. § 203(b)(2) .................................................................... 26

47 U.S.C. § 254(b)(5) .................................................................... 22

47 U.S.C. § 254(c)(1)(B) ............................................................... 21

47 U.S.C. § 254(c)(3) .............................................................. 8, 46

47 U.S.C. § 254(d) ........................................................................ 22

47 U.S.C. § 254(e) ........................................................................ 22

47 U.S.C. § 254(h)(1)(A) ............................................................ 6, 8

47 U.S.C. § 254(h)(1)(B) ............................................................ 6, 9

47 U.S.C. § 254(h)(2)(A) ...................................................... 4, 7–9, 12

47 U.S.C. § 254(j) ......................................................................... 26

47 U.S.C. § 402(a) ........................................................................ 32

47 U.S.C. § 405(a) ........................................................................ 45

47 U.S.C. § 646(c)(2) ..............................................................30

47 U.S.C. § 1752(i)(4) ...........................................................29

47 U.S.C. § 1752(i)(5) ...........................................................29

American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135
   Stat. 4 (2021) ...................................................................29

Federal Advisory Committee Act, 5 U.S.C. §§ 1001–1014 ....................40

Infrastructure Investment and Jobs Act, Pub. L. No. 117-58,
   135 Stat. 429 (2021) ..........................................................23

## Regulations

47 C.F.R. § 54.507 ................................................................11

47 C.F.R. § 54.619 ................................................................11

47 C.F.R. § 54.701(d) ...........................................................35

47 C.F.R. § 54.702(e) ...........................................................25

47 C.F.R. § 54.704(a) ...........................................................35

47 C.F.R. § 54.705(a)(1)(i) .....................................................35

47 C.F.R. § 54.705(a)(1)(ii) ....................................................35

47 C.F.R. § 54.705(a)(1)(iv) ...................................................35

47 C.F.R. § 54.705(a)(1)(xi) ...................................................35

47 C.F.R. § 54.705(b)(1)(i) .....................................................35

47 C.F.R. § 54.705(b)(1)(ii) ....................................................35

47 C.F.R. § 54.705(b)(1)(v) .....................................................35

47 C.F.R. § 54.705(b)(1)(ix) ...................................................35

47 C.F.R. § 54.705(c)(1)(i) .....................................................35

47 C.F.R. § 54.705(c)(1)(ii)...............................................35

47 C.F.R. § 54.705(c)(1)(v)...............................................35

47 C.F.R. § 54.707 .........................................................36

47 C.F.R. § 54.709(a)(3)..................................................46

47 C.F.R. § 54.715 .........................................................35

47 C.F.R. § 54.715(b) .....................................................41

47 C.F.R. § 54.719 .........................................................37

**Other Authorities**

*Addressing the Homework Gap Through the E-Rate Program,*
   FCC 24-76, 2024 WL 3617369 (July 29, 2024)...................................4

*Addressing the Homework Gap Through the E-Rate Program,*
   FCC 25-62, 2025 WL 4481294 (Sept. 30, 2025) ...................................4

*American Heritage Dictionary* (3d ed. 1992) .........................................12

*Connect America Fund ETC Annual Reports & Certifications,*
   32 FCC Rcd. 1624 (2017) ...............................................................21

*MTS & WATS Market Structure,*
   93 FCC.2d 241 (1983) ...................................................................26

*Preemption of Local Zoning Regul. of Satellite Earth Stations,*
   11 FCC Rcd. 19276 (1996) .............................................................45

*Report in Response to Senate Bill 1768,*
   13 FCC Rcd. 11810 (1998) .............................................................27

*Request for Review of a Decision of the Universal Service
   Administrator by Nemont Telephone Cooperative, Inc.,*
   29 FCC Rcd. 11780 (2014) .............................................................36

*Request for Review by Copper Valley Telephone Cooperative, Inc.,*
   2025 WL 4060682 (Nov. 14, 2025)....................................................36

*Request for Review of Decisions of the Universal Service
Administrator by P.R. Dep't of Educ.,*
2026 WL 714147 (Mar. 5, 2026) ........................................................ 36

*Requests for Review of Decision of the Universal Service
Administrator by Cornerstones of Care,*
25 FCC Rcd. 15122 (2010) ................................................................. 36

*Rural Digit. Opportunity Fund,*
35 FCC Rcd. 686 (2020) ..................................................................... 21

*Rural Health Care Support Mechanism,*
27 FCC Rcd. 16678 (2012) ............................................................. 4, 11

*Schools and Libraries Universal Service Support Mechanism,*
25 FCC Rcd. 6872 (2010) .................................................................... 6

## INTRODUCTION AND SUMMARY

In their briefs, the Federal Communications Commission ("FCC") and Intervenors[1] whistle past the Supreme Court's landmark decision in *FCC v. Consumers' Research*, 606 U.S. 656 (2025), acting as if it never happened. And they strain for reasons to excuse FCC's decision to flout the Administrative Procedure Act ("APA") and otherwise attempt to evade judicial review. FCC's position appears to be that its operation of the Universal Service Fund is beyond review: it can tax Americans for universal service at whatever level it chooses with no meaningful judicial oversight, even to the point of ignoring intervening Supreme Court precedent.

This Court should not allow FCC to continue to disregard the Constitution, statute, and binding precedent. In their opening brief, Petitioners explained that FCC's Fourth Quarter 2025 contribution factor for the Universal Service Fund is unlawful because: (1) §§ 254(c)(3) and (h)(2) unconstitutionally delegate legislative power because they

---

[1] Petitioners refer to Respondents FCC and the United States collectively as "FCC," and their brief, Dkt. 71, as "FCC.Br."; Intervenors Schools, Health & Libraries Broadband Coalition, et al., as "SHLB," and their brief, Dkt. 74, as "SHLB.Br."; and Intervenor NTCA—The Rural Broadband Association as "NTCA," and its brief, Dkt. 75, as "NTCA.Br."

provide no meaningful limit on FCC's power to tax and spend on schools, libraries, and health care providers; (2) FCC violated the APA by failing to show that the contribution factor satisfies § 254 as interpreted by the Supreme Court in *Consumers' Research*, 606 U.S. 656; (3) FCC lacks specific and express statutory authority to create or appoint the Universal Service Administrative Company ("USAC") as permanent administrator of the Universal Service Fund; (4) USAC violates Article II of the Constitution because its directors and CEO are "Officers of the United States," but not appointed consistent with the Appointments Clause, U.S. Const. art. II, § 2, cl. 2; and (5) FCC's failure to respond to Petitioners' comments violates the APA.

FCC and Intervenors have no persuasive answer. Their asserted limits on FCC's power under §§ 254(c)(3) and (h)(2) are illusory and, in practice, do not meaningfully bound FCC's authority to raise funds for schools, libraries, and health care providers. They do not deny that FCC failed to address the Supreme Court's binding reading of § 254 in *Consumers' Research*, but incorrectly claim the agency didn't have to. They cannot point to *specific or express* statutory authorization for FCC's creation and appointment of USAC, and so advance theories of *implied*

authorization and ratification by cobbling together disparate legislation and reports. They claim that USAC's directors and CEO are not "officers" for purposes of the Appointments Clause by obscuring the significant authority and discretion USAC wields. And they argue, incredibly, that FCC needn't respond to comments because setting the contribution factor—a prospective tax rate—isn't a "rulemaking," and even if it is, Petitioners' detailed comments raising serious constitutional and statutory issues weren't "significant."

As explained below, FCC and Intervenors are wrong across the board. Because the Fourth Quarter 2025 contribution factor is unlawful, this Court should grant the petition, vacate the factor, and remand to FCC for further proceedings.

## ARGUMENT

I. **FCC AND INTERVENORS IDENTIFY NO MEANINGFUL LIMITS ON FCC'S POWER UNDER SECTIONS 254(C)(3) AND (H)(2)**

FCC does not dispute that its schools, libraries, and rural health care providers programs are not constrained by §§ 254(b) and (c)(1). FCC.Br.28–37. Instead, the agency identifies "multiple restrictions" in §§ 254(c)(3) and (h) that it claims "easily satisfy the intelligible-principle test." FCC.Br.29. But many of these "restrictions" apply to only a portion

3

of the program, and FCC's account shows that even where they do apply, their pliable terms impose no meaningful limits. If the Court disagrees, we respectfully urge it to clarify with specificity the constraints imposed.

*First*, FCC argues that funding under §§ 254(c)(3) and (h) must benefit "an identified set of recipients," i.e., "schools, libraries, and health care providers." *Id.* (citations omitted). That's true so far as it goes, which isn't far. All that means is that the program is directed to particular sectors of the American economy—education and health care.[2]

---

[2] Unlike § 254(h)(1)(A)'s provision for telecommunications services, § 254(h)(2)(A)'s provision for "advanced telecommunications and information services" isn't limited to "rural" health care providers, but allows support "for *all* … health care providers" 47 U.S.C. § 254(h)(2)(A) (emphasis added); *see Tex. Off. of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 446 (5th Cir. 1999). FCC's programs reflect this. *See, e.g., Rural Health Care Support Mechanism*, 27 FCC Rcd. 16678, 16682 ¶ 6 (2012) ("Both rural and non-rural [health care providers] will be allowed to participate" in the Healthcare Connect Fund.). Section 254(h)(2)(A) directs FCC to support "elementary and secondary school *classrooms*," 47 U.S.C. § 254(h)(2)(A) (emphasis added), but in practice "classrooms" has not always been limiting, *see, e.g., Addressing the Homework Gap Through the E-Rate Program*, FCC 24-76, 2024 WL 3617369, at *39 (July 29, 2024) (concluding that § 254(h)(2)(A)'s "reference to services for 'classrooms' includes" funding to access "valuable digital educational resources when [individuals] are not located on the school or library campus"). *But see Addressing the Homework Gap Through the E-Rate Program*, FCC 25-62, 2025 WL 4481294, at *4 (Sept. 30, 2025) (on reconsideration, concluding that services "must be provided *to* eligible locations—namely elementary schools, secondary schools, and libraries").

4

But directing a provision to a particular economic sector doesn't save it from nondelegation. The statute at issue in *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), was directed to a more specific target— petroleum transportation. *Id.* at 415–16. That provision authorized the President "to prohibit the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted … by any State law or valid regulation." *Id.* at 406 (quoting National Industrial Recovery Act of June 16, 1933, Pub. L. No. 73-67, § 9(c) (1933)). Yet the Supreme Court held it unconstitutional, since it "declared no policy, has established no standard, [and] has laid down no rule" to guide the President's discretion. *Id.* at 430. So, too, here.

FCC's assertion that funded services must be "necessary for the provision of health care" or "for educational purposes" doesn't help. FCC.Br.30 (quoting 47 U.S.C. § 254(h)(1)(A), (B)). To start, those purposes are cabined to § 254(h)(1). Section 254(h)(2)(A)'s provision for "advanced telecommunications and information services" specifies no such purposes. But even so, § 254 does not "clearly delineate[]" any "general policy" for determining *what* qualifies as "necessary for the

5

provision of health care" or "for educational purposes," much less specify "boundaries" for determining so.[3] *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946); 47 U.S.C. § 254(h)(1)(A), (B). This doesn't take FCC even "halfway." *Consumers' Rsch.*, 606 U.S. at 682–83. It would be incredible to suggest that Congress could delegate to an agency the power to decide to spend billions on student loans or health insurance whenever the agency deems spending "necessary for the provision of" education or health care. *Cf. Biden v. Nebraska*, 600 U.S. 477, 502–03 (2023); *King v. Burwell*, 576 U.S. 473, 485–86 (2015).

*Second*, FCC argues that Congress "limit[ed] the types of services the FCC may subsidize" because § 254(h)(2)(A) "directs the FCC to adopt rules to enhance access to 'advanced telecommunications *and information* services' for schools, libraries and health care providers." FCC.Br.29–30 (quoting 47 U.S.C. § 254(h)(2)(A)). SHLB notes that Congress defined "telecommunications" and "information services"

---

[3] FCC has accordingly read those purposes expansively. *See, e.g.*, *Schools and Libraries Universal Service Support Mechanism*, 25 FCC Rcd. 6872, 6890 ¶ 42 n.96 (2010) ("educational purposes" include cellphone use by "school bus driver[s] … while delivering children to and from school" and "teachers or other school staff … while accompanying students on a field trip or sporting event").

elsewhere in the Communications Act. SHLB.Br.20 (citing 47 U.S.C. § 153(24), (50)).

But even under those definitions, FCC's authority is virtually limitless. The term "information service" means, among other things, "the offering of a capability for generating … transforming, processing … [or] utilizing … information via telecommunications." 47 U.S.C. § 153(24). That text includes not only services to connect to the Internet, but any service *related to using* information via the Internet. That could include, for example, anything from web hosting and cloud storage to streaming or social media subscriptions to artificial intelligence engines to desktop publishing. Section 254(h)(2)(A) expands that further by allowing FCC to fund anything that "*enhance[s] … access to advanced telecommunications and information services*." *Id.* § 254(h)(2)(A) (emphasis added). Does this mean that FCC can provide every school child an iPad to access the Internet? Starlink subscriptions to all instructors to teach virtually? Training for teachers to use Chat GPT? Salary reimbursements for school or library staff who maintain networks? From the text, it seems so.

*Third*, FCC misleadingly claims that "[t]he statute requires the

FCC to use specific formulas to calculate the amount of the subsidy for most services" for schools, libraries, and health care providers. FCC.Br.31 (citing 47 U.S.C. § 254(h)(1)). But as Petitioners have explained, § 254(h)(1)'s formula only applies to "a sliver" of the Fund.[4] Reply Br. for Petitioners at 37–38, *Consumers' Rsch. v. FCC*, No. 22-60008 (5th Cir. July 15, 2022), Dkt. 124.

Petitioners agree that § 254(h)(1)(A) provides a sufficiently intelligible formula for certain subsidies to rural health care providers. 47 U.S.C. § 254(h)(1)(A).[5] But as FCC explains in a footnote, the formula "applies only to telecommunications services provided to health care providers." FCC.Br.32 n.8. There is no "formula" for information services—or other advanced or additional services—for health care providers. *See id.*; 47 U.S.C. § 254(c)(3), (h)(2)(A). Nor is there any

---

[4] For the challenged quarter, approximately $181 million of the $2.15 billion collected, or about 8%, fund the Rural Health Care Program. JA321. As explained, only a portion of this is subject to § 254(h)(1)(A)'s formula.

[5] That formula provides that telecommunications carriers are "entitled to have an amount equal to the difference … between the rates for services provided to health care providers for rural areas in a State and the rates for similar services provided to other customers in comparable rural areas in that State." 47 U.S.C. § 254(h)(1)(A).

"formula" for schools and libraries, for telecommunications or information services. *See* 47 U.S.C. § 254(h)(1)(B) (allowing FCC to set subsidies at "an amount that [FCC] … determine[s] is appropriate and necessary to ensure affordable access to and use of such services").

*Finally*, FCC argues that § 254(h) requires "FCC to consider the cost of expanding its universal service programs before deciding to subsidize an additional service." FCC.Br.32–34 (construing "ensure affordable access," 47 U.S.C. § 254(h)(1)(B), and "economically reasonable," *id.* § 254(h)(2)(A)). But being "a prudent guardian of the public's resources," FCC.Br.34, isn't a limitation imposed by § 254; it's a restatement of the government's general obligation to safeguard the public fisc, *cf. G4S Tech. LLC v. United States*, 779 F.3d 1337, 1340 (Fed. Cir. 2015) (noting "the government's responsibilities to safeguard taxpayer funds and advance the public interest"); *Brock v. Pierce County*, 476 U.S. 253, 262 (1986) ("protection of the public fisc is a matter that is of interest to every citizen"). And it's hard to see how that meaningfully constrains FCC if it allows the agency to increase the Universal Service Fund tax rate *nearly seven-fold* at-will. *See* Pet.Br.14.

In any event, FCC's account confirms that this consideration

9

provides no ascertainable guidance, but means whatever FCC wants it to in a particular circumstance. In one instance, FCC reads "economically reasonable" to require "a thorough cost-benefit analysis." FCC.Br.35 (citing *Modernizing the E-Rate Program for Schools and Libraries*, FCC 25-63, WC Docket No. 13-184, ¶ 14 (rel. Sept. 30, 2025)). But in other instances, FCC abandons that interpretation and reads "economic reasonableness" to require only consideration of "the effect any new rules would have on growth" of the Fund. FCC.Br.34 (quoting *Rural Health Care Support Mechanism*, 21 FCC Rcd. 1111, 1114 ¶ 11 (2006)). Since § 254 includes no statutory cap, that provides no guidance at all.[6]

FCC's example in footnote 8 of its brief is illustrative. FCC explains that its "Healthcare Connect Fund subsidizes the provision of broadband services to health care providers at a flat 65 percent discount rate" and that the rate was "'economically reasonable and fiscally responsible, given the $400 million cap for the health care support mechanism and the anticipated demand for program support.'" FCC.Br.32 n.8. (quoting

---

[6] FCC's *self-imposed* caps cannot provide the necessary intelligible principle. *Contra* FCC.Br.35; SHLB.Br.23; *see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472–73 (2001) (an agency cannot "cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction" or "by declining to exercise some of th[e] power" given it).

*Rural Health Care Support Mechanism*, 27 FCC Rcd. at 16700 ¶ 48). Setting aside that the cap is arbitrary, FCC doesn't explain why a 65 percent discount is more "economically reasonable" than a 50 percent discount, since both would yield programs well below the cap. *See Rural Health Care Support Mechanism*, 27 FCC Rcd. at 16723–24 ¶ 98 (estimating the 65 percent discount would require "approximately $235 million" in annual funding). "Economically reasonable" does no work at all.[7]

Intervenors propose several constraints not embraced by FCC, but these are similarly illusory or otherwise inadequate.

SHLB argues that § 254(d)'s "sufficiency" requirement applies, and so "sets a floor and a ceiling alike" for funds. SHLB.Br.18 (quoting *Consumers' Rsch.*, 606 U.S. at 681). But as the Supreme Court explained, the critical question is: "[s]ufficient for what?" *Consumers' Rsch.*, 606 U.S. at 682. Sections 254(c)(3) and (h)(2)(A) don't provide adequate guidance, which is why FCC sets its own arbitrary caps. *See* 47 C.F.R. §§ 54.507, 54.619; JA395, 426. SHLB also suggests that § 254(h)(2)(A)'s

---

[7] The same is true now for FCC's schools and libraries programs: the 2025 cap is more than $5 billion, compared to expected payments of just over $3 billion for the year. JA426.

"economically reasonable" is analogous to § 254(b)(1)'s "reasonable … and affordable rates," which the Supreme Court understood "to mean 'more a *basic* than a budget-busting good.'" SHLB.Br.21–22 (quoting *Consumers' Rsch.*, 606 U.S. at 684) (emphasis added). But that makes no sense in context, since § 254(h)(2)(A) relates to "advanced"—not basic—services. 47 U.S.C. § 254(h)(2)(A).

NTCA argues that Congress's instruction that FCC establish rules to "*enhance* … access to advanced telecommunications and information services," *id.* (emphasis added), means that the funded "services must be additive but not transformative." NTCA.Br.18. But NTCA doesn't explain how to differentiate an "additive" service from a "transformative" one. In any event, "enhance" means "[t]o make greater." *American Heritage Dictionary* 611 (3d ed. 1992). It includes no inherent limit as to how much. And NTCA's definition of "technically feasible" confirms that term imposes no limitation in the context of a tax-and-spend program, but permits FCC to fund whatever it conceives as physically possible. NTCA.Br.18 ("technically feasible" means "capable of accomplishment").

Intervenors also argue that the § 254(b) principles apply to programs funded under §§ 254(c)(3) and (h)(2). SHLB.Br.25–28;

NTCA.Br.14–17. FCC appears to disagree. The agency explains that "universal service principles of affordability and sufficiency [in § 254(b)] *inform* the meaning of what is 'economically reasonable'" under § 254(h)(2)(A), but doesn't argue they impose independently mandatory criteria. FCC.Br.34 (emphasis added). Even if the § 254(b) principles do apply, Intervenors fail to identify any concrete constraint they independently impose in the context of §§ 254(c)(3) and (h)(2)(A).

NTCA lastly urges this Court to apply the "canon of constitutional avoidance." NTCA.Br.20. That canon "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of *more than one construction.*" *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (emphasis added). But §§ 254(c)(3) and (h)(2)(A) violate the nondelegation doctrine because their purported limits have *no determinate meaning* in context. If this Court disagrees, we welcome its specific construction.

## II. FCC MUST SHOW THE CONTRIBUTION FACTOR SATISFIES § 254 UNDER *CONSUMERS' RESEARCH*

FCC's excuses for failing to address *Consumers' Research*, 606 U.S. 656, when issuing the Fourth Quarter 2025 contribution factor are meritless.

## A.    FCC Is Obligated to Consider *Consumers' Research*

FCC's assertion that "[n]othing in the Court's opinion … suggested that the Court believed that its reading of section 254 'drastically departed from' the Commission's longstanding interpretation of the statute" is disingenuous and irrelevant. FCC.Br.38. The Court said only that its interpretation was consistent with how the Solicitor General "represented [the statute] *in this Court*." *Consumers' Rsch.*, 606 U.S. at 688 (emphasis added). And it dismissed the dissenters' reference to FCC's longstanding (very different) interpretation of § 254 by observing that in "any event, and yet more important, we must 'exercise *[our] independent judgment* in deciding' what power Congress has conferred." *Id.* (emphasis added) (alteration in original). At a minimum, these statements acknowledge that the Court's reading of § 254 may not be in harmony with FCC's prior constructions.

But it doesn't matter whether the Court explicitly acknowledged the divergence. As the dissenters and Petitioners explained, the Court's reading of § 254(b)'s principles and § 254(c)'s factors as mandatory *does depart* from FCC's longstanding interpretation, which treated those principles and factors as optional. *See id.* at 729–30 (Gorsuch, J.,

14

dissenting); Pet.Br.40–42. Under its APA obligation to engage in reasoned decisionmaking, FCC was required "to acknowledge and account for [that] changed regulatory posture," whether or not the Supreme Court expressly acknowledged the change. *Nat'l Ass'n of Priv. Fund Managers v. SEC*, 151 F.4th 252, 271 (5th Cir. 2025) (quoting *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (per curiam)).

Although FCC doesn't go so far, Intervenors seize on a handful of scattered phrases in the Court's opinion to insist that *Consumers' Research* really didn't change anything at all. SHLB.Br.39–40 (quoting *Consumers' Research* as saying "FCC has operated within" the parameters set by Congress, 606 U.S. at 687 (emphasis removed)); NTCA.Br.29–30. But interpreting that passing language as a definitive conclusion of compliance is untenable—FCC's compliance with § 254 wasn't before the Court. Accordingly, those statements are dicta at best. And Intervenors ignore FCC's past statements that the § 254(b) principles and § 254(c) factors are advisory and need not each be met. *See* Pet.Br.40–42 (cataloging FCC statements). In any event, even if FCC agreed with Intervenors, the agency was required to respond to

Petitioners' comments and explain why, in its view, *Consumers' Research* effected no change. *See* Part VI, *infra*.

### B. FCC Had Notice, Petitioners Have Standing, and the Controversy is Ripe

There is also no merit to FCC's claim that it "did not receive a fair 'opportunity to pass' on the issue," FCC.Br.39 (quoting 47 U.S.C. § 405(a)), because Petitioners' raised a "generalized grievance," FCC.Br.38. FCC's argument collapses § 405(a)'s notice requirement and Article III standing. *See also* SHLB.Br.32–35 (arguing Petitioners lack standing); SHLB.Br.37–39 (arguing Petitioners did not administratively exhaust claim under § 405). But in any event, Petitioners easily satisfy both.

Section 405(a) "does not require an argument to be brought up with specificity, but only reasonably flagged for the agency's consideration. The central question is whether a reasonable Commission necessarily would have seen the question raised before us as part of the case presented to it." *Worldcall Interconnect, Inc. v. FCC*, 907 F.3d 810, 820 (5th Cir. 2018) (cleaned up). The bar to satisfy § 405(a) is low: the record below need only "reference[]" the "general line of argument" made before this Court. *Id.*; *see also Ohio v. EPA*, 603 U.S. 279, 296 (2024) ("A party

need not rehearse the identical argument made before the agency; it need only confirm that the government had notice of the challenge during the public comment period and a chance to consider in substance, if not in form, the same objection now raised in court." (cleaned up) (applying the Clean Air Act's more stringent "reasonable specificity" requirement, 42 U.S.C. § 7607(d)(7)(B))).

Petitioners' detailed comments, which mirror the arguments they make before this Court, easily meet this bar. Those comments explain how the Supreme Court's interpretation of § 254 in *Consumers' Research* is narrower than the interpretation FCC had long advanced. *See* JA9–16, 343–46. They argue that FCC is obligated to acknowledge this change and explain how the Fourth Quarter 2025 contribution factor—which funds programs established under FCC's prior, broader interpretation—satisfies *Consumers' Research*. JA16–17, 346. And they point to specific examples—programs that subsidize "certain high-speed [internet] services"—that are inconsistent with *Consumers' Research*. JA18, 347. These comments were more than "sufficient to 'tee[] up' the issue before" FCC. *Worldcall Interconnect*, 907 F.3d at 820.

Petitioners' grievance is also not "generalized" for standing

17

purposes. FCC.Br.38. Petitioners are injured because the Fourth Quarter 2025 contribution factor—which determines how much they must pay—is unlawfully high, including because the factor requires contributions for programs that FCC lacks authority to fund because they do not satisfy the limits articulated by *Consumers' Research*. Pet.Br.24–25, 43–46. That injury is concrete and "connect[s]" FCC's error to Petitioners' harm. *Contra* SHLB.Br.33. Petitioners experience the harm "not as an 'undifferentiated' member of the general public," *Deanda v. Becerra*, 96 F.4th 750, 760 (5th Cir. 2024), but because they are carriers and subscribers required to pay, directly or indirectly, into the Universal Service Fund, Pet.Br.24–25.[8]

Nor is there merit to SHLB's argument that Petitioners' claim isn't ripe. SHLB.Br.35–37. "The key considerations [for ripeness] are the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe

---

[8] It also makes no difference to standing whether FCC's error "could, at most, have affected discrete subparts of the Universal Service Fund program." SHLB.Br.34. If any subpart is unlawful, the contribution factor is too high.

if further factual development is required." *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012) (quotation marks omitted). Moreover, the challenger "must show some hardship in order to establish ripeness." *Id.*

Petitioners' claim meets these requirements. Whether FCC has appropriately considered and satisfied *Consumers' Research* in determining the Fourth Quarter 2025 contribution factor is a concrete, "purely legal" question that requires no "further factual development." *Id.* And Petitioners face hardship by having to pay a sum that is unlawfully high. *See also Consumers' Rsch. v. FCC*, 88 F.4th 917, 922–23 (11th Cir. 2023) (Petitioners' prior challenge was ripe). Indeed, if Petitioners' claim is not ripe now, it's not clear when they *could* bring a challenge.

SHLB's suggestion that Petitioners' argument would be "better evaluated in a petition for rulemaking as to a specific FCC rule" rather than in a challenge to FCC's "omnibus" quarterly contribution factor is irrelevant. SHLB.Br.31, 36. FCC is taking money from Petitioners now. Moreover, "a petition for a new rulemaking" offers only an "illusory" path to judicial review; it "may take many years for the agency to act" and

review of a denial is extraordinarily deferential. *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 167 (2025). SHLB's proposed "alternative path" therefore "does not supply a basis for denying judicial review." *Id.*

The central issue in *Consumers' Research* was whether "Congress has provided sufficient standards to enable … the courts … to ascertain whether the agency has followed the law." 606 U.S. at 673 (cleaned up). The Supreme Court answered in the affirmative. As FCC explained, that "permit[s] meaningful judicial review" of FCC's actions related to the Fund. FCC Reply Br. at 4, *FCC v. Consumers' Rsch.*, Nos. 24-354 & 24-422 (U.S. Mar. 13, 2024). That is what Petitioners seek here.

## C. Petitioners Were Not Required to Identify Particular Programs, And FCC Didn't Address the Programs Petitioners Did Identify

FCC also complains that Petitioners "identified just one example" of a funded program that likely violates *Consumers' Research*. FCC.Br.40. But Petitioners were not obligated to do even that. Under the APA, FCC must show that it "reasonably considered the relevant issues and reasonably explained the decision," which includes changed circumstances that affect the legal basis for the action. *Nat'l Ass'n of Priv.*

20

*Fund Managers*, 151 F.4th at 265, 271; *Coinbase, Inc. v. SEC*, 126 F.4th 175, 189 (3d Cir. 2025) ("[f]ailure to articulate an adequate legal basis for agency action" is a "ground for setting aside an agency action"). Petitioners raised a relevant issue—the Supreme Court's novel interpretation of § 254 in *Consumers' Research*—and FCC was obligated to explain how it considered it and complied.

In any event, FCC didn't address the examples Petitioners did identify. And the agency's belated explanation in its brief confirms that the Universal Service Fund's ultra high-speed broadband programs do not satisfy § 254 as interpreted in *Consumers' Research*.

Several Universal Service Fund programs fund gigabit-speed broadband data networks. *See, e.g.*, *Rural Digit. Opportunity Fund*, 35 FCC Rcd. 686, 688 (2020); *Connect America Fund ETC Annual Reports & Certifications*, 32 FCC Rcd. 1624, 1626–27 (2017). Such services have not "been subscribed to by a substantial majority of residential customers," a mandatory § 254(c)(1) criterion. 47 U.S.C. § 254(c)(1)(B); *see* Pet.Br.44 & n.5 (explaining that "nowhere near a majority subscribe to gigabit service"). They are therefore not eligible for § 254 funding under *Consumers' Research*. 606 U.S. at 688 (§ 254's statutory criteria

are "separately mandatory").

FCC nonetheless argues that it can collect and disburse funds for ultra high-speed networks so long as those networks are also "used to provide voice telephony service," a basic service that would satisfy § 254(c)(1)(B). FCC.Br.40–41.[9] But that violates, or renders meaningless, § 254's "sufficiency" criterion, which sets "a floor *and a ceiling* alike" on what FCC can fund. *Consumers' Rsch.*, 606 U.S. at 681 (emphasis added); *see* 47 U.S.C. § 254(b)(5), (d), (e). Funding gigabit-speed data networks— which the majority of residential consumers don't have—simply because those networks *can also* be used for basic telephony doesn't just exceed the ceiling, it blows through the roof. Under FCC's logic, "the 'sufficiency' ceiling … do[es] no serious work. The FCC could operate—and collect contributions 'sufficient' for—either the most barebones or the most extravagant program," as long as certain minimum services—basic telephony—are included. *Consumers' Rsch.*, 606 U.S. at 682–83. If there's

---

[9] The Tenth Circuit's 2014 decision affirming FCC's authority to condition funding on deployment of additional services carries minimal weight, since it relied on the now-defunct *Chevron* deference and was decided before the Supreme Court authoritatively construed § 254. *See* FCC.Br.41 n.13 (citing *In re FCC 11-161*, 753 F.3d 1015, 1042–54 (10th Cir. 2014)).

anyone that's reading § 254 "extravagantly," FCC.Br.36, it's FCC.

Nor does the isolated provision of the Infrastructure Investment and Jobs Act ("IIJA"), Pub. L. No. 117-58, § 60104, 135 Stat. 429, 1206 (2021), cited by SHLB, ratify these programs. SHLB.Br.42. That provision directed FCC to "submit … a report on the options … for improving its effectiveness in achieving the universal service goals for broadband." IIJA § 60104(c)(1), 135 Stat. at 1206. But those "universal service goals for broadband" are the "statutorily mandated goals … under section 706 of the Telecommunications Act of 1996 (47 U.S.C. 1302)," not under § 254. IIJA § 60104(a)(2), 135 Stat. at 1205. In any event, Congress's request for a report of recommendations cannot reasonably be read to endorse any particular Universal Service Fund program, much less silently abrogate § 254's otherwise-applicable criteria.

Finally, the Schools and Libraries Cybersecurity Pilot Program is properly before this Court. *Contra* FCC.Br.42–43. Petitioners' comments sufficiently "reference[d] … this general line of argument," so that FCC was on notice that its authority to fund programs like that one were at issue. *Worldcall Interconnect*, 907 F.3d at 820. Petitioners discussed the Cybersecurity Pilot Program in the body of the brief and a footnote, and

23

explained that FCC established the program without showing that the § 254 criteria had been met. Pet.Br.14, 34, 44 n.6.

* * *

FCC "does not get to bury its head in the sand and ignore" changes in the law "it d[oes] not want to consider." *MCR Oil Tools, LLC v. DOT*, 110 F.4th 677, 698 (5th Cir. 2024) (quotation marks omitted). FCC's failure to acknowledge and address the Supreme Court's reinterpretation of § 254 in *Consumers' Research*, 606 U.S. 656, was arbitrary and capricious.

## III. CONGRESS DID NOT AUTHORIZE FCC TO CREATE AND APPOINT USAC AS PERMANENT ADMINISTRATOR

Petitioners explained that the Government Corporation Control Act ("GCCA"), 31 U.S.C. § 9102, and caselaw require FCC to have *specific and express* congressional authorization to create and delegate authority to USAC. Pet.Br.46–54. FCC can point to none. Instead, the agency offers two alternative theories: *implied* authorization, FCC.Br.43–48, and *implied* ratification, FCC.Br.48–50. NTCA offers a third: alleged statutory authority through § 254 and the Communications Act's general rulemaking provision, 47 U.S.C. § 154(i). NTCA.Br.25–28. None of these satisfy the high bar that applies when an outside entity exercises

24

governmental authority. Pet.Br.46–54.

## A. Congress Did Not Impliedly Authorize USAC

To find congressional authorization, FCC attempts to bootstrap USAC to the National Exchange Carrier Association ("NECA"), a non-profit corporation that FCC created decades earlier. FCC.Br.46–47. Specifically, FCC suggests that (1) because USAC is a subsidiary of NECA, its creation does not violate the GCCA, and (2) Congress *impliedly* authorized NECA to administer the Universal Service Fund, which (somehow) *expressly* authorizes USAC to administer the Fund. *Id.* Neither is correct.

*First*, that USAC is an "independent subsidiary" of NECA, 47 C.F.R. § 54.702(e), makes no difference under the GCCA, which was "intended to restrict the creation of *all* Government-controlled policy-implementing corporations, and not just some of them," *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 396 (1995). The GCCA therefore does not differentiate based on subsidiary status or other formalities, but provides that any "corporation [that] act[s] as an agency" can "only" be created "by or under a law of the United States specifically authorizing the action." 31 U.S.C. § 9102. USAC is a corporation and acts as an

agency in administering the Universal Service Fund. Pet.Br.8–10, 47–54 (explaining that USAC performs functions assigned by statute to FCC). It therefore must be "specifically" authorized by law. 31 U.S.C. § 9102. Whether the separate and independent NECA was "lawfully created" to administer different FCC programs is irrelevant. FCC.Br.46.[10]

*Second*, even if USAC could piggy-back on NECA, Congress didn't impliedly, much less expressly, authorize FCC to delegate to NECA administration of the entire Universal Service Fund. Delegations to entities outside the government require "an affirmative showing of congressional authorization." *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004). Congress potentially authorized NECA to administer only one specific component of the Universal Service Fund— the Lifeline program. 47 U.S.C. § 254(j) (providing that nothing in § 254 affects administration of the Lifeline program under regulations that, at

---

[10] It is not clear that NECA was, in fact, "lawfully created." *Contra* FCC.Br.46. FCC's 1983 order directing the creation of NECA cites two statutory provisions: FCC's general rulemaking power under 47 U.S.C. § 154(i), and FCC's power under 47 U.S.C. § 203(b)(2) to "modify any requirement" of that section, 47 U.S.C. § 203(b)(2). *See MTS & WATS Market Structure*, 93 FCC.2d 241, 334 ¶ 342 (1983). Neither provision "specifically" empowers FCC to create a corporation. 31 U.S.C. § 9102; *see also* Part III.C, *infra.*

the time, included a role for NECA). By negative implication, other authorities under § 254 are withheld. *See United States v. Vargas*, 74 F.4th 673, 686 (5th Cir. 2023). This implication is reinforced by context, since throughout § 254, Congress was explicit when it wanted non-federal entities to play a role in implementing universal service. *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013) ("The force of any negative implication … depends on context."); *see* Pet.Br.51–52.

Nor can the necessary authorization be read from Congress's 1998 instruction—contained in language omitted from the enacted law but referenced in a conference report—that FCC submit a "report" that "propose[s] a revised structure" for administering the schools, libraries, and health care programs that "consist[s] of a single entity." *Report in Response to Senate Bill 1768*, 13 FCC Rcd. 11810, 11810 & nn.1–2 (1998); *see* FCC.Br.47. A conference report is not "a law of the United States." 31 U.S.C. § 9102. And by its terms, all that it authorizes is another "report." In any event, the report shows, at most, that Congress was open to considering alternate arrangements to administer certain Universal Service Fund programs, not that it had settled on—and authorized—any particular arrangement, much less USAC.

*Finally*, FCC suggests that Petitioners read too much into Congress's refusal to act on FCC's request to provide specific statutory authorization to delegate to USAC. FCC.Br.48. Although congressional inaction can be an imperfect guide, here it buttresses other indicia that point to the same conclusion. Regardless, "[t]here is no better or more authoritative expression of congressional intent than the statutory text," *Med. Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 394 (5th Cir. 2008), and § 254 contains no text that authorizes FCC to create USAC or to appoint USAC administrator of the Universal Service Fund.

## B. Congress Did Not Impliedly Ratify USAC

FCC and NTCA also argue that Congress impliedly ratified "FCC's authority to appoint USAC to administer universal service programs" when it assigned USAC a role in two temporary programs during the COVID-19 pandemic. FCC.Br.48–50; *see* NTCA.Br.27–28. That is wrong.

"Congressional action can ratify or give the force of law to official action unauthorized when taken," for example, through "positive legislation." *Nat'l Religious Broads. v. FCC*, 138 F.4th 282, 294 (5th Cir. 2025) (quotation marks omitted). Ratification typically applies where Congress "explicitly affirmed," *CFTC v. Schor*, 478 U.S. 833, 846 (1986),

28

or "expressly accepted" the agency action in question through subsequent legislation, *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 382 (1969).

The legislation FCC cites does not explicitly or expressly affirm USAC's administration of the Universal Service Fund. Section 1752 of Title 47 provides that FCC "shall have the authority to avail itself of the services of the Universal Service Administrative Company to implement the Affordable Connectivity Program," a short-lived program that offered certain households discounts on monthly internet service. 47 U.S.C. § 1752(i)(5). A provision of the American Rescue Plan Act of 2021 also provided funding for "the Commission and the Universal Service Administrative Company to administer" an Emergency Connectivity Fund to subsidize equipment purchases by schools and libraries during the COVID-19 emergency. Pub. L. No. 117-2, § 7402(c)(2)(A)(ii), 135 Stat. 4, 109 (2021); *see also* FCC.Br.49 n.15 (describing expiration of programs).

But neither program was part of the Universal Service Fund. *See* 47 U.S.C. § 1752(i)(4); Pub. L. No. 117-2, § 7402(c)(4), 139 Stat. 109. Congress's acknowledgement of a role for USAC in separate, targeted, temporary programs does not explicitly or expressly ratify the far more

sweeping role FCC has given USAC in administering the Fund. The implication is the opposite: these provisions show that Congress knows how to specify when FCC has the authority to rely on or work cooperatively with an outside entity. It did not do so with respect to the Universal Service Fund in § 254.

NTCA also points to 47 U.S.C. § 646(c)(2), which specifies that FCC "may not delegate any of the responsibilities assigned to the Commission under this subchapter [related to broadband mapping] to any third party, including [USAC]." *See* NTCA.Br.28. But a provision explicitly barring delegation for one program cannot reasonably be understood as "explicitly affirm[ing]" delegation for an entirely different one. *Schor*, 478 U.S. at 846. Even if ratification were enough, none of the cited provisions provide it.

## C. Sections 254 and 154(i) Do Not Specifically or Expressly Authorize USAC

NTCA argues that § 254, along with FCC's general catch-all authority in § 154(i) and informed by NECA's historic role in pre-Universal Service Fund programs, authorize FCC to create USAC and appoint it administrator of the Universal Service Fund. NTCA.Br.25–28.

Petitioners have elsewhere explained why neither § 254 nor NECA

provide the specific and affirmative authorization required for FCC to appoint USAC. *See* Pet.Br.46–54; Part III.A, *supra*. Section 154(i) does not help. That provision states that FCC "may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions." 47 U.S.C. § 154(i). But this is an "ancillary authority," *Nat'l Religious Broads.*, 138 F.4th at 292, not "specific[]" or express authorization to create a corporation and delegate functions to it, 31 U.S.C. § 9102. If a general authority of this sort were sufficient, the GCCA—and the caselaw requiring affirmative authorization for delegation to an outside entity, *see* Pet.Br.49–51—would be a dead letter, since many federal agencies have similar general grants.[11]

### D. Petitioners' GCCA Challenge to USAC Is Not Time-Barred

NTCA also argues that Petitioners' GCCA claim is untimely because it was brought more than 60 days after FCC ordered USAC's

---

[11] *See, e.g.*, 15 U.S.C. § 3411 (Federal Energy Regulatory Commission's authority to regulate natural gas); 16 U.S.C. § 590z-9 (Secretary of the Interior's and Secretary of Agriculture's authority over conservation and utilization projects); 43 U.S.C. § 2242 (Secretary of the Interior's authority over drought relief programs).

creation in 1997 and appointed USAC permanent administrator in 1998. NTCA.Br.23–24. This misunderstands the applicable review scheme.

Review of FCC "order[s]" is governed by the Hobbs Act, which requires that parties file a petition to review an order "within 60 days after its entry." 47 U.S.C. § 402(a); 28 U.S.C. § 2344. But many FCC orders, like those issuing rules, "are capable of continuing application." *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C. Cir. 1958). For those actions, "the statutory time limit restricting judicial review of Commission action is applicable only to cut off review directly from the order promulgating [the action]. It does not foreclose subsequent examination of [an action] where properly brought before this court for review of further Commission action applying it." *Id.*

Like orders issuing rules, FCC's orders creating USAC and appointing it administrator have "continuing application." *Id.* Every time USAC acts in its role as administrator those orders are applied. To the extent those earlier orders are implicated here, they are "properly … before this court" in Petitioners' timely challenge to FCC's approval of the Fourth Quarter 2025 contribution factor. *Id.*; *see also Consumers' Rsch.*, 88 F.4th at 922 ("The Fourth Quarter Contribution Factor re-applies the

statutory delegation in § 254. Thus, Petitioners' challenge … restarts the sixty-day clock." (quotation marks omitted)); *Consumers' Rsch. v. FCC*, 67 F.4th 773, 785–86 (6th Cir. 2023) (same).

## IV. USAC DIRECTORS AND CEO ARE OFFICERS BECAUSE THEY EXERCISE DISCRETION IN IMPORTANT GOVERNMENT FUNCTIONS

FCC argues that USAC directors and CEO "exercise[] little or no discretion" and so are not "officers" subject to the Appointments Clause. FCC.Br.52; *see also* NTCA.Br.21–22. But FCC focuses on elements of USAC's operations that are not dispositive and describes USAC's operations with a generality that obscures the discretion its directors and CEO exercise.

FCC observes that USAC "may not make policy"; "must carry out all its tasks consistent with the FCC's rules, orders, written directives, and other instructions"; and that USAC's decisions are reviewable *de novo* by FCC. FCC.Br.52 (quotation marks omitted). But the same is true of the special trial judges that the Supreme Court concluded were officers in *Freytag v. Comm'r*, 501 U.S. 868, 880–82 (1991). Those trial judges do not make policy, but "prepare proposed findings and an opinion" in tax cases. *Id.* at 873. In doing so, they carry out their functions consistent with statute, IRS regulations, and presumably Tax Court rules. And in

the cases at issue in *Freytag*, those judges "lack authority to enter a final decision," meaning their determinations are merely recommendations for Tax Court judges to review.[12] *Id.* at 881. That USAC doesn't make policy, follows FCC-established rules, and makes decisions subject to FCC review, therefore, does not preclude its directors and CEO from being "officers."

FCC attempts to distinguish special trial judges by noting that they "perform a number of 'important functions' that involve the exercise of 'significant discretion,'" like taking testimony and conducting trials. FCC.Br.53–54 (quoting *Freytag*, 501 U.S. at 881–82). But USAC's directors and CEO similarly exercise significant discretion in performing important functions as Fund administrator.

In their roles on the Committees of the Board, USAC's directors and CEO "have the authority to make decisions concerning" subjects that necessarily entail significant discretion, including "[h]ow" to "project[] demand" for each Universal Service Fund program, 47 C.F.R.

---

[12] For some categories of cases, special trial judges could enter a final decision, but the Court's conclusion that the judges were officers did not rest on that aspect of their authority. *Freytag*, 501 U.S. at 873, 880–82.

§ 54.705(a)(1)(i), (b)(1)(i), (c)(1)(i); "[d]evelop[] … applications and associated instructions" for each program, *id.* § 54.705(a)(1)(ii), (b)(1)(ii), (c)(1)(ii); "[p]erform[] … outreach and education functions" for some programs, *id.* § 54.705(a)(1)(iv), (b)(1)(v); and "[d]evelop[] and implement[] … other functions unique to" each program, *id.* § 54.705(a)(1)(xi), (b)(1)(ix), (c)(1)(v). USAC's directors and CEO also set USAC's budget, including salaries and operating expenses, which is then funded through Universal Service Fund contributions. *Id.* § 54.715. These aren't "ministerial," FCC.Br.54, but require discretionary determinations about how best to accomplish each function, including weighing competing considerations like accuracy, cost, and effectiveness. It's not clear why USAC would need directors or committees if its functions were entirely ministerial.

Moreover, USAC's CEO manages the day-to-day operations of USAC. 47 C.F.R. §§ 54.701(d), 54.704(a). Under her supervision, USAC exercises significant discretion and judgment in various functions. For example, USAC determines whether applications are eligible for funding

by interpreting FCC rules.[13] It has significant discretionary authority in conducting and managing audits of program participants, 47 C.F.R. § 54.707, including commissioning and reviewing audits, conducting investigations, and determining when concerns are sufficiently remediated.[14] USAC's actions therefore "critically shape the administrative record," which serves as the basis for FCC review.[15] *Lucia v. SEC*, 585 U.S. 237, 248 (2018). USAC determines if and how rules apply to particular circumstances, much like the special trial judges in

---

[13] *See Requests for Review of Decision of the Universal Service Administrator by Cornerstones of Care*, 25 FCC Rcd. 15122 (2010) (reversing USAC's denial of funding).

[14] *See, e.g., Request for Review by Copper Valley Telephone Cooperative, Inc.*, 2025 WL 4060682, at *2 (Nov. 14, 2025) (USAC "concurred with the audit findings" and sought recovery of payments on that basis); *Request for Review of Decisions of the Universal Service Administrator by P.R. Dep't of Educ.*, 2026 WL 714147, at *1, *5–10 (Mar. 5, 2026) ("*Puerto Rico Appeal*") (describing USAC's oversight of audits and subsequent investigations).

[15] *See, e.g., Puerto Rico Appeal*, 2026 WL 714147, at *11 (reviewing "the record" compiled by USAC); *Request for Review of a Decision of the Universal Service Administrator by Nemont Telephone Cooperative, Inc.*, 29 FCC Rcd. 11780, 11780–83, ¶¶ 2–4, 10 (2014) (USAC shapes record by determining whether to accept late documentation). That FCC reviews USAC determinations *de novo* does not matter. "The *Freytag* Court never suggested that the deference given to [special trial judges'] factual findings mattered to its Appointments Clause analysis." *Lucia*, 585 U.S. at 250.

*Freytag* determined if and how tax rules applied. But unlike the special trial judges' proposed findings, USAC's determinations are binding unless appealed. 47 C.F.R. § 54.719.

It doesn't matter whether all of these functions involve setting the contribution factor. An individual cannot be an officer for some purposes but not others. *Freytag*, 501 U.S. at 882 (that an officer "on occasion performs duties that may be performed by an employee not subject to the Appointments Clause does not transform his status under the Constitution."). In any event, at least some of USAC's discretionary functions *are* related to setting the contribution factor and directly affect how much money USAC collects, including USAC's determinations how to project demand, what its budget will be, and which recipients are funded.

Because USAC's directors and CEO exercise significant discretion in performing important government functions, they are "officers" who must be appointed consistent with Article II. Their appointment does not satisfy those constitutional requirements. *See* Pet.Br.64–65.

## V. USAC'S INVOLVEMENT RENDERS THE CONTRIBUTION FACTOR UNLAWFUL

FCC also argues that even if USAC is unlawful or FCC's delegation

to USAC was not authorized, FCC's contribution factor is nonetheless lawful because USAC was only providing advice and not "*act[ing] as an agency*." FCC.Br.55 (quoting 31 U.S.C. § 9102). In essence, FCC suggests that its approval of the contribution factor ratified USAC's "recommendation" and cured any infirmity. This is incorrect for several reasons.

*First,* the lawfulness of USAC's work product cannot be severed from the lawfulness of USAC. Where an entity acting on behalf of the government "exercise[s] … power that the actor did not lawfully possess," those actions are "void *ab initio." Collins v. Yellen,* 594 U.S. 220, 257–58 (2021). FCC points to no case in which the Supreme Court has held that ratification cures an Appointments Clause violation.[16] *See* FCC.Br.55–57. If ratification could have that effect, the Appointments Clause's provision for inferior officers would be toothless, since those officers are "directed and supervised" by others who can always ratify their actions. *Kennedy v. Braidwood Mgmt.*, 606 U.S. 748, 761 (2025). In APA parlance,

---

[16] This is unlike cases involving *removal restrictions*, in which the Court has suggested that the actions of a constitutionally appointed officer might be ratified if the unconstitutional removal restriction could be severed. *See, e.g., Seila Law LLC v. CFPB*, 591 U.S. 197, 233 (2020).

USAC's unlawful status and contributions "incurably tainted the agency's decisionmaking process." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps. of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015). If USAC is unconstitutional or acting *ultra vires*, any work it does on behalf of USAC is also unlawful, and FCC action promulgated in reliance on it must be vacated.

*Second*, in any event, USAC is not merely providing advice, but "acting as an agency" by performing functions assigned by Congress to FCC. With several specific exceptions, § 254 gives *FCC* the task of implementing the Universal Service Fund. Pet.Br.51–53. Determining how much funding is necessary to support universal service is not one of those exceptions. *Id.*

Moreover, in determining the universal service funding for the Fourth Quarter 2025, USAC didn't engage solely in "nondiscretionary activities such as compiling, hearing, and transmitting technical information," which the D.C. Circuit has suggested outside parties can perform for the government without authorization. *Int'l Dark-Sky Ass'n, Inc. v. FCC*, 106 F.4th 1206, 1216 (D.C. Cir. 2024). USAC's determination of Fourth Quarter 2025 demand involved discretionary determinations,

39

including determining how to project demand, what USAC's budget should be, and which applications and recipients are (or likely will be) funded. *See* Part IV, *supra.*

*Finally*, even if USAC's work product is advice, FCC's reliance on it is still unlawful. Unlike the outside organizations that the D.C. Circuit considered, USAC has no non-governmental purpose. That would make USAC akin to a federal advisory committee, subject to the Federal Advisory Committee Act ("FACA"), 5 U.S.C. §§ 1001–1014.[17]

But USAC does not comply with FACA. At the least, USAC's functions, which include collecting and disbursing Universal Service Fund monies, are not "advisory only," *id.* §§ 1002(b)(6), 1008(b); its membership is not "fairly balanced in terms of the points of view represented," *id.* § 1004(b)(2);[18] it is not overseen by the General Services

---

[17] *See* 5 U.S.C. § 1001(2)(A)(iii) ("'advisory committee' means a committee, board, commission, council, conference, panel, task force, or other similar group … that is established or utilized to obtain advice or recommendations for … one or more agencies or officers of the Federal Government and that is—… established or utilized by one or more agencies").

[18] *See Consumers' Rsch. v. FCC*, 109 F.4th 743, 772 (5th Cir. 2024) (*en banc*) (USAC "is run almost entirely by stakeholders who stand to benefit financially when universal service subsidies grow"), *rev'd on other*

(*footnote continued on next page*)

40

Administration, *id.* § 1006(a); and to Petitioners' knowledge, USAC does not comply with FACA's open meeting requirements, *id.* § 1009, or compensation limits, *compare id.* § 1006(d)(1)(A) (advisory committees) *with* 47 C.F.R. § 54.715(b) (USAC). When a committee violates FACA, "some type of injunctive relief is appropriate," including enjoining the agency from using the committee's work product. *Cargill, Inc. v. United States*, 173 F.3d 323, 341–42 (5th Cir. 1999).

Accordingly, however this Court characterizes USAC's involvement, "to allow the government to use the product of a tainted procedure would circumvent the very polic[ies]" that underlie the Constitution, statutes, and caselaw invoked by Petitioners here. *Ala.-Tombigbee Rivers Coal. v. Dep't of Interior*, 26 F.3d 1103, 1107 (11th Cir. 1994). Vacatur of the Fourth Quarter 2025 contribution factor—and an order enjoining FCC from further reliance on USAC's work product—is therefore appropriate.

---

*grounds*, 606 U.S. 656; *Consumers' Rsch.*, 606 U.S. at 718 (Gorsuch, J., dissenting) ("FCC regulations ensure that a supermajority of [USAC's] board consists of directors who represent industry insiders (like carriers) and groups that benefit financially from universal-service programs (like libraries and schools).").

## VI. THE CONTRIBUTION FACTOR IS A RULEMAKING AND PETITIONERS' COMMENTS WERE SIGNIFICANT

### A. FCC's Contribution Factor is a Rulemaking

FCC and NTCA half-heartedly attempt to characterize the contribution factor as "an adjudication, not a rulemaking." FCC.Br.58; NTCA.Br.31–32. But neither engage with the APA's definitions, and only NTCA invokes caselaw. That alone is telling. FCC's contribution factor is clearly a "rule" under both the APA and precedent.

The contribution factor falls squarely within the APA's definition of a "rule." 5 U.S.C. § 551(4). It is "an agency statement of general or particular applicability and future effect," *id.*: it applies generally to carriers, and through them to subscribers, and sets the amount they must pay in the future into the Universal Service Fund. It is "designed to implement … law or policy," *id.*: namely FCC's obligation to support universal service under § 254. And the factor is an "approval … for the future of rates," which is expressly included in the APA definition of a "rule." *Id.* The Solicitor General's concession that the contribution factor "could be classified as a tax," Tr. of Oral Arg. at 52:22–23, *Consumers' Rsch.*, Nos. 24-354 & 24-422 (U.S. Mar. 26, 2025)—a "quintessentially legislative" exercise, *Consumers' Rsch.*, 109 F.4th at 757—admits as

42

much.

FCC's "process for formulating" the factor is therefore a "rule making." 5 U.S.C. § 551(5); *see also Consumers' Rsch.*, 88 F.4th at 923 (discussing contribution factor as an "exercise of [FCC's] rule-making power"). FCC can't transform a rulemaking into an adjudication merely by codifying its process in regulation. *See* FCC.Br.57 (arguing the factor is an adjudication because FCC "simply applied 47 C.F.R. § 54.709").

Caselaw confirms that the contribution factor is not an adjudication. Adjudications "resolve disputes among specific individuals in specific cases," "involve concrete disputes," and "have an immediate effect on specific individuals (those involved in the dispute)." *Yesler Terrace Comm. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994); *see also City of Arlington v. FCC*, 668 F.3d 229, 242 n.51 (5th Cir. 2012) (citing *Yesler Terrace* with approval). FCC's contribution factor is none of these. Instead, the contribution factor "affects the rights of broad classes of unspecified individuals" (carriers and subscribers), "is prospective," and "has a definite effect on individuals only after the [factor] subsequently is applied"—all "hallmarks of a rule." *Yesler Terrace*, 37 F.3d at 448.

**B. FCC was Required to Respond to Petitioners' Comments**

Because issuing the contribution factor is a rulemaking, FCC was obligated to "consider and respond to significant comments." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015). "Comments the agency must respond to include those that [1] can be thought to challenge a fundamental premise underlying the proposed agency decision or [2] include points that if true and adopted would require a change in an agency's proposed rule." *Chamber of Com. v. SEC*, 85 F.4th 760, 775 (5th Cir. 2023) (cleaned up).

FCC argues that Petitioners' comments don't meet the second category—they wouldn't require the agency to change its ultimate contribution factor or the process for determining it. FCC.Br.58–60. Petitioners have elsewhere explained why this is wrong. Pet.Br.65–67; Part V, *supra.* But even so, Petitioners' comments clearly fall in the first category: they challenge FCC's fundamental interpretation of its authority to determine the contribution factor, as well as the process by which FCC determines it.

Nor is FCC excused from responding because FCC "lacks authority to find section 254 unconstitutional." FCC.Br.58. Even if true, that

wouldn't excuse FCC's failure to respond to Petitioners' comments regarding FCC's *statutory* authority. And in any event, the "rule" that adjudicating "the constitutionality of congressional enactments … [is] beyond the jurisdiction of administrative agencies … is not mandatory." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994) (quotation marks omitted). Elsewhere, FCC has argued that challenges to the constitutionality of statutes that implicate agency regulations are subject to the Hobbs Act and Communications Act review provisions, *Moser v. FCC*, 46 F.3d 970, 973 (9th Cir. 1995), and so necessarily must be raised before the agency first, 47 U.S.C. § 405(a) (FCC must have an "opportunity to pass" on an issue before judicial review). If challengers have an obligation to raise these issues before FCC, surely FCC has a concomitant obligation to respond. Perhaps this is why FCC "has addressed constitutional questions in previous" rulemakings. *Thunder Basin*, 510 U.S. at 215.[19]

Moreover, concluding that § 254(c)(3) is unconstitutional doesn't

---

[19] *See, e.g., Preemption of Local Zoning Regul. of Satellite Earth Stations*, 11 FCC Rcd. 19276, 19302–04 ¶¶ 43–45 (1996) (addressing arguments that statute violated the Fifth Amendment and Commerce Clause).

prevent FCC from "implement[ing] the statute that Congress enacted." FCC.Br.59. Section § 254(c)(3) doesn't *require* FCC to fund "additional services," it permits it. 47 U.S.C. § 254(c)(3) (FCC "*may* designate additional services" (emphasis added)). Although an FCC determination that § 254(c)(3) is likely unconstitutional wouldn't cure the violation, it could—and should—affect how FCC exercises its discretionary authority under the provision.

NTCA's suggestion that requiring FCC to respond to substantive comments would render the Universal Service Fund "unworkable" is similarly unavailing. NTCA.Br.35–38. FCC, not § 254, sets the timeline for review. 47 C.F.R. § 54.709(a)(3). If FCC believes it needs more than 14 days to consider comments, it can adjust its regulations. Nor would FCC "have to completely reconsider all aspects of every one of its mechanisms anew every quarter." NTCA.Br.36. Nothing in § 254 requires FCC to determine the contribution factor quarterly—it could set the factor annually or biannually, reducing how often it faces comments. And once FCC has addressed an issue, if raised again the agency can presumably refer back to its prior response. Here, Petitioners raised specific legal challenges that FCC has never addressed. The APA

requires FCC to respond. *See Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 433–434 (5th Cir. 2021) (APA applies to FCC rulemakings).

Finally, FCC's failure to respond to Petitioners' comments was not "harmless." FCC.Br.60. Petitioners "need not prove that its comments would have persuaded the Commission to reach a different outcome" to be prejudiced by FCC's failure to respond, but merely that they could have. *Cf. Chamber of Com. v. SEC*, 443 F.3d 890, 905 (D.C. Cir. 2006). Accordingly, FCC cannot avoid its obligation to respond simply because it believes "none of petitioners' claims have merit." FCC.Br.60. Such a rule would gut the APA's notice-and-comment requirement by allowing agencies to respond to only those comments they agree with.

This is not a circumstance in which "remand would be pointless" because the "agency's decision is supported by a plethora of factual findings, only one of which is unsound" or "the agency's error 'had no bearing on the procedure used or the substance of the decision reached.'" *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 590 (2025) (cleaned up). Even in proceedings before this Court, FCC has not explained how its Fourth Quarter 2025 contribution factor satisfies *Consumers' Research*, and a conclusion that one or more funded programs do not

satisfy it would alter the "substance"—the amount—of the factor. *Id.* To the extent this Court resolves any issues in Petitioners' favor, or does not resolve all issues before it, the Court should remand to FCC to remediate its violations and provide a full response.

## CONCLUSION

For the foregoing reasons, this Court should grant the petition, vacate the Fourth Quarter 2025 contribution factor, and remand to FCC for further proceedings.

April 3, 2026

Respectfully submitted,

*/s/ Laura B. Ruppalt*
Michael Buschbacher
James R. Conde
Jared M. Kelson
Laura B. Ruppalt
  *Counsel of Record*
BOYDEN GRAY PLLC
800 Connecticut Ave. NW, Suite 900
Washington, DC 20006
202-955-0620
lruppalt@boydengray.com
*Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2026, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

Dated: April 3, 2026

*/s/ Laura B. Ruppalt*
Laura B. Ruppalt
BOYDEN GRAY PLLC
800 Connecticut Ave. NW, Suite 900
Washington, DC 20006
(202) 955-0620

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of this Court's order granting Petitioners' motion to file brief in excess word count, Dkt. 88, because it contains 9,479 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) and Fifth Circuit Rule 32.1 because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14-point font.

Dated: April 3, 2026

/s/Laura B. Ruppalt
Laura B. Ruppalt
BOYDEN GRAY PLLC
800 Connecticut Ave. NW, Suite 900
Washington, DC 20006
(202) 955-0620